UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANTHONY RUCANO,

                                    Petitioner-Defendant,      18-CV-04586 (KAM)

                    -against-
                                                               **AFFIDAVIT IN OPPOSITION
J. LAMANNA,                                                    TO WRIT OF HABEAS
                                                               CORPUS**

                                    Respondent.


STATE OF NEW YORK          )
                                        SS:
COUNTY OF RICHMOND         )

**ALEXANDER FUMELLI**, being an attorney duly admitted to practice law in the State

of New York and the federal court of the Eastern District of New York, deposes and says:

1.      I am a duly appointed Assistant District Attorney in and for the County of

Richmond, State of New York. Having reviewed the papers and records on file in the Richmond

County District Attorney's Office pertaining to the underlying case of <u>People v. Anthony</u>

<u>Rucano</u>, Richmond County Indictment 270/2009, I make this affidavit upon personal knowledge

and upon information and belief based upon my examination of said records.

2.      This Affidavit and the accompanying Memorandum of Law are submitted for the

respondent in opposition to petitioner's pro se motion for a writ of habeas corpus seeking release

from custody grounded in a judgment of the Supreme Court, Richmond County (Rooney, J.),

rendered on September 21, 2010, convicting him, after a jury trial, of Rape in the First Degree

[P. L. § 130.35(1)], Criminal Sexual Act in the First Degree [P. L. § 130.50(1)], Attempted Rape

in the First Degree [P. L. §§ 110/130.35(1)], Assault in the Second Degree [P. L. § 120.05(6)],

Assault in the Third Degree [P. L. § 120.00(1)], and two counts of Criminal Possession of a

Weapon in the Third Degree [P. L. §§ 265.01(2), 265.02(2)]. Petitioner was sentenced on that date to concurrent prison terms of 12 years' imprisonment each for first-degree rape and first-degree criminal sexual act, with each sentence to be followed by five years of post-release supervision; eight years' imprisonment for attempted first-degree rape, to be followed by five years of post-release supervision; five years' imprisonment for second-degree assault, to be followed by three years of post-release supervision; one to three years' imprisonment for third-degree criminal possession of a weapon; and one year's imprisonment for third-degree assault.

## JUDGMENT OF CONVICTION

3.      In March 2009, defendant met Duane Katherine Ramos through an Internet dating site. In April 2009, they began dating; the following month, they were engaged to be married. In July of that year, what had before been an argumentative, tumultuous relationship turned violent, as defendant began to subject his fiancée to a pattern of beatings and sexual abuse. This included violent sexual attacks in July and August 2009. The abuse culminated the following September. On September 3, 2009, defendant threatened to hit the victim with a large battery from a power tool charger, and then choked her until she lost consciousness. On September 25, 2009, defendant forced the victim to fellate him and then attempted to rape her, abandoning the effort to penetrate her only when he pulled off her clothes and saw that she was menstruating. Finally, on September 28, 2009, defendant beat the victim and then penetrated her vaginally.

4.      Defendant was arrested on September 29, 2009. On October 6, 2009, he was charged, by Richmond County Indictment 270/90, with six counts of first-degree rape (incidents of July 17, 28, 30; August 24; September 21, 28), three counts of first-degree criminal sexual act (July 28, 30), one count of attempted first-degree rape (September 25), two counts of second-

2

degree assault (September 21, 28), one count of third-degree criminal possession of a weapon (September 3), and one count of third degree assault (September 3).

5.      On September 8, 2010, defendant proceeded to a jury trial in Richmond County Supreme Court (Rooney, J.). On September 21, 2010, the jury found defendant guilty of one count of first degree-rape (September 28), one count of first-degree criminal sexual act (September 25), one count of second-degree assault (September 28), one count of third-degree criminal possession of a weapon (September 3), and one count of third-degree assault (September 3). The jury acquitted defendant of the remaining counts. On January 21, 2011, the court sentenced defendant as described above.

## THE EVIDENCE AT TRIAL

### *The People's Case*

6.      In March 2009, DUANE KATHERINE RAMOS, known as Katherine, a Bronx resident, met defendant, a Staten Island resident, through an Internet dating site. In April 2009, they started to exchange phone calls and instant email messages, and then met in person and began dating (Ramos: 142, 253-55). At that time, Ramos was 5'2" tall and weighed about 137 pounds, and defendant was 5'10" tall and weighed approximately 270 pounds (Ramos: 174). The following month, they were engaged to be married (Ramos: 143-45). During Memorial Day Weekend 2009, the couple traveled to Delaware so that defendant could meet some of Ramos's relatives (Ramos: 145-47, 256-59). They were having sexual intercourse in a motel when Ramos declined defendant's request that she fellate him. When defendant began to yell, Ramos locked herself in the bathroom, and defendant left the motel (Ramos: 146, 262-63). When Ramos

3

emerged, she called her cousin to pick her up (Ramos: 146-47, 263). Later that night, defendant

asked Ramos to return to the motel with him, and she agreed to do so (Ramos: 147, 263).

7.      In June 2009, Ramos moved into defendant's apartment (Ramos: 148-50, 260-

61). Defendant gave her a set of rules governing their conduct toward each other (Ramos: 215-

17).[1] He also began to call her at work frequently, and occasionally left voice messages in which

he threatened to leave Ramos or throw her clothes onto the street if she did not return his calls.

Ramos selectively recorded these messages. She believed that defendant left the voice messages

to induce her to return his calls (Ramos: 210-13, 278-79, 281-82).

8.      On July 9, 2009, defendant's birthday, he yelled at Ramos because she had not

purchased a gift for him (Ramos: 150-51, 263-64). That day, she had visited a therapist for the

first time, and defendant accused her of deliberately making an appointment that would interfere

with his birthday celebration (Ramos: 151, 269-70). Over the next few weeks, defendant

repeatedly mentioned his birthday and Ramos's failure to properly celebrate it with him (Ramos:

152, 264). She then decided to invite him to join her in several sessions with her therapist

(Ramos: 153, 270-71).

9.      On July 17, 2009, defendant drove Ramos to work in Brooklyn, where she was

employed as a caseworker with people suffering from chronic illness and drug problems (Ramos:

139, 154, 249-50). Ramos had planned to meet a friend for dinner that night. Early in the

---

[1] According to defendant's rules, he promised not to ask Ramos to call him or explain her whereabouts, to give Ramos her space and allow her to take public transportation as she pleased, to be courteous and treat her with respect in public; and, to try to make their relationship easier, provided that she did the same, in part by expressing her desires to defendant clearly and honestly (Ramos: 215-16). Defendant's rules also demanded that Ramos treat defendant with respect, honor a 9:00 p.m. curfew, avoid meeting with other men, discuss her decisions of mutual concern, kiss defenadnt hello and goodbye, refrain from ending sentences with defendant's name, refrain from saying "Same here," and return defendant's phone calls when she received them (Ramos: 217).

4

evening, defendant followed Ramos to her friend's place of employment, yelled Ramos's name, and ran after her. Ramos and her friend boarded the first available bus (Ramos: 154-55). When she arrived on Staten Island that night, Ramos approached defendant's car while speaking with another friend on her cell phone (Ramos: 156). Defendant demanded to know to whom she was speaking, grabbed her phone, and hit her head against the passenger side of his car. After Ramos got into the car, defendant tore her dress strap and twice tried to hit her as he was driving. Ramos responded by shifting the car's transmission into park mode and by hitting him (Ramos: 156-57).

10.     When they arrived home, defendant yelled at Ramos, grabbed her, and ripped her other dress strap. He then tore off her clothing, threw her on a sofa, and started punching her in the face, giving her a black eye (Ramos: 158-60, 162). After he stopped beating her, defendant instructed Ramos to fellate him and have intercourse with him, and she refused (Ramos: 159-60). Defendant pulled her head toward his groin as she told him to stop (Ramos: 160-61). He then turned Ramos over, forced her legs apart, and penetrated her vaginally (Ramos: 161). The next day, July 18, 2009, when Ramos removed her engagement ring, defendant asked her to forgive him (Ramos: 162-63). They then purchased makeup to cover Ramos's black eye (Ramos: 163).

11.     On the evening of July 28, 2009, while defendant and Ramos were driving home from a visit to her therapist, defendant began yelling at Ramos and driving erratically (Ramos: 163-64). When they arrived at his apartment, he grabbed her and said that she was going to be "nice" to him, which Ramos took to mean that she would be expected to have sexual intercourse with him. When she refused and walked away, he hit her on her lower back, arms, legs, and face (Ramos: 164-65). When Ramos again refused, defendant pushed her head toward his crotch and forced his penis into her mouth. Defendant complained that he couldn't ejaculate and that Ramos

was not fellating him correctly. He then turned her over and spread her legs, and penetrated her vaginally (Ramos: 166). The next day, Ramos and defendant went to Greenwich Village together, where he paid for her to get a tattoo (Ramos: 265).

12.     On July 30, 2009, after defendant and Ramos had another argument about her having scheduled a therapy appointment on his birthday, he again demanded that she be "nice" to him (Ramos: 166-67). Defendant grabbed Ramos by the throat and choked her as she screamed. As they struggled, she hit her head against a wall, and then defendant pulled her legs apart and penetrated her vaginally (Ramos: 167-68). He also grabbed her head and forced his penis into her mouth (Ramos: 168).

13.     On August 1, 2009, Ramos and defendant moved into another Staten Island apartment together, and they co-signed the lease (Ramos: 268-69).

14.     On August 24, 2009, during an argument, defendant grabbed some shot glasses from Ramos's shot glass collection and broke them on the floor (Ramos: 170-72, 274-75). She ran to the second floor of their two-story apartment, screaming, as he grabbed a hammer that was on a bookcase and told her to be quiet. Then he put the hammer back (Ramos: 172). When Ramos fell onto a sofa, defendant forcibly removed her shorts, opened her legs, and penetrated her vaginally as he punched her on the back (Ramos: 172-73).

15.     On September 3, 2009, during another argument, defendant grabbed a 3"-by-6" battery from a power-tool charger and threatened to hit Ramos with it (Ramos: 174-76). Defendant then choked Ramos, causing her to lose consciousness briefly (Ramos: 176). When she regained consciousness, she told defendant she could not breathe and asked him to call 911

6

and bring her inhaler. Defendant refused and accused her of feigning difficulty with breathing (Ramos: 176-77).

16.     On September 21, 2009, during yet another argument, defendant demanded that Ramos return a bracelet and engagement ring that he had given her, grabbed her arm, and bit her ring finger, removing the ring and leaving tooth marks on her finger (Ramos: 183-84, 186). When she tried to pull away from him, he bit another of her fingers and choked her (Ramos: 184-85). Defendant then told Ramos that she would have to be "nice" to him, pulled down her shorts, and choked her, causing her to lose consciousness (Ramos: 185-86). Defendant removed Ramos's shorts and when she awoke, he overcame her resistance and penetrated her vaginally (Ramos: 186-87).

17.     On the evening of September 25, 2009, defendant again told Ramos to be "nice" to him. She replied that she was having her period. Defendant called her a liar, grabbed her head, started choking her, and then forcibly inserted his penis into her mouth (Ramos: 187-88). He soon complained that he could not ejaculate and demanded that she have intercourse with him, and forced apart her legs (Ramos: 188-89). When defendant saw her menstrual blood, he told her that she was worthless and kneed her in her lower back, but did not try to penetrate her (Ramos: 188-89).

18.     On the evening of September 28, 2009, after Ramos returned home from a therapy appointment (Ramos: 190-91), defendant asked her whether she would be "nice" to him. When she declined, defendant said that he was going to find a prostitute, and left (Ramos: 191-92). About 15 to 20 minutes later, defendant returned home, knocked Ramos to the floor, and started hitting her. She then sprayed him with hairspray, and she fled the bedroom (Ramos: 193-

7

94). Defendant pursued her, closed the windows, and turned up the television volume as she was screaming. Then defendant punched Ramos about the body and right ear, as she kicked him (Ramos: 194); she did not kick defendant in the groin or bite him on the elbow (Ramos: 286-87). Defendant demanded that Ramos be "nice," removed her pants as she screamed for him to stop, and forcibly penetrated her vaginally (Ramos: 194-96, 276-77). Meanwhile, STEFANIA MACH, defendant and Ramos's downstairs neighbor (Mach: 350-51), heard the sound of people running upstairs and heard Ramos scream, "I no want; leave me alone" (Mach 354-56).

19.     This screaming was consistent with what Mach had heard on other occasions during the summer of 2009. On one occasion, she heard the sound of bed springs upstairs, as well as a woman's voice screaming, "Leave me alone; I no want. Give me a break; I want sleep" (Mach 357-58). Mach complained to defendant several times about the loud noises and screams, and eventually complained to the landlord, but never contacted the police (Mach: 358-59, 361-62).

20.     After defendant forcibly penetrated Ramos on September 28, 2009, he tried, for the first time following an act of coerced intercourse, to force Ramos to shower, stating that he had seen "Law & Order" on television and wanted to ensure that there was no evidence of their sex act. He tried to wash between her legs and choked her as she screamed. She escaped the bathroom and ran downstairs as defendant, naked, followed her and then choked her until she lost consciousness (Ramos: 196-97, 277). When Ramos regained consciousness, she ran back into the apartment and begged for her life as defendant hit her legs, arms, and back (Ramos: 197).

8

21.     On September 29, defendant demanded that Ramos remove the clothes she had been wearing the night before and wash them. She put on new clothes and a new panty liner (Ramos: 198-99, 278). After Ramos arrived at her Brooklyn office that morning, she decided to report defendant to the police at a Brooklyn precinct (Ramos: 199). She did not report him sooner, or discuss his actions with her siblings, therapist, friends or coworkers, because she was afraid of defendant and he once threatened her family, because she loved him and he often apologized and promised to change, and because she had nowhere else to go (Ramos: 204-08, 284, 294-95).

22.     The police brought Ramos to the hospital, where she was examined by RITA GANELES, the attending physician's assistant in the emergency room (Ganeles: 43, 46-47. 62-63). Although Ramos initially testified that she complained to the police on her own initiative, she told hospital personnel that she did so at the suggestion of her coworkers (Ganeles: 63-64; Ramos: 199). She told police that she had been subjected to forced intercourse over a three-month period beginning in July 2009 (Ganeles: 48, 51, 64-65; Ramos: 202), later expanding the reported period of assault to a six-month period (Ganeles: 68-69, 73-74).

23.     Ramos also submitted to a gynecological examination. This was conducted by Ganeles, who found no injury to Ramos's genital area (Ganeles: 51-52, 68-69), although Ganeles did find defendant's semen in Ramos's vaginal swabs, panty liner, and underwear (Ganeles: 53-55; T. 75-76; King: 82-85, 94-96; Ramos: 201-03). A general physical examination revealed that Ramos had some bruising and a scratch over her right eyebrow, redness and bruising around her neck, scratch marks and a bruise on her right forearm, some bruising about her left shoulder and arm, leg bruises, an open leg lesion and a leg scratch, a swollen right ear, and bite marks on

9

multiple fingers (Ganeles: 48, 50; Ramos: 219-20). Additionally, she had a pus collection around her nail bed, suggesting an infected wound (Ganeles: 50-51). Ramos was treated with prophylactic antivirals, antibiotics, and counter-conception medication (Ganeles: 56). At a later date, a pin was placed in one of her fingers and her right ear was treated for a blood clot (Ramos: 221).

24.     DR. NANCY NEEDELL testified about battered-woman syndrome, a set of behaviors and reactions common among victims of physical and sexual abuse (308-10, 328). These behaviors include cycles of violence, a honeymoon period, learned helplessness, and a loss of control (Needell: 310). Dr. Needell testified that battered women do not necessarily leave their abusers or promptly report the abuse, although some victims might do so (Needell: 310-26, 328).

### The Defense Case

25.     In March 2009, defendant met Ramos through an online dating service and by April 2009, they began dating. They soon were having consensual sex as often as four or five times per week. On May 26, 2009, they became engaged (Rucano: 370-75, 391-92).

26.     Later that May, the couple took a vacation to Pennsylvania and Delaware (Rucano: 375). In their motel in Delaware, defendant performed oral sex on Ramos, but she refused to fellate him afterward and did not explain her refusal. Defendant then asked her to leave and drove her to her cousin's home nearby (Rucano: 376-77, 420-21). Later that evening, defendant called Ramos and expressed his disappointment in her failure to reciprocate, and drove her back to the motel (Rucano: 378-79).

27.     By the end of June 2009, Ramos had moved into defendant's apartment (Rucano: 374-75). On July 9, 2009, defendant's birthday, Ramos returned home from work and told

10

defendant that she had a therapy appointment. Defendant was disappointed that she had not given him a gift and that they would not be able to have dinner together, but he still drove her to see her therapist (Rucano: 381-82, 423, 425-26).

28.     By mid-July 2009, Ramos would sometimes ask defendant to pick her up from her job in Brooklyn and then change her plans without telling him (Rucano: 384). Ramos did so on July 17, but later called him and asked him to pick her up from the Staten Island Ferry terminal, on the Staten Island side; he complied. As he drove her home, defendant argued with Ramos about her lack of consideration and her unwillingness to discuss their problems. As he was driving, Ramos hit defendant on his face, started screaming, and grabbed the steering wheel. Then, defendant hit Ramos on her face. Both defendant and Ramos developed black eyes as a result (Rucano: 384-85, 424). When they arrived home, Ramos threatened to call the police and falsely claim that defendant's son was using drugs. Defendant then left the apartment to visit his former girlfriend DIANE SMITH and their children. He showed Smith his scratches, bruises, and black eye (Rucano: 386; Smith: 485-86). The next day, defendant apologized for hitting Ramos, and to make amends he took her to Greenwich Village and paid for her to get a tattoo (Rucano: 386-87).

29.     Ramos soon became less communicative and less responsive during sex, and she and defendant began to argue more often. During one argument, she smashed her own eyeglasses; during another, she cut off some of her own hair; during another she burned her own wrist with a cigarette (Rucano: 387-89, 422). Defendant asked to join Ramos in her counseling sessions and did so several times. He also offered to help her move into a different apartment if

she did not want to live with him. Nevertheless, on August 1, 2009, they moved into a new apartment together and co-signed the lease (Rucano: 388-90, 396-97, 422-24).

30.     During the evening of August 3, 2009, at about 11:00 p.m., following an argument, Ramos charged down the apartment staircase and kicked defendant, and he slid partly down the stairs on his backside (Rucano: 397-98). She then took some of her belongings, left the apartment, and waited outside until a car picked her up (Rucano: 398). Defendant was scared and left to visit Smith, his former girlfriend, along with their oldest daughter and son. He had scratches and bruises on his neck and about his eye, and black-and-blue marks and a rug burn on his rear (Smith: 487-88). Smith and the children spent the night with defendant at his apartment (Rucano: 398-99). Later that night, Ramos called, apologized, and asked to return to the apartment, but defendant refused her request (Rucano: 399-400). The next day, August 4, defendant met with Ramos in Brooklyn. Ramos agreed not to attack defendant and to communicate with him (Rucano: 399-401).

31.     On August 22, after defendant and Ramos returned from a weekend trip, she became angry and violent when he attempted to speak with her. On August 24, 2009, she injured his finger by bending it backward (Rucano: 402-04). When defendant pushed her away and told her to stop, she ran up and down the stairs, stomping her feet (Rucano: 404).

32.     One night in mid-September 2009, defendant brought his friend FRANK ORTIZ to his apartment to try to mediate his dispute with Ramos.[2] While Ortiz was upstairs and defendant was downstairs (Ortiz: 471-75), Ortiz heard Ramos scream that she would treat

_____

[2] The exact date of Ortiz's visit is unclear from his testimony, and defendant did not testify regarding the visit.

12

defendant like a "scumbag" and would call the police to accuse defendant of raping and beating her (Ortiz: 472-477). After Ramos threw a plate at the wall, defendant and Ortiz left the apartment together (Ortiz: 472-73).

33.     On September 21, 2009, after defendant and Ramos had an argument about money, Ramos bent defendant's finger backwards. He bit her hand to get her to stop (Rucano: 406-07, 438-39).[3] Several days later, they visited Ramos's therapist together, where defendant complained of his distress at Ramos's behavior and that Ramos had sex with him only to induce him to think that she would change. He suggested that they separate and offered to help her move out and pay her one month's security (Rucano: 408-09).

34.     On September 28, 2009, Ramos came home from work in an unusually calm mood and initiated sex with defendant (Rucano: 407, 443, 452-53). Later, defendant went to a store. When he returned, he suggested that they go to counseling the next day to discuss a separation. Ramos sprayed him with hairspray, kicked him in the groin, and bent his finger backward; he then pushed her into a wall. The two continued to fight; defendant hit Ramos only in response to her attacks on him (Rucano: 407-09, 440-41, 446-53). Afterward, Ramos took a shower (Rucano: 409).

35.     The next morning, defendant drove Ramos to the ferry. As she departed, she told him that she hated him (Rucano: 409-10). That evening, police arrested defendant and refused to take a complaint from him against Ramos (Rucano: 410-11).

---

[3] Defendant was unsure whether she bit him on that occasion or during another fight near that time (Rucano: 438).

## DIRECT APPEAL

36.     Following his conviction, defendant embarked on a series of filings. In June 2013, he filed a counseled brief in the Appellate Division, Second Department, claiming that his conviction was legally insufficient, against the weight of the evidence, and marred by the ineffective assistance of trial counsel. This filing was coupled with a pro se supplemental brief that argued matters not discussed in the counseled brief. The Appellate Division affirmed the judgment, People v. Rucano, 130 A.D.3d 656 (2d Dept. 2015), and the Court of Appeals denied leave to appeal, People v. Rucano, 27 N.Y.3d 1005 (2016).

37.     On July 15, 2014, defendant filed a pro se C.P.L. § 440 motion for an evidentiary hearing and for vacatur of the judgment on the basis of alleged prosecutorial misconduct and ineffective assistance of counsel. This motion was denied by the court on December 15, 2014, and the Appellate Division, Second Department, denied defendant's application for leave to appeal on April 30, 2015. Defendant next sought a writ of certiorari from the United States Supreme Court; this was denied (Case No. 15-5753).

38.     On September 1, 2016, defendant filed a pro se application for a writ of error coram nobis claiming ineffective assistance of counsel with respect to his June 2013 direct appeal. The Appellate Division denied the application. People v. Rucano, 149 A.D.3d 876 (2d Dept. 2017), and the Court of Appeals denied leave, People v. Rucano, 30 N.Y.3d 983 (2017). Defendant next sought a writ of certiorari from the United States Supreme Court; this was denied (Case No. 17-7914).

39.     Defendant files the instant petition for habeas relief on two formal grounds: that New York law "has been used as a shield to avoid enforcing my federal rights to due process and

14

equal protection" (Pet. App. Point I); and that his claims have "f[a]ll[en] into the abyss of appellate procedure" and demand resolution "through the lost and long-forgotten door of structural and procedural adequacy doctrine" (Pet. App. Point II). Beneath those catchall descriptions, defendant articulates a myriad of specific claims. Essentially, though, defendant asserts that his indictment and trial were plagued by prosecutorial misconduct and judicial error, that trial counsel was ineffective for failing to object to such misconduct and error, that appellate counsel was ineffective for failing to complain of much of trial counsel's failure to so object, and that New York appellate courts misapplied federal law in rejecting his claims.

40.    As discussed in the accompanying Memorandum of Law, defendant's claims are without merit.

WHEREFORE, defendant's petition should be denied in its entirety.


Dated:        Staten Island, New York
              December 10, 2018

                                        Respectfully Submitted,
                                        MICHAEL E. McMAHON
                                        DISTRICTATTORNEY
                                        RICHMOND COUNTY
                                        Attorney for the Respondent
                                        130 Stuyvesant Place
                                        Staten Island, NY 10301

                                        By: ECF *Alex Fumelli*
                                        Alexander Fumelli
                                        Assistant District Attorney
                                        *Of Counsel*

15

To:    Anthony Rucano
        11-A-0528
        Petitioner Pro Se
        Green Haven Correctional Facility
        594 Route 216
        Stormville, NY 12582

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANTHONY RUCANO,

Petitioner-Defendant,

-against-

J. LAMANNA,

Respondent.

18-CV-04586 (KAM)

**MEMORANDUM
OF LAW**

<u>**PRELIMINARY STATEMENT**</u>

Anthony Rucano petitions this Court for a writ of habeas corpus with which to upset a judgment of the Supreme Court, Richmond County (Rooney, J.), under indictment number 270/2009, rendered on September 21, 2010, convicting him, after a jury trial, of Rape in the First Degree [P. L. § 130.35(1)], Criminal Sexual Act in the First Degree [P. L. § 130.50(1)], Attempted Rape in the First Degree [P. L. §§ 110/130.35(1)], Assault in the Second Degree [P. L. § 120.05(6)], Assault in the Third Degree [P. L. § 120.00(1)], and two counts of Criminal Possession of a Weapon in the Third Degree [P. L. §§ 265.01(2), 265.02(2)]. For these crimes, petitioner was sentenced to concurrent prison terms of 12 years' imprisonment each for first-degree rape and first-degree criminal sexual act, with each sentence to be followed by five years of post-release supervision; eight years' imprisonment for attempted first-degree rape, to be followed by five years of post-release supervision; five years' imprisonment for second-degree assault, to be followed by three years of post-release supervision; one to three years' imprisonment for third-degree criminal possession of a weapon; and one year's imprisonment for third-degree assault. Petitioner is incarcerated pursuant to this judgment.

The outline of the underlying facts contained in the accompanying affidavit in opposition is incorporated herein by reference and will be repeated only as necessary to competently answer the petition.

**POINT:**

**NEW YORK COURTS' DENIALS OF DEFENDANT'S INEFFECTIVE-ASSISTANCE CLAIMS WERE CONSISTENT WITH THE RELEVANT FEDERAL PRECEDENT (RESPONDING TO DEFENDANT'S POINTS I AND II)**

Defendant was sentenced to an effective prison term of 12 years for raping his fiancée. When he alleged that counsel's performance had prejudiced him at trial, his claims were rejected by the C.P.L. § 440 court – "defendant's claims … are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record," it wrote (December 15, 2014, Decision and Order) – and rejected by the Appellate Division, Second Department – "There is no merit to the defendant's contention that he was deprived of the constitutional right to effective assistance of counsel," it wrote (People v. Rucano, 130 A.D.3d 656, 657 [2d Dept. 2015]). So defendant sought another bite at the apple, contending, pro se, that his appellate counsel was ineffective in challenging the effectiveness of his trial counsel. In other words, "[t]he case before [the court] involve[d] a second layer of review, in which the Tuesday morning quarterback assail[ed] the Monday morning quarterback for not assailing the quarterback who actually played the game." People v. Stultz, 2 N.Y.3d 277, 287 (2004). The Appellate Division rejected his new claim, holding that "[t]he appellant has failed to establish that he was denied the effective assistance of appellate counsel." People v. Rucano, 149 A.D.3d 876, 876 (2d Dept. 2017).

Defendant now seeks habeas relief pursuant to 28 U.S.C. § 2254(a), on the ground that "he is in custody in violation of the Constitution or laws or treaties of the United States." In such

18

cases, "a federal court shall issue a writ of habeas corpus if the state court adjudication 'resulted in a decision that was contrary to … clearly established Federal law, as determined by the Supreme Court of the United States." Eze v. Senkowski, 321 F.3d 110, 122 (2d Cir. 2003) (quoting 28 U.S.C. § 2254[d][1]). And in the context of a Sixth Amendment ineffective-assistance-of-counsel claim, which forms the heart of defendant's petition for habeas corpus, the law against which a state court's adjudication must be measured is Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, a trial or appellate attorney is constitutionally ineffective if (1) his representation "f[a]ll[s] below an objective standard of reasonableness" based on "prevailing professional norms" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688, 694. "Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") adds another hurdle to defendant's burden. To obtain habeas relief, a defendant "must do more than show that he would have satisfied Strickland's [two prongs] if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly." Bell v. Cone, 535 U.S. 685, 698-99 (2002). Rather, a defendant must show that the Appellate Division "applied Strickland to the facts of his case in an objectively unreasonable manner." Id. at 699. Indeed, "an unreasonable application of federal law is different from an incorrect application of federal law," Williams v. Taylor, 529 U.S. 362, 410 (2000) (O'Connor, J., for majority), and

"some increment beyond error is required," Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).

And, of course, any state prisoner seeking federal habeas review of his conviction ordinarily must first exhaust available state remedies. Picard v. O'Connor, 404 U.S. 270, 275 (1971). The exhaustion requirement is not satisfied unless the federal claim has been "fairly presented" to the state courts, that is, unless the petitioner has informed the state court of both the factual and the legal premises of the claim he asserts in federal court. Daye v. Atty. Gen. of N.Y., 696 F. 186, 191 (2d Cir. 1982). "[T]he petitioner must have placed before the state court essentially the same legal doctrine he asserts in his federal petition." Id. at 192.

Was defendant's trial counsel constitutionally ineffective? Was his appellate counsel constitutionally ineffective in raising trial counsel's ineffectiveness? Did the C.P.L. § 440 court, in assessing the first question, and the Appellate Division, in assessing the second, each apply Strickland "in an objectively unreasonable manner" (Cone, 535 U.S. at 699)? The answer to those questions is a resounding no.

### 1. The Underlying "Misconduct"

Defendant's habeas petition is 77 pages long and does not conform to conventional styles of argumentation. His descriptions of offending behavior by the prosecutor and the court, and the laws violated by such behavior, are frequently discussed in separate places; some of defendant's headings and subheadings signal a complete legal argument, whereas others lead to a mere restatement of a legal standard or an exposition of some factual detail without an explanation of its relevance; at least one entire "Point" is devoted to a policy-oriented analysis of what defendant describes as structural infirmities in the New York criminal appellate system. In other

words, defendant's discrete claims of error are not clearly delineated by his petition. This response endeavors to fairly organize them and to respond to them as so organized.

In essence, defendant puts forward ten claims of impropriety on the trial level. First, he alleges that, in the grand jury, the prosecutor engaged in prosecutorial misconduct by leading the witness with "non-verbal cues," thus evading detection in the transcript of the grand jury presentation. Defendant does not speculate as to the precise design of such leading cues – no suggestion as to when or how the prosecutor was able to influence the witness's testimony – but instead observes the prosecutor's apparently nonverbal approval when the witness asks if she may look at her book to refresh her recollection. Defendant then asks, "How many other non-verbal cues occurred not seen by [the] stenographer?" (Habeas Pet at 18.) The argument was properly raised in his coram nobis filing to the extent that trial and appellate counsel's failure to object constituted "ineffective assistance."

Putting aside for a moment the implausibility of defendant's allegation – that the prosecutor would somehow signal responses to a witness in front of a grand jury – the claim relies entirely on dehors-the-record speculation that offers no basis for appellate review. Moreover, defendant identifies no "clearly established Federal law" violated by such questioning. Instead, he cites the "ABA Standards For Criminal Justice," a book sold by the American Bar Association and described on its website as "hav[ing] guided policymakers and practitioners working in the criminal justice arena" (https://www.americanbar.org/groups/criminal_justice/standards/; accessed December 6, 2018). Not only does the book hardly constitute "clearly established Federal law," but neither the sections cited by defendant – §§ 3-3.5(b) and 3-3.6(f) – nor the sections he appears to mean to cite – §§ 3-4.5 ("Relationship with a

21

Grand Jury") and 3-4.6 ("Quality and Scope of Evidence Before a Grand Jury") – discuss the sort of behavior of which he complains.

Second, defendant alleges that much of the prosecutor's grand jury presentation consisted of "leading questions designed to meet the specific statutory requirements of Counts 1 and 7 [and to] 'stack[] the deck'" (Habeas Pet. at 18) and in violation of the "advocate-witness rule" (Habeas Pet. at 20). This argument was properly raised in his coram nobis filing – again, to the extent that trial and appellate counsel's failure to object constituted "ineffective assistance."

Of course, eliciting testimony in a manner consistent with the statutory requirements of New York law is the opposite of misconduct. But to the extent that defendant's real objection is the "leading" character of some of the prosecutor's questions, the transcript makes clear that few of those questions actually match defendant's description. Even in those few instances where a question might fairly be described as leading, such questions were naturally responsive to the witness's preceding testimony. "Did he pull your legs apart?" was an appropriate follow-up to "He forced himself on top of me. … [H]e took his penis and put it in my vagina"; "Is that what you're using to refresh your recollection?" is a proper follow-up to the witness's reference to her book or diary. Again, defendant cites no federal law concerning why this particular example of "misconduct" should justify habeas relief.

In any event, all of defendant's complaints concerning prejudicial conduct in the grand jury are answered by <u>United States v. Mechanik</u>, 475 U.S. 66 (1986), in which the Supreme Court held that a trial jury's guilty verdict "means not only that there [is] probable cause to believe that [a] defendant[ is] guilty as charged, but also that [he is] in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury

proceeding connected with the charging decision [is] harmless beyond a reasonable doubt" (id. at 70).

Third, defendant alleges that he was not provided with actual notice under C.P.L. § 190.50 that he had the right to testify before the grand jury – and, in fact, suggests that he was only served such notice after the grand jury had already voted to indict (Habeas Pet. at 35). This argument was properly raised in his coram nobis filing – again, to the extent that trial and appellate counsel's failure to object constituted "ineffective assistance."

The claim, however, is both illogical and based entirely on conjecture. Defendant concedes that such notice was served, and that it informed him of his ability to testify on October 5, 2009, a day before the Indictment was filed and four days after his arraignment. What defendant implies, however, is that the notice was served too early – and that the dates on the notice have been doctored, post-litigation, from their original form, to conceal this fact. Even if this bizarre allegation were true, it is not apparent how early service of grand jury notice would have impeded defendant's ability to testify. And, in any case, such notice was filed in court on September 30, 2009 (see Coram Nobis Affidavit ¶ 38), and defendant's arraignment attorney served reciprocal grand jury notice on the record shortly thereafter (see 10/2/09 at 2).

Fourth, defendant alleges that the trial court violated his due process rights by declining to authorize defendant to enlist a forensic document expert. Defendant maintained that such expert should handle and analyze the victim's diary, which at the time was in the People's custody, to determine whether various allegations of sexual abuse contained within that diary were underhandedly altered following defendant's arrest (Habeas Pet. at 25). This argument was

23

properly raised in defendant's coram nobis filing – again, to the extent that trial and appellate counsel's failure to object constituted "ineffective assistance."

But the claim is flawed in almost every respect. At the outset, defendant appears to mischaracterize the effect of the court's ruling. Although it initially denied counsel's motion to make a forensic expert available as part of defendant's indigent defense, the expert was evidently still available to defendant on a pro bono basis; defendant himself told the court that "[h]e was ready to testify. The handwriting expert was in the building" (T. 10/5/10 at 9). Moreover, as defendant concedes on Page 31 of his petition, his objection is not really to any denial by the court, but rather to defense counsel's strategic decision not to raise the existence of an inculpatory diary not in evidence to the factfinder. See also T. 10/5/10 at 10 ("[I]t was my feeling that the defendant agreed with me that at that point it was unwise as a trial strategy to introduce the existence of the diary."). Even further, there is no record support for the notion that the expert would have in fact performed a "water solubility test" to show that vast swaths of the diary were written in one sitting (see Habeas Pet. at 25) – or that such a test would have aided defendant's case. In court on October 5, 2010, defendant's objection to the court betrayed his own failure to have a clear purpose in mind in enlisting the expert: he argued both that an expert was not needed at all ("I showed it to a dozen people and can see the handwriting is different"; T. 9) and that the role of his expert was instead to prove that "every single entry on every single page of the diary was written in a different handwriting by a different pen," as if his real suggestion were that the diary had been written by more than one person (T. 9).

Fifth, defendant alleges that the prosecutor's handling of the diary – namely, turning over a photocopy of the diary to the defense "[only] 2 months before trial" – was a violation of his

ethical requirements under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) (Habeas Pet. at 32). This argument was properly raised in defendant's coram nobis filing – again, to the extent that trial and appellate counsel's failure to object constituted "ineffective assistance."

But the <u>Brady</u> requirement applies only to "evidence … which, if made available, would tend to exculpate [the accused] or reduce the penalty." <u>Id.</u> at 87-88. And the only theory supporting the notion that the victim's diary was exculpatory is defendant's unsupported assertion that a "water solubility test" would have proven that pages of the diary were written on dates other than those listed. The assertion is so speculative that defense counsel opted not to pursue the line of argument at trial; meanwhile, what the diary plainly contains – allegations of sexual abuse over the course of defendant and the victim's relationship – is the quintessence of inculpatory material.

Sixth, defendant complains that he was prejudiced by his trial attorney's "absen[ce] during the beginning of voir dire" (Habeas Pet. at 44). This claim was properly raised in defendant's pro se supplemental brief on direct appeal.

But the factual underpinning of defendant's complaint is unsupported by the record, which offers no hint that counsel was anywhere but in court during this part of the jury selection process (9/8/10 at 53-55). In any event, defendant cites no authority for the claim that his counsel must be present when every prospective juror's name is selected at random by the clerk, prior to the commencement of questioning by the attorneys. Indeed, there appears to be no such authority. And where the event at issue is entirely ministerial, as it has here – tantamount to a scheduling matter – a defense counsel's absence will not constitute a mode of proceedings error

25

or implicate the Sixth Amendment. See People v. Carr, 25 N.Y.3d 105, 110-13 (2015) (citing Kentucky v. Stincer, 48 U.S. 730, 739-44 [1987]).

Seventh, defendant complains that his "federal rights to a fair and impartial trial" were abrogated "when the trial court abused its discretion" by discharging an unsworn alternate juror "[w]ithout determining a valid ground to utilize a cause challenge" (Habeas Pet. at 44-45). This objection refers to alternate juror Beckett, who was discharged without an inquiry when defense counsel informed the court that during the lunch break, counsel was discussing the case with a court officer, noticed Beckett standing nearby, and thought that Beckett could have overheard the conversation (9/10/10 at 413). Counsel challenged Beckett for cause, and the People did not object to the challenge (9/10/10 at 413-14). Defendant now asserts that the court improperly failed to inquire, of Beckett and the rest of the jury pool, whether Beckett shared any prejudicial information he might have overheard with any sworn jurors. This claim was properly raised in defendant's pro se supplemental brief on direct appeal.

Defendant is wrong because the court was not obligated to conduct such an inquiry of an unsworn juror such as Beckett. "[T]he Criminal Procedure Law is silent as to criteria for discharge" of "selected but unsworn jurors." People v. Sanchez, 123 A.D.3d 624, 624 (1st Dept. 2014). However, "[t]he power to excuse an unsworn juror" such as Beckett "is much broader than the statutory limited power to discharge a sworn juror, and [there is] no support in [Criminal Procedure Law § 270.35] for treating a selected, but unsworn juror as a sworn juror." People v. Velez, 255 A.D.2d 146, 146 (1st Dept. 1998). Therefore, the statutory requirement that a trial court may discharge a sworn juror only following a "reasonably thorough inquiry" into the juror's circumstances (C.P.L. § 270.35[2][a]) did not apply to Beckett. And, in any event, a

26

request by counsel for an inquiry of the entire jury pool would have been impermissibly speculative in the absence of any evidence supporting a fair inference that the pool had been tainted.

Eighth, defendant alleges that the complainant's use of the diary to refresh her recollection at trial "without a proper foundation being laid" violated evidentiary rules, including "hearsay [and] the rules of past recollection recorded" (Habeas Pet. at 32-34). This argument was properly raised in defendant's coram nobis filing – once more, to the extent that trial and appellate counsel's failure to object constituted "ineffective assistance."

Framed in terms of either New York evidentiary case law or even the Federal Rules of Evidence, the claim is a nonsense. At no point was the diary in evidence; as a result, any arguments concerning foundation or hearsay exceptions can be quickly dispensed with. It was used merely to refresh the author's recollection, and defendant has offered no case law, federal or otherwise, to support the proposition that such use was inappropriate.

Ninth, defendant alleges that it was improper for Stefania Mach, defendant and Ramos's downstairs neighbor, to testify on direct examination that one evening in late September 2009 – presumably September 28, the date of the rape of which defendant was convicted – she heard defendant and Ramos "start to have sex," Ramos scream, "I no want, leave me alone," and Ramos and defendant running upstairs (Mach: 354) (Habeas Pet. at 38). Indeed, when the prosecutor asked Mach to distinguish between defendant's and Ramos's footsteps, the court sustained defense counsel's objection, stating that the question called for speculation, as Mach would not permissibly "reconstruct what may or may not have happened upstairs" (Mach: 355-56). When the prosecutor then asked Mach what else she heard, defense counsel objected and

asked the court to admonish the jury. The court struck the testimony, stating, "As I said, I think it's clear, I can't let the jury speculate [as to] what may have happened based on testimony from a witness that was not present" (Mach: 356). This claim was properly raised on direct appeal on due process and ineffective-assistance grounds.

Defendant seems to argue that Mach's testimony should have been excluded as prejudicial because it was speculative; after all, the argument goes, Mach could not have known with certainty that defendant and Ramos were having sex when she heard them upstairs. But it was uncontested that defendant and the victim had sex that night, and the basis for Mach's conclusion was straightforward: Ramos's screams, recounted by Mach, of "Leave me alone, I no want. Give me a break, I want sleep" (Mach: 357-58). Further, the testimony had a clear probative value – namely, the central issue of whether defendant forcibly compelled Ramos to have sexual intercourse – that was not outweighed by any risk that it would unfairly prejudice the defense. Because Mach's testimony was based on personal knowledge grounded in what she had actually heard, because the defendant had an opportunity to cross-examine her, and because the court admonished the jury not to "speculate what may have happened based on testimony from a witness that was not present" (Mach: 356), the testimony violated no specific evidentiary prohibition. Meanwhile, because the contested comment, was in evidence, the court was obliged to include it in the readback under Criminal Procedure Law § 310.30. Especially in light of the fact that "[t]he trial judge is in the best position to sense whether the jury is able to proceed properly with its deliberations and … has considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion," United States v. Parker,

28

903 F.2d 91, 101 (2d Cir. 1990), that the court declined to retroactively strike Mach's reference to defendant and Ramos "start[ing] to have sex" is not contrary to clearly established federal law.

Tenth and finally, defendant complains of the Appellate Division, Second Department's denial of "a state-created right to file a pro se supp. reply brief" (Habeas Pet. at 40) – referring to the Appellate Division's July 6, 2015, Decision and Order denying defendant leave to serve and file a supplemental reply brief as part of his otherwise-counseled direct appeal.

The Practice Rules of the Appellate Division, Second Department, hold that "[w]hen assigned appellate counsel," as here, "does not file a brief pursuant to Anders v. California, a defendant wishing to file a pro se supplemental brief shall … move for permission to do so." See Practice Rules of the Appellate Division, Second Judicial Department, at 24 (accessed December 6, 2018). In other words, there is no such permission as of right. Although defendant complains that this rule violates his federal constitutional right to due process, he offers no basis for his conclusion. In fact, where a state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment," a federal habeas court should decline to review it. Coleman v. Thompson, 501 U.S. 722, 729 (1991); see also Wainwright v. Sykes, 433 U.S. 72, 81 (1977).

**2. Counsel's Effectiveness, and the § 440 and Coram Nobis Courts' Review Thereof**

These nine claims of error formed the basis of defendant's view – in his C.P.L. § 440 motion and his pair of filings on direct appeal – not only that he was deprived of due process and a fair trial, but that his counsel's failure to object to most of such error deprived him of effective assistance under the Sixth Amendment. That the above-described events and adjudications were not error, of course, informs the People's assertions that trial counsel was not ineffective for

failing to object to them, that appellate counsel was not ineffective for failing to take up the same issues, and that the state courts of New York did not clearly misapply federal law in affirming the judgment against defendant.

Indeed, as stated, the law against which a state court's adjudication must be measured is Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, a trial or appellate attorney is constitutionally ineffective if (1) his representation "f[a]ll[s] below an objective standard of reasonableness" based on "prevailing professional norms" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688, 694. "Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

In this case, the evidence against defendant was compelling. Yet trial counsel presented a sound defense and followed it in a consistent fashion. See, e.g., People v. Reyes, 287 A.D.2d 660 (2d Dept. 2001) (noting consistency of chosen strategy); compare Torres v. Stinson, 2000 U.S. Dist. LEXIS 19068 (E.D.N.Y. 2000) (examining shift in trial strategy for signs of ineffectiveness). Central to that defense was counsel's effort to cast doubt upon Ramos's credibility, character, and emotional stability. Although such a defense was perhaps required in a "he said/she said" sexual assault case such as this, counsel pursued it at trial with skill and tenacity.

In his opening statement, counsel urged the jury to mind the evidence, which would reveal that defendant and Ramos were locked in a relationship that was "dysfunctional" and tumultuous, but which was not as the prosecutor would portray it to be (T. 36-41). Then, during

30

the People's direct case, counsel extensively cross-examined regarding her history of childhood abuse and abandonment by the men in her life; the drug crime she committed on behalf of her former husband; the circumstances surrounding her physical attacks on defendant; her occasional consensual sexual encounters with defendant; her failure to divulge the abuse to her friends, relatives, co-workers, therapist, or the police for two and a half months after the first incident; her unwillingness to leave defendant; her selective recording of defendant's voicemails; and her inconsistent account of her decision to report defendant to the policy (Ramos: 238-88).

In further support of that defense, defense counsel cross-examined Rina Ganeles, the nurse examiner, regarding Ramos's lack of genital trauma, which could have indicated that Ramos was sexually active (Ganeles: 68-70). Counsel also cross-examined Dr. Nancy Needell, the People's forensic psychiatrist, regarding Needell's failure to examine or even meet with Ramos, and the length of time a battered woman will endure an abusive relationship before leaving it (Needell: 326). By exploring the absence of genital trauma and challenging the relevance of Needell's testimony, counsel underscored for the jury the centrality of Ramos's credibility to the case.

Counsel also presented a defense case wherein defendant testified at length that he and Ramos had only consensual sexual relations; that Ramos slept with him in order to induce him to believe that she would change her erratic behavior, which was sometimes marked by outbursts of violence; and that defendant had suggested to Ramos that they consider a separation the night before she reported him to the police. Defendant's friend Frank Ortiz testified that he had heard Ramos threaten to treat defendant like a "scumbag" and report him to the police, which supported counsel's argument that Ramos was inclined to fabricate the charges. Finally, counsel

31

introduced evidence of defendant's injuries, as well as the testimony of his former girlfriend Diane Smith, to corroborate defendant's claim that Ramos had attacked him.

Counsel delivered a strong closing statement in which he marshaled the evidence supporting his theory that Ramos's testimony was inconsistent and incredible, and that she was determined to punish defendant for crimes that had not occurred, out of a misplaced sense of violation and resentment. In fact, this defense was largely successful, as the jury acquitted defendant of five of the six counts of first-degree rape, two of the three counts of first-degree criminal sexual act, and one of the two counts of second-degree assault. See Morgan v. Lee, 2012 U.S. Dist. LEXIS 154224, *28 (W.D.N.Y. 2012) ("despite the extremely compelling evidence against her client, trial counsel convinced the jury to acquit" petitioner of one "count alleging Course of Sexual Conduct," demonstrating effective assistance); Staton v. Berbary, 2004 U.S. Dist. LEXIS 14898, *32 (E.D.N.Y. 2004) (acquittal of top count in indictment).

Meanwhile, on appeal, counsel wrote a 53-page brief arguing that trial counsel's performance was deficient for failing to object to, or to request a mistrial in response to, three elements of the trial: (1) the eliciting of a Mach's purported speculation that appellant and the complainant were having sex when she heard the complainant say, "I no want"; (2) the prosecutor's attempts to cross-examine a defense witness about his prior "arrest" and "charges" despite the court's admonition that he not do so; and (3) the prosecutor's purported appeal to the jury's emotions in summation. Appellate counsel also made a weight-of-the-evidence claim, though the substance of that claim is not renewed in defendant's instant filing.

Put simply, both at trial and on appeal, petitioner can establish neither deficient performance by counsel or prejudice resulting from that performance. Indeed, he received

effective representation overall. See Linstadt v. Keane, 239 F.3d 191, 199-200 (2d Cir. 2001) (Strickland requires reviewing courts to consider "totality of the evidence" and to examine errors by counsel "in the aggregate"). And "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." Harrington v. Richter, 562 U.S. 86, 90 (2011).

Apart from complaints related to the above-described claims of error, defendant contends that trial counsel's cross-examination left much to be desired, and that these failures were insufficiently addressed by appellate counsel. Defendant wanted trial counsel to "object to voicemails on numerous grounds involving their independent authenticity and admissibility during cross-examination" (Habeas Pet. at 35), and to "to cross-examine P.O. Sharon Brown of the 70th Precinct, who had first contact with Ms. Ramos when she reported the alleged crime" (Habeas Pet. at 36). But defendant fails to follow through by explaining what was inauthentic about the voicemails or what was relevant about P.O. Brown's recollection. Such claims amount to little more than second-guessing, and "[i]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular … omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

One further point bears mentioning: the second prong of Strickland is prejudice. And so, to the extent that defendant assails his appellate counsel for failing to raise all the claims defendant would later raise in his pro se supplemental brief, that pro se supplemental brief had the effect of correcting the error. The Appellate Division was forced to confront the remainder of defendant's objections head-on, and it affirmed the judgment all the same.

33

### 3. Defendant's Other Claims

Defendant raises a third category of claims in his petition that concern what might be described as "structural" deficiencies he encountered as his filings ascended the ranks of the New York State appellate system. He complains that public defenders are underpaid, overworked, and/or incompetent (Habeas Pet. at 55-60); he laments that inexperience and lack of resources among pro se defendants cause them to "face insurmountable difficulty in identifying and prosecuting claims of [ineffective assistance of counsel]" (Habeas Pet. at 64).

This is, of course, a policy argument rather than a legal one; no barrage of Second Circuit case law could squarely respond to petitioner's insistence that legal precedent is itself symptomatic of a legal system unreceptive to the plight of indigent or pro se defendants.

It is worth briefly stating, perhaps, that state rules of criminal procedure are a necessary means of enforcing the evenhanded administration of justice, and that regulations on the content of appellate claims "reflect a recognition that 'society has a strong interest in the finality of [verdicts], and allowing'" the disturbance thereof "'increases the volume of judicial work [and] delays and impairs the orderly administration of justice.'" United States v. Sweeney, 878 F.2d 68, 70 (2d Cir. 1989) (quoting United States v. Timmreck, 441 U.S. 780, 784 (1979). See also United States v. Maher, 108 F.3d 1513, 1529 (2d Cir. 1997) ("society has as strong interest in the finality of guilty please, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice").

In all, defendant has had at least seven chances at overturning his conviction: his C.P.L. § 440 motion; his counseled direct appeal; his pro-se supplemental brief on direct appeal; his

34

coram nobis application; and his seeking of leave from the Appellate Division, the New York State Court of Appeals, and the United States Supreme Court. In every instance, he has been permitted to write extensively and to advance dozens of theories of why his criminal conviction was fatally flawed, many of them lacking in logical plausibility or support in precedent. His case would seem to stand for the proposition that he has been fairly treated by the appellate courts of New York State.

## CONCLUSION

For the foregoing reasons, the petition should be denied in its entirety.


Dated:          Staten Island, New York
                December 10, 2016

                                        Respectfully Submitted,

                                        MICHAEL E. MCMAHON
                                        DISTRICTATTORNEY
                                        RICHMOND COUNTY
                                        Attorney for the Respondent
                                        130 Stuyvesant Place
                                        Staten Island, NY 10301

                                        By: ECF *Alex Fumelli*
                                        Alexander Fumelli
                                        Assistant District Attorney
                                        *Of Counsel*


To:     Anthony Rucano
        11-A-0528
        Petitioner Pro Se
        Green Haven Correctional Facility
        594 Route 216
        Stormville, NY 12582

36

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANTHONY RUCANO, *pro se*,                               18-CV-4586 (KAM)

                              Petitioner,        **ATTORNEY'S
                                                 AFFIRMATION OF SERVICE**

          -against-

J. LAMANNA
Superindent of Green Haven
Correctional Facility,

                              Respondent.

STATE OF NEW YORK        )
COUNTY OF RICHMOND   ) ss.:

      Alexander Fumelli, an assistant district attorney, of counsel to Michael E. McMahon,
District Attorney of Richmond County, admitted to practice before this Court, affirms as follows:

      On December 10, 2018, I served the Affidavit and Memorandum of Law in Opposition to
Petition for Writ of Habeas Corpus on the above-captioned case by mailing one true copy of it,
enclosed in an envelope, addressed to the individual at the address shown below:

             Anthony Rucano
             #11-A-0528
             Green Haven Correctional Facility
             P.O. Box 4000
             Stormville, NY  12582-4000


Into a repository, at the intersection of Stuyvesant Place & Hyatt Street, Staten Island, NY,
maintained by and under the exclusive care and custody of the United States Postal Service.

Date:   December 10, 2018
        Staten Island, NY



                              By: ECF *Alex Fumelli*
                              Alexander Fumelli

37