

OFFICE OF THE DISTRICT ATTORNEY
RICHMOND COUNTY
MICHAEL E. MCMAHON
DISTRICT ATTORNEY

ALEXANDER FUMELLI
ASSISTANT DISTRICT ATTORNEY
(718) 556-7146

December 21, 2018

Honorable Kiyo Matsumoto, U.S.D.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   Rucano v. LaManna, 18-CV-4586
       Court's December 11, 2018, Order Concerning Discrepancies in the State Court Record

Your Honor:

In response to Petitioner's November 26, 2018, letter concerning discrepancies in the state court record, I offer the enclosed amendments to the People's November 8 and 9 filings of that record.

The absence of various even or odd pages in the People's filing of the state record was due to scanning errors dating to the years-ago creation of a computerized version of defendant's case file. In order to correct those scanning errors, we have obtained, sorted through, and re-scanned portions of Petitioner's original paper file, which spans six boxes. There are a few filings, however, that we have not been able to locate despite their having already been scanned into the computerized file. Those omissions are described below.

In his November 28 letter, Petitioner alleged a number of "Missing Items of Record on Appeal." The People have identified and attached all but three of them; we have ordered and labeled those available to us as defendant does in his November 26 letter. Three documents were not recovered: "Appendix Item JJ" (Affirmation in Opposition to Motion to Reargue), "Appendix Item "PP" (Motion to Enlarge Appellate Record), and "Appendix QQ" (Decision and Order Denying Motion to Relieve Counsel). None of these documents appear to bear on the substantive claims raised in defendant's habeas petition.

Petitioner also alleged a series of "Incomplete Filings of State Court Record." As above, I have searched the People's files for those documents and identified and attached all but two of them; again, they are ordered and labeled as in defendant's November 26 letter. Two documents were not recovered: "AD 9-45" (alternating pages of statement in support of leave to appeal) and "AD 9-58" (alternating pages of Appellate Advocates contract and best practices guide).

With respect to all of the above, I have declined to include any exhibits attached to documents that duplicate previous filings.

Paper copies of this letter and attachments have been served on defendant and mailed to the Court.

Respectfully yours,

MICHAEL E. MCMAHON
DISTRICT ATTORNEY

By:     Alexander Fumelli
        Appeals Bureau [ECF signature]

CC:     Anthony Rucano
        11A0528
        Green Haven Correctional Facility
        P.O. Box 4000
        Stormville, New York 12582

Anthony Rucano 11A0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, N.Y. 12929
September 10, 2013

DISTRICT ATTORNEY
RICHMOND COUNTY

RECEIVED
2013 SEP 20 P 2: 19

Appendix Item G

To the Hon. April Anne Agostino,

Good Morning. Enclosed is a motion to Enlarge the Appellate Record. I have provided related documents and transcripts provided to me by Appellate Counsel Mr. Landau of Appellate Advocates, which I was led to believe are already part of the Certified Appellate Record.

On the Exhibit Cover Page, I have identified which files are already part of the record, and have also listed affidavits, transcripts and other files I wish to expand the Appellate record to include.

The most important of these is the complete transcript of the Complainants Grand Jury testimony and the remainder of Mr. Baier's Forensic Document Examiner Court Exhibits and Diary entries.

The complainants Grand Jury testimony and the hand writing expert reports were provided to Appellate Advocates almost 2 years ago, almost 2 years ago.

The court exhibits, affidavits and diary entries which were part of the report were not included in the Appellate record by Appellate Advocates; even though I provided these records and others with detailed documentation providing the context and importance of said records.

These records revolve around one Central Theme, the misuse by ADA Katchen of the diary in his Investigation of it ▓▓ before the Grand Jury, during and after

(Turn over)

I have prepared a detailed and fact specific brief which is culminated from thousands of hours of research over $2\frac{1}{2}$ years and am confident the Honorable Court will find my claims meritorious.

I only ask that I be given the opportunity to present my claims based on a full and complete record, in the event that the Honorable Court grants my pending motion to file a supplemental Pro-Se Brief.

Please note, an extensive discussion occured after trial on October 5, 2010. These transcripts are part of the Appellate record and were provided to me by Appellate counsel.

For the Courts convienence, I have provided a copy of these transcripts as well. The July 6 and July 17, 2010 transcripts, combined with the expert reports, trial transcripts and the October 5, 2010 transcript; provide the Court with an extensive record concerning the handwriting expert.

The records I seek to enlarge the Appellate record to include solidify, strengthen and provide valuable insight and context to the already established record; and I respectfully plead with the Honorable Court to allow me the opportunity to show that the complainant falsified her testimony at the Grand Jury.

God Bless You and thank you for your time and consideration concerning this matter.

Respectfully Yours,

cc: Richmond County District Attorney
Warren Landau, Appellate Advocates

Anthony Rucano and Family

DISTRICT ATTORNEY
RICHMOND COUNTY

RECEIVED SUPREME COURT OF THE STATE OF NEW YORK

2013 SEP 20 APPELLATE 2019 DIVISION, SECOND DEPARTMENT

```
-----------------------------------------X
```

The People of the State of New York,           :

      Plaintiff(s)-Respondent(s),           :           NOTICE OF MOTION

                                      :           TO ENLARGE RECORD

        -against-           :

                                        :

ANTHONY RUCANO,           :           INDICTMENT NO. 270/09

      Defendant-Appellant.           :           APPELLATE DIVISION

                                    :           CASE # 2011-01960

```
-----------------------------------------X
```

    **PLEASE TAKE NOTICE**, that upon the annexed affidavit of Anthony Rucano, sworn to on the 10th day of September, 2013, and upon the annexed affidavit and all the papers and proceedings heretofore had herein, an application will be made in the Supreme Court of the State of New York, Appellate Division, Second Department, County of Kings, located at 45 Monroe Place, Brooklyn, New York, on the 4th day of October, 2013, at 10:00 a.m. in the forenoon of that day or as soon thereafter as the defendant can be heard pro-se for an Order enlarging the record on appeal to include the complete transcript of the grand jury testimony of the complainant when only 4 pages were included as part of the record; Official Court Transcripts of July 7, 2010, July 16, 2010 and August 10, 2010, relating to hearings, motions and matters which already appear on the record; Affidavit of Forensic Document Examiner Mr. Baier, Ms. Montoya and uncalled witness Steve Frankl, and other discovery material not presented to the Nisi Prius Court by appellate counsel and omitted from the record on appeal. The Defendant, Anthony Rucano, raises these issues on the grounds

that he is in the Final Stages of Perfecting a Pro-Se Supplemental Brief, with said application to file such brief now pending before the Honorable Court; to enable him to have a full and fair opportunity to have the Appellate Court Review Claims of Prosecutorial Misconduct and the Ineffective Assistance of Counsel of constitutional dimensions based on a full, complete and accurate record; and for such other and further relief as may be just proper and equitable.

Pursuant to CPLR 2214(b), answering affidavits, if any, are required to be served upon the undersigned at least seven days before the return date of this motion.

Dated: ___September 10th___, 2013

Respectfully Submitted

_Anthony Rucano_

To: Richmond County District
    Att: Appeals Bureau
    Attorneys Office
    130 Stuyvesant Place
    Staten Island, N.Y. 10301

    Warren S. Landau
    Appellate Advocates
    Associate Appellate Counsel
    2 Rector St., 10th Floor
    New York, N.Y. 10006

Anthony Rucano, 11A0528
Clinton Corr. Facility
P.O. Box 2001
Dannemora, N.Y. 12929

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION, SECOND DEPARTMENT

----------------------------------------X
                                         :

The People of the State of New York,    :   AFFIDAVIT IN SUPPORT
           Plaintiff(s)-Respondent(s) :   OF MOTION TO ENLARGE
                                   :   THE RECORD
    -against-                   :

ANTHONY RUCANO             ,      :   INDICTMENT NO. 270/09
        Defendant-Appellant,    :   APPELLATE DIVISION
----------------------------------------X   CASE # 2011-01960

STATE OF NEW YORK    )
                      ) SS.:
COUNTY OF Clinton    )

      Anthony Rucano, being duly sworn, deposes and says:

    1. I am a detainee presently being detained at Clinton Correctional Facility, P.O. Box 2001, Cook st., Dannemora N.Y. 12929

    2. I am personally familiar with the facts and statements hereinafter; I am a laymen in the matter of law and seeks this Court's indulgence for errors defects and faults pursuant to Section 103(C) and 2101(F) of Civil Practice Law and Rules.

    3. I am presently preparing a Pro Se Supplemental Brief to appeal the jury verdict convicting the defendant in the Supreme Court of New York, County of Richmond, on January 21, 2011.

## Preliminary Statement

4.   The defendant recognizes that the assigned counsel plan is overburdened. William J. Stuntz published an article "The Uneasy Relationship Between Criminal Procedure and Criminal Justice", 107 Yale L.J. 1, 3-12 72-76 (1997) and in it he explains the following. "Making Gideon a formal right only, without any ancillary funding requirements has produced a criminal process that is, for poor defendants, a scandal...Over the course of the past couple of decades, legislatures have exercised their funding power to expand substantially the resources devoted to law enforcement.." Yet, the fact is that Assigned Counsel attorneys in New York had their last increase to $75 per hour 10 years ago in 2003, and are among the lowest paid assigned counsel in the entire 50 states.

5.   Professor Eve Brensike Primus published an article called "Structural Reform in Criminal Defense: Relocating Ineffective Assistance of Counsel Claims" 92 Cornell L. Rev. 679 (2007) where she states in brief that "...appellate attorneys be permitted to supplement the trial court record in order to fully support claims of trial attorney ineffectiveness."

6.   The defendant respectfully requests the court to consider these facts in determining the application before you today.

## Argument

7. The defendant, upon inspection of the record and assigned counsel's appellate brief, which was recently submitted to the Honorable Court; has discovered that only 4 pages of the complainant's Grand Jury testimony was provided to the Court as part of the appellate record. (Exhibit "A")

8. The defendant was provided with the entire Grand Jury testimony of the complainant over 2 months before trial, by trial counsel Eugene Lamb Esq., and this contention is further supported the letter from ADA Katchen, provided to me as part of the record by my appellate counsel and received by the Court on June 21, 2010. This letter clearly shows the complete grand jury testimony was released to my trial attorney Eugene Lamb in discovery. (Exhibit "B")

9. Furthermore also part of the record is my trial attorney's Omnibus motion which Judge Rienzi entertained and ruled on, which included a motion to dismiss the indictment. (Exhibit "C") As this is part of the appellate record and the defendant plans to argue multiple issues which include an abuse of discretion in not dismissing the indictment upon his inspection, the defendant requires the complete grand jury testimony of the complainant, which is already in this defendant's possession, to be included as part of the record on

appeal. (Exhibit "D") The defendant asks this court to ORDER the Grand Jury Stenographer Donielle McKenna to provide a certified copy to the Court, District Attorney and Petitioner for inclusion in the record on appeal.

10. The defendant, upon information and belief, states that the grand jury minutes clearly show a pervasive course of misconduct, as the defendant has outlined in his Amended Application for permission to file a Pro-Se Supplemental Brief which is currently pending before the Honorable Court; which raises multiple and significant issues of prosecutorial misconduct and ineffective assistance of trial counsel that are of a constitutional dimension.

11. The defendant was also provided with Forensic Document Examiner Robert Baier's original and supplemental report concerning the complainant's diary as part of the appellate record provided to me by appellate counsel Warren Landau. (Exhibit "E") The diary and court exhibits (Exhibit "E1") were not included with the reports from Mr. Baier in the certified appellate record. The diary was released to trial counsel in a letter dated June 30, 2010 from ADA Katchen (Exhibit "F") with said letter being received as part of the appellate record.

12. Mr. Baier is a handwriting expert and he provided the defendant with a copy of an unsigned and un-notarized affidavit

he submitted to the Court, which is currently on file with the Assigned Counsel Plan.

13.  Mr. Baier, along with the above copy of the affidavit, also provided the defendant with a signed and notarized confirmation letter dated March 2, 2011, attesting to the facts contained in the previous affidavit on file with the Assigned Counsel Plan, and all the important and relevant facts concerning trial attorney Eugene Lamb's contact with him concerning Mr. Baier's plan to testify in this case. (Exhibit "G") These facts extensively appear throughout the appellate record, but Mr. Baier's affidavit provides much needed context and clarity to the facts at issue.

14.  These affidavits provide important and substantive context to the appellate record, and although the one affidavit provided by Mr. Baier was submitted to the nisi prius court and is on file with the Assigned Counsel Plan, it was not submitted as part of the certified appellate record.

15.  The defendant respectfully requests that these affidavits and poorly made Xerox copies of the diary entries that Mr. Baier's reports are based on, which are already part of the record, and court exhibits which said affidavit clearly reveals was provided to the District Attorney; be stipulated to be part of the certified appellate record in this case. The diary has been in the possession of the District Attorney's

Office since before the grand jury first convened in this matter on October 1, 2009, and as is clearly revealed in the complainant's grand jury testimony as well.

16.    The defendant, in support of his argument before the Honorable Court, steadfastly believes that the record of the complainant's complete grand jury testimony clearly reveals that ADA Katchen attempted to deceive the Grand Jurors of the substance of the complainant's testimony, thereby usurping the Grand Jurors fact finding process, and violated multiple rules of professional and ethical conduct. This was accomplished by allowing the complainant to take a previously unknown diary and other papers to the stand to read from during her grand jury testimony, without revealing it to the grand jurors for what it was by constantly referring to it as a "book" instead of a "diary." The fact it was a diary was revealed **ONLY** when it became clear that the complainant could not answer **ANY** questions at all put to her, even ones in the form of leading questions, without reading from this "book."

17.    "Prosecutor should not introduce hearsay evidence before Grand Jury when direct evidence is available." (United States v. Estapa, 471 F.2d 1132, 1136-1137 (2nd Cir. 1972)

18.  Furthermore the grand jury minutes clearly reveal the use of non-verbal cues by ADA Katchen and the complainant which were recorded by the grand jury stenographer, but as there was

TWO ADA's present the grand jury stenographer could not have possibly recorded **ALL** non-verbal cues possibly occurring. There was also the pervasive use of leading statements and questions throughout the entire grand jury proceedings which was enabled by ADA Katchen acting as an investigator in processing this diary before the grand jury proceedings started and **BEFORE** the defendant was arraigned on October 1, 2009; thereby becoming an unsworn witness in this case. The record clearly reveals no mention of any other crimes or the diary in any part of the record of the arrest and investigation.

19.   Finally, the record reveals that 11 of 19 felony counts literally extracted from this diary in a course of pervasive misconduct were dismissed during the charge conference. This was because the complainant, without having the diary to read from during trial like she did at the grand jury; could not provide enough substantive testimony to support the charges presented and were dismissed. The remaining 8 of the 19 felony charges extracted from the diary resulted in findings of not guilty.

20.   The defendant was substantially prejudiced by the misconduct occurring before the grand jury. Under the federal standard articulated by Justice O'Connor in her concurring opinion in United States v. Mechanik, 475 U.S. 66 (1986), dismissal of the indictment is appropriate only "if it is

established that the violation substantially influenced the Grand Jury's decision to indict" or if there is "grave doubt" that the decision to indict was free from substantial influence of such violations. This standard is based on the decision in Kotteakos v. United States, 328 U.S. 750 (1946) where, in construing a statute later incorporated into Federal Rule 52 (a), it was held that a conviction should not be overturned unless, *after examining the record as a whole,* a court concludes that an error may have held "substantial influence" on the outcome of the proceeding.

21. In New York State CPL 210.35(5) provides that a Grand Jury proceeding is defective when "the integrity thereof is impaired and prejudice to the defendant may result." The exceptional remedy of dismissal is thus warranted only where a defect in the indictment created a possibility of prejudice. (see, *People v. Di Falco*, 44 N.Y.2d 482, 487, 406 N.Y.S.2d 279, 377 N.E.2d 732) Although this statutory test "is very precise and very high" (*People v. Darby*, 75 N.Y.2d 449, 455, 554 N.Y.S.2d 426, 553 N.E.2d 974), it does not require actual prejudice (see, *People v. Sayavong*, 83 N.Y.2d 702, 709, 711, 613 N.Y.S.2d 343, 635 N.E.2d 1213; *People v. Wilkins*, 68 N.Y.2d 269, 276, 508 N.Y.S.2d 893, 501 N.E.2d 542). Indeed, two earlier drafts of CPL 210.35(5) required a showing of actual prejudice before an indictment could be dismissed as the result of

defective Grand Jury proceedings. The Legislature, however, rejected a requirement of actual prejudice in favor of the current provision – requiring only that "prejudice to the defendant *may* result". (CPL 210.35[5] [emphasis added]; see *People v. Di Falco*, 44 N.Y.2d 482, 487, 406 N.Y.S.2d 279, 377 N.E.2d 732, *supra*; Preiser, Practice Commentary, McKinney's Cons. Laws of N.Y., Book 11A CPL 210.35, at 676)

21. The defendant has clearly and specifically detailed the correlation between the complainant's grand jury testimony and the diary, showing multiple, specific and detailed instances of ADA Katchen repeatedly guiding the complainant to testify to the events as recorded in the diary, using leading statements and questions to guide her, while himself providing independent and substantial testimony that was not a part of the complainant's independent recollection of the events. The statutory rules provided by legislature in N.Y. State are in accordance with Federal Rule 52(a), and as such the defendant only asks that the record be expanded to include the requested records as part of the certified appellate record so he may have a full and fair opportunity to litigate these issues before the Honorable Court.

20. In closing, the defendant has also secured a notarized affidavit from uncalled witness Steve Frankl, attesting to the fact that at 10:50 PM on July 17, 2009 I emailed him about the complainant's behavior, and this email is in his and my

possession and is verifiable by subpoena from the internet Service provider Yahoo as a certified fact. (Exhibit "H")

21. The defendant asserts that it is not a coincidence that the complainant's first diary entry is also dated July 17, 2009, as defendant told complainant he was emailing his friend about her behavior, which is also part of the trial record. (Trial Transcript, Pg. 386, Lines 11-14)

22. The court transcripts for July 7, 2009 (Exhibit "I") and July 16, 2009 (Exhibit "J") relate to the handwriting expert in various ways and are necessary to provide context and clarity to the existing certified appellate record.

23. The defendant also requests the court transcripts for August 10, 2010 to be included as part of the certified appellate record, in that this was the day that ADA Katchen submitted his written opposition to a handwriting expert. The appellate record is devoid of any written decision and order on this motion. The defendant does not possess these minutes, but believes they provide context to the handwriting expert issue.

24. The defendant also retained, Pro-Bono Forensic Handwriting Expert Treyce d'Gabriel Montoya, President of the Center of Forensic Profiling, President of the National Association of Handwriting & Document Experts (NAHDE) and president of the International Association of Handwriting Formation Therapists. She is also a member of the Southern

States Correctional Association and the Westlaw Round Table Expert Network.

25. I contacted Ms. Montoya on September 8, 2010, which was the first day of Jury selection; and provided trial attorney Eugene Lamb with her information, but he refused to present her CV to the Court as an expert witness in my case. She provided me with a Letter of Opinion dated September 14, 2010, the 2nd Day of trial; after examining portions of the diary provided to her by me. (Exhibit "K")

26. The failure of Mr. Lamb to locate any experts was compounded by his failure to notify me until September 8, 2010, the 1st day of jury selection (Jury Selection Transcripts, September 8, 2010, Pg 8 and 9). That evening I personally located Mr. Baier and Ms. Montoya and retained their services.

27. I respectfully request the Honorable Court to consider allowing this Letter of Opinion become part of the Certified Appellate Record. I am in the process of obtaining an affidavit from Ms. Montoya attesting to the facts and circumstances in this matter.

28. Steve Frankl was a witness that was supposed to testify, which is also clear from the trial record. (See Jury Selection Transcript, September 8, 2010, Pg. 5, Lines 9-10) (See Trial Transcript, September 15, 2010, Pg. 333, Lines 15-19) yet Mr. Lamb never attempted to contact this witness to testify.

## AFFIDAVIT OF SERVICE

**STATE OF NEW YORK)**
                                       **)ss.:**
***COUNTY OF CLINTON)***

Anthony Rucano, being first duly sworn, deposes and says:

That I am the petitioner, herein, and that on the date of notarization indicated below, I have placed in a sealed postpaid wrapper a true and exact copy of the enclosed papers identified as Notice of Motion and Affidavit in Support of Motion to Expand the Appellate Record, addressed to the Second Department, Appellate Division and parties below, by depositing the same in a mail box here under the care, custody and control of Clinton Correctional Facility, P.O. Box 2001 Dannemora N.Y. 12929, for delivery to the United States Postal Service:

TO:  Richmond County District
      Att: Appeals Bureau
      Attorneys Office
      130 Stuyvesant Place
      Staten Island, N.Y. 10301

Warren S. Landau
Appellate Advocates
Associate Appellate Counsel
2 Rector St., 10th Floor
New York, N.Y. 10006

*Sworn to before me this* 10

*day of* Sept *2013.*

Harry DeDuran
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires

*NOTARY PUBLIC*

_____
Anthony Rucamo

**Anthony Rucano, 11A0528**
***Clinton Correctional Facility***
***P.O. Box 2001***
***Dannemora, NY 12929***

*-14-*

WHEREFORE, your deponent prays for an ORDER enlarging the record on appeal to include the complete transcript of the grand jury testimony of the complainant when only 4 pages were included as part of the record; Official Court Transcripts of July 7, 2010, July 16, 2010 and ~~October 5~~, August 10th a.R. 2010 that relate to the handwriting expert and also relate to hearings, motions and matters which already appear on the record; Affidavits and Court Exhibits of Retained Forensic Document Examiner Robert Baier, Diary entries that Mr. Baier's reports were based on, Letter of Opinion of Ms. Montoya and the affidavit and email from uncalled witness Steve Frankl; to fully develop these issues on direct appeal with a full and fair opportunity to litigate them before the Honorable Court, and for such other and further relief as this Court may deem just and proper.

_Anthony Rucano_

Clinton Correctional Facility

P.O. Box 2001

Dannemora, N.Y. 12929

Sworn to Before Me this _10_

Day of _Sept_ , 2013

Notary Public

Harry D. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified In Clinton County
Commission Expires _6/30/N_

-14-

At a term of the Supreme
Court of the State of New
York, held in and for the
County of _____, at
_____, New York, on the
____day of _____, 2013_

Present: Hon. _____, Justice.

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION SECOND DEPARTMENT

---

THE PEOPLE OF THE STATE OF NEW YORK,
                              Plaintiff-Respondent,

          - against -

ANTHONY RUCANO,
                              Defendant-Appellant

---

**O R D E R**

Ind. # 270/09
Appellate Division Case #

2011-01960

The Plaintiff-Appellant, Anthony Rucano in this action, having duly moved for an Order enlarging the record on appeal in the above-entitled action, upon the ground that the Defendant, Anthony Rucano, seeks to have a full and fair opportunity to have the Appellate Court Review Claims of Prosecutorial Misconduct and the Ineffective Assistance of Counsel of constitutional dimensions based on a full, complete and accurate record, and after due deliberation having been held thereon.

**NOW**, upon reading and filing the Motion dated _____, 2013, the affidavit in Support of Motion of Anthony Rucano, sworn to on the ____ Day of _____, 2013, in support of the motion, and the affidavit of _____, sworn to on the ____ Day of _____, 2013, in opposition to the motion, and all the papers filed herein, and after due deliberation having been held thereon,

**NOW**, upon the decision of this Court dated _____, 2013, and upon the motion of Anthony Rucano, the Defendant-Appellant preceding Pro Se herein it is,

**ORDERED** that the motion be and the same is hereby in all respects granted, and it is further,

**ORDERED** that the record on appeal should include the following records _____

_____
_____, and it is further,

**ORDERED** that the Clerk of the Court prepare and/or inform the parties to submit the appropriate certification of stipulation of the appellate record to be filed with the Court.

Dated: _____          Enter,

                                        _____
                                        Justice of Supreme Court

1

# **EXHIBIT LIST**

Items Underlined in Red Already Part of Appellate Record

Exhibit "A" - Four (4) Pages of Grand Jury Testimony Included in Appellate Record

Exhibit "B" - Letter from ADA Katchen dated June 21, 2010

Exhibit "C" - Omnibus motion Decision and Order dated December 17, 2009

Exhibit "D" - Complete Copy of Complainant's Grand Jury Testimony Provided by Trial

Attorney Eugene Lamb. Received by Appellate Advocates October 18, 2011

Exhibit "E" - Forensic Document Examiner Robert Baier's original and supplemental report

Exhibit "E1"- Complainant's Diary Entries Labeled Q1 – Q6 and Court Exhibits Received by Appellate

Exhibit "F" - Letter from ADA Katchen dated June 30, 2010     Advocates on October 18, 2011

Exhibit "G" - Affidavits of Robert Baier - Received by Appellate Advocates October 18, 2011

Exhibit "H" - Affidavit and Email of Steve Frankl

Exhibit "I" - July 7, 2009 Transcript     } Recently Received

Exhibit "J" - July 16, 2009 Transcript

Exhibit "K" - Forensic Handwriting Expert Letter of Opinion from Treyce d'Gabriel Montoya

Provided to Appellate Advocates January-February 2012

Provided for Reference

October 5th 2010 Transcript, concerning Handwriting Expert

DISTRICT ATTORNEY
RICHMOND COUNTY
RECEIVED

Anthony Rucano 11A0528
Clinton Correctional facility
P.O. Box 2001
Dannemora, N.Y. 12929
Docket No. 2010RI009374
October 16th, 2013

2013 OCT 25 P 2: 51

Appendix Item H

To Chief Clerk Paul Kenny,

Good Morning. On October 9th, 2013, I received a letter from my appellate attorney Paul Wiener of the Legal Aid Society with a copy of the appellate brief filed with the court in the above mentioned docket number.

Enclosed is an Ex-Parte motion for permission to file a supplemental pro-se brief in this matter. Proof of service is enclosed showing that it was served on the Richmond County District Attorneys Office, Appeals Bureau, and also upon my appellate counsel Mr. Wiener.

I formally request that this motion be presented to the Honorable Court. God Bless you and Thank you for your time and consideration concerning this matter.

Respectfully Yours

*Anthony Rucano*

cc: Richmond County District Attorneys Office
    Paul Wiener, The Legal Aid Society

Anthony Rucano, Pro-Se

SUPREME COURT OF THE STATE OF NEW YORK
SECOND JUDICIAL DEPARTMENT : APPELLATE TERM
------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK, :
                               :
                               :   EX-PARTE MOTION
           -against-           :   TO FILE SUPPLEMENTAL
                               :   BRIEF PRO SE.
                               :
ANTHONY RUCANO,                :   DOCKET NO.
      Defendant-Appellant.     :   2010RI009374
                               :
------------------------------------X

**PLEASE TAKE NOTICE**, that upon the annexed affidavit of Anthony Rucano, sworn to on the _17th_ day of _October_, 2013, and upon all the proceedings in this case, an ex-parte motion to file a supplemental pro-se brief will be made to a term of this Court to be held at the courthouse thereof, located at 141 Livingston St, City of Brooklyn, County of Kings, N.Y., for an ORDER granting permission for defendant-appellant to file a supplemental pro-se brief, upon the ground that the Plaintiff, proceeding pro-se and being a laymen in the matters of law and procedure; plans to raise issues in his supplemental pro-se brief on the separate points that the accusatory instrument was jurisdictionally defective based on all the counts in the felony complaint, when appellate counsel only pursued that point on 1 count of the complaint, in that all 4 counts

*1*

have insufficient factual allegations to support them and are facially deficient per C.P.L. § 100.40 (4) (a) (b); that appellate counsel either failed to address or was informed of and has declined to pursue for various reasons.

Dated: October 16th, 2013

Location: Dannemora, N.Y

*Anthony Rucano*
[Defendant-Appellant]

To: Steven Banks
**[The Legal Aid Society]**
**[Criminal Appeals Bureau]**
Att: Paul Wiener

199 Water st., 5th Fl

New York, N.Y. 10038

Anthony Rucano, 11A0528

Clinton Corr. Facility

P.O. Box 2001

Dannemora NY 12929

**Chief Clerk Paul Kenny**

**Supreme Court, Appellate Division**

**141 Livingston Street, 15th Floor**

**Brooklyn, N.Y. 11201-5133**

SUPREME COURT OF THE STATE OF NEW YORK
SECOND JUDICIAL DEPARTMENT : APPELLATE TERM
------------------------------------X
                           :
THE PEOPLE OF THE STATE OF NEW YORK,:
                           :  AFFIDAVIT IN SUPPORT
                           :  OF EX-PARTE MOTION
     -against-              :  TO FILE SUPPLEMENTAL
                           :  BRIEF PRO SE.
                           :
ANTHONY RUCANO,            :
     Defendant-Appellant.   :  DOCKET NO.
                         :  2010RI009374
------------------------------------X

STATE OF NEW YORK   )
                 )ss.:
COUNTY OF CLINTON   )

    I, Anthony Rucano, having been duly sworn, deposes and says:

    1.   That I am the Defendant-Appellant in the above-entitled action and I make this affidavit in support of my ex-parte motion to file a Supplemental Brief, Pro Se, on appeal from a judgment of conviction rendered the 21st, day of July, 2011, in the Criminal Court, County of Richmond, Staten Island, N.Y. 10301.

    2.  Subsequent to the judgment of conviction, Defendant-Appellant filed a timely Notice of Appeal and requested to proceed as a Poor Person pursuant to Sections 1101, 1102 of the Civil Practice Law and Rules of the State of New York, and this Court, on July 6, 2012, granted appellant leave to appeal as a poor person on the original

record and assigned Steven Banks of The Legal Aid Society to perfect instant appeal, with Paul Wiener of Counsel.

3. Since Paul Wiener Esq., has been appointed, Defendant-Appellant has contacted counsel and has been informed of the substantive issues that will be presented in the brief prepared by counsel on behalf of Defendant-Appellant, and counsel has also provided me with a copy of said brief which was filed in October of 2013.

4. Defendant-Appellant being a laymen of in the matters of law and procedure, has discovered other errors that were never addressed by appellate counsel Paul Wiener, which include that the accusatory instrument was jurisdictionally defective based on all the counts in the felony complaint, when appellate counsel only pursued that point on 1 count of the complaint, in that all 4 counts have insufficient factual allegations to support them and are facially deficient per C.P.L. § 100.40 (4) (a) (b).

5. I submit this brief to insure that these issues that appear on the record that have potential meritorious claims, which my appellate counsel did not discover or decided not to raise; are preserved for further appellate review.

**WHEREFORE**, it is respectfully prayed for that this Court grant Defendant-Appellant's motion to permit him to file a pro se Supplemental Brief, an enlargement of time to perfect said Supplemental Brief and to provide a copy of the Certified Record from the proceedings had in the below court, and for such other and further relief as to this court, may seem just and proper.

Respectfully Submitted,

X _Anthony Rucano_
Defendant-Appellant Pro Se
Anthony Rucano, 11A0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, N.Y. 12929

Sworn to before me this ‾17‾
day of _October_ , 2013.

_Melissa M. Rendle_
NOTARY PUBLIC

MELISSA M. RENDLE
Notary Public State of New York
No. 01RE6252319
Qualified in Clinton County
Commission Expires 12/5/15

-3-

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

**Appendix Item I**

PEOPLE OF THE STATE OF NEW YORK,

                      Plaintiff-Respondent,

    -against-

ANTHONY RUCANO,

_____Defendant-Appellant

**AFFIRMATION IN SUPPORT**

AD Docket No. 11-01960

Richmond Co. Ind. No. 270/09

Mot. Ret. Date: 11/08/13

WARREN S. LANDAU, an attorney duly admitted to practice law before the Courts of the State of New York, does hereby affirm, under penalty of perjury, the truth of the following:

1.    I am an associate appellate counsel with Lynn W. L. Fahey, of Appellate Advocates, attorney of record for appellant. As such, and by virtue of records and documents maintained by this office, I am fully familiar with the facts and circumstances set forth herein. I am personally familiar with the procedural facts insofar as they occurred following my assignment to this matter.

2.    I make this affirmation in support of appellant's motion to enlarge the record to include certain items he identifies in his motion.

3.    Appellant appealed from a January 21, 2011, judgment of the Supreme Court, Richmond County, convicting him, after a jury trial, of first-degree rape, first-degree criminal sexual act, attempted first-degree rape, second-degree felony assault, third-degree criminal possession of a weapon, and third-degree assault, and sentencing him to concurrent prison terms, the longest of which was 12 years (Rooney, J., at trial and sentence).

4.    On April 12, 2011, this Court deemed appellant's poor person motion to be a timely notice of appeal and, on August 18, 2011, it granted appellant leave to appeal as a poor person, and assigned Lynn W. L. Fahey as appellate counsel. Appellant had no co-defendants. He is currently

2013 NOV -6   DISTRICT ATTORNEY RICHMOND COUNTY RECEIVED

incarcerated pursuant to the judgment and sought no stay.

5.     I was designated by Ms. Fahey to prosecute appellant's appeal.  On June 28, 2013, appellant filed his extensive main brief.  Between August 21 and 23, 2013, the People filed and served their 59-page answering brief.  Appellant has sought permission to file a supplemental pro se brief and, in connection with that, has moved to enlarge the record on appeal.

6.     As to most of appellant's requests, I have no comment and take no position. However, it seems that appellant has procured transcripts of at least 2 additional proceedings in this matter before the trial court, which took place on July 7 and 16, 2009.  He represents that those transcripts are relevant to issues he intends to argue in his supplemental brief.  Transcripts of proceedings before the trial court on the matter under review are inherently part of the record on appeal.  Thus, this Court should enlarge the record to include the transcripts appellant identified and direct that the appeals clerk of the lower court provide the originals to the Clerk of this Court.

7.     Appellant also comments that he will argue a Grand Jury proceedings point and asks the Court to enlarge the record to include the transcript of the complainant's testimony there.  The proceedings before the Grand Jury are likewise part of the record on appeal.  Thus, even if the Court declines to direct that appellant be provided copies of the Grand Jury transcripts he lacks, it should direct the People to provide the Clerk of the Court complete copies thereof.  See People v. Jiminez, 223 A.D.2d 558 (2d Dept. 1996).

WHEREFORE affirmant respectfully urges this Court to grant appellant's motion as to the transcripts of proceedings before the lower court that he has identified and the transcripts of the entirety of the Grand Jury proceedings and direct the production of those transcripts;  and affirmant takes no position as to the balance of appellant's motion.

Dated: October 31, 2013
     New York, NY

                    WARREN S. LANDAU

*Appendix Item J*

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

FILE

THE PEOPLE OF THE STATE OF NEW YORK,

AFFIRMATION IN
RESPONSE TO
DEFENDANT'S MOTION

-against-

A.D. No. 2011-01960

ANTHONY RUCANO,

*Defendant-Appellant.*

Richmond County Ind. No.
270/09

Paul M. Tarr, an attorney admitted to practice before the courts of this state, affirms that:

1.     I am an Assistant District Attorney, of counsel to DANIEL M. DONOVAN, JR., District Attorney of Richmond County. I am familiar with the records on file in the District Attorney's Office pertaining to this indictment, and make this affirmation based upon my examination and review of those documents.

2.     I submit this affirmation in response to defendant's pro se motion to expand the record on appeal to include: the complete transcripts of the grand jury proceedings and various other court appearances; transcripts regarding the testimony of a handwriting expert; affidavits by, diary entries of, and court exhibits relating to a forensic document examiner; a letter of opinion from a handwriting expert; the affidavit of an uncalled witness named Steve Frankl; and, as set forth in defendant's supplemental affidavit, the session notes of a social worker who interviewed defendant and the victim.

3.     In this matter, defendant appeals from a judgment of the Supreme Court, Richmond County (Rooney, J.) rendered on January 21, 2011, convicting him, upon a jury verdict, of Rape in the First Degree [P.L. § 130.35(1)], Criminal Sexual Act in the

1

First Degree [P.L. § 130.50(1)], Attempted Rape in the First Degree [P.L. §§ 110.00/130.35(1)], Assault in the Second Degree [P.L. § 120.05(6)], Assault in the Third Degree [P.L. § 120.00(1)], and Criminal Possession of a Weapon in the Third Degree [P.L. §§ 265.01(2), 265.02(2)]. Defendant was sentenced to an aggregate term of 12 years imprisonment, to be followed by five years of post-release supervision. The defendant is presently incarcerated pursuant to this judgment.

4.      In June of 2013, defendant's appellate counsel, Warren S. Landau, Esq., filed the Appellant's Brief in this Court. On August 20, 2013, the People filed their Respondent's Brief.

5.      On August 9, 2013, defendant moved pro se to file a supplemental brief, and on September 9, 2013, he filed a supplemental affidavit in support of this motion. Neither the People nor defendant's appellate counsel has filed opposition to the motion, and this Court has not yet ruled on it.

6.      On September 10, 2013, defendant filed this pro se motion to enlarge the appellate record and on October 15, 2013, he filed a pro se supplemental affidavit in support of this motion. To date, defendant's appellate counsel has not filed a response.

7.      The People maintain that that branch of defendant's motion to expand the record to include certain transcripts must be denied as unnecessary, as the minutes of proceedings are already part of the record on appeal.

8.      The People oppose the balance of defendant's request because the materials he seeks do not appear to have been introduced as evidence at trial and are dehors the record. This Court may not consider such materials as part of the appellate record. People v. Jenkins, 81 A.D.3d 662, 663 (2d Dept. 2011) ("Since the record is

bereft of any evidence that [the contested evidence] was actually received by the Supreme Court, the defendant's contention is based on matter dehors the record, and therefore is not properly before us on direct appeal"); see also People v. Jackson, 241 A.D.2d 341, 342 (1st Dept. 1997) ("[A]ll of the evidence defendant relies on in support of his claims is dehors the record, precluding appellate review.") (citing People v. Charleston, 54 N.Y.2d 622, 623 (1981)).

9.     To the degree that defendant requests these materials in order to support a claim of ineffective assistance of trial counsel – as he appears to do – his motion should be denied.   Such a claim based on non-record evidence can be presented only in the context of a post-conviction CPL Article 440 motion. See People v. Williams, 2012 WL 231262, *1 (App. Term 2d Dept. 2012) ("To the extent that defendant's contention that he was denied the effective assistance of counsel rests on matters outside the record, we find that it is not reviewable on direct appeal as it implicates matters . . . which are dehors the record on appeal.   Defendant was required to raise this contention in a CPL 440.10 motion so that it could have been evaluated upon a complete record.") (citing People v. Rivera, 71 N.Y.2d 705, 709 (1988)).

Dated:  November 7, 2013
        Staten Island, New York.

Paul M. Tarr
Assistant District Attorney

cc:    Mr. Anthony Rucano
       11-A-0528
       Clinton Correctional Facility
       P.O. Box 2001
       Dannemora, NY 12929

3

Appendix Item L

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION, SECOND DEPARTMENT
------------------------------------------X
The People of the State of New York,    :    NOTICE OF MOTION

    Plaintiff(s)-Respondent(s),    :    TO RESETTLE OR AMEND

                            :    PURSUANT TO 22 NYCRR

      -against-    :    § 670.6(a)

                            :

                            :    INDICTMENT NO. 270/09

ANTHONY RUCANO,    :    APPELLATE DIVISION

    Defendant-Appellant.    :    CASE # 2011-01960
------------------------------------------X

    **PLEASE TAKE NOTICE**, that upon the annexed affidavit of
Anthony Rucano, sworn to on the ____ day of _____, 2014,
and upon the annexed affidavit and all the papers and
proceedings heretofore had herein, an application will be made
in the Supreme Court of the State of New York, Appellate
Division, Second Department, County of Kings, located at 45
Monroe Place, Brooklyn, New York, on the ____ day of
_____, 2014, at 10:00 a.m. in the forenoon of that day
or as soon thereafter as the defendant can be heard pro-se for
an Order to Resettle and/or Amend the Decision and ORDER dated
January 6th, 2014, enlarging the record on appeal to include and
provide the defendant with the transcripts of October 1st and
October 5th, 2009; to provide a copy of the August 10th, 2010
transcripts to the defendant, to provide the defendant the Table
of Contents Pursuant to App. Div. Court Rule § 670.10.2(3) and
the Certification of the Record Pursuant to App. Div. Court Rule
§ 670.10(2)(f)(1-3), and to reconsider providing the Couples
Counseling session notes; all which were requested in my
supplemental affidavit in support of motion to enlarge the

record on appeal which this Honorable Court, by its own letter dated January 7th, 2014, admitted that the papers returned to me on December 17th, 2013 was "sent to you in error."

The Defendant, Anthony Rucano, brings these issues before the Honorable Court to clarify the record and enable him to have a full and fair opportunity to have the Appellate Court Review claims of Prosecutorial Misconduct and the Ineffective Assistance of Counsel of constitutional dimensions based on a full, complete and accurate record; and for such other and further relief as may be just proper and equitable.

Pursuant to CPLR 2214(b), answering affidavits, if any, are required to be served upon the undersigned at least seven days before the return date of this motion.

Dated: _____, 2014

Respectfully Submitted

_____
Anthony Rucano, 11A0528

To: Richmond County District
    Attorneys Office
    Att: Appeals Bureau
    130 Stuyvesant Place
    Staten Island, N.Y. 10301

    Warren S. Landau
    Appellate Advocates
    Associate Appellate Counsel
    2 Rector St., 10th Floor
    New York, N.Y. 10006

Anthony Rucano, 11A0528
Clinton Corr. Facility
P.O. Box 2001
Dannemora, N.Y. 12929

-2-

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION, SECOND DEPARTMENT
-----------------------------------------X

The People of the State of New York,          :     AFFIDAVIT IN SUPPORT
                  Plaintiff(s)-Respondent(s)  :     OF MOTION TO RESETTLE
                                              :     OR AMEND PURSUANT TO
        -against-                             :     22 NYCRR § 670.6(a)
                                              :
ANTHONY RUCANO                                :     INDICTMENT NO. 270/09
                  Defendant-Appellant,        :     APPELLATE DIVISION
-----------------------------------------X          CASE # 2011-01960

STATE OF NEW YORK        )
                         ) SS.:
COUNTY OF Clinton        )

        Anthony Rucano, being duly sworn, deposes and says:


        1.  I am a detainee presently being detained at Clinton

Correctional Facility, P.O. Box 2001, Cook st., Dannemora N.Y.

12929

        2.  I am personally familiar with the facts and statements

hereinafter; I am a laymen in the matter of law and seeks this

Court's indulgence for errors defects and faults pursuant to

Section 103(C) and 2101(F) of Civil Practice Law and Rules.

        3.  I am presently preparing a Pro Se Supplemental Brief

to appeal the jury verdict convicting the defendant in the

Supreme Court of New York, County of Richmond, on January 21,

2011.

## Preliminary Statement

4. The defendant brings this motion for an Order to Resettle and/or Amend the Decision and ORDER dated January 6th, 2014, enlarging the record on appeal to include and provide the defendant with the transcripts of October 1st and October 5th, 2009; to provide a copy of the August 10th, 2010 transcripts to the defendant, to provide the defendant the Table of Contents Pursuant to App. Div. Court Rule § 670.10.2(3) and the Certification of the Record Pursuant to App. Div. Court Rule § 670.10(2)(f)(1-3).

5. Furthermore, I asked the Court to consider providing the Individual and Couples Counseling session notes. This and the above requests were all included in my supplemental affidavit in support of motion to enlarge the record on appeal which this Honorable Court, by its own letter dated January 7th, 2014, admitted that the papers returned to me on December 17th, 2013, were "sent to you in error."

6. Finally, when the defendant had his supplemental affidavit in support of motion to enlarge the appellate record with a "Papers Rejection Notice - Criminal" returned to him with a handwritten note stating "Please make a separate motion for your relief being sought", the defendant resubmitted a motion to enlarge the record which combined the first application

submitted on September 10th, 2013, with the supplemental affidavit in support dated October 15th, 2013. The defendant now realizes this motion crossed in the mail with the Decision and Order, and is under the impression that the Honorable Court **only** considered the original motion dated September 10th, 2013 **because** the supplemental affidavit in support was mistakenly returned to me **and** the relief requested in the supplemental affidavit and renewed motion was never considered in the Court's decision.

7.   It is this confusion and/or overlooking of papers that the defendant is addressing in these moving papers, and seeking to resolve. Once again, this defendant apologizes for any inconvenience and confusion this may have caused, and I want to assure the Court that my only intention is to see justice served by having a full and fair opportunity to proceed on my appeal on a full, complete and accurate record.

## Procedural History

8.  On July 9th, 2013 the defendant submitted an ex-parte motion to file a supplemental pro-se brief to the Honorable Court with proof of service it was sent to my appellate attorney Warren Landau ESQ. of Appellate Advocates.

9.  After receiving notification the motion was calendared with the Honorable Court to be heard on August 30th, 2013, I received a letter from Anne Grady of the Richmond County

District Attorneys Office informing me that they had requested an extension of time to respond to said motion.

10. The defendant immediately wrote the Honorable AprilAnne Agostino, Clerk of this Court, requesting permission to file an Amended Application for Permission to File a Supplemental Pro-Se Brief and for an extension of time to do so; as the defendant had discovered important and substantive issues to be raised which were omitted from his first application. The defendant sent a copy of this to the Anne Grady of the Richmond County District Attorneys Office as well in which she responded and did not oppose.

11. The defendant submitted his Amended Affidavit in Support of Motion to File Supplemental Pro-Se Brief on September 3rd 2013. Shortly after submitting it, the defendant received a letter ORDER from the Honorable Court granting permission to file an Amended Motion to File Supplemental Pro-Se Brief by October 18th, 2013.

12. On September 10th, 2013, the defendant submitted a Motion to Enlarge the Record which had a return date of October 4th, 2013, after being informed his motion to file a supplemental Pro-se Brief was calendared for November 8th, 2013.

13. On October 15th, 2013, the defendant submitted a supplemental affidavit in support of motion to enlarge the record, which was stamped received by the Second Department,

-6-

Appellate Division on October 22nd, 2013. This was done to clarify the relief sought and to add requests that this Pro-Se litigant thought would provide context to his direct appeal record.

14. Almost 2 months later on December 20th, 2013, the defendant received a large manila envelope postmarked December 18th, 2013. (Ex. "A") Inside this envelope was a returned copy of an opposition to defendant's cross motion to dismiss and reply to plaintiff's motion to enlarge time, App. Div. Docket # 2013-03360. This motion was notarized and mailed to the court on December 10th, 2013 with an affidavit of service. This motion has already been decided.

15. Also inside the envelope received on December 20th, 2013 was a "Papers Rejection Notice – Criminal" (Ex. "B"), a copy of a Letter sent to Clerk AprilAnne Agostino dated October 16th, 2013 (Ex. "C") and a copy of my supplemental affidavit in support of motion to enlarge the record notarized on October 15th, 2013, App. Div. Docket # 2011-01960 (Ex. "D"). Both the letter and the motion are stamped received by the Appellate Division, Second Department on October 22nd, 2013 at 9:22 a.m.

16. As the Papers rejection Notice was marked "Criminal", I concluded the short handwritten note on the bottom stating "Please make a separate motion for your relief being sought" was

applicable to the supporting affidavit in support of motion to enlarge the record.

17. This defendant, proceeding Pro-Se and being a laymen in the matters of law and procedure, considered this vague handwritten note to mean the Honorable Court wanted this defendant to submit one "separate motion" seeking relief to enlarge the record. Upon review of both motions I realized the unnecessary confusion and additional work this caused the court in seeking this relief, so I combined both motions into one, correcting, streamlining and organizing it for the Honorable Court to relive any confusion and unnecessary work.

18. This renewed affidavit in support of motion to enlarge the record was submitted on January 2nd, 2014 with a return date of January 31st, 2014. This motion combined the original motion dated September 10th, 2013 with the supplemental affidavit in support of motion to enlarge the record submitted October 15th, 2013, which was returned to me in the large manila envelope postmarked December 18th, 2013 (Ex "A"). A copy of the letter and motion returned to me is labeled and attached as Ex. "B" and Ex. "C".

19. The supplemental affidavit in support of motion to enlarge the record clarified the request of the **October 1st, 2009** and **October 5th, 2009** transcripts of my arraignment and 180/80 (Felony Hearing) dates, my request for the Table of Contents per

2nd Dept. Rule § 670.10.2(3) and the Certification of the Record per 2nd Dept. Rule § 670.10.2(f)(1-3).

20   I would like to note that defendant's supplemental affidavit in support of motion to enlarge the record, which was recently returned to me, ~~specifically~~ asked for the October 1st, 2009 and October 5th, 2009 transcripts; and these transcripts were provided to the Honorable Court. As this Honorable Court has already issued an ORDER directing that a transcript of the Grand Jury proceeding be delivered under seal to the Justices of this Court, the transcripts of my arraignment on October 1st, 2009, which occurred 3-6 hours **after** a Grand Jury was convened and heard the complete testimony of the complainant, and the transcripts of October 5th, 2009, in which the representative of the ADA's Office and the Honorable Judge Desmond Green had no knowledge of impeding Grand Jury Action at 2:15 p.m. that day for the second time in 3 business days; are intrinsically intertwined with the course of pervasive misconduct pursued by the District Attorney's at the Grand Jury. (See Amended Affidavit in Support of Ex-Parte Motion to File a Supplemental Brief pro-Se on File with this Court dated September 3rd, 2014, Pgs. 2-4 at 4[a][i-viii]). That being the case, the failure to include these transcripts as part of the appellate record, where no opposition papers were submitted to **either** of my motions to enlarge the record by the Richmond County District Attorney, and

no prejudice would ensue; would defeat the adversarial process and the pursuit of justice in providing this defendant with a full and accurate record on appeal.

21. If the Court would like to further clarity, this Pro-Se defendant was able to expound on this point with more detail in his renewed motion to enlarge the record, notarized on January 2nd, 2014 and crossing in the mail with this Honorable Court's Decision and Order (See Renewed Motion to Enlarge the Record, Pgs. 7-10 at ¶ 15-24).

22. I also provided an individual session note of the complainant released as Brady material during the trial proceedings dated July 21st, 2009, and Couples Counseling Session Notes Dated July 28th, 2009, August 11th, 2009 and September 22nd, 2009, which confidentiality was waived by myself and complainant on the record and were released to both parties. The Honorable Judge Rooney never marked these session notes as Court exhibits, and regardless of that error they should be part of the certified record on appeal.

23. To add to the confusion, on January 9th, 2014, I received a letter dated January 2nd, 2014, but postmarked January 7th, 2014, listing 2 Appellate Division Docket Numbers which are currently pending before the court, Rucano v. Lorusso-Moramarco, 2013-03360 and Matter of Rucano v. Richmond County District Attorney, 2013-03363.

24.  In this letter the "Clerk's Office" stated we are returning papers dated December 10th, 2013, received here December 17th, 2013, seeking to supplement the papers submitted on the subject motions as they were received after the return date.

25.  The papers returned consisted of a handwritten letter dated December 10th, 2013, informing the court I never received a copy of the court rules I requested, informed the court of a pending submission of a cross-motion and also informed the court of the denial of poor person applications by this Court, which were now being appealed to the court of appeals. Copies of these papers are enclosed for your review. (Ex. "E")

26.  On January 13th, 2014, I received a letter dated January 7th, 2014 in an envelope with a copy of the App. Div. Second Department Court Rules, postmarked January 9th, 2014. The letter referred to my criminal case, App. Div. Case # 2011-01960 (Ex "F").

27.  The letter informed me that the "letter dated January 2nd, 2014, **a copy of which is enclosed**, returning the papers received here on December 17th, 2013, **was sent to you in error**. We retained a copy of these papers for our files, therefore you do not need to return them."

28.  To clarify this for the Court, I did **not** receive a copy of the letter dated January 2nd, 2014 with the Court Rules

which I was told was enclosed. The letter dated January 2nd, 2014 did **not** refer to case # 2011-01960. That being the case, this defendant took that to mean that the Court was referring to the return of the papers (Ex. "B" and "C") received in the large manila envelope postmarked December 18th, 2013 (Ex "A"), which was papers referring to civil case Docket # 2013-03360 and criminal case docket # 2011-01960.

29.   Since this letter **did** refer to App. Div case # 2011-01960, with said supplemental affidavit in support of motion to enlarge the record being returned to me with the vague handwritten note "Please make a separate motion for your relief being sought", this defendant concluded it was this motion that was returned in error.

30.   Finally, I received a Decision and Order dated January 6th, 2014 on my motion for permission to file a supplemental pro-se brief and motion to enlarge the record, which was also postmarked January 7th, 2014, but incorrectly mailed to Downstate Correctional Facility (Ex. "G"). I received this letter on January 13th, 2014.

31.   I was granted permission to file a supplemental pro-se brief, and directed to file nine copies with the Court and 1 copy with the District Attorney by April 7th, 2014.

32.   I was granted the following relief on my motion to enlarge the record:

A) That the transcripts of July 7th, 2010, July 16th, 2010 and August 10th, 2010 be included as part of the appellate record, with directions for the clerk of the trial court to prepare and submit 2 copies, with one being served on the clerk of the appellate court.

B) Ordered that on or before January 20th, 2014, the District Attorney shall file a copy of the Grand Jury Proceedings under seal to the appellate Court, for in-camera review.

C) Ordered that the motions are otherwise denied.

33. The defendant respectfully requests that this Honorable Court, based on the preceding information hereby sworn to, Resettle and/or Amend their Decision and Order dated January 6th, 2014 enlarging the record to include the additional following relief:

A) Ordered that the branch of the motion which is to enlarge the Judgment Roll to include the transcripts of the proceedings which occurred on October 1st, 2009 and October 5th, 2009, ; is Granted, and it is further,

B) Ordered that the Decision and Order on Motion of this Court dated August 18th, 2011, which Granted Poor Person relief to the appellant is amended to include a direction to the court reporter to make, certify and file transcripts of the stenographic minutes of the proceedings

*-13-*

which occurred October 1st, 2009 and October 5th, 2009, if they are available; and it is further

C) Ordered that the stenographer is directed to make, certify and file such minutes within 45 days of the date of this decision and order on motion, and the Clerk of the trial court shall furnish one copy to the Clerk of this Court, without charge (see CPL 460.70...)

34. The defendant does **not** possess the stenographic transcripts for August 10th, 2010, so I would respectfully request that the Honorable Court issue an additional order to the Clerk of the Court to provide me with a copy.

## Extenuating Circumstances in Support of Motion to Resettle/Amend the Decision and Order of January 6th, 2014

35. It was only after Appellate Counsel Mr. landau wrote me a letter dated October 23rd, 2013 (Ex. "H") acknowledging receipt of my letter and supplemental affidavit to enlarge the record that he submitted an affirmation in partial support of my motion to enlarge the record, which was dated October 31st, 2013 (Ex. "I"). As my supplemental affidavit and Mr. Landau's affirmation in support were both received in a timely fashion before the return date of November 8th, 2013, my supplemental affidavit in support should have been accorded due consideration

-14-

in the Honorable Court's Decision and Order dated January 6th, 2014.

36. Although Mr. Landau admits in his letter (Ex. "H") that "transcripts of proceedings in the Supreme Court, upon one's indictment, or in the criminal court, leading up to the indictment (October 1st, 2009 and October 5th, 2009), should normally be made part of the record on appeal, on request, if transcripts are available" [Emphasis Added], Mr. Landau neglected to provide any support to include transcripts "in the criminal court, leading up to the indictment", in his affirmation in support to enlarge the record on appeal (Ex. "I"). The transcripts of October 1st and October 5th, 2009, were provided to the Honorable Court with his supplemental affidavit in support of motion to enlarge the record (Ex. "D"), were requested from Mr. Landau repeatedly by me since 2011, and were available as I was able to acquire them myself.

37. Important to note, Mr. Landau admits "Between August 21 and 23, 2013, the People filed and served their 59 page answering brief", in his affirmation in support submitted to the court on October 31st, 2013, yet he has repeatedly ignored my request to provide me with a copy in letters sent to him on October 29th and November 6th, 2013. I also sent a final request on December 26th, 2013, and filed a copy of said letter with

proof of service with the County Clerk Stephen J. Fiala of Richmond County, and this Honorable Court (Ex. "J").

38.  I sent a letter to Attorney in Charge Lynn Fahey of Appellate Advocates, dated December 23rd, 2013, marked personal and confidential, requesting the District Attorney's response to the brief submitted by Mr. Landau and informing her in a detailed 7 page synopsis of the various issues and history revolving around Mr. Landau's representation of me (Ex. "K"). Despite these numerous requests to Mr. Landau and Ms. Fahey, I still have not been provided with the District Attorney's response to my appellate brief, almost 5 months after filing.

39.  I feel it prudent to note that this defendant, upon information and belief, believes the above extenuating circumstances are endemic of appellate counsel's ignorance and/or failure to address, discuss or consider the numerous prosecutorial misconduct and ineffective assistance of counsel issues amounting to "mixed claims" that have been consistently and repeatedly brought to his attention beginning in September 2011, through documentary evidence and supporting affidavits. Considering more then 50% of defendant's cognizable and meritorious issues are mixed claims, appellate counsels failure to address them cannot be said to be that of an advocate with an eye benefiting his client.

40      The defendant would like to bring to the Courts attention People v. Maxwell, 933 N.Y.S.2d 386, 89 A.D.3d 1108 (2nd Dept. 2011), which is analogous to the defendants case, where it was stated "In this case since some of the defendant's allegations of ineffectiveness involve matters appearing on the record, while others involve matters that are outside the record. The defendant has presented a "mixed claim" of ineffective assistance (People v. Evans, 16 N.Y.3d 571, 575 n. 2, 925 N.Y.S.2d 366, 949 N.E.2d 457, cert. denied --- U.S. ---, 132 S.Ct. 325, --- L.Ed.2d --- 2011 WL 4536210, 2011 U.S. LEXIS 6439) In order to properly review a defendant's claim of ineffective assistance, a court must consider all of his or her allegations — as well as the evidence the law, and the circumstances of the case — "in totality" (People v. Baldi, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400). Thus, where, as here, a defendant presents a mixed claim of ineffective assistance that depends, in part, upon matters that do not appear on the record, it cannot be said that "sufficient facts appear on the record with respect to the ground or issue raised upon such motion to permit adequate review thereof upon such an appeal" (CPL 440.10[2] [b]).

## Conclusion

41.   The defendant would like to remind the Honorable Court that in his Amended Motion to file a supplemental pro-se brief, I asked the Honorable Court to provide me with a copy of the certification of the appellate records from the court below. Furthermore, in my supplemental affidavit in support of motion to enlarge the record I also asked for the Table of Contents for the record on appeal Pursuant to § 670.10.2 (3) and Certification of the Record Pursuant to § 670.10.2 (f)(1-3). (See Exhibit "D", Pg. 3-4 at ¶ 11)

42.   Without these documents listing, clarifying and certifying the record on appeal, this pro-se defendant will be unable to verify that he possesses a complete record to prepare and submit his supplemental pro-se brief.

43.   I respectfully request this Honorable Court to resettle an/or Amend their Decision and Order dated January 6th, 2014, to provide this defendant with the requested transcripts, Table of Contents, Certification of the Record on Appeal and People's response to Mr. Landau's Appellate brief; so he may verify he has a complete and accurate copy of the record on appeal, or alternatively; to provide the defendant with a complete court certified record on appeal which would be

returned once I have perfected and submitted my supplemental pro-se brief.

### Request For Memoranda Decision and Order

44. The defendant requests that the Court consider issuing a memoranda decision and ordery to expound on the decision reached based on facts and law in denying relief to enlarge the judgment roll for the items the defendant requested to made part of the record on appeal. This would include relief requested in his motion to enlarge the record dated September 13th, 2013 **and** his supplemental affidavit dated October 15th, 2013.

45. The defendant requests this from the Court to have a clear record for the court's ruling based on the merits of his motions, in the event they should be reviewed by the Court of Appeals or the Federal Court in any future possible proceeding.

46. This would prevent any unnecessary waste of judicial resources in the future if this matter were to be reviewed and remitted for a more definite statement based on the merits. Requesting this relief now while seeking a motion to Resettle or Amend would be in the interest of Judicial Economy.

47. My goal is to seek a full and fair opportunity to have my direct appeal reviewed on a complete and accurate record, to enable the Honorable Court to consider all of my allegations — including the evidence, the law and the circumstances of the case in the proper context and "in totality."

WHEREFORE, your deponent prays for an ORDER enlarging the record on appeal to include the Official Court Transcripts of October 1st, 2009, and October 5th, 2009, and to provide a copy of the August 10th, 2010 transcripts to the defendant. The defendant also requests the Court issue an ORDER to the Clerk of the Court directing him to provide the defendant the Table of Contents Pursuant to App. Div. Court Rule § 670.10.2(3) and Certification of the Record Pursuant to App. Div. Court Rule § 670.10(2)(f)(1-3); and to reconsider providing the Couples Counseling session notes which were released during trial but not marked as Court exhibits.

This will enable this defendant to develop these issues on direct appeal with a full and fair opportunity to litigate them before the Court, and for such other and further relief as this Court may deem just and proper.

_____
Anthony Rucano, 11A0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, N.Y. 12929

Sworn to Before Me this _____
Day of _____, 2014

_____
Notary Public

*-20-*



SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

               Plaintiff-Respondent,

    -against-

ANTHONY RUCANO,

               Defendant-Appellant

**AFFIRMATION IN SUPPORT**

AD Docket No. 11-01960

Richmond Co. Ind. No. 270/09

Mot. Ret. Date: 2/28/14

    WARREN S. LANDAU, an attorney duly admitted to practice law before the Courts of the State of New York, does hereby affirm, under penalty of perjury, the truth of the following:

    1.    I am an associate appellate counsel with Lynn W. L. Fahey, of Appellate Advocates, attorney for appellant. As such, and by virtue of records and documents we maintain, I am fully familiar with the facts set forth herein. I am personally familiar with the procedural facts insofar as they occurred following my assignment to this matter. I submit this affirmation in support of appellant's motion to enlarge the record to include certain items he identifies.

    2.    Appellant appealed from a January 21, 2011, judgment of the Supreme Court, Richmond County, convicting him, after a jury trial, of first-degree rape, first-degree criminal sexual act, attempted first-degree rape, second-degree felony assault, third-degree criminal possession of a weapon, and third-degree assault, and sentencing him to concurrent prison terms, the longest of which was 12 years (Rooney, J., at trial and sentence).

    3.    On April 12, 2011, this Court deemed appellant's poor person motion to be a timely notice of appeal and, on August 18, 2011, it granted appellant leave to appeal as a poor person and assigned Lynn W. L. Fahey as appellate counsel. Appellant had no co-defendants. He is currently incarcerated pursuant to the judgment and sought no stay.

4.     I was designated by Ms. Fahey to prosecute appellant's appeal.  On June 28, 2013, appellant filed his main brief.  Between August 21 and 23, 2013, the People filed and served their answering brief.  Appellant has been granted permission to file a supplemental pro se brief and, relatedly, he moved to enlarge the record.  On January 6, 2014, this Court granted the motion, in part.

5.     As to a number of appellant's requests, I have no comment and take no position.  However, beyond the transcripts the Court directed be produced in its January 6, 2014, order, appellant has identified additional transcripts that, he represents, would be relevant to issues he intends to argue in his supplemental pro se brief.  The proceedings for which he requests transcripts took place on October 1 and 5, 2009.  As appellant explained in his moving papers, he unsuccessfully sought to supplement his prior motion by requesting these items.  However, his supplemental request apparently was not included among the moving papers that resulted in the Court's January 6, 2014, order.  Thus, this Court should enlarge the record to include the transcripts appellant has identified and direct that the appeals clerk of the lower court provide the originals to the Clerk of this Court.  The Court should also direct the Clerk of the Court to provide appellant, at the appropriate time, copies of these transcripts and the other transcripts the Court ordered produced.

WHEREFORE affirmant respectfully urges this Court to grant appellant's motion as to the transcripts of proceedings before the lower court that he has identified and direct that copies thereof be provided to appellant at the appropriate time;  and affirmant takes no position as to the balance of appellant's motion.

Dated: February 24, 2014
         New York, NY

WARREN S. LANDAU



SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

ANTHONY RUCANO,

*Defendant-Appellant.*

FILE

AFFIRMATION IN
RESPONSE TO
DEFENDANT'S
SUPPLEMENTAL MOTION

A.D. No. 2011-01960

Richmond County Ind. No.
270/09

Paul M. Tarr, an attorney admitted to practice before the courts of this state, affirms that:

1.     I am an Assistant District Attorney, of counsel to DANIEL M. DONOVAN, JR., District Attorney of Richmond County.  I am familiar with the records on file in the District Attorney's Office pertaining to this indictment, and make this affirmation based upon my examination and review of those documents.

2.     I submit this affirmation in response to defendant's pro se supplemental motion to expand the record on appeal to include: the complete transcripts of the grand jury proceedings and various other court appearances; transcripts regarding the testimony of a handwriting expert; affidavits by, diary entries of, and court exhibits relating to a forensic document examiner; a letter of opinion from a handwriting expert; the affidavit of an uncalled witness named Steve Frankl; and, as set forth in defendant's supplemental affidavit, the session notes of a social worker who interviewed defendant and the victim.

3.     In this matter, defendant appeals from a judgment of the Supreme Court, Richmond County (Rooney, J.) rendered on January 21, 2011, convicting him, upon a jury verdict, of Rape in the First Degree [P.L. § 130.35(1)], Criminal Sexual Act in the

1

First Degree [P.L. § 130.50(1)], Attempted Rape in the First Degree [P.L. §§ 110.00/130.35(1)], Assault in the Second Degree [P.L. § 120.05(6)], Assault in the Third Degree [P.L. § 120.00(1)], and Criminal Possession of a Weapon in the Third Degree [P.L. §§ 265.01(2), 265.02(2)]. Defendant was sentenced to an aggregate term of 12 years imprisonment, to be followed by five years of post-release supervision. The defendant is presently incarcerated pursuant to this judgment.

4.      On September 10, 2013, defendant filed a pro se motion to enlarge the appellate record and on October 15, 2013, he filed a pro se supplemental affidavit in support of this motion. On October 31, 2013, defendant's appellate counsel, Warren S. Landau, Esq. filed a response in which he argued that certain transcripts of the proceedings before the trial court should be included in the record on appeal, and otherwise took no position.

5.      On November 7, 2013, the People opposed the motion, arguing that: (1) the transcripts at issue are already part of the record on appeal; (2) the rest of material that defendant seeks do not appear to have been introduced as evidence at trial and are thus dehors the record; and (3) to the degree that defendant requests these materials in order to support a claim of ineffective assistance of trial counsel, such a claim can be presented only in the context of a post-conviction CPL Article 440 motion. See Exhibit A at ¶¶ 7-9.

6.      Defendant's instant supplemental motion is, as he explains in a covering letter to this Court, a combination of his September 10, 2013 motion to enlarge the record and his October 15, 2013, pro se supplemental affidavit. He claims that he has resubmitted these materials in combined form for the Court's convenience.

7.     The instant supplemental motion contains no new arguments.  It merely reiterates the arguments previously submitted, expands some of these arguments, and adds a "procedural history" section.  Thus, the People rely on our previous opposition papers, attached hereto as Exhibit A.

Dated:  February 27, 2014
        Staten Island, New York

                                        Paul M. Tarr
                                        Assistant District Attorney

cc:     Mr. Anthony Rucano
        11-A-0528
        Clinton Correctional Facility
        P.O. Box 2001
        Dannemora, NY 12929

3

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

ANTHONY RUCANO,

*Defendant-Appellant.*

**FILE**

AFFIRMATION IN
RESPONSE TO
DEFENDANT'S MOTION

A.D. No. 2011-01960

Richmond County Ind. No.
270/09

Paul M. Tarr, an attorney admitted to practice before the courts of this state, affirms that:

1.  I am an Assistant District Attorney, of counsel to DANIEL M. DONOVAN, JR., District Attorney of Richmond County. I am familiar with the records on file in the District Attorney's Office pertaining to this indictment, and make this affirmation based upon my examination and review of those documents.

2.  I submit this affirmation in response to defendant's pro se motion to expand the record on appeal to include: the complete transcripts of the grand jury proceedings and various other court appearances; transcripts regarding the testimony of a handwriting expert; affidavits by, diary entries of, and court exhibits relating to a forensic document examiner; a letter of opinion from a handwriting expert; the affidavit of an uncalled witness named Steve Frankl; and, as set forth in defendant's supplemental affidavit, the session notes of a social worker who interviewed defendant and the victim.

3.  In this matter, defendant appeals from a judgment of the Supreme Court, Richmond County (Rooney, J.) rendered on January 21, 2011, convicting him, upon a jury verdict, of Rape in the First Degree [P.L. § 130.35(1)], Criminal Sexual Act in the

1

First Degree [P.L. § 130.50(1)], Attempted Rape in the First Degree [P.L. §§ 110.00/130.35(1)], Assault in the Second Degree [P.L. § 120.05(6)], Assault in the Third Degree [P.L. § 120.00(1)], and Criminal Possession of a Weapon in the Third Degree [P.L. §§ 265.01(2), 265.02(2)].   Defendant was sentenced to an aggregate term of 12 years imprisonment, to be followed by five years of post-release supervision.   The defendant is presently incarcerated pursuant to this judgment.

4.     In June of 2013, defendant's appellate counsel, Warren S. Landau, Esq., filed the Appellant's Brief in this Court.  On August 20, 2013, the People filed their Respondent's Brief.

5.     On August 9, 2013, defendant moved pro se to file a supplemental brief, and on September 9, 2013, he filed a supplemental affidavit in support of this motion. Neither the People nor defendant's appellate counsel has filed opposition to the motion, and this Court has not yet ruled on it.

6.     On September 10, 2013, defendant filed this pro se motion to enlarge the appellate record and on October 15, 2013, he filed a pro se supplemental affidavit in support of this motion.  To date, defendant's appellate counsel has not filed a response.

7.     The People maintain that that branch of defendant's motion to expand the record to include certain transcripts must be denied as unnecessary, as the minutes of proceedings are already part of the record on appeal.

8.     The People oppose the balance of defendant's request because the materials he seeks do not appear to have been introduced as evidence at trial and are dehors the record.  This Court may not consider such materials as part of the appellate record.  People v. Jenkins, 81 A.D.3d 662, 663 (2d Dept. 2011) ("Since the record is

2

bereft of any evidence that [the contested evidence] was actually received by the Supreme Court, the defendant's contention is based on matter dehors the record, and therefore is not properly before us on direct appeal"); see also People v. Jackson, 241 A.D.2d 341, 342 (1st Dept. 1997) ("[A]ll of the evidence defendant relies on in support of his claims is dehors the record, precluding appellate review.") (citing People v. Charleston, 54 N.Y.2d 622, 623 (1981)).

9.     To the degree that defendant requests these materials in order to support a claim of ineffective assistance of trial counsel – as he appears to do – his motion should be denied.    Such a claim based on non-record evidence can be presented only in the context of a post-conviction CPL Article 440 motion. See People v. Williams, 2012 WL 231262, *1 (App. Term 2d Dept. 2012) ("To the extent that defendant's contention that he was denied the effective assistance of counsel rests on matters outside the record, we find that it is not reviewable on direct appeal as it implicates matters . . . which are dehors the record on appeal.    Defendant was required to raise this contention in a CPL 440.10 motion so that it could have been evaluated upon a complete record.") (citing People v. Rivera, 71 N.Y.2d 705, 709 (1988)).


Dated:  November 7, 2013
        Staten Island, New York.


                                        Paul M. Tarr
                                        Assistant District Attorney


cc:     Mr. Anthony Rucano
        11-A-0528
        Clinton Correctional Facility
        P.O. Box 2001
        Dannemora, NY 12929

*Appendix Item P*

# NEW YORK SUPREME COURT
## APPELLATE DIVISION SECOND DEPARTMENT

---

**THE PEOPLE OF THE STATE OF NEW YORK,**
Respondent,

-against-

**ANTHONY RUCANO,**
Defendant-Appellant.

---

Ind. No. 270/09
A.D. No. 2011-01960

---

## DEFENDANT-APPELLANT MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO WITHDRAW APPELLATE COUNSEL'S
## BRIEF AND/OR FOR STAY OF ACTION
## PURSUANT TO CPLR 2201

---

ANTHONY RUCANO, 11A0528
CLINTON CORRECTIONAL FACILITY
P.O. BOX 2001
DANNEMORA, N.Y. 12929

MARCH 2014

i

## Table of Contents

PRELIMINARY STATEMENT ............................................................................................ 1

**POINT 1** ....................................................................................................................... 4
Development of Doctrine to Raise Ineffective Assistance of Counsel .......................... 4
Claims in Post-Conviction Proceedings Before Direct Appeal ..................................... 4

   A. Analogous Facts and Circumstances of *Massaro v. United States* ........................ 4

   B. Similarities to Holdings in Unanimous Decision of *Massaro v. United States* .................... 7

**POINT 2** ..................................................................................................................... 12
Various Statutes and Procedural Protocols Associated With CPL Article 440 Are Violative of the
Due Process, Equal Protection and Supremacy Clauses of the United States Constitution ........ 12

   A.   Application Of Any Of The Procedural Bars Under CPL § 440.10(2) or CPL § 440.10(3)
   Would Be Contrary To Clearly Defined Supreme Court Precedent ........................................ 12

   B.   When Viewed Through The Statements In Martinez v. Ryan, 132 S.Ct. 1309 (2012),
   Failure To Assign Me Counsel To Help Prepare And Submit a CPL § 440.10 Motion Would
   Render County Law § 722 and CPLR § 1101, As Applied, Unconstitutional ........................ 14

   C.   In Light Of Martinez V. Ryan, 132 S.Ct. 1309 (2012), Trevino v. Thaler, 133 S.Ct. 1911
   (2013), The Procedural And Evidentiary Protocols Enacted Under CPL § 440.30 Violates Due
   Process And Equal Protection Guarantees .......................................................................... 16

   D.   CPL § 440.10 is the Only Vehicle to Obtain A Full and Fair Review of My Ineffective
   Assistance Of Trial Counsel Claims ................................................................................... 19

**POINT 3** ..................................................................................................................... 21
The Domino Effect of Under-Qualified, Inexperienced and Poorly Compensated Counsel at
Trial, Through a Mismanaged Assigned Counsel Plan, Has Created Convoluted Practices, Which
Violate Due Process and Equal Protection, Resulting in Waste of Financial and Judicial
Resources in New York State ....................................................................................... 21

   A.   Under-Qualified, Inexperienced and Poorly Compensated Counsel at Trial Creates A
   Domino Effect Resulting in Violations of the Rights of Indigent Defendants ........................ 22

   B.   The Mismanagement of the Assigned Counsel Plan Has Created Convoluted Practices. 23

      I.   The Specific Facts Detailing the Underlying Causes to Deficiencies in the Assigned
      Counsel Plan Has Been Known For Over A Decade ............................................................ 24

      II.   Convoluted Practices Result in Detrimental Actions Taken Against 18-B Assigned
      Counsel Attorneys ............................................................................................................ 26

a.   Stephen T. Mitchell...................................................................... 26
b.   David Bliven................................................................................. 28
c.   Class Action Case of Nicholson v. Williams............................... 29

III.   Hurrell-Harring v. State Brings Statewide Attention to the Systemic Problems of the Assigned Counsel Plan ........................................................................................... 31
a. The Lack of Political and Professional Independence ................................... 33
b. Inadequate Compensation and Lack of Parity with Prosecutorial Counterparts .......... 33
c. The Effect of the Public Defense Crisis on Indigent Criminal Defendants .................. 34

C.  The Lack of a Funding Mandate Allowing Appellate Counsel to Address Unpreserved Issues During Appellate Review Has Resulted in a Domino Effect, Seriously Prejudicing The Defendant's Ability to Meet the Baldi Standards "Representation As A Whole" on Direct Appeal Before this Court............................................................................................35

CONCLUSION...........................................................................................................36

## Table of Cases

**Federal Cases**
Billy-Eko v. United States, 509 U.S. 901 (1993)...............................................................4
Bretch v. Abrahamson, 507 US 619, 635 [1993]................................................................12
Carney v. Fabian, 441 F.Supp.2d 1014, 1019 [D. Minnesota 2006]...................................19
Cuyler v. Sullivan, 446 U.S. 335 (1980)...........................................................................30
Douglas v. California, 373 U.S. 905 (1963).......................................................................30
English v. Cody, 146 F.3d 1257, 1262 (1998)......................................................................5
Gideon v. Wainwright, 372 U.S. 335 (1963).....................................................................30
Guinan v. United States, 6 F.3d 468 (C.A. 7, 1993)...........................................................10
Hayes v. Battaglia, 403 F3d 935, 937 [7th Cir. 2005].........................................................19
Herring v. Estelle, 491 F.2d 125, 127 (5th Cir. 1974).........................................................30
MacKenna v. Ellis, 280 F.2d 592, 599 (5th Cir. 1960).......................................................30
Martinez v. Ryan, 132 S.Ct. 1309 (2012)............................................................................3
Martinez v. Ryan, 132 S.Ct. 1309 [2012]...........................................................................12
Massaro v. United States, 538 U.S. 500 (2003).....................................................................3
Massaro v. United States, 538 U.S. 500, 500 (2003)..............................................................8
Massaro v. United States, 538 US 500 (2003).............................................................13, 19
Massaro v. United States, 538 US 500, 504 [2003].............................................................13
Mitchell v. Fishbein, 377 F.3d 157 (2nd Cir. 2004)............................................................26
Nicholson v. Williams, 203 F.Supp.2d 153 (E.D.N.Y. 2002).............................................29
Opie v. Meacham, 293 F.Supp 647, 650 (D.C. Wyo 1968).................................................29
Rose v. Lundy, 455 US 509, 518 [1982].............................................................................12
Sanchez-Llama v. Oregon, 548 US 331 (2006)...................................................................19
Sanchez-Llama v. Oregon, 548 US at 359...........................................................................19
Strickland v. Washington, 104 S.Ct. 2052, 2066 [1984].....................................................20
Sweet v. Bennett, 335 F3d 135 (2nd Cir. 2003)...................................................................19
Trevino v. Thaler, 133 S.Ct. 1911 (2013).............................................................................3
United States v. Chronic, 466 U.S. 648, 667 n.42 (1984).....................................................4
United States v. Galloway, 56 F.3d 1239, 1242 (10th Cir. 1995).........................................4
Vitek v. Jones, 445 U.S. 480 (1980)..................................................................................30
Walter v. Dalshiam, 669 F.Supp. 68 (S.D.N.Y 1987).........................................................20
Walter v. Dalshiam, 669 F.Supp. 68, 70 [SDNY 1987].......................................................13

**Statutes**
C.P.L. § 440.10 (2) (b)..........................................................................................................7
C.P.L. § 440.10 (2) (c)..........................................................................................................7
County Law § 722(4)...........................................................................................................12
CPL § 440.10(2)..................................................................................................................20
CPL § 440.30......................................................................................................................12
CPLR §§ 1101/1102............................................................................................................12
N.Y. County Law § 722-b (2007)........................................................................................33

**Other Authorities**

Justice Walter V. Schaefer of the Supreme Court of Illinois, *Federalism and State Criminal Procedure.* 70 Harv. L. Rev. 1, 8 (1956) ........................................................................ 1

Structural Reform in Criminal Defense: Relocating Ineffective Assistance of Counsel Claims, 92 Cornell L. Rev. 679 (2007) ........................................................................................ 2

William J. Stuntz – "The Uneasy relationship between Criminal Procedure and Criminal Justice" 107 Yale L.J. 1, 3-12, 72-76 (1977).................................................................................. 1

**Rules**

DR 2-103 (22 NYCRR 1200.8 ............................................................................................ 33

**Treatises**

ABA Ten Principles, Principle 6 ........................................................................................ 32

NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standard K-1 .................................................................................................................... 34

NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standard K-3 .................................................................................................................... 33

NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standards A-1.................................................................................................................. 33

NYSBA Standards for providing Mandated Representation (Revised June 19th, 2010), Standard E-2........................................................................................................................................ 32

NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Legal Representation in New York State (2004), Standard III(C) ............................................ 34

NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Representation in New York State (2004), Standards II, III-A .................................................................. 33

**State Cases**

New York County Lawyers Ass'n v. State, 196 Misc.2d 761 (N.Y.Sup. 2003) ........................ 24

People v. Brown, 382 N.E.2d 1149, 1149 (N.Y. 1978) ........................................................ 6

People v. Brown, 45 NY2d 852, 853-854 [1978] ................................................................ 13, 20

People v. Freeman, 93 AD3d 805 (2nd Dept. 2012)............................................................. 3

People v. Freeman, 93 AD3d 805 [2nd Dept. 2012]............................................................. 13

People v. Lopez, 71 NY2d 662, 665 [1988] ........................................................................ 13

People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011)............................................................ 3

People v. Maxwell, 89 AD3d 1108 [2nd Dept. 2011]............................................................ 13

People v. Melendez-Smith, 66 AD3d 1042 (2nd Dept. 2009).............................................. 20

People v. Mendoza, 298 AD2d 532 [2nd Dept. 2003] ........................................................ 20

People v. Morales, 58 NY2d 1008 [1983] .......................................................................... 20

People v. Rivera, 71 NY2d 705 [1988].............................................................................. 13

People v. Stultz, 2 NY3d 277, 284 [2004]........................................................................ 13

PRELIMINARY STATEMENT

"Making Gideon a formal right only, without any ancillary funding requirements, has produced a criminal process that is, for poor defendants, a scandal. Under funding of criminal defense counsel limits the number of procedural claims that can be pressed.

Constitutional criminal procedure raises the cost of prosecuting wealthier defendants by giving those defendants more issues to litigate. The result, at the margin, is to steer prosecutors away from such defendants and toward poorer ones. By giving defendants other, cheaper claims to raise, constitutional criminal procedure also raises the cost to defense counsel of investigating and litigating factual claims, claims that bear directly on their clients innocence or guilt...More Fourth, Fifth and Sixth Amendment claims probably mean fewer self-defense and mens rea arguments. This turns the standard conservative criticism of the law of criminal procedure on its head. Ever since the 1960's, the right has argued that criminal procedure frees too many of the guilty. *The better criticism may be that it helps to imprison too many of the innocent.*

Over the course of the past couple of decades, legislators have exercised their funding power to expand substantially the resources devoted to law enforcement." William J. Stuntz – "The Uneasy relationship between Criminal Procedure and Criminal Justice" 107 Yale L.J. 1, 3-12, 72-76 (1977)

"Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he might have. [Procedural Rules] are designed for those who know [them], and they can become a source of entrapment for those who do not. Substantive criminal law also presents difficulties to the uninitiated." Justice Walter V. Schaefer of the Supreme Court of Illinois, *Federalism and State Criminal Procedure.* 70 Harv. L. Rev. 1, 8 (1956)

1

Eve Brensike Primus wrote, Structural Reform in Criminal Defense: Relocating Ineffective Assistance of Counsel Claims, 92 Cornell L. Rev. 679 (2007), and "Points out that federal courts and most state courts refuse to hear claims on direct appeal that trial counsel provided ineffective counsel, requiring such claims to be presented in collateral review proceedings...Professor Primus proposes that appellate attorneys be allowed to raise ineffective assistance of trial counsel claims on direct appeal and that, in appropriate cases, appellate attorneys be permitted to supplement the trial court record in order to fully support claims of attorney ineffectiveness."

In New York State, collateral review claims of ineffective assistance of counsel **before** your direct appeal are virtually impossible for the unskilled pro-se litigant, who is a laymen in the matters of law and procedure, who faces the risk of being procedurally barred if raising a claim that could be partially determined from the record.

The result is that the majority of claims raised are issues lying partially on and off the record, "mixed claims", and the defendant has to hope the appellate court, if egregious enough, will invoke their "interest of justice" jurisdiction. It is here that the defendant is prejudiced.

In the narrowly defined cases, such as this defendant's, where a majority (more then 50%) of his cognizable and meritorious issues are either "mixed claims", or involve issues that dehor the record (involving affidavits from expert witness, court documents and exhibits not used by trial counsel at the Nisi Prius Court), the defendant is prevented by state procedural rules that fail to provide funding to indigent defense systems to pursue Article 440's before a defendant's direct appeal, allowing a full and complete review of all claims of Ineffective Assistance of Counsel on and off the record on direct appeal.

2

This prevention causes extreme prejudice in that defendant is required to meet the "Baldi" standard of "representation as a whole" and "in totality", plainly impossible where more then 50% of defendant's claims are procedurally barred from being raised on direct appeal. Combined with the lack of funding for collateral review proceedings, the defendant is forced to have his direct appeal on less then 50% of his cognizable claims, forever being barred from having his collateral review claims heard **in conjunction** with his direct appeal. This is because the defendant will either: (A) Raise issues pro-se in Article 440 proceeding before his direct appeal, that he is simply not capable of doing well enough to be granted a hearing to have those claims reviewed on the merit, or (B) Raise issues pro-se in Article 440 proceeding after his direct appeal, forever losing the ability to have those issues resolved in the context of "representation as a whole" of trial counsel "in totality", **in conjunction** with those limited issues raised by appellate counsel on direct appeal and of the pro-se defendant in a supplemental pro-se brief, if the court so grants permission to file one.

This pro-se defendant, after 3 ½ years of dedicating his entire being to learning the intricacies of the law, now submits this motion in an effort to have the State of New York address these issues. I will attempt to do so in the context of the Supreme Court cases, Massaro v. United States, 538 U.S. 500 (2003), Martinez v. Ryan, 132 S.Ct. 1309 (2012), and Trevino v. Thaler, 133 S.Ct. 1911 (2013), in conjunction with the recent State Court cases of People v. Freeman, 93 AD3d 805 (2nd Dept. 2012) and People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011).

3

**POINT 1**
Development of Doctrine to Raise Ineffective Assistance of Counsel
Claims in Post-Conviction Proceedings Before Direct Appeal

A. Analogous Facts and Circumstances of *Massaro v. United States*

The case of *Massaro* reveals the Supreme Courts Premise that post-conviction relief is the best avenue of attack for claims of ineffective assistance of counsel (hereinafter "IAC") in the Federal Courts. This stance is analogous to raising IAC claims in New York State Pursuant to an Article 440 proceeding.

The Supreme Court has clearly expressed its reasoning on this stance. "In *United States v. Chronic*, 466 U.S. 648, 667 n.42 (1984), the Solicitor General embraced the approach that 'a defendant can attack the actual performance of trial counsel only through a position for post-conviction relief under 28 U.S.C. § 2255, and not through direct appeal.' The Government's principal reason for advocating this rule is that such claims inevitably require consideration of facts that 'are outside the record on direct appeal and that should be considered by the district court in the first instance.'" Solicitor General Br. In Supp. Of Cert. at 6, *Billy-Eko v. United States*, 509 U.S. 901 (1993) (No. 92-7897)

"The prevailing rule is deeply rooted in the doctrines on Judicial Economy and Due Process, and provides that even if the claim could fairly be resolved on direct appeal, no procedural bar will apply to ineffectiveness claims that were first brought in post-conviction proceedings instead." (emphasis added) See e.g. *United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995) (en banc) (claims that are fully developed in the record *may* be brought under direct appeal or under § 2255)

In the current practice of New York State, judicial economy and due process are forced to take a back seat to financial economy and constraints. This State practices the routine denial of

4

due process by placing financial constraints on the indigent defense/public defense services, which fails to provide finances to assign counsel for post-conviction Article 440 proceedings, where appellate counsel clearly discovers the need for one.

In effect, appellate counsel instead bypasses or ignores these "mixed-claims" and other claims dehoring the record and clearly involving IAC claims, and submits an appellate brief lacking in substance and merit. Furthermore, this defeats the adversarial process because New York State practices the Baldi standard for IAC claims, defined as "representation as a whole" and "in totality" of counsels representation, which can not possibly be met when appellate counsel fails to develop substantive claims directly contributing to meeting such standard.

"[F]orcing criminal defendants to raise ineffective assistance claims on direct appeal is an impractical approach which fails miserably at furthering the goal of finality in judgments" because, in part, the procedural bar doctrine is "painfully labor intensive to sort through and apply." *English v. Cody*, 146 F.3d 1257, 1262 (1998)

This error is compounded when appellate counsel raises an unripe or sheer ineffectiveness claim which results in the appellate court rejecting the claim on the merits, finding the incomplete and underdeveloped record was sufficient for adjudication. That defendant would then be barred from raising the same issue in a collateral review proceeding because the court reached the merits on the ineffectiveness claim, even though further actual development – outside of what appeared on the record – may have established that counsel was truly ineffective.

The opposite is also true. If the appellate court deems the claim lies partially outside the record, they will decline to review it and state that it should have been raised in a collateral

review proceeding, unless, in a limited exception, the court invokes its discretionary review "in the interest of justice."

New York State is among the States that permit, but do not require, ineffectiveness claims to be raised on direct appeal. *People v. Brown*, 382 N.E.2d 1149, 1149 (N.Y. 1978) ("in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceedings."

This creates an illusion that permits defendants to file an Article 440 proceeding in the Nisi Prius Court, before their direct appeal, in the hopes of developing the record to enable a review on a complete record on direct appeal. Unfortunately, this illusion is exactly that, and is shattered because in conjunction with this States unconstitutional rule denying the assignment of counsel in these collateral-review/post-conviction proceedings, the following prejudice occurs.

The lack of a funding mandate for assignment of counsel to pursue an Article 440 proceeding results in a pro-se defendant, who by nature is a layman in the matters of law and procedure, being forced to prepare and submit an Article 440 brief which even the most experienced criminal defense attorney has difficulty doing. Compound that with the conflicting applications of the law concerning mixed claims as applied by the courts of this State, and the obstacles become insurmountable.

The likelihood of a pro-se defendant being granted a hearing is infinitesimal. Ironically, if the defendant had an assigned attorney to properly develop and submit this brief, his chances of being granted relief in the form of a hearing are substantially improved. This is just the beginning of the procedural morass that a pro-se defendant encounters.

The Courts in this State, virtually on a whim, randomly and inappropriately deny hearings before a defendant has his direct appeal, stating that "sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such appeal." C.P.L. § 440.10 (2) (b). In many instances, judicial economy takes a hit because the matter is appealed and subsequently sent back to the Nisi Prius Court with the direction to review the claim because it is a "mixed-claim." This process can take years in the appellate courts of this state, and becomes an undue burden on judicial economy.

Furthermore, if a defendant submits an Article 440 after his direct appeal, the Nisi Prius Courts of this State deny a defendant a hearing stating that, "Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon appeal actually perfected by him." C.P.L. § 440.10 (2) (c) Once again, the defendant is stuck in a procedural morass preventing him from having his claims reviewed in the proper forum.

The position taken by *Massaro* is closely aligned with the facts and circumstances of the defendant's case. There exists a procedural morass, created by the unconstitutional rules involving collateral review proceedings in conjunction with the lack of a funding mandate for the assignment of counsel in such proceedings.

B. Similarities to Holdings in Unanimous Decision of *Massaro v. United States*

The Supreme Court held in Massaro that "An ineffective assistance of counsel claim may be brought in a collateral proceedings under § 2255 (the federal equivalent of an Article 440),

whether or not the petitioner could have raised on direct appeal." *Massaro v. United States*, 538 U.S. 500, 500 (2003)

These holdings abrogate N.Y. Crim. Pro. L. § 440.10 (2) (c), which procedurally bars these same claims if they could have been raised on direct appeal.

The *Massaro* court held the reason to be that "requiring a criminal defendant to bring ineffective assistance claims on direct appeal does not promote the procedural default rules objectives: conserving judicial resources and respecting the laws important interest in the finality of judgments." Id at 500.

In practice, New York State attempts to circumvent this holding by allowing defendants to raise an Article 440 proceeding before his direct appeal, an illusion which is shattered by the lack of a funding mandate to assign counsel to effectively prepare such a brief. This practice in New York State has the same effect, as held by the *Massaro* court, which states "Applying that rule to ineffective-assistance claims would create a risk that defendants would feel compelled to raise the issue before there has been an opportunity fully to develop the claims factual predicate, and would raise the issue for the first time in a forum not best suited to assess those facts, even if the record contains some indication of deficiencies in counsel's performance." Id at 500.

The defendant, in this narrowly defined case, made his appellate counsel aware of numerous "mixed-claims" requiring an Article 440 proceeding to develop the claims factual predicate (Aff. at ¶ 9-60). The defendant submits that due to the policy in place that discourages indigent/public defense providers, specifically ones like Appellate Advocates located in large metropolitan cities where financial constraints and political pressure are prevalent, from pursuing these mixed claims in collateral review proceedings before direct appeal; the due process rights of defendants are violated by the submission of an appellate brief raising IAC claims on an

incomplete and undeveloped record. This makes it virtually impossible of meeting the State standard of "representation as a whole" and "in totality" of all the facts required to make such a determination (Aff. at ¶ 70-71). (See Addendum #1, Appellate Advocate cases where court held "mixed-claims" required collateral review proceedings)

This defendant was required, before this very court, to present transcripts, affidavits from experts and uncalled witness Steve Frankl, police reports and other records, all intertwined from his "mixed claims" and other meritorious claims dehoring the record; in an application to enlarge the judgment roll (Aff. at ¶ 66-69). This court granted the motion in part and allowed the grand jury proceedings to produced under seal, in camera, along with various transcripts, to be included as part of the certified appellate record.

Appellate Counsel Warren Landau, as has been proven with documentary records submitted with this brief, was made aware of the above transcripts, affidavits and records in detail. These all substantiate the need to develop the defendant's IAC claims in an Article 440 proceeding.

The Massaro Court clearly explains what would happen if a claim of ineffectiveness is brought on direct appeal for the first time, a position this defendant feels will violate his due process rights if continuing on the course his appellate attorney set for him. "When a claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record that is not developed precisely for, and is therefore often incomplete or inaccurate for, the purpose of litigating or preserving the claim. A defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial. *Strickland v. Washington*, 466 U.S. 668." *Massaro*, id at 500-501.

9

The *Massaro* court relies heavily on Judge Easterbrooks rulings in *Guinan v. United States*, 6 F.3d 468 (C.A. 7, 1993), who eloquently explained "[r]ules of procedure should be designed to induce litigants to present their contentions to the right tribunal at the right time." *Guinan*, supra, at 474 (concurring opinion)

"The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seeming unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. See *Guinan*, supra, at 473 (Easterbrook, J., concurring) ("no matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did...Or it may turn out that counsel's overall performance was sufficient despite a glaring omission..."). The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them. And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are not introduced. Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial." Massaro, Id at 505.

The development and implementation of a collateral review doctrine is required in this State. The collateral review doctrine will:

1) present a bright-line rule that provide attorneys and courts with certitude as to when specific claims must be raised;

10

2) allow for a complete development of the record relating to the facts and circumstances underlying the ineffectiveness claim;

3) provide trial lawyers with an opportunity to be heard before any determination is made as to whether or not they were ineffective;

4) ensure that the trial court has an opportunity to pass on *all* ineffectiveness claims before their presentation to an appellate court;

5) avoid time-consuming litigation over procedural issues, such as raised by the convoluted procedural bars in C.P.L. Article 440;

6) enable defendants to better assess the consequences of counsel's conduct.

The cumbersome parsing and paring of ineffectiveness claims is completely avoided by a rule that allows for collateral review, rather than a procedural bar. Significantly, one of the main virtues of the collateral review rule is that all ineffectiveness claims can be brought in a single proceeding in the trial court, which has the facilities for developing a full record.

Furthermore, a simple procedural rule can allow for a single appellate review of all IAC claims in conjunction with defendants other claims lying on the record. Hence, appellate counsel can now file his appellate brief on an unmistakably full and complete record, in full compliance with the doctrine of judicial economy and defendant's due process rights, resulting in a far more superior use of judicial resources and finances.

It is these circumstances that the defendant submits fully support his position that the rules preventing him, in the narrowly defined circumstances pled within, from having his factual claims fully developed in a collateral review proceeding by his first court appointed counsel, are unconstitutional. The defendant will expound on this by pleading the merits of his claim further in the context of the more recent Supreme Court case, *Martinez V. Ryan.*

11

POINT 2

Various Statutes and Procedural Protocols Associated With CPL Article 440 Are Violative of the Due Process, Equal Protection and Supremacy Clauses of the United States Constitution

The Supreme Court has recently stated that in certain circumstances, there may be a constitutional right to the assistance of counsel for the investigation, preparation and submission of a viable post conviction application challenging the effectiveness of trial counsel (see Martinez v. Ryan, 132 S.Ct. 1309 [2012]), Moreover, in Trevino v. Thaler, 133 S.Ct. 1911 (2013), the Supreme Court held that procedural bars to claims of ineffective assistance of trial counsel would not be allowed when the state's post conviction protocols are convoluted, and prevent adequate review on appeal of an ineffectiveness of trial counsel claim.

As demonstrated below, when viewed through the lens of the Supremacy Clause, and the fact that the federal system entrusts state courts with initial and primary responsibility for enforcing federal constitutional rights in the course of administering their criminal justice systems (see e.g. Bretch v. Abrahamson, 507 US 619, 635 [1993]; also see Rose v. Lundy, 455 US 509, 518 [1982]), not only are the procedural bars under CPL § 440.10 --- when applied to claims of ineffective assistance of counsel --- unconstitutional, but the failure of CPLR §§ 1101/1102, County Law § 722(4) and CPL § 440.30 to have funded mandates for the assignment of counsel for the investigation, preparation and submission of a CPL § 440.10 application on claims of ineffective assistance of counsel, renders those statutes --- as applied --- unconstitutional.

A.    Application Of Any Of The Procedural Bars Under CPL § 440.10(2) or CPL § 440.10(3) Would Be Contrary To Clearly Defined Supreme Court Precedent

Because constitutional challenges relating to trial counsel's performance failures are difficult to measure based on a cold record as:

12

> [a] trial lawyer's decision to adopt one course or another often rests on strategies
> that cannot be gleaned from the record on appeal

(see People v. Stultz, 2 NY3d 277, 284 [2004]), an ineffective assistance of trial counsel claim is best suited for a post conviction motion (see e.g. People v. Rivera, 71 NY2d 705 [1988]; also see People v. Lopez, 71 NY2d 662, 665 [1988]), not an appeal (see e.g. Massaro v. United States, 538 US 500, 504 [2003]).

In Massaro v. United States, 538 US 500 (2003), the Supreme Court held that a trial court rather than an appellate court is best suited to develop the record necessary for determining the adequacy of representation during proceedings before the trial court (see Massaro v. United States, 538 US at 504-505. This was recently made applicable to the states by the recent decision in Trevino v. Thaler, 133 S.Ct. 1911 (2013), where the Supreme Court specifically held that when ineffective assistance of trial counsel claims depend on evidence outside the trial record, states direct appeal process could never be effective for developing the factual basis for an ineffective assistance of trial counsel claims (also see Martinez v. Ryan, 132 S.Ct. 1309 [2012]).

This rational is supported by the Court of Appeals holding that in the "typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel [must] be bottomed on an evidentiary exploration by collateral or post conviction proceedings brought under CPL § 440.10" (see People v. Brown, 45 NY2d 852, 853-854 [1978]; also see People v. Freeman, 93 AD3d 805 [2nd Dept. 2012]; People v. Maxwell, 89 AD3d 1108 [2nd Dept. 2011]; Walter v. Dalshiam, 669 F.Supp. 68, 70 [SDNY 1987] [where the Southern District reasoned that an appellate court has no basis upon which it would be able to consider the substance of an ineffective assistance of counsel claim until a record of the relevant facts has been made at the trial court level]).

13

In the instant case at bar, the district attorney and no doubt this Court, will attempt to assert procedural bars on the claims of ineffective assistance of counsel I raised on the grounds that sufficient facts appeared on the record to have allowed review on direct appeal (see CPL § 440.10[2][c]), or that I could have made enough facts appear on the record to cause such review (see CPL § 440.10[3][a]). But any such application would fly directly into the face of the prohibition of such procedural bars outlined in Martinez v. Ryan, supra, and Trevino v. Thaler, supra. And as the Supremacy Clause demands that any state law which contradicts the laws passed by the Supreme Court must be knocked down as invalid, I am asking this Court to find that, as applied to the specific situations dealing with my ineffective assistance of counsel claims, any applications of the procedural bars under CPL § 440.10(2) and CPL § 440.10(3), would be unconstitutional.

B.   When Viewed Through The Statements In Martinez v. Ryan, 132 S.Ct. 1309 (2012), Failure To Assign Me Counsel To Help Prepare And Submit a CPL § 440.10 Motion Would Render County Law § 722 and CPLR § 1101, As Applied, Unconstitutional

In initial review collateral proceedings, which, as here, provide the first occasion to raise mixed claims of ineffective assistance of trial counsel, the Supreme Court has stated that the constitution may require the assignment of counsel. This is because by deliberately choosing --- either explicitly or implicitly (see Trevino v. Thaler, 133 S.Ct. 1911 [2013]) --- to move trial counsel ineffectiveness claims outside of the direct appeal process where counsel is constitutionally guaranteed, the state is required to provide the same instruments (i.e. an attorney and other support services), as it would on appeal (see Martinez v. Ryan, 132 S.Ct. 1309, 1315, 1318 [2012]).

But New York State has no provisions in place to allow for assignment of counsel in the manner articulated in Martinez v. Ryan, supra. Specifically, County Law § 722(4) only has

14

provisions for assignment of counsel after a CPL § 440.10 motion has been filed, and a hearing has been ordered.

But what good is it then? By then the pro se litigant, unlearned in the law, will have already unwittedly sprung many of the procedural traps courts used to shut the door on meritorious claims of ineffective assistance of trial counsel. And because he does not have the knowledge and/or resources (financial or otherwise) to conduct interviews of the appropriate witnesses and experts to author the necessary affidavits and other documentation that will meet the evidentiary requirements of CPL § 440.30(1), he is really at a heavy disadvantage. Something I am experiencing first hand.

Here, because the investigation and preparation of claims raised in my affidavit can only occur with the assistance of the trained professional and investigative services outlined in Martinez v. Ryan, supra (at 132 S.Ct. 1315-1317), County Law § 722(4)'s post submission appointment protocols simply no longer can stand constitutional muster because not only does the appointment of counsel comes after, rather than before, the submission of a post conviction application, but because the appointment is discretionary.

CPLR §§ 1101/1102 has similar, if not greater defects in its assignment protocols. The conditional, rather than mandatory requirements for the assignment of counsel to investigate, prepare and submit a CPL § 440.10 application attacking the constitutional appropriateness of trial counsel's performance places CPL § 1101(b) in direct violation of the statements in Martinez v. Ryan, supra, which provide the factual scenario where the right to counsel in post conviction review applications should attach. For instance, CPLR § 1101(b) requires that I provide certification from an attorney that my action has merit. But tell me, how am I (or any

other inmate for that matter) going to do this when very few attorneys will even look at an inmate's case without requiring some upfront money? Money many of us simply do not have.

These facts have created a viable claim that County Law § 722 and CPLR § 1101 post hearing assignment protocols are no longer workable in light of Martinez v. Ryan, supra, and Trevino v. Thaler, supra.

C. In Light Of Martinez V. Ryan, 132 S.Ct. 1309 (2012), Trevino v. Thaler, 133 S.Ct. 1911 (2013), The Procedural And Evidentiary Protocols Enacted Under CPL § 440.30 Violates Due Process And Equal Protection Guarantees

There is no question that Martinez v. Ryan, supra represents the first shot across the bow of post conviction statutes which do not provide counsel or other support services for the investigation, preparation and submission of post conviction applications for indigent prisoners in order for them to challenge the effectiveness of their trial attorneys, and that the recent decision in Trevino v. Thaler, supra, makes such assertion applicable to states like New York when ineffective assistance claims, even those seemingly record based, must be raised in a post conviction motion (see People v. Stultz, 2 NY3d 277, 284 [2004]; also see People v. Freeman, 93 AD3d 805 [2nd Dept. 2012]). And as CPL § 440.30 holds a pro se inmate to the standard of a well trained attorney by implementing presentation and review protocols that cannot be met, it has created a catch 22 which simply no longer can stand constitutional muster. A defendant will receive an attorney and other support services if he proves his application has merit. But in order to prove his application has merit, he needs an attorney and other support services. This reality of pro se litigation boggles the mind.

16

In light of the Supreme Court's statements that:

① Defendants pursuing first-tier review are generally ill-equipped to represent themselves (Martinez v. Ryan, 132 S.Ct. 1309, 1317 [2012]), and

② Without the help of an adequate attorney a prisoner will have difficulties vindicating a substantial ineffective assistance of trial counsel claim (id., at 1317), and

③ Claims of ineffective assistance of trial counsel often require investigative work and an understanding of trial strategy (id., at 1317), and

④ To present a claim of ineffective assistance of trial counsel in accordance with a state's procedures, a prisoner likely needs an effective attorney (id., at 1317), and

⑤ The prisoner, unlearned in the law, may not comply with the state's procedural rules and may misapprehend the substantive details of federal constitutional law (id., at 1317), and

⑥ A pro se inmate requires the guiding hand of counsel at every step in the proceedings against him … because he does not know how to establish his innocence (id., at 1317) (citations and inner quotation marks omitted), and

⑦ Ineffective assistance of counsel claims often depend on evidence outside of the trial record (id., at 1318), and

⑧ By deliberately choosing to move trial ineffectiveness claims outside of the direct appeal process, either explicitly or implicitly, where counsel is constitutionally guaranteed, the state significantly diminishes prisoners' ability to file such claims (id.), and

⑨ The prisoner, unlearned in the law, may not comply with the state's procedural rules and may misapprehend the substantive details of federal constitutional law (id., at 1317) (citing to Halbert v. Michigan, 545 US 605, 620-621 [2005], which describes the deficient educational background of the prison population).

How can CPL § 440.30, which does not even come close to adhering to any of these statements, still be deemed to be constitutional?

17

In my case, I am not able to compel counsel[1] to answer the interrogatories concerning his errors of omission and commission at trial. While the protocols laid out in Martinez v. Ryan, supra, would demand that I be allowed, at the very least, the assignment of counsel and compulsory process to command counsel to answer these claims, CPL § 440.30 does not have such protocols unless a hearing is granted (see County Law § 722[4]).

CPL § 440.30 will not provide me with funding to assign counsel. But, prior to the granting of a hearing, no such expenditures could even be asked for (see CPL § 440.10[1][b]).

What these two examples show is that there is an unbreakable catch 22. I am entitled to these provisions once I prove my ineffective assistance claim (see County Law § 722[4]; CPL § 440.10[1][b]), but in order to prove my ineffective assistance claim I need the assistance of an attorney and other services. How could these be constitutional?

Indeed, without any provisions that will recognize the pro se nature of a defendant's claims must be read liberally, as well as those statements in Martinez v. Ryan, supra, there can be no question that CPL § 440.30, as applied, to me and similarly situated indigent defendants, is unconstitutional.

There is an equal protection violation going on here because only those who could afford an attorney may have the privilege of passing through the very high hurdles that CPL § 440.30 places on presentation of Article 440 applications, hurdles the Supreme court in Martinez v. Ryan, 132 S.Ct. 1309, 1315-1317, says are constitutionally unfair, I am respectfully asking this Court to take a comprehensive look at these issues, and provide a well reasoned explanation that would justify the existence of CPL § 440.30, and the other statutes challenged in Subsections A and B, supra.

---

[1] See Trevino v. Thaler, 133 S.Ct. 1911 (2013), holding that when a state process for raising a claim of ineffective assistance of counsel on appeal is convoluted, the same restrictions articulated in Martinez v. Ryan, supra, applies.

D. CPL § 440.10 is the Only Vehicle to Obtain A Full and Fair Review of My Ineffective Assistance Of Trial Counsel Claims

In <u>Massaro v. United States</u>, 538 US 500 (2003), the Supreme Court held that a trial court rather than an appellate court is best suited to develop the record necessary for determining the adequacy of representation during proceedings before the trial court (see <u>Massaro v. United States</u>, 538 US at 504-505). But in <u>Sweet v. Bennett</u>, 335 F3d 135 (2nd Cir. 2003), the Second Circuit held that because <u>Massaro</u> was not decided on constitutional grounds its holdings are not applicable to State post conviction applications (see <u>Sweet v. Bennett</u>, 335 F3d at 140-141; also see <u>Carney v. Fabian</u>, 441 F.Supp.2d 1014, 1019 [D. Minnesota 2006] [holding that there is no constitutional ruling in <u>Massaro</u> that is binding on State courts]; <u>Hayes v. Battaglia</u>, 403 F3d 935, 937 [7th Cir. 2005]).

In <u>Sanchez-Llama v. Oregon</u>, 548 US 331 (2006), the Supreme Court seemed to conditionally overrule these holdings. Addressing a claim of whether the States are required to hear Vienna Convention claims raised for the first time in State post conviction proceedings, the Supreme Court held that "given that the convention itself imposed no such [post conviction presentation] requirement" (see <u>Sanchez-Llama v. Oregon</u>, 548 US at 359), the Court could not perceive of any grounds to require State procedural rules to adhere to <u>Massaro</u> (<u>id</u>.).

From this language it can rationally be inferred that <u>if</u> <u>there</u> <u>is</u> some State court procedural rule or case-law that holds that presentation of an ineffective assistance of counsel claim would best be developed on a post conviction application, then the application of <u>Massaro</u> would apply. Fortunately, under both the New York State and Federal jurisprudence there are post conviction presentation requirements which even state courts have acknowledged using the same language and rational as <u>Massaro</u>, supra.

In People v. Melendez-Smith, 66 AD3d 1042 (2nd Dept. 2009), the Second Department held that when a defendant's claim is based on affirmations and other matters dehors the main record, it is not properly before the Appellate Division without initial presentation to the State trial court (also see People v. Mendoza, 298 AD2d 532 [2nd Dept. 2003]). Supporting this rational is the Court of Appeals holding that in the "typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel can be bottomed on an evidentiary exploration by collateral or post conviction proceedings brought under CPL § 440.10" (see People v. Brown, 45 NY2d 852, 853-854 [1978]), particularly when trial counsel's rational for his performance failures are necessary to evaluate counsel's strategic and tactical decisions (see e.g. Strickland v. Washington, 104 S.Ct. 2052, 2066 [1984]; also see People v. Morales, 58 NY2d 1008 [1983]).

For instance, in Walter v. Dalshiam, 669 F.Supp. 68 (S.D.N.Y 1987), the district court held that under New York law the proper vehicle for raising a claim of ineffective assistance of trial counsel is generally not a direct appeal but a motion to the trial court to vacate the judgment under CPL § 440.10. The district court reasoned that an appellate court has no basis upon which it would be able to consider the substance of an ineffective assistance of counsel claim until a record of the relevant facts has been made at the trial court level (compare Massaro v. United States, 538 US at 504-505 with Walter v. Dalshiam, 669 F.Supp. at 70).

Based on the above, my ineffective assistance of counsel claim, which is supplemented by non-record facts, can only be brought by way of a post conviction motion, not an appeal. Any application of the procedural bars under CPL § 440.10(2) would violate my due process right to access to the only forum actually capable of providing a full and fair hearing of my ineffective assistance of counsel claims under Strickland's performance/prejudice test. It is for this reason

20

that I ask this Court to assign new appellate counsel to research, draft and submit a CPL 440.10 to the Nisi Prius Court before my direct appeal, to hear my ineffective assistance claims on the merits of a full and completely developed record.

### POINT 3

The Domino Effect of Under-Qualified, Inexperienced and Poorly Compensated Counsel at Trial, Through a Mismanaged Assigned Counsel Plan, Has Created Convoluted Practices, Which Violate Due Process and Equal Protection, Resulting in Waste of Financial and Judicial Resources in New York State

As previously discussed, the failure to provide competitive pay rates to attract qualified and experienced counsel as trial counsel, combined with the serious mismanagement of Appellate Assigned Counsel Plans, results in convoluted practices, which violate due process and equal protection based solely on a defendant's indigent status. (Aff. at ¶ 110-113)

The end result is a domino effect causing an endless parade of post-conviction proceedings that ripples through to Appellate Assigned Counsel Plans who fail to investigate and develop the very issues created by incompetent and inexperienced counsel at the trial level. The multitudes of mixed claims are largely ignored and undeveloped due to lack of funding to pursue such claims. The defendant alleges this is endemic to the common practice of the Assigned Counsel Plan for the Second, Eleventh and Thirteenth Judicial District at the trial court level and Appellate Advocates at the appellate level.

The history and oversight of the Assigned Counsel Plan reveals that the current problems have been known for over a decade, and even with standardized rules and regulations for the institutional providers of Indigent Defense Organizations, the problem continues to prejudice the indigent defendants in the State of New York. (Aff. at ¶ 114-128)

21

In the defendants case before this Honorable Court it has been revealed that although Appellate Counsel Mr. Landau of Appellate Advocates was informed numerous times over an almost 2 year period concerning ineffective assistance of counsel claims representing more then 50% of his cognizable claims, he has continuously ignored and failed to address these issues in collateral review proceedings. (Aff. at ¶ 9-60, 94-101, 129-131) His previous history shows he has done this on previous occasions. (Aff. at ¶ 102, See also, Addendum #1)

A. Under-Qualified, Inexperienced and Poorly Compensated Counsel at Trial Creates A Domino Effect Resulting in Violations of the Rights of Indigent Defendants

As previously stated, the financial constraints imposed by the State of New York that attract only the poorest quality of attorneys who can "warehouse" cases to turn a profit, results in trial counsel who effectively fails to act by an advocate by performing the most basic functions like objecting with specificity, making timely motions and preserving the record for appellate review. (Aff. at ¶ 110-121)

This in turn leads to appeals with a large majority of the issues involving either "mixed-claims" or matters dehoring the record, which can only be reviewed in the interest of justice **unless** these matter are developed in collateral review proceeding **before** direct appeal. Failure to do this results in an appeal being submitted in which more then 50% of the issues raised unpreserved for appellate review, in which the appellate court only in the most egregious of cases, will invoke its "in the interest of justice" exception.

Furthermore, these unpreserved claims raised on direct appeal are forever lost to be raised in **conjunction** with the issues lying off the record or involving mixed claims.

22

B. The Mismanagement of the Assigned Counsel Plan Has Created Convoluted Practices

The underlying causes and factors contributing to deficiencies in the Assigned Counsel Plan starts with the mismanagement of assigning attorneys who are underpaid, inexperienced and unqualified to effectively handle the large amount of cases they are assigned. (Aff. at ¶ 110-113)

This mismanagement has created convoluted practices in which qualified attorneys who adamantly and effectively advocate for their clients are subject to harassment by reduction of vouchers, grievances being filed against them and eventually the denial to be recertified to the 18-B panel they practice on, while the inexperienced and underpaid ones learn to "warehouse" cases, setting aside their ethical and professional responsibilities to turn a profit. (Aff. at ¶ 114-121)

Considering that the Assigned Counsel Plan rules and by-laws, which are supposed to prevent political and judicial interference and bias; in fact actually promote it by allowing the committee members to refuse to recertify an attorney without any explanation whatsoever. This effect is furthered by a system comprised of judges who approve individual vouchers in the trial court, and another set of judges who help "administer", create, and sit on the various committees compromising the Assigned Counsel Plan, all of which are politically motivated to conform to the political and financial views of the legislature.

The end result is a system that lets due process and equal protection to be forgotten and lost for the indigent citizens of the State of New York.

I.      The Specific Facts Detailing the Underlying Causes to Deficiencies in the
Assigned Counsel Plan Has Been Known For Over A Decade.

In 2003, the New York County Lawyers Association brought to light the serious
deficiencies in the Assigned Counsel Plan caused by unconstitutional statutory caps on pay rates.

In the action of *New York County Lawyers Ass'n v. State*, 196 Misc.2d 761 (N.Y.Sup.
2003), the court relied upon the evidence of 41 witnesses and 435 exhibits in reaching its
determination. Although this case dealt with indigent defense for family and criminal courts, its
findings are indicative of the problem as it existed over 10 years ago. Below is an excerpt of
what the court discovered over a decade ago.

"The shortage of assigned counsel in the Criminal Courts, as in the Family Court, has
also resulted in less then meaningful and effective assistance of counsel. Too many assigned
counsel do not: conduct a prompt and thorough interview of the defendant; consult with the
defendant on a regular basis; examine the legal sufficiency of the complaint or the indictment;
seek the defendant's prompt pre-trial release; retain investigators, social workers or other experts
where appropriate; file pre-trial motions where appropriate; fully advise the defendant regarding
any plea and only after conducting an investigation of the law and facts; prepare for trial and
court appearances; and engage in appropriate pre-sentencing advocacy, including seeking to
obtain the defendant's entry into any appropriate diversionary programs...In addition, the
evidence showed that many attorneys do not conduct appropriate investigations of the facts or
the law; and of those that do, many fail to do so prior to engaging in plea negotiations and only
do so immediately prior to trial...Many do not file meaningful pre-trial motions." The court
concluded that the portions of § 722-b of the County Law ... and § 35 of the Judiciary Law that
relate to assigned counsel rates are unconstitutional as applied. Id. At ¶ 774-775, 778

The defects in the Assigned Counsel Plan created a culture of indifference resulting in indulgence of deficient performance which was often hidden behind the label "meaningful representation." The commission on the Future of Indigent Defense Services (herein, the "Kaye Commission") concluded that the numerous constitutional deficiencies were so ingrained that not even an overhaul could fix the problems. Rather, it proposed scraping the roundly criticized patchwork defense network and replacing it with a new, state-wide, state-funded system governed by regulations and standards (Caher, Report for Replacement of Indigent Defense System, NYLJ, Volume 235, No. 125 [6/29/06], at page 1).

It is now 2014, and the assigned counsel plan compensation rates have not been increased since the last increase to $75 in 2003, over 11 years ago. Meanwhile, inflation and the cost of living have skyrocketed in New York. It is time for the Legislature to act and address the issue.

The assigned counsel plan is part of the infrastructure created by the City of New York, mandated to provide legal representation to indigent defendants. The State has the obligation to provide assigned counsel with a reasonable basis upon which they can carry out their professional responsibilities, without either personal profiteering or undue financial sacrifice. The current rates, combined with the lack of a funding mandate for counsel on collateral review proceedings, threaten the adversarial process by creating an unacceptable tension between adherence to professional standards and the financial constraints attorneys and indigent defense firms face in providing constitutionally adequate and meaningful representation.

Indigent citizens and defendants like myself do not represent a substantial lobby in Albany. However, at the cornerstone of justice is the precept that all citizens will be treated equally under the law. The circumstances detailed above demand an overhaul of the system.

II.     Convoluted Practices Result in Detrimental Actions Taken Against 18-B
        Assigned Counsel Attorneys

a.   Stephen T. Mitchell

In March 2001 Mitchell commenced an action under 42 U.S.C. §§ 1981 and 1983 and
State Law, alleging that the state defendants had terminated his appointment to the First
Department 18-B Panel on the basis of his race and in retaliation for his complaints of racial
discrimination.

A brief synopsis from the case he initiated, which wound up in the Second Circuit Court
of Appeals, *Mitchell v. Fishbein*, 377 F.3d 157 (2nd Cir. 2004), provides a clear understanding of
his position, which this defendant claims is analogous to the instant case. This position is that
attorneys, who do not comply with the plans unwritten rules to conform and "warehouse" cases,
disposing of them quickly, are removed from participation in the Assigned Counsel Plan.

Mitchell began practicing law in 1986 and until 1989 he was an A.D.A. in New York
County. Between 1991 and 1995 he was a member of the Kings County 18-B Supreme Court
Panel, and in 1995 he was appointed to the New York County Panel in 1995. By the spring of
1998, Mitchell had tried more then 20 felony matters to verdict, including 3 murder trials. He
had also negotiated pleas in dozens of felony matters as lead counsel for indigent defendants. In
addition, he had briefed and argued at least 2 appeals. During 1996-1998, he was never
reprimanded for poor performance or misconduct with respect to his representation of an
indigent client. His record of winning acquittals was outstanding, and both his peers and the
judges before whom he tried cases had high regard for his trial skills and experience. Id at ¶ 161-
162.

Mitchell applied for recertification to the First Department 18-B Supreme Court Panel in 1997 or 1998. He contended that many white assigned counsel attorneys were not providing zealous advocacy for their African American and Latino clients and were more interested in "churning" (warehousing) cases in order to increase their fees. Id at ¶ 162

By letter dated March 18th, 1998, the Committee notified Mitchell that it was denying his application for recertification and terminating his appointment to the First department 18-B Panel. The Committee gave no reasons for its decision. The text of the one-page letter read as follows:

> We regret to inform you that following a thorough and careful review of your recertification application, a decision has been made by the Central Screening Committee to terminate your appointment to the Assigned Counsel Plan felony and misdemeanor panels. That decision is final.
>
> On behalf of the Central Screening Committee, we want to express our appreciation to you for your years of service to the indigent accused.
>
> You are expected to continue to handle to conclusion any assigned cases you now have and to submit a voucher for your work.

(Letter from Committee Chair Norman L. Reimer to Stephen T. Mitchell dated March 18th, 1998. "Committee Letter to Mitchell").

Although Mr. Mitchell performed outstanding according to his peers, he was not reinstated because of his zealous representation of the clients he was assigned. This decision by the Committee makes no sense whatsoever, and suggests that the Committee members actually punish any attorney who effectively provides constitutionally meaningful representation to his clients.

b.   David Bliven

From 2000 until April 2005, Bliven was a member of New York City's Assigned Counsel Panel, serving as a public defender principally in New York Family Court in Queens County. He was assigned cases in that Court by individual family court judges and represented children, as their law guardians, or adults in cases involving child custody and support, family offenses, juvenile delinquency, and children in need of protection.

Bliven commenced an action in 2005 alleging that since 2002, the individual defendants Judge John Hunt, Judge Barbara Salinitro and Supervising Judge Guy DePhillips conspired to deny him compensation to which he was entitled, in retaliation for his having made disfavored motions in approximately 15 child protective and foster care cases in 2001 to compel the disclosure of the entire caseload maintained by the Administration of Children's Services ("ACS"). He alleged that between March and September 2002, nearly every voucher he submitted for public defender compensation – at least regarding an ACS or foster care agency case – to Judges Hunt or Salinitro were reduced by $50 - $150 with no oral or written excuse. He was told they were reduced because of his filing of the motions to compel disclosure of complete ACS files. *Bliven v. Hunt*, 579 F.3d 204, 207-208 (2009)

Bliven alleged that as a result of him complaining about the reduction of his vouchers, he was threatened that the judges would file a grievance against him. He alleged that he was thus forced to withdraw from the public defender panel, losing two-thirds of his income. Id. at ¶ 208.

Once again, once an attorney acts as an advocate and provides zealous representation for his assigned indigent clients, he becomes the subject of harassment. An attorney should not be punished for acting as an advocate and providing meaningful representation for his clients.

28

c.  Class Action Case of Nicholson v. Williams

The case of *Nicholson v. Williams*, 203 F.Supp.2d 153 (E.D.N.Y. 2002), represents the failure of the Assigned Counsel Plan to provide effective representation to indigent parents involved in the Family Courts who were subject to Domestic Abuse and deemed to be neglecting their children, with said children being separated from their parents.

If a parent is indigent, Article 18-B of the New York County Law requires that a lawyer be appointed for the parent. Unlike the City Division of Legal Services of the legal Aid Juvenile Rights Division, the 18-B panels are not institutional. They do not provide any office or other support services for the private practitioners ho are members.

The problems created by the 18-B deficiencies resonate through the entire court system. As a Family Court judge put it, "[i]f representation is inadequate, then the entire court is inadequate. The court culture accepts delays, adjournments, and being unprepared...With so few resources, sloppiness is accepted." *Justice Denied* at 32. As a matter of fact, the present assigned counsel system is corrupting of legal ethics and a disgrace to the law." *Nicholson v. Williams*, 203 F.Supp.2d at 227, supra.

The problems highlighted in *Nicholson* can be attributed to a widespread acceptance of inadequate representation to indigent citizens of the State of New York. The implications of this have continued to the present day, over one decade from when it was originally addressed. These raise due process implications for indigent defendants to receive constitutionally adequate and effective representation.

It follows that, where the government is under a due process obligation to appoint counsel, it cannot do so in a way that structurally impedes the ability of counsel to effectively represent clients. *See Opie v. Meacham*, 293 F.Supp 647, 650 (D.C. Wyo 1968) ("The state is

responsible under the due process requirement contained in the Fourteenth Amendment to protect an accused's right to have the effective assistance of competent counsel.").

The right to appointed counsel when necessary for due process is a right to effective counsel. See *Herring v. Estelle*, 491 F.2d 125, 127 (5th Cir. 1974) ("we interpret the right to counsel as the right to effective counsel.") (*quoting MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960)). The Supreme Court has recognized the government's obligation in certain situations to provide counsel to satisfy due process as required by the Fourteenth Amendment. *See, e.g. Gideon v. Wainwright*, 372 U.S. 335 (1963) (the Fourteenth Amendment right to due process requires that an indigent defendant in a felony trial be appointed counsel); *Vitek v. Jones*, 445 U.S. 480 (1980) (indigent prisoners whom the state wished to treat as mentally ill have right to appointed counsel); *Douglas v. California*, 373 U.S. 905 (1963) (state providing appeals as of right must appoint counsel for indigent defendants in those appeals). The Court has separately emphasized the government's related obligation not to impair the effectiveness of counsel under the Sixth Amendment. *See e.g. Cuyler v. Sullivan*, 446 U.S. 335 (1980) (states may not conduct trials in a way that unconstitutionally impairs a defendant's right to effective counsel). *Nicholson v. Williams*, 203 F.Supp.2d at 239, supra.

In the context of ineffective assistance of appellate counsel for indigent defendants, the financial constraints imposed upon appellate indigent defense organizations like Appellate Advocates, which prevent them from developing and pursuing Article 440 claims involving issues off the record including ineffective assistance of counsel; is conduct that constitutionally impairs an indigent defendant's right to effective and meaningful representation as is practiced in New York State under the Baldi standard.

The appropriate test for determining whether the system for appointed counsel is adequate should be whether counsel so appointed are "reasonably likely to render…reasonably effective assistance." *See Herring*, 491 F.2d at 127.

III.    Hurrell-Harring v. State Brings Statewide Attention to the Systemic Problems of the Assigned Counsel Plan

The State of New York's broken public defense system has deteriorated to the point where it deprives or threatens to deprive indigent defendants the rights guaranteed to them by article I, section 6 of the New York State Constitution; CPLR §§ 1101/1102, County Law 722(4) and CPL § 440.30, and the Sixth and Fourteenth Amendments to the United States Constitution. Hurrell-Harring is closely related to the issues the defendant is raising today, but instead focuses on the New York City area, and more specifically, Staten Island for trial representation and the Second, Eleventh and Thirteenth Judicial Districts covered by Appellate Advocates for appellate representation; but is in no way limited or unique to these counties.

The right to counsel is a right to *meaningful* and *effective* assistance of counsel. Constitutionally adequate counsel is counsel that is capable of putting the prosecution's case to meaningful adversarial testing. Where, as is the case in New York, public defense counsel do not have the resources and the tools to engage actively and meaningfully in the adversarial process, courts cannot ensure that their decisions, judgments, verdicts and punishments are rendered fairly and accurately.

The constitutional and statutory obligation to provide indigent defendants with meaningful and effective assistance of counsel rests with the State. Since 1965, the State has abdicated its responsibility to guarantee the right to counsel for indigent persons and has left

31

each of its sixty-two counties to establish, fund and administer their own public defense programs, with little or no fiscal and administrative oversight or funding from the State.

There are no meaningful attorney hiring criteria, performance standards or supervisory controls to ensure basic quality of representation among public defense service providers. The Kaye Commission Report played a big part in the Hurrell-Harring case, which found that "[d]espite the existence of various sets of standards for representation that bar associations have issued over the years, there is no single set of standards that actually governs what 'adequate' indigent defense services means." Moreover, because the practice standards that exist are not enforceable in New York, "in some areas, substandard practice has become the acceptable norm."

National and state standards for the administration of a public defense system state that written hiring criteria are necessary to ensure an attorney's ability, training and experience **match the complexity of the cases he or she faces**. NYSBA Standards for providing Mandated Representation (Revised June 19th, 2010), Standard E-2; *see also* ABA Ten Principles, Principle 6 (requiring that counsel's ability, training and experience match the complexity of the case).

Instead, the criteria for placement on the assigned counsel panels are minimal and do not create any meaningful check on the quality of representation. This is by necessity because the pay rates are so low that if the standard is set to high, no attorneys would be able to participate. This is endemic of the financial constraints placed on the Assigned Counsel Plan. The domino effect is poor representation at trial, and then the inability of appellate defense plans to develop mistakes to preserve the record by inexperienced and unqualified trial counsel.

a. The Lack of Political and Professional Independence

The system of county-based funding and administration causes a lack of independence from judicial, prosecutorial and political authorities for public defense services providers.

The Kaye Commission found that, because of the State's abdication of public defense funding and administration responsibilities to the counties, "New York fails to ensure the independence of its indigent defense providers who are too often subject to undue interference from the counties that fund them." NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Representation in New York State (2004), Standards II, III-A: NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standards A-1. *See also* DR 2-103 (22 NYCRR 1200.8)

b. Inadequate Compensation and Lack of Parity with Prosecutorial Counterparts

Public defense service providers are inadequately compensated and lack the resources needed to provide effective representation.

National and State standards recognize the importance of adequately compensating both assigned counsel lawyers and institutional public defense service providers. NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Legal Representation in New York State (2004), Standard III(C); NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standard K-3. *See also* N.Y. County Law § 722-b (2007).

National and State standards also hold that comparable funding for prosecutorial and public defense services is a key measure of the health of a criminal justice system. NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Legal Representation in New

33

York State (2004), Standard III(C); NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standard K-1.

### c. The Effect of the Public Defense Crisis on Indigent Criminal Defendants

Hampered by the aforementioned systemic flaws, public defense counsel do not or are not able to perform even the most basic tasks necessary to provide meaningful and effective representation to their clients. They fail to act as an adversarial check on the prosecutor in criminal cases.

Indigent criminal defendants in New York therefore are experiencing or are at severe and unacceptably high risk of experiencing: wrongful denial of representation; wrongful conviction of crimes and waiver of meritorious defenses.

These factors are multiplied when faced with a public defense provider at the appellate level which lacks a funding mandate to properly develop the trial record, largely because of trial counsels failure to provide the basic level of advocacy required for meaningful representation.

The case before the court now shows the complete havoc an inexperienced and unqualified 18-B trial attorney can inflict and the dire consequences he is facing because of those systemic failures. Appellate Counsel Warren Landau submitted an appellate brief to this Honorable Court with 75% of the issues rose being unpreserved for this court's review. The defendant had to submit a formal complaint with the Departmental Disciplinary Committee just to receive a copy of the District Attorneys response. This is because Mr. Landau knew he submitted an appellate brief that fell woefully short of proper appellate advocacy, and knew that I was capable of pointing that out to him. Mr. Landau was made aware and provided with information and documents clearly informing him of the need to file an Article 440 brief.

C. The Lack of a Funding Mandate Allowing Appellate Counsel to Address Unpreserved Issues During Appellate Review Has Resulted in a Domino Effect, Seriously Prejudicing The Defendant's Ability to Meet the Baldi Standards "Representation As A Whole" on Direct Appeal Before this Court

These moving papers have shown the various systemic problems that Indigent Defense Organizations like Appellate Advocates face on a day to day basis. The deprivation of finances by the State of New York to hire qualified and experienced 18-B trial counsels, combined with the lack of a funding mandate to address the multitude of unpreserved errors caused by the unqualified and inexperienced 18-B attorneys at the trial level; has resulted in a domino effect seriously prejudicing indigent defendants in the State of New York, and more specifically, in the Second, Eleventh and Thirteenth Judicial Districts of the Second Judicial Department where Appellate Advocates operates.

These failures systematically prevent indigent defendants from having **all** their claims developed and reviewed by the Appellate Court "in totality", prejudicing their ability to meet the State Of New York's Baldi Standard of "Representation as a Whole."

The defendant, in his narrowly defined case, has shown this court that appellate counsel Warren Landau was given specific, direct and overwhelming documentation and information in support of the fact that an Article 440 proceeding was necessary to effective appellate advocacy on his direct appeal.

Mr. Landau not only ignored this information, but then submitted an appellate brief with the majority of issues unpreserved for appellate review, and then undertook a course of action designed to prevent me from discovering said actions on his part. Mr. Landau knew that this defendant was well informed and knowledgeable concerning the law and his case, and instead of

35

acting as an advocate and communicating with his client, he consistently told the defendant one thing and did another.

## CONCLUSION

The Defendant prays for an ORDER Withdrawing the Appellate Brief of Warren S. Landau, Assigning new Appellate Counsel on Defendants' Direct Appeal and providing a funded mandate which will allow him to utilize the Information in outlined in this brief which are Mixed Claims, in a CPL § 440.10 application, and/or Granting A Stay of Action Pursuant to CPLR 2201 to have new assigned Counsel Perfect and Submit an Article 440 Brief Before Placing My Direct on the Appellate Court's Calendar, which will be within a time period so designated by the Honorable Court; so that meritorious issues addressed in said Article 440.10 Motion can be developed and heard.

Respectfully Submitted,

_Anthony Rucano_

Anthony Rucano, 11A0528

Dated: _MArch 20th_, 2014

36

*Appendix Item Q*

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

ANTHONY RUCANO,

*Defendant-Appellant.*

**FILE**

AFFIRMATION IN RESPONSE
TO DEFENDANT'S MOTION
TO WITHDRAW HIS
COUNSELED APPELLATE
BRIEF

A.D. No. 2011-01960

Richmond County Ind. No.
270/09

Paul M. Tarr, an attorney admitted to practice before the courts of this state, affirms that:

1.     I am an Assistant District Attorney, of counsel to DANIEL M. DONOVAN, JR., District Attorney of Richmond County. I am familiar with the records on file in the District Attorney's Office pertaining to this indictment, and make this affirmation based upon my examination and review of those documents.

2.     I submit this affirmation in response to defendant's pro se motion to have his counseled appellate brief withdrawn, for assignment of new appellate counsel, and for a stay of these proceeding so that he may submit a CPL Article 440 motion.

3.     In this matter, defendant appeals from a judgment of the Supreme Court, Richmond County (Rooney, J.) rendered on January 21, 2011, convicting him, upon a jury verdict, of Rape in the First Degree [P.L. § 130.35(1)], Criminal Sexual Act in the First Degree [P.L. § 130.50(1)], Attempted Rape in the First Degree [P.L. §§ 110.00/130.35(1)], Assault in the Second Degree [P.L. § 120.05(6)], Assault in the Third Degree [P.L. § 120.00(1)], and Criminal Possession of a Weapon in the Third Degree

1

[P.L. §§ 265.01(2), 265.02(2)].   Defendant was sentenced to an aggregate term of 12 years imprisonment, to be followed by five years of post-release supervision.   The defendant is presently incarcerated pursuant to this judgment.

4.      In June of 2013, defendant's appellate counsel, Warren S. Landau, Esq., filed the Appellant's Brief in this Court.   On August 20, 2013, the People filed their Respondent's Brief.

5.      On August 9, 2013, defendant moved pro se to file a supplemental brief, and on September 9, 2013, he filed a supplemental affidavit in support of this motion. On November 25, 2013, the People filed opposition to the motion.   On January 6, 2014, this Court granted the motion and on April 21, 2014, this Court enlarged the time to file the brief until July 21, 2014.   To date, the People have not received defendant's pro se supplemental brief.

6.      The People oppose defendant's pro se motion to have his counseled appellate brief withdrawn.   This case has been exhaustively briefed by defendant's appellate counsel.   Withdrawal of the counseled appellant's brief and assignment of new appellate counsel would not enable defendant to raise any additional meritorious issues; any additional appellate issues that defendant seeks to advance by this motion can be raised in the pro se supplemental brief that he has not yet filed, or in a CPL Article 440 motion.   Thus, granting the motion would merely waste judicial recourses and cause further delay in this already unnecessarily protracted appeal.

7.      Further, defendant's motion should be denied to the degree that he moves in order to support a claim of ineffective assistance of trial counsel based on non-record evidence – as he appears to do.   Such a claim can be presented only in the context of a

2

CPL Article 440 motion. See People v. Williams, 2012 WL 231262, *1 (App. Term 2d Dept. 2012) ("To the extent that defendant's contention that he was denied the effective assistance of counsel rests on matters outside the record, we find that it is not reviewable on direct appeal as it implicates matters . . . which are dehors the record on appeal. Defendant was required to raise this contention in a CPL 440.10 motion so that it could have been evaluated upon a complete record.") (citing People v. Rivera, 71 N.Y.2d 705, 709 (1988)).

Dated:  May 1, 2014
       Staten Island, New York.


Paul M. Tarr
Assistant District Attorney

cc:    Mr. Anthony Rucano
        11-A-0528
        Clinton Correctional Facility
        P.O. Box 2001
        Dannemora, NY 12929

        William Loeb, Esq.
        Attorney for Defendant-Appellant
        Appellate Advocates
        2 Rector Street, 10th Floor
        New York, NY 10006

3

Appendix Item R

RICHMOND COUNTY
RECEIVED

2014 APR 30 P 3: 52

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION, SECOND DEPARTMENT

----------------------------------------X

The People of the State of New York,          :

            Plaintiff(s)-Respondent(s)  :

                                 :

        -against-                            :

                                 :

ANTHONY RUCANO,                               :

            Defendant-Appellant,          :

                                 :

----------------------------------------X

REPLY AFFIDAVIT IN
RESPONSE TO WITHDRAW
APPELLATE COUNSEL'S
BRIEF AND/OR FOR STAY
OF ACTION PURSUANT TO
CPLR 2201

INDICTMENT NO. 270/09
APPELLATE DIVISION
CASE # 2011-01960

STATE OF NEW YORK    )
                 ) SS.:
COUNTY OF Clinton    )

Anthony Rucano, being duly sworn, deposes and says:

1.    I am the defendant in the above-captioned matter proceeding pro-se, and am a laymen in the matters of law and procedure. I seek this Court's indulgence for errors, defects and faults pursuant to Section 103(c) and 2101(f) of the CPLR.

2.    I submit this reply affidavit in response to Appellate Counsel Warren Landau's Affirmation in Response to my motion to withdraw appellate counsels brief and other related relief, dated April 15th, 2014.

3.    Mr. Landau's statement that I have no problem with the brief has no basis in fact from the papers submitted initiating this action. Specifically, the majority of points raised in

*1*

appellate counsel's brief are unpreserved for appellate review and can only be ruled on by the appellate court if they decide to exercise their option of reviewing "In the Interest of Justice" (Aff. at ¶ 99-103)[1].

4. Furthermore, Mr. Landau's statement that he has communicated with me extensively, primarily about issues on my appeal, only began with any meaning or substance **after** I filed a complaint with the Departmental Disciplinary Committee just 3 months prior to this date (Aff. at ¶ 94-98), which includes his agreement to send out FOIL letters and look into possible 440 issues.

5. The problem with this statement by Mr. Landau, made almost 2 years after he was assigned by Appellate Advocates to represent me on my direct appeal by his supervisor Lynn Fahey; is that numerous substantial and meritorious Article 440 issues have been "spoon fed" to Mr. Landau and Appellate Advocates since September 2009, as the entirety of documentation in the form of letters to and from Mr. landau and his supervisors reveal. (Aff. at ¶ 9-60) This information was not just in the form of mere allegations by the defendant, but in the form of sworn statements from multiple expert witnesses never called to the stand, an affidavit from family friend Steve Frankl which amounted to real "prompt outcry" by the defendant. This was not the type of prompt

---

[1] *Numbers followed by Aff. refer to paragraph numbers of defendants Affidavit in Support Initiating this Action*

outcry identified by my inadequate trial attorney Eugene Lamb, who attempted to tell Judge Rooney that the complainant made prompt outcry to her "diary" in a court session 2 months before trial.[2]

6.   Mr. Landau's failure to obtain and submit a complete appellate record was inexcusable, when in fact he was informed of a multitude of reasons the transcripts were needed and given detailed reasons why they were important to my defense.(Aff. at ¶ 66-73)

7.   Finally, Mr. Landau sums it up by stating "Our primary function is to represent criminal defendants on appeal. We do not routinely file 440.10 motions, although we do so when we believe they would be particularly meritorious." (Atty. Aff. at ¶ 6)[3]

8.   This defendant does not know what standard Appellate Advocates has set in order to meet this standard to file an Article 440.10 motion.

9.   Based upon the numerous points raised in defendants application to file a pro-se supplemental brief, which this Honorable Court granted, and this Court's subsequent ruling on my motion to enlarge the record; this defendant has come to the conclusion that because this court denied adding any of the records requested in his motion to enlarge the record that were

---

[2] *This erroneous statement by Trial Attorney Eugene Lamb was made in one of the transcripts that this Honorable Court granted in my motion to enlarge the appellate record. This amounts to a further failure of Mr. Landau for his failure to make this transcript part of the appellate record, when I notified him of its importance and requested that he obtain it.*
[3] *Numbers followed by Atty. Aff., refer to paragraph numbers in Mr. Landau's Affirmation in response.*

**NOT** stenographic transcripts, the court has deemed them to be outside the record and unavailable for use on this defendant's direct appeal.

10.   The defendant has sought clarity from this Honorable Court with his motion to Resettle and/or Amend the Decision and ORDER dated January 6th, 2014, which requested that the Court consider issuing a memoranda decision and order to expound on the decision reached, based on facts and law in denying relief to enlarge the judgment roll for the items the defendant requested to made part of the record on appeal. This motion is still pending before the Honorable Court.

11.   The documents that were sought to be made part of the appellate record and were denied by this court form the basis of the defendant's most cognizable claim, the falsification of the charges against him. The defendant never denied the complainant and he had sex, he denied that it was forced. This claim revolves around the falsification of the diary, which was used at the grand jury as the "truth of the matter asserted". This was never marked for identification or entered into evidence, and the grand jury minutes reveal the complainant was allowed to take this diary on the stand at the grand jury and was allowed to read from it during her entire grand jury testimony. The multiple experts' reports all revolve around this diary, as well as the affidavit and email from

*4*

uncalled witness Steve Frankl, which was received on July 17th, 2009, the first entry in the diary, hardly a coincidence.

12. To reiterate from my moving papers, these multiple affidavits, expert reports, police records and medical records, which all dehor the record, which were made known to Mr. Landau, combined with the following unexplained tactical reasons and/or strategic purposes which were also made known to Mr. Landau and dehor the record, of trial attorney Eugene Lamb, includes, but is not limited to:

- Failure to call multiple expert witnesses
- Failure to cross-examine complainant on prompt outcry and request CJI 7.26 of prompt outcry to be charged to the jury.
- Cross-Examine complainant on her grand jury testimony
- Failure to move for dismissal of indictment under CPL § 210.35(5) for prosecutorial misconduct
- Complete failure to cross-examine complainant about September 21st, 2009
- Complete failure to cross-examine complainant about September 25th, 2009
- Failure to object to witness Ms. Mach testifying to the "end of September"

➢ Failure to adequately prepare for trial, investigate, provide and use evidence in support of the theory of the defense including:

    A) Grand Jury Minutes

    B) Medical Records

    C) DD5 Reports

    D) Pictures exempt under Rape Shield Law

    E) Multiple emails written to complainant

➢ Failure to know and apply the law concerning defendant's constitutional right to a trial by a "particular jury chosen according to the law" in whose selection the defendant has a voice. N.Y. Const. Art. 1 § 2

➢ Failure to object with effectively and with specificity

    A) To Voice mail recordings with numerous identifiable issues concerning their admissibility

    B) To Numerous errors of Attorney Dennis J. O'Sullivan in relation to the Grand Jury Proceedings

13. The result is a plethora of mixed claims and off the record issues that are procedurally barred from being addressed on defendant's direct appeal.

*6*

14.  In this specific, individual and narrowly drawn case at hand, the defendant would suffer serious prejudice if not allowed to develop and pursue these issues before his direct appeal **solely** based on the provision of an incompetent and unqualified 18-B attorney Eugene Lamb Esq., by the Assigned Counsel Plan of the Second, Eleventh and Thirteenth Judicial Districts, combined with the unconstitutional mandates that deny funding for indigent defendant's to receive an attorney, in the narrowly defined and unique case such as the defendant's, where a majority (over 50%) of defendant's cognizable and meritorious claims are procedurally barred from being raised on direct appeal. The defendant's direct appeal is the only appeal the defendant is provided with an attorney in New York State, regardless of the fact that he would be unable to meet the practiced standard of "meaningful representation as a whole", and "in totality."

15.  If these numerous issues, which include affidavits from multiple experts, do not outweigh the few unpreserved issues raised in appellate counsels brief; then I can not see how any defendant can meet a standard high enough for Appellate Advocates to consider performing an Article 440 for their client.

16.  Uncovering and laying out the numerous issues involving mixed-claims and records/claims that dehor the record took this pro-se defendant thousands of hours of research and drafting, with the end result being the proposed Article 440 submitted to this

Honorable Court with my moving papers. Even a seasoned attorney would have to spend an inordinate amount of time to obtain, evaluate and brief these numerous issues. This is a task which an overwhelmed and underpaid/understaffed firm like Appellate Advocates is just unable to perform.

17. As my moving papers explain in great detail, with as much documentary proof as this pro-se defendant could acquire over the past 18-24 months through FOIL, Article 78 proceedings and other avenues of investigation; the problem ultimately lies with the unqualified and inadequate 18-B assigned counsels. Mr. Lamb destroyed my defense with a combination of failures, which include but is not limited to, failure to investigate, failure to review available records, failure to contemporaneously object and a complete failure to cross-examine effectively. The failure to use these important and necessary basic tools in the trial lawyer's arsenal is enough to bring the adversarial process to a screaming halt, which also has the causal effect of practically obliterating any type of cognizable review on direct appeal. This problem is systemic and described in detail in my moving papers.(Aff. at ¶ 133-173)

18. It is these issues that I bring before this Honorable Court. I implore this Court to take a stand to the injustice that is suffered by the indigent defendant in the State of New York. Too long has this problem been shuffled from one Committee to

another, as I have detailed in my moving papers. (Aff. at ¶ 110-121)

19.   In closing, I respectfully request this Honorable Court consider the facts and circumstances outlined in his moving papers, when reviewing the relief requested for an attorney to perfect and submit an Article 440 brief, while placing a stay on my direct appeal until that is performed. (Aff. At ¶ 180-186)

20.   In support of the need for this, I ask this Honorable Court with the utmost respect and sincerity, to review the proposed Article 440 provided to this Court, which is the result of thousands of hours of research and explains in very factual detail how important this is to have a full and fair opportunity for this defendant to appeal his conviction. (Aff. at ¶ 187-191)

WHEREFORE, your deponent prays for an ORDER Withdrawing the Appellate Brief of Warren S. Landau, Assigning new Appellate Counsel on defendants' Direct Appeal and providing a funded mandate which will allow him to utilize the Information in outlined in his previously submitted moving papers which are Mixed Claims, in a CPL § 440.10 application, and/or Granting A Stay of Action Pursuant to CPLR 2201 to have new assigned Counsel Perfect and Submit an Article 440 Brief Before Placing My Direct on the Appellate Court's Calendar, which will be within a time period so designated by the Honorable Court; so that meritorious issues addressed in said Article 440.10 Motion can be developed and heard, and for such other and further relief as this Court may deem just and proper.

_____
Anthony Rucano, 11A0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, N.Y. 12929

Sworn to Before Me this 24
Day of _____, 2014

_____
Notary Public
Harry D. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires

*10*

## **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK)
)*ss.:*
*COUNTY OF CLINTON)*

       Anthony Rucano, being first duly sworn, deposes and says:

       That I am the petitioner, herein, and that on the date of notarization indicated below, I have placed in a sealed postpaid wrapper a true and exact copy of the enclosed papers identified as Reply Affidavit in Response of Motion to Withdraw Appellate Counsel's Brief and/or For Stay of Action Pursuant to CPLR 2221, addressed to the Second Department, Appellate Division and parties below, by depositing the same in a mail box here under the care, custody and control of Clinton Correctional Facility, P.O. Box 2001 Dannemora N.Y. 12929, for delivery to the United States Postal Service:

TO:  Richmond County District     Warren S. Landau
     Att: Appeals Bureau         Appellate Advocates
     Attorneys Office            Associate Appellate Counsel
     130 Stuyvesant Place       2 Rector St., 10th Floor
     Staten Island, N.Y. 10301   New York, N.Y. 10006

     Attorney General of the State of New York
     Att: Eric T. Schneiderman
     Law Department
     The Capitol
     Albany, N.Y. 12224

*Sworn to before me this* 24

*day of* April *2014.*

Harry D. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires
*NOTARY PUBLIC*

*Anthony Rucano*

**Anthony Rucano, 11A0528**
***Clinton Correctional Facility***
***P.O. Box 2001***
***Dannemora, NY 12929***

*11*



SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,:
                                  :  NOTICE OF MOTION
                                  :  TO FILE SUPPLEMENTAL
      -against-                 :  PRO SE REPLY BRIEF
                                  :
                                  :  IND. 270/09
ANTHONY RUCANO,               :  APP. DOCKET NO.
     Defendant-Appellant.     :  2011-01960
                                  :
------------------------------------X

    **PLEASE TAKE NOTICE**, that upon the annexed affidavit of

Anthony Rucano, sworn to on the 26th day of MAY , 2015,

and upon all the proceedings in this case, a motion will be made

to a term of this Court on the 12th day of June, 2015, located

at 45 Monroe Place, City of Brooklyn, County of Kings, N.Y., for

an ORDER granting permission for defendant-appellant to file a

supplemental pro-se reply brief, to effectively distinguish the

position of the respondent, and to be afforded a full and fair

opportunity to be heard, and for such other and further relief

as this Honorable Court deems just and proper.

**Dated:** MAY 26th , 2015
**Location:** Dannemora, N.Y

                                     *Anthony Rucano*
                                   [Defendant-Appellant]

**cc:** A. Alexander Donn
    [Appellate Advocates]
    111 John St., 9th Fl
    New York, N.Y. 100038

    **Richmond County D.A.**
    130 Stuyvesant Place
    Staten island, N.Y. 10301

Anthony Rucano, 11A0528
Clinton Corr. Facility
P.O. Box 2001
Dannemora NY 12929

*1*

**3**. As I am a layman in the matters of law and procedure, I respectfully request the Honorable Court excuse my oversight in overlooking this rule, which was not intentional.

**4**. **My reply brief is 27 pages**, and it primarily distinguishes the district attorney's opposition, explaining how their position is incorrect, and also reiterates and strengthens my position that relief should be granted, which not only involve ineffective assistance of counsel but also an abuse of discretion by the Honorable Judge Stephen J. Rooney on multiple occasions. **I have included the original and eight copies on my reply brief with this motion to expedite the matter in the interest of judicial economy**.

**5**. My appellate lawyer A. Alexander Donn explained to me that this matter is on for **oral arguments** on Friday, **May 15**[th], **2015** in front of the **Honorable Justices Mastro**, **Chambers**, **Roman** and **LaSalle** at 10 a.m.

**6**. I am under the belief that I have a constitutional right to a complete round of appeals in the state courts. Furthermore, when this Honorable Court granted my permission to file a pro-se supplemental brief, I was not notified that I had to ask permission to file a reply brief, which essentially gives me the final say and

provides me with a full and fair opportunity to advance my position. I humbly and respectfully ask this Honorable Court to consider my pro-se status and excuse this oversight, and please file my reply brief and consider it when deciding my appeal,

7.   I respectfully pray that this Honorable Court take into consideration my diligent and extensive participation in this direct appeal process, which included multiple motions to enlarge the record, and a motion to re-argue this Honorable Courts Decision and Order on that motion, which resulted in this Court granting both motions in part, providing me with relief. I also submitted an extensive and detailed motion to withdraw appellate counsels brief.

8.   Finally, this Honorable Court currently has my extensive motion for leave to appeal the erroneous denial of my Article 440 by Richmond county Supreme Court Judge Stephen J. Rooney, which is currently pending a decision by this Honorable Court as well.

9.   Considering all the above stated facts, and this Court's review of my included reply brief, I humbly ask this Court for the relief requested.

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK   )
                    ) SS.:
COUNTY OF CLINTON   )

Anthony Rucano, Being first duly sworn, deposes and says, that I am the Defendant-Appellant herein, and that on the date of notarization indicated below, I have placed in a sealed postpaid wrapper a true and exact copy of the enclosed papers identified as [**motion to file supplemental pro-se reply brief**] by depositing same in a mail box here at the Clinton Correctional Facility, P.O. Box 2001, Dannemora, N.Y. 12929, for delivery to the United States mail addresses of the parties below:

ORIGINAL COPY TO:
 Hon. AprilAnne Agostino
 Clerk of the Court
 Appellate Division
 Second Judicial Department
 45 Monroe Place
 Brooklyn, N.Y. 11201

 Richmond County District Attorney
 Att: Appeals Bureau
 130 Stuyvesant Place
 Staten Island, N.Y. 10301

Sworn to before me this 26

day of May , 2015

_____
[NOTARY PUBLIC]

CARBON COPY TO:
 A. Alexander Donn.
 Appellate Advocates
 111 John St, 9th Floor
 New York, N.Y. 10038

X _Anthony Rucano_____

Signature

Anthony Rucano, Pro-Se, 11A0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, N.Y. 12929

Robert R. Rabideau
Notary Public, State of New York
No. 01RA6304593
Qualified in Clinton County
Commission Expires 5/28/18

- 5 -

COPY



Anthony Rucano 11A0528
Senior Administrative Law Clerk
Clinton Correctional Facility
P.O. Box 2001
Dannemora, N.Y. 12929
May 26th, 2015
App. Div. Case No. 2011-01960

Appellate Division, Second Department
Att: Honorable Clerk Aprilanne Agostino
45 Monroe Place
Brooklyn, N.Y. 11201

Dear Ms. Agostino,

Good Morning, Enclosed I have submitted a Notice of Motion and Affidavit in Support of Motion for permission to file my Pro-Se Reply Brief, which I re-delivered to this court last week, in haste, with just an affidavit in support of motion (**No Notice**) due to my erroneous assumption that the upcoming oral arguments in my case would prevent the court from considering said pro-se reply brief.

I have since been informed by my appellate attorney, A. Alexander Donn of Appellate Advocates that oral arguments were on his submitted brief only. I apologize for the confusion. Please accept this Notice of Motion and Affidavit in Support of Motion for permission to file a Pro-Se reply brief, which is properly notarized, and humbly request that this court grant the relief requested, and to file and consider said reply brief already in the Honorable Courts possession.

God Bless you and thank you for your time and consideration concerning this matter.

Very Truly Yours,

*Anthony Rucano*

Anthony Rucano and Family, 11A0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, N.Y. 12929

Richmond County District Attorney
Hon. Daniel M. Donovan
130 Stuyvesant Place
Staten Island, N.Y. 10301

Appellate Advocates
Att: William A. Loeb
111 John Street, 9th Floor
New York, New York 10038

1



Appendix Item X

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

COPY

THE PEOPLE OF THE STATE OF NEW YORK,

AFFIRMATION IN
RESPONSE TO
DEFENDANT'S MOTION TO
FILE SUPPLEMENTAL BRIEF

-against-

ANTHONY RUCANO,

A.D. No. 2011-01960

*Defendant-Appellant.*

Richmond County Ind. No.
270/09

Paul M. Tarr, an attorney admitted to practice before the courts of this state, affirms that:

1.      I am an Assistant District Attorney, of counsel to DANIEL L. MASTER, JR., Acting District Attorney of Richmond County.  I am familiar with the records on file in the District Attorney's Office pertaining to this indictment, and make this affirmation based upon my examination and review of those documents.

2.      I submit this affirmation in response to defendant's pro se motion dated May 26, 2015, to file what he terms a supplemental pro se reply brief in this case.

3.      In this matter, defendant appeals from a judgment of the Supreme Court, Richmond County (Rooney, J.) rendered on January 21, 2011, convicting him, upon a jury verdict, of Rape in the First Degree [P.L. § 130.35(1)], Criminal Sexual Act in the First Degree [P.L. § 130.50(1)], Attempted Rape in the First Degree [P.L. §§ 110.00/130.35(1)], Assault in the Second Degree [P.L. § 120.05(6)], Assault in the Third Degree [P.L. § 120.00(1)], and Criminal Possession of a Weapon in the Third Degree [P.L. §§ 265.01(2), 265.02(2)].  Defendant was sentenced to an aggregate term of 12

1

years imprisonment, to be followed by five years of post-release supervision. The defendant is incarcerated pursuant to this judgment.

4.     On May 15, 2015, oral argument was held in this Court on defendant's appeal from his judgment of conviction. This Court has not yet issued its decision.

5.     The People take no position in regard to this motion. We note, however, that by order dated May 27, 2014, this Court granted defendant leave to file a pro se supplemental brief in connection with his appeal, which he filed, and that the appeal has been fully briefed and argued.

Dated:  June 3, 2015
        Staten Island, New York


                                              Paul M. Tarr
                                              Assistant District Attorney


cc:     Mr. Anthony Rucano
        11-A-0528
        Clinton Correctional Facility
        P.O. Box 2001
        Dannemora, NY 12929

# SUPREME COURT OF THE STATE OF NEW YORK
## APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

ANTHONY RUCANO,

Defendant-Appellant.

## AFFIRMATION IN RESPONSE TO DEFENDANT'S MOTION TO FILE SUPPLEMENTAL BRIEF

Richmond Co. Ind. No. 270/09
A.D. 2011-01960

**DANIEL L. MASTER, JR.**
Acting District Attorney
Richmond County
130 Stuyvesant Place
Staten Island, New York 10301
(718) 556-6300

Paul M. Tarr
Assistant District Attorney
Of Counsel

Appendix Item Y

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

---------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,      :

                Respondent,      :

        -against-      :

ANTHONY RUCANO,      :

           Defendant-Appellant.      :

---------------------------------------X

**AFFIRMATION IN RESPONSE TO MOTION TO FILE <u>PRO SE</u> REPLY BRIEF**

Richmond County
Ind. No. 270/09
A.D. No. 11-01960

Return date:
June 19, 2015

    A. ALEXANDER DONN, an attorney admitted to practice in the courts of this State, hereby affirms under penalty of perjury that the following statements are true:

    1.  I am associated with Lynn W. L. Fahey, who, on August 18, 2011, was assigned by this Court to represent appellant on his appeal from a judgment of the Supreme Court, Richmond County, dated January 21, 2011, convicting him, after a jury trial, of first-degree rape, first-degree criminal sexual act, attempted first-degree rape, second-degree assault, third-degree criminal possession of a weapon, and third-degree assault (Rooney, J.).  I am the attorney currently responsible for Mr. Rucano's appeal.

    2.  Appellant filed his main brief on June 28, 2013.  The People filed and served their responding brief between August 21 and 23, 2013.

    3.  On January 6, 2014, this Court granted Mr. Rucano's motion to file a <u>pro se</u> supplemental brief.  That brief was filed on or around April 30, 2015, and the People subsequently filed a supplemental responding brief.

    4.  Oral argument on this appeal took place on May 15, 2015.

5.   Mr.  Rucano  now  seeks  permission  to  file  a  <u>pro</u>  <u>se</u> supplemental reply brief.  Throughout our office's representation of him, Mr. Rucano has consistently demonstrated an exceptionally deep interest in his appeal.  He has filed numerous <u>pro</u> <u>se</u> motions in this Court and has corresponded regularly with our office about his case.

WHEREFORE, we support Mr. Rucano's motion to file a <u>pro</u> <u>se</u> supplemental reply brief.

Dated:   June 8, 2015
         New York, New York

                                    _____
                                    A. ALEXANDER DONN

2

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK           :

                        Respondent,           :   AFFIRMATION
                                      OF SERVICE
              -against-           :   A.D. 11-01960

ANTHONY RUCANO,                               :

              Defendant-Appellant.   :

-------------------------------------------x

STATE OF NEW YORK )
               ) ss.:
COUNTY OF NEW YORK )

      Anthony Alexander Donn, an attorney duly admitted to the practice of law in this State, does hereby affirm and show:

      That on June 8, 2015, the within Affirmation was served upon defendant-appellant Anthony Rucano, 11-A-0528, Clinton Correctional Facility, 1156 Rt. 374, P.O. Box 2001, Dannemora, New York 12929, by depositing a true copy of the same in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service in the State of New York.

Dated:   New York, New York
        June 8, 2015

                               _____
                           Anthony Alexander Donn

*Appendix Item 2*

## Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

M194971
E/sl

WILLIAM F. MASTRO, J.P.
CHERYL E. CHAMBERS
SHERI S. ROMAN
HECTOR D. LASALLE, JJ.

2011-01960

The People, etc., respondent,
v Anthony Rucano, appellant.

DECISION & ORDER ON MOTION

(Ind. No. 270/09)

Motion by the appellant pro se for leave to serve and file a supplemental reply brief on an appeal from a judgment of the Supreme Court, Richmond County, rendered January 21, 2011.

Upon the papers filed in support of the motion and the papers filed in relation thereto, it is

ORDERED that the motion is denied.

MASTRO, J.P., CHAMBERS, ROMAN and LASALLE, JJ., concur.

ENTER:

Aprilanne Agostino
Clerk of the Court

July 6, 2015

PEOPLE v RUCANO, ANTHONY



*Appendix Item MM*

**Appellate Division**
**Supreme Court of the State of New York**
**Second Judicial Department**
**45 Monroe Place**
**Brooklyn, N.Y. 11201**
**(718) 875-1300**

RICHMOND COUNTY
RECEIVED
15 OCT

MEG E. PARRIS
KAREN HOCHBERG-TOMMER
MARIA T. FASULO
DEPUTY CLERKS

RANDALL T. ENG
PRESIDING JUSTICE

APRILANNE AGOSTINO
CLERK OF THE COURT

DARRELL M. JOSEPH
KENNETH BAND
ASSOCIATE DEPUTY CLERKS

October 7, 2015

Anthony Rucano
11A0528
Clinton C.F.
P.O. Box 2001
Dannemora, N.Y. 12929

Re:     2011-01960
People v Rucano, Anthony
Ind. 270/09 - Appeal from
J - 01/21/2011 - Supreme Richmond

Dear Sir/Madam:

We have received your application for the following relief:

Motion to relieve assigned counsel and assign new.

The application will be placed on the motion calendar for **10/23/15.**

Yours truly,

**CLERK'S OFFICE**

---

NOTICE TO:  Daniel L. Masters, Jr. w/papers & Lynn W.L. Fahey w/papers

Dear Sir/Madam:

The above mentioned application will be placed on the motion calendar for **10/23/15.**

On or before that date, please furnish the motion clerk with an affidavit expressing your views in this matter.

Yours Truly,

**CLERK'S OFFICE**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION, SECOND DEPARTMENT
-----------------------------------------------------------------X
The People of the State of New York,

               Plaintiff(s)-Respondent(s),

          -against-

ANTHONY RUCANO,

            Defendant-Appellant.
-----------------------------------------------------------------X

:  NOTICE OF MOTION TO

:  WITHDRAW APPELLATE

:  COUNSEL AS COUNSEL

:  OF RECORD AND ASSIGN

:  NEW COUNSEL

:

:  INDICTMENT NO. 270/09

:  APPELLATE DIVISION

:  CASE # 2011-01960

*RECEIVED 15 OCT -6 AM 10: 25 APPELLATE SECOND DEPARTMENT*

**PLEASE TAKE NOTICE,** that upon the annexed affidavit of Anthony Rucano, duly sworn to on the 1<u>st</u> day of *October* , 2015, and upon the annexed affidavit and all papers and proceedings heretofore had herein, the above-named Appellant, proceeding pro-se, will move this Court Pursuant to 22 NYCRR 670.5 (a), and Judiciary Law § 2-b(3), in the Supreme Court of the State of New York, Appellate Division, Second Department, County of Kings, located at 45 Monroe Place, Brooklyn, New York, on the 29<u>th</u> day of *October* , 2015, at 10:00 a.m. in the forenoon of that day or as soon thereafter as the appellant can be heard pro-se for:

AN ORDER:  Withdrawing Appellate Counsel A. Alexander Donn of Appellate Advocates as Attorney of Record, and Assigning Pro-Bono and/or Neutral Counsel on the Grounds that **the Court of Appeals Granted Me Permission to Separately Brief an Argument for Leave to Appeal the May 19th, 2014 Order of this Court**, in addition to my Leave to Appeal application from this Court's Order dated July 1st, 2015; which advanced the claim Appellate Advocates failed to utilize the information outlined herein, which are Mixed Claims, in a CPL § 440.10 application as part of the appellate protocols outlined in ABA Standards

*1*

**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DIVISION, SECOND DEPARTMENT**
-------------------------------------------------------------------X

The People of the State of New York,

              Plaintiff(s)-Respondent(s)

          -against-

ANTHONY RUCANO,

            Appellant-Appellant,

-------------------------------------------------------------------X

       : AFFIDAVIT IN SUPPORT
       : OF MOTION TO WITHDRAW
       : APPELLATE COUNSEL AS
       : COUNSEL OF RECORD
       : AND ASSIGN NEW COUNSEL

       : INDICTMENT NO. 270/09
       : A.D. CASE # 2011-01960

STATE OF NEW YORK  )
                ) SS.:
COUNTY OF CLINTON  )

Anthony Rucano, being duly sworn, deposes and says:

1.    I, Anthony Rucano, am the Appellant in the above-entitled action, and respectfully move this Court to issue an Order pursuant to County Law § 722-C, withdrawing A. Alexander Donn of Appellate counsel as counsel of record for the Appellant due to an inherent conflict of interest, and authorizing the assignment of counsel whose background, knowledge and experience would enable him or her to properly represent Appellant in the proceedings, with due consideration to the seriousness and the unique and complex nature of the litigation.

2.    I am personally familiar with the facts and statements hereinafter; I am a layman in the matter of law and seek this Court's indulgence for errors defects and faults pursuant to Section 103(C) and 2101(F) of Civil Practice Law and Rules.

3.    I am presently appealing the jury verdict convicting the appellant in the Supreme Court of New York, County of Richmond, on January 21st, 2011. The appellant has continually and consistently attempted to work with Appellate Advocates since September of 2011 and with his first Appellate Counsel Warren Landau since he was assigned on April 20th, 2012.

*1*

**Equal Protection** because they do not have provisions for the assignment of counsel to help prepare and submit a meritorious post conviction motion before the perfection of my appeal.

7.      As the inherent failure of Appellate Advocates to perform its duty to pursue a collateral review proceeding for the appellant is intertwined with the appellant's claims challenging the constitutionality of County Law § 722, CPL § 440.10(2), CPL § 440.30 and CPLR §§ 1101/1102; because it inhibits and/or prevents institutional providers from bringing these claims due to unconstitutional laws combined with financial and/or political reasons; it would be an inherent conflict of interest for Appellate Advocates to represent me in perfecting and briefing such claim. This is the most important reason why this Honorable Court should grant my application.

**POINT 1**

**The Previous Application For Withdrawal of Appellate Counsel's Brief Decided By This Court on May 19th, 2014, Has Now Become Part of the Record When The Court of Appeals Granted Me Leave To Appeal This Order <u>Separately</u>, And An Inherent Conflict of Interest Exists Preventing Appellate Advocates From Appealing This Matter On My Behalf**

8.      Even though this Appellant pursued the Motion to Withdraw Appellate counsel's brief pro-se before this Honorable Court, while assigned Appellate Advocates, their continued representation of me on this Leave Application, which encompasses **all** issues granted leave on by the Court of Appeals, presents an inherent conflict of interest preventing Appellate Advocates from representing me before the Court of Appeals.

9.      The leave to appeal of the May 19th, 2014 order denying appellant's motion to withdraw appellate counsel's brief[3], recently granted by the Court of Appeals provided this Court with detailed documentary records with that motion. That motion claimed that Appellate

---

[3] Which challenged that, <u>as applied, County Law § 722, CPL § 440.10(2), CPL § 440.30 and CPLR §§ 1101/1102 are violative of my constitutional rights to Due Process and Equal Protection.</u>

*3*

discourages indigent/public defense providers, specifically ones like Appellate Advocates located in large metropolitan cities where financial constraints and political pressure are prevalent, from pursuing these mixed claims in collateral review proceedings before direct appeal; the due process rights of Appellants are violated by the submission of an appellate brief raising IAC claims on an incomplete and undeveloped record.

13.    It would be fundamentally unfair to leave Appellant to his own resources, and it would be fundamentally unfair to require Appellant, an indigent inmate, to argue this motion without the guiding hand of qualified counsel. Counsel is reasonable necessary to safeguard against a miscarriage of justice. The stakes are simply too high for this Court not to grant Appellant the benefit of qualified counsel that does not have a conflict of interest.

14.    My motion to Withdraw Appellate Counsels brief addressed the failures, in detail, of Warren Landau of Appellate Advocates, who not surprisingly left that firm after I filed a complaint against him with the Departmental Disciplinary Committee for ignoring multiple requests for the District Attorneys response to his direct appeal brief. Once I received that response to his brief from the Richmond County District Attorney's Office over 6 months later, I knew why he did not want to send it to me. It revealed that Mr. Landau raised 2 issues which were unpreserved, and 1 count of ineffective assistance of counsel, representing less then 10% of the "mixed claim" ineffective assistance of counsel claims <u>that I brought to his attention!</u>[5]

15.    Yet, when this Court summarily denied my motion to Withdraw Appellate Counsels brief on May 19th, 2014, it actually mirrored the claims I presented in that motion. In this Court's decision and order dated July 1st, 2015, this Honorable Court held that two (2) of the

---

[5] These claims not raised are too numerous to list, but most notably involve prosecutorial misconduct at the grand jury, medical records received during trial, and billing records received from AETNA Insurance through the Connecticut Attorney General's Office, showing that medical records received under subpoena by the trial court were falsified!

law, failure to use experts and other resources, and overall completely failing to preserve the reviewable record on appeal. My case is a prime example and perfect storm of the utter destruction these unqualified attorneys can inflict when faced with the convoluted, unconstitutional and unworkable procedural scheme in this State, combined with political and financial constraints.

19.     More then half the points raised by Mr. Landau in his appellate brief are unpreserved for appellate review because of trial counsel's failure to preserve the record, as stated above. Yet, this does not stop Mr. Landau from submitting these unpreserved claims on direct appeal. This is done in a large majority of cases by Appellate Advocates. This is supported by the following addendum showing cases over the past few years, decided by the Second Department, where Appellate Advocates submitted briefs involving mixed-claims or issues that dehor the record. These cases specifically address that a CPL 440.10 proceeding is the appropriate forum for reviewing the claim in its entirety. (Addendum No. 1, Cases Handled by Appellate Advocates)

20.     This can be attributed to political and financial constraints, which allow the outdated and unconstitutional laws to be overlooked, at the cost of "justice for all", that provide inadequate funding to 18-b trial attorneys, who instead have learned to "warehouse" cases in order to turn a profit, at the expense of indigent defendant's right to effective assistance of counsel, especially in Richmond County, New York[6]. This, in turn, creates a domino effect by leaving a large majority of potential issues unpreserved due to trial counsels overall errors of omission and commission during the trial process

---

[6] 18-B Assigned Counsel Attorneys last received a raise to $75 an hour in 2002, almost 13 years ago. Due to inflation, attorneys on the 18-B panel make less profit now then they did 13 years ago, exasperating the problem even further,

27.     As it stands, even though the Court of Appeals stated that "mixed claims" are properly raised in a post-conviction motion, when Appellate counsel fails to raise those claims because they are "mixed claims", an argument can be made that I am being denied due process and equal protection under the law, preventing me from vindicating my federal ineffective assistance of counsel claims.

### POINT 2
**Appellate Advocates Was Provided With Records Supporting The Need For A Collateral Review Motion And Knowingly Failed To Act As An Advocate For Their Client, Due In Part To An Unworkable, Unconstitutional Procedural Scheme in this State; Thereby Preventing Them From Representing Me In A Leave Application Challenging Their Actions, Which Are Implacably Intertwined With The Unconstitutional Procedural Scheme in This State**

28.     Since Appellate Advocates first contacted me on September 15th, 2011, informing me they were assigned to represent me on direct appeal, I continually communicated with them and provided numerous documents and affidavits supporting the need to pursue a collateral review application. The history of that communication is outlined below.[7]

**A.     Correspondence With Appellate Advocates Concerning Need For Post-Conviction Motion**

29.     On September 30th, 2011, I wrote my first letter to Irene Wojcicki, Paralegal for Appellate Advocates asking her to estimate when my trial record would be assembled. On October 10th, 2011, I drafted a letter to Ms. Wojcicki..

30.     It is at this early stage during Appellate Advocate's representation of me that a complete copy of the **Complainant's Grand Jury Testimony** was provided to them, along with proof that the **"Diary"** was released to Mr. Lamb by ADA Katchen on June 21st, 2010, a full two

---

[7] The correspondence quoted was included in my Motion to Withdraw Appellate Counsel's Brief, which was filed 14 months before this Honorable Court affirmed my direct appeal, and is mentioned for context only.

my criminal trial. I specifically told Mr. Landau that: "I would like to know, after your initial review, **if you plan on submitting an Article 440**, on what issues, and the reason why you will or will not submit one. I think preserving all of the record issues, then consolidating the appeal from that Article 440 with my direct appeal, can only strengthen my direct appeal by giving the appellate court a more clear and explained view of all of the issues involved. [Emphasis Added].

36.      I received a letter from Mr. Landau on May 23, 2012 stating "Thus, while I will review the draft of the C.P.L. §440.10 motion you sent, I urge you not to file it **unless and until we advise you that we will be unable to file a C.P.L. §440.10 motion on your behalf.**"

37.      After contacting his Supervisor, Warren Landau send me a letter on October 4, 2012, where Mr. Landau admonished me about contacting the senior attorney. He communicated with me concerning my issues that dehor the record, stating in brief "I will consider whether we should file a motion to vacate your conviction pursuant to C.P.L. Article 440." He did specifically tell me at this point that "we rarely represent an appellate client beyond the appeal on which we were appointed by the Appellate Division."

38.      On November 22nd, 2012, I drafted and sent a letter to Mr. Landau and stated to him, "Once you start reviewing letters, research and documents, I want to see outline you prepare that shows the points you plan on pursuing before you start writing my brief." Furthermore, I reiterated the importance of communicating with me **before** filing my brief, as I have intimate knowledge of things outside the record in support of my appeal, including an Article 78 against the Assigned Counsel Plan, against the Richmond County District Attorney's office and the NYC Police Department, which all seek records in support of my defense.

39.      After 3 months without hearing from Mr. Landau, I wrote the Attorney in Charge of Appellate Advocates on December 24th, 2012, informing her of the importance of receiving

42.     On March 6th, 2013, Mr. Landau sent me a letter stating "In answer to some of your concerns, I have not yet begun working on your appeal and I will not do so until I believe we have all the necessary documents within the appellate record. As you may recall, I am waiting for an additional transcript that you requested we obtain (July 7th, 2010).

43.     **Important to note** is Mr. Landaus statement also made in the March 6th, 2013, correspondence from him, stated on page 2 which said "Most of the points you have suggested seem to require a C.P.L. §440.10. As I have also previously mentioned if I conclude that some of the materials you provide/have provided and arguments you have brought/bring to my attention cannot be used or made in connection with the direct appeal from the conviction, I will consider whether we should file a motion to vacate your conviction pursuant to that section." Finally, on page 3, "When I have tentatively decided what issues to argue, I will advise you of that as well."

44.     On April 22nd, 2013, I specifically informed Mr. Landau "I can not take the chance that you may not choose to submit one [Article 440], so I will be submitting one ONLY AFTER you tell me you will not be so either way I will be asking you to delay submitting and/or preparing your brief until after it is filed and decided as additional issues put on the record by the Article 440 may be addressed by you, in support of any ineffective assistance of counsel issues you may already be raising."

45.     Finally, I received a letter from Mr. Landau on June 7th, 2013, 3 months after his last correspondence; which stated "I am now about to begin drafting your brief, so if you have any suggestions on appellate issues that you have not already provided please let me know now. When I have tentatively what I will argue, probably within days I will let you know. When I file your brief with the Court, I will give you my thoughts as to some of the issues I considered but decided not to argue."

*13*

in said application. This request was granted and the Amended Application was filed with the Court on September 3rd, 2013.

51.     On September 10th, 2013, the Appellant submitted a motion to enlarge the record on appeal. On October 15th, 2013 the Appellant submitted a supplemental affidavit in support of the motion to enlarge the record, correcting a typographical error and supplementing requests to my previous motion.

52.     On October 23rd, 2013, almost 4 months since Mr. Landau last contacted me, he wrote me a letter informing me he received a copy of the motion in support of motion to enlarge the record. He admitted that "transcripts of proceedings in Supreme Court, upon one's indictment, or in criminal court leading up to an indictment, should normally be made part of the record on appeal, **on request, if the transcripts are available**. Similarly, transcripts of Grand Jury Proceedings that leads to one's indictment are **almost** always part of the record on appeal from a conviction stemming from same indictment." [Emphasis Added]

53.     Mr. Landau states "I need you to tell me...how these transcripts are relevant to any points you intend to argue...", showing that he did not review the letters and documentation I sent him as these issues were consistently mentioned over a period of 2 years.

54.     Mr. Landau's only concern in responding to my motion to enlarge the record was to cover himself of any deficiencies in his performance. Mr. Landau was well aware of the issues I wanted to address with the Grand Jury which was intertwined with the diary and expert witnesses never called, and never once acted as an advocate to discuss these important issues with me. If he would have acted with a bare minimum of advocacy, he would have insured a complete record on appeal which included the requested transcripts of proceedings and testimony

59.     Finally, I received a Decision and Order dated January 6th, 2014 on my motion for permission to file a supplemental pro-se brief and motion to enlarge the record. I received this letter on January 13th, 2014, and I was granted permission to file a supplemental pro-se brief.

60.     I was granted relief on my motion to enlarge the record, which included the transcripts of July 7th, 2010, July 16th, 2010 and August 10th, 2010 be included as part of the appellate record, and that on or before January 28th, 2014, the District Attorney shall file a copy of the Grand Jury Proceedings under seal to the appellate Court, for in-camera review.

61.     The Appellant submitted a motion to Resettle and/or Amend their Decision and Order dated January 6th, 2014 enlarging the record, to enlarge the Judgment Roll to include the transcripts of the proceedings which occurred on October 1st, 2009 and October 5th, 2009.

**D.     Events Leading Up to Disciplinary Proceedings Being Brought Against Warren Landau**

62.     Mr. Landau admitted in his letter dated October 23rd, 2013, that "transcripts of proceedings in the Supreme Court, upon one's indictment, **or in the criminal court, leading up to the indictment (October 1[st], 2009 and October 5[th], 2009)**, should normally be made part of the record on appeal, on request, if transcripts are available", yet he neglected to provide any support to include transcripts "in the criminal court, leading up to the indictment", in his affirmation in support to enlarge the record on appeal.

63.     Furthermore, Mr. Landau admitted that between August 21st and 23rd, 2013, the People filed and served their 59 page answering brief, in his affirmation in support submitted to the court on October 31st, 2013, yet he has repeatedly ignored my request to provide me with a copy in letters sent to him on October 29th and November 6th, 2013. I also sent a final request on

*17*

68.     Mr. Landau finally included the District Attorney's response to his appellate brief filed in June 2013. It became instantly clear why Mr. Landau was hesitant and neglected to provide it to me until I filed a formal complaint against him.

.69.     Review of the District Attorney's opposition clearly revealed the underlying premise of these moving papers, which is that Appellate Advocates routinely practices the submittal of Appellate briefs in cases where there lies a clear need for collateral review proceedings de to political and financial constraints, combined with an unworkable, convoluted and unconstitutional procedural scheme which seriously prejudiced his right to a full and fair adjudication of his Federal ineffective assistance of counsel claims in state court.

### Conclusion

70.     In Point 2, this appellant has provided a synopsis of appellate counsel's numerous deficiencies, all of which were raised in my motion to Withdraw Appellate Counsel's brief which this Court summarily denied on May 19th, 2014.

71.     The Court of Appeals has now granted me permission to file a separate Leave . Application on this motion. The underlying premise of this motion is that an inherent conflict of interest exists, preventing Appellate Advocates from representing me on this appeal and as such this Court, who assigned Appellate Advocates to represent me on my direct appeal, is no longer capable of representing me on this application.

72.     Specifically, the motion to Withdraw Appellate Counsel's brief specifically claims that Appellate Advocates was in fact "negligent." ABA Standard 4-8.3(b) requires appellate counsel to utilize post conviction proceedings on issues which affect the validity of the judgment **prior** to perfecting an appeal if, **after investigation**, he is satisfied that trial counsel provided ineffective assistance of counsel.

**Addendum No. 1**

People v. Cass, 79 A.D.3d 768, December 10th, 2010 (W.L.)

People v. General Waiters, 95 A.D.3d 1043, May 8th, 2012 (J.K.)

People v. Delancey, 94 A.D.3d 1015, April 17th, 2012 (W.K.)

People v. Jackson, 97 A.D.3d 693, July 11th, 2012 (K.L. & D.L.)

People v. Taylor, 98 A.D.3d 209, August 8th, 2012 (E.H.) (S.I.)

People v. Thompson, 99 A.D.3d 819, October 10th, 2012 (K.H.)

People v. Candelaria, 101 A.D.3d 1139, December 26th, 2012 (A.P.)

People v. Zappulla, 103 AD.3d 759, February 13th, 2013 (P.S.L & EC.)

People v. Reddick, 104 A.D.3d 708, March 6th, 2013 (J.L.) (S.I.)

People v. Jones, 105 A.D.3d 1059, April 24th, 2013 (A.A.)

People v. Washington, 2013 WL 3336704, July 3rd, 2013 (J.K.)

# EXHIBIT



Letter From Court of Appeals **Dated September 15th, 2015**, Granting Permission to Appeal the May 19th, 2014 ORDER denying Motion to Withdraw Appellate Counsel's Brief

Letter From Court of Appeals **Dated September 22nd, 2015**, acknowledging that the Court of Appeals has granted separate Leave Applications from **Both the July 1st, 2015 and May 19th, 2014** ORDER of the Second Department, Appellate Division, and Informing Appellant that **any Motion for Poor Person and The Assignment of Counsel Must be Made to the 2nd Dept.**



*State of New York*
*Court of Appeals*

*Andrew W. Klein*
*Chief Clerk and*
*Legal Counsel to the Court*

*Clerk's Office*
*20 Eagle Street*
*Albany, New York 12207-1095*

September 15, 2015

Anthony Rucano
#11-A-0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

Re:  People v Rucano (Anthony)

Your application by letter dated August 17, 2015 for a certificate permitting an appeal from an order of the Appellate Division, Second Department, dated May 19, 2014, has been assigned to:

> Hon. Leslie E. Stein
> Judge of the Court of Appeals
> Court of Appeals Hall
> 20 Eagle Street
> Albany, NY 12207-1095

The papers you have submitted on the application are being forwarded to the assigned Judge.  Additional submissions, if any, must be mailed within three weeks after the date of this letter, and a copy must be served on the adverse party.  Any responsive communications must be mailed within two weeks after the due date for the applicant's additional submissions, with a copy also served on the adverse party.

Particular written attention should be given to identifying reviewability and preservation issues (Rules of Practice, § 500.20[a]).

Very truly yours,

John P. Asiello
Deputy Clerk

cc:  Hon. Daniel L. Master Jr.,
Richmond County District Attorney
Attn:  Paul M. Tarr, ADA

A. Alexander Donn, Esq.



*State of New York*
*Court of Appeals*

*Clerk of the Court*

*Clerk's Office*
*Albany, New York 12207-1095*

September 22, 2015

Anthony Rucano
#11-A-0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

     Re:  <u>People v Rucano (Anthony)</u>

Dear Mr. Rucano:

     I acknowledge receipt on September 14, 2015 of your letter dated September 9, 2015, addressed to Chief Judge Lippman. I also acknowledge receipt on September 21, 2015 of your letters dated September 16 and 17, 2015, addressed to me.

     Your applications for leave to appeal from an order of the Appellate Division, Second Department, dated July 1, 2015, and an order of a Justice of that court dated May 19, 2014, are both now pending before Judge Leslie E. Stein. It is noted as well that you provided a copy of a September 16, 2015 letter to the Hon. Aprilanne Agostino in which you indicated that you do not wish to have papers you filed with that court treated as an application to have a Justice of that court grant you leave to appeal.

     If you wish to have Appellate Advocates relieved of its assignment as your counsel, you must request such relief from the Appellate Division, Second Department, the court that assigned it, with copies to the District Attorney, Appellate Advocates and this Office.

     Further, your request for poor person relief is premature. If leave to appeal is granted, you may apply to this Court at that time for such relief.

                            Very truly yours,

                            John P. Asiello

cdb

cc:    Hon. Aprilanne Agostino
       Solicitor General of the State of New York
       Paul M. Tarr, ADA
       A. Alexander Donn, Esq.

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK)
　　　　　　　　　　) ss.:
COUNTY OF CLINTON)

　　　Anthony Rucano, 11A0528, being first duly sworn, deposes and says:

　　　That I am the defendant, herein, and that on the date of notarization indicated below, I have placed in a sealed postpaid wrapper the enclosed papers identified as Motion to Withdraw Appellate Counsel as Counsel of Record and Assign New Counsel, for Ind. No. 270/09, Appellate Division No 2011-01960, as addressed to the Appellate Division, Second Department and parties below, by depositing the same in a mail box here under the care, custody and control of Clinton Correctional Facility, P.O. Box 2001 Dannemora N.Y. 12929, for delivery by the United States Postal Service to the following parties:

To: Richmond County District Attorneys Office
　　 Att: Appeals Bureau
　　 130 Stuyvesant Place
　　 Staten Island, N.Y. 10301

　　 Solicitor General of the State of New York
　　 Att: Nikki Kowalski
　　 120 Broadway
　　 New york, N.Y. 10271-0332

New York State Court of Appeals
Att: Deputy Clerk John P. Asiello
Court of Appeals Hall, Eagle Street
Albany, New York 12207

Appellate Advocates
Att: A. Alexander Donn
111 John St., 9th Floor
New York, N.Y. 10038

Sworn to before me this _____

day of ___O c t____ 2015

_____
NOTARY PUBLIC

_Henry D. Dko_
_Notary Public, State of New York_
_No. 01DU6406876_
_Qualified in Clinton County_
_Commission Expires_ _____

_Anthony Rucano_

_____
Anthony Rucano, 11A0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

Appendix Item NN

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

ANTHONY RUCANO,

*Defendant-Appellant.*

AFFIRMATION IN
RESPONSE TO
DEFENDANT'S PRO SE
MOTION TO SUBSTITUTE
APPELLATE COUNSEL

A.D. No. 2011-01960

Richmond County Ind. No.
270/09

APPELLATE DIVISION
SECOND DEPARTMENT
15 OCT 23 AM 11:3

RECEIVED

Paul M. Tarr, an attorney admitted to practice before the courts of this state, affirms that:

1.      I am an Assistant District Attorney, of counsel to DANIEL L. MASTER, JR., Acting District Attorney of Richmond County. I am familiar with the records on file in the District Attorney's Office pertaining to this indictment, and make this affirmation based upon my examination and review of those documents.

2.      I submit this affirmation in response to defendant's pro se motion to substitute his assigned appellate counsel based on an alleged conflict of interest. Counsel has represented defendant in connection with this Court's order dated July 1, 2015, People v. Rucano, 130 A.D.3d 656 (2d Dept. 2015), which denied his appeal from the judgment of conviction underlying this matter. By letters to the Court of Appeals dated July 16 and August 7, 2015, defendant has sought leave to appeal this Court's order.

3.      The underlying judgment of conviction of the Supreme Court, Richmond County (Rooney, J.), rendered on January 21, 2011, convicted defendant, upon a jury verdict, of Rape in the First Degree (P.L. § 130.35[1]), Criminal Sexual Act in the First Degree (P.L. § 130.50[1]), Attempted Rape in the First Degree (P.L. §§

1

110.00/130.35[1]), Assault in the Second Degree (P.L. § 120.05[6]), Assault in the Third

Degree (P.L. § 120.00[1]), and Criminal Possession of a Weapon in the Third Degree

(P.L. §§ 265.01(2), 265.02[2]).  Defendant was sentenced to an aggregate term of 12

years imprisonment, to be followed by five years of post-release supervision.  He is

incarcerated pursuant to this judgment.

      4.    Respondent takes no position as to defendant's motion for substitution of

his appellate counsel.

Dated:  October 22, 2015
       Staten Island, New York


                                             Paul M. Tarr
                                           Assistant District Attorney


cc:    Mr. Anthony Rucano
       11-A-0528
       Clinton Correctional Facility
       P.O. Box 2001
       Dannemora, NY 12929

       A.  Alexander Donn, Esq.
       *Counsel for Defendant-Appellant*
       Appellate Advocates
       111 John Street, 9th Floor
       New York, NY 10038

Appendix Item '00'

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,      :

                    Respondent,           :

            -against-                     :

ANTHONY RUCANO,                           :

                    Defendant-Appellant.  :
------------------------------------X

AFFIRMATION IN
RESPONSE TO MOTION TO
RELIEVE ASSIGNED
COUNSEL

Richmond County
Ind. No. 270/09
A.D. No. 11-01960
Return date:
October 23, 2015

A. ALEXANDER DONN, an attorney admitted to practice in the courts of this State, hereby affirms under penalty of perjury that the following statements are true:

1.  I am associated with Lynn W. L. Fahey, who, on August 18, 2011, was assigned by this Court to represent appellant on his appeal from a judgment of the Supreme Court, Richmond County, dated January 21, 2011, convicting him, after a jury trial, of first-degree rape, first-degree criminal sexual act, attempted first-degree rape, second-degree assault, third-degree criminal possession of a weapon, and third-degree assault (Rooney, J.). I am the attorney currently responsible for Mr. Rucano's appeal.

2.  Another attorney then in our office filed Mr. Rucano's main brief on June 28, 2013. The People responded on August 16, 2013.

3.  On May 19, 2014, this Court denied a motion filed by Mr. Rucano to relieve our office as his assigned counsel and strike the brief we had filed.

4.  Mr. Rucano filed a pro se supplemental brief on October 14, 2014. The People responded on April 14, 2015.

5.   This Court unanimously affirmed Mr. Rucano's conviction on July 1, 2015.

6.   I filed an initial leave letter to the Court of Appeals on July 16, 2015, and sent a supplemental letter to Judge Leslie E. Stein, who had been assigned to decide the application.

7.   In a pro se letter to the Court of Appeals dated August 17, 2015, Mr. Rucano sought leave to appeal this Court's May 19, 2014, order denying his motion to relieve our office as counsel. In response, John Asiello of the Court of Appeals directed Mr. Rucano to send any additional submissions regarding that application to Judge Stein.

8.   In a subsequent letter to Mr. Asiello, Mr. Rucano requested that Appellate Advocates be relieved as his counsel on the portion of his leave application related to this Court's May 19, 2014, order and that new counsel be assigned.

9.   On September 22, 2015, Mr. Asiello informed Mr. Rucano, "If you wish to have Appellate Advocates relieved as your counsel, you must request such relief from the Appellate Division, Second Department[.]"

10.   On October 1, 2015, Mr. Rucano filed the instant motion, which seeks to relieve our office as counsel because of our "inherent conflict of interest" regarding the application for leave to appeal this from this Court's May 19, 2014, order to the Court of Appeals.

11.   We take no position on Mr. Rucano's motion.

2

Dated:   October 22, 2015
         New York, New York

A. ALEXANDER DONN

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK       :
                                          :
                          Respondent,     :    AFFIRMATION
                                          :    OF SERVICE
          -against-                       :    A.D. 11-01960
                                          :
ANTHONY RUCANO,                           :
                                          :
                          Defendant-Appellant.  :
                                          :
------------------------------------x

STATE OF NEW YORK  )
                   )  ss.:
COUNTY OF NEW YORK )

        Anthony Alexander Donn, an attorney duly admitted to the
practice of law in this State, does hereby affirm and show:

        That on October 22, 2015, the within Affirmation was
served upon defendant-appellant Anthony Rucano, 11-A-0528,
Clinton Correctional Facility, 1156 Rt. 374, P.O. Box 2001,
Dannemora, New York 12929; and Hon. Daniel L. Master, Jr.,
Acting District Attorney, Richmond County, 130 Stuyvesant
Place, 7th Floor, Staten Island, NY 10301, Attn: A.D.A. Paul
M. Tarr, by depositing true copies of the same in post-paid
properly addressed wrappers, in an official depository under
the exclusive care and custody of the United States Postal
Service in the State of New York.

Dated:  New York, New York
        October 22, 2015

                                        _____
                                        Anthony Alexander Donn

AD 9-20

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND
- - - - - - - - - - - - - - - - - - - -X
  THE PEOPLE OF THE STATE OF NEW YORK,

                  - against -                    (09-0692)


     ANTHONY RUCANO,

                    Defendant.

- - - - - - - - - - - - - - - - - - - -X


                              TAKEN ON:   OCTOBER 1, 2009

                              BEFORE:     TERM TEN
                                          SEPT.-OCT. 2009
                                          GRAND JURY




                P R E S E N T:

                    HONORABLE ANTHONY KATCHEN
                    HONORABLE YOLANDA RUDICH
                    ASSISTANT DISTRICT ATTORNEY
                    RICHMOND COUNTY








DONIELLE MCKENNA
GRAND JURY
STENOGRAPHER

2

1    BY MR. KATCHEN:

2                    (So marked Grand Jury Exhibit

3                    Nos. 1 through 6 for

4                    identification.)

5              Good morning, everybody.  My name

6    is Assistant District Attorney Anthony Katchen.

7    With me is Assistant District Attorney Yolanda

8    Rudich.  We are presenting the case of Anthony

9    Rucano, R-U-C-A-N-O.  The file number is 09-0692.

10   I expect that you are going to hear from one

11   witness today, and then the case will be

12   continued until Monday.

13             The first witness we are going to

14   hear from is Duane Ramos.

15

16

17

18

19

20

21

22

23

24

25

3

1     D U A N E    R A M O S, residing at 50 Silverton

2     Terrace, being called as a witness on behalf of

3     the People, first being duly sworn and testifies

4     as follows:

5          Q     Miss Ramos, I'm just going to ask

6     you to spell your name for the Grand Jury and

7     state it in a loud voice.

8          A     Duane, D-U-A-N-E, Ramos, R-A-M-O-S.

9          Q     Okay. Now, Miss Ramos, because of

10    speaking with you this morning, I'm just going to

11    ask that you do your best to speak as loud as you

12    can, okay, this way everyone in the room can hear

13    you. Okay?

14         A     Yes.

15         Q     Miss Ramos, where do you reside?

16         A     40 Silverton Terrace.

17         Q     Is that in Staten Island?

18         A     Yes.

19         Q     And who do you live with at that

20    location?

21         A     I lived with my boyfriend, Anthony

22    Rucano.

23         Q     And how long have you known that

24    individual?

25         A     Six months.

RAMOS                                    4

1          Q       And when did you begin living with

2     him at 40 Silverton Terrace?

3          A       We moved in August 1st of 2009.

4          Q       And prior to that, you were dating

5     him?

6          A       Yes.

7          Q       And where was he living?

8          A       Merry Mount Street.

9          Q       Is that in Staten Island, as well?

10         A       Yes.

11         Q       Okay.  Miss Ramos, I'd like to

12    direct your attention to July 17th of 2009.  Were

13    you at Mr. Rucano's Merry Mount Street address on

14    that date?

15         A       Yes.

16         Q       Would you please tell the Grand

17    Jury what happened -- what, if anything, happened

18    between you and Mr. Rucano?

19         A       Can I look at my book to refresh?

20         Q       (NO VERBAL RESPONSE.)

21         A       Yes.

22         Q       What happened?

23         A       He wanted -- we got into an

24    argument.  He wanted to know who was I calling on

25    the phone and he wanted to check the phone.

RAMOS                                          5

1      Q       Okay.  And what happened during the

2  course of that conversation?

3      A       It turned violent.

4      Q       What do you mean by that?

5      A       He ripped my dress off --

6      Q       Okay.

7      A       -- broke the other strap of my

8  dress.

9      Q       When you say he broke the other

10  strap of your dress, did he initially break the

11  first strap of your dress?

12      A       Yes.  What happened on that day, I

13  got off the ferry and he was at the ferry picking

14  me up.

15      Q       Okay.

16      A       And he -- when I got into the car

17  he grabbed me and then he wanted to know who was

18  I talking to on the phone.

19      Q       Okay.

20      A       And that's when the first strap,

21  um, broke.

22      Q       And then you went back to his house

23  on Merry Mount Street --

24      A       Yes.

25      Q       -- on Staten Island?

FORM C-100 · LASER  REPORTERS PAPER & MFG. CO.   800·626·6313

RAMOS                                    6

1          Okay.  And that's when he broke the

2     second strap?

3          A     Yes.

4          Q     Were you inside the house?

5          A     Yes.  I was in the -- in the house.

6          Q     After he broke the second strap of

7     your dress, tell me what happened next?

8          A     Then I put on a shirt.

9          Q     Okay.

10         A     And then he ripped the shirt off.

11         Q     Okay.

12         A     And then he, um, he ripped my bra

13    off.  I'm sorry.

14         Q     You don't have to apologize.

15         A     Then, um, once he ripped my bra

16    off, then he threw me on the sofa.  Then he

17    started punching me in my face, and then he told

18    me that I was gonna, um, have oral sex with him.

19         Q     Okay.  And did you?

20         A     Yeah.

21         Q     Okay.  And by "oral sex", you mean

22    his penis was in your mouth?

23         A     Yeah.  Yes.  He forced me, um, to

24    put his penis in my mouth.

25         Q     How did he do that?

RAMOS                                    7

1          A       Um, he took my head and then he
2     forced it towards him.
3          Q       Okay.  Okay.  And what happened
4     after that?
5          A       Then he told me -- He was like, now
6     I'm gonna fuck you.
7          Q       And what happened?
8          A       Then he forced himself -- he took
9     his penis and, um, inserted it into my vagina.
10         Q       And how did he go about forcing
11    that?
12         A       He forced himself on top of me.
13         Q       Did he pull your legs apart?
14         A       Yes.
15         Q       Okay.  I'd like to now direct your
16    attention to July 28th, did anything take place
17    between you and Mr. Rucano on that date?
18         A       Yes.
19         Q       Okay.
20         A       Um, I have to look at my
21    (indicating)--
22         Q       Miss Ramos, just before you answer
23    that, from July 17th to the present, did you keep
24    a diary?
25         A       Yes, I have.

RAMOS                                    8

1        Q        Okay.  And what was the point of --
2   what were the entries that were made in that
3   diary?
4        A        The entries in the diary are of all
5   the incidents that's been happening between
6   Anthony and I.
7        Q        Is that what you're using to
8   refresh your recollection?
9        A        Yes.
10       Q        Now, as far as July 28th goes - I'm
11  sorry that I jumped around - did anything happen
12  with you and Mr. Rucano on that date?
13       A        Yes.  We went, um -- we went to see
14  a couple's counselor.  And after we left the
15  counseling, we went back to his place and --
16       Q        That's on Merry Mount Street on
17  Staten Island?
18       A        Yes.
19       Q        And what happened at that location?
20       A        We got into another fight.
21       Q        Okay.
22       A        And, um, he became violent again.
23       Q        What did he do?
24       A        Um, he told me I better be nice to
25  him.

RAMOS                                    9

1        Q        And what did you understand that to

2    mean?

3        A        Have sex.

4        Q        Why did that mean to have sex to

5    you?

6        A        Because that's the way he says to

7    have it all the time.

8        Q        He describes having sex to be nice

9    to him?

10       A        Yes.

11       Q        Then what happened next?

12       A        Then, um, he started hitting me.

13       Q        Did you give a response to him

14   saying that you better be nice to me?

15       A        I said no.

16       Q        And continue, describe what he did.

17       A        I told him no.  And then he started

18   hitting me and, um, he grabbed me and then he

19   forced himself again.  And I kept saying no.

20       Q        When you say he forced himself upon

21   you, you mean to have sexual intercourse?

22       A        Yes.

23       Q        And that means he inserted his

24   penis into your vagina?

25       A        Yes.

1       Q       Did you have oral sex with him that

2    day?

3       A       Yes; I was also forced.

4       Q       Okay.  How were you forced to

5    perform oral sex?

6       A       He would -- he would grab the back

7    of my head and like pull it towards him, and then

8    he would insert his penis into my mouth.

9       Q       Okay.  Okay.  Regarding when you

10   mentioned that he was hitting you, do you recall

11   where he would hit you?

12      A       He would hit me in the face.

13      Q       Okay.

14      A       Um, he would first hit -- punch me

15   in my lower back.  And then -- if I start

16   screaming, then he'll choke me and then he'll hit

17   me in the face.

18      Q       Okay.  Did that cause you to suffer

19   pain?

20      A       Yes.

21      Q       Did it result in bruising?

22      A       Yes.

23      Q       Okay.  Were those -- the way you

24   just described the violence committed against

25   you, did that -- was the result the same the

RAMOS                          11

1   first time as well?  Did he cause you to suffer

2   the same injuries on July 17th?

3          A       July 17th, um, when he punched me

4   in the face, I went to work with a black eye.

5          Q       Now, I'm going to direct your

6   attention to July 30th of 2009, what, if

7   anything, happened to you -- between you and

8   Mr. Rucano on that day?

9          A       Um, we got into an argument and he

10  started hitting me.

11         Q       Where was he hitting you?

12         A       Um, on my lower back and then he

13  started hitting me on my legs, on my arms.

14         Q       Okay.

15         A       And then I started screaming --

16  screaming and then he choked me.

17         Q       Did that cause you to suffer pain?

18         A       Yes.

19         Q       And you suffered bruising that

20  time, as well -- on that occasion?

21         A       Yes.

22         Q       And what else, if anything,

23  happened?

24         A       He forced himself on top of me

25  again.

RAMOS                          12

1       Q       And could you describe what he did?

2       A       He, um -- once again he forced me

3    to have oral sex.

4       Q       Okay.

5       A       He took the back of my head and

6    basically, um, put his penis in my mouth.  And

7    then after that, he then forced my legs open to

8    have sex.

9       Q       Okay.  Were you wearing clothing

10   prior to him doing that?

11      A       I was wearing shorts.

12      Q       Okay.  And what did he do with the

13   shorts?

14      A       Um, took them off.

15      Q       Okay.  And this occurred at his

16   house at Merry Mount Street in Staten Island?

17      A       Yes.

18      Q       I'd now like to direct your

19   attention to August 24, 2009, did anything

20   happened between you and Mr. Rucano on that date?

21      A       Yeah.  Um, we got into another

22   argument and then he started, um, breaking my

23   things, and then I ran upstairs.

24      Q       When you say breaking your things,

25   what do you mean by that?

RAMOS                          13

```
 1          A       I had like, um, little shots
 2   glasses that friends have given me, um -- when
 3   they go on trips, they would bring back shot
 4   glasses, 'cause I collect them.
 5          Q       Oh, okay.
 6          A       So then he started breaking them.
 7          Q       How was he breaking them?
 8          A       Throwing them on the floor.  I had
 9   a scrapbook and he started ripping up my
10   scrapbook which had pictures in it.
11          Q       Okay.
12          A       And then when I ran upstairs he
13   followed me.  And then he grabbed the hammer.
14          Q       Now, that takes place at Silverton
15   Terrace?
16          A       Yes.  Sorry.
17          Q       Describe the area of that location?
18          A       We're on the second floor.
19          Q       Okay.
20          A       So there's two bedrooms downstairs,
21   the bathroom --
22          Q       Okay.
23          A       -- and, um, a dining area.  And
24   then upstairs is supposed to be the master
25   bedroom, but we turned it into a living room.
```

RAMOS                                    14

1         Q        So you're in the second-floor

2    apartment, but, essentially, it's two levels?

3         A        Yes, it's two levels.

4         Q        Okay.  You ran upstairs to your own

5    apartment?

6         A        Yes.

7         Q        Describe what happened next?

8         A        When I get to the second level --

9    well, when I'm running up the stairs he's behind

10   me, and there's a bookcase, and on the bookcase

11   there's a hammer, and he, um, grabs the hammer --

12   I'm sorry.  He, um, started to threaten me with

13   the hammer, telling me to shut up.

14        Q        Were you screaming?

15        A        Yes.

16        Q        Okay.

17        A        I was screaming.  And then, um, he,

18   again, forced himself on me to have intercourse.

19   This time it wasn't oral.

20        Q        What did he do?

21        A        He, um -- oh, I landed on the sofa

22   and then he turned me around, and took his knees

23   and hit me on my lower back.

24        Q        Now, were you -- do you recall if

25   you were wearing clothes prior to that?

RAMOS                          15

1          A       Yes.  I had -- I had shorts and a

2     T-shirt on.

3          Q       Did he rip your clothes in the

4     process?

5          A       No.

6          Q       Did he choke you?

7          A       Yeah.

8          Q       And he inserted his penis into your

9     vagina?

10         A       Yes.

11         Q       I'd now like to direct your

12    attention to September 3rd of 2009.  Okay?

13         A       Say that again.

14         Q       I'd like to direct you attention to

15    September 3rd of 2009.

16         A       Okay.

17         Q       I believe this would be Thursday

18    prior to Labor Day weekend.

19         A       Yes.

20         Q       Do you recall anything happening

21    between you and Mr. Rucano on that date?

22         A       Yes.

23         Q       Okay.  Can you please describe what

24    happened.

25         A       It's like I get home and, um, he

1   wanted to know where was I. He wanted to know,

2   'cause he would call the office and check up on

3   me.  And then he kept asking me where was I. And,

4   um, as usual, I'd just -- you know, just walk

5   away, try not to answer his questions.  But that

6   night I took a shower.  I was in the room and,

7   um, he started yelling at me and told me to be

8   nice.

9        Q       Which you understood to be to have

10  sex with him?

11       A       Yes.

12       Q       And go on.

13       A       Then he had this huge battery that

14  was on a charger, and he grabbed the battery.

15  And he's like, if you don't shut up, I'm gonna

16  hit you with this.  Then I kept screaming and I

17  told him to stop.  And then he came towards me on

18  the bed and he started choking me.

19       Q       Okay.  And what happened while he

20  was choking you?

21       A       I was begging him to stop; I can't

22  breathe; I can't breathe.  But the choking just

23  kept on until I blacked out.

24       Q       And are you able to even recall if

25  he had sex with you on that night?

RAMOS                                17

1          A        Uh-uh.

2          Q        Miss Ramos, I want to now just

3     direct your attention to September 21st of 2009.

4                   And incidentally, if I could -- I'm

5     sorry, just going back to September 3rd.  That

6     took place at 40 Silverton Terrace?

7          A        Yes.

8          Q        Okay.  On September 21st of 2009,

9     I'd like to direct your attention to that date.

10    What, if anything, took place on that date?

11         A        Which date?

12         Q        September 21st.

13         A        Um, we got into another argument

14    and, um -- I'm sorry.

15         Q        Take your time, Miss Ramos.

16         A        He started fighting with me and

17    then he, um, grabbed me about the -- he started

18    choking me and started telling me to shut up.

19    And then he went towards my shorts -- I had

20    shorts on.  He kept grabbing them.  And I kept

21    saying, no, no; stop.  And then he kept choking

22    me and then I passed out.

23         Q        Okay.

24         A        And then I do remember that -- when

25    I came to, he was forcing himself on top of me.

RAMOS                                    18

1          Q         Okay.  And what was he doing?

2          A         He inserted his, um, penis into my,

3     um, vagina.

4          Q         And you were, to the best of your

5     recollection, unconscious when he first started

6     doing that?

7          A         Yes.

8          Q         You woke up and his penis was

9     inside of your vagina?

10         A         Once I woke up, he just kept

11    pulling on my shorts.  And I was saying, no, no.

12    And I just didn't have the strength anymore.

13         Q         Okay.  I'd like to -- This was at

14    40 Silverton Terrace, as well?

15         A         Yes.

16         Q         I'd like to next direction your

17    attention to September 25th of 2009.  What, if

18    anything, happened on that date?

19         A         Um, we started fighting again.

20         Q         Okay.

21         A         And he basically told me that I

22    better be nice to him tonight.

23         Q         And you understood that to mean to

24    have sex with him?

25         A         Yes.

RAMOS                                          19

1        Q       And what happened after that?

2        A       I told him no.  I told him I had my

3   period.

4        Q       Okay.

5        A       And then he called me a lying cunt,

6   that he didn't believe me, and, um -- um, he

7   started choking me again.  And I begged him -- I

8   told him I can't breathe. "I can't breathe."

9   Then he, um, turned around and, um, he forced me

10  to have oral sex.

11       Q       Okay.  How did he do that?

12       A       He took my head -- well, this -- he

13  laid down and then he just grabbed me and put my

14  face towards his penis.

15       Q       Okay.  And did he attempt on that

16  date to have sexual intercourse with you at all?

17       A       Yes.

18       Q       Can you describe what he did?

19       A       He, um, he basically told me, um,

20  I'm unable to, um, cum.  He was like, so now

21  you're gonna be nice and let me fuck you.  And he

22  grabbed my shorts.  And I kept begging him --

23  told him no, no.  And he finally pulled them down

24  and then, um, he forced his legs -- I mean he

25  forced my legs open and he saw that I was

RAMOS                                    20

1       bleeding.

2            Q       And he did not go on to have

3       intercourse with you?

4            A       Huh?

5            Q       He did not go on to have sexual

6       intercourse with you?

7            A       No.

8            Q       Now, directing your attention to

9       September 28, 2009.  What, if anything, happened

10      on that date?

11           A       That day I came home and I put my

12      keys -- 'cause I take my shoes off before

13      entering the apartment.  I opened up the door and

14      he was between the bathroom -- I call it the

15      foyer.

16           Q       Okay.

17           A       So, he was standing there with this

18      look.  And I was like, oh, God.  I didn't like

19      the look.  And he was like, hi, asshole.  I was

20      like, hi, asshole.  And then he just looked at me

21      and then I proceeded to go into the bathroom,

22      because it was raining that day so all of my

23      clothes were soaked.  So I started gathering my

24      clothes together and I, um -- I was taking

25      medication at the time, so I needed to eat

1    something before I took the medication.

2         Q       Okay.

3         A       So I went into the kitchen and I

4    grabbed something to eat before I took the

5    medication.  And he asked me -- he's like, you're

6    awfully nice tonight; are you taking anything?

7    So, I went upstairs -- I put my clothes in the

8    bathroom.  I went upstairs to the second --

9    towards where the living room is at and I sat

10   down.  I started smoking a cigarette.  He

11   followed me upstairs and then, um, he sat on the

12   floor.  He started talking to me.  He's like, I'm

13   sorry for everything that's been going on.  And

14   he says, everything's going to be okay; it's

15   going to be changing.  He's like, um -- he,

16   basically said that he was gonna change.

17        Q       Okay.

18        A       So I went downstairs and I grabbed

19   my clothes, went in the bathroom, took a shower.

20   Then, um, I went into the kitchen.  I made some

21   cookies.  And, um, I went back into the bedroom,

22   and he went -- he was sitting on the edge of the

23   bed.  He went and got some cookies and then went

24   and sat down -- laid down next to me and started

25   like rolling over and then he sighed.  He took a

1    deep breath and said, are you going to lay down?

2    I said no. He said, that's what I mean, you don't

3    show affection; are you going to be nice to me?

4    So I said no.  I laid down.  I didn't want an

5    argument, I didn't want the fighting no more.  He

6    laid down next to me and said, are you gonna be

7    nice.  I said no.  He got upset -- got angry.

8    He's like, well, why you starting an argument

9    with me?  I said, it takes two to argue and I'm

10   not arguing.  He's like, so you're not gonna be

11   nice?  I said, no. He said, fine, I'll get a

12   hooker.  I said, get a hooker.  Then he walked

13   out.

14            I knew -- when he left the

15   apartment, I knew what was gonna happen when he

16   came back into the apartment.  So, I ran

17   upstairs, I hid my pocketbook, and I got the

18   small can of hairspray.

19            He came back about fifteen, twenty

20   minutes later.  And he was like, are you gonna be

21   nice?  I was like, no.  So, he came towards me as

22   I was laying down in the bed and, um, I grabbed

23   the hairspray and I sprayed him.  And I tried to

24   make it out the door, but I couldn't.  He punched

25   me in my lower back.  I fell on the floor.  He

1    started choking me.  And I'm begging him to stop.

2    "Stop.  I can't breathe."  Finally, he gets off

3    of me.  I run upstairs.  He follows.  I start

4    screaming, hoping somebody can hear me, even my

5    neighbor downstairs.  I run upstairs.  He

6    follows.  He starts closing all the windows, and

7    I know what's gonna happen.  He turns on the TV

8    real loud, 'cause I'm still screaming.  I'm on

9    the sofa.  He takes his knee and hits me on my

10   lower back, then he starts punching me in my ear,

11   telling me to shut up.  "Shut up.  Shut up."  And

12   I'm begging him to stop.  Then I finally fall to

13   the floor.  And he says, you're gonna be nice to

14   me; are you gonna be nice.  And I kept telling

15   him no.  "No." He finally, um, grabs my

16   sweatpants and I'm struggling to keep them up and

17   on.  He -- I just didn't have the energy anymore

18   to fight.  Then he takes them off.  He takes my

19   underwears off and he then forces my legs open

20   and then he starts -- he -- he inserts himself

21   inside me, he forced me to have sex.

22          Q     You mean he inserted his penis into

23   your vagina?

24          A     Yes.

25          Q     And this occurred at 40 Silverton

RAMOS                                    24

1    Terrace?

2         A       Yes.

3         Q       What did you -- describe the --

4                 September 21st, that also occurred

5    at 40 Silverton Terrace?

6         A       Yes.

7         Q       After he forced himself inside of

8    you, what happened after that?

9         A       Then he picked me up and throws me

10   on the floor -- I mean, not the floor, throws me

11   on the bed.  And then he starts becoming real

12   rough.  And he says, this is the way you like it,

13   don't you; this is the way you like it.  And I

14   kept begging him to stop.  "Stop."  And I'm

15   screaming, but nobody can hear me because the TV

16   is on real loud, the windows are closed, not even

17   the neighbor downstairs can hear me.

18        Q       Okay.  And what happened after this

19   sexual intercourse?

20        A       Then he grabs me, brings me into

21   the shower, and I'm sitting on the tub -- on the

22   toilet seat.  He turns on the shower and he's

23   like, you're getting in.  I said no, no.  So he

24   drags me into the shower and there's like a

25   little, um, like a seat or bench kind --

RAMOS                                25

```
1        Q        That's within the shower?

2        A        Within the shower --

3        Q        Okay.

4        A        -- 'cause it's a stand-up shower.

5        Q        Okay.

6        A        And I kept telling him no, no. And

7   then he finally starts choking me in the shower,

8   and then he's forcing my legs open to bathe me.

9        Q        Did he say why he's doing that?

10       A        He said because he watched Law and

11  Order.

12       Q        Did he say anything beyond that?

13       A        Yeah.  He says, there will be no

14  evidence.

15       Q        Is he in the shower with you when

16  he's forcing you to take a shower?

17       A        Yes, he was in the shower with me.

18       Q        Okay.

19       A        And then he starts to choke me in

20  the shower.  And I'm trying to push him away, but

21  I didn't -- just didn't have the strength

22  anymore.

23       Q        And with respect to the clothes

24  that you were wearing that he had taken off of

25  you, what happened with those clothes?
```

1          A        I was already -- he thew the
2     sweatpants across the room.  The T-shirt that I
3     had on, he threw me in the shower with it.
4          Q        Okay.  Did there come a time when
5     you washed those sweatpants?
6          A        Yes.
7          Q        And when did you wash them?
8          A        The next day.
9          Q        Why did you wash them?
10         A        Because he told me to.
11         Q        Okay.  Did he tell you why?
12         A        He says, now there's no proof.
13         Q        Okay.  Miss Ramos, I'm going to
14    show you what has been premarked as Grand Jury
15    Exhibit No. 2 for identification.  What do you
16    recognize that to be?
17         A        My ear.
18         Q        Okay.  And when was that photograph
19    taken?
20         A        Yesterday, the 30th.
21         Q        Okay.  And does that photograph
22    fairly and accurate represent the condition of
23    your ear yesterday?
24         A        Yes.
25                  MR. KATCHEN:  Okay.  I'm

RAMOS                              27

1                 going to admit this into

2                 evidence as Grand Jury

3                 Exhibit 2.

4                 (So marked Grand Jury Exhibit

5                 No. 2 in evidence.)

6        Q       Next I'm going to show you what's

7    been marked, in reverse order, as Grand Jury

8    Exhibit No. 1 for identification.  What do you

9    recognize that to be?

10       A       My arm.

11       Q       Okay.  And when was that photograph

12   taken?

13       A       On the 30th.

14       Q       And does that photograph fairly and

15   accurately represent the condition of your arm --

16       A       Yes.

17       Q       -- as it was yesterday?

18                MR. KATCHEN:  Okay.  I'm

19                going to admit, into

20                evidence, Grand Jury

21                Exhibit 1.

22                (So marked Grand Jury Exhibit

23                No. 1 in evidence.)

24       Q       Finally, I'm going to show you what

25   has been premarked for identification as Grand

RAMOS                    28

1    Jury Exhibit No. 6.  What do you recognize that

2    to be?

3            A       My throat.

4            Q       When was that photograph taken?

5            A       The 30th.

6            Q       Okay.  And does that photograph

7    fairly and accurately represent the condition of

8    your throat as it was yesterday?

9            A       Yes.

10           Q       And all of these, what are now in

11   evidence as Grand Jury Exhibits 1, 2, and 6, were

12   the bruises and marks as depicted were they

13   caused by Anthony Rucano?

14                           (So marked Grand Jury Exhibit

15                           No. 6 in evidence.)

16           A       Yes.

17           Q       Are you able to approximately give

18   the weight of Mr. Rucano to the Grand Jury?

19           A       I'd say about 270.

20           Q       Okay.  And if you don't mind, how

21   much do you weigh?

22           A       137.

23                           MR. KATCHEN:  Okay.  I have

24                           no further question of this

25                           witness.

RAMOS                                    29

```
 1                    Do any members of the Grand
 2                    Jury have any questions?
 3                    JUROR: (JUROR HAS ACCENT.)
 4                    After the second, third,
 5                    fourth times of these whole
 6                    incidents, why she keep being
 7                    with him?  Why didn't she
 8                    leave?
 9          Q      Okay.  Would you like to answer the
10   question?  Why, after this first happened a few
11   times, why did you remain?
12          A      He kept threatening me.
13          Q      Okay.  Were you afraid?
14          A      Yes, 'cause he also threatened my
15   family.
16          Q      How did he threaten them?
17          A      He threatened to get someone to
18   shoot my brother and to go after my mother.
19                    MR. KATCHEN:  Does that
20                    answer your question?
21                    JUROR:  Well, why didn't she
22                    call police right away?  I
23                    mean, it's not relevant right
24                    now --
25                    MR. KATCHEN:  It's going to
```

RAMOS                                   30

1              be -- it's beyond the scope

2              as to what we are asking for

3              today.  Yes, ma'am.

4              JUROR:  How long have you

5              known each other?

6    Q    How long have you known Mr. Rucano?

7    A    Six months.

8    Q    Have you been dating the entire

9  time?

10   A    Yes.

11             MR. KATCHEN:  Any other

12             questions?

13             (NO RESPONSE.)

14             There being no show of hands,

15             the witness is excused.

16             (WITNESS EXCUSED.)

17             Ladies and gentlemen, that is

18             all the evidence.

19             Just to put on the record,

20             the Grand Jury exhibits are

21             being passed around the Grand

22             Jury at the current time.

23             There will be no further

24             witnesses today.  The case

25             will be continued Monday.

31

1                    I'm just warning you not to

2                    discuss the case until you

3                    have been given the charges

4                    on the law.

5                    And there are nineteen

6                    members of the Grand Jury

7                    present at this time.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Detective Bureau - DD5 Attachments

Appendix Item 9-21

|  | **COMPLAINT - FOLLOW UP INFORMATIONAL REPORT** | | Crime/Condition RAPE | Cmd Code 120 | Date of This Report 10/06/2009 |
|---|---|---|---|---|---|

| Date of UF61 09/29/2009 | Date Case Assigned 09/29/2009 | Complaint No. 2009-120-11351 | Case No. 270 | Unit Reporting SQUAD | | Follow-Up No. 6 |
|---|---|---|---|---|---|---|

| Complainant's Name RAMOS, DUANE | Nickname, First Name, Alias | Address 40 SYLVATON TERRACE STATEN ISLAND NY | | Apt No. 40 |
|---|---|---|---|---|
| Sex FEMALE | Race WHITE | Date of Birth 08/22/1969 | | Age 40 |
| Home Telephone | Business Telephone | Cell Phone | | E-Mail Address |

**Topic/Subject:**
(CLOSING) CLOSING OF CASE.

**Summary of Investigation:**
1. On October 6, 2009, at approximately 1100 hrs the undersigned requests that this case be closed A-1 based on the following.
A)On 09/29/2009 the undersigned did interview c/v who stated that she was punched and chocked by her boyfriend and then held down by boyfriend at which time he had sexual intercourse with c/v (penis to vagina).
B)On 09/29/2009 the undersigned did conduct the following computer checks on Anthony Rucano E-JUSTICE,DIR CHECK,WARRANT CHECK,DMV CHECK.
C)On 09/29/2009 the undersigned did arrest Mr.Anthony Rucano under arrest # S09610806Q and charged with Rape1 and Assault 2 without incident.Mr.Rucano didn't answer any questions and requested a lawyer.

2.Based on the above information the undersigned requests that this case be marked closed A-1.

3.CASE CLOSED A-1.

| Reporting Officer: | Rank DT2 | Name WILLIAM WASSON | | Tax Reg. No. 899979 | Command 305 |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing A | Date Reviewed 10/09/2009 | Date of Next Review | Name GRACE ODONNELL | Supv. Tax No. 892528 |





Case 1:18-cv-04586-KAM   Document 26-1   Filed 12/21/18   Page 185 of 250 PageID #: 3880

| INITIAL INVESTIGATIVE STEPS TAKEN: (CANVASS, INTERVIEWS, COMPUTER CHECKS, ALARM, PHOTOS, ETC.) | | | | | |
|---|---|---|---|---|---|
| INTERVIEW COMPLAINTANT<br>COMPUTER CHECKS<br>ARREST PERPETRATOR. | | | | | |
| **M.E.:** | | | | **RTCC:** | |
| **M.E. Case #:** | | | | **RTCC Case #:** | |
| Complaint #<br>2009-120-11351 | Pct<br>120 | Case #<br>270 | Det Assigned<br>WILLIAM WASSON (DT2) | Shield # | Command<br>BROOKLYN DETECTIVE AREA SEX CRIMES SQUAD |
| Date of this Report<br>09/30/2009 | | Supervisor Signature<br>DEBRA ABBADESSA (SGT) | | | Command<br>BROOKLYN DETECTIVE AREA SEX CRIMES SQUAD |

Detective Bureau - DD5 Attachments                                    Page 8 of 12

| DETECTIVE BUREAU UNUSUAL OCCURRENCE REPORT | ATTACHMENT A ORIGINAL Page 1 of 1 |
|---|---|

| Pct. of Occurrence 120 | Date of Original Report WEDNESDAY 09/30/2009 | Time 0800 | Place of Occurrence and Type of Premise 40 SYLVATON TERRACE (APARTMENT). | Crime/Condition RAPE / ARREST |
|---|---|---|---|---|

**Apparent Motive:** SEXUAL GRATIFICATION

**DETAILS: (COMPLETE AND CONCISE; INCLUDE DESCRIPTION AND VALUE OF ANY PROPERTY TAKEN)**

1. ON 09/28/2009 AT APPROXIMATELY 2300 HRS.C/V STATES THAT HER AND LIVE IN BOYFRIEND (ANTHONY RUCANO) DID GET INTO A PHYSICAL ALTERCATION,C/V WAS PUNCHED AND CHOKED BY PERP.C/V ALSO STATES THAT PERP HELD HER DOWN AND REMOVED HER PANTS AND UNDERWEAR THEN PROCEEDED TO HAVE SEXUAL INTERCOURSE WITH C/V (PENIS TO VAGINA).

2. ON 09/29/2009 AT APPROXIMATELY 1700 HRS PERP WAS ARRESTED BY STATEN ISLAND SPECIAL VICTIMS SQUAD WITHOUT INCIDENT AND CHARGED WITH RAPE1 AND ASSAULT 2.

**COMPLAINANT(S): (SEX CRIME VICTIMS ARE NOT TO BE NAMED)**

| Last Name KTD | First Name | M.I. | Last Name | First Name | M.I. |
|---|---|---|---|---|---|
| Address | | City/State | Apt # | Address | City/State | Apt # |
| Sex F | Race/Ethnicity WHITE | Age 40 | Date of Birth | Sex | Race/Ethnicity | Age | Date of Birth |
| NYSIS # | Actions Prior to Incident | | | NYSIS # | Actions Prior to Incident | |
| Type of Injury CUTS AND BRUISING | Hospital CONEY ISLAND HOSPITAL | Condition/Prognosis T/R | Type of Injury | Hospital | Condition/Prognosis |

**PERPETRATOR(S) - NUMBER OF PERPS : 1 - NUMBER ARRESTED : 1**

| Last Name RUCANO | First Name ANTHONY | M.I. | Arrested Y | Last Name | First Name | M.I. | Arrested |
|---|---|---|---|---|---|---|---|
| Address 40 SYLVATON TERRACE | City/State STATEN ISLAND, NY | Apt # 2FL | Address | City/State | Apt # |
| Sex M | Race/Ethnicity WHITE | Age 43 | Height 5' 8" | Weight 250 | D.O.B. 07/09/1966 | Sex | Race/Ethnicity | Age | Height | Weight | D.O.B. |
| Description of Clothing: BROWN SHIRT/BLUE JEANS | | | | Description of Clothing: | | |
| NYSIS # 5117688J | Nickname | On Parole N | Warrant N | NYSIS # | Nickname | On Parole | Warrant |
| Criminal History 9 DIFFERENT ARRESTS DATING BACK TO 11/13/1984 AND CHARGED WITH VARIOUS CRIMES . | | | | Criminal History | | |
| Type of Injury | Weapons | | | Type of Injury | Weapons | |
| Vehicle Used | Make | Model | Color | Plate | Vehicle Used | Make | Model | Color | Plate |
| Arresting Officer DT2 - WILLIAM WASSON | | Command 305 | Arresting Officer | | Command |

Detective Bureau - DD5 Attachments

Page 7 of 12

| | COMPLAINT - FOLLOW UP INFORMATIONAL REPORT | Crime/Condition RAPE | Cmd Code 120 | Date of This Report 09/30/2009 |
|---|---|---|---|---|

| Date of UF61 09/29/2009 | Date Case Assigned 09/29/2009 | Complaint No. 2009-120-11351 | Case No. 270 | Unit Reporting SQUAD | | Follow-Up No. 5 |
|---|---|---|---|---|---|---|

| Complainant's Name RAMOS, DUANE | Nickname, First Name, Alias | Address 40 SYLVATON TERRACE STATEN ISLAND NY | Apt No. 40 |
|---|---|---|---|
| Sex FEMALE | Race WHITE | Date of Birth 08/22/1969 | Age 40 |
| Home Telephone | Business Telephone | Cell Phone | E-Mail Address |

Topic/Subject:
(UNUSUAL OCCURRENCE) UNSUAL REPORT PREPARED

Summary of Investigation:
1. On September 28, 2009, at approximately 0800 hrs the undersigned did prepare an unusual report regarding this incident.

2. CASE ACTIVE.

| Reporting Officer: | Rank DT2 | Name WILLIAM WASSON | | Tax Reg. No. 899979 | Command 305 |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing | Date Reviewed 09/30/2009 | Date of Next Review | Name DEBRA ABBADESSA | Supv. Tax No. 896536 |

Detective Bureau - DD5 Attachments

| | COMPLAINT - FOLLOW UP INFORMATIONAL REPORT | | Crime/Condition RAPE | Cmd Code 120 | Date of This Report 10/06/2009 |
|---|---|---|---|---|---|

| Date of UF61 09/29/2009 | Date Case Assigned 09/29/2009 | Complaint No. 2009-120-11351 | Case No. 270 | Unit Reporting SQUAD | | Follow-Up No. 4 |
|---|---|---|---|---|---|---|

| Complainant's Name RAMOS, DUANE | Nickname, First Name, Alias | Address 40 SYLVATON TERRACE STATEN ISLAND NY | | Apt No. 40 |
|---|---|---|---|---|
| Sex FEMALE | Race WHITE | Date of Birth 08/22/1969 | | Age 40 |
| Home Telephone | Business Telephone | Cell Phone | | E-Mail Address |

| Perpetrator's Last Name, First M.I. RUCANO, ANTHONY | | | | Nickname, First Name, Alias | | Wanted/Arrested ARRESTED |
|---|---|---|---|---|---|---|
| Address 40 SYLVATON TERRACE STATEN ISLAND NY | | | | Apt No. 40 | Res. Pct. 0 | NYSID No. 5117688J |
| Position/Relationship BOYFRIEND | Sex MALE | Race WHITE | Date of Birth 07/09/1966 | Age 43 | Height 5FT8IN | Weight 250 |
| Home Telephone | Business Telephone | Cell Phone | E-Mail Address | | | |
| Description Eye Color:BROWN Hair Color:BROWN Hair Length:SHORT Hairstyle:STRAIGHT Complexion:CLEAR Skin Tone:MEDIUM | | | | | | |
| Weapon | Describe Weapon (if firearm, give color, make, caliber, type, model, etc.) | | | | | |
| Mask: | | | Gloves: | | | |
| Clothing Description Head Gear:UNK Foot Gear:UNK Outer Wear:UNK Other Clothing/Accessories:UNK | | | | | | |
| Scars, Marks Distinguishing Body Marks (1):UNKNOWN Distinguishing Body Marks (2):UNKNOWN | | | | | | |

| Topic/Subject: (ARREST) ARREST OF ANTHONY RUCANO. |
|---|
| Summary of Investigation: 1. On September 29, 2009, at approximately 1700 hrs the undersigned did arrest Anthony Rucano and charged with Rape1 and Assault 2 under arrest # S09610806Q without incident.Mr.Rucano refused to answer questions and requests a Lawyer. 2.CASE ACTIVE. |

| Reporting Officer: | Rank DT2 | Name WILLIAM WASSON | | Tax Reg. No. 899979 | Command 305 |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing | Date Reviewed 10/09/2009 | Date of Next Review | Name GRACE ODONNELL | Supv. Tax No. 892528 |

Detective Bureau - DD5 Attachments

| | COMPLAINT - FOLLOW UP INFORMATIONAL REPORT | Crime/Condition RAPE | Cmd Code 120 | Date of This Report 10/06/2009 |
|---|---|---|---|---|

| Date of UF61 09/29/2009 | Date Case Assigned 09/29/2009 | Complaint No. 2009-120-11351 | Case No. 270 | Unit Reporting SQUAD | | Follow-Up No. 3 |
|---|---|---|---|---|---|---|

| Complainant's Name RAMOS, DUANE | Nickname, First Name, Alias | Address 40 SYLVATON TERRACE STATEN ISLAND NY | | Apt No. 40 |
|---|---|---|---|---|
| Sex FEMALE | Race WHITE | Date of Birth 08/22/1969 | | Age 40 |
| Home Telephone | Business Telephone | Cell Phone | | E-Mail Address |

**Topic/Subject:**
COMPUTER CHECKS

**Summary of Investigation:**
1. On September 29, 2009, at approximately 1300 hrs the undersigned conducted the following computer checks with there results.
A)E-JUSTICE CHECK- revealed 9 previous arrests dating from 1984 thru 1999,numerous charges of Larceny,Criminal Mischief and Assault.
B)DIR CHECK-revealed two previous DIR on 08/04/2009 in the 94 pct incident #2009-094-00510,and another in the 63 pct incident # 2008-063-002246.
C)WARRANT CHECK-revealed 5 previous warrants dating back to 1986 and most recent in 2000.
D)DMV CHECK-revealed the address of 40 Sylvaton Terrace 2fl and 1 registered vehicle 2008 Dodge Charger Red in color.

2.CASE ACTIVE.

| Reporting Officer: | Rank DT2 | Name WILLIAM WASSON | | Tax Reg. No. 899979 | Command 305 |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing | Date Reviewed 10/09/2009 | Date of Next Review | Name GRACE ODONNELL | Supv. Tax No. 892528 |

Detective Bureau - DD5 Attachments

| POLICE DEPARTMENT | COMPLAINT - FOLLOW UP INFORMATIONAL REPORT | | Crime/Condition RAPE | Cmd Code 120 | Date of This Report 10/06/2009 |
|---|---|---|---|---|---|

| Date of UF61 09/29/2009 | Date Case Assigned 09/29/2009 | Complaint No. 2009-120-11351 | Case No. 270 | Unit Reporting SQUAD | Follow-Up No. 2 |
|---|---|---|---|---|---|

| Complainant's Name RAMOS, DUANE | Nickname, First Name, Alias | Address 40 SYLVATON TERRACE STATEN ISLAND NY | | Apt No. 40 |
|---|---|---|---|---|
| Sex FEMALE | Race WHITE | Date of Birth 08/22/1969 | | Age 40 |
| Home Telephone | Business Telephone | Cell Phone | | E-Mail Address |

| Person Interviewed Last Name, First M.I. RAMOS, DUANE | | Nickname, First Name, Alias | Address 40 SYLVATON TERRACE STATEN ISLAND NY | | Apt No. 40 |
|---|---|---|---|---|---|
| Position/Relationship | Sex FEMALE | Race WHITE | Date of Birth 08/22/1969 | | Age 40 |
| Home Telephone | Business Telephone | Cell Phone | E-Mail Address | | |

**Topic/Subject:**
(INTERVIEW) INTERVIEW DUANE RAMOS(C/V).

**Summary of Investigation:**
1. On September 29, 2009, at approximately 1130 hrs the undersigned along with Det.Murphy were present at Coney Island Hospital regarding this case.The undersigned did interview Duane Ramos who stated that last night at approximately 2330 hrs,she and her live in boyfriend Anthony Rucano did get into an argument following the argument her boyfriend Anthony became very violent.The c/v states that Anthony choked and punched her numerous times ans then he threw her onto the bed and removed her pants and under wear then proceeded to have sexual intercourse with c/v (penis to vagina).The undersigned did observe bruising and swelling on c/v's right ear and bruising around c/v's neck area.

2.CASE ACTIVE.

| Reporting Officer: | Rank DT2 | Name WILLIAM WASSON | | Tax Reg. No. 899979 | Command 305 |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing | Date Reviewed 10/09/2009 | Date of Next Review | Name GRACE ODONNELL | Supv. Tax No. 892528 |

Detective Bureau - DD5 Attachments

| | COMPLAINT - FOLLOW UP INFORMATIONAL REPORT | | Crime/Condition RAPE | Cmd Code 120 | Date of This Report 10/06/2009 |
|---|---|---|---|---|---|

| Date of UF61 09/29/2009 | Date Case Assigned 09/29/2009 | Complaint No. 2009-120-11351 | Case No. 270 | Unit Reporting SQUAD | | Follow-Up No. 1 |
|---|---|---|---|---|---|---|

| Complainant's Name RAMOS, DUANE | Nickname, First Name, Alias | Address 40 SYLVATON TERRACE STATEN ISLAND NY | | Apt No. 40 |
|---|---|---|---|---|
| Sex FEMALE | Race WHITE | Date of Birth 08/22/1969 | | Age 40 |
| Home Telephone | Business Telephone | Cell Phone | | E-Mail Address |

**Topic/Subject:**
RECEIVED CASE.

**Summary of Investigation:**
1. On September 29, 2009, at approximately 1000 hrs the undersigned did receive a call P.O.Brown of the 70 th pct who stated that a Ms.Duane Ramos walked into the 70 pct and stated that she was Raped by her boyfriend.P.O.Brown stated that Ms.Ramos further stated that her live in boyfriend Anthony Rucano on 09/28/2009 between 2300 hrs thru 0200 hrs did punch and choke her,then proceeded to hold down c/v and remove her pants and have sexual intercourse with c/v (penis to vagina).P.O.Brown stated that Ms.Ra mos has visible injuries and will be taken to Coney Island Hospital for treatment.The undersigned stated that he will meet them at the Hospital for further investigation.

2.CASE ACTIVE.

| Reporting Officer: | Rank DT2 | Name WILLIAM WASSON | | Tax Reg. No. 899979 | Command 305 |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing | Date Reviewed 10/09/2009 | Date of Next Review | Name GRACE ODONNELL | Supv. Tax No. 892528 |

# Diary Comparison
# Anthony Rucano
# Case 1009-455-4

Prepared by:
Mr. Robert Baier
Forensic Document Examiner

Handwriting Services International
24 Regent Rd.
Warwick, NY 10990
888 460-3828



Q-1

7/17/09 - 9:30 pm

As soon as i got into the car, Anthony started yelling at me. He grabbed my phone and ript my dress. He started yelling at me and asking me who have i been calling and wanted to check my phone. He just kept yelling at me and then he put his on me. As soon as i got in the house he kept yelling and then he rip the straps of my dress and then he got turn my bra off. He kept hitting me. I had to fight back and he tore my shirt off. He held me down on the sofa and punch me in the face. Now i have a black eye. He force me to have sex. He said Tonight your going to suck my dick and i'm going to fuck you. I said no but he force me anyways.

Q-2

7/28/09

We went today to see the couple counselor. Anthony didn't like what the counselor was stating and he got up and walked out. Anthony started driving like a maniac. I kept telling him to slow down but he didn't want to slow down. He came out and stated that i set it all up for him to talk first. He has real issues to deal with in his past life, he keep comparing me to his ex-wife. I'm not like his ex-wife. As soon as i walked through the doors of the apartment he grabbed me and started to hit me. He started yelling and telling me i better be nice or else he will get violate. I told him no that i didn't want to have sex. He grabbed me and started to feel him self on top of me.

No

Q-3

7/30/09

i don't know how much longer i
can take with abbusive behavior, he
has called me at least ten
times wanting to know where i am
at and what i'm doing. I told him
i'm not doing anything to let me
be alone and relax. He acts like a
child and keeps threating me and
yesterday he took all of my belongs
and threw them out in the
street I control myself and didn't
re-act to the way he was yelling
and carry on like a mad man. He has
serious issues and he doesn't want to
handle them. He stop taking his medication
I'm running out of answers Please
God help me. He started hitting me again
and he force again to live with

Q-4

9/18/09

I haven't had the chance to write things
are not getting better It's getting worst to
the point that he (anthony) is starting to
choke me until i black out I have
bruises all over my body and again
another black eye I try to fight back
but he's too strong. The other night he
grabbed me by the throat & started
to choke me and im trying to tell
i can't breath; but he didn't all
i remember was falling on the floor
and can't remember what happen
next When i finally came to
i was on the floor. Everyone at my job
are asking about the marks on my
body and face including my neck.
Where he continued to choke me.
He calls me on my job and hangs
up to see if im at work. He has

9/18/11

Q-5

bcose so many cell phones. He calls
me all day on my cell phone and i cant
spend time with friends. I have to hurry
up and save money to move far away from
him. I don't know how long i plan
take the abuse from him. again he continues
to force me to live self and if I dint he
starts to choke me.

— 9/18 Page 2

## Q-6

9/21/09

He started to fight with me again.
He keeps choking me until i passed
out. He forced me to have sex and
i told him no and he just grabbed
me and told me to shut up he covered
my mouth so i wouldn't scream.
He started to pull my shorts off.
I started to cry and begged him to
stop; and he said no. He started to
threaten my family and friend. He said
to me that he will get them to shoot
my brother. I lay there and waited for
it to be over.

Q-1

7/17/09

Questioned Writings 150%



Drastic changes in slant. Not synchronous writing. Writing was added at another time.

Court Display 2
Case 1009-455-4 Anthony Rucano
Robert Baier FDE



Questioned Writings 150%

Q's – top writing "started to" is darker and indicates heavier pen pressure into the paper. The bottom "started to" is lighter and is slanted a lot more to the right and is only one line down on the entry page of the diary. This is not synchronous writing.

Writing far left was made with a liquid marker, to the right of the period ball point pen. This last sentence was added to the document at a later date/time.

Q-6
9/21/09

Q-5
9/18/09
page 2

The entire 1 and ½ pages was written in liquid marker and the last sentence only is much lighter in color and written in ball point pen.

Court Display 1
Case 1009-455-4 Anthony Rucano
Robert Baier FDE

1

1   SUPREME COURT OF THE STATE OF NEW YORK.

2   COUNTY OF RICHMOND - CRIMINAL TERM - PART: 5
    ------------------------------------------X
3   THE PEOPLE OF THE STATE OF NEW YORK,

4                   -against-

5   ANTHONY RUCANO,

6                               Defendant.
    ------------------------------------------X
7
    Indict. No. 270/2009        18 Richmond Terrace
8                               Staten Island, New York
                                July 7, 2010
9

10

B E F O R E:
11
        HONORABLE STEPHEN J. ROONEY, Justice
12

13

14
A P P E A R A N C E S:
15

16          DANIEL M. DONOVAN
            DISTRICT ATTORNEY, RICHMOND COUNTY
17             Attorney for the People
        BY:  ANTHONY KATCHEN, ESQ.,
18             RAJA RAJESWARI, ESQ.,
               Assistant District Attorneys
19

20          EUGENE LAMB, ESQ.
21          18B Attorney for the Defendant

22

23

24

25          ELAINE FORLENZA, RPR
            OFFICIAL COURT REPORTER

'14 MAR 13 A9:56
SUPREME COURT
RICHMOND COUNTY
STATEN ISLAND, N.Y.

EF

Proceedings                                              2

1          THE CLERK:   Number 2 from the audience,

2     step up, Anthony Rucano, 270 of '09.   The

3     defendant is present.

4          MR. KATCHEN:  Anthony Katchen, Raja

5     Rajeswari for the People.

6          MR. LAMB:  Eugene Lamb for the defendant.

7          THE COURT:  You want to step up?

8          (Discussion held off the record at the

9     bench.)

10          THE COURT:  We've had a bench conference.

11     I have received a motion within the last couple of

12     days.  I have an affidavit from a prior lawyer

13     today.  I have a response from the People.

14          If you want to add anything go right

15     ahead.  I mean if you want to send me a reply or

16     an additional argument based on this affidavit

17     which I think you just got.

18          MR. KATCHEN:  We actually haven't been

19     provided with it but we reviewed it with Mr. Lamb

20     while we were waiting for the case to be called.

21     I expect to be getting it later today.

22          MR. LAMB:  I suggested to Mr. O'Sullivan,

23     the author of the affidavit, that he fax a copy to

24     the District Attorney's Office.  And,

25     unfortunately, I provided an old fax number that

EF

Proceedings                                           3

1    isn't in the DA's Office.

2               THE COURT:  Do you have a copy?

3               MR. LAMB:  I have a copy FedEx'd to me

4    this morning.  I will definitely make a copy,

5    provide DA with a copy.  I move at this time based

6    on the motion that I already submitted that the

7    affidavit be incorporated into that motion to be

8    part of it.

9               THE COURT:  All right.  We'll attach it

10   to the Court -- the motion is in the Court's file.

11              MR. LAMB:  Thank you.

12              THE COURT:  So I am reserving decision on

13   that issue.  We have agreed on July 16th.  I will

14   give you a decision then and we'll pick a trial

15   date then.  The way vacation schedules are shaking

16   up as I discussed at the bench it looks like

17   August 16th.  We could talk about that on Friday

18   July 16th which is the adjourned date.

19              MR. LAMB:  Also, Judge, with regard there

20   were several pages of the complaining witness's

21   diary which were just provided to me.  I am not

22   sure when they were mailed to me, but I returned

23   from vacation to find them in my mail last night.

24              After having extensive conferences with

25   the DA's office with regard to the diary and with

1    regard to in general the notation that the

2    complaining witness made a timely outcry with

3    regard to this, I am just now being provided with

4    a copy of the diary which seems to indicate she

5    wrote in the diary that she had been sexually

6    abused.

7               THE COURT:  You are equating a diary

8    entry with a prompt outcry?

9               MR. LAMB:  Yes, Judge.

10              THE COURT:  I don't understand. Who would

11   the outcry be to?  The diary?

12              MR. LAMB:  That there was some notation

13   in the diary regarding sometime around the time

14   when the alleged crimes were being committed, some

15   kind of notation in this diary indicating that the

16   defendant had sexually abused her.

17              THE COURT:  Okay.  So you have it.

18              MR. LAMB:  I am just receiving this now,

19   the pages that actually refer to that issue.

20   Although I have been given other --

21              THE COURT:  What's your point?  You have

22   it?

23              MR. LAMB:  And so I ask the Court and I

24   am placing on the record I am requesting I will be

25   able to review the original diary as part of the

1      Rosario.

2                  THE COURT:  The DA said they would show

3      it to you.

4                  MR. KATCHEN:  That's correct.

5                  THE COURT:  They've given you Xerox

6      copies.

7                  MR. LAMB:  Now the defendant is

8      indicating he is familiar -- having lived with her

9      for approximately six months, he is indicating to

10     me that he has -- he is looking at the copy that I

11     provided him, it appears it is not her

12     handwriting.

13                 THE COURT:  Well, that's a trial issue if

14     you want to get into it.  I don't know why you

15     want to get into a diary at trial.

16                 THE DEFENDANT:  Your Honor, I would like

17     to say something.

18                 THE COURT:  You really shouldn't talk.

19     Everything you say is being taken down on these

20     minutes.

21                 THE DEFENDANT:  I do want it on the

22     record.

23                 THE COURT:  Tell your lawyer, you could

24     speak to him.

25                 THE DEFENDANT:  Okay.

Proceedings                          6

1              (Discussion held off the record between

2       the defendant and Mr. Lamb.)

3              THE COURT:  Anything else?

4              MR. LAMB:  Nothing further, Judge.

5              THE COURT:  Withdrawn.  July 16th.  I

6       will give you a decision on the pending motion

7       then and we will pick a trial date which as I say

8       is now looking like August 16th.  Everybody is

9       indicating to me that's a good day.  Let's keep it

10      that way.

11             THE CLERK:  Bail continues.

12             THE COURT:  Bail continues.

13             THE CLERK:  Step out.  Bail continued

14      July 16th.

15

16                    *   *   *   *

17

18             It is hereby certified that the
        foregoing is a true and accurate
19      transcript of the proceedings.

20      _____
        *Elaine Forlenza*

21      ELAINE FORLENZA, RPR
        OFFICIAL COURT REPORTER

22

23

24

25

CRIMINAL CASE VERDICT SHEET
## SUPREME COURT OF THE STATE OF NEW YORK
## PART V          RICHMOND COUNTY



THE PEOPLE OF THE STATE OF NEW YORK :

      -AGAINST-            :

Anthony Rucano,              :

             Defendant.    :

**VERDICT SHEET**

Indictment No. 270/2009
Rooney, J.S.C.
Date: 9/21/2010

| COUNT NUMBER | CRIME | GUILTY | NOT GUILTY |
|---|---|---|---|
| 1. | Rape in the First Degree (July 17, 2009) | | ✓ |
| 2. | Rape in the First Degree (July 28, 2009) | | ✓ |
| 3. | Rape in the First Degree (July 30, 2009) | | ✓ |
| 4. | Rape in the First Degree (August 24, 2009) | | ✓ |
| 5. | Rape in the First Degree (September 21, 2009) | | ✓ |
| 6. | Rape in the First Degree (September 28, 2009) | ✓ | |
| 8. | Criminal Sexual Act in the First Degree (July 28, 2009) | | ✓ |
| 9. | Criminal Sexual Act in the First Degree (July 30, 2009) | | ✓ |
| 10. | Criminal Sexual Act in the First Degree (September 25, 2009) | ✓ | |
| 11. | Attempted Rape in the First Degree (September 25, 2009) | ✓ | |

VERDICT SHEET CONTINUED Indictment No. 270/2009

|  |  | GUILTY | NOT GUILTY |
|---|---|---|---|
| 16. | Assault in the Second Degree (September 21, 2009) | | ✓ |
| 18. | Assault in the Second Degree (September 28, 2009) | ✓ | |
| 23. | Criminal Possession of a Weapon in the Third Degree | ✓ | |
| 24. | Assault in the Third Degree (September 3, 2009) | ✓ | |

_____
FOREPERSON

September ___21___ , 2010

TIME: __2:22 PM__

E.L.

2            A.K.

AD 9-23

# NEW YORK SUPREME COURT
# APPELLATE DIVISION SECOND DEPARTMENT

## THE PEOPLE OF THE STATE OF NEW YORK,
### Respondent,

### -against-

## ANTHONY RUCANO,
### Defendant-Appellant.

### Ind. No. 270/09
### A.D. No. 2011-01960

## DEFENDANT-APPELLANT MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO WITHDRAW APPELLATE COUNSEL'S
## BRIEF AND/OR FOR STAY OF ACTION
## PURSUANT TO CPLR 2201

ANTHONY RUCANO, 11A0528
CLINTON CORRECTIONAL FACILITY
P.O. BOX 2001
DANNEMORA, N.Y. 12929

MARCH 2014

i

## Table of Contents

PRELIMINARY STATEMENT ................................................................................ 1

**POINT 1** ................................................................................................................ 4
Development of Doctrine to Raise Ineffective Assistance of Counsel ........................... 4
Claims in Post-Conviction Proceedings Before Direct Appeal .................................... 4

    A. Analogous Facts and Circumstances of *Massaro v. United States* ....................... 4

    B. Similarities to Holdings in Unanimous Decision of *Massaro v. United States* .................... 7

**POINT 2** ................................................................................................................ 12
Various Statutes and Procedural Protocols Associated With CPL Article 440 Are Violative of the
Due Process, Equal Protection and Supremacy Clauses of the United States Constitution ......... 12

    A.   Application Of Any Of The Procedural Bars Under CPL § 440.10(2) or CPL § 440.10(3)
Would Be Contrary To Clearly Defined Supreme Court Precedent ......................................... 12

    B.   When Viewed Through The Statements In Martinez v. Ryan, 132 S.Ct. 1309 (2012),
Failure To Assign Me Counsel To Help Prepare And Submit a CPL § 440.10 Motion Would
Render County Law § 722 and CPLR § 1101, As Applied, Unconstitutional ......................... 14

    C.   In Light Of Martinez V. Ryan, 132 S.Ct. 1309 (2012), Trevino v. Thaler, 133 S.Ct. 1911
(2013), The Procedural And Evidentiary Protocols Enacted Under CPL § 440.30 Violates Due
Process And Equal Protection Guarantees ......................................................................... 16

    D.   CPL § 440.10 is the Only Vehicle to Obtain A Full and Fair Review of My Ineffective
Assistance Of Trial Counsel Claims ................................................................................. 19

**POINT 3** ................................................................................................................ 21
The Domino Effect of Under-Qualified, Inexperienced and Poorly Compensated Counsel at
Trial, Through a Mismanaged Assigned Counsel Plan, Has Created Convoluted Practices, Which
Violate Due Process and Equal Protection, Resulting in Waste of Financial and Judicial
Resources in New York State ........................................................................................ 21

    A.   Under-Qualified, Inexperienced and Poorly Compensated Counsel at Trial Creates A
Domino Effect Resulting in Violations of the Rights of Indigent Defendants ......................... 22

    B.   The Mismanagement of the Assigned Counsel Plan Has Created Convoluted Practices. 23

        I.   The Specific Facts Detailing the Underlying Causes to Deficiencies in the Assigned
Counsel Plan Has Been Known For Over A Decade ....................................................... 24

        II.   Convoluted Practices Result in Detrimental Actions Taken Against 18-B Assigned
Counsel Attorneys ....................................................................................................... 26

a.    Stephen T. Mitchell.................................................................................. 26
b.    David Bliven.............................................................................................. 28
c.    Class Action Case of Nicholson v. Williams............................................. 29

III.    Hurrell-Harring v. State Brings Statewide Attention to the Systemic Problems of the Assigned Counsel Plan .......................................................................................... 31
    a. The Lack of Political and Professional Independence .................................... 33
    b. Inadequate Compensation and Lack of Parity with Prosecutorial Counterparts ......... 33
    c. The Effect of the Public Defense Crisis on Indigent Criminal Defendants ................. 34

C.  The Lack of a Funding Mandate Allowing Appellate Counsel to Address Unpreserved Issues During Appellate Review Has Resulted in a Domino Effect, Seriously Prejudicing The Defendant's Ability to Meet the Baldi Standards "Representation As A Whole" on Direct Appeal Before this Court.......................................................................................35

CONCLUSION...............................................................................................36

<u>Table of Cases</u>

**Federal Cases**

<u>Billy-Eko v. United States</u>, 509 U.S. 901 (1993)............................................................. 4
<u>Bretch v. Abrahamson</u>, 507 US 619, 635 [1993]............................................................. 12
<u>Carney v. Fabian</u>, 441 F.Supp.2d 1014, 1019 [D. Minnesota 2006] ............................ 19
<u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1980).......................................................................... 30
<u>Douglas v. California</u>, 373 U.S. 905 (1963) .................................................................... 30
<u>English v. Cody</u>, 146 F.3d 1257, 1262 (1998)................................................................... 5
<u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963).................................................................... 30
<u>Guinan v. United States</u>, 6 F.3d 468 (C.A. 7, 1993) ....................................................... 10
<u>Hayes v. Battaglia</u>, 403 F3d 935, 937 [7th Cir. 2005].................................................... 19
<u>Herring v. Estelle</u>, 491 F.2d 125, 127 (5th Cir. 1974) .................................................... 30
<u>MacKenna v. Ellis</u>, 280 F.2d 592, 599 (5th Cir. 1960).................................................... 30
<u>Martinez v. Ryan</u>, 132 S.Ct. 1309 (2012)......................................................................... 3
<u>Martinez v. Ryan</u>, 132 S.Ct. 1309 [2012]......................................................................... 12
<u>Massaro v. United States</u>, 538 U.S. 500 (2003)................................................................ 3
<u>Massaro v. United States</u>, 538 U.S. 500, 500 (2003)....................................................... 8
<u>Massaro v. United States</u>, 538 US 500 (2003)......................................................... 13, 19
<u>Massaro v. United States</u>, 538 US 500, 504 [2003]......................................................... 13
<u>Mitchell v. Fishbein</u>, 377 F.3d 157 (2nd Cir. 2004) ........................................................ 26
<u>Nicholson v. Williams</u>, 203 F.Supp.2d 153 (E.D.N.Y. 2002) ........................................ 29
<u>Opie v. Meacham</u>, 293 F.Supp 647, 650 (D.C. Wyo 1968)............................................. 29
<u>Rose v. Lundy</u>, 455 US 509, 518 [1982] .......................................................................... 12
<u>Sanchez-Llama v. Oregon</u>, 548 US 331 (2006)............................................................... 19
<u>Sanchez-Llama v. Oregon</u>, 548 US at 359........................................................................ 19
<u>Strickland v. Washington</u>, 104 S.Ct. 2052, 2066 [1984] ................................................ 20
<u>Sweet v. Bennett</u>, 335 F3d 135 (2nd Cir. 2003)................................................................ 19
<u>Trevino v. Thaler</u>, 133 S.Ct. 1911 [2012] ......................................................................... 3
<u>United States v. Chronic</u>, 466 U.S. 648, 667 n.42 (1984) ............................................... 4
<u>United States v. Galloway</u>, 56 F.3d 1239, 1242 (10th Cir. 1995) .................................... 4
<u>Vitek v. Jones</u>, 445 U.S. 480 (1980)................................................................................. 30
<u>Walter v. Dalshiam</u>, 669 F.Supp. 68 (S.D.N.Y 1987) ..................................................... 20
<u>Walter v. Dalshiam</u>, 669 F.Supp. 68, 70 [SDNY 1987] .................................................. 13

**Statutes**

C.P.L. § 440.10 (2) (b)...................................................................................................... 7
C.P.L. § 440.10 (2) (c)...................................................................................................... 7
County Law § 722(4) ........................................................................................................ 12
CPL § 440.10(2)................................................................................................................ 20
CPL § 440.30 .................................................................................................................... 12
CPLR §§ 1101/1102 ......................................................................................................... 12
N.Y. County Law § 722-b (2007)..................................................................................... 33

## Other Authorities

Justice Walter V. Schaefer of the Supreme Court of Illinois, *Federalism and State Criminal
   Procedure.* 70 Harv. L. Rev. 1, 8 (1956) .................................................................................. 1
Structural Reform in Criminal Defense: Relocating Ineffective Assistance of Counsel Claims, 92
   Cornell L. Rev. 679 (2007) ...................................................................................................... 2
William J. Stuntz – "The Uneasy relationship between Criminal Procedure and Criminal Justice"
   107 Yale L.J. 1, 3-12, 72-76 (1977)......................................................................................... 1

## Rules

DR 2-103 (22 NYCRR 1200.8.................................................................................................... 33

## Treatises

ABA Ten Principles, Principle 6 ............................................................................................... 32
NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010],
   Standard K-1 .......................................................................................................................... 34
NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010],
   Standard K-3 .......................................................................................................................... 33
NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010],
   Standards A-1.......................................................................................................................... 33
NYSBA Standards for providing Mandated Representation (Revised June 19th, 2010), Standard
   E-2.......................................................................................................................................... 32
NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Legal
   Representation in New York State (2004), Standard III(C) .................................................... 34
NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Representation in
   New York State (2004), Standards II, III-A .......................................................................... 33

## State Cases

New York County Lawyers Ass'n v. State, 196 Misc.2d 761 (N.Y.Sup. 2003) .......................... 24
People v. Brown, 382 N.E.2d 1149, 1149 (N.Y. 1978).............................................................. 6
People v. Brown, 45 NY2d 852, 853-854 [1978]................................................................. 13, 20
People v. Freeman, 93 AD3d 805 (2nd Dept. 2012) ................................................................... 3
People v. Freeman, 93 AD3d 805 [2nd Dept. 2012]................................................................... 13
People v. Lopez, 71 NY2d 662, 665 [1988] .............................................................................. 13
People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011).................................................................. 3
People v. Maxwell, 89 AD3d 1108 [2nd Dept. 2011].................................................................. 13
People v. Melendez-Smith, 66 AD3d 1042 (2nd Dept. 2009) ..................................................... 20
People v. Mendoza, 298 AD2d 532 [2nd Dept. 2003]................................................................. 20
People v. Morales, 58 NY2d 1008 [1983] ................................................................................. 20
People v. Rivera, 71 NY2d 705 [1988]....................................................................................... 13
People v. Stultz, 2 NY3d 277, 284 [2004].................................................................................. 13

PRELIMINARY STATEMENT

"Making Gideon a formal right only, without any ancillary funding requirements, has produced a criminal process that is, for poor defendants, a scandal. Under funding of criminal defense counsel limits the number of procedural claims that can be pressed.

Constitutional criminal procedure raises the cost of prosecuting wealthier defendants by giving those defendants more issues to litigate. The result, at the margin, is to steer prosecutors away from such defendants and toward poorer ones. By giving defendants other, cheaper claims to raise, constitutional criminal procedure also raises the cost to defense counsel of investigating and litigating factual claims, claims that bear directly on their clients innocence or guilt...More Fourth, Fifth and Sixth Amendment claims probably mean fewer self-defense and mens rea arguments. This turns the standard conservative criticism of the law of criminal procedure on its head. Ever since the 1960's, the right has argued that criminal procedure frees too many of the guilty. *The better criticism may be that it helps to imprison too many of the innocent.*

Over the course of the past couple of decades, legislators have exercised their funding power to expand substantially the resources devoted to law enforcement." William J. Stuntz – "The Uneasy relationship between Criminal Procedure and Criminal Justice" 107 Yale L.J. 1, 3-12, 72-76 (1977)

"Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he might have. [Procedural Rules] are designed for those who know [them], and they can become a source of entrapment for those who do not. Substantive criminal law also presents difficulties to the uninitiated." Justice Walter V. Schaefer of the Supreme Court of Illinois, *Federalism and State Criminal Procedure.* 70 Harv. L. Rev. 1, 8 (1956)

1

Eve Brensike Primus wrote, Structural Reform in Criminal Defense: Relocating Ineffective Assistance of Counsel Claims, 92 Cornell L. Rev. 679 (2007), and "Points out that federal courts and most state courts refuse to hear claims on direct appeal that trial counsel provided ineffective counsel, requiring such claims to be presented in collateral review proceedings...Professor Primus proposes that appellate attorneys be allowed to raise ineffective assistance of trial counsel claims on direct appeal and that, in appropriate cases, appellate attorneys be permitted to supplement the trial court record in order to fully support claims of attorney ineffectiveness."

In New York State, collateral review claims of ineffective assistance of counsel **before** your direct appeal are virtually impossible for the unskilled pro-se litigant, who is a laymen in the matters of law and procedure, who faces the risk of being procedurally barred if raising a claim that could be partially determined from the record.

The result is that the majority of claims raised are issues lying partially on and off the record, "mixed claims", and the defendant has to hope the appellate court, if egregious enough, will invoke their "interest of justice" jurisdiction. It is here that the defendant is prejudiced.

In the narrowly defined cases, such as this defendant's, where a majority (more then 50%) of his cognizable and meritorious issues are either "mixed claims", or involve issues that dehor the record (involving affidavits from expert witness, court documents and exhibits not used by trial counsel at the Nisi Prius Court), the defendant is prevented by state procedural rules that fail to provide funding to indigent defense systems to pursue Article 440's before a defendant's direct appeal, allowing a full and complete review of all claims of Ineffective Assistance of Counsel on and off the record on direct appeal.

This prevention causes extreme prejudice in that defendant is required to meet the "Baldi" standard of "representation as a whole" and "in totality", plainly impossible where more then 50% of defendant's claims are procedurally barred from being raised on direct appeal. Combined with the lack of funding for collateral review proceedings, the defendant is forced to have his direct appeal on less then 50% of his cognizable claims, forever being barred from having his collateral review claims heard **in conjunction** with his direct appeal. This is because the defendant will either: (A) Raise issues pro-se in Article 440 proceeding before his direct appeal, that he is simply not capable of doing well enough to be granted a hearing to have those claims reviewed on the merit, or (B) Raise issues pro-se in Article 440 proceeding after his direct appeal, forever losing the ability to have those issues resolved in the context of "representation as a whole" of trial counsel "in totality", **in conjunction** with those limited issues raised by appellate counsel on direct appeal and of the pro-se defendant in a supplemental pro-se brief, if the court so grants permission to file one.

This pro-se defendant, after 3 ½ years of dedicating his entire being to learning the intricacies of the law, now submits this motion in an effort to have the State of New York address these issues. I will attempt to do so in the context of the Supreme Court cases, Massaro v. United States, 538 U.S. 500 (2003), Martinez v. Ryan, 132 S.Ct. 1309 (2012), and Trevino v. Thaler, 133 S.Ct. 1911 (2013), in conjunction with the recent State Court cases of People v. Freeman, 93 AD3d 805 (2nd Dept. 2012) and People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011).

**POINT 1**

Development of Doctrine to Raise Ineffective Assistance of Counsel
Claims in Post-Conviction Proceedings Before Direct Appeal

A. Analogous Facts and Circumstances of *Massaro v. United States*

The case of *Massaro* reveals the Supreme Courts Premise that post-conviction relief is
the best avenue of attack for claims of ineffective assistance of counsel (hereinafter "IAC") in
the Federal Courts. This stance is analogous to raising IAC claims in New York State Pursuant to
an Article 440 proceeding.

The Supreme Court has clearly expressed its reasoning on this stance. "In *United States v.
Chronic*, 466 U.S. 648, 667 n.42 (1984), the Solicitor General embraced the approach that 'a
defendant can attack the actual performance of trial counsel only through a position for post-
conviction relief under 28 U.S.C. § 2255, and not through direct appeal.' The Government's
principal reason for advocating this rule is that such claims inevitably require consideration of
facts that 'are outside the record on direct appeal and that should be considered by the district
court in the first instance.'" Solicitor General Br. In Supp. Of Cert. at 6, *Billy-Eko v. United
States*, 509 U.S. 901 (1993) (No. 92-7897)

"The prevailing rule is deeply rooted in the doctrines on Judicial Economy and Due
Process, and provides that even if the claim could fairly be resolved on direct appeal, no
procedural bar will apply to ineffectiveness claims that were first brought in post-conviction
proceedings instead." (emphasis added) See e.g. *United States v. Galloway*, 56 F.3d 1239, 1242
(10th Cir. 1995) (en banc) (claims that are fully developed in the record *may* be brought under
direct appeal or under § 2255)

In the current practice of New York State, judicial economy and due process are forced to
take a back seat to financial economy and constraints. This State practices the routine denial of

4

due process by placing financial constraints on the indigent defense/public defense services, which fails to provide finances to assign counsel for post-conviction Article 440 proceedings, where appellate counsel clearly discovers the need for one.

In effect, appellate counsel instead bypasses or ignores these "mixed-claims" and other claims dehoring the record and clearly involving IAC claims, and submits an appellate brief lacking in substance and merit. Furthermore, this defeats the adversarial process because New York State practices the Baldi standard for IAC claims, defined as "representation as a whole" and "in totality" of counsels representation, which can not possibly be met when appellate counsel fails to develop substantive claims directly contributing to meeting such standard.

"[F]orcing criminal defendants to raise ineffective assistance claims on direct appeal is an impractical approach which fails miserably at furthering the goal of finality in judgments" because, in part, the procedural bar doctrine is "painfully labor intensive to sort through and apply." *English v. Cody*, 146 F.3d 1257, 1262 (1998)

This error is compounded when appellate counsel raises an unripe or sheer ineffectiveness claim which results in the appellate court rejecting the claim on the merits, finding the incomplete and underdeveloped record was sufficient for adjudication. That defendant would then be barred from raising the same issue in a collateral review proceeding because the court reached the merits on the ineffectiveness claim, even though further actual development – outside of what appeared on the record – may have established that counsel was truly ineffective.

The opposite is also true. If the appellate court deems the claim lies partially outside the record, they will decline to review it and state that it should have been raised in a collateral

review proceeding, unless, in a limited exception, the court invokes its discretionary review "in the interest of justice."

New York State is among the States that permit, but do not require, ineffectiveness claims to be raised on direct appeal. *People v. Brown*, 382 N.E.2d 1149, 1149 (N.Y. 1978) ("in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceedings."

This creates an illusion that permits defendants to file an Article 440 proceeding in the Nisi Prius Court, before their direct appeal, in the hopes of developing the record to enable a review on a complete record on direct appeal. Unfortunately, this illusion is exactly that, and is shattered because in conjunction with this States unconstitutional rule denying the assignment of counsel in these collateral-review/post-conviction proceedings, the following prejudice occurs.

The lack of a funding mandate for assignment of counsel to pursue an Article 440 proceeding results in a pro-se defendant, who by nature is a layman in the matters of law and procedure, being forced to prepare and submit an Article 440 brief which even the most experienced criminal defense attorney has difficulty doing. Compound that with the conflicting applications of the law concerning mixed claims as applied by the courts of this State, and the obstacles become insurmountable.

The likelihood of a pro-se defendant being granted a hearing is infinitesimal. Ironically, if the defendant had an assigned attorney to properly develop and submit this brief, his chances of being granted relief in the form of a hearing are substantially improved. This is just the beginning of the procedural morass that a pro-se defendant encounters.

6

The Courts in this State, virtually on a whim, randomly and inappropriately deny hearings before a defendant has his direct appeal, stating that "sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such appeal." C.P.L. § 440.10 (2) (b). In many instances, judicial economy takes a hit because the matter is appealed and subsequently sent back to the Nisi Prius Court with the direction to review the claim because it is a "mixed-claim." This process can take years in the appellate courts of this state, and becomes an undue burden on judicial economy.

Furthermore, if a defendant submits an Article 440 after his direct appeal, the Nisi Prius Courts of this State deny a defendant a hearing stating that, "Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him." C.P.L. § 440.10 (2) (c) Once again, the defendant is stuck in a procedural morass preventing him from having his claims reviewed in the proper forum.

The position taken by *Massaro* is closely aligned with the facts and circumstances of the defendant's case. There exists a procedural morass, created by the unconstitutional rules involving collateral review proceedings in conjunction with the lack of a funding mandate for the assignment of counsel in such proceedings.

B. Similarities to Holdings in Unanimous Decision of *Massaro v. United States*

The Supreme Court held in Massaro that "An ineffective assistance of counsel claim may be brought in a collateral proceedings under § 2255 (the federal equivalent of an Article 440),

whether or not the petitioner could have raised on direct appeal." *Massaro v. United States*, 538 U.S. 500, 500 (2003)

These holdings abrogate N.Y. Crim. Pro. L. § 440.10 (2) (c), which procedurally bars these same claims if they could have been raised on direct appeal.

The *Massaro* court held the reason to be that "requiring a criminal defendant to bring ineffective assistance claims on direct appeal does not promote the procedural default rules objectives: conserving judicial resources and respecting the laws important interest in the finality of judgments." Id at 500.

In practice, New York State attempts to circumvent this holding by allowing defendants to raise an Article 440 proceeding before his direct appeal, an illusion which is shattered by the lack of a funding mandate to assign counsel to effectively prepare such a brief. This practice in New York State has the same effect, as held by the *Massaro* court, which states "Applying that rule to ineffective-assistance claims would create a risk that defendants would feel compelled to raise the issue before there has been an opportunity fully to develop the claims factual predicate, and would raise the issue for the first time in a forum not best suited to assess those facts, even if the record contains some indication of deficiencies in counsel's performance." Id at 500.

The defendant, in this narrowly defined case, made his appellate counsel aware of numerous "mixed-claims" requiring an Article 440 proceeding to develop the claims factual predicate (Aff. at ¶ 9-60). The defendant submits that due to the policy in place that discourages indigent/public defense providers, specifically ones like Appellate Advocates located in large metropolitan cities where financial constraints and political pressure are prevalent, from pursuing these mixed claims in collateral review proceedings before direct appeal; the due process rights of defendants are violated by the submission of an appellate brief raising IAC claims on an

8

incomplete and undeveloped record. This makes it virtually impossible of meeting the State standard of "representation as a whole" and "in totality" of all the facts required to make such a determination (Aff. at ¶ 70-71). (See Addendum #1, Appellate Advocate cases where court held "mixed-claims" required collateral review proceedings)

This defendant was required, before this very court, to present transcripts, affidavits from experts and uncalled witness Steve Frankl, police reports and other records, all intertwined from his "mixed claims" and other meritorious claims dehoring the record; in an application to enlarge the judgment roll (Aff. at ¶ 66-69). This court granted the motion in part and allowed the grand jury proceedings to produced under seal, in camera, along with various transcripts, to be included as part of the certified appellate record.

Appellate Counsel Warren Landau, as has been proven with documentary records submitted with this brief, was made aware of the above transcripts, affidavits and records in detail. These all substantiate the need to develop the defendant's IAC claims in an Article 440 proceeding.

The Massaro Court clearly explains what would happen if a claim of ineffectiveness is brought on direct appeal for the first time, a position this defendant feels will violate his due process rights if continuing on the course his appellate attorney set for him. "When a claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record that is not developed precisely for, and is therefore often incomplete or inaccurate for, the purpose of litigating or preserving the claim. A defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial. *Strickland v. Washington*, 466 U.S. 668." *Massaro*, id at 500-501.

9

The *Massaro* court relies heavily on Judge Easterbrooks rulings in *Guinan v. United States*, 6 F.3d 468 (C.A. 7, 1993), who eloquently explained "[r]ules of procedure should be designed to induce litigants to present their contentions to the right tribunal at the right time." *Guinan,* supra, at 474 (concurring opinion)

"The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seeming unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. See *Guinan, supra,* at 473 (Easterbrook, J., concurring) ("no matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did...Or it may turn out that counsel's overall performance was sufficient despite a glaring omission..."). The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them. And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are not introduced. Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial." Massaro, Id at 505.

The development and implementation of a collateral review doctrine is required in this State. The collateral review doctrine will:

1) present a bright-line rule that provide attorneys and courts with certitude as to when specific claims must be raised;

10

2) allow for a complete development of the record relating to the facts and circumstances underlying the ineffectiveness claim;

3) provide trial lawyers with an opportunity to be heard before any determination is made as to whether or not they were ineffective;

4) ensure that the trial court has an opportunity to pass on *all* ineffectiveness claims before their presentation to an appellate court;

5) avoid time-consuming litigation over procedural issues, such as raised by the convoluted procedural bars in C.P.L. Article 440;

6) enable defendants to better assess the consequences of counsel's conduct.

The cumbersome parsing and paring of ineffectiveness claims is completely avoided by a rule that allows for collateral review, rather than a procedural bar. Significantly, one of the main virtues of the collateral review rule is that all ineffectiveness claims can be brought in a single proceeding in the trial court, which has the facilities for developing a full record.

Furthermore, a simple procedural rule can allow for a single appellate review of all IAC claims in conjunction with defendants other claims lying on the record. Hence, appellate counsel can now file his appellate brief on an unmistakably full and complete record, in full compliance with the doctrine of judicial economy and defendant's due process rights, resulting in a far more superior use of judicial resources and finances.

It is these circumstances that the defendant submits fully support his position that the rules preventing him, in the narrowly defined circumstances pled within, from having his factual claims fully developed in a collateral review proceeding by his first court appointed counsel, are unconstitutional. The defendant will expound on this by pleading the merits of his claim further in the context of the more recent Supreme Court case, *Martinez V. Ryan*.

11

**POINT 2**

Various Statutes and Procedural Protocols Associated With CPL Article 440 Are Violative of the Due Process, Equal Protection and Supremacy Clauses of the United States Constitution

The Supreme Court has recently stated that in certain circumstances, there may be a constitutional right to the assistance of counsel for the investigation, preparation and submission of a viable post conviction application challenging the effectiveness of trial counsel (see Martinez v. Ryan, 132 S.Ct. 1309 [2012]), Moreover, in Trevino v. Thaler, 133 S.Ct. 1911 (2013), the Supreme Court held that procedural bars to claims of ineffective assistance of trial counsel would not be allowed when the state's post conviction protocols are convoluted, and prevent adequate review on appeal of an ineffectiveness of trial counsel claim.

As demonstrated below, when viewed through the lens of the Supremacy Clause, and the fact that the federal system entrusts state courts with initial and primary responsibility for enforcing federal constitutional rights in the course of administering their criminal justice systems (see e.g. Bretch v. Abrahamson, 507 US 619, 635 [1993]; also see Rose v. Lundy, 455 US 509, 518 [1982]), not only are the procedural bars under CPL § 440.10 --- when applied to claims of ineffective assistance of counsel --- unconstitutional, but the failure of CPLR §§ 1101/1102, County Law § 722(4) and CPL § 440.30 to have funded mandates for the assignment of counsel for the investigation, preparation and submission of a CPL § 440.10 application on claims of ineffective assistance of counsel, renders those statutes --- as applied --- unconstitutional.

A.    Application Of Any Of The Procedural Bars Under CPL § 440.10(2) or CPL § 440.10(3) Would Be Contrary To Clearly Defined Supreme Court Precedent

Because constitutional challenges relating to trial counsel's performance failures are difficult to measure based on a cold record as:

12

> [a] trial lawyer's decision to adopt one course or another often rests on strategies
> that cannot be gleaned from the record on appeal

(see People v. Stultz, 2 NY3d 277, 284 [2004]), an ineffective assistance of trial counsel claim is best suited for a post conviction motion (see e.g. People v. Rivera, 71 NY2d 705 [1988]; also see People v. Lopez, 71 NY2d 662, 665 [1988]), not an appeal (see e.g. Massaro v. United States, 538 US 500, 504 [2003]).

In Massaro v. United States, 538 US 500 (2003), the Supreme Court held that a trial court rather than an appellate court is best suited to develop the record necessary for determining the adequacy of representation during proceedings before the trial court (see Massaro v. United States, 538 US at 504-505. This was recently made applicable to the states by the recent decision in Trevino v. Thaler, 133 S.Ct. 1911 (2013), where the Supreme Court specifically held that when ineffective assistance of trial counsel claims depend on evidence outside the trial record, states direct appeal process could never be effective for developing the factual basis for an ineffective assistance of trial counsel claims (also see Martinez v. Ryan, 132 S.Ct. 1309 [2012]).

This rational is supported by the Court of Appeals holding that in the "typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel [must] be bottomed on an evidentiary exploration by collateral or post conviction proceedings brought under CPL § 440.10" (see People v. Brown, 45 NY2d 852, 853-854 [1978]; also see People v. Freeman, 93 AD3d 805 [2nd Dept. 2012]; People v. Maxwell, 89 AD3d 1108 [2nd Dept. 2011]; Walter v. Dalshiam, 669 F.Supp. 68, 70 [SDNY 1987] [where the Southern District reasoned that an appellate court has no basis upon which it would be able to consider the substance of an ineffective assistance of counsel claim until a record of the relevant facts has been made at the trial court level]).

13

In the instant case at bar, the district attorney and no doubt this Court, will attempt to assert procedural bars on the claims of ineffective assistance of counsel I raised on the grounds that sufficient facts appeared on the record to have allowed review on direct appeal (see CPL § 440.10[2][c]), or that I could have made enough facts appear on the record to cause such review (see CPL § 440.10[3][a]). But any such application would fly directly into the face of the prohibition of such procedural bars outlined in Martinez v. Ryan, supra, and Trevino v. Thaler, supra. And as the Supremacy Clause demands that any state law which contradicts the laws passed by the Supreme Court must be knocked down as invalid, I am asking this Court to find that, as applied to the specific situations dealing with my ineffective assistance of counsel claims, any applications of the procedural bars under CPL § 440.10(2) and CPL § 440.10(3), would be unconstitutional.

B.   When Viewed Through The Statements In Martinez v. Ryan, 132 S.Ct. 1309 (2012), Failure To Assign Me Counsel To Help Prepare And Submit a CPL § 440.10 Motion Would Render County Law § 722 and CPLR § 1101, As Applied, Unconstitutional

In initial review collateral proceedings, which, as here, provide the first occasion to raise mixed claims of ineffective assistance of trial counsel, the Supreme Court has stated that the constitution may require the assignment of counsel. This is because by deliberately choosing --- either explicitly or implicitly (see Trevino v. Thaler, 133 S.Ct. 1911 [2013]) --- to move trial counsel ineffectiveness claims outside of the direct appeal process where counsel is constitutionally guaranteed, the state is required to provide the same instruments (i.e. an attorney and other support services), as it would on appeal (see Martinez v. Ryan, 132 S.Ct. 1309, 1315, 1318 [2012]).

But New York State has no provisions in place to allow for assignment of counsel in the manner articulated in Martinez v. Ryan, supra. Specifically, County Law § 722(4) only has

14

provisions for assignment of counsel after a CPL § 440.10 motion has been filed, and a hearing has been ordered.

But what good is it then? By then the pro se litigant, unlearned in the law, will have already unwittedly sprung many of the procedural traps courts used to shut the door on meritorious claims of ineffective assistance of trial counsel. And because he does not have the knowledge and/or resources (financial or otherwise) to conduct interviews of the appropriate witnesses and experts to author the necessary affidavits and other documentation that will meet the evidentiary requirements of CPL § 440.30(1), he is really at a heavy disadvantage. Something I am experiencing first hand.

Here, because the investigation and preparation of claims raised in my affidavit can only occur with the assistance of the trained professional and investigative services outlined in Martinez v. Ryan, supra (at 132 S.Ct. 1315-1317), County Law § 722(4)'s post submission appointment protocols simply no longer can stand constitutional muster because not only does the appointment of counsel comes after, rather than before, the submission of a post conviction application, but because the appointment is discretionary.

CPLR §§ 1101/1102 has similar, if not greater defects in its assignment protocols. The conditional, rather than mandatory requirements for the assignment of counsel to investigate, prepare and submit a CPL § 440.10 application attacking the constitutional appropriateness of trial counsel's performance places CPL § 1101(b) in direct violation of the statements in Martinez v. Ryan, supra, which provide the factual scenario where the right to counsel in post conviction review applications should attach. For instance, CPLR § 1101(b) requires that I provide certification from an attorney that my action has merit. But tell me, how am I (or any

15

other inmate for that matter) going to do this when very few attorneys will even look at an inmate's case without requiring some upfront money? Money many of us simply do not have.

These facts have created a viable claim that County Law § 722 and CPLR § 1101 post hearing assignment protocols are no longer workable in light of <u>Martinez v. Ryan</u>, supra, and <u>Trevino v. Thaler</u>, supra.

C. In Light Of <u>Martinez V. Ryan</u>, 132 S.Ct. 1309 (2012), <u>Trevino v. Thaler</u>, 133 S.Ct. 1911 (2013), The Procedural And Evidentiary Protocols Enacted Under CPL § 440.30 Violates Due Process And Equal Protection Guarantees

There is no question that <u>Martinez v. Ryan</u>, supra represents the first shot across the bow of post conviction statutes which do not provide counsel or other support services for the investigation, preparation and submission of post conviction applications for indigent prisoners in order for them to challenge the effectiveness of their trial attorneys, and that the recent decision in <u>Trevino v. Thaler</u>, supra, makes such assertion applicable to states like New York when ineffective assistance claims, even those seemingly record based, must be raised in a post conviction motion (see <u>People v. Stultz</u>, 2 NY3d 277, 284 [2004]; also see <u>People v. Freeman</u>, 93 AD3d 805 [2nd Dept. 2012]). And as CPL § 440.30 holds a pro se inmate to the standard of a well trained attorney by implementing presentation and review protocols that cannot be met, it has created a catch 22 which simply no longer can stand constitutional muster. A defendant will receive an attorney and other support services if he proves his application has merit. But in order to prove his application has merit, he needs an attorney and other support services. This reality of pro se litigation boggles the mind.

In light of the Supreme Court's statements that:

⊘ Defendants pursuing first-tier review are generally ill-equipped to represent themselves (<u>Martinez v. Ryan</u>, 132 S.Ct. 1309, 1317 [2012]), and

⊘ Without the help of an adequate attorney a prisoner will have difficulties vindicating a substantial ineffective assistance of trial counsel claim (<u>id.</u>, at 1317), and

⊘ Claims of ineffective assistance of trial counsel often require investigative work and an understanding of trial strategy (<u>id.</u>, at 1317), and

⊘ To present a claim of ineffective assistance of trial counsel in accordance with a state's procedures, a prisoner likely needs an effective attorney (<u>id.</u>, at 1317), and

⊘ The prisoner, unlearned in the law, may not comply with the state's procedural rules and may misapprehend the substantive details of federal constitutional law (<u>id.</u>, at 1317), and

⊘ A pro se inmate requires the guiding hand of counsel at every step in the proceedings against him … because he does not know how to establish his innocence (<u>id.</u>, at 1317) (citations and inner quotation marks omitted), and

⊘ Ineffective assistance of counsel claims often depend on evidence outside of the trial record (<u>id.</u>, at 1318), and

⊘ By deliberately choosing to move trial ineffectiveness claims outside of the direct appeal process, either explicitly or implicitly, where counsel is constitutionally guaranteed, the state significantly diminishes prisoners' ability to file such claims (<u>id.</u>), and

⊘ The prisoner, unlearned in the law, may not comply with the state's procedural rules and may misapprehend the substantive details of federal constitutional law (<u>id.</u>, at 1317) (citing to <u>Halbert v. Michigan</u>, 545 US 605, 620-621 [2005], which describes the deficient educational background of the prison population).

How can CPL § 440.30, which does not even come close to adhering to any of these statements, still be deemed to be constitutional?

In my case, I am not able to compel counsel[1] to answer the interrogatories concerning his errors of omission and commission at trial. While the protocols laid out in Martinez v. Ryan, supra, would demand that I be allowed, at the very least, the assignment of counsel and compulsory process to command counsel to answer these claims, CPL § 440.30 does not have such protocols unless a hearing is granted (see County Law § 722[4]).

CPL § 440.30 will not provide me with funding to assign counsel. But, prior to the granting of a hearing, no such expenditures could even be asked for (see CPL § 440.10[1][b]).

What these two examples show is that there is an unbreakable catch 22. I am entitled to these provisions once I prove my ineffective assistance claim (see County Law § 722[4]; CPL § 440.10[1][b]), but in order to prove my ineffective assistance claim I need the assistance of an attorney and other services. How could these be constitutional?

Indeed, without any provisions that will recognize the pro se nature of a defendant's claims must be read liberally, as well as those statements in Martinez v. Ryan, supra, there can be no question that CPL § 440.30, as applied, to me and similarly situated indigent defendants, is unconstitutional.

There is an equal protection violation going on here because only those who could afford an attorney may have the privilege of passing through the very high hurdles that CPL § 440.30 places on presentation of Article 440 applications, hurdles the Supreme court in Martinez v. Ryan, 132 S.Ct. 1309, 1315-1317, says are constitutionally unfair, I am respectfully asking this Court to take a comprehensive look at these issues, and provide a well reasoned explanation that would justify the existence of CPL § 440.30, and the other statutes challenged in Subsections A and B, supra.

---

[1] See Trevino v. Thaler, 133 S.Ct. 1911 (2013), holding that when a state process for raising a claim of ineffective assistance of counsel on appeal is convoluted, the same restrictions articulated in Martinez v. Ryan, supra, applies.

D. CPL § 440.10 is the Only Vehicle to Obtain A Full and Fair Review of My Ineffective
Assistance Of Trial Counsel Claims

In Massaro v. United States, 538 US 500 (2003), the Supreme Court held that a trial court
rather than an appellate court is best suited to develop the record necessary for determining the
adequacy of representation during proceedings before the trial court (see Massaro v. United
States, 538 US at 504-505). But in Sweet v. Bennett, 335 F3d 135 (2nd Cir. 2003), the Second
Circuit held that because Massaro was not decided on constitutional grounds its holdings are not
applicable to State post conviction applications (see Sweet v. Bennett, 335 F3d at 140-141; also
see Carney v. Fabian, 441 F.Supp.2d 1014, 1019 [D. Minnesota 2006] [holding that there is no
constitutional ruling in Massaro that is binding on State courts]; Hayes v. Battaglia, 403 F3d 935,
937 [7th Cir. 2005]).

In Sanchez-Llama v. Oregon, 548 US 331 (2006), the Supreme Court seemed to
conditionally overrule these holdings. Addressing a claim of whether the States are required to
hear Vienna Convention claims raised for the first time in State post conviction proceedings, the
Supreme Court held that "given that the convention itself imposed no such [post conviction
presentation] requirement" (see Sanchez-Llama v. Oregon, 548 US at 359), the Court could not
perceive of any grounds to require State procedural rules to adhere to Massaro (id.).

From this language it can rationally be inferred that if there is some State court
procedural rule or case-law that holds that presentation of an ineffective assistance of counsel
claim would best be developed on a post conviction application, then the application of Massaro
would apply. Fortunately, under both the New York State and Federal jurisprudence there are
post conviction presentation requirements which even state courts have acknowledged using the
same language and rational as Massaro, supra.

19

In People v. Melendez-Smith, 66 AD3d 1042 (2nd Dept. 2009), the Second Department held that when a defendant's claim is based on affirmations and other matters dehors the main record, it is not properly before the Appellate Division without initial presentation to the State trial court (also see People v. Mendoza, 298 AD2d 532 [2[nd] Dept. 2003]). Supporting this rational is the Court of Appeals holding that in the "typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel can be bottomed on an evidentiary exploration by collateral or post conviction proceedings brought under CPL § 440.10" (see People v. Brown, 45 NY2d 852, 853-854 [1978]), particularly when trial counsel's rational for his performance failures are necessary to evaluate counsel's strategic and tactical decisions (see e.g. Strickland v. Washington, 104 S.Ct. 2052, 2066 [1984]; also see People v. Morales, 58 NY2d 1008 [1983]).

For instance, in Walter v. Dalshiam, 669 F.Supp. 68 (S.D.N.Y 1987), the district court held that under New York law the proper vehicle for raising a claim of ineffective assistance of trial counsel is generally not a direct appeal but a motion to the trial court to vacate the judgment under CPL § 440.10. The district court reasoned that an appellate court has no basis upon which it would be able to consider the substance of an ineffective assistance of counsel claim until a record of the relevant facts has been made at the trial court level (compare Massaro v. United States, 538 US at 504-505 with Walter v. Dalshiam, 669 F.Supp. at 70).

Based on the above, my ineffective assistance of counsel claim, which is supplemented by non-record facts, can only be brought by way of a post conviction motion, not an appeal. Any application of the procedural bars under CPL § 440.10(2) would violate my due process right to access to the only forum actually capable of providing a full and fair hearing of my ineffective assistance of counsel claims under Strickland's performance/prejudice test. It is for this reason

20

that I ask this Court to assign new appellate counsel to research, draft and submit a CPL 440.10 to the Nisi Prius Court <u>before</u> my direct appeal, to hear my ineffective assistance claims on the merits of a full and completely developed record.

**POINT 3**

The Domino Effect of Under-Qualified, Inexperienced and Poorly Compensated Counsel at Trial, Through a Mismanaged Assigned Counsel Plan, Has Created Convoluted Practices, Which Violate Due Process and Equal Protection, Resulting in Waste of Financial and Judicial Resources in New York State

As previously discussed, the failure to provide competitive pay rates to attract qualified and experienced counsel as trial counsel, combined with the serious mismanagement of Appellate Assigned Counsel Plans, results in convoluted practices, which violate due process and equal protection based solely on a defendant's indigent status. (Aff. at ¶ 110-113)

The end result is a domino effect causing an endless parade of post-conviction proceedings that ripples through to Appellate Assigned Counsel Plans who fail to investigate and develop the very issues created by incompetent and inexperienced counsel at the trial level. The multitudes of mixed claims are largely ignored and undeveloped due to lack of funding to pursue such claims. The defendant alleges this is endemic to the common practice of the Assigned Counsel Plan for the Second, Eleventh and Thirteenth Judicial District at the trial court level and Appellate Advocates at the appellate level.

The history and oversight of the Assigned Counsel Plan reveals that the current problems have been known for over a decade, and even with standardized rules and regulations for the institutional providers of Indigent Defense Organizations, the problem continues to prejudice the indigent defendants in the State of New York. (Aff. at ¶ 114-128)

21

In the defendants case before this Honorable Court it has been revealed that although Appellate Counsel Mr. Landau of Appellate Advocates was informed numerous times over an almost 2 year period concerning ineffective assistance of counsel claims representing more then 50% of his cognizable claims, he has continuously ignored and failed to address these issues in collateral review proceedings. (Aff. at ¶ 9-60, 94-101, 129-131) His previous history shows he has done this on previous occasions. (Aff. at ¶ 102, See also, Addendum #1)

A. Under-Qualified, Inexperienced and Poorly Compensated Counsel at Trial Creates A Domino Effect Resulting in Violations of the Rights of Indigent Defendants

As previously stated, the financial constraints imposed by the State of New York that attract only the poorest quality of attorneys who can "warehouse" cases to turn a profit, results in trial counsel who effectively fails to act by an advocate by performing the most basic functions like objecting with specificity, making timely motions and preserving the record for appellate review. (Aff. at ¶ 110-121)

This in turn leads to appeals with a large majority of the issues involving either "mixed-claims" or matters dehoring the record, which can only be reviewed in the interest of justice **unless** these matter are developed in collateral review proceeding **before** direct appeal. Failure to do this results in an appeal being submitted in which more then 50% of the issues raised unpreserved for appellate review, in which the appellate court only in the most egregious of cases, will invoke its "in the interest of justice" exception.

Furthermore, these unpreserved claims raised on direct appeal are forever lost to be raised in **conjunction** with the issues lying off the record or involving mixed claims.

B.  The Mismanagement of the Assigned Counsel Plan Has Created Convoluted Practices

The underlying causes and factors contributing to deficiencies in the Assigned Counsel Plan starts with the mismanagement of assigning attorneys who are underpaid, inexperienced and unqualified to effectively handle the large amount of cases they are assigned. (Aff. at ¶ 110-113)

This mismanagement has created convoluted practices in which qualified attorneys who adamantly and effectively advocate for their clients are subject to harassment by reduction of vouchers, grievances being filed against them and eventually the denial to be recertified to the 18-B panel they practice on, while the inexperienced and underpaid ones learn to "warehouse" cases, setting aside their ethical and professional responsibilities to turn a profit. (Aff. at ¶ 114-121)

Considering that the Assigned Counsel Plan rules and by-laws, which are supposed to prevent political and judicial interference and bias; in fact actually promote it by allowing the committee members to refuse to recertify an attorney without any explanation whatsoever. This effect is furthered by a system comprised of judges who approve individual vouchers in the trial court, and another set of judges who help "administer", create, and sit on the various committees compromising the Assigned Counsel Plan, all of which are politically motivated to conform to the political and financial views of the legislature.

The end result is a system that lets due process and equal protection to be forgotten and lost for the indigent citizens of the State of New York.

23

I.     The Specific Facts Detailing the Underlying Causes to Deficiencies in the Assigned Counsel Plan Has Been Known For Over A Decade.

In 2003, the New York County Lawyers Association brought to light the serious deficiencies in the Assigned Counsel Plan caused by unconstitutional statutory caps on pay rates.

In the action of *New York County Lawyers Ass'n v. State*, 196 Misc.2d 761 (N.Y.Sup. 2003), the court relied upon the evidence of 41 witnesses and 435 exhibits in reaching its determination. Although this case dealt with indigent defense for family and criminal courts, its findings are indicative of the problem as it existed over 10 years ago. Below is an excerpt of what the court discovered over a decade ago.

"The shortage of assigned counsel in the Criminal Courts, as in the Family Court, has also resulted in less then meaningful and effective assistance of counsel. Too many assigned counsel do not: conduct a prompt and thorough interview of the defendant; consult with the defendant on a regular basis; examine the legal sufficiency of the complaint or the indictment; seek the defendant's prompt pre-trial release; retain investigators, social workers or other experts where appropriate; file pre-trial motions where appropriate; fully advise the defendant regarding any plea and only after conducting an investigation of the law and facts; prepare for trial and court appearances; and engage in appropriate pre-sentencing advocacy, including seeking to obtain the defendant's entry into any appropriate diversionary programs...In addition, the evidence showed that many attorneys do not conduct appropriate investigations of the facts or the law; and of those that do, many fail to do so prior to engaging in plea negotiations and only do so immediately prior to trial...Many do not file meaningful pre-trial motions." The court concluded that the portions of § 722-b of the County Law ... and § 35 of the Judiciary Law that relate to assigned counsel rates are unconstitutional as applied. Id. At ¶ 774-775, 778

24

The defects in the Assigned Counsel Plan created a culture of indifference resulting in indulgence of deficient performance which was often hidden behind the label "meaningful representation." The commission on the Future of Indigent Defense Services (herein, the "Kaye Commission") concluded that the numerous constitutional deficiencies were so ingrained that not even an overhaul could fix the problems. Rather, it proposed scraping the roundly criticized patchwork defense network and replacing it with a new, state-wide, state-funded system governed by regulations and standards (Caher, Report for Replacement of Indigent Defense System, NYLJ, Volume 235, No. 125 [6/29/06], at page 1).

It is now 2014, and the assigned counsel plan compensation rates have not been increased since the last increase to $75 in 2003, over 11 years ago. Meanwhile, inflation and the cost of living have skyrocketed in New York. It is time for the Legislature to act and address the issue.

The assigned counsel plan is part of the infrastructure created by the City of New York, mandated to provide legal representation to indigent defendants. The State has the obligation to provide assigned counsel with a reasonable basis upon which they can carry out their professional responsibilities, without either personal profiteering or undue financial sacrifice. The current rates, combined with the lack of a funding mandate for counsel on collateral review proceedings, threaten the adversarial process by creating an unacceptable tension between adherence to professional standards and the financial constraints attorneys and indigent defense firms face in providing constitutionally adequate and meaningful representation.

Indigent citizens and defendants like myself do not represent a substantial lobby in Albany. However, at the cornerstone of justice is the precept that all citizens will be treated equally under the law. The circumstances detailed above demand an overhaul of the system.

25

II.     Convoluted Practices Result in Detrimental Actions Taken Against 18-B
        Assigned Counsel Attorneys

a.  Stephen T. Mitchell

In March 2001 Mitchell commenced an action under 42 U.S.C. §§ 1981 and 1983 and State Law, alleging that the state defendants had terminated his appointment to the First Department 18-B Panel on the basis of his race and in retaliation for his complaints of racial discrimination.

A brief synopsis from the case he initiated, which wound up in the Second Circuit Court of Appeals, *Mitchell v. Fishbein*, 377 F.3d 157 (2nd Cir. 2004), provides a clear understanding of his position, which this defendant claims is analogous to the instant case. This position is that attorneys, who do not comply with the plans unwritten rules to conform and "warehouse" cases, disposing of them quickly, are removed from participation in the Assigned Counsel Plan.

Mitchell began practicing law in 1986 and until 1989 he was an A.D.A. in New York County. Between 1991 and 1995 he was a member of the Kings County 18-B Supreme Court Panel, and in 1995 he was appointed to the New York County Panel in 1995. By the spring of 1998, Mitchell had tried more then 20 felony matters to verdict, including 3 murder trials. He had also negotiated pleas in dozens of felony matters as lead counsel for indigent defendants. In addition, he had briefed and argued at least 2 appeals. During 1996-1998, he was never reprimanded for poor performance or misconduct with respect to his representation of an indigent client. His record of winning acquittals was outstanding, and both his peers and the judges before whom he tried cases had high regard for his trial skills and experience. Id at ¶ 161-162.

26

Mitchell applied for recertification to the First Department 18-B Supreme Court Panel in 1997 or 1998. He contended that many white assigned counsel attorneys were not providing zealous advocacy for their African American and Latino clients and were more interested in "churning" (warehousing) cases in order to increase their fees. Id at ¶ 162

By letter dated March 18th, 1998, the Committee notified Mitchell that it was denying his application for recertification and terminating his appointment to the First department 18-B Panel. The Committee gave no reasons for its decision. The text of the one-page letter read as follows:

> We regret to inform you that following a thorough and careful review of your recertification application, a decision has been made by the Central Screening Committee to terminate your appointment to the Assigned Counsel Plan felony and misdemeanor panels. That decision is final.
>
> On behalf of the Central Screening Committee, we want to express our appreciation to you for your years of service to the indigent accused.
>
> You are expected to continue to handle to conclusion any assigned cases you now have and to submit a voucher for your work.

(Letter from Committee Chair Norman L. Reimer to Stephen T. Mitchell dated March 18th, 1998. "Committee Letter to Mitchell").

Although Mr. Mitchell performed outstanding according to his peers, he was not reinstated because of his zealous representation of the clients he was assigned. This decision by the Committee makes no sense whatsoever, and suggests that the Committee members actually punish any attorney who effectively provides constitutionally meaningful representation to his clients.

b.  David Bliven

From 2000 until April 2005, Bliven was a member of New York City's Assigned Counsel Panel, serving as a public defender principally in New York Family Court in Queens County. He was assigned cases in that Court by individual family court judges and represented children, as their law guardians, or adults in cases involving child custody and support, family offenses, juvenile delinquency, and children in need of protection.

Bliven commenced an action in 2005 alleging that since 2002, the individual defendants Judge John Hunt, Judge Barbara Salinitro and Supervising Judge Guy DePhillips conspired to deny him compensation to which he was entitled, in retaliation for his having made disfavored motions in approximately 15 child protective and foster care cases in 2001 to compel the disclosure of the entire caseload maintained by the Administration of Children's Services ("ACS"). He alleged that between March and September 2002, nearly every voucher he submitted for public defender compensation – at least regarding an ACS or foster care agency case – to Judges Hunt or Salinitro were reduced by $50 - $150 with no oral or written excuse. He was told they were reduced because of his filing of the motions to compel disclosure of complete ACS files. *Bliven v. Hunt*, 579 F.3d 204, 207-208 (2009)

Bliven alleged that as a result of him complaining about the reduction of his vouchers, he was threatened that the judges would file a grievance against him. He alleged that he was thus forced to withdraw from the public defender panel, losing two-thirds of his income. Id. at ¶ 208.

Once again, once an attorney acts as an advocate and provides zealous representation for his assigned indigent clients, he becomes the subject of harassment. An attorney should not be punished for acting as an advocate and providing meaningful representation for his clients.

c.  Class Action Case of Nicholson v. Williams

The case of *Nicholson v. Williams*, 203 F.Supp.2d 153 (E.D.N.Y. 2002), represents the failure of the Assigned Counsel Plan to provide effective representation to indigent parents involved in the Family Courts who were subject to Domestic Abuse and deemed to be neglecting their children, with said children being separated from their parents.

If a parent is indigent, Article 18-B of the New York County Law requires that a lawyer be appointed for the parent. Unlike the City Division of Legal Services of the legal Aid Juvenile Rights Division, the 18-B panels are not institutional. They do not provide any office or other support services for the private practitioners ho are members.

The problems created by the 18-B deficiencies resonate through the entire court system. As a Family Court judge put it, "[i]f representation is inadequate, then the entire court is inadequate. The court culture accepts delays, adjournments, and being unprepared...With so few resources, sloppiness is accepted." *Justice Denied* at 32. As a matter of fact, the present assigned counsel system is corrupting of legal ethics and a disgrace to the law." *Nicholson v. Williams*, 203 F.Supp.2d at 227, supra.

The problems highlighted in *Nicholson* can be attributed to a widespread acceptance of inadequate representation to indigent citizens of the State of New York. The implications of this have continued to the present day, over one decade from when it was originally addressed. These raise due process implications for indigent defendants to receive constitutionally adequate and effective representation.

It follows that, where the government is under a due process obligation to appoint counsel, it cannot do so in a way that structurally impedes the ability of counsel to effectively represent clients. *See Opie v. Meacham*, 293 F.Supp 647, 650 (D.C. Wyo 1968) ("The state is

responsible under the due process requirement contained in the Fourteenth Amendment to protect an accused's right to have the effective assistance of competent counsel.").

The right to appointed counsel when necessary for due process is a right to effective counsel. See *Herring v. Estelle*, 491 F.2d 125, 127 (5th Cir. 1974) ("we interpret the right to counsel as the right to effective counsel.") (*quoting MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960)). The Supreme Court has recognized the government's obligation in certain situations to provide counsel to satisfy due process as required by the Fourteenth Amendment. *See, e.g. Gideon v. Wainwright*, 372 U.S. 335 (1963) (the Fourteenth Amendment right to due process requires that an indigent defendant in a felony trial be appointed counsel); *Vitek v. Jones*, 445 U.S. 480 (1980) (indigent prisoners whom the state wished to treat as mentally ill have right to appointed counsel); *Douglas v. California*, 373 U.S. 905 (1963) (state providing appeals as of right must appoint counsel for indigent defendants in those appeals). The Court has separately emphasized the government's related obligation not to impair the effectiveness of counsel under the Sixth Amendment. *See e.g. Cuyler v. Sullivan*, 446 U.S. 335 (1980) (states may not conduct trials in a way that unconstitutionally impairs a defendant's right to effective counsel). *Nicholson v. Williams*, 203 F.Supp.2d at 239, supra.

In the context of ineffective assistance of appellate counsel for indigent defendants, the financial constraints imposed upon appellate indigent defense organizations like Appellate Advocates, which prevent them from developing and pursuing Article 440 claims involving issues off the record including ineffective assistance of counsel; is conduct that constitutionally impairs an indigent defendant's right to effective and meaningful representation as is practiced in New York State under the Baldi standard.

30

The appropriate test for determining whether the system for appointed counsel is adequate should be whether counsel so appointed are "reasonably likely to render...reasonably effective assistance." *See Herring*, 491 F.2d at 127.

III.    Hurrell-Harring v. State Brings Statewide Attention to the Systemic Problems of the Assigned Counsel Plan

The State of New York's broken public defense system has deteriorated to the point where it deprives or threatens to deprive indigent defendants the rights guaranteed to them by article I, section 6 of the New York State Constitution; CPLR §§ 1101/1102, County Law 722(4) and CPL § 440.30, and the Sixth and Fourteenth Amendments to the United States Constitution. Hurrell-Harring is closely related to the issues the defendant is raising today, but instead focuses on the New York City area, and more specifically, Staten Island for trial representation and the Second, Eleventh and Thirteenth Judicial Districts covered by Appellate Advocates for appellate representation; but is in no way limited or unique to these counties.

The right to counsel is a right to *meaningful* and *effective* assistance of counsel. Constitutionally adequate counsel is counsel that is capable of putting the prosecution's case to meaningful adversarial testing. Where, as is the case in New York, public defense counsel do not have the resources and the tools to engage actively and meaningfully in the adversarial process, courts cannot ensure that their decisions, judgments, verdicts and punishments are rendered fairly and accurately.

The constitutional and statutory obligation to provide indigent defendants with meaningful and effective assistance of counsel rests with the State. Since 1965, the State has abdicated its responsibility to guarantee the right to counsel for indigent persons and has left

31

each of its sixty-two counties to establish, fund and administer their own public defense programs, with little or no fiscal and administrative oversight or funding from the State.

There are no meaningful attorney hiring criteria, performance standards or supervisory controls to ensure basic quality of representation among public defense service providers. The Kaye Commission Report played a big part in the Hurrell-Harring case, which found that "[d]espite the existence of various sets of standards for representation that bar associations have issued over the years, there is no single set of standards that actually governs what 'adequate' indigent defense services means." Moreover, because the practice standards that exist are not enforceable in New York, "in some areas, substandard practice has become the acceptable norm."

National and state standards for the administration of a public defense system state that written hiring criteria are necessary to ensure an attorney's ability, training and experience **match the complexity of the cases he or she faces**. NYSBA Standards for providing Mandated Representation (Revised June 19th, 2010), Standard E-2; *see also* ABA Ten Principles, Principle 6 (requiring that counsel's ability, training and experience match the complexity of the case).

Instead, the criteria for placement on the assigned counsel panels are minimal and do not create any meaningful check on the quality of representation. This is by necessity because the pay rates are so low that if the standard is set to high, no attorneys would be able to participate. This is endemic of the financial constraints placed on the Assigned Counsel Plan. The domino effect is poor representation at trial, and then the inability of appellate defense plans to develop mistakes to preserve the record by inexperienced and unqualified trial counsel.

a. The Lack of Political and Professional Independence

The system of county-based funding and administration causes a lack of independence from judicial, prosecutorial and political authorities for public defense services providers.

The Kaye Commission found that, because of the State's abdication of public defense funding and administration responsibilities to the counties, "New York fails to ensure the independence of its indigent defense providers who are too often subject to undue interference from the counties that fund them." NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Representation in New York State (2004), Standards II, III-A: NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standards A-1. *See also* DR 2-103 (22 NYCRR 1200.8)

b. Inadequate Compensation and Lack of Parity with Prosecutorial Counterparts

Public defense service providers are inadequately compensated and lack the resources needed to provide effective representation.

National and State standards recognize the importance of adequately compensating both assigned counsel lawyers and institutional public defense service providers. NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Legal Representation in New York State (2004), Standard III(C); NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standard K-3. *See also* N.Y. County Law § 722-b (2007).

National and State standards also hold that comparable funding for prosecutorial and public defense services is a key measure of the health of a criminal justice system. NYSDA, Standards for Providing Constitutionally and Statutorily Mandated Legal Representation in New

33

York State (2004), Standard III(C); NYSBA Standards for Providing Mandated Representation (2005) [Revised June 19th, 2010], Standard K-1.

c. The Effect of the Public Defense Crisis on Indigent Criminal Defendants

Hampered by the aforementioned systemic flaws, public defense counsel do not or are not able to perform even the most basic tasks necessary to provide meaningful and effective representation to their clients. They fail to act as an adversarial check on the prosecutor in criminal cases.

Indigent criminal defendants in New York therefore are experiencing or are at severe and unacceptably high risk of experiencing: wrongful denial of representation; wrongful conviction of crimes and waiver of meritorious defenses.

These factors are multiplied when faced with a public defense provider at the appellate level which lacks a funding mandate to properly develop the trial record, largely because of trial counsels failure to provide the basic level of advocacy required for meaningful representation.

The case before the court now shows the complete havoc an inexperienced and unqualified 18-B trial attorney can inflict and the dire consequences he is facing because of those systemic failures. Appellate Counsel Warren Landau submitted an appellate brief to this Honorable Court with 75% of the issues rose being unpreserved for this court's review. The defendant had to submit a formal complaint with the Departmental Disciplinary Committee just to receive a copy of the District Attorneys response. This is because Mr. Landau knew he submitted an appellate brief that fell woefully short of proper appellate advocacy, and knew that I was capable of pointing that out to him. Mr. Landau was made aware and provided with information and documents clearly informing him of the need to file an Article 440 brief.

C. The Lack of a Funding Mandate Allowing Appellate Counsel to Address Unpreserved Issues During Appellate Review Has Resulted in a Domino Effect, Seriously Prejudicing The Defendant's Ability to Meet the Baldi Standards "Representation As A Whole" on Direct Appeal Before this Court

These moving papers have shown the various systemic problems that Indigent Defense Organizations like Appellate Advocates face on a day to day basis. The deprivation of finances by the State of New York to hire qualified and experienced 18-B trial counsels, combined with the lack of a funding mandate to address the multitude of unpreserved errors caused by the unqualified and inexperienced 18-B attorneys at the trial level; has resulted in a domino effect seriously prejudicing indigent defendants in the State of New York, and more specifically, in the Second, Eleventh and Thirteenth Judicial Districts of the Second Judicial Department where Appellate Advocates operates.

These failures systematically prevent indigent defendants from having **all** their claims developed and reviewed by the Appellate Court "in totality", prejudicing their ability to meet the State Of New York's Baldi Standard of "Representation as a Whole."

The defendant, in his narrowly defined case, has shown this court that appellate counsel Warren Landau was given specific, direct and overwhelming documentation and information in support of the fact that an Article 440 proceeding was necessary to effective appellate advocacy on his direct appeal.

Mr. Landau not only ignored this information, but then submitted an appellate brief with the majority of issues unpreserved for appellate review, and then undertook a course of action designed to prevent me from discovering said actions on his part. Mr. Landau knew that this defendant was well informed and knowledgeable concerning the law and his case, and instead of

acting as an advocate and communicating with his client, he consistently told the defendant one thing and did another.

## CONCLUSION

The Defendant prays for an ORDER Withdrawing the Appellate Brief of Warren S. Landau, Assigning new Appellate Counsel on Defendants' Direct Appeal and providing a funded mandate which will allow him to utilize the Information in outlined in this brief which are Mixed Claims, in a CPL § 440.10 application, and/or Granting A Stay of Action Pursuant to CPLR 2201 to have new assigned Counsel Perfect and Submit an Article 440 Brief Before Placing My Direct on the Appellate Court's Calendar, which will be within a time period so designated by the Honorable Court; so that meritorious issues addressed in said Article 440.10 Motion can be developed and heard.

Respectfully Submitted,

*Anthony Rucano*

Anthony Rucano, 11A0528

Dated: _MArch 20th_ , 2014

36

Exhibit "2Y"

Proposed Affidavit in Support of Article 440 Brief With Exhibit List, Id. at ¶ 187