\* = Documents That Dehor The Record   (\*) = Court Records
√ = Tactical Reason or Strategic Purpose Dehor the Record

Supreme Court of the State of New York
County of Richmond, Part V
--------------------------------------------------
The People of the State of New York,
                                    Plaintiff,

        -against-

Anthony Rucano,
                                Defendant,
--------------------------------------------------

State of New York)
                        ss:
County of Clinton)

Affidavit in Support of Motion
to Vacate Judgment Pursuant to
Criminal Procedure Law
§ 440.10 (1) (C) (D) (F) (G) (H)

\* PROPOSED - NOT FOR SUBMISSION \*

Indictment No. 270/09

JS = Jury Selection Minutes
TR = Trial Minutes

Anthony Rucano, being duly sworn, deposes and says:

1.      I am the defendant in the above-entitled proceeding. I am a layman in the matters of law and procedure, and as such I ask the Honorable Court to excuse any errors of omission or defects in these moving papers.

2.      I make this affidavit in support of Motion to Vacate Judgment Pursuant to Criminal Procedure Law § 440.10 (1) (C) (D) (F) (G) (H) herein, upon the grounds that the defendants statutory right to be afforded the opportunity to testify at the grand jury was violated, the Prosecutorial Misconduct of the District Attorneys Office, and the Ineffective Assistance of Counsel Eugene Lamb Esq.

3.      I was arraigned for rape, sexual misconduct and assault on October 1st, 2009. I entered a plea of Not Guilty and posted bail the next day in the amount of $5,000. I was tried in this Court before the Honorable Judge Stephen Rooney on September 9th, 2010. The case was submitted to a jury, which rendered a verdict of guilty.

4.      On January 21st, 2011, I was sentenced to a twelve year determinate sentence.

5.      The grounds raised upon in this motion have not been determined previously on the merits upon an appeal from the judgment since such appeal is now pending before the Second

1

Department, Appellate Division; nor do sufficient facts appear on the record with respect to such grounds to permit adequate review thereof upon appeal. These said grounds also do not relate solely to the validity of the sentence.

6.    After filing a motion requesting permission to file a supplemental pro-se brief, and a separate motion to enlarge the judgment roll, on January 6th, 2014 the Appellate Division, Second Department granted permission to file a supplemental pro-se brief by April 7th, 2014. The defendant's motion to enlarge the judgment roll was granted in part, and the Court issued an order for the Grand Jury proceedings to be produced by the Nisi Prius Court to the Appellate Division under seal, as well as an order to produce the stenographic transcripts for July 7th, July 16th, and August 10th, 2010 as part of the judgment roll.

7.

### Preliminary Statement

8.     The People failed to provide actual notice that apprised the defendant of his statutory right to testify at the grand jury, which was asserted at arraignment. N.Y. Const. Art. I, § 6.

9.     The Prosecutorial Misconduct of the Richmond County District Attorneys Office, and in particular ADA Anthony Katchen; before, during and after the Grand Jury proceedings up until trial, combined with the continuous suppression of Brady/Rosario material known to the prosecution at the onset of the case, constituted a substantial likelihood of prejudice which deprived the defendant of a fair trial. U.S. Const. Amend. XIV, N.Y. Const. Art. I, § 6.

10.     Finally, the cumulative effects of numerous errors of omission and commission by Eugene Lam Esq., resulted in less then meaningful representation that fell below an objective standard of reasonableness, in violation of the defendants state and federal constitutional rights to the effective assistance of counsel and his due process right to a fair trial. U.S. Const. Amend. XIV, N.Y. Const. Art. I, § 6.

### Statement of Facts

### Arrest and Arraignment

11.     The defendant was arrested on September 29th, 2009, at 5PM and charged with two crimes allegedly occurring on September 28th, 2009.

12.     The defendant was kept in the 120th Precinct overnight after being booked and processed, then brought to Criminal Court the next morning, on September 30th, 2009, to be arraigned. This was recorded in the Criminal Court folder Docket Cover Sheet. (EX. "A")

13.     The defendant never saw a lawyer or Judge on September 30th, 2009, yet the following documents were completed and signed that day:

3

a. Order of Protection dated 9/30/09 which was then crossed out and changed to 10/1/09 right next to it. (EX. "B")

b. Notice Pursuant to C.P.L. § 710.30 and 250.20, dated 9/30/09, with the "to" field left blank, which is designated for the "Attorney for Defendant." (EX. "C")

c. Notice Pursuant to C.P.L. § 190.50 (5) (A) (B) which was also dated 9/30/09. (EX. "D")

14.    Furthermore, the defendants Criminal History Record Information report, also known as "Rap Sheet", shows the initial report of Docket Number to the Criminal Court as September 30th, 2009, which indicates that the case had action taken by the Court that day. The arraignment was listed as having occurred on October 1st, 2009. (EX. "E")

15.    The defendant was picked up at Crim. Court at approximately 2 PM on September 30th, 2009, never spoke to a lawyer or judge, then brought to the 120th Precinct to stay overnight.

16.    A grand jury was convened on the morning of October 1st, 2009, under File # 09-0692, Term 10, Sept. – Oct. 2009, which is shown on Page 2 of the Grand Jury minutes. (EX. "F")

17.    The Order of Protection (EX. "B") shows that service was executed on October 1st, 2009, at time 1515. (3:15PM)

18.    Judge Meyers Court Clerk, in the regular course of arraignments is required to complete form CRC 3078 (12/93), which records the following fields, (A) Arrest date and Time (B) Arraignment Notices Served, (C) Other Open Cases, (D) Related Cases, (E) Attorney Name, (F) Adjournment, (G) Bail Condition with choices for various court orders, (H) Notes/Offer and lastly, (I) Choices to select including Hearing Waived, Hearing Held, Dismissed or Held for Grand Jury with a space to insert Grand Jury Presentation Date and Time.

19.   Arraignment Form CRC 3078 for Docket No. 2009RI009311, shows CPL 190.50 and Cross Grand Jury Notice Submitted, but the space for "Held For Grand Jury" to enter a date and time is blank. The form is dated with a stamp indicating 10/1/09. This is because the Court was unaware a Grand Jury was convened, as the Adjournment section is marked charged with reason being 180.80. (EX. "G")

20.   The defendant was not informed the case would be presented to a grand jury, nor was he provided with a Notice that gave a date and a time he could testify, otherwise Judge Meyers' Court Clerk would have recorded that information in the appropriate fields.(EX. "G")

21.   The People convened a Grand Jury before the defendant was arraigned on October 1st, 2009, which was a Thursday, and the arraignment court had no knowledge a Grand Jury was already convened as the following court records reflect. She asserted the defendant's right to testify at the Grand Jury at arraignment, which is reflected in Form CRC 3078 (EX."G"), and shows the case was adjourned for 180.80 purposes (Preliminary Hearing) until October 5th, 2009.

22.   The defendant was arraigned after 3 PM on October 1st, 2009 and bail was set at $5,000. Ms. Siegel or the Court did not inform the defendant he could testify at the Grand Jury.

23.   Ms. Siegel explains the ambiguity of this case from the start. Here is a synopsis of the testimony from the Arraignment Transcripts of October 1st, 2009. (EX. "H")

ADA Jenks: The People are requesting $100,000 bail because of the nature of the offense, which is a "B" felony, the defendant has multiple criminal justice contacts and is rated as a high risk of flight and has out-of-state contacts. (Pg. 2, at ¶ 21-25)

Ms. Siegel: Your Honor, I ask that you consider releasing my client on his own recognizance.

The parties have been living together; they have been seeing a couple's counselor on a regular basis.

The night of the incident there was sexual intercourse which was consensual, my client tells me they had an argument afterwards, that they went to sleep and the next morning they had breakfast and he drove her to the ferry.

Apparently, after he drove her to the ferry to go to work, a complaint was made. It does not appear there was immediate outcry. I don't know why she went to a hospital in Brooklyn when she got on the ferry to go to Manhattan. There are too many things that don't make sense in this case.

My client has prior contacts with the system. However, his last contact was 1999. Those contacts are all old. He has been gainfully employed for the past three years; he has ties to the community. He informs me that he and the complainant are in fact engaged. It is not that -- they are more than just boyfriend and girlfriend, living together.

They have been having some problems, which is why they were seeing a couple's counselor and the counselor is aware that they are having physical altercations on both sides and there is every reason to believe that he will appear on all court adjournments as well as abide by the Order of protection, which I have explained to him. (Pg. 3, at ¶ 1-25, Pg. 4, at ¶ 1-7)

⊘ The Court: Full Order of Protection being issued, bail is $5,000 insurance company bail bond or cash. (Pg. 4, at ¶ 8-9)

24. The defendants bail was paid and he was released from custody the next day, Friday, October 2nd, 2009 at approximately 2 PM.

## Notice of Grand Jury Action

✲    25.    The defendant received through a FOIL request to the DA's Office the CPL §
190.50(5) (A) (B) notice allegedly served on him. (EX. "I") This notice specifically asked "for a
copy of the fax regarding the Notice of Grand Jury Action sent to your attorney the week of
October 5, 2009." (EX. "J")

✲    26.    This notice is dated 9/30/09. The defendant was not in Court or assigned an attorney on
this date, so this notice could not have possibly been served on his attorney at this time. (EX. "I")

✲    27.    Furthermore, the people must have provided notice to testify via Fax to his attorney of
record Carol Siegel Esq. before October 5th, 2009, who was replaced by his attorney of record
Dennis J. O'Sullivan the morning of October 5th, 2009, before a Grand Jury was convened.

✲    28.    An examination of the Notice of Grand Jury Action received from the DA's Office
(EX. "I") through a FOIL request (EX. "J") reveals irregularities that are not easily reconciled.

✲    29.    First of all, the notice is dated 9/30/09, and the defendant did not receive an attorney,
nor was he arraigned; until after 2PM on October 1, 2009.

✲    30.    The handwritten date 9/30/09 looks physically altered. The number "9" in the year
"09" looks normal, but the number "9" in the month looks like the number "7" changed to a
number "9." (EX. "I")

✲    31.    Furthermore, the date that was written in to notify me of a date and a time I could
testify also looks altered. It looks like someone started to write the upper loop of a number "9",
then made a number "0" out of it and put a number "1" in front of it; to make it appear like the
number "10". (EX. "I")

✲    32.    Finally, the notice has a date/time fax stamp on the upper left hand side of the page,
with approximately 10-15% of the top of the date/time stamp cut off, but clearly readable. The

7

date shows SEPT 10, 2009 at 10:50, which was almost 3 weeks *before* the defendant was arrested. This provides physical proof that can be verified by phone records that this Notice was physically altered, as it could not have been possibly been faxed to my attorney before the defendant was arrested. (EX. "I")

33.    Upon information and belief, this is substantive proof of the continuing effort of the District Attorneys Office, specifically, ADA Katchen; to suppress this information throughout these proceedings. This alleged misconduct amounting to the falsification of court records allows a dismissal of the indictment Pursuant to C.P.L. § 210.35(5), and should be investigated thoroughly for possible criminal prosecution.

34.    The defendant made bail on Friday, October 2nd, 2009, which was the day after arraignment, then appeared in Court on the 2nd business day after arraignment, Monday, October 5th, 2009, at 9 AM with his new attorney Dennis O'Sullivan.

### Proceedings on October 5th, 2009 the 180.80 Day

35.    The Defendant appeared in Court on Monday October 5th, 2009, in front of Judge Desmond Green in Part AP1 with Bankruptcy Attorney Dennis J. O'Sullivan ESQ. for the first time.

36.    The stenographic transcripts for October 5th, 2009 indicate that A.D.A Brian Jenks was informed by the Court that the defendant made bail. A.D.A. Jenks then informed the Court:

    ⊘ ADA: "People do not have their file at this time."

    ⊘ Judge Green: "I take it you are reaffirming cross?"

    ⊘ Mr. O'Sullivan: "Yes."

    ⊘ Judge Green: "December 3rd is fine. AP-1 for Grand Jury action, cross grand jury is reaffirmed." (EX. "K")

37. This is further supported by the Criminal Courts "Record of Court Action", FORM CRC 3031, showing the case was adjourned for "GJA" (Grand Jury Action) until 12/3, Part 1. (EX. "L")

38. Less then 4 hours after appearing in Court with his attorney of record on October 5th, 2009, ADA Anthony Katchen convened a Grand Jury for the 2nd time since defendant was arrested, and two business days after being arraigned which voted a true bill and indicted him.

39. On October 6th, 2009 ADA Katchen filed a Notice of Arraignment on Indictment with the Court which was mailed to the defendant and to Carol Siegel Esq., who was no longer the defendant's attorney of record on file with the Court. (EX. "M")

40. On October 7th, 2009 ADA Katchen filed a Notice of Arraignment on Indictment with the Court which was mailed to the defendant and to Dennis O'Sullivan Esq., who was the defendants' attorney of record on file with the Court since October 5th, 2009. (EX. "N")

**The Diary or Its Allegations Were Unknown to Any Law Enforcement Investigator**

41. The Felony Complaint sworn to by Det. Wasson, Shield # 7126 of the Staten Island S.V.U., stated he was informed by the Complainant Duane Ramos of an alleged crime occurring on September 28th, 2009 at 11 pm, with no other allegation of crimes occurring on any other date. (EX. "O")

42. Detective Wasson's Complaint – Follow up Informational reports (DD5's) show the case was investigated on September 29th, 2009, and at approximately 11:30 am he performed an interview of the Complainant which only spoke about the one alleged incident occurring on September 28th, 2009. No further investigation was done after that date and the case was closed on October 6th, 2009. (EX. "P")

✳ 43.   The complainant came to the Grand Jury that morning and presented ADA Katchen with a Diary alleging crimes not included in the felony complaint, which was never seen or mentioned to any law enforcement agency prior to that day. (EX. "Q")

## The Substance of the Grand Jury Testimony of the Complainant

44.   The cover page of the grand jury minutes indicate they were taken in October 1st, 2009 before "TERM TEN" "SEPT. – OCT. 2009 Grand Jury", by Grand Jury Stenographer Donielle McKenna. Also present were A.D.A. Anthony Katchen, who is the only person recorded as verbally and non-verbally communicating in the proceedings; and A.D.A. Yolanda Rudich. (EX. "F", Page 1)

**45.**   ADA Katchen marked for identification Grand Jury Exhibits Nos. 1-6 for Identification, as noted by the stenographer, Ms. McKenna. (EX. "F", Page 2)

✴ **46.**   ADA Katchen introduces himself stating "Good Morning". Indicating this case was presented to the Grand Jury on the morning of October 1st, 2009 before the defendant was arraigned after 2 PM that afternoon. This fact was unknown by the Court, as noted in the Arraignment Form CRC 3078, which shows the case was adjourned for 180.80 purposes (felony hearing). (EX. "G")

47.   ADA Katchen asks the Complainant, "Okay. Miss Ramos, I'd like to direct your attention to July 17th of 2009. Were you at Mr. Rucanos' Merry Mount street address that date?" This provided the date and location in the form of a leading statement and question essentially testifying for the complainant. (EX. "F", Pg. 4, at ¶ 11-14)

48.   These allegations by the defendant become fully realized and substantiated when ADA Katchen asks the question "Would you please tell the grand jury what happened – what, if anything happened between you and Mr. Rucano?"   The upcoming colloquy between the

complainant and ADA Katchen lays the foundation and the substance of the alleged pervasive misconduct occurring during these grand jury proceedings. (EX. "F", Pg. 4, at ¶ 16-18)

49.    The complainant, states the following, "Can I look at my book to refresh?" (id. at ¶ 19)

50.    The defendant alleges that nobody but lawyers and legal professionals use the word "refresh" in normal conversation, the word "refresh" in this context is exclusively used in the legal profession concerning the rules of past recollection recorded. It is alleged that this is indicative that ADA Katchen "instructed" the Complainant how to testify on the stand during these proceedings concerning this "book", which is revealed later on in the proceedings as a diary.

## Non-Verbal Cues During The Grand Jury

51.    Grand Jury Stenographer Donielle McKenna records ADA Katchen's NON VERBAL COMMUNICATION, which defendant alleges is indicative of ADA Katchen's' attempt to keep the "diary" off the record; Stenographer McKenna records the following for ADA Katchen, "NO VERBAL RESPONSE". (id. at ¶ 20.)

52.    The Complainant then states "Yes" (id. at ¶ 21). What she has responded to de hors the record, and one can only come to the conclusion that the complainant received some non-verbal cue, for example a nod of the head by either ADA Katchen or ADA Yolanda Rudich; indicating it was ok to read from her "diary."

53.    Unfortunately, Stenographer McKenna was not trained to record non-verbal cues, and could not be expected to record testimony and non-verbal cues of the complainant, ADA Katchen ADA Rudich at the same time. As their locations, except for the complainant on the stand, could not possibly be known; it can not be said with absolute certainty that there were not other non-verbal cues that Stenographer McKenna did not record during these proceedings.

54.    Therefore, with the foregoing mentioned instances of non-verbal cues on the record that conveyed testimony, the question is "How many non-verbal cues actually occurred and were not recorded, and what was their substance?" and "Why were non-verbal cues being used in this proceeding in the first place?"

55.    Also important is the complainants response to ADA Katchen's question, which was "Can I look at my book to refresh?" (EX. "F", Pg. 5, at ¶ 19) The fact that the complainant can not testify with any information of what allegedly happened only 2 months earlier is cause for suspicion. Couple that with the words she used to convey the request to ADA Katchen. The complainant uses the word "book", not diary; yet that is what it was later revealed as. On top of that is the way the complainant conveyed "why" she had to look at it, which she stated was "to refresh." Not *remember*, nor *recollect* and not even *refresh her memory, just to refresh.*

56.    The defendant poses the question, when is it common to hear someone say "Let me look at my calendar to *refresh?*" or "Let me check my email to *refresh?*" It is alleged that this is particularly indicative of a complainant who has been coached by someone with legal expertise on how to testify to subvert the grand jury process concerning a highly unreliable, inadmissible and exculpatory document, exclusively processed by ADA Katchen, and used by him to formulate his entire line of questioning for his direct examination of the complainant. The alleged manipulation of the complainants testimony usurped the Grand Jury's fact finding process, who are designated to make an independent examination of the evidence, free of prosecutorial misconduct, and prejudiced the defendants right to a fair trial.

57.    It is alleged that ADA Katchen continues to guide the Complainant by providing random pieces of information designed to lead her to testify about certain events that the complainant had no independent recollection of trying to prevent the complainant from

constantly and consistently referring to her alleged diary. Because ADA Katchen allowed the complainant to go to the stand in possession of the diary, instead of presenting the complainant with the document to refresh her recollection after marking it for identification; for all we know the complainant read from the alleged diary during almost her entire testimony.

58.    The defendant in fact alleges that the complainant came to the grand jury with the alleged diary as a tool, specifically provided for one purpose; to exact her revenge on the defendant because of the knowledge she had of the defendants desire to return to his common law wife, which was expressed to her two days after returning from the Pocono's with the defendant in a couples counseling session, one week before the defendants arrest. (EX. "R")

<u>Leading Questions and Statements at The Grand Jury</u>

59.    An example of ADA Katchen leading the complainant occurs on Page 5 of the Grand Jury Minutes (EX. "F", Page 5, at ¶ 9-11), where he leads the complainant to testify about her dress and himself offering the facts into evidence "...Did he initially break the first strap of your dress?" There was no testimony as to the first strap of the dress, the proper question should have been "How did the other strap break?" because the complainant stated that "he broke the other strap of my dress." (Page 5, at ¶ 7-8)

60.    Furthermore, we have no idea that this act allegedly occurred at the Ferry until the complainants' testimony after this colloquy. (Page 5, at ¶ 12-13)

61.    ADA Katchen continues to usurp the grand jury's fact finding process by refusing to allow the complainant to testify to the alleged events as they occurred from an independent recollection. ADA Katchen again placed facts not offered into evidence by the Complainant concerning the timeline by interjecting "And then you went back to his house on merry Mount Street – (Complainant responded "Yes") – in Staten Island?" (Page 5, at ¶ 22-25)

13

62.    ADA Katchen is primarily testifying numerous facts by himself, and continues asking leading questions by stating "Okay and that's when he broke the second strap?" (Page 6, at ¶ 1-2)

63.    The Complainant testified that I told her "…that I was gonna, um, have oral sex with him." (Page 6, at ¶ 18)

64.    ADA Katchen not only provides testimony through leading questions, he now introduces testimony specifically designed to meet the statutory requirements of "Criminal Sexual Act in the First Degree" P.L. § 130.50(1), which was Count 7 of the Indictment. Reading verbatim from the indictment it states in brief "in that said defendant made contact between his penis and Duane Ramos' mouth, by forcible compulsion." ADA Katchen enters testimony into evidence in an unethical and improper manner with the following response to her statement "Okay and by 'Oral Sex', you mean his penis was in your mouth?" (Page 6, at ¶18-19)

65.    ADA Katchen's continues questioning in this manner by stating on Page 7 "How did he go about forcing that?" concerning the alleged rape the same day (id at ¶ 10-11), and he continued "Did he pull your legs apart? (id at ¶ 13); which was specifically designed to elicit a response of "Yes", showing force; thereby meeting the requirements of P.L. § 130.35(1), Count 1 of the Indictment, which reads verbatim from the indictment in brief "…engaged in sexual conduct with Duane Ramos, by forcible compulsion."

66.    ADA Katchen asks a leading question, providing the date instead of letting her testify from her own independent recollection. "Okay, I'd like to now direct your attention to July 28th did anything take place between you and Mr. Rucano on that date?" (EX. "F", Pg. 7, at ¶.15-17)

67.    The Complainant responds "Yes." (id at ¶ 18)

68.    ADA Katchen states "Okay." (id at ¶ 19) Why didn't he just wait for her to testify about that date and state Okay instead?  The defendant alleges she was reading from her book,

improperly brought to the stand with her, because she had no independent recollection of what the defendant alleges were the "lies" that she recorded in them. ADA Katchen, in an attempt to get her attention and avoid the awkward silence stated "Okay" to get her attention.

69.    This claims are supported by the complainants response, "Um, I have to look at my (indicating) - -". The word "indicating" is what Grand Jury Stenographer recorded, which one can only come to the conclusion was another non-verbal cue now being used by the complainant as well, to point to her book she was allowed to take to the stand improperly.

70.    The defendant poses the question "Why was the complainant unwilling to say "look at my book" again? The defendant alleges that the answer is, the agreed upon plan discussed before the complainant took the stand was to not reveal the existence of the diary in the complainants possession, which was why she was allowed to take the stand with it without marking it for identification like the other exhibits were.

71.    ADA Katchen, now in an effort to overtly conceal his attempt to keep the "book" hidden, does damage control, and states "Miss Ramos, just before you answer that, from July 17th to the present did you keep a diary?" (EX. "F", Page 7, id at ¶ 22-24)

72.    Why did ADA Katchen interrupt saying "before you answer that?" The last thing on the record is a statement from the complainant that she needed to look at her ("indicating") book. It is alleged that the reason why he interrupted her was to effect damage control as he saw the complainant could not "stick to the script" and brought too much attention to the book.

73.    The complainant responds "Yes I have." (id at ¶ 25)

74.    ADA Katchen continues, stating "Okay, and what was the point of - - what were the entries that were made in that diary?" (EX. "F", Page 8, id at ¶ 1-3)

75.   The complainants revealing reply was "The entries (repeating ADA Katchen's descriptive word "entries") in the diary are of all the *incidents* that's been happening between Anthony and I." (Lines 4-6) [Emphasis added] The complainants' choice of the word "incidents", to describe an alleged series of violent assaults and rapes, is unusual to say the least. As a further note, this alleged "Diary" had 7 dated entries over a 2 ½ month period.

76.   At this point ADA Katchen states "Is that what you're using to *refresh your recollection*?" (id at ¶ 7-8), and the complainant replies "Yes." (id at ¶ 9)

77.   It is alleged that at this point the conduct of ADA Katchen is not only unethical, it constitutes prosecutorial overreaching and the manipulation of the grand jury on such a level to meet the standard set in CPL § 210.35(5) which provides that a grand jury proceeding is defective when "the integrity thereof is impaired and prejudice to the defendant **may** result."

78.   Important to note, Count 7 of the Indictment, Criminal Sexual Act in the First Degree, allegedly occurring on July 17th, 2009, did not have enough supporting testimony during trial to be presented to the Trial Jurors for deliberation, and was dismissed. (EX. "S")

79.   Furthermore, Count 1 on the Indictment, Rape in the First Degree, allegedly occurring on July 17th, 2009, resulted in a verdict of "Not Guilty". (EX. "S")

80.   In fact, Counts 7, 12-15, 17, 19-22 and 25, for a total of 11 counts; every one of which resulted from the testimony extracted from the inadmissible and exculpatory "alleged diary" at the Grand Jury were dismissed and never presented to the Trial Jurors for deliberation. (EX. "S")

81.   Furthermore, EVERY SINGLE OTHER COUNT of the Indictment which resulted from the testimony extracted from the inadmissible, unreliable and exculpatory "alleged diary" resulted in a verdict of NOT GUILTY. (Counts 1-5, Rape in the First Degree, Counts 8-9, Criminal Sexual Act in the First Degree and Count 16, Assault in the Second Degree) (EX. "W")

16

82.   It is alleged that ADA Katchen was aware of the statutory requirement that these charges would be required to run concurrent, so in order to bolster his weak and circumstantial case he "stacked the deck" by introducing multiple unsupported, unsubstantiated charges through an inadmissible hearsay document to obtain one conviction. The facts that all charges resulting from the diary at the Grand Jury were either dismissed or resulted in a verdict of "Not Guilty" support and substantiate the defendant's claims.

83.   The Complainant was provided the date and location for each line of questioning; she was unable to provide any information without reading from this alleged diary. She did so not to refresh her memory, which implies she had some knowledge of the events but not details; but used it to testify from as the truth of the matter asserted, which is clearly against the rules of evidence before the grand jury. This is clear from a review of the Grand Jury minutes. (EX. "F")

**84.**   The diary was not shown to the witness, but kept on the stand with her without anyway to know the complainant was _orally_ testifying to its contents. This prevented it from being admitted as substantial evidence of its truth and requiring competent testimony establishing proper foundation. The alleged manipulation and deception of the facts as they actually occurred usurped the Grand Jury's fact finding process; resulting in an invalid indictment, and allowed the Prosecution to assert an erroneous theory of Battered Woman's Syndrome which did not exist.

85.   It is alleged that the diary was evidence that A.D.A. Anthony Katchen wanted to obscure because of its exculpatory nature. It had 7 dated entries over a 3 month period, with 6 of the entries having one line added at the end accusing the defendant of a crime. (EX. "Q").

86.   Concerning the prior consistent statement exception to rebut a charge of recent fabrication by the complainant in the presentation and use of this alleged diary, the subversion

employed to use the bolstering pretrial statements that the complainant read from her diary at the grand jury impaired the integrity of the grand jury and amounts to reversible error.

✳   87.   In applying the exception, it is important to identify when the motive to fabricate arose. In this case, the motive existed from the actual creation and first entry of the diary on July 17th, 2009, after she observed me, and upon questioning told her; that I was sending an email to my friend Steve Frankl about the disturbing events that were going on in our relationship. (EX. "T")

88.   The defendants attempt and denial to expose the improper use of the diary at the grand jury, a prior consistent statement; was exacerbated by the Honorable Judge Rooney's oral decision on July 17th, 2010, where he erroneously denied to allow an expert Forensic Document Examiner review the diary in his laboratory. The issues concerning the late disclosure of the diary in its original form and the prejudice that occurred will be discussed later in this affidavit.

✳   **The Nature and the Substance of the Alleged Diary** ✳  Pg 18-31 ✳

89.   The alleged diary (EX."Q") had 7 dated entries, 7-17-09, 7-28-09, 7-30-09, 8-24-09, 9-3-09, 9-18-09 and 9-21-09.

90.   The defendant alleges that a diary is used as a daily recording device of one's feelings and thoughts, both good and bad; and 7 entries over a 10 week period depicting accusations of crimes does not meet that criteria, but exhibits signs of being a tool for revenge.

### (i) July 17th, 2009

91.   The complainant's grand jury testimony is virtually synchronous to what is recorded in the diary entry for this date. As we have seen from the grand jury testimony for this date, ADA Katchen directs the complainant's attention to July 17th, 2009, and provides her the location, Merry Mount Street, in a leading question; which does not appear in the diary entry (EX. "F", Pg. 4, at ¶ 11-14), by asking her if she was there that day.

- Complainant: "Yes." (id at ¶ 15)

- ADA Katchen: "Would you please tell the Grand Jury what happened – what if anything happened between you and Mr. Rucano?" (id at ¶ 16-18)

- Complainant: "Can I look at my book to refresh?" (id at ¶ 19)

- ADA Katchen: This results in a non-verbal cue recorded by the Grand Jury stenographer in the minutes as "No Verbal Response" (id at ¶ 20)

- Complainant: The complainant, receiving no *verbal* response, states "Yes." (id at ¶ 21)

92.    The diary entry for July 17th, 2009 (EX. "X", Pg Q1) is a litany of the events the complainant was allowed to read from during her entire grand jury testimony, which the defendant alleges was not only unethical but in violation of multiple rules including rules of evidence, hearsay exception and rules for refreshing recollection.

- Diary: "As soon as I got into the car, Anthony started yelling at me. He grabbed my phone and rip my dress. He started yelling at me and asking me who have I been calling and wanted to check my phone." (EX. "X", pg. Q1) [Compare to Grand Jury Testimony]

- Complainant: "He wanted - - [She reads from diary and realizes she forgot to mention argument] we got into an argument. He wanted to know who I was calling on the phone and he wanted to check the phone." (id at ¶ 23-25)

- ADA Katchen: "Okay. And what happened during the course of the conversation?" (Exhibit "U", Pg. 5, id at ¶ 1-2)

- Complainant: "It turned violent." (id at ¶ 3)

- ADA Katchen: "What do you man by that?" (id at ¶ 4)

- Complainant: "He ripped my dress off - -" [Reading from diary] (id at ¶ 5)

- ADA Katchen: Breaks the silence stating "Okay." (id at ¶ 6)

⊘  Complainant: Done reading, "- - broke the other strap of my dress." (id at ¶ 7)

⊘  ADA Katchen: "When you say he broke the other strap of your dress, did he initially break the first strap of your dress?" (id at ¶ 8-9)

93.   It is alleged that at this point that ADA Katchen reveals that he knows the chain of events as allegedly recorded in the diary, because the complainant testified "ripped my dress off", then ADA Katchen breaks the silence until she is done reading from the diary or whatever other notes or script of her testimony she was allowed to take with her to the stand in addition to the diary, and she continues correctly "broke the other strap of my dress".

94.   Now ADA Katchen, allegedly using the exclusive knowledge obtained from him acting as an investigator, becoming an unsworn witness and violating his ethical and professional responsibilities including the advocate-witness rule; has to correct the chain of events as recorded in the diary as he knows the "other strap" was broke in the house. This is where he starts to testify for the complainant and introduce evidence, which he repeats in a course of pervasive misconduct throughout the grand jury proceeding.

⊘  Diary: (Continued) "He just kept yelling at me and then he put his hand on me. As soon as I got in the house he kept yelling and then he rip the other strap of my dress and then he…" (EX. "Q", Pg. Q1)

⊘  ADA Katchen: "Did he initially break the first strap of your dress?" (id at ¶ 10-11)

95.   ADA Katchen, because of his exclusive processing of this alleged diary allegedly guided and manipulated the complainant's testimony to conform to the diary, thereby usurping the grand jury's fact finding process from receiving an *independent recollection* of the events as remembered by the complainant. Then the following colloquy occurs.

☯ Complainant: "Yes. What happened on that day, I got off the ferry and he was at the ferry picking me up." (id at ¶ 12-14)

☯ ADA Katchen: "Okay" (id at ¶ 15)

☯ Complainant: "And he - - [pauses to read from diary] when I got into the car he grabbed me and then wanted to know who I was talking to on the phone." (id at ¶ 16-18)

☯ ADA Katchen: "Okay." (id at ¶ 19)

☯ Complainant: "And that's when the first strap, um, broke." [says um when she lies] (Lines 20-21)

96.    ADA Katchen again allegedly provides substantive testimony to the Grand Jury, testifies for the complainant and usurps the grand jury's province as exclusive evaluator of the evidence from an independent recollection of events by the complainant by stating the following.

☯ ADA Katchen: "And then you went back to his house on Merry Mount Street - -." [ADA Katchen pauses and the complainant has time to read from diary and get back on same page, then complainant responds] (id at ¶ 22-23)

☯ Complainant: "Yes." (id at ¶ 24)

☯ ADA Katchen: "- - on Staten Island? (id at ¶ 25)

☯ ADA Katchen: Continues ."Okay. And that's where he broke the second strap?" (EX. "U", Pg. 6, at ¶ 1-2)

☯ Complainant: "Yes." (id at ¶ 3)

97.    The testimony provided by ADA Katchen concerning a statement that provided the answer of "And then you went back to his house on merry Mount Street" and the question "Okay. And that's where he broke the second strap?" is alleged to be improper and manipulative; as its intent was to provide testimony which conformed to the events as recorded in the diary.

(See Aff. at ¶ 94, "As soon as I got in the house he kept yelling then he rip the other strap of my dress...")

     ⏱ ADA Katchen: "Were you inside the house?" (id at ¶ 4)

     ⏱ Complainant: "Yes. I was in the - - [pauses to read from diary] in the house." (id at ¶ 5)

     ⏱ ADA Katchen: "After he broke the second strap of your dress, tell me what happened next." (id at ¶ 6-7)

     ⏱ Complainant: "Then I put on a shirt." (id at ¶ 8)

     ⏱ ADA Katchen: "Okay." (id at ¶ 9)

     ⏱ Complainant: "Then he ripped off the shirt." (id at ¶ 10)

     ⏱ ADA Katchen: "Okay." (id at ¶ 11)

     ⏱ Complainant: "And then he, um [reading from diary], he ripped my bra off. I'm sorry." (id at ¶ 12-13)

98.   The defendant alleges she stated she was sorry after picking up on a non-verbal cue from ADA Katchen, reading from the diary and realizing she testified to the events incorrectly as stated in the diary.

     ⏱ Diary: [continuing] "...torn my bra off. He kept hitting me. I had to fight back and he tore my shirt off." (EX. "X", Pg. Q1)

99.   This contradicts the chain of events as they occurred in the diary, with the shirt being ripped off first, then the bra. The diary continues stating:

     ⏱ Diary: "He held me down on the sofa and punch me in the face. Now I have a black eye. He force me to have sex. He said tonight you're going to suck my dick and I'm going to fuck you. I said no but he force me anyway." (EX. "X")

100.  It is alleged that ADA Katchen goes one step further now, knowing he needs to have testimony that will substantiate the charges he is seeking to include in the indictment; he provides substantive testimony not included in the diary that complainant is reading from; again usurping the grand jury's province to receive an independent recollection of the events as remembered by the complainant and acting as an unsworn witness by making the following statements in response to the complainants testimony.

- ⊘ Complainant: "Then, um [reading from diary] once he ripped my bra off, then he threw me on the sofa. Then he started punching me in the face, and then he told me that I was gonna, um [reading from diary and realizing she was told not to say "suck my dick"], have oral sex with him." (id at ¶ 15-18)

- ⊘ ADA Katchen: "Okay. And did you?" (id at ¶ 19)

- ⊘ Complainant: "Yeah." (id at ¶ 20)

- ⊘ ADA Katchen: "Okay. And by 'oral sex', you mean his penis was in your mouth?" (id at ¶ 21-22)

- ⊘ Complainant: "Yeah. Yes. He forced me, um, [referring to notes] to put his penis in my mouth." [Repeating ADA Katchen's testimony of what occurred] (id at ¶ 23-24)

- ⊘ ADA Katchen: "How did he do that?" (id at ¶ 25)

- ⊘ Complainant: "Um, [referring to notes] he took my head and then he forced it towards him." (EX. "F", Pg. 7, id at ¶ 1-2)

101.  First, oral sex is defined as "Oral Sexual Conduct" means conduct between persons consisting of contact between the mouth and the penis, mouth and the anus or the mouth and the vulva or vagina." P.L. § 130.00(2)(a)

102. Once again, ADA Katchen allegedly provides substantive testimony not provided by the complainant by stating the type of oral sex allegedly occurring when their was no such testimony to that effect, in a continuous course of pervasive misconduct, now provided to specifically meet the statutory requirement of crimes he wished to include in the indictment.

103. Secondly, the defendant alleges that not only did the complainant have the diary in her possession upon taking the stand to testify at the grand jury, she also had a "script", notes of responses to certain questions that were decided upon by ADA Katchen and herself when ADA Katchen first examined the diary prior to her testifying. These scripted responses were mostly identifiable from when the complainant pauses with an "um" after reading from the diary, to then switch to and read from those scripted responses, some of these were:

&#x25aa; "Can I look at my book to refresh?" (EX. "F", Pg. 4, id at ¶ 19)

&#x25aa; "He forced me, um, to put his penis in my mouth" (EX. "F", Pg. 6, id at ¶ 23-24)

&#x25aa; "Um, he took my head and then forced it towards him." (EX. "F", Pg. 7, id at ¶ 1-2)

104. The defendant presents the question, who speaks in such a mechanical, unemotional and identical way about a series of events? Common language would dictate responses like "Hold on, I can't remember." Furthermore, why ask permission to look at a book which is in your possession, and why refer to it as a book when it's actually a diary, to *refresh*?

105. Why not state "You're going to suck my dick" like the complainant recorded in the diary. The answer is that it does not meet the statutory requirement for the crime. Almost all the other testimony was identical to the sequence of events and description as recorded in the diary.

106. Furthermore, how do you force someone to open their mouth to "suck a dick?" This requires voluntary action on the complainant's part, plus; there is NO testimony as to any type of force to open her mouth to participate or comply. Finally, what man in their right mind would

place his dick in the mouth of a woman he was physically fighting with and put himself in a position to have his penis bitten off in an angry fit of rage? The scripted responses continue in the completion of testimony on July 17th, 2009.

⊘ ADA Katchen: "Okay. Okay. And what happened after that?" (id at ¶ 3-4)

⊘ Complainant: "then he told me - - [reading from diary] He was like, now I'm *going to fuck you.*" [Emphasis added for verbatim quote from diary] (id at ¶ 5-6)

⊘ ADA Katchen: "And what happened?" (id at ¶ 7)

⊘ Complainant: "Then he forced himself - - [Again, this pause if for complainant to switch from reading from the diary which only states "he forced me anyways", to reading from her script] - - he took his penis and, um, inserted it into my vagina." (id at ¶ 8-9)

107.  This is the 4th instance of the complainant reading from a mechanical sounding script, no one speaks in this manner, they say "He fucked me." But, ADA Katchen needs to meet the statutory requirement of rape which is force, so when the complainant does not testify to his satisfaction, he just enters it into the record himself in the following manner.

⊘ ADA Katchen: "And how did he go about *forcing* that?" (id at ¶ 10-11)

⊘ Complainant: "He forced himself on top of me." (id at ¶ 12)

⊘ ADA Katchen: "Did he pull your legs apart?" (id at ¶ 13)

⊘ Complainant: "Yes."

108.  Once again, there was no testimony about "Pull your legs apart", but ADA Katchen allegedly decided it was necessary to testify to it independently to have the complainant confirm his testimony and in a continuous course of unethical and pervasive misconduct places more substantive testimony before the grand jury, usurping the grand jury's fact finding process as exclusive evaluators on the *independent recollection* of the complainant.

109.  The importance of this is realized when looked at in context to the diary entry dated September 18, 2009, the only entry to alleges serious crimes but had no charges filed. Let us look briefly at the next date first.

### (ii)  July 28th, 2009

110.  It is at this point that the book the complainant is reading from is now revealed as an alleged diary, which the complainant was allowed to take the stand with in her possession and up until this point deceive the grand jurors into thinking that she had an independent recollection of the events, by reading from it during her entire grand jury testimony, and violating the rules of past recollection recorded. I will continue after she reveals this book as an alleged diary.

- ☺ ADA Katchen: "Now as far as July 28th goes – I'm sorry that I jumped around – did anything happen with you and Mr. Rucano that date?" (EX. "U", Pg. 8, id at ¶ 10-12)

- ☺ Complainant: "Yes, we went, um - - [reading from diary] we went to see a couple's counselor. And after we left the counseling, we went back to his place and - - [ADA Katchen interrupts]" (id at ¶ 13-15) Compare to diary now…

- ☺ Diary: "We went to see the couple's counselor." (EX. "X", Q2)

- ☺ ADA Katchen: "That's on Merry Mount Street on Staten island?" (id at ¶ 16-17)

- ☺ Complainant: "Yes." (id at ¶ 18)

111.  ADA Katchen testifies to the location, as the complainant is at the end of the diary entry; and provides testimony not of the independent recollection of the complainant.

- ☺ Complainant: "I told him no. And then he started hitting me and, um [reading from diary], he grabbed me and then he forced himself again. And I kept saying no." (id at ¶ 17-19) [Now Compare to Diary]

⊙ Diary: "I told him no that I didn't want to have sex. He grabbed me and forced himself on top of me." (EX. "X", Pg Q2, end)

⊙ ADA Katchen: "When you say he forced himself *upon you*, you mean to have *sexual intercourse?*" [Emphasis Added] (id at ¶ 20-21)

⊙ Complainant: "Yes." (id at ¶ 22)

⊙ ADA Katchen: "*And that means he inserted his penis into your vagina*?" (id at ¶ 23-24)

⊙ Complainant: "Yes." (id at ¶ 25)

112.   ADA Katchen repeatedly enters testimony into the record not presented by the independent recollection of the complainant. The complainant said "he forced himself again" (id at ¶ 18-19). The complainant never said *what* "he forced himself again" to do. ADA Katchen independently offers, in a manner which repeatedly made him an unsworn witness; the testimony "*Upon you*", "*sexual intercourse*" and then, *"And that means he inserted his penis into your vagina*?" ADA Katchen might as well testify for the complainant completely.

113.   The complainant, starting on July 28th, states in the grand jury minutes that I would hit her and choke her in the same general manner (EX. "F", Pg. 10, id at ¶ 14-17). This repeats over and over for each date, July 30 (Pg. 11, id at ¶ 12-13, 15-16), August 24 (Pg. 14, id at ¶ 21-24, Pg. 15, id at ¶ 6-7) and September 3 (Pg. 16, id at ¶ 17-18)

114.   This is important because all five dated diary entries up until September 18th, 2009 have no mention of any choking or blacking out occurring until September 18th, 2009.

115.   The reason why this is important is that the diary entry dated September 18th, 2009 is the only entry 2 pages long, accusing me of choking her 4 separate times, sometimes in the past tense; and for some unknown reason the complainant, for the first time, needs to identify he as "Anthony". Why all of the sudden does this need to be clarified? NO CORRESPONDING

CHARGES are brought at the grand jury for this date, because allegedly this is the date that was completely and falsely entered for the purpose of her plan to have me arrested for crimes I did not commit. The Forensic Document Examiners report will distinguish more clearly the lines added on the previous entries accusing me of crimes, which was added at a later date in addition to the <u>real</u> entries about us fighting, a fact the defendant never denied.

### (iii)  September 18th, 2009

116.  The dated diary entry of September 18th, 2009 is 2 pages long, and is the only diary entry that consistently and repeatedly accuses me of crimes throughout both pages; yet no testimony or corresponding charges resulted from this entry in the grand jury proceedings.

117.  It is at this point that we ultimately arrive at the alleged cause and purpose of ADA Katchen's continuous course of pervasive misconduct throughout the grand jury proceedings, which was caused by ADA Katchen subverting the rules of evidence to avoid dealing with laying a foundation for an exception to the hearsay rule and/or to avoid the rules concerning past recollection recorded.

118.  The defendant submits that the intent of the Complainant in bringing the diary to the grand jury was to use it as a revenge tool, as it was only created by her on July 17th, 2009. When the complainant got violent with me and I told her I was emailing my friend Steve Frankl to tell him what was going on because I was scared of what she may be capable of, that is when she came up with the idea to create this diary. I was always open and communicative to my fiancée during the entire relationship because I knew that she had a rough childhood.(EX. "T") (Affidavit of Steve Frankl)

119.  At first the entries recorded events as they occurred *ONLY* in the beginning portions of those entries. Forensic Document Examiner Robert Baiers reports clearly show that all

allegations of crimes up until and including the entry of September 18th, 2009 were made at a later date and/or time; with noticeable changes in the angle of handwriting, pen pressure and even different types of pens; all indicative of someone adding entries at a later time with malicious intent and purpose.

120.   The following decisive differences and information all fully support the allegations of the defendant that the entry of September 18th and 21st, 2009, was added to this diary for the sole purpose of a plan for revenge.

### a. The Complainant Has the Need to Identify Anthony by Name in This Entry

121.   A diary is a personal reflection of events recorded for your own use, and by its nature is not meant to be shared or shown to anyone else. The defendant poses the question, why would the complainant have the need to go out of her way and identify the defendant in parentheses ("Anthony") in a personal diary for the first time on September 21st, 2009?

122.   The answer is the diary was no longer a reflection of personal events in her mind at the time that she made this entry, it was now a tool *planned* on being used against the defendant to exact her revenge. The complainant allegedly, with this mindset and context firmly in place with her plan, needed to make sure "Anthony" was identified correctly when she carried out her *plan* to present this to the District Attorney.

### b. The Complainant Has the Need to Reiterate 4 Separate Times How the Defendant "Choked her"

123.   Important to remember is that no diary entry up until September 18th, 2009 accused the defendant of "choking" her. Yet, it is clear that this was part of her "plan", as her grand jury

testimony reflected in the same monotonous tone and sequence and timeline of events that we fought, I hit her, I choked her and forced myself on her.

124.   The complainant, realizing that she forgot to add choking when she hastily added the lines accusing me of crimes to the previous entries; had a strong need and desire to make sure her "plan" was carried out as she intended, resulting in the fabricated entries in the September 18th, 2009 diary entry. (EX. "F", Pg. Q4)

⊘ Q4, id at ¶ 2-4: "It's getting worst to the point that he (Anthony) is starting to choke me until I black out.

⊘ Q4, id at ¶ 7-10: "The other night he grabbed me by the throat and started to choke me and I'm trying to tell I can't breathe; but he didn't."

⊘ Q4, id at ¶ 14-17: "Everyone at my job are asking about the marks on my body and face including my neck where he continues to choke me."

125.   In an even further obsessive and compulsive need, the complainant continues on Page 2 of the diary entry of September 18th, 2009, labeled "Q5", by adding an entry to the end accusing me of an alleged crime, switching from a felt tip pen to a ball point pen with noticeably different angle of handwriting; following her pattern of adding sentences to the end of entries accusing me of crimes:

⊘ Q5, id at ¶ 7-9: "Again he continues to force me to have sex, and if I don't he starts to choke me." (See EX. "Q", Court Display #1) She is now talking in the present sense.

126.   The Forensic Document Examiner Robert Baiers Complete Report, Supplemental Report, Affidavits, Confirmation Letter and Court Exhibits will be explored later in this affidavit.

### c. The Complainant Drove To the Pocono's With the Defendant for An All-Inclusive Romantic Weekend on September 18th, 2009

127.  I picked up the complainant at work on September 18th, 2009, and we drove to the Pocono's for a romantic weekend in a room with a heart shaped Jacuzzi and bed, miniature pool, steam room, mirrored ceilings and breakfast in bed, all on a lakeside villa.

128.  We went for dinner, drinks and a comedy show Saturday night, September 19th, and went on a nature walk and horse and carriage ride on Sunday morning, September 20th, 2009. We had sexual relations of various types at least 5 separate times in 48 hours.

129.  The purpose of this trip was an effort to reach out to her as couples counseling was not resolving her issues of communication. The complainant agreed to open up and communicate more, and every time I encouraged it she would avoid the subject, and she used a pattern of initiating sex with me as a way to avoid dealing with it. When this was starting to wear thin and tensions rose between us, I made it the focus of our upcoming couples counseling session on September 22nd, 2009. My trial attorney Eugene Lamb never used credit card receipts; EZ-Pass records and emails I wrote to the complainant, all which would have proved the weekend occurred and provided a photographic line of evidence that we spent a happy and cordial weekend together. The couples counseling session contents and their substance will be addressed further along in this affidavit..

### Substance of Testimony and Witnesses to be Presented and Available for the Grand Jurors to Hear, and Prejudice resulting from Denial to Present in a Timely Manner Pg 32-36

130.  Defendant made bail 24 hours after his arraignment and would have been available to testify, and also been able to present numerous witnesses and evidence to the Grand Jurors to mitigate the charges against him if they so chose to hear from those witnesses. As the witnesses

31

would not have been presented in a vacuum, but been provided to them along with the substance and relevancy of their proposed testimony, their decision to hear from them if they so chose would have greatly affected the outcome of the grand jury's vote.

131.  The passing of almost 3 years and the inability to provide the same quality and quantity of witnesses' testimony and evidence that could have been provided immediately after the alleged crimes occurred has irreversibly and permanently prejudiced the defendant from being able to re-present this to a new Grand Jury, with the resulting prejudice never to be fully known.

132.  The People rushed this case to the Grand Jury before he was arraigned on October 1st, 2009, then again 2 business days later on October 5th, 2009. Upon information and belief, with the purposeful intent of bolstering the Peoples weak and circumstantial Domestic Violence case and turning into a Battered Woman's Syndrome Case that did not exist. This is supported by the fact that the defendant was found not guilty of all serious charges alleged during the Grand Jury testimony of the defendant which were not part of the original felony complaint.

### iv. Witnesses Available for Subpoena by Grand Jury

### a. Licensed Clinical Social Worker Anna Lorusso-Moramarco

133.  The Complainants own grand jury testimony admit she was attending couples counseling with the defendant in front of Anna Lorusso-Moramarco LCSW. (EX. "F")(See Page 8)

134.  The defendant specifically informed his attorney of record Carol Siegel ESQ. at arraignment that the complainant and he had left for a 3 day All Inclusive Romantic Weekend in the Pocono's in Pennsylvania from September 18th, 2009 until September 20th, 2009, just 9 days before the defendants' arrest and that we were currently enrolled in couples counseling. Ms. Siegel provided these facts to Judge Meyers of the arraignment Court. (EX. "H")

135. The People asked for a high bail and Judge Meyer expressed his concern with the charges. Although the defendant had an extensive criminal history when he was a young adult, and was being charged with a Violent "B" Felony with the potential of 10-15 years in jail; Judge Meyer set a reasonable bail in the amount of $5,000 which the defendant posted. (EX. "G")

136. It is reasonable that a Grand Jury presented with the option of hearing testimony from a Social Worker performing couples counseling for the complainant and the defendant who were engaged to be married and living together would have taken the option to hear from this witness.

137. The Social Workers own session notes revealed that the defendant offered the complainant, 7 days before his arrest on September 22nd, 2009 during a couples counseling session, to help her move out and pay all moving expenses. (EX. "R") It is safe to say that the Social Worker would have been questioned about their most recent session and the problems they were having and this information would have been shared with the Grand jurors.

138. The defendants own testimony would have further explained and provided context to the Grand Jurors to show that the defendant himself sought out these sessions because of the escalating physical violence between them. Along with the following supporting testimony from other witnesses, it is extremely likely that the Grand Jury would have returned an indictment on much less serious charges if they returned an indictment at all.

**b. Diane Smith, Defendants Common Law Wife and Mother of His 7 Children**

139. Diane Smith, the defendants' common law wife for over 25 years and the mother of his 7 children, testified during his trial and would have testified at the Grand Jury if given the opportunity to do so.

140. Ms. Smiths' testimony would have been the same substance of her trial testimony, in that she observed the defendant as early as mid-July with bruises and scratches on multiple

occasions. She also would have testified as to the attempted murder of the defendant on August 3rd, 2009 when the complainant pushed him down a full flight of stairs and almost killed him, causing him extensive bruising and pain on multiple parts of his body.

141. Ms. Smith would have testified that the defendant had her and his children sleep over for 2 days at the new apartment he just moved into the complainant with, (Tr. Pg. _____ at ¶ _____), a fact the complainant denies ever happened during trial. (Tr. Pg. _____ at ¶ _____)

142. Ms. Smith also would have testified that the defendant and she were in the process of reconciling, and that the defendant was open and willing to work things out.

143. The defendant's testimony that he threatened to call the Police on the Complainant would have also been shared. Ironically and after the fact, the Complainant went to her mothers' house in Brooklyn and filed a Complaint report against the complainant on August 4th, 2009 at 5:10 am, about 6 hours after she attempted to kill him. This shows the propensity of the Complainant to use any and all means necessary to exact her revenge by using the Police and the Courts as a weapon. The Complaint Report Number is 2009-00510-94. (EX. "U")

144. The defendant would have also testified to the numerous emails sent to the complainant expressing his love care and concern for her going back to before the first alleged incidents, and provided the documents to the Grand Jurors if they so requested them.

145. Ms. Smiths' testimony, along with the defendants, would have provided a more complete and accurate view of the relationship to the grand jurors; providing detail into the relationship, contradicting the vague and inconclusive grand jury testimony of the complainant who needed to read from an alleged diary before answering any questions. This would have resulted in the grand jury returning an accurate vote resulting in a vote of no true bill.

### c. Catherine Smith, Defendants Adult Daughter

146.  Catherine Smith the defendants' 20 year old daughter, if given the opportunity, was willing to testify at trial; but was not called due to his trial counsels failure.

147.  Catherine's testimony would have related to the repeated times she witnessed her father physically abused with bruises and scratch marks all over his body, his mental and emotional suffering displayed when visiting, which were all at the hands of the complainant.

148.  Catherine's testimony would have described the events of August 3rd, 2009 at 11:30 pm when the defendant showed up at their home limping, bruised and emotionally distraught after the complainant tried to throw him down a flight of stairs to kill him.

149.  Catherine's testimony would have related how she spent 2 nights with her mother and youngest brother in the apartment that her Dad just moved into 3 days earlier with the complainant, describing the complainants multiple phone calls, received over the defendants' car kit through the speaker which everyone in the car could hear; saying how sorry she (the complainant) was for hurting me and begging if she could come back.

150.  Catherine's testimony would have related the defendants' reluctance to shield my youngest so from the trauma her father was experiencing by taking him night fishing for a few hours so her Mom could comfort her dad.

151.  If Diane, Catherine and the defendant would have been allowed to opportunity to testify, it would have provided a contradictory and more realistic picture for the Grand Jurors into the background and substance of the relationship. This would have been opposed to the complainants' allegations which were weak, undefined and vague.

152.  In support of all this, 11 counts of the indictment were so unsupported, unsubstantiated and undeveloped during the complainants' testimony that they were never presented to the jury

to deliberate on and another 8 counts the defendant was found not guilty on. The majority of these charges were related to the alleged diary the complainant read from during her grand jury testimony. The grand jury minutes reveal the DA provided the date and time at the beginning of questioning for each date and location and still, the complainant was unable to answer any question without reading from her book not refreshing as the rules of evidence require.

### Pre-Trial Proceedings Concerning The Diary

153. ADA Katchen first mentions an "additional" page of the diary (which is a spiral bound book) in a letter received by the court on June 21st, 2010 releasing "Rosario/Discovery", which was addressed to Defense Counsel Mr. Lamb. (EX. "V")

154. ADA Katchen, in a letter dated June 30th, 2010, releases additional Rosario material, i.e., "Copies of all diary entries made by Duane Ramos in the people possession" (EX. "W"), which was a very poor black and white Xerox copy of a partially color document; which did not reflect the true nature of the exculpatory entry and obscured the fact that one of the pages was made with two different types of pens, a felt tip pen and a ball point pen.

155. Mr. Lamb presented an in limine motion on July 7th, 2010 for an ORDER directing the People to provide the original copy of the diary kept by Duane Ramos to handwriting expert John Paul Osborne for examination, by allowing the District Attorney to hand deliver it to the expert's laboratory and remain there while examining to insure its integrity, and then re-take custody immediately upon completion (EX. "X"), because upon viewing the copies it appeared entries were altered or added on to at a later time.

156. On July 16th, 2010, Mr. Lamb reiterated his argument of July 7th, 2010, as reflected by the Stenographic Transcripts (EX. "Y"), where he states in relevant parts about the diary:

⊘ "...made those notations in such a fashion, made it appear [Pg 2, at ¶ 24-25] contemporaneous with the actual incidents taking place." [Pg. 3, at ¶ 1]

⊘ "Even a laymen viewing these pages would see there is different angles to the writing with different, obviously, different ink used." [Pg. 3, at ¶ 2-4]

⊘ "These are, obviously, later entries to these diary entries. [on the same dated entry] And, there is opposition that this goes directly to her credibility, directly to her motive to fabricate the charges against the defendant." [Pg 3, at ¶ 5-8]

⊘ [Mr. Lamb mentions Mr. Osborne's credentials with U.S. Attorneys office and the Federal Courts and states] "The only requirement I need would be the People to bring the diary to him because of equipment he uses is not...conducive to carrying in the field." [Pg. 3, at ¶ 16-19]

⊘ "I think it is very relevant issue in this case and I'm asking the court[s] permission to permitting an order [as]signing this handwriting expert. He indicated it would be pro bono, will not submit a bill to the 18-B panel, strictly because of his belief that all individuals should have equal rights to defend themselves." [Pg 3, at ¶ 20-25, Pg 4 at ¶ 1]

⊘ I would ask that the Court sign the order when I prepare it, which I hope to have along with his C.V. by the middle of next week." [Pg. 4, at ¶ 2-4]

✱ 157. This was submitted in written form on July 26th, 2010 along with an ORDER which was denied orally on July 16th, 2010. (EX. "Z") The last paragraph of this written motion specifically informs Judge Rooney that "Mr. Osborne has also represented to me that it is *impossible* to conduct a thorough, meaningful and accurate examination of a photo static or Xerox copy, such as the copies provided to me by the District Attorney." [Emphasis Added]

※ 158.  The Honorable Judge Rooney never provided a written decision and Order denying the motion, instead putting a line across a copy of the Order provided to him, stamping it July 26th, 2010, and writing denied on it. (EX. "AA") The substance of his oral decision is as follows:

⊘ The Court: "If he's going to do it pro bono, I don't see why you need an order. The D.A. agreed. You and your expert want to go to them for purposes of examination, they're provide the original for that purpose. They're not going to send the original in the field.

⊘ *Mr. Lamb*: "That would be the order, to order the People to submit the original to the expert. He has indicated to me that the equipment that he uses is not conducive to carrying in the field, very delicate equipment, expensive delicate equipment that cannot be carried to a location."

⊘ "The documents being examined have to be brought to his office where the equipment is located."

⊘ *The Court*: "I'm not going to sign any such order at this point."

⊘ "Number one, you say he's working pro bono. If he can work off the copies the D.A. provided, if you want to go with the D.A., that's agreed, they meet him at a mutual time."

⊘ "I'm not going to send an order sending the original diary."

⊘ *"The D.A. is not going to offer the diary. I don't see how they could."* [Emphasis added]

⊘ "The same would apply to the defense. However, if you wanted to get into this without objection then, I stay out of it and we'll see where we go with it."

⊘ *"I can't imagine why you want to get into it, prior consistent statements by the complainant. I haven't read it."* [Emphasis added]

⊘ "If you want to use it for impeachment purposes. At this point, I'm not going to sign an order. There are other methods you can use to examine it."

① "If this becomes a trial issue, I can't imagine if it would, but if it does, we'll deal with it then.

② "August 11[th]."

159.  It is alleged that this prejudiced the defendant by preventing him from challenging these violations occurring at the grand jury during the pre-trial proceedings in a motion to dismiss the indictment, as it allowed the unfair and improper use of material which was inadmissible in any fashion before the grand jury. It is alleged that this allowed the People to pursue an Erroneous and Improperly Bolstered Theory of Battered Woman's Syndrome and present experts that would not have been allowed otherwise.

160.  In this case the late disclosure of the diary as Rosario material instead of Brady resulted in the hurried attempt to obtain an expert witness, John Osborne & Sons; to examine it on the eve of trial. This was amplified by ADA Katchen's reluctance to allow the diary to be examined at no cost to the State, Pro Bono, by an expert document examiner. This was adamantly refused by ADA Katchen on July 7th, 2010, even though he stated on the record that he had no plans to introduce it at trial. (EX. "X")

161.  This was further supported by Judge Rooney himself in, upon information and belief, in an erroneous decision which he gave on July 16th, 2010, in response to my trial attorney's request to have an order signed directing the District Attorneys Office to produce the original diary for examination in the experts office.

✳ 162.  The late disclosure also prevented the defendant from securing the testimony of another expert, Treyce d'Gabriel-Montoya, President of the Center of Forensic Profiling, National Association of Handwriting & Document Experts (NAHDE) and the International Association of Handwriting Formation Therapists (IAHFT); who submitted a Letter of Opinion on September

14th, 2010. Her field of expertise is the forensic review of handwriting to determine deception and accompanying Personality factors of the Persons handwriting. (EX "BB") This will be discussed in depth later in this affidavit

## A. Defense Counsel's Failures To Review the Trial Record

163.  Defense counsel's failure to review the trial record, which included the Grand Jury testimony of the Complainant, Medical records of the Complainant, voicemail recordings provided by the complainant for "no purpose" according to her trial testimony, DD5 reports of Detective William Wasson, Affirmation of Dennis J. O'Sullivan and related trial records concerning grand jury proceedings and notebook entries of Police Officer Sharon Brown; directly resulted in a "snowball effect" of numerous errors which cumulatively deprived the defendant of defense counsel that was able to apply the facts to the law directly relevant to his clients defense, which amounted to less then meaningful representation in violation of the defendants due process right to a fair trial.

### (i) Failure to Review Grand Jury Minutes

164.  On June 21st, 2010, more then 2 ½ months before jury selection started; ADA Katchen submitted a letter to the court and defense attorney Mr. Lamb (EX. "V"), detailing the release of numerous discovery items including the complete transcripts of the Grand Jury testimony of the Complainant (EX. "F") and the diary (EX. "Q")

165.  Although Mr. Lamb admitted to reviewing the grand jury minutes on the first day of trial, September 13th, 2010, concerning the complaining witness' testimony as it related to allowing a Battered Woman's Syndrome Expert; he failed to raise numerous colorable issues concerning the impairment of the integrity of the grand jury.

40

(ii) **Failure to Review Medical Records of the Complainant**

166.  Mr. Lamb's failure to review the medical records with due diligence led to his failure to provide evidence in support of the theory of the defense, that complainant falsified the charges allegedly committed by the defendant, and caused him to overlook numerous opportunities to impeach the credibility of the complainant.

167.  On the first day of trial, September 13th, 2010 defense counsel cross examined Rina Ganeles P.A. (Physician Assistant), who completed the sexual assault assessment form at 1:00 p.m. on September 29th, 2009. (Exhibit "CC")

168.  On page 2 of 6 Ms. Ganeles reported the complainant as stating the following:

⊘ <u>Weapon Shown:</u> "Yes" checked, described as "Hammer".

⊘ <u>Brief Narrative of Assault (optional):</u> [in relevant parts] "...shown hammer and threatened to use it..."

169.  During Mr. Lamb's cross examination, Ms. Ganeles testified that complainant told her she was sexually assaulted since July 2009 (Tr. Pg. 66, at ¶ 15-25, Pg. 67 at ¶ 1-5)

170.  Mr. Lamb then informed Ms. Ganeles that the complainant had indicated she had been sexually assaulted for 6 months and showed her the hospital report (EX. "DD"). Ms. Ganeles indicated the report in question was not hers (Tr. Pg. 67 at ¶ 6-25, Pg. 68 at ¶ 1-9).

**a. Mr. Lamb Failed to Thoroughly Review the Medical Records**

171.  Mr. Lamb failed to identify the Hospital Chart Review Print record (EX. "DD") of hospital employees who spoke with complainant before sexual assault examination at 1:00 p.m., resulting in the inability to impeach complainant with conflicting accounts made by her.

② Mr. Lamb failed to identify the Emergency Dept. Ambulance Assessment Note, chart review print 1 of 8, recorded at 11:28 a.m. by Donna Coules P.A., as related to her at 11:25 a.m., which states "Pt c/o being raped Friday, yesterday by boyfriend." (EX. "DD")

② Mr. Lamb also failed to identify the Nursing Emergency Dept. Ambulance Assessment Note, chart review print 2 of 8, recorded at 12:31 p.m. by Lili Frost R.N., occurring at 12:13 p.m., 45 minutes before sexual assault examination was started by Ms. Ganeles. The complainant gives a different recollection of what occurred, "Pt stated: I was raped by boyfriend at 11:30 p.m. on 9/28/09." The history part of the report states under the Physical/Sexual Abuse section, "No, Patient states no physical/sexual abuse", and the Domestic Violence Assessment part states "History of abuse: none reported" (EX. "DD")

172.  Mr. Lamb did identify Emergency Dept. Progress Note, chart review print 4 of 8, recorded at 1456 (2:56 p.m.) by Shiney Valiyaparambil P.A., as related to her at 1454 (2:54 p.m.), with the chief complaint listed as "Pt states she has been repeatedly sexually assaulted over 6 months ans has by physically injured by bites and hits." (EX. "DD")

### (iii) Failure to Review DD5 Reports of Detective William Wasson

173.  The failure of Mr. Lamb to review the DD5 Reports, Felony Complaint and Memo Book entries of Detective Wasson, and to utilize the information in them; served no tactical reason or strategic purpose.

### a. DD5 Follow Up Reports Show No Report of Any Crime by the Complainant Other Then the Event Alleged to Occur on September 28, 2009

174.  Complaint Follow Up Informational Report, Complaint # 2009-120-11351 (EX. "U"), Follow-Up No.1 has a section called Topic/Subject labeled as "received case." The summary of investigation indicated P.O. Brown stated complainant walked into 70th precinct, stated she was

raped by her boyfriend the previous night and was taken to Coney Island Hospital; and Detective Wasson indicated he would meet them at hospital for further investigation. Except for Follow-Up No. 5, which states "Unusual Occurrence, unusual report prepared", all follow-up notes were entered into the system on 10/6/09.

175.   Follow Up No. 2 indicated that Detective Wasson and Detective Murphy interviewed complainant at approximately 11:30 a.m., where the complainant repeated the same series of events as she did to P.O. Brown, that she was raped the previous night; with no mention of any other crimes on any other dates.

176.   Follow Up No. 3 shows background checks performed by Detective Wasson on the defendant, which reveals two (2) Domestic Incident reports ("DIR"). The first was on 8-4-2009 [which was 4 days after the complainant co-signed a lease and moved into a new apartment together with the defendant], Complaint Report # 2009-094-00510, which was filed in the 94th precinct in Brooklyn [a short distance from the complainant's mother's house], and another one in the 63rd precinct in 2008 [filed by defendant a short time before he broke up with his common law wife of 28 years], Complaint # 2008-063-00246.

177.   Follow Up No. 5 was the only report completed on 9/30/09, the same day as the Felony Complaint (Exhibit "1-A"). This refers to the Detective Bureau Unusual Report Occurrence, Attachment "A", completed at 8 a.m. on 9/30/09. Both this report and the Felony Complaint again only discuss *one* crime allegedly occurring on September 28th, 2009, at about 11 p.m.

178.   The final report page of the DD5, Follow Up No. 6, was labeled "Closing of Case", which along with all the other follow up reports except #5, was dated 10/6/09. Detective Wasson summarized the contents of his previous updates and stated "Based on the above information the undersigned requests that this file be marked closed A-1."

### b. Memo Book Entries of Detective Wasson

179. The memo book entries of Detective Wasson, labeled "Addendum 3" in Judge Rooney's Supreme Court folder (EX. "FF") completely omits one entire page of the memo book entries the defendant received from Trial Attorney Eugene Lamb. [Compare] (EX. "GG")

180. The missing page shows Detective Wasson's interview of the complainant as stating "Move in 8 August together for 6 months, therapist 8:30 p.m., argument ensued went upstairs."

### c. Mr. Lamb Contradicts Himself Concerning His Cross-Examination of the Complainant Concerning Her Extensive Contact With Detective Wasson

181. In a discussion after the jurors are excused on the 1st day of trial Mr. Lamb expresses his surprise concerning the People's position that they do not intend to call him as a witness.

⊘ Mr. Lamb: "I would certainly think they would want to call him. It's rather an extensive contact with the complainant which I'm going to question the complainant about." (Tr. Pg. 103 at ¶ 5-8)

⊘ Mr. Lamb: "I'm just expressing my surprise." (Tr. Pg. 103 at ¶ 18-19)

182. It becomes obvious at this point that Mr. Lamb did not adequately review the DD5 reports of Detective Wasson, as there was no investigation into this matter by Detective Wasson, which contradicted Mr. Lamb's statement at trial; other then taking a statement at the hospital, performing ministerial background checks into the defendant and closing the case.

183. Mr. Lamb never cross-examined the complainant about her contact with Detective Wasson in any way at all, in complete contradiction to his aforementioned statements at trial.

184. In actuality, I demanded that Mr. Lamb call Detective Wasson as a witness as to my statements to him upon his first contact with me, upon questioning and as to my demeanor before, during and after my arrest; but he ignored my pleas repeatedly.

44

### (iv) Failure to Review Voice Mail Recordings

185.  Mr. Lamb's failure to move for suppression in a pre-trial hearing was evidence of his unfamiliarity with the rules of evidence and his overall lack of basic trial skills.

186.  Mr. Lamb failed to object to the admission of voice mails when offered on direct examination by ADA Katchen (Tr. Pg. 212 at ¶ 14-20), which were then played for the jury.

### a. Weakly Formulated Objections Made After Voicemails Were Played

187.  The following actions by Mr. Lamb were insufficient to establish a contemporaneous objection and thereby were insufficient to preserve for appellate review.

188.  Mr. Lamb made an objection regarding the tape recordings, stating they appeared to be speeded up (Tr. Pg. 224 at ¶ 22-25, Pg. 225 at ¶ 1-3) and gave the impression of heightened anger and anxiety, which was an unnatural portrayal of his emotions. (Tr. Pg. 225 at ¶ 6-10)

189.  Mr. Lamb admits not reviewing the material recently. "I have listened to it in my office many, many months ago." (Tr. Pg. 225 at ¶ 23-24) and "[i]t almost sounded like a 33 1/3 record being played at 78 speed." (Tr. Pg. 226 at ¶ 1-2) Mr. Lamb even said "This almost sounded like when a person sounds like Alvin and the Chipmunks." (Tr. Pg. 226 at ¶ 17-18)

190.  Judge Rooney tries to help Mr. Lamb out by stating "I'm not sure what else I can do. I don't know if you have a *legitimate objection* or not." [Emphasis Added] (Tr. Pg. 227 at ¶ 7-8)

191.  It is here in Mr. Lamb's response that he reveals his unfamiliarity concerning the requirements of admissibility of recorded material into evidence by his response.

① Mr. Lamb: "Perhaps it was the way it was recorded by the complaining witness, in which case it would be cross-examination fodder." (Tr. Pg. 227 at ¶ 9-11)

② Mr. Lamb: "Quite frankly, Judge, *I don't know either*. Ideally, from a defense standpoint
I'd ask that it be stricken and the Jury admonished to disregard that." [Emphasis Added]
(Tr. Pg. 228 at ¶ 6-9)

192.  Again, Judge Rooney can not tell Mr. Lamb what to do, so he once again tries to help
out Mr. Lamb and suggest the following.

② The Court: "I don't know if I have a reason to do that. *Both sides heard it prior*, it came
into evidence, the jury heard it. I don't know if you have a point or not. I will listen to it
again." [Emphasis Added] (Tr. Pg. 228 at ¶ 15-16)

② Mr. Lamb: "I will withhold any further objections until after that is done." (Tr. Pg. 228 at
¶ 15-16)

193.  It is at this time that Mr. Lamb should have listened to the voicemails over again, to
refresh his recollection. A short time later the complainant reveals on cross examination that she
saved the voicemails on a digital recorder, which she kept at her job. (Tr. Pg. 281 at ¶ 1-9)

√ **b. Mr. Lamb Was Informed of the Nature of Voicemails and Failed to Identify Issues** √
**Concerning Their Inadmissibility**

194.  The defendant was arrested on September 29th, 2009 and the complainant was in the
hospital almost the entire day. The complainant had to have gone to work the next day, allegedly
after being violently beaten, choked to unconsciousness and raped; in order for her to pick up her
digital recorder which she stated she left at work (Tr. Pg. 281 at ¶ 1-9) and her diary, in order to
fulfill her plan and present it to the District Attorney on October 1st, 2009 (Tr. Pg. 280 at ¶ 23-
25) when the grand jury convened. This series of events seems highly improbable and worthy of
cross examination by Mr. Lamb, but he never pursues this line of questioning which was replete
with colorable arguments.

46

195.   Furthermore, the voicemails in question were provided to Mr. Lamb on cd-rom, yet the complainant stated she saved them to a digital recorder (Tr. Pg. 281 at ¶ 1-9). How did the voicemail recordings get onto cd-rom? These are colorable arguments against admissibility that were never pursued by Mr. Lamb.

196. ADA Katchen, in a supplement to Molineux application dated June 10th, 2010, misrepresents the evidence by stating "the recordings form the best evidence of the nature and extent of the defendants continued harassment of the victim." (EX. "HH") Best evidence would have been a subpoena of the messages from the phone carrier certifying that they are a true and exact copy, which would have included date and time stamps. Complainant was not challenged why she could not save the voicemails in their original form in her voicemail box.

197.   In a 2nd supplement to Molineux application by ADA on June 21st, 2010, the voicemail details are revealed in footnote. "[A]s such, the People will play an edited version of such disc where certain calls, such as messages left by *Detective Wasson,* are omitted." (EX. "II")

198.   This statement revealed at a very early date to Mr. Lamb the following information which would have shown the complainants state of mind and what she did the day after having me arrested, in completion of her plans to prosecute the defendant for crimes he did not commit.

199.   How did voicemails from Detective Wasson, which had to have occurred after the defendant was arrested and before she attended the grand jury on the morning of October 1st, 2009, get recorded onto the digital recorder which was left at her work? (Tr. Pg. 281 at ¶ 1-9) The complainant, in a need to fulfill her plan; had to have gone to work on September 30th, 2009 after being in the hospital the entire day prior and recorded the voicemails selectively and without the timestamps onto her digital recorder, which included the voicemails of Detective

↑ Important ↑

47

Wasson. This shows a conscious decision of the complainant, in an intentional act of revenge as the recording of the voicemail from Detective Wasson served no purpose.

200. Finally, also in the second supplement to Molineux application ADA Katchen recorded that the complainant told her "The voicemails that Ms. Ramos _chose_ to save were done based upon what she perceived to be the most overtly threatening that were left on the phone by defendant. Other then stating a range of time [2-3 months], Ms. Ramos was unable to provide a more specific date and time corresponding to each call." (EX. "II")

201. Mr. Lamb was provided with the information to impeach the defendant that she indeed did have a purpose and to why she chose to save the voicemails, and to then challenge inadmissibility as to when they were recorded and how they got to cd-rom format from digital recorder and then elicited the fact that the complainant also _chose_ not to record the date and time stamps when saving the messages to a digital recorder for _no purpose_.

### (v) Failure to Review Circumstances of Grand Jury Proceedings in Relation to Retained Bankruptcy Attorney Dennis J. O'Sullivan's Numerous Errors

202. On June 29th, 2010, Defense Counsel Mr. Lamb submitted an affirmation in support of a motion to dismiss the indictment for ineffective assistance of counsel Dennis J. O'Sullivan, who represented me from October 5th, 2009, my 180.80 day; until my arraignment on the Supreme Court indictment on October 27th, 2009. The reason Mr. Lamb gave was the alleged failure of attorney Dennis J. O'Sullivan to consult with the defendant regarding his right to testify at the grand jury proceedings. (EX. "JJ")

203. On June 30th, 2010, ADA Katchen submitted an answer to the motion to dismiss the indictment. (EX. "KK")

204. The defendant obtained a signed affirmation from bankruptcy attorney Dennis J. O'Sullivan on July 6th, 2010. (EX. "LL")

205. In this affirmation, Mr. O'Sullivan states that I called him on the phone upon arrest and that he informed me that I would be arraigned within 20 hours or so and nothing else could be done at that point. He also stated "Additionally, at his following court appearance [October 5th, 2009], I filed a Notice of Appearance in the Criminal Court."

206. Dennis J. O'Sullivan also states "Under these circumstances and after receiving notice that the matter was being presented to the Grand Jury, I discussed, with Mr. Rucano, *the possibility that the complaining witness might elect not to appear before the Grand Jury.* In that event, I believed the matter would likely come to an end." [Emphasis Added]

207. Mr. O'Sullivan stated "At no time following the Supreme Court Arraignment or at any other time, did I inform Mr. Rucano that he had a limited time to challenge the Indictment based on the fact that he was not made aware that he had a right to testify before the Grand Jury."

208. Finally, he admitted the following "Although I have been an attorney since July 25th, 1990, my practice has been almost exclusively limited to consumer bankruptcy. Through the years I have handled many misdemeanor cases before the NYC Criminal Court; however I have never handled any matter that appeared before the Grand Jury."

209. The following day, ADA Katchen submitted a Supplement to Response to Defendant's Motion to Dismiss, which was dated July 7th, 2010.

210. Although Mr. Lamb was presented with this affirmation from Mr. O'Sullivan, he submitted no amended pleadings concerning the identifiable issues contained in the affirmation which contradicted the record and the facts, which was a direct result of not performing any investigation into the facts affirmed by Mr. O'Sullivan, or the procedural history of the case.

## a. Affirmation of Dennis J. O'Sullivan and the Inconsistencies Mr. Lamb Failed to Address

211. The actual procedural history of the case reveals that the affirmation of Dennis J. O'Sullivan was flawed in numerous ways.

212. The defendant was arraigned on October 1st, 2009. (EX. "H")

213. A Grand Jury was convened and heard testimony from the complaining witness on the morning of October 1st, 2009, before the defendant was arraigned (Aff. at ¶ 21). No further testimony was heard from the complainant or any other witness after October 1st, 2009.

214. How then could Attorney Dennis J. O'Sullivan, who first put in his notice of appearance on October 5th, 2009 (Aff. at ¶ 35) have possibly gave the defendant advice that the complaining witness may not elect to testify at the grand jury, when she already had testified 4 days earlier?   (See ¶ 206)

215. The failure of Dennis J. O'Sullivan was exacerbated by Mr. Lamb's failure to do a basic investigation into the procedural history of the defendant's case before submitting a motion for ineffective assistance of counsel, instead of the appropriate failure by the prosecution to provide reasonable notice that afforded a date and a time the defendant could exercise his statutory right to testify at the grand jury.

216. The defendant informed Mr. Lamb upon accepting the defendant's case that he was not afforded the opportunity to testify at the grand jury and Mr. Lamb refused to address it. When the defendant persisted about this, and after waiting 7 months; he submitted a poorly written and unsubstantiated motion based on non-existent facts purely to appease the defendant, which served no tactical reason or strategic purpose.

217. Judge Rooney's Decision and Order clearly states "The defense makes no claim that the People or the Court violated the defendant's right to testify at the grand jury." (EX. "MM"),

and based his decision on all the erroneous, uninvestigated and unsubstantiated facts given by Mr. Lamb in his affirmation. (EX. "LL")

### (vi) Failure to Use Sexually Explicit Pictures Showing Prior Consensual Relations With The Complainant

218.  The defendant provided Mr. Lamb with pictures of the complainant in the first weeks and months of the relationship, which showed her promiscuity and aberrant sexual nature and her willingness to engage in such acts consensually.

219.  Under P.L. § 60.42, Rules of Evidence titled "Admissibility of Evidence Received of Victim's Sexual Conduct in Sex Offense Cases"; these pictures which show the complainant willingly posing were admissible under multiple subdivisions of the law.

**220.**  P.L. § 60.42 states "Evidence of a victim's sexual conduct shall not be admissible in a prosecution for an offense or attempt to commit an offense defined in Article 130 of the penal law unless such evidence:" [relevant sections listed]

- P.L. § 60.42 (1), Proves or tends to prove specific instances of the victim's prior sexual conduct with the accused, or

- P.L. § 60.42 (3), Rebuts evidence introduced by the People of the victim's failure to engage in sexual intercourse, deviate sexual intercourse or sexual conduct during a given period of time; or

- P.L. § 60.42 (5), Is determined by the court after an offer of proof by the accused outside the hearing of the jury, or such hearing as the court may require, and a statement of the court of it's findings of facts essential to it's determination, to be relevant and admissible in the interests of justice.

221. The pictures in question were taken in Delaware and in the defendant's home on Merry Mount Street in May, June and July, and the People introduced testimony of the complainant's failure to engage in deviate sexual intercourse and contact. There were pictures of the complainant lying nude in a Jacuzzi displaying her tongue with a recent piercing of a ball and pin through her tongue, specifically obtained for the purpose of enhancing oral sex; which rebuts her testimony and was allowable under P.L. § 60.42 (1); as well as the complainant posing nude with her legs wrapped around a pole on top of the Jacuzzi deck in the hotel room in Delaware.

222. Furthermore, various other pictures of complainant in lingerie sticking her ass out, spreading her legs while nude; shows specific instances of prior consensual sexual contact with the defendant during a time where she was allegedly beaten and raped. These pictures occurred right before she co-signed a lease and moved in with the defendant on August 1st, 2009, and allegedly being raped multiple times, all allowable under P.L. § 60.42 (3).

## (vii) Failure to Subpoena Emails to Complainant

223. The defendant provided counsel with approximately 15 emails that he sent to the complainant over a 3 month period that expressed his heartfelt love, care and concern for the complainant; in an effort to open up a line of communication between them. About 1 month after getting engaged, the complainant started to "shut down" and exhibited violent and angry episodes like cutting of her own hair, burning herself with cigarettes and throwing things in a fit of anger. (Tr. Pg. 389 at ¶ 11-16)

224. Counsel refused to even look at them, and defendant's repeated attempts to have him subpoena them from his email accounts "sent" folder, to substantiate from the internet service provider that they were actually sent to the complainants email address, resulted in a few loud verbal arguments where on one occasion defense counsel hung up the phone on me.

**225.** I provided printed copies of these emails to Mr. Lamb, which he refused to use to impeach the complaining witness at trial, adamantly stating "they are not admissible."

**226.** Mr. Lamb cross examined the complainant and asked "And did he email you send emails to you telling you he was going to leave you?" Complainant "No." (Tr. Pg. 283 at ¶ 3-5)

**227.** These emails would have shown the defendant's state of mind and deep concern for complainant, and would have impeached her testimony that I never offered to help her move out.

**228.** Email messages were admissible as evidence of statements made to her about the defendant's intention to help her move out, and were not subject to the Rape Shield Law.

**229.** Yet, ADA Katchen, in his "Rosario/Discovery" letter to Mr. Lamb dated June 21st, 2010 released a printed email from me to the complainant, thereby showing that the prosecution believed they were relevant. (EX. "V") The failure to subpoena the emails resulted in the loss of verifiable proof of the defendant's attempt to reach out to the complainant with love, care and concern. They would have provided evidence of the defendant's offer to help her move out, and would have supported the defense theory that she fabricated the alleged rapes by impeaching her testimony concerning her leaving on August 3rd, 2009 after a fight, and supported by the complaint report she filed at 5:10 a.m., August 4, 2009 at 94th precinct. (EX. "U") This would have damaged the credibility of the complainant where her credibility was precarious at best.

## √ (viii) Failure to Investigate Prompt Outcry of Dr. Saluja Raveen M.D. √

**230.** The complainant had a doctor's visit the week of September 21st, 2009 at Bellevue Hospital to have her finger examined presumably after we had a fight that week and I wound up biting her because she tried to break my finger.

**231.** While at Bellevue Hospital she met with Dr. Saluja Raveen M.D., License # 207330 and the medical record revealed prompt outcry by complainant which supported defendant's

theory which Mr. Lamb never used. The medical record submitted by the DA recorded that "Boyfriend assaulted her, she has a plan to leave, refuses shelter, has family." (EX. "NN")

232. The medical record of the complainant reveals the following important information:

- ☺ The complainant was able to make a prompt outcry of *assault* to her doctor.

- ☺ The complainant lied to the doctor when she implied that she was going to stay with family when she refused a shelter, but did not.

233. Mr. Lamb failed to interview this doctor about complainant's statement to her, and got substantive testimony that she made a prompt outcry of *assault* only. Mr. Lamb could have presented the following questions to the Complainant after receiving this information:

- ☺ "Why didn't you tell your doctor about the alleged rapes that were committed against you?"

- ☺ "For what reason did you tell the doctor you were assaulted, but did not mention rape?"

- ☺ "Why did you lie to your doctor about going to your family's house when you went back to Anthony that night, and never had any intention to stay with your family?"

- ☺ "What was your plan to leave and what exactly did it involve?"

234. The failure of Mr. Lamb to pursue this avenue was investigation was critical to showing the willingness of the complainant to lie and fabricate the charges against him.

## B. Trial Counsel Failed to Object To Recuse ADA Katchen As An Unsworn Witness

235. Defense counsel received the grand jury minutes of the complainant on June 21st, 2010; a full 10 weeks before trial started. The grand jury minutes of the complainant clearly reveal that ADA Katchen had exclusive knowledge of the diary, and the arrest reports and other investigatory police records reveal nothing about any crimes on any other dates but September

28th, 2009. How did ADA Katchen know to ask about all these specific dates, which he provided to the complainant in the form of leading statements and questions?

236. The DD5 report and felony complaint all show there were only crimes alleged to have occurred on September 28th, 2009. (EX. "P" and EX. "O") Once defense counsel was provided with the diary and the grand jury minutes on June 21st and June 30th, 2010, he should have immediately moved for dismissal of the indictment and/or recusal of ADA Katchen as being an unsworn witness in this case, because where the prosecutor's pretrial [investigatory] involvement will be an issue, recusal is the appropriate course of action.

237. There was no other logical conclusion as to how ADA Katchen gained exclusive knowledge of the events to question the complainant at the grand jury. A cursory examination of the diary would have revealed that complainant's grand jury testimony was practically identical to that of diary. The grand jury testimony shows her reading from this diary throughout grand jury. Mr. Lamb failed to identify these issues and apply the rules of professional conduct and ethics, and the law as it applies to leading, bolstering, hearsay and numerous other issues.

238. The defendant informed counsel about ADA Katchen being an unsworn witness months before trial, which I repeated before trial started in a statement made directly to the Court by me on September 8th, 2010, which is reflected in the transcripts. (J.S. Tr. Pg. 8 at ¶ 3-10)

## C. Failure to Challenge Prosecution Theory with Expert Witnesses Lacked Any Tactical Reasoning or Strategic Purpose

239. Mr. Lamb failed to use any of the three experts he petitioned the Court for in the pursuit of the theory of his defense, although the use of those expert's would have provided testimony in support of his theory that the complainant was fabricating the charges against him.

240. The defendant petitioned for experts to refute the prosecution's expert concerning "Battered Woman's Syndrome" and defendant found and presented to Mr. Lamb multiple experts to perform forensic examinations of the alleged diary. The defendant had to find both these forensic document examiners on his own because Mr. Lamb was unable to find one in New York prior to trial. In fact, defendant found both experts on the evening of September 8th, 2010, after Mr. Lamb told him he could not find any on the 18-B panel list of experts.

### (i) Expert Testimony To Refute Prosecution Theory of Battered Woman's Syndrome

241. Mr. Lamb petitioned Court for two expert witnesses and submitted two affirmations for services under County Law, Section 722-C. One of the experts was to provide testimony that refuted Prosecution's Theory of Battered Woman's Syndrome, but was never called to the stand.

242. The defendant provided Mr. Lamb with detailed studies published by the U. S. Government concerning I.P.V. (Inter Personal Violence), which recognizes violence of one person against another. The studies tracked instances of Domestic Violence across the United States in various groups, including a 2,000 couple study of diversified couples, which included various ethnic backgrounds, locations, ages, financial status and other factors. These studies conclusively showed that women suffer more from bi-polar syndrome, depression and other clinical diagnosis related to a deficient mental state.

243. These studies were provided to Mr. Lamb by the defendant 3-4 months before trial, and he never gave them to the Clinical Psychologist Dr. Michael Brustein, or called him to testify.

### a. Clinical Psychologist Dr. Michael Brustein

244. Dr. Michael Brustein has an office in Manhattan, and was approved by the Honorable Court to provide testimony on April 28th, 2010. (EX. "OO")

245. Mr. Lamb's Affirmation for Services other then Counsel in Criminal Court and Supreme Court Criminal term under Article 18-B of the County Law, Section 722-C (EX. "PP") clearly states "People are Offering Evidence of 'battered wife syndrome' by way of expert witness Dr. Brustein is being offered to rebut said evidence."

246. Dr. Brustein completed his pre-doctoral internship at Harvard Medical School and currently participates in a group forensic practice conducting court ordered psychological evaluations through Forensic Pathology P.C., and works at James J. Peters VA Medical Center. He completed a one year course on family forensics specifically focusing on legal ethics and family dynamics at Washington Square University in New York in August 2006.

247. His testimony would have been crucial in presenting the government studies on Inter Personal Violence ("IPV") that I gave to Mr. Lamb months before trial and provided an alternate theory to the prosecutor's "Battered Woman's Syndrome" theory, that the complainant's testimony could be ruled out as inconsistent with a person suffering from such syndrome.

248. Mr. Lamb asked to present Dr. Brustein, possibly out of order, on the first day of jury selection, September 8th, 2010. (J.S. Tr., Pg. 3 at ¶ 14-20) Mr. Lamb's decision to not call this expert to testify was against his sworn affidavit to the court that he was offering this expert to rebut the prosecutions theory and served no tactical reason or strategic purpose.

CRUCIAL

(ii) Expert Testimony of Forensic Document Examiner and Handwriting Analyst

249. After Mr. Lamb was told by Judge Rooney to find an expert who could examine the diary at the D.A.'s office on July 17th, 2010, and being denied to have it brought to the laboratory of John Osborne (EX. "AA"); Mr. Lamb failed to find anyone else by September 8th, 2010. Mr. Lamb stated on September 8th, 2010 "Just for the record, Judge, I contacted quite a while

ago...the assigned counsel plan gave me a very short list of the people that are on the plan that

hold themselves out as forensic document experts." (J.S. Tr., Pg.11 at ¶ 8-13)

250.  Mr. Lamb also reminded the court that the one expert he did find could not bring his

equipment to the D.A.'s Office, and the court would not sign an order instructing the D.A. to

bring it to him. (EX. "Y") (J.S. Tr., Pg. 11 at ¶ 14-23)

251.  The defendant made it clear to the court on September 8th, 2010 that he wanted to find

an expert himself and explained the relevant factors involved and elicited the following:

① Defendant: "Your Honor I just wanted to be on the record that I still as you've said on the

stand on our last date in court, that given my opportunity for my attorney to have a

handwriting expert come to the District Attorney's office because he was unwilling to let

this diary that was only seen by the District Attorney [unsworn witness]...No other

investigation on this specific piece of paper called a diary has been made." (J.S. Tr. Pg 7

at ¶ 23-35 Pg. 8 at ¶ 1-8)

② Defendant: "[C]atherine comes to the District Attorney with this diary which is a falsified

document and then all these charges are against my account. No other investigation was

done on this piece of paper." (J.S. Tr. Pg 8 at 11-15)

③ Defendant: "My attorney just told me just now he was unable to get somebody to come to

his office. I would like to at my own expense and my family's expense get a handwriting

expert to come... to prove there were falsified statements written in on different dates at

the same time. In other words, she went back and added in stuff on multiple dates at the

same time concerning these charges and then presented that to the District Attorney as

proof what all these previous charges were. There was - - nobody else saw this diary

except the District Attorney technically making him a potential witness for being the only one to see that." (J.S. Tr. Pg. 8 at ¶ 21-24 Pg. 9 at ¶ 1-10)

⊘ The Court: "Okay. Let me say first based on the record the last time and also in chambers, the DA does not intend to introduce the diary on their direct case; am I correct?" (J.S. Tr. Pg 9 at ¶ 17-20)

⊘ Mr. Katchen: "That's correct." (J.S. Tr. Pg. 9 at ¶ 21)

⊘ Defendant: "If it's not planned to be brought into evidence there is no reason why the District Attorney shouldn't allow it to be examined." (J.S. Tr. Pg 12 at ¶ 12-15)

⊘ The Court: "It's not going to be in evidence. There is no reason to talk about it." (J.S. Tr. Pg 12 at ¶ 16-17)

252.  The defendant made the court aware that ADA Katchen acted in an investigatory manner, potentially becoming an unsworn witness (J.S. Tr. Pg. 8 at ¶ 21-24 Pg. 9 at ¶ 1-10) and also informed the court of the substance of the expert document examiner's investigation and testimony, all highly relevant to the defense. The defendant went on the internet that evening and found 18-B certified Forensic Document Examiner Robert Baier located in Warwick, N.Y. and Forensic Handwriting Analyst Treyce d'Gabriel-Montoya. Let's take a look at their proposed testimony.

### √ a. Proposed Testimony of Forensic Document Examiner Robert Baier √

253.  Mr. Lamb presented an oral motion on July 7th, 2010 to request that a handwriting expert John Paul Osborne perform a forensic examination of the diary, because upon viewing the copies it appeared entries were altered or added on to at a later time. (EX. "Y")

254.  Mr. Lamb was told by the court when the defendant himself raised the issue on the first day of jury selection, "The DA does not want to send an original document to New Jersey for an

expert to examine in his office rather then come here. I indicated you could find someone else and that offer still stands. We will start picking today, but you have several days." (J.S. Tr. Pg 13 at ¶ 1-6) Judge Rooney was unwilling to let it be taken to the expert's professional laboratory, even though Mr. Lamb made it clear that "Mr. Osborne has also represented to me that it is impossible to conduct a thorough, meaningful and accurate examination of a photo static or Xerox copy, such as the copies provided to me by the District Attorney." (EX. "Y")

255.  The defendant found a Forensic Document Examiner in the evening of the first day of Jury selection, September 8th, 2010; after Mr. Lamb told the Honorable Court he could not find one who was assigned to the 18-B panel list of approved experts (J.S. Tr. Pg. 8 at ¶ 21-24 Pg. 9 at ¶ 1-10). He provided the expert with photocopies via email for a preliminary evaluation and informed defense counsel Mr. Lamb with the expert's information the next day.

256.  I explained to Mr. Lamb that the expert could perform a "Water Solubility Test", which places a small amount of water on the ink of the paper and by watching the ink dissolve under a microscope, it can be determined if some ink on the page is older then other ink on the same page. The purpose of this test was to definitively prove that the added lines accusing me of crimes of 7 different dated entries **were all the same age.** This would scientifically prove that the added entries accusing me of crimes on 7 different dated entries were all written at **the same time.** This would prove that she testified falsely at the grand jury as her entire testimony was **word for word** exactly as recorded in her diary, which she was allowed to take to the stand and read from during her entire grand jury testimony. Let us take a look at Mr. Baier's reports.

√ **b. Reports and Exhibits of Forensic Document Examiner Robert Baier** √

※ 257.  On September 11th, 2010, Mr. Baier submitted Document examiner Letter of Opinion (EX. "QQ") which was a preliminary report of photocopies emailed to him by the defendant. His

60

opinion stated in brief "the evidence supports my professional opinion that it is 'highly probable' some of the writings…were not written at the original time of entry."

✳ 258.  Mr. Baier also reiterated, as did the previous expert Mr. Osborne, "It is not possible to bring my laboratory with all my equipment to the site of the diary. He also stated that based on the level of examination he may be able to "show a high probability that someone went back and made all of the [additional] entries at the same time." (EX. "QQ") ✳

259.  Then, on September 13th, 2010, Mr. Baier was allowed to review 8 pages of original documents under supervision at the District Attorney's Office and on September 14th, 2010, he submitted a Supplemental Report. His conclusive findings in that report state the following:

⊘ Findings: "After examining the original writings of the diary I was able to reinforce my opinions expressed in the original report. I feel certain that the last sentence of Q4/Q5 was added at a later date/time. The writing of both pages was done with a liquid writing implement for 1 and ½ pages until the last sentence which was done with a ball point pen. There is no logical reason someone would stop their writing at the last sentence after writing a page and a half and change writing implements unless the liquid implement ran out of ink and I would have been able to determine that."

⊘ "It is my opinion that Q1, Q2, Q3, Q6 had writings that were added after the time of the original entries. All of the added writings contained the accusations of rape." (EX. "RR") ✳

√ **c. Proposed Testimony of Forensic Handwriting Analyst Treyce d'Gabriel-** √
**Montoya**

260.  Expert Witness Treyce d'Gabriel-Montoya, President of the Center of Forensic Profiling, National Association of Handwriting & Document Experts (NAHDE) and the International Association of Handwriting Formation Therapists (IAHFT); who submitted a Letter

of Opinion on September 14th, 2010; has a field of expertise is the forensic review of handwriting

to determine deception and accompanying personality factors of the persons handwriting. Her 40

page CV includes local, state and govt. agencies across the country and the world. (EX. "BB")

261.  Mr. Lamb refused to submit this expert's CV to the Court to provide testimony in my

behalf. This evidence would have greatly affected the jury's deliberation, as it raised serious

questions of the complainant's credibility and state of mind. The refusal of Mr. Lamb to use

available evidence in support of the theory of the defense had no basis in tactical reasoning or

strategic purpose and as a result the defense once again lost the ability to put the complainant's

credibility in question in a case where credibility was the only defining factor.

**d. Expert Report of Forensic Handwriting Analyst Treyce d'Gabriel-Montoya**

262.  Ms. Montoya examined 3 diary entries, July 17th, 28th and 30th of 2009. Her opinion

was based on the following factors stated in brief:

- The <u>severe slant</u> of the writer indicates she has significant and pronounced indicators of
  bipolar disorder. This occurs in 90% of her writings.

- The use of <u>lowercase ©</u> used in place of appropriate capital I indicates her low self
  esteem and inferiority complex. This appears in 60% of her writings.

- Her <u>lead-in strokes</u> of letters h m, n, p, w and y predominately indicate her resistance
  argumentativeness, ability to criticize, find fault and blame others. This occurs in 75% of
  her writings.

- Words and letters that <u>raise above the pre-printed line</u> indicate an excessive need to
  engage in mental thought or activity such as *thinking about what to write*. [Emphasis
  Added] If the statements are honest and happened in the recent days, hours or minutes

62

prior to writing the event would be immediately memorable and the need for excessive mental thoughts would not be necessary. This occurs in 70% of the writings.

○ "Liar's Loops" appear on many vowels. Vowels are communication letters and vowels that are illegible, have excessive marks or loops, close or are too narrow, all indicate ones unwillingness to tell the truth and indicate withholding information. This occurs in 75% of the writings.

○ Entrance strokes on the letter c (which cause them to become closed like an o) indicate her obsessive thoughts. Once she has a plan or idea in her head combined with the above-mentioned resistance, critical, and argumentativeness, she obsesses until she is satisfied. In this situation, this only feeds into her desire to make you, Mr. Rucano, miserable. This occurs in over 50% of her writings.

○ Deceptive letters or letters that, if they stood alone, would be illegible or unrecognized by the general public indicate deception and anxiety. This occurs in over 95% of the writings.

263. Ms. Montoya then identifies clear places where deception is obvious in each dated entry. (EX. "BB") Her synopsis is brief states "the writer of these diary entries is being deceptive and extorting any truths that may exist within", and are fully stated previously.

264. The failure of Mr. Lamb to present the C.V. of this handwriting expert, in a case where damaging the credibility of the complainant and impeaching her testimony would have resulted in an acquittal of all charges; served no tactical reason or strategic purpose as it supported the theory of the defense that the alleged charges of rape were fabricated because the defendant was going to leave her. (Tr. Pg. 281 at ¶ 16-18, Pg. 282 at ¶ 13-15 22-24, Pg. 283 at ¶ 6-9 Pg. 285 at ¶ 15-17, Pg. 287 at ¶ 9-10) Mr. Lamb also spoke about this in summation. (Tr. Pg 569 at ¶ 17-23)

## D. Defense Counsel Failed to Use Cross-Examination Effectively as an Impeachment Tool

265.   The credibility examination of witnesses is the central focus of the trial process, with its main focus on witness examination, credibility testing and impeachment.

266.   The purpose of cross-examination is to develop evidence on behalf of the defendant's case where possible. It as also useful to minimize or destroy the condemning aspects of direct examination in the following ways:

☺ By highlighting the implausibility of witness opinions.

☺ To demonstrate witness perception is less then adequate.

☺ To attack the ability to observe and recollect

☺ To confront witness with his or her prior statements, written or oral

☺ To ask witness about prior criminal convictions

☺ To attack the witness character for truthfulness.

267.   To accomplish effective cross-examination you have make sure of the following factors:

☺ Do not have the witness repeat his or her testimony from direct examination.

☺ You must exercise witness control to supply short, direct and responsive answers.

☺ You should use leading questions and ask the witness to agree.

268.   Counsels failed attempts to impeach witnesses by ineffective means demonstrated he was incapable and simply unaware how to do so by using evidence provided to him before trial.

### (i)Police Officer Sharon Brown

269.   On September 13th, 2010, ADA Katchen asks about stipulating the testimony of 3 witnesses as to chain of custody of evidence concerning D.N.A. swabs. (Tr. Pg. 7 at ¶ 4-12)

64

270.  Mr. Lamb specifically states the following concerning P.O. Sharon Brown, who had first contact with the complainant when she walked into the 70th precinct in Brooklyn to report the rape. "I won't stipulate to it with regard to Brown, because I intend to cross-examine her with regards to what was said by the complaining witness when she first walked into the 70[th] precinct. (Tr. Pg. 8 at ¶ 14-17) The complaining witness allegedly walked into the 70[th] precinct and told P.O. Brown 'I was raped' or words to that effect." (Tr. Pg. 8 at ¶ 24-25 Pg. 9 at ¶ 1)

271.  Then a few hours later Mr. Lamb, for no tactical reason or strategic purpose; allows P.O. Brown's testimony to be stipulated away. (Tr. Pg. 75 at ¶ 6-16) This initial first contact was crucial because the complaining witness told numerous conflicting stories to 3 different hospital personnel at Coney Island Hospital. (Aff. at ¶ 168-172) P.O. Brown's statement to Detective William Wasson, recorded in his memo book entry (Aff. at ¶ 179-180) and in his DD5 Report (Aff. at ¶ 174-178); shows the complainant told P.O. Brown that she moved in 8th of August, presumably to avoid questioning about the situation where the complaining witness tried to push the defendant down a flight of stairs on August 3rd, 2009. The complainant was told that the defendant was calling the police, but he never did.

272.  Ironically, the complainant filed a Police report at 5:10 a.m. the next morning, August 4th, 2009 at the 94th precinct, minutes from her mother's house (Aff. at ¶ 176); yet on cross examination at trial she adamantly denied that she left the house that night and stayed at her mother's (Tr. Pg. 295 at ¶ 2-15).

273.  Mr. Lamb admits to reading the DD5 report at the first mention of ADA Katchen's application to have P.O. Brown's testimony stipulated to as a chain of custody witness, when Mr. Lamb states "In fact, my reading of the DD-5's in this case indicates that the complaint by the

complainant was first made to Police Officer Brown when she went into I believe it was the 70th precinct, that she was the first Police Officer that the victim spoke with." (Tr. Pg. 7 at ¶ 15-22)

274.  Yet somehow, Mr. Lamb failed to notice the Domestic Incident Report listed in the DD5 as also occurring in early August on August 4th, 2009. (Aff. at ¶ 177)

### (ii)  Rina Ganelas

275.  Direct Examination of Rina Ganelas by ADA Katchen, one of the many hospital employees that had contact with the complainant, revealed the following.

☺ ADA Katchen: "Did you ever ask why she came to Brooklyn to report it?" (Tr. Pg. 64 at ¶ 3-4)

☺ Rina Ganelas: "Yes, because she was at work in Brooklyn and her co-workers actually picked up on her bruising and encouraged her to go to police." (Tr. Pg. 64 ¶ 5-7)

276.  This directly contradicts the testimony of the complainant on direct examination by ADA Katchen, which revealed the following.

☺ ADA Katchen: "Did you in fact go to work?" (Tr. Pg. 199 ¶ 15)

☺ Complainant: "Yes." (Tr. Pg. 199 ¶ 16)

☺ ADA Katchen: "What if anything happened while you were at work?" (Tr. Pg. 199 ¶ 17)

☺ Complainant: "I came into work, nobody was there, my supervisor was in the office. And I just sat in my chair, looked out the window thinking about what happened the night before. Turned on my computer and I said, that's it. I had enough." (Tr. Pg. 199 ¶ 18-21)

☺ ADA Katchen: What did you do?" (Tr. Pg. 199 ¶ 22)

☺ Complainant: "...I got up, went to my supervisor's office and told her I had to leave." (Tr. Pg. 200 ¶ 1-3)

277. It was at this point that Mr. Lamb should have impeached the complainant with testimony of what she told Ms. Ganeles, who testified complainant told her "…her co-workers actually picked up on her bruising and encouraged her to go to police." (Tr. Pg. 64 ¶ 3-7)

278. Further cross-examination of the complainant could have also revealed her sudden forgetfulness of whether or not she ever told anyone at work, and could have been used to impeach her.

⊘ Mr. Lamb: "Did you ever tell Elizabeth, your friend at work, or any of your co-workers? (Tr. Pg. 284 ¶ 15-16)

⊘ Complainant: "I don't recall if I did." (Tr. Pg. 284 ¶ 17)

⊘ Mr. Lamb: "You don't recall?" (Tr. Pg. 284 ¶ 18)

⊘ Complainant: "I don't remember." (Tr. Pg. 284 ¶ 19)

### (iii) Cross Examination of Complainant Concerning Voice Mail Recordings

279. Defense counsel had no strategic reason for not suppressing the voice mail recordings. Mr. Lamb failed to understand the law when he did not move for a timely pretrial suppression hearing concerning voicemails with colorable arguments of foundation, chain of custody and proof not altered.

280. The complainant selectively recorded voicemails over a period of months from her cell phone, where they were stored in their original condition; then recorded manually by her onto a digital recorder without the date and time stamps, allegedly without choosing and with no purpose, as the complainant repeated over and over. Mr. Lambs failed to use available evidence to him as to her previous statement of how she chose (EX. "II").

281. Mr. Lamb's inability to properly review the record and use cross examination effectively become very clear in the following excerpts.

- Mr. Lamb: "And you were the person who gave those voicemails - - got the tapes of the voicemails to the District Attorney?" (Tr. Pg. 279 at ¶ 2-3)

- Complainant: "They were saved and I did turn them over." (Tr. Pg. 279 at ¶ 4)

- Mr. Lamb: "Okay. And over what period span of time did those voicemails represent?" (Tr. Pg. 279 at ¶ 7-8) "So they expand from July to September 28th; is that right?" (Tr. Pg. 279 at ¶ 14-15)

- Complainant: "Yes." (Tr. Pg. 279 at ¶ 18)

- Mr. Lamb: "...Did you receive quite a few voicemails?" (Tr. Pg. 280 at ¶ 3-4)

- Complainant: "Yes." (Tr. Pg. 280 at ¶ 5)

282. Mr. Lamb states "But you chose to save only those voicemails; is that right?" Complainant "No, I didn't choose." Mr. Lamb "You didn't choose to save them, somebody else saved them?" Complainant "No, I didn't choose to save those." Mr. Lamb "But you saved them, right?" Complainant "Yes." (Tr. Pg. 280 at ¶ 6-13)

283. It is quite clear that the complainant is being non-responsive and Mr. Lamb's lack of basic trial skills and inability to cross examine effectively become quite evident at this point, as he fails to ask the Court to direct the complainant to answer the question. The complainant could not possibly save only certain and specific voicemails without choosing to a digital recorder kept at her job without the date and time stamps for no purpose but this is exactly what the complainant alleges. Mr. Lamb's inability and lack of knowledge on how to use the most important tool in his arsenal in a case where credibility is the deciding factor, effective cross examination; becomes a critical failure as is revealed by the following.

284. Mr. Lamb "Why did you save them, what was your purpose for saving them?" Complainant "There was no purpose in saving them." Mr. Lamb "No purpose?" Complainant

68

"He was basically filling up my voicemail, I had to delete voicemail so people could leave voice messages." Mr. Lamb "But you saved those voicemails for a purpose, did you not?" Complainant "I didn't - - I just pressed the button and saved." (Tr. Pg. 280 at ¶ 14-22)

285.   It is here that Mr. Lamb, if he had the basic trial skills to effectively cross examine; could have asked "Why didn't you just delete the voicemails you didn't want from the mailbox from the phone provider, why did you have to go out of your way to put them on a digital recorder without also recording the date and time stamp played before each message?" He could have also asked "When you pressed the button to save, where were they saved to?" This would have showed her conscious decision to save specific messages and show an act of choosing. The possibilities to extract the information from her were endless, but Mr. Lambs lack of basic trial skills destroyed the defendants chance to be exonerated completely in this case where credibility of the complainant was precipitous at best.

√ **a. The Complainant Reveals Motive and Intent to Use the Voicemails as a Tool For** √
**Revenge**

286.   The continuing testimony of the complainant reveals her motive and intent for revenge.

287.   Mr. Lamb "And when did you turn them over to the D.A. do you remember?" Complainant "October 1st." (Tr. Pg. 280 at ¶ 23-25)

288.   Mr. Lamb "So you saved those voicemails that we heard yesterday some of them going back to July you saved them, right, am I right?' Complainant "Yes." Mr. Lamb "And did you hide them somehow so you make sure that Anthony didn't find them or see what they were did you hide them somehow?" Complainant "They were on my digital recorder, and the recorder was left at my job." Mr. Lamb "Okay. And so I ask you again, what was the purpose for saving them?" Complainant "I didn't have a purpose." (Tr. Pg. 281 at ¶ 1-9)

69

289. Mr. Lamb was informed of the nature of voicemails and failed to identify issues concerning their inadmissibility, which was previously discussed. (Aff. at ¶ 185-201) He had available information before trial started that Detective Wassons voicemails were part of the voicemails provided to the D.A., yet he failed to question why after the defendant was already arrested was the complainant still recording voicemails onto her digital recorder. (Tr. Pg. 280 at ¶ 23-25, Pg. 281 at ¶ 1-9) At this point he should have also asked "So you retrieved the digital recorder from work the next day on September 30th, correct?"

290. Effective cross examination after a thorough review of the trial record would have revealed this information and provided key information as to the complainant's motive for revenge gathering the diary and recording voicemails for the D.A. to use at the grand jury. The fact that she recorded voicemails from Detective Wasson means it could have only been done after the defendant was already arrested (Aff. at ¶ 198-199). It is important to note the D.A. did not ask for this information, she made a conscious decision to gather and provide it in such a way to fulfill her plan for revenge.

### (iv) Mr. Lambs Lack of Focus, Direction and Inability to Cross Examine Effectively Resulted in His Failure to Impeach Complainant with Illogical and Inconsistent Statements

291. Mr. Lamb failed to provide meaningful representation due to his lack of focus, direction and inability to cross-examine effectively while using the evidence provided to him, resulted in his failure to impeach complainant with illogical and inconsistent statement.

### a. Mr. Lambs Lack of Focus Defeated the Adversarial Process

292. Mr. Lamb's lack of focus and inability to narrow in on topics of substance defeated the adversarial process. There was a particular instance where the complainant was questioned about

her furniture after she gave up her apartment in June (Tr. Pg. 260 at ¶ 7-18). The complainant admits she put those items in storage (Tr. Pg. 260 at ¶ 19-22), then Mr. Lamb states:

- ☺ Mr. Lamb: "Okay. Just in case something didn't work out right with Anthony, you would have some furniture; is that right?" (Tr. Pg. 260 at ¶ 23-24)

- ☺ Complainant: "Yes." (Tr. Pg 269 at ¶ 25)

- ☺ Mr. Lamb: "As of June 30th when you moved in with Anthony to the Merry Mount street address, everything was fine between you and Anthony; is that right?" (Tr. Pg. 261 at ¶ 1-3)

**293.** After asking about August 1st, 2009, and reminding her that was the day she co-signed a lease with me and moved in together he pursues questions like "Who helped you move?", then jumps back to July 9th, 2009, about her first individual counseling session she had. Mr. Lamb fails to ask meaningful questions that cross examine the complainant effectively like:

- ☺ "Why would you move in with the defendant after being beaten, choked and raped on July 17th, 2009, and two more times in the last 3 days before moving in on July 28th and July 31st, 2009, when your stuff was in storage in case something went wrong like you just testified?"

- ☺ "Why didn't you leave, confide in family, friends, co-worker's or your counselor?"

294. Mr. Lamb's lack of focus then leads him back to Memorial Day where he once again bypasses the opportunity to impeach the complainant and damage her credibility when he fails to introduce pictures and question the complainant in depth about getting her tongue pierced in the first few weeks of the relationship, before going to Amish country and then to visit her cousin in Delaware. (Tr. Pg 261 at ¶ 6-23)

- Mr. Lamb: "As a matter of fact, and I don't mean to embarrass you or anything, but at some point you posed nude for him? This was meant for his eyes, but you posed nude for him?" (Tr. Pg. 261 at ¶ 24-25, Pg. 262 at ¶ 1-2) Complainant: "Yes." (Tr. Pg 262 at ¶ 3)

- Mr. Lamb: "As a matter of fact I believe you had your tongue pierced and had some kind of -- ...Did you have, like, some kind of an object stuck in your tongue that you were displaying in some of the pictures?" (Tr. Pg. 262 at ¶ 4-5, 8-9) Complainant: "Yes." (Tr. Pg. 262 at 16)

- Mr. Lamb: "And I believe you indicated yesterday at some point you had some sex, and then Anthony wanted oral sex and you had a fight with him; isn't that right? ...an argument?" (Tr. Pg. 262 at ¶ 17-19, 21-24)

295.  Mr. Lamb's fails to cross examine the complainant on why she got her tongue pierced with a pin and small metal ball on the end in the following ways:

- "Isn't it true you had your tongue pierced to enhance the oral sex you performed on Anthony?"

- "What was your purpose for getting your tongue pierced just weeks after dating Anthony?"

- "Who was with you when you got your tongue pierced and who paid for it?"

296.  Mr. Lamb's failure to introduce the picture clearly displaying her laying nude in a Jacuzzi with her tongue sticking out at this moment, displaying the piercing while smiling and happy; caused the loss of testimony that proved the complainant had a propensity for doing painful things as a tongue piercing is very painful, and shows her promiscuity at a very early stage of the relationship.

297. Furthermore, the defendant provided numerous other pictures of that night and shortly after it, which all would have been allowable into evidence under exceptions to the Rape Shield statutes various exceptions (Aff. at ¶ 218-222) which were taken in the hotel room that night. Mr. Lamb's lack of focus and knowledge of the law caused him to lose an opportunity to create a meaningful challenge to the adversarial process.

298. When Mr. Lamb finally gets back to the issue of moving in with the defendant on August 1st, after asking the complainant if she was raped on July 28th and July 30th (Tr. Pg. 268 at ¶ 5-12), he has to remind the complainant she moved into a new apartment with the defendant and co-signed a lease, while her stuff was still in storage. (Tr. Pg. 268 at ¶ 13-25, Pg. 269 at ¶ 1-23)

299. Once again, Mr. Lamb fails to ask any type of substantial questions, and instead focused on "Did anybody help you move?" (Tr. Pg. 269 at 5)

300. Mr. Lamb then jumps backward again and asks "By the way, you had - - during the period of time when you were with Anthony, you were seeing a counselor, were you not?" (Tr. Pg. 269 at ¶ 24-25, Pg. 270 at ¶ 1) The Complainant answers "I was seeing a therapist." (Tr. Pg 270 at ¶ 2)

### b. Mr. Lamb's Lack of Direction Prevents Him From Focusing on Substantive Issues With A Coherent Trial Strategy

301. Mr. Lamb's confusion and inability to effectuate effective cross examination is obvious when he consistently fails to press any logical line of questioning that could damage the credibility of the complainant. His trial strategy was non-existent; he consistently jumps back and forth between dates and issues with no substantive questioning or purpose. He completely bypassed questioning the complainant about pushing the defendant down a flight of stairs on

August 3rd, 2009 (Aff. at ¶ 176, 229), and instead jumped forward to August 24th, 2009. (Tr. Pg. 271 at ¶ 16-17)

302. When Mr. Lamb stumbles upon and returns to this line of questioning on re-cross concerning August 3, 2009, he asks the complainant "Didn't you and Anthony have a fight in Early August in which - - and you had left the Sylvaton address and spent the night at your mother's house because of the fight?" (Tr. Pg. 295 at ¶ 2-5) The complainant answers "No." then states "The following day my mother called me and her attitude was you made your bed now you lay in it." (Tr. Pg. 295 at ¶ 6-10) Mr. Lamb rewords the question and she repeats no then he drops the line of questioning completely. (Tr. Pg. 295 at ¶ 11-14) The complainant was non-responsive and he did not direct her to answer the question he had presented.

303. I repeatedly asked Mr. Lamb to subpoena complaint # 2009-094-00510, which was filed at 5:10 a.m. in the 94th precinct in Brooklyn, minutes from her mother's house; but he adamantly refused. (Aff. at ¶ 176)

### c. Mr. Lamb's Critical Failure to Address the Weekend in the Pocono's

304. Mr. Lamb jumps forward from August 24th, 2009 to September 21st, 2009 (Tr. Pg. 273 at ¶ 2-4), then goes back to the weekend of September 18th through 20th, when we spent an all inclusive weekend in a Pocono's resort called Paradise Stream. (Tr. Pg. 273 at ¶ 6-14)

305. The complainant is non-responsive to the following question, "And during that period of time, did you - - were you and he intimate?" (Tr. Pg. 273 at ¶ 15-16) and she responds "At one point it turned violent." (Tr. Pg. 273 at ¶ 17)

306. Once again, Mr. Lamb should have immediately objected to strike as non-responsive. Instead of directing the complainant's testimony in a meaningful and purposeful direction, he

allows the complainant to go into a rambling tirade about drinking and violence. (Tr. Pg. 273 at ¶ 18-25, Pg. 274 at ¶ 1-21) .

307. The inability for Mr. Lamb to focus on any line of substantive questioning about the weekend in the Pocono's becomes painfully obvious when he is cross examining the complainant about September 19th, 2009 and allows her to testify about July 19th, and then apologizes when the Court intervenes to correct him (Tr. Pg. 273 at ¶ 22-25 Pg. 274 at ¶ 8-18); upon which he abandons his line of questioning to spend  time discussing "some other time" concerning breaking shot glasses, which had no relevance or importance in a rape case. Mr. Lamb spending time on this topic, which has no strategic purpose then much more viable issues, was at a great prejudice to the defense. (Tr. Pg. 274 at ¶ 22-25,  Pg. 275 at ¶ 1-21)

308. The failure of Mr. Lamb to inquire about her Grand Jury testimony and the alleged fight which occurred in the Pocono's (Tr. Pg. 273 at ¶ 6-25, Pg. 274 at ¶ 1-20), and his failure to question her of what happened on September 18th, 2009, were critical errors. As the diary reveals, the complainant alleged in 1 and ½ pages of the diary entry dated September 18th, 2009 that the defendant beat, choked her to unconsciousness and raped her (EX. "Q") The failure of Mr. Lamb to question the complainant why she would travel to a remote area of Pennsylvania in the mountains literally hours after recording that entry on September 18th, 2009 defeated the adversarial process in proving the complainant fabricated the charges against the defendant.

309. Instead, Mr. Lamb abandons the line of questioning concerning this romantic weekend together and jumps forward to September 28th, 2009, completely skipping over and leaving unchallenged the allegation of Attempted Rape on September 25th, 2009, and spends an inordinate amount of time talking about her underwear and panty liner (Tr. Pg. 276 at ¶ 4-25, Pg. 277 at ¶ 1-25, Pg. 278 at ¶ 1-18) Furthermore, his attempts to insure the only prosecution

witness, Ms. Mach; testified to events on specific dates and not to the "end of September", was grossly inadequate, incompetent and less then what a reasonable attorney would be expected to employ, and allowed speculation of the jurors as to what event during the end of October she was actually testifying about.

### d. Mr. Lamb's Critical Failure to Object And Effectively Cross-Examine Ms. Mach And The Complainant Concerning The Conflicting Accounts of "The End of September" Was An Inexcusable Error

310.   Mr. Lamb reveals his inability to perform a few of the most important aspects of the adversarial process, contemporaneous objections and effective cross-examination, during the cross-examination of the prosecution witness Ms. Mach, the defendant's downstairs neighbor, and the complainant about the events occurring at the end of September.

### (A1) Direct and Cross-Examination of Prosecution Witness Ms. Mach

311.   ADA Rajeswari elicits information from Ms. Mach about the location of the defendant's bedroom. (Tr. Pg. 352 at ¶ 12-22) Ms. Mach testifies that the defendant's bedroom is right above hers.

312.   If Mr. Lamb would have performed a basic investigation of the crime scene, the defendant's apartment, he would have then discovered the defendant's bedroom was on the third floor and not directly above Ms. Mach's bedroom.

313.   Mr. Lamb's failure to cross-examine Ms. Mach to ascertain if she was ever in the defendant's apartment left the jurors with the impression of unsubstantiated facts that were in fact incorrect, and failed to prove that Ms. Mach had no direct knowledge where the defendant's bedroom was located.

314. ADA Rajeswari elicits information concerning when Ms. Mach goes to sleep during August into September of 2009 and Mr. Lamb objects as to what specific day. The Court intervenes and allows the witness to answer. (Tr. Pg. 352 at ¶ 23-25, Pg. 353 at ¶ 1-12)

315. ADA Rajeswari then draws the witnesses' attention to the end of September 2009 and asks the generic questions "Do you remember the last time that his fiancée lived at Sylvaton Terrace?" Ms. Mach responds "Yes", and then asks "What, if anything, did you hear that night from your bedroom?" What, if anything, **happened**, did you hear anything that night?" (Tr. Pg. 353 at ¶ 13-25, Pg. 354 at ¶ 1-4)

316. Mr. Lamb's failure to object to the question of when defendant's fiancée last lived at Sylvaton Terrace was error, as his fiancée stayed at apartment for weeks after the last alleged incident. Furthermore, his failure to object as to what specific day at the "end of September" as Mr. Lamb just previously did was also a critical error as the defendant was accused of three alleged crimes within less then 1 week at the end of September. This allowed the jury to speculate about what day the witness was testifying about; when in fact she had no independent and specific recollection about when these events occurred. This defeated the adversarial process and prejudiced the defendant.

317. The defendant was found not guilty of events occurring on September 21st, 2009, and Mr. Lamb failed to raise a defense by challenging the complainant's version of events on September 25th, 2009, thereby conceding Guilt to this alleged crime (Aff. at ¶ 328-332). This decision by trial counsel served no tactical reason or strategic purpose, amounted to taking a position contrary to the defense and seriously prejudiced the defendant's ability to impeach or discredit this witness.

318.  Furthermore, ADA Rajeswari specifically elicited what "happened" upstairs from the witness while acknowledging she was in her bedroom downstairs and not present, a question clearly designed to elicit speculative and prejudicial testimony; yet Mr. Lamb failed to contemporaneously object and allowed the witness to repeatedly enter this clearly inadmissible testimony into the record in great detriment and extreme prejudice to the defendant. (Tr. Pg. 354 at ¶ 5-25, Pg. 355 at ¶ 1-14)

319.  The following testimony elicited substantiated that the day Ms. Mach is testifying to could not have been September 28th, 2009 when compared to the complainant's testimony.

     ℭ  ADA Rajeswari: "…in the end of September, the last time his fiancée lived with him, what, if anything, did you hear that night?"

     ℭ  Ms. Mach: "I hear this time, maybe nine, maybe ten - -."

     ℭ  ADA Rajeswari: "At night?"

     ℭ  Ms. Mach: "Yes, night, Mr. Rucano fiancée go to bed. Soon - - as **soon start to sex,** and the fiancée no want. Start screaming, I no want, leave me alone." {Emphasis Added] (Tr. Pg. 354 at ¶ 2-9)

320.  The following critical testimony allows Ms. Mach to clarify, with ADA Rajeswari's help, and explain the reason why Ms. Mach believed we were having sex upstairs at the "end of September."

     ℭ  ADA Rajeswari: "Miss Mach, what about the beginning of August, after Mr. Rucano and his fiancée moved in, did you hear anything in early August, the beginning of August?

     ℭ  Ms. Mach: "Well, this is - - in night, every night - - maybe not every night, but lots of times have very loud sex. She scream."

     ℭ  Mr. Lamb: "Objection Judge."

ℛ The Court: "Sustained as to sex."

ℛ ADA Rajeswari: "Go ahead."

ℛ Ms. Mach: "She scream."

ℛ ADA Rajeswari: "One second. Just tell us what you heard, not what you thought happened. What did you actually here from **your bedroom downstairs**?" {Emphasis Added]

ℛ Ms. Mach: "Yeah, I listened to bed, have bed for metal, like - -."

ℛ ADA Rajeswari: "Springs."

ℛ Ms. Mach: "Yes, like springs working, because this mean – I don't know. I don't know, it's very loud, very loud working. The bed working, very noisy." (Tr. Pg. 357 at ¶ 2-19)

321.  It is at this point Ms. Mach clarifies that she equates hearing the bed working to mean the couple upstairs were having sex, as stated by Ms. Mach when asked about what happened at the "end of September" by ADA Rajeswari. Ms. Mach clearly states "…as soon start to sex…" at "…time, maybe nine, maybe ten" when referring to this day.

322.  A close examination of the complainant's own testimony on direct examination for September 21st, 25th and 28th of 2009, clearly and unequivocally substantiates and proves beyond a reasonable doubt that this testimony of Ms. Mach could **not** have been about the night of September 28th, 2009. Keep in mind that the defendant was found not guilty of all crimes on September 21st, 2009, which was 24 hours after returning from a Romantic weekend in the Pocono's where she admitted we had sex multiple times; and that no rape (or bed working during sex) occurred on September 25th, 2009.

### (A2)  Direct Examination of Complainant about September 21, 2009

323.   The complainant states she got home and we had an argument about some jewelry, that the defendant allegedly grabbed her and then bit her finger. (Tr. Pg. 183 at ¶ 5-25, Pg. 184 at ¶ 1-25, Pg. 185 at ¶ 1-8)

324.   The complainant then states the defendant allegedly choked her, told her she was going to be nice to him while pulling on her shorts until she blacked out. (Tr. Pg. 185 at ¶ 9-25)

325.   ADA Katchen had the complainant clarify this was happening in the **bedroom**. Then allegedly the complainant fell unconscious and when she woke up the defendant was still pulling on her shorts until she finally succumbed and they had sex. (Tr. Pg. 186 at ¶ 1-25, Pg. 187 at ¶ 1-6)

326.   The defendant was found not guilty by the petit jury on all charges related to this date. That night the complainant had a fight with defendant when she first got home because, as the defendant testified; we had just come back from an all inclusive romantic weekend in the Pocono's and the defendant had run up all his charge cards and that morning had asked to borrow money from her. When the complainant came home that night she had her nails and hair done, which caused them to argue and it turned physical. Both of them physically abused each other, a fact the defendant never denied.

327.   The complainant later that night initiated sex with the defendant and was quite enthusiastic and very vocal. The complainant had been consistently using sex with the defendant as a way to coerce and convince him that she would open up more and change when in fact she was lying. At some point after the defendant told her he wanted to separate and return to his common law wife and 7 children, she started using these fights to lay the groundwork for her plan to falsely accuse the defendant of rape.

**(A3) Mr. Lamb's Critical Failure to Cross-Examine the Complainant In Any Way About September 21 and 25, 2009 Amounted to Counsel Being Unavailable During a Portion of the Trial**

328. Mr. Lamb's cross examination of the complainant about September 21st, 2009 was non-existent. Furthermore, he greatly prejudiced the defendant by beginning every line of questioning to the complainant like this, "I believe you indicated that next time after August 24th that Mister - - that Anthony forced himself on you was September 21st, is that correct?" (Tr. Pg. 273 at ¶ 2-4)

329. The way Mr. Lamb asked these questions reinforced the prosecutions theory of the events, that the sex was forced; and was a position contrary to the defense. Mr. Lamb should have stated "I would like to direct your attention to September 21st, what if anything happened that day."

330. Then, Mr. Lamb completely bypasses the date of September 21st and asks the complainant about the Pocono's, then spends time talking about shot glasses and jumps directly to September 28. (Tr. Pg. 274 at ¶ 22-25, Pg. 275 at ¶ 1-21)

331. Mr. Lamb jumps forward from August 24th, 2009 to September 21st, 2009 (Tr. Pg. 273 at ¶ 2-4), then without addressing September 21st, 2009 at all; goes back to the weekend of September 18th through 20th, when we spent an all inclusive weekend in a Pocono's resort called Paradise Stream. (Tr. Pg. 273 at ¶ 6-14) Mr. Lamb then jumps forward to September 28th, 2009, completely skipping over and leaving unchallenged the allegation of Rape on September 21st, 2009 and Attempted Rape on September 25th, 2009.

332. The critical failure of Mr. Lamb to cross-examine the complainant on the events is clear from review of the trial testimony and amounts to a concession of guilt in the eyes of the jury.

※ PG 81-84 ※ Critical ※

**(A4) Direct Examination of Complainant about September 28, 2009**

333.   The Complainant had admitted that after an argument when she first got home, that the defendant left and she "knew what was going to happen that night." (Tr. Pg. 192 at ¶ 2)

334.   ADA Katchen asked the complainant "Why didn't you leave the apartment?" concerning September 28th, 2009 and the complainant stated "Because he has a car and if I took the bus he would track - -." (Tr. Pg. 192 at ¶ 7-11)

335.   Mr. Lamb objected, it was overruled and the complainant was directed to finish the answer, and she stated "He would track the bus down. I wouldn't get to the bus stop on time." (Tr. Pg. 192 at ¶ 12-16)

336.   The complainant then stated the defendant was gone for fifteen or twenty minutes, and that she hid her purse and cell phone. (Tr. Pg. 192 at ¶ 17-23)

337.   The complainant states the defendant returned home and came toward the bed and tried to grab her. She sprayed him with hairspray and then he knocked her to the floor then punched and choked her, at which point she ran upstairs. (Tr. Pg. 193 at ¶ 20-25, Pg. 194 at ¶ 1-6)

338.   There was no testimony as to sex at this time. The complainant then states the following important facts when asked by ADA kitchen "What happened upstairs?" The Complainant replied "When I ran upstairs he was - - he came behind me, he started closing the living room door and he started closing all the windows. He started putting the TV on real loud and I'm screaming. And I screaming **hoping** that my neighbor downstairs hears me." [Emphasis Added] (Tr. Pg. 194 at ¶ 8-12)

339.   The Complainant then states that while upstairs we fought, I pulled her shorts and underwear off and **"he grabbed me onto the bed"** then forced her legs open and we had sex. [Emphasis added] (Tr. Pg. 195 at ¶ 1-16)

340.   This testimony that was left unchallenged by Mr. Lamb was critical. It is at this point in the complainant's own testimony that she admits our bed was upstairs, on the 3rd floor, and not on the 2nd floor above where Ms. Mach testified it was. Mr. Lamb should have recalled Ms. Mach to the stand for impeachment purposes as to the events of September 28th to show the jury that according to the Complainant's own testimony on direct examination she could not have possibly been recalling the events of September 28th, 2009. Mr. Lamb had the following critical cross-examination fodder for his possible direct examination of the Ms. Mach.

- "The complainant just testified that on the night of September 28th, 2009, she ran up the stairs and Anthony closed all the windows and doors and turned the TV on loud. She also testified that the alleged events that occurred that night happened on the third floor in their bed."

- "Ms. Mach, isn't it true that your testimony was incorrect, and that in fact you heard nothing that night, but instead were referring to the beginning of August, when the defendant had used the bedroom downstairs where the complainant's bed was an old spring platform and mattress."

- "Ms. Mach, isn't it true when Detective Wasson interviewed you the day after the incident, you said 4 words to him 'heard fighting, then shower?' Ms. Mach, explain to the jury how one year later, you can suddenly recall all these details of what allegedly happened?"

- "Ms. Mach, can you recall what documents the District Attorney had you look at when he called you down to his office to review your testimony?"

- "Ms. Mach, isn't it true that after the first few weeks of August you no longer heard a bed working real noisy, because when you complained about the noise the defendant moved

his bedroom to the third floor where he had a platform bed with no springs, just a solid platform that made no noise."

Ⓠ "Ms. Mach, isn't it true that according to the complainant's testimony your testimony to the end of September was in fact incorrect, and you have no idea when the events you described actually occurred."

341.   The crucial error of Mr. Lamb not objecting to Ms. Mach testifying as to the "end of September" allowed all the critical testimony of the complainant concerning September 28th, 2009 to go unchallenged, crippling the defendant's ability to impeach the complainant and Ms. Mach. Combining this with Mr. Lambs failure to cross-examine the complainant about September 21st and September 25th, 2009, he created a perfect storm of errors so damaging that the defendant could not have possibly received a fair trial with an outcome worthy of confidence.

*Critical Pg 84-86*

√ (A5)  Cross- Examination of Complainant about September 28, 2009   √

342.   Although Mr. Lamb had a plethora of cross-examination fodder to discredit the complainant, his lack of the most basic and important trial skill of cross-examination becomes painfully obvious, critically damaging the defense. The importance of effective cross-examination was critical in a case where the deciding factor in the case revolved around credibility. This is summed up by Dean-Wigmore who termed cross-examination as "the greatest legal engine ever invented for the discovery of truth." When this process is impaired the adversarial process comes to a halt, which is what happened here at a great prejudice to the defendant.

343.   Mr. Lamb starts his cross-examination of the complainant by repeating her testimony over and over bolstering and supporting her version of the facts. He states "[d]id you testify that he forced you to have sex, sexual intercourse with him, is that right, on September 28[th]?" She

84

responds "Yes." Mr. Lamb then asks "That he had first taken your clothes off; is that correct?" She responds "Yes." Mr. Lamb asks "Your underwear off, and panty liner?" She responds "Yes." (Tr. Pg. 275 at ¶ 25, Pg. 276 at ¶ 1-8)

344.   He then spends time asking what the defendant did with her clothes, panty liner and menstrual pad. Mr. Lamb then focuses on if she took a shower and what she went to bed wearing, then asked if she went to work the next day and if she put on new underwear and a panty liner. (Tr. Pg. 276 at ¶ 9-25, Pg. 277 at ¶ 1-25, Pg. 278 at ¶ 1-18)

345.   None of this is adversarial in any fashion; all Mr. Lamb is doing is confirming and validating her testimony under direct examination by ADA Katchen.

346.   At this point Mr. Lamb's failure is exacerbated when he asks the complainant about the voice mails she recorded (Aff. at ¶ 188-196). The Complainant's testimony concerning these voice mails were previously discussed in extensive detail and show that she had a clear motive to use these for the purposes of revenge (Aff. at ¶ 197-205)

347.   He also asks about emails the complainant admits that she received emails from the defendant, but when asked "And did he email you, send emails to you telling you he was going to leave you?" She responds "No." (Tr. Pg. 282 at ¶ 25, Pg. 283 at ¶ 1-5) Mr. Lamb was made known shortly after representing the defendant that he had numerous emails he sent to the defendant, a few of which directly related to the fight in the beginning of August and the defendant's willingness to separate and help her move out. (Aff. at ¶ 223-229)

348.   Mr. Lamb then touches on the complainant's therapy sessions, when in fact the session he was referring to was a couples counseling session; and he asks "[d]idn't he say even in front of your therapist that he was going to leave you?" She answered "No." Mr. Lamb then asks "during the period of time that you were living with Anthony and seeing your therapist did you

ever tell your therapist that he was sexually abusing you?" Now the complainant says "I don't recall if I did" and she repeats that when asked if she ever told her mom, brother sister, friends and co-workers. (Tr. Pg. 283 at ¶ 8-25, Pg. 284 at ¶ 1-19)

349.   Mr. Lamb then asked the complainant "After he told you that, isn't it a fact that you began screaming and hollering and stomping your foot on the floor?" and "So in an effort that the neighbor downstairs would think that you and he were fighting?" The complainant responds "No." (Tr. Pg. 285 at ¶ 21-25, Pg. 286 at ¶ 1-11). This testimony directly contradicts the complainants own testimony on direct examination by ADA Katchen. (Tr. Pg. 194 at ¶ 8-12)

### (v) Failure to Cross Examine Complainant on Prompt Outcry

350.   During the proceedings held before trial on July 7th, 2010, Mr. Lamb addressed the Court concerning several pages of the complaining witness's diary being provided to him. He explained after "extensive conferences with the D.A.'s office with regard to the diary and with regard to in general the notation that the complaining witness made a timely outcry with regard to this, I am just now being provided with a copy of the diary which seems to indicate she wrote in the diary that she had been sexually abused." (EX. "X") (July 7th, 2010, Tr. Pg 3 at ¶ 24-25, Pg. 4 at ¶ 1-6)

351.   The Court stated "You are equating a diary entry with a prompt outcry?" Mr. Lamb responded "Yes, Judge." The Court responded "I don't understand. Who would the outcry be to? The diary?" Mr. Lamb then states "That there was some notation in the diary regarding sometime around the time when the alleged crimes were being committed, some kind of notation in the diary indicating that the defendant had sexually abused her." The Court just states "Okay. So you have it." (Tr. Pg. 4 at ¶ 7-17)

352. From this exchange it is clear that Mr. Lamb has no knowledge of the law concerning prompt outcry, which is supported by his failure to provide any adversarial process to elicit that there was no prompt outcry in this case throughout trial.

353. On July 16th, 2010, another exchange occurs in relation to this diary and its importance in this case. (EX. "Y") Mr. Lamb extensively argues for a handwriting expert to examine the diary.

354. Mr. Lamb then states "For the record I did serve the social worker Ms. Marco [Moramarco] with a subpoena for her records. I believe she has contacted those Courts that those records will be forthcoming." The Court responded in relevant parts "I'll do an in camera inspection and we'll keep you advised. Just so the record is clear, my recollection Mr. Lamb, you told me you were interested in examination of those records with regard to whether or not the complainant made a prompt outcry to the therapist." Mr. Lamb responded "That's correct." (July 16, 2010, Tr. Pg. 5 at ¶ 16-25, Pg. 6 at ¶ 1-6)

355. Once again Mr. Lamb refers to the intention of raising the failure of prompt outcry to the complainant's therapist but never raised the issue or used those records during trial. It is important to note that the complainant was under the care of this social worker throughout the entire time the complainant alleges these crimes occurred. The failure of Mr. Lamb to cross-examine the complainant on prompt outcry served no tactical reason or strategic purpose and defeated the adversarial process, at great prejudice to the defendant.

✓   **a. Failure To Use Session Notes of Licensed Clinical Social Worker Anna Lorusso-** ✓
**Moramarco To Cross-Examine Complainant on Prompt Outcry Was A Position Contrary**
**To The Defense**

356. Licensed Clinical Social Worker Anna Lorusso-Moramarco was treating the complainant in individual counseling sessions starting on July 9th, 2010. Shortly thereafter, I arranged for us to go to separate couples counseling sessions billed to my insurance. Judge Rooney released 1 individual session note of the complainant as potential Brady material on September 8, 2010 (J.S. Tr. Pg. 28 at ¶ 11-25), and all three couples counseling session notes on September 9, 2010 (J.S. Tr. Pg. 223 at ¶ 10-15), after the complainant and the defendant each waived there right to confidentiality on the record. (J.S. Tr. Pg. 223 at ¶ 1-5, Pg. 224 at ¶ 1-5)

✗   357. In the individual session note of the complainant dated July 21st, 2009, which is redacted for privacy reasons, it shows the complainants propensity to initiate violent behavior. (EX. "SS") Mr. Lamb failed to use this potential Brady material to show the complainants violent tendencies and otherwise inquire further about her actions directly after the first alleged incident claimed by the complainant.

✗   358. In this individual session between her and Ms. Mormarco she offers, "Duane stated they had a really big fight on Friday night. She had gone out with friends. When she came home he was yelling at her, she got angry and swung at him and he in turn punched her in the eye." (EX. "SS")

359. The complainant's contemporaneous prompt outcry to her social worker on July 21st, 2009, 4 days after it happened; admit that during a verbal argument she swung at the defendant first. Of course, she fails to state she punched me in my face while driving (Tr. Pg. 385 at ¶ 3-

12). The complainant's testimony at the grand jury almost 2 ½ months later is surprisingly more detailed, especially when reading from her diary of fabrications. (Aff. at ¶ 91-109)

360.  More importantly, there was no prompt outcry of rape 4 days after it allegedly occurred as Ms. Moramarco a Licensed Clinical Social Worker, would have been duty bound to report it. At this point there was no "learned helplessness" of a person allegedly suffering from battered woman's syndrome, no testimony by the complainant of threats. The failure to use these session notes to impeach her was a position contrary to the defense, as they supported the theory of the defense that these allegations were fabricated.

361.  The session note for July 28th, 2009 (EX. "TT") is clearly marked "This was a couple's session" and confirmed the defendant's claims of her inability to communicate and being intimate and withdrawn during sex. (Tr. Pg. 389 at ¶ 1-4)

362.  Mr. Lamb pursues a line of questioning that takes a position contrary to the defense when he asks "Okay, Matter of fact, didn't you invite Anthony to sit in on several sessions, turn it into couples' sessions?" (Tr. Pg. 270 at ¶ 21-25). This was in direct contradiction to my testimony that these sessions were requested by me and completely separate from the complainant's individual sessions on different days. (Tr. Pg. 401 at ¶ 8-23, Pg. 402 at ¶ 16-20)

363.  Mr. Lamb consistently attempts to impeach his own client's testimony by stating that the complainant invited the defendant into her sessions A subpoena for the social workers billing records would have revealed the sessions were indeed billed to the defendant's insurance of which the complainant was not a part of. Mr. Lamb failed to subpoena Ms Moramarco as a hostile witness which would have exposed the complete contents of the session notes which revolve exclusively around the defendant. This would have shown his effort to receive

counseling in the relationship, and impeached the complaining witness' testimony as to the truth of her statements.

364.  Mr. Lamb's failure to use the session notes and to call Ms. Moramarco as a witness prevented him from pursuing proof that the complainant never made prompt outcry to her counselor.

## b. Email Sent by Defendant to Steve Frankl

365.  On July 17th, 2009, the defendant sent an email to his friend Steve Frankl. He stated in email "Hold onto this, problems with girlfriend" and attached a word document called KatherineProblems.doc. (Tr. Pg. 386 at ¶ 11-14)

366.  The word document sent with the email was prompt outcry by the defendant concerning the growing concern defendant was having about his now live-in fiancées erratic behavior and surprisingly, is the same date as the first entry in the complainant's alleged diary. The contents of the document, in which a certified copy is available by subpoena from Yahoo, the internet service provider; was sent on July 17th, 2009 at 10:50 and 40 seconds P.M. and states the following:

> "I picked her up from the ferry and she started talking about killing herself. She started hitting herself then bit me and punched me in the face; I had to defend myself so I grabbed her hand. She tried to make me crash my car so I hit her in the side of the face. She calmed down and we got home then she started cursing me and telling me she was going to stab me in my sleep then sad she was going to call the cops and say I hit her. She has a history of trying to kill herself, I have been trying hard to get her to counseling and she started 2 weeks ago, but I think her talking about the past is making her worst. This morning in the car she started talking about killing herself, I told her not to play around

like that but I could not tell if she was serious or not. She is in the bathroom smoking a cigarette, I have ice on my eye and I have her teeth marks in my arm, I don't want to call the cops on her so I am writing this and sending it to a few friends of mine So I have some proof of what is going on. I spoke to my friend Jimmy Owens and also Ray Mojica from NYCT, Coney Island yard about the problems I have been having with Katherine for the past few weeks. I hope she calms down but I need to protect myself now because I don't know if she will try to stab and kill me or kill herself." Anthony Rucano 10:45 pm on 7/17/09

367. This email provides details concerning the problems between the complainant and defendant. The complainant observed me as I was sending this email and asked me what I was doing and I told her (Aff. at ¶ 87). It is at this point that the complainant formulates her "plan" to create the diary.

368. The fact is the diary was a fabrication from the start, recording our fights which actually occurred; in a way that portrayed her as a victim. In fact, the trauma and pain she was experiencing from her past rape by a family member in her childhood (Tr. Pg. 240 at ¶ 7-20), combined with her now being in a relationship which was open, loving and caring scared her to death and started her on a path to self-destruction because of her lack of self worth.

369. On September 8th, 2010, Steve Frankl was brought to the attention of the court. (J.S. Tr. Pg. 5 at ¶ 9-10) Again, on September 15th, 2010, there was a discussion of upcoming defense witness', and Steve Frankl was on that list (Tr. Pg. 333 at ¶ 15-19), yet Mr. Lamb never attempted to contact Mr. Frankl who was ready and willing to testify.

370. Mr. Lamb's failure to cross examine the complainant about the email sent on July 17th, 2009 that night produce it, then call Steve Frankl as a defense witness was a critical error to a case where the credibility of the complainant was precarious at best.

### E. Defense Counsel Took A Position Contrary to the Defense

371. Defense counsel was responsible for errors of commission and omission, which caused him to take a position contrary to the defense. Such decisions were not strategic in nature and served no tactical reason or strategic purpose, and they did not further the adversarial process.

### (i) Mr. Lamb's Failure to Call Forensic Document Examiner Robert Baier to the Stand to Testify Was a Position Contrary to the Defense

372. I contacted Mr. Baier in February 2010 and on March 2nd, 2010; Mr. Baier sent me a requested confirmation letter for Case # 1009-455-4, which was notarized. (EX. "UU") He stated in brief that he prepared court displays and booklets in preparation for trial on September 15th, 2010. Mr. Baier specifically stated the following:

- "I was told to be at court on September 15th by both Mr. Rucano with confirmation the night before and by attorney Eugene Lamb. Upon my arrival I was told my services would no longer be needed in this case."

- "I have enclosed an affidavit (EX. "VV") which explains in great detail everything that transpired in only 4 business days which was prepared and submitted to the Assigned Counsel Plan 18b. This is an unsigned un-notarized copy of the affidavit with the original being signed and notarized and is on file with the Assigned Counsel Plan 18b."

373. Mr. Lamb's sudden and unexplained reason for not introducing the diary into evidence by asking her on cross-examination how she remembered all the dates at the Grand Jury, where

there was no mention in any law enforcement report of any crimes on any other date but September 28th, 2009 (Aff. at ¶ 41); had no tactical reason or strategic purpose and was a position contrary to the defense.

374.  Beside Mr. Lamb petitioning for an expert on July 7th, 2010 (EX. "X") and again in a written motion on July 16th, 2010 (EX. "Y"), he stated the following during the first 2 days of trial:

- ☺ Mr. Lamb: [September 13th, 2010] "Before we do that, Judge, my handwriting expert did in fact have an opportunity to and did in fact examine the diary at the D.A.'s Office...I feel he has evidence value and I _intend_ to call him as an expert witness on behalf of the defense offer his testimony offer him as an expert." {Emphasis Added] (Tr. Pg. 58 at ¶ 8-16)

375.  Mr. Lamb goes further to highlight the importance of the witness to testify and the concern for the expert's time due to a death in his family.

- ☺ Mr. Lamb: [September 13th, 2010] "As far as scheduling is concerned, he comes from Warwick, New York, and recently had a death in the family, as a matter of fact, his mom - -." (Tr. Pg. 59 at ¶ 10-13)

- ☺ The Court: "You want to put him out of order on Wednesday." (Tr. Pg. 59 at ¶ 14-15)

- ☺ Mr. Lamb: "I'd like to be able to call him, if necessary, out of order on Wednesday afternoon; is that all right with the Court?" (Tr. Pg. 59 at ¶ 16-18)

- ☺ The Court: "It's fine with me." (Tr. Pg. 59 at ¶ 19)

- ☺ Mr. Lamb: "Thursday he may have to go back to Massachusetts to make further arrangements regarding his mother's funeral." (Tr. Pg. 59 at ¶ 20-22)

376.   The next day the Honorable Judge Rooney confirms with Mr. Lamb about Mr. Baier, the handwriting expert, testifying tomorrow.

⊘ The Court: "And your handwriting expert is not available until tomorrow afternoon?" (Tr. Pg. 231 at ¶ 10-11)

⊘ Mr. Lamb: "Yes." (Tr. Pg. 231 at ¶ 12)

377.   Keeping in mind that Mr. Baier got confirmation to come to court the next day on Tuesday night, September 14th, 2010, from both the defendant and Mr. Lamb (Aff. at ¶ 257-259), and the fact that Mr. Baier drove over 2 hours from Warwick N.Y. to court to testify that morning; here is what Mr. Lamb stated a short while after cross examining the complainant the next day.

⊘ Mr. Lamb: "We took a short break after I finished my cross examination of the complaining witness in this case and I thought I had communicated clearly with my client that I was prepared to rest and did he have any other problems. He is now telling me that he did not understand and that he is protesting the fact that I did not make any reference to the diary which would then allow the expert witness to testify. *In my judgment it shouldn't have come in and no reference should have come in on the cross examination and therefore we make the expert's testimony irrelevant. He is protesting that."* [Emphasis Added] (Tr. Pg 331 at ¶13-25, Pg. 332 at ¶1)

⊘ The Court: "You've made your record. There's nothing for me to say." (Tr. Pg. 332 at ¶ 2-3)

✱ 378.   In Mr. Baiers affidavit submitted to the Assigned Counsel Plan (EX. "VV") on Page 3, paragraph 8, he states, "When I arrived home I contacted my client and client's attorney to find

out what happened and was told that the District Attorney decided not to enter the diary into evidence."

379.  This complete contradiction by Mr. Lamb to refuse to cross examine the complainant about her initial reports of the incidents to ADA Katchen just prior to her grand jury testimony, with questions concerning how did she remember the alleged rapes in question in such detail; served no tactical reason or strategic purpose.

380.  Furthermore, Mr. Lamb, who was so concerned with Mr. Baiers time and being able to have him testify because of the death of his mother, showed no concern at all by making him drive down from Warwick, N.Y., in over a 2-hour drive; just to be told he was not needed.

381.  On October 5th, 2010, the defendant was produced for sentencing and made a statement concerning Mr. Baier, and then Mr. Lamb makes a record concerning his conduct at trial.

- Mr. Lamb: "I mean the major thrust of my conduct at trial is my belief that if the use of the diary then introduced a handwriting expert to impeach the diary would have been harmful." (Tr. Oct. 5, Pg. 8 at ¶ 25, Pg. 9 at ¶ 1-4)

- Defendant: "He was ready to testify. The handwriting expert was in the building that day. Because of his failure to bring up that I believe that he would have been able to show the jury prejudice in the fact that every single page of the diary was written in a different handwriting by a different pen." (Tr. Oct. 5, Pg. 9 at ¶ 5-11)

- Defendant: "It shows she went back and maliciously added stuff to the diary, took it to the grand jury and presented a false document. I was never given notice of Grand Jury. I had filed a notice for that as well." (Tr. Oct. 5 Pg. 9 at ¶ 12-16)

- Defendant: "I showed it to a dozen people and can see the handwriting is different." (Tr. Oct. 5, Pg. 9 at ¶ 19-20)

95

① Mr. Lamb: "There was a handwriting expert that was brought on actually assigned to 18b, he was actually in the building ready, willing and able to testify." (Tr. Oct. 5, Pg. 10 at ¶ 6-9)

② The Court: "For strategic reasons you decided not to call him." (Tr. Oct. 5, Pg. 10 at ¶ 10-11)

③ Defendant: "Against my wishes." (Tr. Oct. 5, Pg. 10 at ¶ 12)

④ Mr. Lamb: "We did discuss it. As a result of our conversation regarding that it was my feeling that the defendant agreed with me that at that point that it was unwise as a trial strategy to introduce the existence of the diary." (Tr. Oct. 5, Pg. 10 at ¶ 13-17)

⑤ Defendant: "I wouldn't have had the guy drive down from Upstate New York if I didn't want him to testify. That morning Mr. Lamb talked about a lot of stuff and he may not remember, but I specifically told him that was the most important part of my trial. And I object and I wouldn't have had the guy drive down three hours. (Tr. Oct. 5, Pg. 10 at ¶ 19-25)

⑥ Defendant: "I found the handwriting expert. Mr. Lamb couldn't find one. I made all the arrangements for this guy to be here. Why would I do that if I didn't want him to testify in my trial?" (Tr. Oct. 5, Pg. 11 at ¶ 1-4)

⑦ The Court: "All right, your lawyer is going to make that 330.30 application." (Tr. Oct. 5, Pg. 10 at ¶ 5-6)

√√ 382.  These statements made by Mr. Lamb contradict all his earlier statements concerning Mr. Baier testifying in this matter, and are clearly a position contrary to the defense. This decision, based on the underlying record, the theory of the defense that these charges were fabricated and the overall facts of the case; show that this decision of Mr. Lamb took a position

that served no tactical reason or strategic purpose, which defeated the adversarial process and can not be understood to be a position that benefited his client. This prejudiced the defendant's ability to mount a viable defense and resulted in less then meaningful representation and the ineffective assistance of counsel.

## II. Defense Counsels Failure to Know and Apply The Law Concerning Jury Selection

### (i) Error During Voir Dire in Selection of Sworn Juror # 1 Brian Merrick

PG 97- 109   Unobjected

383.  Juror # 1, Brain Merrick, had a peremptory challenge issued for his removal as a prospective juror. Because of the confusion of two Assistant District Attorneys participating in voir dire combined with the unexpected and confusing statement of Judge Rooney; Mr. Merrick was allowed to be a sworn juror even though the record clearly reveals Mr. Lamb did not want him as a juror. Here is what occurred.

- The Court: "That's fine. Whatever you like. We're going to go one at a time. I am a little confused how this is going to work out."

- (Continued): "Seat Number 1, Mr. Merrick, Cause People?"

- Mr. Katchen: "No."

- The Court: "Defense?"

- Mr. Lamb: "No."

- The Court: "Peremptory People?"

- Mr. Katchen: "No."

- The Court: "Defense?"

- Mr. Lamb: "Yes." [Mr. Lamb Clearly states he is using a peremptory to discharge this juror]

97

⊘ The Court: "Number 2 is Mr. Schlaeger."

⊘ (Continued): "Cause People?"

⊘ Mr. Katchen: "No."

⊘ The Court: "Defense?"

⊘ Mr. Lamb: "Comeford you said number one." (J.S. Tr. Pg. 120 at ¶ 13-25, Pg. 121 at ¶ 1-4)

384.   It is clear that Mr. Lamb is stating that he thought Comeford was number 1. This is because when the Clerk pulled sixteen names from the drum, Mr. Lamb was distracted and not paying attention as the following reveals.

> ⊘ The Court: "So the Clerk is now going to pull sixteen names randomly from the drum. If you hear your name called, step up and have a seat where the officer directs you."
>
> ⊘ The Clerk: "Seat Number 1, step up Brian Merrick. M E R R I C K. Seat Number 1."
>
> ⊘ (Continued): "Seat two, Robert Schlaeger. S C H L A E G E R."
>
> ⊘ (Continued): "Seat three, Patricia Comerford, C O M E R F O R D."
>
> ⊘ The Clerk: "Mr. Lamb, the lineup so far is Merrick one, Schlaeger two, Comerford three."
>
> ⊘ (Continued): "Number 4, step up, Benjamin Santlofer. Could you spell your last name?"
>
> ( J.S. Tr., Pg. 55 at ¶ 12-23)

385.   So this is the cause of the confusion, Mr. Lamb was effectively absent from this crucial part of voir dire, and defendant was deprived his right to counsel, a non-waivable constitutional right and a mode of proceeding error not subject to harmless error review and requiring a

reversal as a matter of law. Because of his absence, combined with the upcoming confusion of 2 Assistant District Attorney's participating in the Voir dire of one prospective juror and on top of that, with the upcoming added confusion at the same time of Judge Rooney's inexplicable statement; allowed a juror who was not selected by defense counsel to be a sworn juror to actually become a sworn juror. Here is the continuation of what occurred.

⊘ [Repeating] Mr. Lamb: "Comerford you said number one."

⊘ The Court: "No cause. No cause. No peremptory. You asked for a peremptory." [The record does not reveal the cause of this unexplained of what appears to be frustration]

⊘ Mr. Lamb: "I thought we had moved to Number 2."

⊘ Ms. Rajeswari: "We never did number one." [Throughout the entire Voir dire, both ADA Rajeswari and ADA Katchen are participating, a lot of times both make comments on the same juror, adding to the confusion]

⊘ The Court: "You want one?"

⊘ Mr. Lamb: "I do want one."

⊘ The Court: "Are you withdrawing your peremptory to number one?"

⊘ Mr. Lamb: "I thought it was Number 2 was going to be seated number - - as Juror Number 1."

⊘ (Continued): "Yes." [As Mr. Lamb just stated he thought number 2 (Schlaeger) was Juror Number 1]

⊘ The Court: "Carmine (Clerk's first name), that's number one."

386. Mr. Merrick, which the record reveals that Mr. Lamb issued a peremptory, becomes Juror Number 1, even though Mr. Lamb stated he thought number 2 (Schlaeger) was going to be seated as Juror Number 1, yet in further confusion Mr. Lamb does the following:

⑦ (Continued): "Next is Schlaeger. Cause People?"

⑧ Mr. Katchen: "No."

⑨ The Court: "Defense?"

⑩ Mr. Lamb: "No."

⑪ The Court: "Peremptory People?"

⑫ Mr. Lamb: "No." *** [Why is Mr. Lamb Answering for the People?]

⑬ The Court: "Defense?"

⑭ Mr. Lamb: "Yes." [At this point the record is replete with errors, and the confusion of Mr.
   Lamb in this critical stage of jury selection is painfully obvious]

⑮ The Court: "Next Ms. Comerford. Cause People?"

⑯ Mr. Katchen: "No cause."

⑰ The Court: "No cause. Defense?"

⑱ Mr. Lamb: "She did say - - I don't think she was rehabilitated as an x-ray technician. She
   frequently sees rape victims. She said that it would be difficult for her to be fair, so I
   challenge her for cause."

⑲ The Court: "You want to be heard?"

⑳ Mr. Katchen: "She did say that."

㉑ Ms. Rajeswari: "We will consent." (J.S. Tr., Pg. 121 at ¶ 4-25, Pg. 122 at ¶1-12)

### (ii) Jurors Selected as Trial Jurors Not Sworn Immediately Under CPL 270.15

387. Every sworn juror selected was immediately sworn in with the second oath under CPL
§ 270.15 (2) right after they were selected and the non-selected prospective jurors were excused,
as is mandated by the statute, except Mr. Gill (Potential Juror #12) and Mr. Beckett (Potential
Alternate Juror #1). Both of these jurors were selected as jurors, then excused for lunch and told

they were excused and to <u>be at the jury room by 2pm</u>, which was where the previously sworn jurors were waiting. (J.S. Tr., Pg. 405 at ¶ 1-23)

388. C.P.L. § 270.15 (3) provides in relevant part that "In the court's discretion, sworn jurors who are removed from the jury box as provided herein may be seated elsewhere in the courtroom <u>separate and apart from the unsworn members of the panel or may be removed to the jury room or be allowed to leave the courthouse.</u>" [Emphasis Added] This statutory provision commands that unsworn jurors should **NOT** be seated with sworn jurors in the courtroom, and especially not in the jury room.

389. This problem is compounded by the following set of facts particular to this case. After lunch Mr. Lamb, my trial attorney, shares with the court that right after lunch outside the courtroom Mr. Lamb was speaking with a Correction Officer about the trial for several minutes about the case. When he was done conversing he noticed chosen, but as of yet unsworn juror, Mr. Beckett standing 3-4 feet behind him playing with his phone, and stated to the court that he was fairly convinced that Mr. Beckett was close enough and could have heard him speaking about the case. This was a selected juror NOT immediately sworn, who after hearing this conversation right after they broke for lunch was allowed to go back to the jury room with SWORN Jurors until 2PM as directed by the court. (J.S. Tr., Pg. 413 at ¶ 14-25, Pg. 414 at ¶ 1-7)

390. When the court convenes after lunch Mr. Lamb brings this matter up to Judge Rooney who asks Mr. Lamb, "Your application is what?" and Mr. Lamb states "Would be to challenge him." Judge Rooney states, "For Cause?" and Mr. Lamb repeats, "For cause."

391. Judge Rooney states "he hasn't been sworn. A cause challenge can be raised at any time prior to a juror being sworn. Possibly even after sworn. [This juror was selected as a sworn juror, and not immediately sworn due to Judge Rooney's error in not following C.P.L. § 270.15

(3) and swearing him immediately] I am not sure about that but he hasn't been sworn. I will grant the cause challenge based on what you just said." (J.S. Tr., Pg. 414 at ¶ 8-17)

392. C.P.L. § 270.15 (4) was not meant to offer a way to circumvent the requirements of 270.15 (3) that a juror selected for service immediately be sworn. Subdivision 4 clearly states "A challenge for cause of a **prospective juror** which is not made before he is sworn as a trial juror shall be deemed to have been waived, except that such a challenge based upon a ground not known to the challenging party at that time may be made at any time before a witness is sworn at trial." [Emphasis Added] In this case, this juror was selected for service and not sworn because of an error on the part of the trial judge to immediately swear the juror once selected for service as the statutory provision of subdivision 3 provides. This *changes* the statutory requirements for removal of a juror chosen by the defendant, as is conferred by his constitutional right to a jury of his choosing, to the more stringent application as provided in subdivision 3 that **ONLY** allows dismissal of a sworn juror only for reasons of **illness or incapacity.**

393. In the instant case, this juror could only be challenged for illness or incapacity. Judge Rooney failed to apply the rules for dismissing a sworn juror and because he did not immediately swear him, his summary dismissal of this juror was not harmless and an error of law. He was required to do an inquiry on whether or not the juror even heard any of the conversation at all and if he did hear some of it, the juror should have been inquired of as to what, if anything, he heard, and ask him if it would affect his ability to render a verdict based on the evidence free from bias. This juror, chosen by the defendant to be on the jury, was removed because of Judge Rooney's procedural error and erroneous application of the law. Furthermore, Mr. Lamb's acceptance of all these procedural errors and his failure to preserve the record and object amounted to less then meaningful representation and the ineffective assistance of counsel.

394.   Judge Rooney calls selected juror who has not been sworn yet, Mr. Beckett into the courtroom and discharges him with no inquiry at all, just telling him a logistical situation came up and we are going to excuse you, and to go back to central jury. (J.S. Tr., Pg. 418 at ¶ 1, Pg. 419 at ¶ 1-14)

395.   The error in dismissing Mr. Beckett without knowing if this selected trial juror who was not immediately sworn due to Judge Rooney's procedural error was actually unable to perform his duties, is highlighted by ADA Katchen later in the proceedings that day during a disagreement of prospective juror Mr. Balaj. Mr. Katchen states "A person [Mr. Beckett] was dismissed for cause based upon a conversation we couldn't know anything about outside." (J.S. Tr. Pg. 484 at ¶ 1-3)

396.   Judge Rooney made no attempt to ascertain whether or not Mr. Beckett actually heard anything, or based on what if anything he heard; could still render an impartial verdict based on the evidence free from bias in this case. This deprived me of my constitutional right to a jury of my choice, as well as failed to insure I had a jury pool free from bias and insuring I was granted my constitutional right to a fair and impartial trial. Mr. Lamb's failure to contemporaneously object with specificity was necessary to establish and preserve the error as "a question of law." His failure to do so was not the action of a reasonably competent attorney with his client's best interest in mind.

397.   The failure of Judge Rooney to do this deprived the defendant of his constitutional right to a jury of his choosing free from bias and furthermore, violated his right to a fair and impartial jury as a whole because this selected but unsworn juror overheard this conversation then went to the jury room with the SWORN jurors until 2PM. Hence, the fact that there was no inquiry leaves open the question if the entire jury pool was biased by the conversation of this

unsworn juror, the substance of which the court failed to ascertain; with the sworn jurors in the jury room. The prejudice to the defendant is compounded with Alternate Juror #1 becoming Juror #12, which will be discussed in the upcoming section, *(iv) Sworn Juror # 12 Jennifer Buonincontro Was Erroneously Kept as a Sworn Juror When Judge Rooney Failed to Apply The Law Correctly.*

### (iii) Sworn Juror # 4 Omar Pereyra Was Excused Under Wrong Standard

**398.** On September 10, 2010, Previously Sworn Juror #4, Omar Pereyra had made the Court aware he had a problem and the following occurs.

ଓ The Clerk: "Juror number four is present."

ଓ The Court: "He can have a seat. Just have any seat, Mr. Pereyra. I'm sorry, are you having some kind of difficulty? Can you tell us what it is?"

ଓ Prospective Juror: "Yes, sir. Pretty much, you know, I have anxiety problems and in the past I have had panic attacks. And you know when we were first here and I had explained to you about what was going on at work and then I understood the reason you retained me."

ଓ (Continued): "You know, I really thought this was something I could do. But as you know the time comes dragging on I am just getting increasingly anxious about not being at work."

ଓ (Continued): "You know I have been prescribed Xanax. Not like yesterday, just in the past to deal with my anxiety issues. I mean obviously I am a functioning person. I am a director of operations at work. I manage a team of people. But I just feel that this is too much for me right now."

ଔ (Continued): "And, you know obviously I have been having problems sleeping. And I just don't think I am going to be able to sit here and concentrate and do what I need to do as a jury member because I am just stressed out."

ଔ The Court: "Counsellors, you want to step up for a moment?" [Then a discussion is held off the record] (J.S. Tr., Pg. 407 at ¶ 11-25, Pg. 408 at ¶ 1-17)

399.  The following occurs once Juror No. 4 leaves the courtroom.

ଔ The Court: "Okay, he's left the courtroom. Counsellors make your record please."

ଔ Mr. Lamb: "It would be my feeling based on what he just said that he could not be truly helpful as a juror for either side. His anxieties and concerns about work is too distracting. Although I'm sorry to see him go, I was happy with his original answers when we originally questioned him, what he is saying now I have to take at face value and if so I think he would be a less than desirable juror."

ଔ The Court: "Grossly unqualified is the standard for a sworn juror. You think he is grossly unqualified for reasons we didn't know when he was selected?"

ଔ Mr. Lamb: "I believe so."

ଔ Mr. Katchen: "I do as well."

ଔ The Court: "Mr. Rucano, this is a sworn juror so I'd like to get your - - I guess the people and Mr. Lamb are consenting to excuse this juror?"

ଔ Mr. Lamb: "Yes."

ଔ Mr. Katchen: "Yes."

ଔ The Court: "Since he is sworn it's up to him, Mr. Rucano?"

ଔ The Defendant: "I will agree with my lawyer." (J.S. Tr., Pg. 409 at ¶ 1-25, Pg. 410 at ¶ 1-3)

**400.** Once again, I am not informed of my right to participate in the decision of removing this sworn juror. This juror admitted he was a functioning director of operation and only stated very vaguely he was "anxious" and "stressed out", and had panic attacks in the past. Furthermore, Juror No. 4 stated "as you know the time comes dragging on I am just getting increasingly anxious about not being at work." He was only selected as a juror 2 days earlier, which is not a lot of time. Again the court only took a statement from him, discussed it and let him go. This was merely the juror reiterating his original argument to be excused for cause because he was nervous about being away from work which he stated before he was selected as a sworn juror, which Judge Rooney denied. (Tr. Pg. ??? at ¶ ?-?)

**401.** The same issue arises on the first day of trial with Juror No. 12, as we will look at now. But in Juror No. 12's case, a completely opposite ruling for the same "anxious" and "stressed out" feelings, expressed as "nervous", "don't feel right" and "hands are shaking" is made by the Court. The circumstances between Juror No. 4 and Juror No. 12 are analogous, yet the Court decides to keep Juror # 12, a single woman living at home with Mom, and decides to let go a functioning Director of Operations.

**402.** The differentiating factor is the trial is ready to start when Juror # 12 steps up and states she is nervous, hand's are shaking and doesn't feel right, after all alternates and Jurors are sworn in. Furthermore, in the case of Juror # 12, the Court violates the holding in People v. Buford in that they fail to put the reasons **why** Juror No. 12 wants out of service as a juror, and failed to record the reason on the record. Juror # 4 made a statement as to **why,** he was worried about work, but he admitted he was a functioning person; but in both cases a **probing** and **tactful** inquiry was not performed; only statements were taken.

### (iv) Sworn Juror # 12 Jennifer Buonincontro Was Erroneously Kept as a Sworn Juror When Judge Rooney Failed to Apply The Law Correctly

**403.** Sworn Juror #12, Jennifer Buonincontro, comes to court on the first day of trial, September 13th, 2010; after all the jurors and alternates were sworn in and selected; and the following occurred:

⊙ Court Officer: "Juror # 12 entering."

⊙ (Whereupon, Juror # 12 enters the courtroom)

⊙ The Court: "She can have a seat. Any seat is good. This is Juror # 12 counselors. I'm told you want to speak to us. What is on your mind?"

⊙ Juror # 12: "I don't know. I just - - I didn't feel right this morning when I came in. I felt very nervous and just, like, my hands were shaking, **and I just didn't feel like I should be, like, part of this.** I don't know. I didn't feel right."

⊙ The Court: "Counselors, do you want to step up."

⊙ (Whereupon, an off the record discussion was held at the bench)

⊙ The Court: "We have talked about this, Miss Buonincontro. It is not at all unusual for people to get nervous. It happens. A lot of jurors are nervous, a lot of lawyers are nervous, I get nervous; it's part of the trial process.

⊙ (Court Continued): "At this point what I want to say to you, this is not enough for me to excuse you from this matter. You are a sworn juror and once you're sworn you go into a category, and it's hard for me to let you go without a much better reason."

&#9312; (Court Continued): "What I'm going to say to you is this, the lawyers and I discussed this we are going to ask you to stay with us; we are going to start the trial and proceed."

&#9313; (Court Continued): "If as the trial unfolds your mindset becomes such that you want to talk to us again, tell the officers and we will speak to you again. And please don't discuss this discussion with the other jurors. Thank you very much."

&#9314; (Court Continued): "And we are going to send an officer in with you to tell the other jurors we're going to be about 20 minutes before we get started. Thank you."

&#9315; (Whereupon, Juror # 12 exits the courtroom)

&#9316; The Court: "For the record, that juror has left. We had our bench conference off the record. Counselors, did I say what you agreed that I should say?"

&#9317; Mr. Lamb: "Yes."

&#9318; Mr. Katchen: "Yes."

&#9319; The Court: "So that's satisfactory at this point?"

&#9320; Mr. Lamb: "It is to the defense."

&#9321; Mr. Katchen: "To the People also." (Exhibit "G", Trial, Day 1, Pg. 12 at ¶ 7-25, Pg. 13 at ¶ 1-25, Pg. 14 at ¶ 1-2)

In making such a determination "the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys **and defendant**" conducting "a 'probing and tactful inquiry' into the 'unique facts' of each case including a careful consideration of the juror's 'answers and demeanor'. "The trial court's reasons for the ruling should be placed on the record [and] the court may not speculate as to possible partiality of the juror"

**404.** The opposite is also true in these circumstances. When a juror expresses a reluctance to continue to serve as a sworn juror based on unknown factors like Juror # 12 expressed, the same rules apply in order for a Judge to determine if this juror should be kept as a sworn juror. Holding this as true, "The trial court improperly discharged a sworn juror without conducting a sufficient investigation into the juror's unavailability to continue serving. In determining whether discharge of a juror is warranted based on illness, incapacity or unavailability, the court is required to make a 'reasonably thorough inquiry' into the **juror's circumstances** [Emphasis Added] (CPL 270.35 [2] [a]

405. The record does not establish that the court made the requisite inquiry of Ms. Buonincontro and the circumstances revolving around her nervousness and expression that she no longer wanted to be a part of the trial. The defendant alleges that this Juror was the subject of sexual abuse in the past and did not reveal this during voir dire, hence the reason for the "hands shaking" and "feeling like I should not be a part of this." The trial court never determined the reason why, failed to record it on the record and the court never asked Juror No. 12 if she could render a fair and impartial verdict free from bias on the evidence. Instead, the court purely speculated that she could remain impartial.

The failure of the trial court to do a probing and tactful inquiry, in fact, to do any type of inquiry at all; resulted in the trial court making a "determination that the juror was not grossly unqualified to serve [that] was based on speculation . Additionally, the Supreme Court erred in failing to place the reasons for its ruling on the record. As the error is not subject to harmless error analysis, the conviction must be reversed

**Newly Discovered Evidence of Falsified Session Notes Released Under Subpeona**

**406.** Furthermore, trial counsel Eugene Lamb was able to petition the Honorable Judge Rooney for Social Worker Anna-Lorusso Moramarco's session notes during the trial in my case. Trial Counsel Mr. Lamb never introduced these session notes into evidence at trial. These session notes are highly relevant as they support his ineffective assistance of counsel claims against Eugene Lamb Esq.

**407.** Judge Rooney released 1 individual session note of the complainant as potential Brady material on September 8th, 2010 (Jury Selection [J.S.] Tr. Pg. 28 at ¶ 11-25) (EX. "SS"), and all three couples counseling session notes on September 14th, 2010 (Tr. Pg. 223 at ¶ 10-15) (Exhibits "TT, WW, XX"), after the complainant and the defendant each waived there right to confidentiality on the record. (Tr. Pg. 223 at ¶ 16-25, Pg. 224 at ¶ 1-5).

**408.** In the individual session note of the complainant dated July 21st, 2009, which is redacted for privacy reasons, it shows the complainants propensity to initiate violent behavior. (Exhibit "SS")

**409.** The session note dated July 28th, 2009 (EX. "TT") is the first couples counseling session I paid for and attended with Anna Lorusso-Moramarco L.C.S.W. The two other sessions were dated August 11th, 2009 and September 22nd, 2009. (Exhibit "WW, XX")

**410.** This couples counseling session note is clearly marked "This was a couple's session." Although the session note lists the complainant as the patient, my AETNA Claims Report clearly show that this session and the 2 other sessions that followed were all billed to my insurance, which the complainant was never a part of. (Exhibit "TT")

**411.** This defendant initiated a complaint with the Connecticut Attorney General George C. Jepsen in a letter dated October 17th, 2013, concerning my Health Insurance Provider, AETNA,

110

being reluctant to provide documents proving that the session notes that were released by subpoena to the Honorable Judge Rooney prior to the start of my criminal trial were falsified, thereby making this provider guilty of Falsifying Business records. Mr. Jepsen's office contacted AETNA in an effort to get them to comply with my requests. This was assigned case Number 2014-9646. (Exhibit "YY")

❋ **412.** The defendant has initiated a malpractice lawsuit against Anna Lorusso-Moramarco L.C.S.W. in Richmond County Supreme Court, Index # 102435/12, which is currently on appeal before the Honorable Court. Ms. Moramarco is also under investigation by the New York State Department of Financial Services Insurance Frauds Bureau. On May 28, 2013 Director Frank Orlando informed me that the Investigation was assigned Log # 2013-L-008985. (Exhibit "ZZ")

❋ **413.** Ms. Moramarco submitted an affidavit in this malpractice lawsuit where she stated that at no time did she ever provide services to the defendant in a couples counseling capacity or in any capacity. (Exhibit "AAA") This affidavit fails to explain how Ms. Moramarco billed the defendant's AETNA medical insurance for the services of counseling, when the complainant was NEVER a part of his insurance policy at any time.

❋ **414.** On December 17th, 2013, AETNA replied to Frances T. McCaffrey of the Connecticut Office of the Attorney General, Antitrust and Government Program Fraud Department, who in turn forwarded documents providing proof that Anna Lorusso-Moramarco billed me 3 times for individual psychotherapy, which correspond with the 3 dated session notes submitted to Judge Rooney which all talk about me. Considering Ms. Moramarco submitted a sworn affidavit to the Honorable Judge Philip Minardo of the Richmond County Supreme Court that she "never provided services to me individually or in a couples counseling capacity", how did Ms. Moramarco obtain my private health care insurance and bill me for services she swears she never

provided when my fiancée, the complainant, is verified by these records as never being a beneficiary on my health care insurance? (Exhibit "BBB')

✳  **415.** Even more condemning is this provider billed for the service of CPT code "90801" on July 28th, 2009, verified as being for a "Psychiatric Diagnostic **Interview** Examination", which is billed at a higher rate to compensate for the additional time required to do an "intake" on a new patient for the first time. This patient was me, **not** my fiancée, as my fiancée saw this provider twice before, once on July 9th, 2009 and again on July 21st, 2009, which was billed to her own private insurance with her employer. This is verified by the individual session note of July 21st, 2009 provided to you (EX. "SS"), which does not show on my AETNA claims report.

**416.** An investigation and subpoena for this providers billing records of Duane Katherine Ramos will reveal the separate billing to her private insurance for the dates July 9th, 2009 and July 21st, 2009, as well as multiple dates after these. These were all separate from the dates billed to my insurance where I was the primary patient, for couples counseling. The content of the session notes, that talk exclusively about me, and the billing records, all support these claims.

✳  **417.** Paralegal Specialist Frances T. McCaffrey sent me a letter dated December 19th, 2013 forwarding documents received from AETNA, which were stamped received by the Connecticut Office of the Attorney General on December 18th, 2013, with all the documents received from AETNA via the Connecticut Attorney General attached. (Exhibit "CCC")

✳  **418.** The AETNA letter/report had annexed to it a Certified and unredacted copy pf my AETNA Claims Report (Exhibit "DDD"), which is an exact copy of the redacted claims report previously submitted to your office. The claims report provided by AETNA in this package (Exhibit "DDD") has a computer generated "document control number" (DCN) of 131106068686 EI, which is verifiable as the copy of the electronic record on file with AETNA.

**419.** On Page 1 and 2 of the AETNA letter/report provided to the Connecticut Attorney General, then to me, is a listing of all covered members on my AETNA Health Insurance, described as "printouts from our eligibility database showing the coverage effective and termination dates for the subscriber and each dependant as follows:", which uncontrovertibly verifies that Duane Katherine Ramos was **NEVER** a covered member on my insurance, and as such the billing of services to AETNA by this provider for services that she submitted a sworn affidavit stating she "never provided to me in either an individual or couples counseling capacity", must result in multiple criminal charges being brought against this provider, Anna Lorusso-Moramarco.

**420.** Anna Lorusso-Moramarco submitted falsified session notes under subpoena from the Honorable Judge Rooney for use in my criminal trial under Indictment # 270/09. The evidence shows that this provider is guilty of one or more of the following crimes in New York State, and possibly other crimes in Connecticut and/or violations on interstate federal commerce laws:

    A.    Falsifying Business Records in the First degree (P.L. § 170.10), which one is guilty of "when he commits the crime of falsifying business records in the second degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."

    B.    Health Care Fraud in the Fifth Degree (P.L. § 177.05), which one is guilty of "when, with intent to defraud a Health Care Plan, he or she knowingly and willingly provides materially false information or omits material information for the purpose of requesting payment from a Health Care Plan for a health care item or service and, as a result of such information or omission, he or she or another person receives payment in an amount that he, she or another person is not entitled to under the circumstances."

C.      Perjury in the Second Degree (P.L. § 210.10) which one is guilty of "when he swears falsely and when his false statements is, (A) made in a subscribed written instrument for which an oath is required by law, and (B) made with intent to mislead a public servant in the performance of his official functions, and (C) material to the action, proceeding or matter involved."

## SUPPLEMENT (TO BE FURTHER DEVELOPED AND ADDED TO BRIEF)
### Points Raised By Warren Landau Unpreserved for Appellate Review

1.   Failure to object to testimony of Ms. Mach speculating because Mr. Landau could not hear. (Mr. Landau failed to develop this in his appellate brief to include issues of further merit)

2.   Failure to Object to Prejudicial Remarks made by the Prosecutor in Summation.

3.   Failing to Articulate a Specific Reason for a Mistrial Following the Summations

The above issues were submitted by Warren Landau in the hopes the Appellate Court would review them "in the interest of justice", and account for 75% or more of the issues raised in his brief.

Combine these issues with the entirety of this proposed Article 440 Brief, and it is a substantially more meritorious course for obtaining a reversal on this conviction.

Unfortunately, this would require a lot of work and effort on the part of Warren Landau and Appellate Advocates, which my supporting papers show is just not available to indigent citizens of the State of New York.

114



**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DIVISION, SECOND DEPARTMENT**
---------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK        :
                                           :
                **Respondents,**        :
                                           :
                                           :
      -against-                    :
                                           :
                                           :
**ANTHONY RUCANO,**                         :
                                           :
                                           :
           **Defendant-Appellant,**   :
---------------------------------------------------------------------X


**AFFIDAVIT IN SUPPORT OF APPLICATION TO APPELLATE DIVISION**
**FOR CERTIFICATE GRANTING LEAVE TO APPEAL §450.15**

**INDICTMENT NO. 270-09**



                                   **Anthony Rucano, 11A0528**

                                   **Clinton Correctional Facility**

                                   **P.O. Box 2001**

                                   **Dannemora, N.Y. 12929**

## TABLE OF CONTENTS

QUESTIONS PRESENTED ........................................................................ 3

I.   RELEVANT BACKGROUND FACTS AND PROCEDURAL HISTORY ............... 5

II.  THE COURT'S DECISION AND ORDER ON THE ARTICLE 440 ........................ 6

A.  THE TRIAL COURTS OPINION .................................................... 7

III. QUESTIONS OF LAW AND FACT WHICH OUGHT TO BE REVIEWED BY
     THIS COURT..................................................................... 10

POINT 1 ............................................................................ 10
BECAUSE NEITHER CPL § 440.30(1) OR (4) (B) APPLIED TO MY APPLICATION,
THE MOTION COURT'S FAILURE TO HOLD THE MANDATORY HEARING I
WAS ENTITLED TO UNDER CPL § 440.30(5) VIOLATED MY RIGHT TO DUE
PROCESS ........................................................................... 10

POINT 2 ............................................................................ 13
THE MOTION COURT'S DECISION AND ORDER APPLYING PROCEDURAL
BARS UNDER CPL § 440.10(2) (B), VIOLATED THE HOLDINGS OF MASSARO V.
UNITED STATES, 538 US 500 (2003), AND MARTINEZ V. RYAN, 132 S.CT. 1309
(2012)............................................................................. 13

A.  THE MOTION COURT'S APPLICATION OF CPL § 440.10'S PROCEDURAL
    BARS TO MY CLAIMS OF PROSECUTORIAL MISCONDUCT AND
    INEFFECTIVE ASSISTANCE OF COUNSEL WAS CONTRARY TO
    CLEARLY DEFINED STATE COURT PRECEDENTS..................................... 15

B.  THE MOTION COURT ABUSED IT'S DISCRETION IN FAILING TO
    CONSIDER THE NUMEROUS NON-RECORD BASED EXHIBITS UPON
    WHICH HIS MOTION TO VACATE THE JUDGMENT WAS PREDICATED
    ON, AND THEREFORE IGNORED THE SECOND DEPARTMENT AND
    COURTS OF APPEALS PRECEDENTS INVOLVING "MIXED CLAIMS".... 17

    (i)    PROSECUTORIAL MISCONDUCT................................................ 18

    (ii)   THE ALLEGED "DIARY" .................................................... 19

    (iii)  FAILURES CONCERNING EXPERT WITNESSES .................................. 20

    (iv)   TRIAL COUNSEL'S NUMEROUS ERRORS OF OMISSION AND
           COMMISSION .......................................................... 23

C.    THE DEFENDANT ASKS THIS COURT TO TAKE JUDICIAL NOTICE OF HIS PREVIOUS APPLICATION TO THIS COURT TO ENLARGE THE JUDGMENT ROLL AND TO WITHDRAW APPELLATE COUNSEL'S BRIEF WHEN CONSIDERING WHETHER THE TRIAL COURT'S APPLICATION OF PROCEDURAL BARS WAS ERRONEOUS AND CONTRARY TO FEDERAL AND STATE PRECEDENTS.................................................................. 26

D.    CPL § 440.10 IS THE ONLY VEHICLE TO OBTAIN A FULL AND FAIR REVIEW OF MY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS............................................................................................................. 29

POINT 3 ...................................................................................................... 31
BECAUSE THE LOWER COURT ANSWERED NONE OF THE CONSTITUTIONAL QUESTIONS RAISED BY MY CPL § 440.10 APPLICATION, THIS MATTER MUST BE HELD IN ABEYANCE, AND REMITTED TO THE LOWER COURT FOR COMPLIANCE WITH CPL § 440.30(7) WITH DIRECTIONS TO ANSWER SPECIFIC QUESTIONS OF LAW AND FACT AFFECTING THE MERITS OF THE MOTION ...................................................................................................... 31

POINT 4 ...................................................................................................... 33
THIS COURT SHOULD TAKE THE "PROVERBIAL LEAP" AND FIND THAT THE UNCONSTITUTIONAL AND CONVOLUTED PROCEDURAL SCHEME IN THIS STATE THAT MOVES INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS OUTSIDE THE DIRECT APPEAL PROCESS PREVENTS DEFENDANTS FROM DETERMINING THESE CLAIMS FULLY ON THE MERITS UNDER THE STATE PRACTICED STANDARD FOR THOSE CLAIMS, "BALDI", WHICH IS "REPRESENTATION AS A WHOLE" AND "IN TOTALITY"; BECAUSE IN PRACTICE IT IS IMPOSSIBLE TO REACH, AND WILL LEAD TO THE CHALLENGE OF THESE LAWS VIA THE ADEQUACY DOCTRINE ...................... 33

A.    FIRST-TIER REVIEW BY COUNSEL IS CRITICAL TO THE IDENTIFICATION AND DEVELOPMENT OF CLAIMS BASED ON INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ......................................... 34

B.    BECAUSE OF THE CONVOLUTED PROCEDURAL RULES IN NEW YORK STATE, A DEFENDANT'S FIRST OPPORTUNITY TO RAISE A CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON A COMPLETE RECORD DOES NOT OCCUR ON DIRECT APPEAL, BUT IN A COLLATERAL REVIEW PROCEEDINGS WITHOUT HIS CONSTITUTIONAL RIGHT TO COUNSEL ......................................................... 35

C.    MARTINEZ V. RYAN AND ITS EFFECT ............................................ 36

D.    THE HOLDINGS OF TREVINO V. THALER ARE APPLICABLE TO THE LAW IN NEW YORK STATE.................................................................. 39

E.   THE DEFENDANT IS ENTRENCHED IN A PROCEDURAL MORASS AS A RESULT OF THE CONVOLUTED PROCEDURAL RULES IN NEW YORK STATE ................................................................................................................. 41

CONCLUSION ............................................................................................................... 42

CONSOLIDATION WITH APPELLANT'S PENDING DIRECT APPEAL ...................... 44

## TABLE OF AUTHORITIES

*Carney v. Fabian*, 441 F.Supp.2d 1014, 1019 [D. Minnesota 2006]............................................ 29

*Coleman v. Thompson*, 501, U.S. 1277 (1991) ........................................................................... 34

*Hayes v. Battaglia*, 403 F3d 935, 937 [7th Cir. 2005]................................................................. 29

*Hoffman v. Arave*, 236 F.3d 523, 535-36 (9th Cir. 2001)............................................................ 35

*Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir.2012)..................................................................... 36

*Jackson v. Shanks*, 143 F.3d 1313, 1319 (10th Cir. 1998) .......................................................... 35

*Kimmelman v. Morrison*, 477 U.S. 365, 378 (1986) .................................................................... 34

*Martinez v. Ryan*, 132 S.CT. 1309 (2012) ......................................................................... passim

*Massaro v. United States*, 123 S.Ct. 1690 (2003)............................................................... passim

*People v. Ausserau*, 77 AD2d 152 [4th Dept. 1980])........................................................... 10, 11

*People v. Baldi*, 54 N.Y.2d 137, 147 ................................................................... 9, 16, 29, 33

*People v. Baxley*, 84 NY2d 208 [1994] ................................................................................ 11, 12

*People v. Brown*, 45 NY2d 852, 853-854 [1978] ................................................................. 15, 30

*People v. Evans*, 16 N.Y.3d 571, 575 n. 2, cert. denied --- U.S. ---, 132 S.Ct. 325...................... 9

*People v. Freeman*, 93 AD3d 805 (2nd Dept. 2012)....................................................... 3, 15, 17, 18

*People v. Gayle*, 148 AD2d 307 [1998]................................................................................... 12

*People v. Hughes*, 181 AD2d 912 [2nd Dept. 1992]................................................................. 11

*People v. Maxwell*, 89 AD3d 1108 (2nd Dept. 2011)....................................................... 3, 8, 15, 17, 18

*People v. Melendez-Smith*, 66 AD3d 1042 (2nd Dept. 2009).................................................... 15, 30

*People v. Mendoza*, 298 AD2d 532 [2nd Dept. 2003].............................................................. 15, 30

*People v. Morales*, 58 NY2d 1008 [1983]........................................................................ 15, 17, 30

*People v. Rodriguez*, 23 AD2d 683 [2nd Dept. 1965]............................................................... 10

*People v. Taylor*, 211 AD2d 603 [1st Dept. 1999]..................................................................... 17

*People v. Wedra*, 56 AD2d 903 [2nd Dept. 1977].................................................................... 12

*People v. Williams*, 184 AD2d 608 [2nd Dept. 1992]............................................................... 32

*Pham v. United States*, 371 F.3d 178, 186-87 [2nd Cir. 2003] .................................................... 35

*Robinson v. State*, 16 S.W.3d 808, 810-811 [Tex. Crim. App. 2000].......................................... 36

*Sanchez-Llama v. Oregon*, 548 US 331 (2006)....................................................................... 14

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2066 [1984].................... 15, 16, 30, 34

*Sweet v. Bennett*, 335 F3d 135 (2nd Cir. 2003)........................................................................... 29

*Trevino v. Thaler*, 133 S.Ct. 1911, 1915 (2013)...................................................... 14, 36, 37, 40

*Walter v. Dalshiam*, 669 F.Supp. 68 (S.D.N.Y 1987) ........................................................ 15, 30

### Statutes

*C.P.L.R. § 1012(a)(1)* ........................................................................................................... 7

*County Law § 722* ............................................................................................................ 6, 28

*CPL § 440.30(5)* ................................................................................................................... 4

*CPL § 440.10(1)* ................................................................................................................. 32

*CPL § 440.10(1)(g)*............................................................................................................. 32

*CPL § 440.10(2)* ................................................................................................................. 32

*CPL § 440.30*............................................................................................................... passim

*CPL § 440.30(7)* ...................................................................................................... 3, 5, 32, 33

*CPL §§ 450.15*....................................................................................................................... 2

*CPLR § 1012(b)*.............................................................................................................. 7, 28

*CPLR § 2221(e)(2)* ......................................................................................................... 3, 11

*Executive Law § 71* ................................................................................................ 7
*Executive Law § 7101* ........................................................................................ 7, 28

**Other Authorities**

Effective Trial Counsel After <u>Martinez v. Ryan</u>: *Focusing on the Adequacy of State Procedures*, 122 Yale L.J. 2604, June 2013........................................................*33*

Mary Dewey, Comment, <u>Martinez v. Ryan</u>; *A Shift Toward Broadening Access to Federal Habeas Corpus*, 90 DENV. U.L. REV. 268, 270 (2012)..............................................*37*

Eric M. Freedman, *State Post-Conviction Remedies in the Next Fifteen Years: How Synergy Between the State and Federal Government Can Improve the Criminal Justice System Nationally*, 24 Fed. Sent'g Rep. 298, 298 (2012)..................................................*39*

Justin F. Marceau, *Challenging the Habeas Process Rather Than The Result*, 69 Wash. Lee L. Rev. 85, 146-56, 166-76 (2011)...........................................................*39*

Daniel J. Meltzer, *State Court Forfeitures of Federal Rights*, 99 Harv. L. Rev. 1128, 1182 (1986)......................................................................................*39, 40*

**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DIVISION, SECOND DEPARTMENT**
-----------------------------------------------------------------------X
The People of the State of New York
                        **Respondents,**    :

              -against-         :

Anthony Rucano,
                  **Defendant-Appellant,**:
-----------------------------------------------------------------------X

**Affidavit in Support of Application To Appellate Division For Certificate Granting Leave To Appeal §450.15**

**Indictment No.** 270-09
**Year of Ind.** 2009

STATE OF NEW YORK   )
                  ) ss:
COUNTY OF CLINTON  )

Anthony Rucano, being duly sworn, deposes and says:

1.   I am the defendant-appellant in the above-captioned matter, and as such, am fully familiar with the facts and circumstances surrounding this case. My information having been gathered from the facts that occurred on and off the record, and reading recent decisional law from the United States Supreme Court and other legal bases.

2.   This Affidavit is submitted in support of an application pursuant to CPL §§ 450.15, 460.15 --- and this Court Rules --- for a certificate granting leave to appeal to this Court from an order of the Supreme Court, Richmond County (Rooney, J.), dated December 15th, 2014, which summarily denied my CPL § 440.10 application and motion for an Evidentiary Hearing. The Notice of Entry was filed by me on January 6th, 2015.

3.   To support my application I have submitted a copy of my original CPL §§ 440.10 motion (see Exhibit 4-A), motion for an Evidentiary Hearing (see Exhibit 4-B), and a copy of the Order upon which leave is sought (see Exhibit 4-C).

*1*

4.    This application is brought by Notice of Motion because I am incarcerated serving a prison term pursuant to a judgment of the Supreme Court.  In the event a certificate were to be ordered, I will move the Court for an order allowing an expedited appeal.

5.    I am bring this application because the motion court: (a) failed to make findings of fact and conclusions of law on all of the issues I raised in my CPL § 440.10 application as required by CPL § 440.30(7); (b) failed to hold the mandatory hearing I was entitled to under CPL § 440.30(5)[1]; (c) applied procedural bars to my federal question of whether or not I received the effective assistance of counsel in violation of the holdings in Massaro v. United States, 123 S.Ct. 1690 (2003), and Martinez v. Ryan, 132 S.CT. 1309 (2012), and the separately appealed ground that (d) denied my request to assign counsel[2]. The court's decision has created several questions of law and fact which warrant extended discussion by this Court.

6.    Also note, that I am using some of the exhibits from my CPL § 440.10 exhibit package as independent parts of this leave application's exhibit package, to emphasize the gravity of the motion court's erroneous and unconstitutional denial of my application for relief (without a hearing). All exhibits that start with the number "4" (i.e. "4-A") are exhibits unique to this application, and all other exhibits (i.e. "1-A", "2-A" and "3-A", etc) relate to exhibits submitted with my original Article 440 brief to the Court. **Please note:** I have included my original Article 440 application with exhibits, and Motion for an Evidentiary Hearing with exhibits that were submitted to the trial court with this application for this Courts review. The assignment of counsel motion has been provided for context (See Exhibit "4-G").

---

[1] Because exhibits identified in Appendix "A" were outside the record and not refuted by the prosecutor's opposition, neither CPL § 440.30(1) nor CPL § 440.30(4) applied, and therefore I was entitled to a hearing under CPL § 440.30(5).
[2] Notice of Entry and Notice of Appeal were filed with the Richmond County Clerk on the Motion for Assignment of Counsel, which is Appealable as of Right, and as it raises a question concerning the constitutionality of the law, it was appealed directly to the Court of Appeals Pursuant to CPLR § 5601 (b) (2)

## QUESTIONS PRESENTED

### QUESTION 1

Because neither CPL § 440.30(1) or (4) (b) applied to my application, as the defendant submitted sworn allegations of fact from 2 different expert witnesses, an uncalled witness, as well as his own affirmation, which was further supported by numerous pieces of documentary evidence and information tending to support the allegations in his moving papers all in support of his constitutional claims...

    a).    Did the motion court's failure to hold the mandatory hearing I was entitled to under CPL § 440.30(5) violate my right to due process?

### QUESTION 2

The trial courts order denying my application for CPL §§ 440.10 relief stated that my record based claims "are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based on matters that are within the record... [and are] based upon conclusory allegations. See C.P.L. 440.30 (1) and (4) (b)" Furthermore, the court also quoted C.P.L. 440.10 (2) (b) and applied a procedural bar to my claim, stating the issues [which were mixed claims] could have been raised on my pending appeal.

    a).    Was the court's invocation of CPL § 440.10's procedural bar to my claims of ineffective assistance of counsel violative of and contrary to the holdings of <u>Massaro v. United States</u>, 538 US 500 (2003) and <u>Martinez v. Ryan</u>, 132 S.CT. 1309 (2012)?

    b).    Was the motion court's application of CPL § 440.10's procedural bar to my claims of ineffective assistance of counsel violative of and contrary to the holdings of the clearly defined state court precedents of <u>People v. Maxwell</u>, 89 AD3d 1108 (2nd Dept. 2011) and <u>People v. Freeman</u>, 93 AD3d 805 (2nd Dept. 2012)?

    c).    Did the motion court abuse it's discretion when it failed to consider the numerous non-record based exhibits upon which the defendants motion to vacate the judgment was predicated on, and therefore ignore the Second Department and Courts of Appeals precedents involving "Mixed Claims"?

    d)    Should this Court take Judicial Notice of the Appellant's Previous Applications to Enlarge the Judgment Roll and to Withdraw Appellate Counsel's Brief When Considering Whether the Trial Court's Application of Procedural Bars was Erroneous and Contrary to Federal and State Precedents?

e)      Is CPL § 440.10 the Only Vehicle to Obtain A Full and Fair Review of My Prosecutorial Misconduct and Ineffective Assistance Of Trial Counsel Claims, When Considering Sub-Points (a), (b), (c) and (d), *supra*?

## QUESTION 3

Considering the Defendants Application To Enlarge the Judgment Roll With Records Previously Submitted to This Court, Which this Court Denied **Except** for the Requests for Stenographic Transcripts (Thereby Implying Those Records Dehor The Record); and also Considering the Defendants Application To Withdraw Appellate Counsel's Brief Because of His Failure To Develop Substantive and Numerous Claims of Ineffective Assistance of Counsel, Which This Court Summarily Denied…

a).     Regardless of whether the lower court has conducted an evidentiary hearing on a motion to vacate judgment, it is statutorily required to set forth its findings of fact, conclusions of law and the reasons for its determination for each of the constitutional and/or procedural arguments raised by a defendant's motion (see CPL § 440.30[7]). Was its failure to do so considered a violation of due process as the defendant was not given effective notice of the court's decision denying his application, and therefore was deprived of an effective means of challenging the decision in future appellate or federal review applications?

b).     Because the lower court answered none of the constitutional questions raised by my CPL § 440.10 application, should this matter be held in abeyance and remitted to the lower court for compliance with CPL § 440.30(7), with directions to answer specific questions of law and fact affecting the merits of the motion?

## QUESTION 4

Should This Court Take the "Proverbial Leap" and Find that the Unconstitutional and Convoluted Procedural Scheme in this State that Moves Ineffective Assistance Of Counsel Claims Outside The Direct Appeal Process Prevents Defendants From Determining These Claims Fully on the Merits Under The State Practiced Standard for Those Claims, "**Baldi**", Which is "**Representation as a Whole**" and "**In Totality**"; Because in Practice It is Impossible To Reach and Will Lead To The Challenge Of These Laws Via the Adequacy Doctrine?

## I.   RELEVANT BACKGROUND FACTS AND PROCEDURAL HISTORY

7.    I was arraigned for rape, sexual misconduct and assault on October 1st, 2009. I entered a plea of Not Guilty and posted bail the next day in the amount of $5,000. I was tried in this Court before the Honorable Judge Stephen Rooney on September 9th, 2010. The case was submitted to a jury, which rendered a verdict of guilty.

8.    On January 21st, 2011, I was sentenced to a twelve year determinate sentence.

9.    After filing a motion requesting permission to file a supplemental pro-se brief, and a separate motion to enlarge the judgment roll, on January 6th, 2014 the Appellate Division, Second Department granted permission to file a supplemental pro-se brief by April 7th, 2014. My motion to enlarge the judgment roll was granted in part, and the Court issued an order for the Grand Jury proceedings to be produced by the Nisi Prius Court to the Appellate Division under seal, as well as an order to produce the stenographic transcripts for July 7th, July 16th, and August 10th, 2010 as part of the judgment roll (Exhibit "4-D").

10.    I filed a motion to amend the decision and order of January 6th, 2014, to enlarge the record to include the October 1st, 2009 and October 5th, 2009 transcripts, which were requested as part of the original motion. On April 21st, 2014, the Appellate Division, Second Department issued a Decision and Order enlarging the judgment rolls, and ordered the stenographer to produce said transcripts within 45 days, which ended on June 5th, 2014. The Court also extended the time for me to file my supplemental pro-se brief until July 21st, 2014 (Exhibit "4-E").

11.    On March 20th, 2014, I filed a motion to withdraw appellate counsel's brief, and if granted, for the assignment of new counsel on the appeal to aid in the preparation of a CPL 440 motion, and to hold the appeal in abeyance pending the determination of the CPL 440 motion. This motion also challenged the constitutionality of County Law § 722 and the potential

application of CPL § 440.10(2) procedural bars, and was served on the Attorney General Pursuant to Executive Law § 7101 and CPLR § 1012(b).

12.   I received a response dated April 30th, 2014, from Nikki Kowalski, Deputy Solicitor General for Criminal Matters, of the Office of the Attorney General, explaining that her office will not intervene concerning the constitutional challenges Pursuant to Executive Law § 71 or C.P.L.R. § 1012(a)(1) at this time.

13.   The Richmond County District Attorney's response was silent on the constitutional challenges also, simply stating that appellate counsel's brief should not be withdrawn.

14.   On May 19th, 2014, this Court issued a Decision and Order on the motion to Withdraw Appellate Counsel's brief and related relief. This Court's decision simply stated that the motion is denied (Exhibit "4-F"). As this Court denied the motion to withdraw appellate counsels brief, which was a prerequisite to be granted for this Court to entertain the assignment of counsel portion of the motion, this court never considered the assignment of counsel application.

15.   On July 15th, 2014, the defendant filed 3 separate and distinct motions with the Richmond County Supreme Court, which were:

   a.   Notice of Motion and Affidavit in Support of Motion for the Assignment of Counsel.
   b.   Notice of Motion and Affidavit in Support of Motion for An Evidentiary Hearing
   c.   Notice of Motion, Affidavit in Support and Memorandum of Law in Support of Motion to Vacate Judgment Pursuant to Criminal Procedure Law § 440.10 (1) (C) (D) (F) (G) (H)

## II.   THE COURT'S DECISION AND ORDER ON THE ARTICLE 440

16.   The court-below denied all three separately submitted motions in one combined Decision and Order dated December 15th, 2014, on the grounds that (1) Motion to Vacate the

*6*

Judgment: The arguments were either conclusory and not supported by documentary evidence or affidavits, or are record based claims and could have been raised on direct appeal (see CPL § 440.10 [2][b]), (2) Motion For An Evidentiary Hearing: There is no constitutional or common-law right to discovery in criminal cases, as defendant's motion is nothing more than an attempt to depose his trial attorney, which is not authorized by C.P.L. Article 240 or 440 and therefore, must be denied, and (3) Motion for the Assignment of Counsel: A defendant cannot claim a state or federal constitutional right to effective assistance of counsel on a motion pursuant to C.P.L. 440. (Exhibit "4-C")

## A.   THE TRIAL COURTS OPINION

17.   The trial court dedicated a single paragraph of its decision to state that "The defendant's claims fall into two categories. They are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record. The defendant does not state his basis of knowledge for his conclusory allegations (e.g. the defense attorney failed to investigate and the defense attorney failed to adequately prepare). Hence, the defendant is not entitled to the relief he seeks based upon conclusory allegations, See, C.P.L. 440.30 (1) and (4) (b)" (see Exhibit "4-C").

18.   The trial court states further, "Additionally, pursuant to CPL § 440.10(2)(b) the Court must deny a motion when the judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal. The defendant's direct appeal is currently pending before the Appellate Division, Second Department. Therefore, petitioner's motion to vacate his judgment pursuant to C.P.L. § 440.10 is denied" (see Exhibit "4-C").

19.     Then, the trial court denied defendant's motion for an evidentiary hearing, stating the defendant is attempting to discover evidence that would support his conclusory allegations, and then qualified this by stating there is no constitutional or common-law right to discovery in criminal cases. The Court stated "the defendant's motion for an evidentiary hearing is nothing more then an attempt to depose his trial attorney. Such a procedure is not authorized by either C.P.L. Article 240 or 440 and therefore, must be denied" (see Exhibit "4-C").

20.     The trial court ignored multiple affidavits from expert and other witnesses who were never called to testify at trial, ignored documentary evidence in the form of billing records received with the help of the Connecticut Attorney General's Office showing that falsified documents were submitted by Licensed Clinical Social Worker Anna Lorusso-Moramarco after Judge Rooney issued a subpoena for these records, emails and multiple other documents.

21.     Judge Rooney's statement that, "They are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record"; is completely unfounded as the motion and accompanying exhibits clearly include this documentary evidence and affidavits (See Appendix "A", list of exhibits).

22.     The trial court ignored the Court of Appeals precedents clearly and concisely laid out by the defendant in his motion for Assignment of Counsel, which stated:

> ➤ The defendant would like to bring to the Courts attention People v. Maxwell, 89 A.D.3d 1108 (2nd Dept. 2011), which is analogous to the defendants case, where it was stated "In this case since some of the defendant's allegations of ineffectiveness involve matters appearing on the record, while others involve matters that are outside the record. The defendant has presented a "mixed claim" of ineffective assistance (People v. Evans, 16 N.Y.3d 571, 575 n. 2, cert. denied --- U.S. ---, 132 S.Ct. 325) In order to properly review a defendant's claim of ineffective assistance, a court must consider all of his or her allegations – as well as the evidence the law, and the circumstances of the case – "in totality" (People v. Baldi, 54 N.Y.2d 137, 147). Thus, where, as here, a defendant presents a mixed claim of ineffective assistance that depends, in part, upon matters that do not appear on the record, it cannot be said that "sufficient facts appear on the record

with respect to the ground or issue raised upon such motion to permit adequate review thereof upon such an appeal" (CPL 440.10[2] [b]).

23.    The Assignment of Counsel motion (Exhibit "4-G"), although not part of the appeal before this Court[3] was part of the combined response by the Richmond County District Attorney's office to all 3 of my separately filed motions[4], and the trial court issued a single combined Decision and Order. Due to the Prosecutor and Trial Courts treatment of them, it is being provided to this Court to provide proper context to the Trial Court's Decision and Order.

24.    The defendant filed the combined Decision and Order Issued by the Honorable Judge Rooney with a Notice of Appeal and Notice of Entry, with the Richmond County Clerk Stephen J. Fiala on January 6th, 2015 (Ex. "4-H"), to appeal as of right the denial of the Assignment of Counsel Motion, which challenged the constitutionality of the laws in N.Y.

24A.  In the defendants reply brief (Ex. "4-J"), he specifically pointed out that in respondents opposition they conceded to eight particular claims of ineffective representation of trial counsel that dehor the record (Ex. "4-I", at ¶ 7), and the defendant then reiterated to the trial court that he has presented "mixed claims" and that procedural bars should not be imposed (Ex. "4-J", at ¶ 4-5). Finally, the defendant refuted respondents contention that he has not explained his failure to obtain an affidavit from trial counsel (Ex. "4-I", at ¶ 8), yet Ex. "3-L" clearly shows Mr. Lamb refused to respond to a certified letter, sent with return receipt, asking for an affidavit.

24B.  For the following reasons as stated below, the trial court misinterpreted the law involving mixed claims of ineffective assistance of trial counsel, which involves issues of fact and law which dehor the record. Accordingly, this Court should remit this matter back to the trial court with instructions to have an evidentiary hearing to develop these non-record based claims.

---

[3] Appealed to the Court of Appeals as of Right Pursuant to CPLR § 5601 9b0 (2).
[4] Motion for Article 440 Relief, Evidentiary Hearing and Assignment of Counsel, also *See* Letter Requesting an Extension of Time to Respond to Assignment of Counsel Motion from District Attorney, Ex. "4-I"

### III.    QUESTIONS OF LAW AND FACT WHICH OUGHT TO BE REVIEWED BY THIS COURT

### POINT 1
**BECAUSE NEITHER CPL § 440.30(1) OR (4) (B) APPLIED TO MY APPLICATION, THE MOTION COURT'S FAILURE TO HOLD THE MANDATORY HEARING I WAS ENTITLED TO UNDER CPL § 440.30(5) VIOLATED MY RIGHT TO DUE PROCESS**

25.    If, as here, CPL § 440.30(1) or (4) (b) does not apply, a motion court must conduct a hearing and make findings of fact (see e.g. People v. Ausserau, 77 AD2d 152 [4th Dept. 1980]). Moreover, a hearing should be held to promote justice when the issues raised by the motion are sufficiently unusual as to suggest searching investigation (see People v. Crimmins, 38 NY2d 407, 416 [1975]).

26.    In this case, CPL § 440.30(1) does not apply because the defendant submitted sworn allegations of fact from 2 different expert witnesses and an uncalled witness, as well as his own affirmation, which was further supported by numerous pieces of documentary evidence and information tending to support the allegations in his moving papers, all in support of my constitutional claims (see People v. Rodriguez, 23 AD2d 683 [2nd Dept. 1965]). Indeed, the court who presided over this action failed to adequately review the moving papers submitted, or it would have seen the multiple affidavits and documentary support. Furthermore, as the facts and circumstances warranted detailed pleadings of fact and law, the defendant should not be punished for submitting a detailed and extended brief, which is not repetitive and has merit

27.    CPL § 440.30(4) (b) does not apply because the moving papers specifically and explicitly contain sworn allegations tending to substantiate all the essential facts. The subdivision of the statute reads as follows:

> CPL § 440.30(4) "Upon considering the merits of the motion, the court may deny it without conducting a hearing if: (b) The Motion is based upon

*10*

the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts, as required by subdivision one..."

29.    Therefore, because the claims were neither (1) conclusively refuted by unquestionable documentary proof in the prosecutor's affirmation in opposition, nor contradicted by a court record or other official document which establishes that the allegations were false or without merit, and (2) the prosecutors affirmation in opposition admits that the claims raised dehor the record (see Exhibit "4-I" pages 3-4) --- none of the subdivisions of CPL § 440.30(4) (b) applied, and I was entitled to a mandatory hearing (see People v. Ausserau, 77 AD2d 152 [4th Dept. 1980]); also see People v. Baxley, 84 NY2d 208 [1994]).

30.    It will no doubt be argued that because the chances of my ultimate success at a hearing were slim, no hearing was required. But the fact that my chances of success in meeting my burden of proof with respect to issues raised in my motion might have been slight, or even remote, did not furnish a basis for the motion court to deny my motion without a hearing where my motion was not based merely on my own averments (see e.g. People v. Hughes, 181 AD2d 912 [2nd Dept. 1992]), but supported by objective proof in the form of affidavits and other records establishing that trial counsel's failures to use evidence available to him during trial (Appendix "A") prevented the defendant from arguing actual innocence to the most serious charges against him, rape, in a case substantially based on the credibility of the complainant's allegation that the sex was forced. This prejudiced the defendant and resulted in a violation of his constitutional right to a fair trial.

31.    I am asking this Court to follow its previous precedent case-law in holding that a hearing will be granted on a defendant's motion to vacate judgment where the defendant's unrefuted allegations claim prosecutorial misconduct (see People v. Gayle, 148 AD2d 307

[1998]; also see <u>People v. Wedra</u>, 56 AD2d 903 [2nd Dept. 1977]), or where there are allegations that the judgment was obtained because of numerous claims of ineffective assistance of counsel.

32.    In light of the district attorney's affirmation's failure to comport with the evidentiary rebuttal requirements implicitly recognized by the Court of Appeals in (see <u>People v. Baxley</u>, 84 NY2d 208 [1994])[5] concerning the Prosecutorial Misconduct at the Grand Jury and claims of Ineffective Assistance of Counsel, and the courts ignorance of the multiple affidavits and other documentary support tending to support the allegations be the defendant (see Exhibit "<u>4-A</u>"), there is a valid question of law and/or fact as to whether the motion court's failure to hold the mandatory hearing to which I was entitled under CPL § 440.30(5) was an inexcusable abuse of discretion, arbitrary and capricious, or otherwise violative of procedural due process protections.

33.    Furthermore, the defendant would like the Court to take Judicial Notice of the fact that the District Attorney has failed to acknowledge considerable and substantial claims of prosecutorial misconduct at the Grand jury in his response, and that the Court also has bypassed the issue. The defendant deems this important in light of this Courts previous decision on January 6th, 2014 that enlarged the judgment roll to include the complete Grand Jury proceedings under seal for this Court's review on my pending direct appeal, after making a prima facie showing of multiple instances of prosecutorial misconduct.

34.    Furthermore, Judge Rooney, my trial judge, is in charge of Grand Jury matters in Richmond County. When I filed an Article 78 petition seeking to compel release of ministerial records of the grand jury in the possession of the D.A.'s Office, the Petition was given Index # 80275/2012, and Judge Rooney assigned.[6] (EX "3-I").

---

[5] See District Attorneys Affirmation in Opposition, Ex "<u>4-I</u>".
[6] Judge Rooney was in charge of handling all Grand jury matters in Richmond County, and made rulings concerning the Grand Jury in my trial. This created a substantial appearance of a conflict of interest, and his failure to recuse himself was an abuse of discretion.

**POINT 2**

**THE MOTION COURT'S DECISION AND ORDER APPLYING PROCEDURAL BARS UNDER CPL § 440.10(2) (B), VIOLATED THE HOLDINGS OF <u>MASSARO V. UNITED STATES</u>, 538 US 500 (2003), AND <u>MARTINEZ V. RYAN</u>, 132 S.CT. 1309 (2012)**

35.    In the trial court's order denying my application for CPL §§ 440.10 relief, the motion court stated that my record based claims "are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based on matters that are within the record...Hence, the defendant is not entitled to the relief he seeks based upon conclusory allegations. See C.P.L. 440.30 (1) and (4) (b)" (see Exhibit "<u>4-C</u>", page 1).

36.    Furthermore, the court also stated that "Additionally, pursuant to C.P.L. 440.10 (2) (b) the court must deny a motion when the judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal. The defendant's direct appeal is currently pending before the Appellate Division, Second Department. Therefore, petitioner's motion to vacate his judgment pursuant to C.P.L, 440.10 is denied."

37.    This finding, however, presupposes that a direct appeal is the appropriate venue to raise claims of ineffective assistance of counsel which by their very nature are mixed claims of law and fact. Furthermore, the court's finding completely ignores recent precedent set in the Supreme Court --- and in this Court --- which would not allow the application of procedural bars to initial review proceedings involving full pallet ineffective assistance of counsel claims.

38.    For instance, in <u>Martinez v. Ryan</u>, 132 S.CT. 1309 (2012), the Supreme Court held that because ineffective assistance claims often depend on evidence outside the trial record (even when it seems record based), direct appeals are not equipped for resolving such claims (see <u>Martinez v. Ryan</u>, 132 S.CT. 1309, at 1318 (2012). The Supreme Court further reasoned that

*13*

when a state's jurisprudence defers the resolution of an ineffective assistance claim to a post conviction application (i.e. initial review proceedings), the state cannot assert procedural bars to those claims when, through no fault of the defendant, his state appellate counsel fails to raise that claim in a state court post conviction proceeding as required by state law.[7]

39.   I asked for the assignment of counsel to help me prepare and submit my CPL § 440.10 application. But instead of granting the hearing I was entitled to (see Point 1, supra), the motion court invoked a procedural bar to my prosecutorial misconduct and ineffective assistance of counsel claims (see Exhibit "4-C", Page 1), failed to respond on the merits to any of my claims (see Point 2, supra), and never even considered assigning counsel to my case, simply stating that I have no constitutional right to effective assistance of counsel (see Exhibit "4-C", page 2).

40.   In Massaro v. United States, 538 US 500 (2003), the Supreme Court held that a trial court rather than an appellate court is best suited to develop the record necessary for determining the adequacy of representation during proceedings before the trial court (see Massaro v. United States, 538 US at 504-505)[8].

41.   In Sanchez-Llama v. Oregon, 548 US 331 (2006), the Supreme Court,  addressing a claim of whether the States are required to hear Vienna Convention claims raised for the first time in State post conviction proceedings, held that "given that the convention itself imposed no such [post conviction presentation] requirement" (see Sanchez-Llama v. Oregon, 548 US at 359), the Court could not perceive of any grounds to require State procedural rules to adhere to Massaro (id.).

42.   From this language it can rationally be inferred that if there is some State court procedural rule or caselaw that holds that presentation of an ineffective assistance of counsel

---

[7] This is narrowed and clarified in Trevino v. Thaler, Point 4 (B), *supra*.
[8] There is a question of law as to whether the Supreme Court in Martinez v. Ryan, 132 S.Ct. 1309 (2012), made this decision binding on the court by citing Massaro.

claim would best be developed on a post conviction application, then the application of Massaro would apply (see Martinez v. Ryan, 132 S.Ct. 1309, 1318, [holding that states do not act with impropriety by reserving claims of ineffective assistance for collateral proceedings]). Fortunately, under New York State jurisprudence there are post conviction presentation requirements which even Federal courts have acknowledged using the same language and rational as Massaro, supra.

A.    THE MOTION COURT'S APPLICATION OF CPL § 440.10'S PROCEDURAL BARS TO MY CLAIMS OF PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL WAS CONTRARY TO CLEARLY DEFINED STATE COURT PRECEDENTS

43.    In People v. Melendez-Smith, 66 AD3d 1042 (2nd Dept. 2009), the Second Department held that when a defendant's claim is based on affirmations and other matters dehors the main record, it is not properly before the Appellate Division without initial presentation to the State trial court (also see People v. Mendoza, 298 AD2d 532 [2nd Dept. 2003])[9]. Supporting this rational is the Court of Appeals holding that in the "typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel can be bottomed on an evidentiary exploration by collateral or post conviction proceedings brought under CPL § 440.10" (see People v. Brown, 45 NY2d 852, 853-854 [1978]), particularly when trial counsel's rational for his performance failures are necessary to evaluate counsel's strategic and tactical decisions (see e.g. Strickland v. Washington, 466, U.S. 668, 104 S.Ct. 2052, 2066 [1984]; also see People v. Morales, 58 NY2d 1008 [1983]).

44.    Also, in Walter v. Dalshiam, 669 F.Supp. 68 (S.D.N.Y 1987), the district court held that under New York law the proper vehicle for raising a claim of ineffective assistance of trial

---

[9] Also see People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011); People v. Freeman, 93 AD3d 805 (2nd Dept. 2012).

counsel is generally not a direct appeal but a motion to the trial court to vacate the judgment under CPL § 440.10. The district court reasoned that the appellate court has no basis upon which it would be able to consider the substance of an ineffective assistance of counsel claim until a record of the relevant facts has been made at the trial court level (compare Massaro v. United States, 538 US at 504-505 with Walter v. Dalshiam, 669 F.Supp. at 70).

45.    This was recently echoed in Martinez v. Ryan, 132 S.Ct. 1309 (2012), where the Supreme Court held that because ineffective assistance of trial counsel claims often depend on "evidence outside the trial record," direct appeal is not effective for "developing the factual basis" for the ineffective assistance claims (id. at 1318) (citing to Massaro v. United States, supra). And as Exhibit "4-A" establishes that the records identified in Appendix "A" were outside of the record, a mixed question was raised upon which I was entitled to de novo review.

46.    Based on the above, my prosecutorial misconduct and ineffective assistance of counsel claim --- both of which are supplemented by non-record facts never presented in any other proceeding (i.e. 190.50 Notice received through FOIL, the Affidavits from Experts, Records from AETNA, etc. [See Appendix "A"]) --- can only be brought by way of a post conviction motion, not an appeal. The motion court's application of procedural bars under CPL §§ 440.10(2) violated my due process right to access to the only forum actually capable of providing a full and fair hearing of my ineffective assistance of counsel claims under either Strickland's performance/prejudice test, or Baldi's overall performance test (see Martinez v. Ryan, supra), which relies on "representation as a whole" and "in totality".

**B.    THE MOTION COURT ABUSED IT'S DISCRETION IN FAILING TO CONSIDER THE NUMEROUS NON-RECORD BASED EXHIBITS UPON WHICH HIS MOTION TO VACATE THE JUDGMENT WAS PREDICATED ON, AND THEREFORE IGNORED THE SECOND DEPARTMENT AND COURTS OF APPEALS PRECEDENTS INVOLVING "MIXED CLAIMS"**

47.    Because an inquiry into defense counsel's rational is essential to any post conviction evaluation of trial counsel's litigation decisions, and the best source of this information would be trial counsel himself (see People v. Morales, 58 NY2d 1008 [1983]; also see People v. Taylor, 211 AD2d 603 [1st Dept. 1999]), such an inquiry by its very nature requires reference to non-record facts (i.e. trial counsel's affidavit, which this defendant attempted to obtain numerous times, see Exhibit "3-L", also referred to in Page 4 of my motion for an Evidentiary Hearing). Therefore a CPL § 440.10 motion, not an appeal, was (and is) the appropriate venue to raise my ineffective assistance of counsel claims, notwithstanding appellate counsel's raising components of this claim on defendant's direct appeal pending before this Court.

48.    This understanding was recently echoed in People v. Freeman, 93 AD3d 805 (2nd Dept. 2012), where this Court held that when an ineffective assistance of trial counsel claim is based on matters not appearing on the record, and in part, on matters outside of the record, a mixed claim of ineffective assistance of counsel has been created which cannot be resolved on direct appeal.

49.    Similarly, in People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011), the Second Department held that because an ineffective assistance claim constitutes but a single ground, requiring reference to both record and non-record based issues, and as the ultimate question is with the fairness of the process as a whole, the entirety of counsel's conduct must be reviewed, making application of any procedural bars under either CPL § 440.10(2) or CPL § 440.10(3), inapplicable to my ineffective assistance of counsel claims.

50.   In light of the recent Supreme Court holdings in Martinez v. Ryan, 132 S.CT. 1309 (2012), and Massaro v. United States, 123 S.CT. 1690 [2003] [requiring all ineffective assistance of counsel claims to be raised on a post conviction motion, not an appeal], and in light of the holdings by this Court in People v. Freeman, supra, and People v. Maxwell, supra, the Richmond County Court's failure to review my mixed claims of ineffective assistance of counsel --- under the facts advanced above and in my original CPL § 440.10 application --- warrants an extended discussion which can only occur if this Court grants leave.

51.   Even though this Court has held that an ineffective assistance of trial counsel claim constitutes but a single ground requiring reference to both record and non-record based facts, and that in reviewing claims of ineffective assistance of counsel the motion court must review the entirety of the allegations of counsel's alleged misconduct (see People v. Maxwell, 89 AD3d 1108 (2011), the motion court ignored detailed records that were clearly "Mixed Claims", which include, but are not limited to, the following:[10]

### (i)   PROSECUTORIAL MISCONDUCT

52.   First, the defendant raised issues of Prosecutorial Conduct by the Richmond County District Attorney's Office before, during and after the grand jury proceedings in excruciating detail, which were supported in part by Court Records that were part of the lower court's file. The problem is that many records that were available to Mr. Lamb were never used. There were also multiple records obtained by the defendant, like a Notice of Grand Jury Action received from the Richmond County District Attorney's Office through FOIL on 2 separate occasions **that irrefutably show this document was allegedly faxed to my trial attorney almost 3**

---

[10] Defendant refers the Court to his Preliminary Statement in the Memorandum of Law (Exhibit "4-A"), Pages ix through xx, for a complete synopsis of all claims presented.

**weeks before I was arrested** (see Ex. "1-D"[11], compare to Ex. "1-I"[12] and ""1-J"[13]). This conclusively shows this document was altered, as the physical characteristics of the handwriting on the document clearly show. Furthermore, Mr. Lamb's failure to contemporaneously object and file a motion Pursuant to C.P.L. § 210.20 and/or § 210.35 to dismiss the indictment failed to preserve these meritorious issues for appellate review (see Section 2 [Affidavit in Support of Article 440], and Point 2, [Memorandum of Law in Support of Article 440] and appropriate paragraphs highlighted in Footnote 7, 8 and 9, *supra*, in the Affidavit in Support).

### (ii)     THE ALLEGED "DIARY"

53.   Second, also intertwined in the pervasive misconduct occurring in the grand jury proceedings is the alleged "diary" (See Ex. "1-Q")[14]. This diary permeates not only the grand jury but the entire trial from the beginning to the end. The District Attorney allowed the complaining witness to read from the diary during her entire grand jury testimony, and the diary was never marked for identification, nor was it used to refresh her recollection. Once again, my trial attorneys failure to review the grand jury minutes and challenge it in a § 210.20 and/or § 210.35 motion to dismiss the indictment failed to preserve these issues for appellate review.

54.   Mr. Lamb tried to equate the diary with contemporaneous prompt outcry by the complainant (See Ex. "1-X")[15] on July 7th, 2010, which left the trial judge stupefied. Furthermore, Mr. Lamb requested the subpoena of records from Licensed Clinical Social Worker

---

[11] Notice Pursuant to CPL § 190.50(5)(A)(B) dated September 30th, 2009, ¶ 117, 171, 174, 181-82, 188, 190, 192
[12] Notice Pursuant to CPL § 190.50(5) (A) (B) Received Through FOIL, ¶ 134, 135, 139-141
[13] FOIL Related Papers Sent to Richmond County District Attorney, ¶ 134, 137
[14]   Complainants Diary, ¶ 152, 199, 206, 209, 211, 213, 215, 216, 227-28, 241, 242, 291, **Also see** Ex. "1-T" Affidavit from Steve Frankl concerning Email sent to him, which corresponds to first dated entry in alleged diary, ¶ 203, 235, 500
[15] Stenographic Transcripts of July 7th, 2010, ¶ 272, 273, 283  (see also ¶ 274-275)

Anna Lorusso-Moramarco (See Ex. "2-X")[16], and when the Court asked if he was interested in examination of those records (see Exhibit "2-S"[17], "2-T"[18], "2-W"[19] and "1-R"[20]) with regard to whether or not the complainant made a prompt outcry to the therapist, he replied yes.[21]

55.    Furthermore, Mr. Lamb failed to investigate lack of prompt outcry (of rape) to a doctor seen by the complainant less then 1 week before my arrest, where the complainant did make prompt outcry of assault, an allegation the defendant never denied (See Ex. "2-N").[22] **Yet, Mr. Lamb did not introduce the session notes into evidence, question the complainant on prompt outcry or pursue prompt outcry in any manner, failing to preserve the issue for appellate review**.

### (iii)    FAILURES CONCERNING EXPERT WITNESSES

56.    Third, the diary was entrenched further into another mixed claim issue which involved multiple expert witness reports and testimony which was central to the defendant's case. Multiple affidavits from both experts were submitted with the defendants Article 440 claims, a fact the trial court completely ignored by stating that "They are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record. The defendant does not state his basis of knowledge for his conclusory allegations (e.g. the defense attorney failed to investigate and the defense attorney failed to adequately prepare). Hence, the defendant is not entitled to the relief he seeks based upon conclusory allegations, See, C.P.L. 440.30 (1) and (4) (b)" (see Exhibit B).

---

[16] Subpoena Issued By Judge Rooney for Anna Lorusso-Moramarco, ¶ 541 [Records were Produced]
[17] Session Note of L.C.S.W. Ms. Moramarco dated July 21st, 2009, ¶ 492-493, 542, 543, 550
[18] Session Note of L.C.S.W. Ms. Moramarco dated July 28th, 2009, ¶ 496, 542, 544
[19] Session Note of L.C.S.W. Ms. Moramarco dated August 11th, 2009, ¶ 542, 544
[20] Session Note of L.C.S.W. Ms. Moramarco dated September 22nd, 2009, ¶ 167, 254
[21] See Affidavit in Support at ¶ 276-277
[22] Medical Records of Dr. Saluja Raveen, M.D. of Complainant, ¶ 372, see also ¶ 371-375

57.    To the contrary the defendant submitted a report from expert witness Treyce d'Gabriel-Montoya (see Exhibit "2-B ")[23], and Mr. Lamb refused to present her CV to the Court so she could testify at my trial and present the report to the Court. The defendant also submitted multiple reports and signed affidavits of Handwriting Expert Robert Baier (See Exhibits "2-Q"[24] and "2-R"[25]), all which dehor the record because they were not introduced into evidence, nor was Mr. Baier called to the stand to testify. I contacted Mr. Baier after trial and he supplied me with an affidavit relating the facts about him being sent home from Court (See Exhibit "2-U"[26]). Mr. Lamb had highlighted for the Court the importance of Mr. Baiers testimony and the concern for the expert's time due to a death in his family (See Exhibit "4-A", Affidavit in Support at ¶ 509-511), yet he still made Mr. Baier drive 2 ½ hours from Warwick, N.Y. to testify in this matter while his mother was in a funeral home waiting to be buried.

58.    When the defendant objected to Mr. Lamb not questioning the complainant about and introducing the diary into evidence during the cross-examination of the complainant, Mr. Lamb completely contradicted himself by stating "...In my judgment it shouldn't have come in and no reference should have come in on the cross examination and therefore we make the expert's testimony irrelevant. He is protesting that." (Tr. Pg 331 at ¶13-25, Pg. 332 at ¶1) (See Affidavit in Support at ¶ 512-514)

59.    Finally, to add injury to insult, the Trial Court abused its discretion on October 5th, 2010, the proposed day of sentencing, by engaging in tactics designed to prevent appellate review of counsel's failure concerning the handwriting expert during the following colloquy:

---

[23] **Forensic Handwriting Personality Profiler Treyce d'Gabriel-Montoya Letter of Opinion dated September 14th, 2010, ¶ 285, 404**
[24] **Forensic Document Examiner Robert Baier Letter of Opinion, ¶ 398**
[25] **Forensic Document Examiner Robert Baier Supplemental Report, ¶ 400**
[26] **Confirmation Letter from Robert Baier dated March 2nd, 2011, ¶ 507**

➢ Mr. Lamb: "I mean the major thrust of my conduct at trial is my belief that if the use of the diary then introduced a handwriting expert to impeach the diary would have been harmful." (Tr. Oct. 5th, Pg. 8 at ¶ 25, Pg. 9 at ¶ 1-4)

➢ Defendant: "He was ready to testify. The handwriting expert was in the building that day. Because of his failure to bring up that I believe that he would have been able to show the jury prejudice in the fact that every single page of the diary was written in a different handwriting by a different pen." (Tr. Oct. 5, Pg. 9 at ¶ 5-11)

➢ Defendant: "It shows she went back and maliciously added stuff to the diary, took it to the grand jury and presented a false document. I was never given notice of Grand Jury. I had filed a notice for that as well." (Tr. Oct. 5 Pg. 9 at ¶ 12-16)

➢ Defendant: "I showed it to a dozen people and can see the handwriting is different." (Tr. Oct. 5th, Pg. 9 at ¶ 19-20)

➢ Mr. Lamb: "There was a handwriting expert that was brought on actually assigned to 18b, he was actually in the building ready, willing and able to testify." (Tr. Oct. 5th, Pg. 10 at ¶ 6-9)

➢ The Court: "For strategic reasons you decided not to call him."[27] (Tr. Oct. 5th, Pg. 10 at ¶ 10-11)

➢ Defendant: "Against my wishes." (Tr. Oct. 5th, Pg. 10 at ¶ 12)

➢ Mr. Lamb: "We did discuss it. As a result of our conversation regarding that it was my feeling that the defendant agreed with me that at that point that it was unwise as a trial strategy to introduce the existence of the diary." (Tr. Oct. 5th, Pg. 10 at ¶ 13-17)

➢ Defendant: "I wouldn't have had the guy drive down from Upstate New York if I didn't want him to testify. That morning Mr. Lamb talked about a lot of stuff and he may not remember, but I specifically told him that was the most important part of my trial. And I object and I wouldn't have had the guy drive down three hours. (Tr. Oct. 5th, Pg. 10 at ¶ 19-25)

➢ Defendant: "I found the handwriting expert. Mr. Lamb couldn't find one. I made all the arrangements for this guy to be here. Why would I do that if I didn't want him to testify in my trial?" (Tr. Oct. 5th, Pg. 11 at ¶ 1-4)

➢ The Court: "All right, your lawyer is going to make that 330.30 application." (Tr. Oct. 5th, Pg. 10 at ¶ 5-6)

60.    These statements clearly contradict all of Mr. Lamb's earlier statements concerning Mr. Baier testifying in this matter, and are clearly a position contrary to the defense (See Mem. of Law [Ex. "4-A"] Point 3, I, C & F, *supra*). The trial court's action of placing words in trial counsel's mouth concerning his reasoning was prejudicial, biased and inappropriate.

61.    When considering the totality of the circumstances involving expert witness Robert Baier, the centrality of the diary to this entirely circumstantial case where credibility was the

---

[27] **The Honorable Court abused its discretion by giving trial counsel direction concerning his trial decision and strategy in this matter, which violated the Ethical and Professional Canons of Judges.**

crucial determining factor for the jury to consider, and the further involvement of this diary's inappropriate use at the Grand Jury; the severity of misconduct, prejudice and bias demands further review by the lower court in the form of an evidentiary hearing.

### (iv)    TRIAL COUNSEL'S NUMEROUS ERRORS OF OMISSION AND COMMISSION

62.    Intertwined with the above mentioned issues in sub-points **i, ii**, and **iii**, *supra*, and standing alone on numerous other issues, were trial counsels errors of omission and commission which dehor the record, and could only be determined by trial counsel himself as they relate to any tactical reasons or strategic purposes trial counsel may have made.

63.    It is here that the defendant would like to provide context and bring to the Court's attention the lack of qualifications and experience of Eugene Lamb ESQ., who should have never been allowed to participate in the 18-B Assigned Counsel Plan, or at the very least, should never have been assigned to a case such as defendant's involving allegations of rape, as Mr. Lamb was inexperienced, unqualified and incapable of creating an effective adversarial process.

64.    The defendant refers this Honorable Court to Section 1 of his Affidavit in Support of his Article 440 brief, titled "**The Domino Effect of Under-Qualified, Inexperienced and Poorly Compensated Counsel at Trial, Through a Mismanaged Assigned Counsel Plan, Has Created Convoluted Practices, Which Violate Due Process and Equal Protection, Resulting in Waste of Financial and Judicial Resources in New York State**". Specifically, the defendant would like the Court to take notice of Section 1 (IV) titled "**Assigned Counsel Plan Deficiencies**", (A), where I provide the comparative guidelines from the "**New York State Bar Association Revised Standards for Providing Mandated Representation**", outlining the "Qualification of Counsel" and "Performance" standards.

65.    In Section 1 (IV) (B), I provide detailed records of trial attorney Eugene Lamb ESQ in the form of a summary of Vouchers for the last seven years[28], application and recertification documents received from the Office of Court Administration[29] and Vendor Payment Records[30]. These records, when viewed in conjunction with each other and in context of Mr. Lamb's representation of me, provide detailed insight into his inexperience, which resulted in his inability to create an effective adversarial process. When looking at a summary of his failures outlined below[31] and plead fully in my Article 440 application, it becomes apparent his errors of omission and commission seriously prejudiced my right to receive my federal right to the effective assistance of counsel.

➢ Mr. Lamb's failure to review the trial record, which included his failure to review the Grand Jury minutes (Aff. at ¶ 291-292), Medical Records of the Complainant (Aff. at ¶ 293-299), DD5 Reports of Detective Wasson (Aff. at ¶ 300-311), Voice Mail Recordings (Aff. at ¶ 312-327), Circumstances of the Grand Jury proceedings in relation to Mr. Sullivan's numerous errors (Aff. at ¶ 328-343), Sexually explicit pictures showing prior consensual relations with complainant (Aff. at ¶ 344-348), Emails sent to Complainant (Aff. at ¶ 349-370), Lack of Prompt Outcry to Dr. Raveen (Aff. at ¶ 371-375); resulted in a "snowball effect" of numerous errors, cumulatively depriving me of counsel that was able to apply the facts to the law relevant to my defense, amounting to less then meaningful representation and the ineffective assistance of counsel, violating my due process right to a fair trial.

➢ These errors of omission and commission led to Mr. Lamb's failure to move to recuse ADA Katchen as an unsworn witness for violating the advocate-witness rule (Aff. at ¶ 376-379), his failure to challenge the prosecution theory with multiple expert witnesses he requested (Aff. at ¶ 380-405), his failure to use cross-examine effectively as an impeachment tool (Aff. at ¶ 406-431); which further resulted in his failure to impeach complainant with illogical and inconsistent statements, defeating the adversarial process (Aff. at ¶ 432-422). This also prevented him from focusing on substantive issues with a coherent trial strategy (Aff. at ¶

---

[28] Provided as Exhibits were Vouchers of cases he went to trial on, all of which resulted in a finding of Guilt, and none of which (except my own case in 2009) for a case involving rape. These vouchers were received through a FOIL request to the Department of Finance, the city agency who processes payments for the Assigned Counsel Plan.

[29] These documents were received after a Judiciary Law request sent to this Court was appealed and fulfilled by the Office of Court Administration.

[30] These documents were received during ongoing Article 78 Litigation against the Assigned Counsel Plan for the Second, Eleventh and Thirteenth Judicial Districts, and show Mr. lamb receiving between $125,000 and $150,000 per year, and billing 42-48 full 40 hour work weeks per year, essentially making him a full time employee of the City of New York.

[31] In the interest of brevity, the following outline of issues is fully plead in my Article 440 Affidavit and Supported with Arguments of Law in the accompanying Memorandum of Law.

442-444), like his failure to address the weekend in the Pocono's in relation to the diary entry of September 18th, 2009 (Aff. at ¶ 445-450) and finally, like his critical failure to object and effectively cross-examine Ms. Mach and the Complainant concerning the conflicting accounts of "The end of September" (Aff. at ¶ 451-490).

➢ Unfortunately, Mr. Lamb's failures don't stop there. He failed to use session notes of Licensed Clinical Social Worker Anna Lorusso-Moramarco to cross examine complainant on prompt outcry, which he argued for to the Court and received, some designated by the Court as potential Brady material (Aff. at ¶ 491-499). This was exacerbated when I recently obtained and discovered proof that the records submitted to the court under subpoena by Ms. Moramarco were falsified and misrepresented to this Court, amounting to obstruction of justice (Aff. at ¶ 541-555).

➢ We continue with Mr. Lamb's failure to review an email sent to family friend Steve Frankl on July 17th, 2009, which amounted to prompt outcry by me concerning my fiancés erratic behavior. Ironically, the complainant's alleged diary's first entry is also July 17th, 2009, hardly a coincidence. Mr. Lamb had Mr. Frankl on the defense witness list, but never called him to the stand (Aff. at ¶ 500-505).

➢ Mr. Lamb took a position contrary to the defense on multiple occasions, but most dramatically when he failed to call Forensic Document examiner Robert Baier to the stand to testify (Aff. at ¶ 506-516).

➢ The use of the inadmissible diary at the Grand Jury resulted in retroactive misjoinder, allowing the people to assert a theory of "Battered Woman's Syndrome" and present evidence from an expert witness which ordinarily would not be allowed, improperly bolstering the prosecution's case. This resulted in prejudicial spillover from the 11 dismissed counts, which represented more then half the evidence in support of the People's theory of "Battered Woman's Syndrome." The failure of Mr. Lamb to identify and address the issues concerning the diary in a pre-trial motion to dismiss the indictment allowed this to occur (Aff. at ¶ 556-563).

➢ I was denied due process when the trial court abused its discretion and allowed testimony stricken during trial to be read back to the jurors after trial was over during a request for a read-back, even though Mr. Lamb requested this testimony to be read back (Aff. at ¶ 565-570).

➢ Mr. Lamb failed to ask for a mistrial concerning the prosecutors questions to defense witness Ortiz about his arrests (Aff. at ¶ 571-575), failed to object and ask for a mistrial for the prejudicial remarks made by the prosecutor in summation (Aff. at ¶ 576-580), and failed to object and seek a mistrial for the court's error of not issuing a written decision and order, and for failing to seek a mistrial for the court's abuse of discretion, in denying permission for the expert witness to examine the diary in his laboratory (Aff. at ¶ 581-589).

➢ These errors of omission and commission by Mr. Lamb failed to protect me from prejudicial evidentiary rulings and summation remarks, prejudicing my right to a fair and impartial trial worthy of confidence (Aff. at ¶ 590-593).

66. All of these issues outlined above mostly fall into two distinct categories, (1) They involve trial counsels failure to investigate and use records and information available to him at

the time of trial. This is why there are numerous records submitted as exhibits like official court docket sheets, discovery letters etc., technically part of the record, but trial counsels failure to use them to the defendant's benefit distinctly involve trial counsels reasoning, which dehors the record; or (2) They involve extra-record material obtained after trial that was never obtained by trial counsel due his lack of investigation, or entered into evidence as an exhibits and as such they dehor the record.

67.    In the following section, the defendant will reiterate his previous applications presented to this Court to enlarge the Judgment Roll, and to Withdraw Appellate Counsel's brief; as they directly relate to the defendant's due process rights to have a full and fair opportunity to an adequate and complete appeal as of right, with an attorney. This is important for this Court to consider as I will explain in <u>Point 4</u>, *supra*, of these moving papers, concerning the unconstitutional and convoluted procedural scheme in this state that moves ineffective assistance of counsel claims outside the direct appeal process.

**C.    THE DEFENDANT ASKS THIS COURT TO TAKE JUDICIAL NOTICE OF HIS PREVIOUS APPLICATION TO THIS COURT TO ENLARGE THE JUDGMENT ROLL AND TO WITHDRAW APPELLATE COUNSEL'S BRIEF WHEN CONSIDERING WHETHER THE TRIAL COURT'S APPLICATION OF PROCEDURAL BARS WAS ERRONEOUS AND CONTRARY TO FEDERAL AND STATE PRECEDENTS**

68.    The defendant submitted a motion to enlarge the judgment roll, which specifically asked to include the following documents, which were attached as exhibits to the motion to enlarge the judgment roll. (Records Eventually Granted to be Part of the Record in **Bold**)[32]

> 1-Q      Complainants Diary
> **1-F      Grand Jury Transcripts of October 1st, 2009**
> **1-K      Stenographic Transcripts of October 5th, 2009 (180/80 Day)**

---

[32] These exhibit numbers reflect the exhibit numbers as attached to the Article 440 Application, <u>not</u> the motion to enlarge the judgment roll

➢ **1-H**      **Stenographic Transcripts of October 1st, 2009 (Arraignment)**
➢ 1-R       Session Note of L.C.S.W. Ms. Moramarco dated September 22nd, 2009,
➢ **1-X**      **Stenographic Transcripts of July 7th, 2010**
➢ 1-T       Affidavit Concerning Email to Steve Frankl
➢ **1-Y**      **Stenographic Transcripts of July 16th, 2010**
➢ 2-B       Forensic Handwriting Personality Profiler Treyce d'Gabriel-Montoya Letter of
              Opinion dated September 14th, 2010
➢ 2-G       Detective Wasson's Memo Book Entries received from Mr. Lamb
➢ 2-S       Complainant's Individual Session Note with Anna Lorusso-Moramarco Released
              as Brady Material, Dated July 21st, 2010
➢ 2-U       Confirmation Letter from Robert Baier dated March 2nd, 2011
➢ 2-V       Unsigned Affidavit of Mr. Baier on File with Assigned Counsel Plan
➢ 2-T       Session Note of L.C.S.W. Ms. Moramarco dated July 28th, 2009
➢ 2-W       Session Note of L.C.S.W. Ms. Moramarco dated August 11th, 2009

69.    On January 6th, 2014, this Court, in a combined decision and order, granted permission

to file a supplemental pro-se brief by April 7th, 2014, and also granted my motion to enlarge the

judgment roll in part. This Court issued an order for the Grand Jury proceedings to be produced

by the Nisi Prius Court to the Appellate Division under seal, as well as an order to produce the

stenographic transcripts for July 7th, July 16th, and August 10th, 2010 as part of the judgment

roll.[33]

70.    I then filed a motion to amend the decision and order of January 6th, 2014, to enlarge

the record to include the **October 1st, 2009** and **October 5th, 2009** transcripts, which were

requested as part of the original motion. On April 21st, 2014, this Court granted my motion and

issued a Decision and Order enlarging the judgment rolls further, ordering the stenographer to

produce said transcripts within 45 days, which ended on June 5th, 2014.

71.    The decision by this Court granted my motion for transcripts only, which by default

told this defendant that these other requested records were not properly a part of the record on

appeal, hence the defendant's inclusion of these documents supporting his claims of ineffective

---

[33] The defendant did not possess the August 10th, 2010 transcripts (which were actually August 11th, 2010),
but as the defendant explained their relevancy by referring to previous transcripts, this Court enlarged the
record to include these transcripts as well.

assistance of counsel were included in his Article 440 application (as they dehor the record), the subject of this leave to appeal application.

72.    After fully realizing my appellate counsel's failure to expand the record via an Article 440 proceeding, on March 20th, 2014, I filed a motion to withdraw appellate counsel's brief with this Court This motion, if granted, also asked for the further relief of the assignment of new counsel on the appeal to aid in the preparation of a CPL 440 motion, and to hold the appeal in abeyance pending the determination of the CPL 440 motion. This motion also challenged the constitutionality of County Law § 722 and the potential application of CPL § 440.10(2) procedural bars (**which is exactly what occurred**), and was served on the Attorney General Pursuant to Executive Law § 7101 and CPLR § 1012(b).

73.    I submitted detailed pleadings which conclusively provided this court with exhibits in the form of correspondence to and from Mr. Landau, my assigned appellate attorney from Appellate Advocates, showing he consistently told me he would discuss pursuing an Article 440 motion with me and never did. This Court declined my motion without explaining its decision, simply stating that the motion is denied. As this Court denied the motion to withdraw appellate counsels brief, which was a prerequisite to be granted for this Court to entertain the assignment of counsel portion of the motion, this court never considered the assignment of counsel portion of the application.[34]

74.    I am asking this Court to take judicial notice of the previous applications, and this Court's Decision and ORDER on each of them, because I believe it is important to let the record reflect that I have exhausted every possible avenue for relief, in an effort to receive a full and fair opportunity to have my issues heard on my first and only appeal in N.Y. State where I am

---

[34] It is for this reason the defendant presented this application in a separate stand alone motion to the lower court, a more suitable venue, and is now appealing that motion directly to the Court of Appeals Pursuant to CPLR 5601 (b) (2).

afforded counsel **as of right**. This directly relates to the defendant's due process rights, as when a state, like New York, in practice (as occurred in the case presented to you here today) effectively moves ineffective assistance of counsel claims outside the direct appeal process, where counsel is not provided, it becomes violative of federal law. To reiterate, this is important for this Court to consider as I will explain in Point 4, *supra*, of these moving papers, titled:

> "This Court Should Take The "Proverbial Leap" And Find That The Unconstitutional And Convoluted Procedural Scheme In This State That Moves Ineffective Assistance Of Counsel Claims Outside The Direct Appeal Process Prevents Defendants From Determining These Claims Fully On The Merits Under The State Practiced Standard For Those Claims, 'Baldi', Which Is 'Representation As A Whole' And 'In Totality'; Because In Practice It Is Impossible To Reach, And Will Lead To The Challenge Of These Laws Via The Adequacy Doctrine."

75.    The common practice in New York to obtain a full and fair review of my ineffective assistance of counsel claims is to file a CPL § 440.10 motion, which is expounded on below.

## D.    CPL § 440.10 IS THE ONLY VEHICLE TO OBTAIN A FULL AND FAIR REVIEW OF MY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS

76.    In Massaro v. United States, 538 US 500 (2003), the Supreme Court held that a trial court rather than an appellate court is best suited to develop the record necessary for determining the adequacy of representation during proceedings before the trial court (see Massaro v. United States, 538 US at 504-505). But in Sweet v. Bennett, 335 F3d 135 (2nd Cir. 2003), the Second Circuit held that because Massaro was not decided on constitutional grounds its holdings are not applicable to State post conviction applications (see Sweet v. Bennett, 335 F3d at 140-141; also see Carney v. Fabian, 441 F.Supp.2d 1014, 1019 [D. Minnesota 2006] [holding that there is no constitutional ruling in Massaro that is binding on State courts]; Hayes v. Battaglia, 403 F3d 935, 937 [7th Cir. 2005]).

77.    Fortunately, under both the New York State and Federal jurisprudence there are post conviction presentation requirements which even state courts have acknowledged using the same language and rational as Massaro, supra.

78.    In People v. Melendez-Smith, 66 AD3d 1042 (2nd Dept. 2009), the Second Department held that when a defendant's claim is based on affirmations and other matters dehors the main record, it is not properly before the Appellate Division without initial presentation to the State trial court (also see People v. Mendoza, 298 AD2d 532 [2nd Dept. 2003]). Supporting this rational is the Court of Appeals holding that in the "typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel can be bottomed on an evidentiary exploration by collateral or post conviction proceedings brought under CPL § 440.10" (see People v. Brown, 45 NY2d 852, 853-854 [1978]), particularly when trial counsel's rational for his performance failures are necessary to evaluate counsel's strategic and tactical decisions (see e.g. Strickland v. Washington, 466, U.S. 668, 104 S.Ct. 2052, 2066 [1984]; also see People v. Morales, 58 NY2d 1008 [1983]).

79.    For instance, in Walter v. Dalshiam, 669 F.Supp. 68 (S.D.N.Y 1987), the district court held that under N.Y. law the proper vehicle for raising a claim of IAC is generally not a direct appeal but a motion to the trial court to vacate the judgment under CPL § 440.10. The district court reasoned that an appellate court has no basis to consider the substance of an IAC claim until a record of the relevant facts has been made at the trial court level (compare Massaro v. United States, 538 US at 504-505 with Walter v. Dalshiam, 669 F.Supp. at 70).

80.    I am entitled to full and fair review of the constitutional issues affecting the validity of my trial counsel's performance, which could only occur if I am provided with an attorney and an expert to help investigate, prepare and submit my CPL § 440.10 application. **It is only under**

**these circumstances that my assigned attorney could question trial counsel's performance at my trial, an important pre-requisite to properly evaluate the defendant's claims.**

81.    I am respectfully asking this Court to take a comprehensive look at these issues, and determine if its dicta in <u>Martinez v. Ryan</u>, supra, should be applied to this case challenging the effectiveness of trial counsel, to the extent that without having a hearing and assigning counsel for the investigation, preparation and submission of my **initial** review collateral proceedings challenging the effectiveness of trial counsel, this Court will be denying the defendant his **first** opportunity to a full a fair hearing of these issues on their merits.

82.    Based on the above, my IAC claim, which is supplemented by non-record facts, can only be brought by way of a post conviction motion, not an appeal. The application of the procedural bars by the trial court under CPL § 440.10(2) has violated my due process right to access to the only forum actually capable of providing a full and fair hearing of my IAC claims under <u>Strickland</u>'s performance/prejudice test, and <u>Baldi</u>'s "Representation as a Whole" and "In Totality" standard.

**POINT 3**

**BECAUSE THE LOWER COURT ANSWERED NONE OF THE CONSTITUTIONAL QUESTIONS RAISED BY MY CPL § 440.10 APPLICATION, THIS MATTER MUST BE HELD IN ABEYANCE, AND REMITTED TO THE LOWER COURT FOR COMPLIANCE WITH CPL § 440.30(7) WITH DIRECTIONS TO ANSWER SPECIFIC QUESTIONS OF LAW AND FACT AFFECTING THE MERITS OF THE MOTION**

83.    Prior to the enactment of CPL § 440. 10 there were several writs which could be filed affecting the validity of a judgment (see Practice Commentary to CPL § 440.10). The eight subdivisions of CPL § 440.10(1) codified these prior writs, and established specific evidentiary thresholds for their review. Therefore, objective evidence that would not warrant post conviction relief under the newly discovered evidence subdivision of CPL § 440.10(1) (g), theoretically

*31*

could establish post conviction relief under subdivisions (b), (c) and/or (h) of CPL § 440.10(1); the subdivisions I used to establish my prosecutorial misconduct and ineffective assistance of counsel claims, respectively.

84.   And regardless of whether a motion court has conducted an evidentiary hearing on a motion to vacate judgment, it is statutorily required to set forth its findings of fact, conclusions of law and the reasons for its determination for each of the constitutional and/or procedural arguments raised by a defendant's motion (see CPL § 440.30[7]). Its failure to do so may be considered a violation of due process as a defendant is not given effective notice of the court's decision denying his application, and therefore is deprived of an effective means of challenging the decision in future appellate or federal review applications.

85.   But when, as here, the motion court fails to make any findings of fact or conclusions of law as to each branch of the motion before it, or provides only conclusions of law based on an incomplete assessment of the facts, an Appellate Court reviewing a leave application challenging the constitutionality of a decision and order of a county court must hold its determination in abeyance and remit the matter to the motion court for compliance with CPL § 440.30(7) (see e.g. People v. Williams, 184 AD2d 608 [2nd Dept. 1992]). Furthermore, when justice so demands, the Appellate Court is authorized to submit the matter back to the lower court with directions to answer specific questions of law and fact essential to its review of the application.

86.   In the instant matter at bar, the motion court supplied only conclusions of law based on procedural bars to the issues I raised in my CPL § 440.10 motion, and declined to review them on their merits as mixed claims. It provided no findings of fact or conclusions of law as to my ineffective assistance of counsel claim (CPL § 440.10[1][h]) or my prosecutorial misconduct claims (CPL § 440.10[1][b,c]).

87.   The failure to provide findings of fact and conclusions of law to my prosecutorial misconduct and ineffective assistance of counsel claims deprived me of my right to due process. This is because I don't have notice of how the allegations promoted herein did or did not affect the constitutional questions raised in my CPL § 440.10 application. I will be deprived of appellate and federal review of the merits of important issue of law and fact relative to my ineffective assistance of counsel and prosecutorial misconduct violation claims.

88.   An abeyance order is required to allow compliance with CPL § 440.30(7), and the notice demands of due process.

<u>POINT 4</u>
**THIS COURT SHOULD TAKE THE "PROVERBIAL LEAP" AND FIND THAT THE UNCONSTITUTIONAL AND CONVOLUTED PROCEDURAL SCHEME IN THIS STATE THAT MOVES INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS OUTSIDE THE DIRECT APPEAL PROCESS PREVENTS DEFENDANTS FROM DETERMINING THESE CLAIMS FULLY ON THE MERITS UNDER THE STATE PRACTICED STANDARD FOR THOSE CLAIMS, "<u>BALDI</u>", WHICH IS "<u>REPRESENTATION AS A WHOLE</u>" AND "<u>IN TOTALITY</u>"; BECAUSE IN PRACTICE IT IS IMPOSSIBLE TO REACH, AND WILL LEAD TO THE CHALLENGE OF THESE LAWS VIA THE ADEQUACY DOCTRINE**

89.   In state's, such as New York, where "defendants are de facto forced to raise their ineffective assistance of trial counsel claims in collateral review proceedings without the aid of competent counsel, defendant's could argue that the state's procedural scheme discriminates against their Sixth Amendment right to an effective trial attorney by failing to afford them a reasonable opportunity to ever challenge their trial attorney's performance." (See "Effective Trial Counsel after <u>Martinez v. Ryan</u>: *Focusing on the Adequacy of State Procedures*, 122 Yale L.J. 2604, June 2013)

A.    **FIRST-TIER   REVIEW   BY   COUNSEL   IS   CRITICAL   TO   THE
IDENTIFICATION   AND   DEVELOPMENT   OF   CLAIMS   BASED   ON
INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

90.    *Pro-Se* defendant face insurmountable difficulty in identifying and prosecuting claims

of ineffective assistance of trial counsel. Counsel is critical for litigants to prove – and for courts

to assess – both deficient trial counsel performance and resulting prejudice, as required by

Strickland, 466 U.S. at 697. Generally speaking, to bring an ineffective assistance of counsel

claim, a defendant must (a) identify instances where counsel's performance fell below legally

permissible standards; (b) conduct an investigation into the facts concerning these issues; and (c)

frame these issues in post-conviction briefing in a manner that is legally sufficient. These tasks,

which are discussed below, present clear difficulties for *Pro-Se* defendants.

91.    First, claims of ineffective assistance of trial counsel very often raise complicated legal

issues that lay persons cannot reasonably be expected to identify, much less understand and

develop unaided by counsel. *See* Kimmelman v. Morrison, 477 U.S. 365, 378 (1986) ("A layman

will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional

performance.") As a practical matter, it is difficult for someone without any legal background

first to identify an error then determine whether it is sufficient to form the basis of an ineffective

assistance of counsel claim.

92.    Second, claims of ineffective assistance of counsel can require extensive post-trial

investigation to supplement the trial record with evidence specific to a finding of ineffective

assistance and resulting prejudice. *See* Massaro v. United States, 538 U.S. 500, 504-505 (2003)

("When an ineffective-assistance claim is brought n direct appeal, appellate counsel and the court

must proceed on a trial record not developed precisely for the object of litigating or preserving

the claim and thus often incomplete or inadequate for this purpose.") Criminal defendants must

*34*

often identify experts, not previously investigated by trial counsel, or other witnesses who can offer exculpatory affidavits or testimony. Furthermore, trial counsels tactical reasons or strategic purposes are virtually impossible to ascertain by an imprisoned *Pro-Se* litigant.

93.     Third and most importantly, these claims must be presented in a way that is procedurally and substantially proper, a task that, again, is difficult without assistance of counsel. While "**[a] prisoner not trained in law or familiar with legal process might reasonably suppose that a heartfelt avowal of his or her veracity, however generalized, is sufficient to secure an evidentiary hearing**," Pham v. United States, 371 F.3d 178, 186-87 (2nd Cir. 2003) (Sotomayor, J., concurring), **that is simply not the case** [Emphasis Added]. Criminal defendants proceeding Pro-Se are typically in no position to meet these demands.

**B.     BECAUSE OF THE CONVOLUTED PROCEDURAL RULES IN NEW YORK STATE, A DEFENDANT'S FIRST OPPORTUNITY TO RAISE A CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON A COMPLETE RECORD DOES NOT OCCUR ON DIRECT APPEAL, BUT IN A COLLATERAL REVIEW PROCEEDINGS WITHOUT HIS CONSTITUTIONAL RIGHT TO COUNSEL**

94.     Direct appeal in New York State does not provide criminal defendants with a meaningful opportunity to prosecute claims of ineffective trial counsel because the record on appeal is ordinarily limited to the trial record, whereas ineffectiveness claims typically require that defendants investigate and supplement the trial record with additional evidence showing that trial counsel provided prejudicially deficient assistance. Accordingly, the first meaningful opportunity to prosecute these claims will arise, practically or legally, on post-conviction review.

95.     The Supreme Court has recognized - in the federal system – that defendants often cannot reasonably expect to vindicate their right to effective trial counsel on direct appeal. In Massaro v. United States, the Court explained:

*35*

> The evidence introduced at trial [] will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the Strickland analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it...The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them...Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial.

Id. at 504-05 (internal citations omitted.

96.   Massaro recognized that claims of ineffective assistance of trial counsel are uniquely complex and not easily resolved simply by reference to the trial record. Unless the error is plain on the fact of that record, or a court on direct review permits a defendant to **fully** supplement the record, the first meaningful forum to prosecute ineffectiveness claims will be in post-conviction proceedings, and not on direct appeal. The more recent Supreme Court cases of Martinez v. Ryan and Trevino v. Thaler has expanded the Supreme Courts view on these issues, as explained below.

## C.    MARTINEZ V. RYAN AND ITS EFFECT

97.   In Martinez v. Ryan, the Supreme Court capitalized on its Coleman[35] dicta and held that "when a state requires defendants to raise ineffective assistance of trial counsel claims in initial-review collateral proceedings, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective under Strickland" (Martinez, 132 S.Ct. at 1320).

98.   Furthermore, many defendants like me, in the instant case; have ineffective assistance of trial counsel claims that involve a mix of on-the-record and off-the-record components. In this

---

[35] Coleman v. Thompson, 501 U.S. 1277 (1991)

case, I am better off presenting all of my ineffective assistance of trial counsel claims in a post-conviction proceeding (like I did in the instant case), in the hopes that the cumulative prejudice from the record and extra-record claims will be sufficient to satisfy the Baldi standard ("**Representation as a Whole**" and "**In Totality**") and Strickland's prejudice requirement.

99.    There is precedent to support adequacy challenges predicated on a state's failure to provide effective procedures for allowing defendant's to raise ineffective assistance of trial counsel claims. Oklahoma's procedural rules, for example, require defendant's to raise ineffective assistance of trial counsel on direct appeal and provide defendant's with the opportunity to ask for a remand for an evidentiary hearing to expand the trial record to support their ineffective assistance of trial counsel claims when necessary. In practice, however, appellate courts (like the ones in New York) provide limited expansion ability (see Point 2 [C], *supra*), and trial courts almost never grant hearings despite frequent requests, as occurred in my case (see Point 1, *supra*).

100.    Federal Courts have also struck down procedures in Idaho[36] and New Mexico[37] that required defendants to raise ineffective assistance of trial counsel claims on direct appeal. Although these adequacy challenges were raised in states that required defendants to present ineffective assistance of trial counsel claims on direct appeal, a similar challenge can be raised about the lack of a fair opportunity to present ineffective assistance of trial counsel claims in states like Texas and New York that do not have that requirement. Because the opportunity to raise these extra-record claims is illusory or non-existent on direct appeal in these states, **the state's procedures for raising ineffective assistance of trial counsel claims on direct appeal**

---

[36] See <u>Hoffman v. Arave</u>, 236 F.3d 523, 535-36 (9th Cir. 2001)
[37] See <u>Jackson v. Shanks</u>, 143 F.3d 1313, 1319 (10th Cir. 1998)

**fail to give defendants a realistic opportunity to vindicate their Sixth Amendment rights to effective trial counsel and can be deemed inadequate.**

101.  As the Martinez court recognized, without an effective attorney, defendants will not be able to vindicate their ineffective assistance of trial counsel claims, because such claims often require extra-record investigation and an understanding of trial strategy (Martinez v. Ryan, 132 S.Ct 1309, 1317 [2012]). As a result, states that make a conscious choice to move trial ineffectiveness claims outside of the direct-appeal process (like in New York) - - where counsel is constitutionally guaranteed - -  and then refuse to appoint counsel to aid defendants in raising the claims in initial collateral review proceedings are significantly compromising defendants' abilities to file ineffective assistance of trial counsel claims (Id. at 1318) ("By deliberately choosing to move trial-ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims").

102.  Adequacy doctrine is designed to address state practices that place precisely this type of undue burden on the exercise of a federal right. Given that the right at issue is the fundamental right to effective counsel, which the Martinez Court described as a "bedrock principle in our justice system" and the "foundation of our adversary system" (Id. at 1317), the federal courts should be particularly resistant to state procedures that prohibit enforcement of the right.

103.  Whereas cause arguments tend to focus on the individual circumstances of a habeas petitioner's case, adequacy challenges are often used to raise broad questions about the operation of a state's procedural rule. In contrast, the focus under adequacy doctrine is on the state's (New York's) procedures. As a result, a federal court's ruling on an adequacy challenge often has

broader implications for the offending state than an individual finding of cause in a particular litigant's case.

## D.    THE HOLDINGS OF <u>TREVINO V. THALER</u> ARE APPLICABLE TO THE LAW IN NEW YORK STATE

104.    The <u>Martinez</u> Court explicitly declined to address whether the right to counsel should be extended to collateral proceedings.[38] In its opinion in what would become <u>Trevino</u>, the Fifth Circuit had taken <u>Martinez</u> at its word, limiting its application to situations where ineffectiveness claims were explicitly delayed until the collateral stage - - in contrast to Texas, where certain procedures exist for bringing ineffectiveness allegations on direct appeal.[39] But Texas law, while permitting ineffectiveness claims to be raised on direct appeal, "make[s] it 'virtually impossible' for an ineffective assistance claim to be presented on direct review."[40]

105.    The question the Supreme Court faced in <u>Trevino</u> was: is there a significant difference between "impossible" and "virtually impossible?" The Court answered in the negative. Its opinion hinged in part on its conclusion that, "as a systematic matter, Texas [does not] afford [] meaningful review of a claim of ineffective assistance of trial counsel" on direct review. Texas, like New York, allows claims of ineffectiveness to be raised both on direct and collateral review. Because "the Texas procedural system...does not offer most defendants a meaningful opportunity to present a claim on ineffective assistance of trial counsel on direct appeal," it

---

[38] *Id.* at 1315; *see also* Mary Dewey, Comment, <u>Martinez v. Ryan</u>; *A Shift Toward Broadening Access to Federal Habeas Corpus*, 90 DENV. U.L. REV. 268, 270 (2012)
[39] <u>Ibarra v. Thaler</u>, 687 F.3d 222, 227 (5th Cir.2012)
[40] <u>Trevino v. Thaler</u>, 133 S.Ct. 1911, 1915 (2013) (quoting <u>Robinson v. State</u>, 16 S.W.3d 808, 810-811 [Tex. Crim. App. 2000])

"precludes as a matter of course" what "Arizona law [in Martinez] prohibited by explicit terms."[41]

106.   Thus was the Martinez holding expanded: "where, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal," ineffectiveness or absence of counsel at post-conviction stage can be "cause" for excusing a procedural default.

107.   In Texas, for example, defendants are theoretically permitted to raise ineffective assistance of trial counsel claims on direct appeal. As a practical matter, however (just like in New York), there is no realistic mechanism for expanding the record on direct appeal (see Point 2, Sub-Section C, supra) such that ineffective assistance of trial counsel claims that require extra-record development typically must be reserved for state post-conviction proceedings.

108.   As an initial matter, a state like Texas, where the opportunity to raise ineffectiveness challenges on direct appeal is illusory (comparable to New York, where a majority of ineffective claims on direct appeal are shot down because they rely on matters that "dehor the record"), should be estopped from claiming that it is exempt from Martinez because it allows defendants to raise ineffective assistance of trial counsel in state post-conviction proceedings. Adequacy, much like cause, is a doctrine rooted in equity. If equity concerns motivated the Martinez court to hold that states had to provide adequate post-conviction counsel to defendants who were forced to raise ineffective assistance of trial counsel in collateral review proceedings for their procedural defaults to be enforced in federal court, those same equity concerns will find a state procedural scheme that de facto forces defendants to raise ineffective assistance of trial counsel claims in post-conviction proceedings without the assistance of effective counsel are inadequate.

---

[41] Id, at 1919-21

## E.   THE DEFENDANT IS ENTRENCHED IN A PROCEDURAL MORASS AS A RESULT OF THE CONVOLUTED PROCEDURAL RULES IN NEW YORK STATE

109.   State post-conviction review is attracting the attention of legal scholars across the United States.[42] The application of the Adequacy Doctrine being employed by the courts will create obligations that bind state courts themselves, when a state-court litigant asserts a claim of a federal right that was denied by a state procedural rule. In other words, when the Court holds a state procedural ground inadequate to bar direct review, the Court in effect holds, as a matter of federal common law, that the ground cannot validly be used by state courts to bar a litigant's assertion of a federal law contention.[43] It follows then that if the state law ground is inadequate, the Federal Court can review the federal law issue and can vacate or reverse the judgment if the Court's disposition of the federal issue so requires.

110.   The Court's holding of inadequacy, in effect, binds the state court, and as a matter of federal law cannot bar the vindication of the federal right either in the state court on remand. The vacature of the state court judgment indicates that the state's high court's prior disposition of the case was incorrect, and indicates that the correct disposition would have been for the state court to ignore the inadequate procedural ground and reach the merits of the federal issue. Logically, it seems hard to confine such a duty to the case in which the inadequacy ruling is announced; if the ground is inadequate to block the state court's duty to consider the federal-law contention in one

---

[42] E.g. Eric M. Freedman, *State Post-Conviction Remedies in the Next Fifteen Years: How Synergy Between the State and Federal Government Can Improve the Criminal Justice System Nationally*, 24 Fed. Sent'g Rep. 298, 298 (2012) ("[T]he Adequacy of State Post-conviction Proceedings Will be a Centrally Contested Issue in the Years Ahead."); Justin F. Marceau, *Challenging the Habeas Process Rather Than The Result*, 69 Wash. Lee L. Rev. 85, 146-56, 166-76 (2011)

[43] E.g. Daniel J. Meltzer, *State Court Forfeitures of Federal Rights*, 99 Harv. L. Rev. 1128, 1182 (1986) (arguing that "when state foreclosure rules...cannot be squared with federal purposes, state and federal courts should be free to exercise their authority to fashion federal common law in order to ensure the vindication of federal rights")

case, it ought to be equally inadequate in all similar cases[44] and weaken the presumption that state courts can condition the vindication of federal rights on a litigants compliance with state procedural rules.

## CONCLUSION

111.  This Court is faced with a conundrum, in that if it agrees with the lower court and finds these issues should have been raised on direct appeal, it will be, in effect, negating its previous decision denying my motion to withdraw appellate counsel's brief, where I argued that appellate counsel ignored substantial issues of ineffective assistance of counsel that were in my opinion outside the record. Regardless of where the issues lie, on or off the record, they do exist, and appellate counsels failure, either way, to develop them properly for direct review constituted ineffective assistance of counsel and will open the door for a Writ of Error Coram Nobis. This would fully support my claims of the appellant being entrenched in a procedural morass as a direct result of the convoluted procedural rules in practice in New York State.

112.  My appellate brief was filed in June of 2013, 19 months ago, and I still have not received a response from the Richmond County District Attorney's Office on my Pro-Se Supplemental Brief filed on October 7th, 2014, over 2 months ago. This delay is attributable solely to appellate counsel's failure, after being notified in excruciating detail, that my appellate record was incomplete. This forced this appellant to submit multiple motions to this Court to enlarge the judgment roll and then withdraw appellate counsel's brief, because this appellant realized that the core of appellant's issues, the "**diary**" and everything that revolved around it, all either dehor the record or were mixed claims. This forced me to remove these issues from my

---

[44] See Meltzer, *supra* note 33, at 1184 (making this point)

*42*

pro-se brief and submit it in my Article 440 application pro-se, without the aid of an attorney, which is the subject of this leave to appeal this Court is considering today.

113. If, on the other hand, this Court agrees with me, then the defendant respectfully asks this Honorable Court that this matter should be remitted with direction for a full and fair hearing on the merits, to investigate and substantiate my claims with the assignment of counsel, outside the 18-B panel if possible, so that justice may be served and the truth about the prosecutors misconduct at the Grand Jury can be revealed, as well as the errors of omission and commission of 18-B trial attorney Eugene Lamb Esq.

114. In light of the Eric Garner case and the allegations of misconduct at the Richmond County Grand Jury, combined with this Court's perusal of the complete Grand Jury proceedings in this case which it received under seal via this Court's January 6th, 2014 decision and order enlarging the judgment roll; and put together in further context with the various transcripts, exhibits and documents received through FOIL that all revolve around the Grand Jury proceedings; this Court is in a unique situation to expose the truth and see that justice is served.

115. In the wake of Martinez and Trevino, the Supreme Court has paved the way for petitioners to argue that a majority of states (i.e. New York) have procedural schemes that have the effect of preventing most defendants from vindicating their Sixth Amendment rights to effective trial counsel. Considering the evolving and defining law being handed down from the Supreme Court in Martinez v. Ryan, I ask this Court to take to proverbial leap and remit this case to the Trial Court with an ORDER for an evidentiary hearing, which would result in the assignment of counsel

## CONSOLIDATION WITH APPELLANT'S PENDING DIRECT APPEAL

116.   On a final note, the appellant, proceeding pro-se, is unsure if his direct appeal could be held in abeyance in the event this Court remits this matter back to the trial court for an evidentiary hearing, and in the event that results in the affirming of his conviction and subsequent appeal back to this Court. It is the appellant's belief that this would be the only way which this Court could possess and have the ability to render a decision on this case with a completely developed record, and the appellant respectfully requests that if it is in the authority of this Court to hold his direct appeal in abeyance, that it does so.

117.   The appellant respectfully asks this Court that, in the event it grants this Application for Leave to Appeal that it consolidates it with the appellant's direct appeal (App. Div. Case No. 2011-10960) currently pending before this Honorable Court. This will not only help this Court to have a full and fair opportunity to render a decision on a completely developed record, while at the same time providing this appellant with the opportunity to have his case heard fully on the merits; but it will also be in the interest of financial and judicial economy by allowing the use of the Court's resources in the most efficient and effective method possible.

WHEREFORE, for the foregoing reasons it is respectfully submitted that defendant's application for certificate granting leave to appeal be granted in all respects, and that the defendant's direct appeal be consolidated with this motion, or in the alternative, that this matter be remitted back to the trial court with direction to hold an evidentiary hearing, and for such other and further relief as this Court may deem just and proper.

Sworn to Before me This 13

Day of _____, 2015

_____
Notary Public

Harry D. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires

Respectfully Submitted,

_____
Anthony Rucano, 11A0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, N.Y. 12929

45

*46*

DIST RICT, T ROONEY
RICHMOND COUNTY

AD 9-31

RECEIVED

SUPREME COURT OF THE STATE OF NEW YORK
15 FEB 27 PM 3 39
APPELLATE DIVISION SECOND DEPARTMENT

------------------------------------------------------------------X

People of the State of New York                    :

                                    Respondents,        :

                    -against-                      :

Anthony Rucano,                                    :

                            Defendant-Appellant,:

------------------------------------------------------------------X

Reply    Affidavit    in
Support of Application
To Appellate Division
For Certificate Granting
Leave To Appeal §450.15

Indictment No. 270-09
Year of Ind.   2009

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF CLINTON        )

Anthony Rucano, being duly sworn, deposes and says:

1.    I am the defendant-appellant in the above-captioned matter, and as such, am fully familiar with the facts and circumstances surrounding this case.  My information having been gathered from the facts that occurred on and off the record, and reading recent decisional law from the United States Supreme Court and other legal bases.

2.    This Reply Affidavit is submitted in support of an application pursuant to CPL §§ 450.15, 460.15 --- and this Court Rules --- for a certificate granting leave to appeal to this Court from an order of the Supreme Court, Richmond County (Rooney, J.), dated December 15th, 2014, which summarily denied my CPL § 440.10 application and motion for an Evidentiary Hearing. The Notice of Entry was filed by me on January 6th, 2015.

3.    I am personally familiar with the facts and statements hereinafter; I am a layman in the matter of law and seek this Court's indulgence for errors defects and faults pursuant to Section 103(C) and 2101(F) of Civil Practice Law and Rules.

1

4.    Despite numerous letters to this Court and to Robert H. Tembeckjian, Esq., Administrator and Counsel, Commission on Judicial Conduct; County Clerk Stephen J. Fiala has failed to file and return the ORDER with Notice of Entry filed with his office, so I may pursue an appeal to the Court of Appeals, Pursuant to CPLR § 5601 (b) (2), on the part of the ORDER denying the assignment of counsel motion, which challenged the constitutionality of several laws in the State of New York. I had previously opened complaint numbers 2014/N-0956 and 2014/N-0961-0963 with the Commission of Judicial Conduct concerning the handling of my Article 440 by the Richmond County Supreme Court Clerk, which included the refusal to inform me about the status of motions I filed. On January 29th, 2015, I sent a new letter outlining the failure of County Clerk Stephen J. Fiala to file this ORDER with Notice of Entry, which as of this date has not been responded to.

5.    The People's affirmation in Opposition to my Application for Leave to Appeal is almost identical to their response to my Article 440 in the Nisi Prius court, and merely changes the wording to supply context for the leave to appeal. The People fail to refute or otherwise address any of the claims I specifically raise in my Leave to Appeal Application.

6.    The People's vague allegations continue to be insufficient to establish what "bulk of defendant's particular claims" are entirely record based. Furthermore, respondent, in the next breath, concedes to the fact that defendant raises eight particular claims of ineffective representation of trial counsel, which are dehors the record (Aff. R. at ¶ 7)[1]. This admission supports the defendants contention, which was previously brought to this Honorable court's attention, that People v. Maxwell, 89 A.D.3d 1108 (2nd Dept. 2011) is analogous and on point to the defendants case, where it was stated "In this case since some of the defendant's allegations of

---

[1] "Aff. R." followed by numbers refers to paragraph numbers in the Peoples Affirmation in Opposition to Application for leave to Appeal.

ineffectiveness involve matters appearing on the record, while others involve matters that are outside the record. The defendant has presented a "mixed claim" of ineffective assistance (People v. Evans, 16 N.Y.3d 571, 575 n. 2, *cert. denied* --- U.S. ---, 132 S.Ct. 325) In order to properly review a defendant's claim of ineffective assistance, a court must consider all of his or her allegations – as well as the evidence the law, and the circumstances of the case – "in totality" (People v. Baldi, 54 N.Y.2d 137, 147).

7.    Thus, where, as here, a defendant presents a mixed claim of ineffective assistance that depends, in part, upon matters that do not appear on the record, it cannot be said that "sufficient facts appear on the record with respect to the ground or issue raised upon such motion to permit adequate review thereof upon such an appeal" (CPL 440.10[2] [b]).

8.    The People's further contention that defendant has failed to support my claims with an affidavit from trial counsel, or that defendant has not explained his failure to do so, is unsupported and a blatant misrepresentation of the papers submitted to this Honorable Court. (Aff. R. at ¶ 8-9)

9.    Furthermore, the Peoples opposition (Aff. R. ¶ 7-9) are factually contradictory of themselves and create several triable issues of fact which require a hearing before the Court can decide the legal issues. See CPLR 2218, People v. Gruden, 42 N.Y.2d 214. The People concede in ¶ 7 that there are facts dehor the record, and then in ¶ 8-9 misrepresent that defendant has failed to support the dehors-the-record claims with an affidavit from his trial counsel. Whereas, documented evidence substantiate that Defendant has made attempts to reach trial counsel and has been unable to obtain an affidavit because trial counsel refuses to correspond with defendant by mail. This proof was attached to the defendant's Article 440 application as **Exhibit "3-L"**.

10.    A recent N.Y. Law Journal Article Dated Wednesday, December 14th, 2014 with the

3

headline "High Court Broadens Its Review of Motions to Vacate Convictions", written by Joel Stashenko, highlights the fact that the Court of Appeals recognizes the abuse of discretion by the lower courts in denying hearings on Article 440 applications with merit that involve newly discovered evidence.

11.     Judge Eugene Pigott Jr. writing for the majority in People v. Jones, 219 (2014 WL 7069803 [Dec. 16th, 2014]), added 440.10 (1) (g) to the list of recognized claims the Court of Appeals can review for the erroneous denial of Article 440, stating in pertinent parts "…We are not precluded from exercising our power to determine whether in a particular judgment and factual setting there has been an abuse of discretion as a matter of law."

12.     Judge Pigott stated the four already recognized circumstances where the Court of Appeals has recognized its power to review CPL 440 motion denials, where there are allegations that (1) **the decision was procured by fraud, duress of misrepresentation**, (2) **material evidence was false**, (3) **improper or prejudicial conduct occurred off the record**, and (4) **judgment was in violation of his state or federal constitutional rights**.

13.     **My case falls into multiple categories**. In addition to the request for an affidavit from trial counsel, the defendant has submitted multiple affidavits from expert witnesses never called in this matter (Exhibits "**2-B**", "**2-Q**" and "**2-R**"), and letters and records received from the Office of the Connecticut Attorney General (**constituting newly discovered evidence**) providing evidence that the Trial Court received falsified documents under subpoena from Licensed Clinical Social Worker Anna Lorusso-Moramarco (Exhibits "**2-Y**", "**3-B**" and "**3-C**"). These documents clearly show that that session notes provided under subpoena from Ms. Moramarco that show the complainant as the patient are falsified. This is because the sessions were billed to my AETNA Insurance, and the records clearly show **the complainant was never a member of**

4

**my insurance! I was the patient! Furthermore, the session notes talk exclusively about me**!

14.    Subpoenas were provided for the Court to issue upon a hearing that would have provided certified copies of E-Mails from Yahoo, Complaint Reports from the Police Department, and records from Ms. Moramarco; all tending to substantiate the numerous claims of ineffective assistance of counsel and fraud by Ms. Moramarco. These were forwarded in my application to Vacate the Judgment and completely disregarded by the trial court.

15.    At the very least, a hearing should have been granted, and the subpoenas provided to the Court should have been issued so the Court could have received certified copies of said copies substantiating my claims. All of the claims above can be equally be construed as ineffective assistance of counsel (as they were presented in my Article 440 application), as trial counsel's failure to listen to me concerning these sessions resulted in him ignoring one of many very important lines of investigation that would have shattered the credibility of the complainant.

16.    In a case such as this, where I never denied that we had sex but denied it was forced, **credibility was the central and only key component to this case**. Considering that Counts 7, 12-15, 17, 19-22 and 25, for a total of 11 counts; every one of which resulted from the testimony extracted from the inadmissible, unreliable and exculpatory "alleged diary" by ADA Katchen, were dismissed and never presented to the Trial Jurors for deliberation; trial counsel's failure not to present multiple expert witnesses that would have destroyed the credibility of the complainant, along with his failure to attack the grand jury proceedings (of which he had transcripts of) with a motion to dismiss the indictment, **can not be said to be harmless error.**

17.    Furthermore, EVERY OTHER COUNT of the indictment resulting from the testimony extracted from this "alleged diary" resulted in a verdict of NOT GUILTY. (Counts 1-5, Rape in the First Degree Counts 8-9, Criminal Sexual Act in the First Degree, Count 16, Assault in the

5

Second Degree). Again, this shows the weakness of the evidence and testimony in this case.

18.    Upon information and belief, and based on the unique facts and circumstances surrounding my case, the trial court maliciously abused its discretion in denying my motion without a hearing. My Article 440 application, which provided detailed information tending to support my allegations, was ignored. The trial court's reluctance to address the extensive and detailed allegations, (154 Page Affidavit in Support, 112 Page Memorandum of Law, and extensive exhibits which constituted record and non-record based documents), resulted in their deliberate and erroneous denial based on procedural bars. This was done with the sole purpose of delaying this matter and pushing it off to the Appellate Division so it could have the time to deal with the scrutiny they are under in the Eric Garner case. My case has substantial and detailed factual allegations of prosecutorial misconduct and multiple instances of abuse of discretion by Judge Rooney during my trial. The trial court is preventing me from expeditiously consolidating the potential denial of this Article 440 with my direct appeal, which is currently pending before this Honorable Court.

19.    In the interest of brevity I will not reiterate the extensive arguments forwarded in my initial application, and ask this Honorable Court, in the interest of justice, to review my Initial Article 440 application including the affidavit, memorandum of law and exhibits, so it can determine if the trial court, in fact, abused its discretion. The fact is the People have not addressed any of the questions presented in the Leave application to this Court. As such they are uncontested, I ask this Honorable Court to accept them as true and grant the relief requested in my application.

**WHEREFORE,** for the foregoing reasons it is respectfully submitted that defendant's application for certificate granting leave to appeal be granted in all respects, and that this matter be placed on the calendar for the submission of briefs arguing facts and law, and for such other and further relief as this Court may deem just and proper.

*Defendant Pro se*
Anthony Rucano
DIN # 11-A-0528
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929

Sworn to Before Me This ____

Day of _____, 2015

_____
Notary Public

Harry D. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires

7

## AFFIDAVIT OF SERVICE

**STATE OF NEW YORK)**
              )**ss.:**
***COUNTY OF CLINTON)***

Anthony Rucano, being first duly sworn, deposes and says:

That I am the defendant, herein, and that on the date of notarization indicated below, I have placed in a sealed postpaid wrapper a true and exact copy of the enclosed papers identified as a Reply Affidavit in Support of Application to the Appellate Division for a Certificate Granting Leave to Appeal Pursuant to CPL § 450.15, addressed to the Second Department, Appellate Division and parties below, by depositing the same in a mail box here under the care, custody and control of Clinton Correctional Facility, P.O. Box 2001 Dannemora N.Y. 12929, for delivery by the United States Postal Service:

TO:     Richmond County District Attorney          Alex Donn
        Att: Appeals Bureau                        Appellate Advocates
        130 Stuyvesant Place                       Associate Appellate Counsel
        Staten Island, N.Y. 10301                  111 John St, 9th Floor
                                                   New York, N.Y. 10038

*Sworn to before me this* 24

*day of* _____ 2015

Mark D. Burgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires

***NOTARY PUBLIC***

_Anthony Rucano_

**Anthony Rucano, 11A0528**
***Clinton Correctional Facility***
***P.O. Box 2001***
***Dannemora, NY 12929***

*1*



SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-v-

ANTHONY RUCANO,

Appelant.

Supplemental Memorandum of Law in Support Of Motion
For A Writ Of Error Coram Nobis
And to Expand the Record

Ind. No. 270/09
A.D. # 2011-01960

Anthony Rucano, 11A0528
Great Meadow Correctional Facility
P.O. Box 51
Comstock, N.Y. 12821-0051

Table of Contents

Preliminary Statement ................................................................................ vi

QUESTIONS PRESENTED ...................................................................... vii

POINT 1 ..................................................................................................... 1
This Court Should Take The "Proverbial Leap" To Determine Whether The
Procedural Scheme In New York State That Prevents Ineffective Assistance Of
Counsel Claims From Being Determined Within The Direct Appeal Process With
Counsel Requires A Provision To Expand The Record............................................. 1

I.    First-Tier Review By Counsel Is Critical To The Identification And
      Development of Claims Based On Ineffective Assistance of Trial Counsel.. 1

II.   The Convoluted Procedural Rules In New York State Prevent Me From
      Raising Ineffective Assistance of Trial Counsel Claims With A Complete
      Record On Direct Appeal And In this Writ Of Error Coram Nobis.............. 3

III.  Moving Ineffective Assistance of Counsel Claims Outside The Direct
      Appeal Process, During The Only Time A Defendant Has The Help of
      Trained Counsel, Runs Afoul of Due Process, Equal Protection and the
      Supremacy Clause................................................................................ 5

      A.  The Question As To Whether The Dicta in Martinez v. Ryan, 132 S.Ct.
          1309 (2012),  And Its Refinement in Trevino v. Thaler, 133 S.Ct. 1911
          (2013) Renders State Statutes Like, or Similar to, County Law § 722,
          CPLR § 1101 and Procedural Protocols Associated With Article 440
          Unconstitutional, Is One Of State-Wide and Nation-Wide Importance
          Which Ought To Be Reviewed By This Court.......................................... 5

      B.  In Light of Martinez v. Ryan, *Supra*, and Trevino v. Thaler, *Supra*, The
          Procedural and Evidentiary Protocols Enacted Under CPL § 440.30
          Violates Due Process and Equal Protection Guarantees, As Well As The
          Supremacy Clause ................................................................................ 8

C. Compelling Appellate Counsel To Answer Questions Concerning His Strategic and Tactical Decisions, Combined With A Discretionary Ruling To Expand The Record; Will Provide A Full And Fair Review of Ineffective Assistance Of Appellate Counsel Claims on This Writ Of Error Coram Nobis Application .......................................................................... 10

IV. Martinez v. Ryan, *supra*, and the Refinements In Trevino v. Thaler, *supra*, Cry Out For a Refinement Of The Convoluted Procedural and Statutory Mechanisms Dealing With Ineffective Assistance of Trial Counsel Claims, And A Discretionary Ruling To Expand The Record And Assign Appellate Counsel In This Writ Of Error Coram Nobis Application For Mr. Rucano. 11

A. This Court Should, In The Unique Facts and Circumstances Herein, Take Judicial Notice of My Previous Application To Enlarge The Judgment Roll and Withdraw Appellate Counsel's Brief, Expand The Record In This Proceeding And Assign Qualified Appellate Counsel .............................. 12

B. The Failure To Expand The Record And Assign Counsel In This Proceeding Will Prevent Me From Determining My Ineffective Assistance of Counsel Claims On the Merits In Any State Court Under The Baldi Standard, "Representation As A Whole" and "In Totality", Because In Practice It Is Impossible To Reach .......................................................... 15

C. The Holdings Of Trevino V. Thaler, *Supra*, Are Applicable To the Law In New York State......................................................................................... 17

D. The Unconstitutional Statutory and Procedural Schemes In This State Will Lead To Them Being Challenged Via The Adequacy Doctrine ............... 20

V. When Considering the Unconstitutional and Convoluted Procedural Morass Defendant Rucano Is Entrenched In As A Result Of The Mechanisms In Place, This Court Should, In the Unique Facts and Circumstances Presented Herein, Expand The Record, Assign Counsel and Compel Prior Appellate Counsel To Answer Questions Concerning His Appellate Decisions .......... 22

## Table of Cases
## Federal Law

Brecht v. Abrahamson, 507 U.S. 619, 635 [1993] ....................................... 6
Case v. Nebraska, 381 U.S. 336, 337 (1965) ............................................... 8
Coleman v. Thompson, 501 U.S. 722 (1991)............................................... 11
Ex Parte Torres, 943 S.W.2d 469, 475 ....................................................... 18
Halbert v. Michigan, 545 U.S. 605, 620-621 [2005] ................................. 10
Hoffman v. Arave, 236 F.3d 523, 535-36 (9th Cir. 2001) ......................... 15
Ibarra v. Thaler, 687 F.3d 222, 227 (5th Cir. 2012)................................... 19
Jackson v. Shanks, 143 F.3d 1313, 1319 (10th Cir. 1998)........................... 15
Kimmelman v. Morrison, 477 U.S. 365, 378 (1986) .................................... 2
Martinez v. Ryan, 132 S.Ct. 1309, 1315, 1318 [2012] ...................... passim
Massaro v. United States, 538 U.S. 500, 504-505 (2003)............................ 2
Pham v. United States, 371 F.3d 178, 186-87 [2nd Cir. 2003] ................... 3
Robinson v. State, 16 S.W. 808, 813 at n.7................................................. 18
Robinson v. State, 16 S.W.3d 808. 810-811 [Tex. Crim App. 2000] ..................... 19
Rose v. Lundy, 435 U.S. 509, 518 [1982]...................................................... 6
Rylander v. State, 101 S.W.3d 107, 111 & n.1 [Tex. Crim App. 2003]................. 17
Strickland v. Washington, 466 U.S. 668, 697 (1994) .................................... 1
Thompson v. State, 9 S.W.3d 808, 814 n.6 [Tex. Crim. App. 1999]...................... 17
Trevino v. Thaler, 133 S.Ct. 1911, 1915 (2013) ............................... passim

## State Law

People v. Anthony Rucano, App. Div. Docket No. 2015-01499 [2nd Dept. 2015]....
................................................................................................. 13, 19
People v. Brown, 45 N.Y.2d 852, 853-854 [1978] .............................. 16, 17
People v. Evans, 16 N.Y.3d 571, 575, n.2 ................................................... 17
People v. Freeman, 93 A.D.3d 805 [2nd Dept. 2012] ................................... 8
People v. Maxwell, 89 A.D.3d 1108 (2nd Dept. 2011)................................. 16
People v. Stultz, 2 N.Y.3d 277, 284 [2004] .................................................. 8

## Statutes

C.P.L § 440.30.................................................................... 8, 9, 10, 18
C.P.L. § 440.10(2)(b) .................................................................. 18
C.P.L. § 440.10(2)(c).................................................................. 13
County Law § 722 ................................................................... passim
CPLR § 1101 .................................................................... ii, 5, 7
CPLR §§ 1101/1102 .............................................................. 7, 13

## Treatises

ABA Standard 4-8.3(b) ............................................................................. 14

ABA Standard 4-8.6(a)............................................................................. 14

## Law Journal Articles

Effective Trial Counsel after Martinez v. Ryan: Focusing on the Adequacy of State
    Procedures, 122 Yale L.J. 2604, June 2013 ........................................... 1

Daniel J. Meltzer, State Court Forfeitures of Federal Rights, 99 Harv. L. rev. 1128,
    1182 (1986) ........................................................................................ 21

Eric M. Freedman, State Post-Conviction Remedies in the Next Fifteen Years:
    How Synergy Between the State and Federal Government Can Improve the
    Criminal Justice System Nationally, 24 Fed. Sent'g rep. 298, 298 (2012) ......... 21

Justin F. Marceau, Challenging the Habeas Process Rather Than the Result, 69
    wash. Lee. L. Rev. 85, 146-56, 166-76(2011) ................................... 21

Mary Dewey, Comment, Martinez v. Ryan; A Shift Toward Broadening Access to
    Federal Habeas Corpus, 90 Denv. U.L. Rev. 268, 270 (2012) ........................ 19

## Preliminary Statement

The novel questions of first impression addressed within are of statewide public interest and our deserving of this Court's attention. Considering them will allow this Court to formulate and invoke new appellate procedures consistent with holdings of <u>Gideon v. Wainwright</u>, and prevent the challenge of the current statutory scheme via the Federal Adequacy Doctrine.

## QUESTIONS PRESENTED

Should a defendant, on his first effective appeal as of right with assigned counsel, be provided with a meaningful statutory provision to expand the record on appeal in this States Appellate Divisions, to bring clarity to issues involving mixed claims (i.e. attributable to trial counsels errors of omission and commission), in order to meet the widely accepted and practiced standard in this state, "Representation as a Whole" and "In Totality?

Should Mr. Rucano, in the unique facts and circumstances presented herein, be provided with a discretionary ruling to expand the record in this Writ of Error Coram Nobis Application and assigned appellate counsel to assist him?

<u>POINT 1</u>

This Court Should Take The "Proverbial Leap" To Determine Whether The Procedural Scheme In New York State That Prevents Ineffective Assistance Of Counsel Claims From Being Determined Within The Direct Appeal Process With Counsel Requires A Provision To Expand The Record

In New York State, where "defendants are de facto forced to raise their ineffective assistance of trial counsel claims in collateral review proceedings without the aid of competent counsel, defendant's could argue that the state's procedural scheme discriminates against their Sixth Amendment right to an effective trial attorney by failing to afford them a reasonable opportunity to ever challenge their trial attorney's performance" (*see* "Effective Trial Counsel after <u>Martinez v. Ryan</u>: Focusing on the Adequacy of State Procedures, 122 Yale L.J. 2604, June 2013).

I.   First-Tier Review By Counsel Is Critical To The Identification And Development of Claims Based On Ineffective Assistance of Trial Counsel

In my main affidavit in support and memorandum of law in support of a Writ of Error Coram Nobis, I have shown that I have faced insurmountable difficulty in my effort to identify and prosecute my claims of ineffective assistance of trial counsel. Counsel is critical for me to prove – and for courts to assess – both deficient trial counsel performance and resulting prejudice, as required in <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1994). Generally speaking, to bring an ineffective assistance of counsel claim, I must (a) identify instances where counsel's performance fell below legally permissible standards; (b) conduct an

1

investigation into the facts concerning these issues; and (c) frame these issues either in post-conviction briefing or on direct appeal in a manner that is legally sufficient. These tasks, which are discussed below, present clear difficulties for me, as a Pro-Se defendant.

First, claims of ineffective assistance of trial counsel very often raise complicated legal issues that lay persons cannot reasonably be expected to identify, much less understand and develop unaided by counsel. See Kimmelman v. Morrison, 477 U.S. 365, 378 (1986)("A layman will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance.") As a practical matter, it is difficult for me, an indigent defendant without any legal background first to identify an error then determine whether it is sufficient to form the basis of an ineffective assistance of counsel claim.

Second, claims of ineffective assistance of counsel can require extensive post-trial investigation or expansion of the record to supplement the trial record with evidence specific to a finding of ineffective assistance and resulting prejudice. See Massaro v. United States, 538 U.S. 500, 504-505 (2003) ("When a ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating and preserving the claim and thus often incomplete or inadequate for this purpose.") I must identify experts, not previously investigated by trial counsel, or other

witnesses who can offer exculpatory affidavits or testimony. Furthermore, trial counsels tactical reasons or strategic purposes are virtually impossible to ascertain by me, an imprisoned *pro-se* litigant.

Third and most importantly, these claims must be presented in a way that is procedurally and substantially proper, a task that, again, is difficult without assistance of counsel. While "[a] prisoner not trained in law or familiar with legal process might reasonably suppose that a heartfelt avowal of his or her veracity, however generalized, is sufficient to secure an evidentiary hearing" (Pham v. United States, 371 F.3d 178, 186-87 [2nd Cir. 2003][Sotomayor, J. concurring]), that is simply not the case. As a criminal defendant, proceeding pro-se, I am typically in no position to meet these demands.

II.    The Convoluted Procedural Rules In New York State Prevent Me From Raising Ineffective Assistance of Trial Counsel Claims With A Complete Record On Direct Appeal And In this Writ Of Error Coram Nobis

Direct appeal in New York State does not provide me with a meaningful opportunity to prosecute claims of ineffective trial counsel because the record on appeal is ordinarily limited to the trial record, whereas ineffectiveness claims typically require that I investigate and supplement the trial record with additional evidence showing that trial counsel provided deficient assistance.

In my case, motions to enlarge the judgment roll (Appendix Item L & M) were presented to this Court, but no meaningful enlargement was granted. This is

closely aligned with the procedural system that Texas law follows, and as in the case of <u>Trevino v. Thaler</u>, 133 S.Ct. 1911, 1915 (2013), where it was held that while permitting ineffectiveness claims to be raised on direct appeal, they make it "virtually impossible" for an ineffectiveness claim to be presented on direct review.

The Supreme Court has recognized – in the federal system – that defendants often cannot reasonably expect to vindicate their right to effective trial counsel on direct appeal. In <u>Massaro v. United States</u>, 538 U.S.500 (2003), the court explained

> The evidence introduced at trial [] will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the Strickland analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reason for it...The trial record may contain no evidence of alleged errors of omission, no less the reasons underlying them...

Id. at 504-05 (internal quotation marks omitted)

But what about a case where records are available to trial counsel, the prosecution and are in the trial courts possession, and those records are so central, relevant and material to the theory of the defense that no tactical reason or strategic purpose could possibly be offered why they were not used. Will the appellate court exercise their authority to expand the record?

III.   Moving Ineffective Assistance of Counsel Claims Outside The Direct Appeal Process, During The Only Time A Defendant Has The Help of Trained Counsel, Runs Afoul of Due Process, Equal Protection and the Supremacy Clause

New York State has deliberately chosen to move trial counsel ineffectiveness claims outside the direct appeal process where counsel is constitutionally guaranteed. However, the Supreme Court has held, although in dicta, that under such circumstances, the state is required to provide the same instruments (i.e. attorney and other support services) as it would on appeal (*see Martinez v. Ryan*, 132 S.Ct. 1309, 1315, 1318 [2012]), an attorney.

Various statutes and procedural protocols associated with Article 440, the currently practiced standard to raise ineffective assistance of trial counsel claims, are violative of Due Process, Equal Protection and the Supremacy Clauses of the United States Constitution. The time for change of the convoluted, procedural scheme in this State that fails to provide counsel to vindicate their federal claims of ineffective assistance of counsel is long past due.

A.   The Question As To Whether The Dicta in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), And Its Refinement in *Trevino v. Thaler*, 133 S.Ct. 1911 (2013) Renders State Statutes Like, or Similar to, County Law § 722, CPLR § 1101 and Procedural Protocols Associated With Article 440 Unconstitutional, Is One Of State-Wide and Nation-Wide Importance Which Ought To Be Reviewed By This Court

The Supreme Court has recently stated that in certain circumstances, there may be a constitutional right to the assistance of counsel for the investigation,

preparation and submission of a viable post conviction application challenging the effectiveness of trial counsel (*see* Martinez v. Ryan, 132 S.Ct 1309 [2012]). Moreover, in Trevino v. Thaler, 132 S.Ct. 1911 [2013]), the Supreme Court held that procedural bars to claims of ineffective assistance of trial counsel would not be allowed when the state's post conviction protocols are convoluted and prevent adequate review on appeal of an ineffectiveness of trial counsel claim.

In my case, I have run head on into the convoluted procedural rules in this State while attempting to vindicate my ineffective assistance of trial counsel claims in an Article 440 proceeding, where I was not assigned counsel to assist me. As almost all of the claims I have raised in my Writ of Error Coram Nobis can be partially attributed to trial counsel's errors of omission and commission to some greater or lesser degree, how can this Court truly vindicate my claims using the standard of "representation as a whole" or "in totality" without considering these claims in their fullest and truest form?

As demonstrated below, when viewed through the lens of the Supremacy Clause, and the fact that the federal system entrusts state courts with initial and primary responsibility for enforcing federal constitutional rights in the course of administering their criminal justice systems (*see e.g.* Brecht v. Abrahamson, 507 U.S. 619, 635 [1993]; *also see* Rose v. Lundy, 435 U.S. 509, 518 [1982]), not only are the procedural bars under CPL § 440.10 - - when applied to claims of

6

ineffective assistance of counsel - - unconstitutional, but the failure of CPLR §§ 1101/1102, County Law § 722(4) and CPL § 440.30 to have funded mandates for the assignment of counsel for CPL § 440.10 motions, renders those statutes - - as applied - - unconstitutional.

New York State has no provisions in place to allow for assignment of counsel in the manner articulated in the dicta of Martinez v. Ryan, *supra*. Rather, County Law § 722 (4) only has the provision for the assignment of counsel after a CPL § 440.10 motion has been filed (pro-se, without the assistance of counsel), and a hearing has been ordered.

CPLR §§ 1101/1102 has similar, if not greater defects in its assignment protocols. Under the statute, the conditional, rather than mandatory requirements for the assignment of counsel to investigate, prepare and submit a CPL § 440.10 applications attacking the constitutional appropriateness of trial counsel's performance requires that I provide certification from an attorney that my action has merit. But tell me, how am I (or any other inmate for that matter) going to do this when very few attorneys will even look at an inmates case without requiring upfront money which we simply do not have.

Both County Law § 722 and CPLR § 1101's post submission assignment protocols are no longer workable in light of the dicta in Martinez v. Ryan, *supra*, and the refinements in Trevino v. Thaler, *supra*. New York State has identical

7

unworkable post conviction protocols that frustrate the meaningful review of ineffective assistance of trial counsel claims.

Finally, the stringent evidentiary requirements of CPL § 440.30 implicates Equal protection concerns because the wealthy can afford the services which are necessary to meet the initial evidentiary requirements, while an indigent defendant like myself must fend for himself in an arena that most indigent defendants simply do not have the education, skills or access to properly navigate. To frustrate my presentation by constructing barriers which cannot be met because of my indigency is contrary to the minimum standards outlined in the concurring opinions of Case v. Nebraska, 381 U.S. 336, 337 (1965).

B.   In Light of Martinez v. Ryan, *Supra*, and Trevino v. Thaler, *Supra*, The Procedural and Evidentiary Protocols Enacted Under CPL § 440.30 Violates Due Process and Equal Protection Guarantees, As Well As The Supremacy Clause

There is no question that Martinez v. Ryan, *supra*, represents the first shot across the bow of post conviction statutes that do not provide counsel or other support services for the vindication of indigent defendants ineffective assistance of trial counsel claims, and that the recent decision in Trevino v. Thaler, *supra*, makes such assertions applicable to states like New York when ineffective assistance claims, even those seemingly record based, must be raised in a post conviction motion (*see* People v. Stultz, 2 N.Y.3d 277, 284 [2004]; *also see* People v. Freeman, 93 A.D.3d 805 [2nd Dept. 2012]).

8

And as CPL § 440.30 holds me, a pro se inmate, to the standard of a well trained attorney by implementing presentation and review protocols that cannot be met, it has created a catch 22 which no longer can stand constitutional muster. The reality of pro se litigation boggles the mind.

In light of the Supreme Court's statement's that:

➢ Defendants pursuing first-tier review [of ineffective assistance of counsel claims] are generally ill-equipped to represent themselves (Martinez v. Ryan, 132 S.Ct. 1309, 1317 [2012]), and

➢ Without the help of an adequate attorney a prisoner will have difficulties vindicating a substantial ineffective assistance of trial counsel claim (id. at 1317), and

➢ Claims of ineffective assistance of trial counsel often require investigative work and an understanding of trial strategy (id. at 1317), and

➢ To present a claim of ineffective assistance of trial counsel in accordance with a state's procedures, a prisoner likely needs an effective attorney (id. at 1317), and

➢ The prisoner, unlearned in the law, may not comply with the state's procedural rules and may misapprehend the substantive details of federal constitutional law (id. at 1317), and

➢ A pro se inmate requires the guiding hand of counsel at every step in the proceedings against him...because he does not know how to establish his innocence (id. at 1317)(citations and inner quotation marks omitted), and

➢ Ineffective assistance of counsel claims often depend on evidence outside of the trial record (id. at 1318), and

➢ By deliberately choosing to move trial ineffectiveness claims outside of the direct appeal process, either explicitly or implicitly, where counsel is constitutionally guaranteed, the state significantly diminishes prisoners' ability to file such claims (id.), and

> The prisoner, unlearned in the law, may not comply with the state's procedural rules and may misapprehend the substantive details of federal constitutional law (id. at 1317) (*citing* Halbert v. Michigan, 545 U.S. 605, 620-621 [2005], which describes the deficient educational background of the prison population).

How can C.P.L. § 440.30, which does not come close to adhering to any of these statements, still be deemed constitutional?

C.    Compelling Appellate Counsel To Answer Questions Concerning His Strategic and Tactical Decisions, Combined With A Discretionary Ruling To Expand The Record; Will Provide A Full And Fair Review of Ineffective Assistance Of Appellate Counsel Claims on This Writ Of Error Coram Nobis Application

In my case, I was not able to compel trial counsel to answer questions concerning his errors of omission and commission, as he refused to sign for a certified letter, return receipt, posing such questions. Although I had informed the trial court of this and provided proof that I had attempted to have him answer such questions, the trial court denied my application, in part, pursuant to C.P.L. § 440.30(1) and (4)(b) (*see* Decision and Order on Article 440, Exhibit "2-H").

While the protocols laid out in Martinez v. Ryan, *supra*, would demand that I be allowed, at the very least, the assignment of counsel to answer these claims, C.P.L § 440.30 does not have such protocols to command counsel to answer said claims unless a hearing is granted (see County Law § 722[4]).

Will this court, in an almost identical circumstance concerning appellate counsel's failure, grant me an opportunity to compel assigned appellate counsel

Warren Landau of Appellate Advocates to answer questions concerning his tactical reasons and strategic purpose for what I claim amounted to errors of omission and commission? I have provided this court with a substantial showing that these errors of omission and commission have merit. Without such answers to the claims raised in this Coram Nobis application, I will once again be denied the opportunity to reach these claims fully on the merits under the state practiced standard of "representation as a whole" and "in totality."

IV.    Martinez v. Ryan, *supra*, and the Refinements In Trevino v. Thaler, *supra*, Cry Out For a Refinement Of The Convoluted Procedural and Statutory Mechanisms Dealing With Ineffective Assistance of Trial Counsel Claims, And A Discretionary Ruling To Expand The Record And Assign Appellate Counsel In This Writ Of Error Coram Nobis Application For Mr. Rucano

In Martinez v. Ryan, *supra*, the Supreme Court capitalized on its Coleman[1] dicta and held that "when a state requires defendants to raise ineffective assistance of counsel claims in initial-review collateral proceedings, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceedings, there was no counsel or counsel in that proceeding was ineffective under Strickland" (Martinez, 132 S.Ct at 1320).

New York's policy and practice effectively hinders and prevents defendants from vindicating the majority of their State and Federal ineffective assistance of

---

[1] Coleman v. Thompson, 501 U.S. 722 (1991)

counsel claims in the Courts of this state, forcing an already unqualified and indigent Pro-se defendant to navigate the even more complex federal courts with a habeas application, where the currently accepted dicta clearly states that a procedural default will not bar him.

A.   This Court Should, In The Unique Facts and Circumstances Herein, Take Judicial Notice of My Previous Application To Enlarge The Judgment Roll and Withdraw Appellate Counsel's Brief, Expand The Record In This Proceeding And Assign Qualified Appellate Counsel

After Appellate Counsel failed to assemble, investigate and present a complete record on appeal (Aff. at ¶ 10-13), I was forced to submit, *Pro-se*, a motion to enlarge the judgment roll (Appendix L & M). On January 6th, 2014, this court granted those motions in part (Appendix N) and issued an order to produce the grand jury proceedings under seal, as well as transcripts for July 7th, 2010, July 16th, 2010 and August 10th, 2010 (Aff. at ¶ 14).

Upon submittal of a motion to Resettle or Amend Pursuant to 22 NYCRR § 670.6(a) (Appendix O), this court, on April 21st, 2014 (Appendix P) further enlarged the record to include the October 1st, 2009 and October 5th, 2009 transcripts as part of the record on appeal (Aff. at ¶ 15-17).

The Court only expanded the record to include various transcripts of court dates before trial and the grand jury proceedings under seal (Aff. at ¶ 14-15), but denied my request to enlarge the judgment roll to include the diary (Aff. at ¶ 21-22), the expert reports of Forensic Document Examiner Robert Baier (Aff. at ¶ 23-

26), the session notes of Anna Lorusso-Moramarco, Licensed Clinical Social Worker (Aff. at ¶ 29-39), and the expert reports of Treyce d'Gabriel Montoya (Aff. at ¶ 40-45).

As this Court denied Leave to Appeal of my Article 440 application (People v. Anthony Rucano, App. Div. Docket No. 2015-01499 [2nd Dept. 2015]), agreeing with the lower court that these issues should have been raised on direct appeal, with direct appeal still pending, I can never have these records, supporting these claims, considered to support my claims of ineffective assistance of counsel in conjunction with my direct appeal claims, frustrating and preventing my ability to meet the state standard of "representation as a whole" and "in totality."

After fully realizing my appellate counsel's failure to expand the record via an Article 440 proceeding, on March 20th, 2014, I filed a motion to withdraw appellate counsel's brief (Appendix B) and asked for the assignment of a new attorney to prepare an Article 440 motion and hold my direct appeal in abeyance. This application also challenged the constitutionality of County Law § 722, CPLR §§ 1101/1102 and potential application of procedural bars via C.P.L. § 440.10(2)(c) (which is exactly what occurred). This court declined the motion without any explanation.

The exhibits submitted with my motion to withdraw appellate counsel's brief included detailed correspondence between Appellate Advocates and myself

13

showing that he ignored and/or bypassed a great amount of documentation providing support for what I believe was mixed claims in an Article 440 application.

ABA Standard 4-8.3(b) requires appellate counsel to utilize post conviction proceedings on issues that affect the validity of the judgment prior to perfecting an appeal. And that ABA Standard 4-8.6(a) directs appellate counsel to seek relief for his client on ineffective grounds if, **after investigation**, he is satisfied that trial counsel provided ineffective assistance of counsel.

Furthermore, in this narrowly defined case, I made appellate counsel aware of numerous, what I believed were "mixed-claims", requiring an article 440 to develop the claims factual predicate (*see* Appendix B, Affidavit at ¶ 9-60), but Appellate Counsel Warren Landau failed to investigate the validity of those claims.

I am asking this Court to take judicial notice of these previous applications, and this Court's decision on each of them, because I believe it is important to let the record reflect that I have exhausted every possible avenue of relief in an effort to receive a full and fair opportunity to have my State and Federal Ineffective Assistance of Counsel claims vindicated in the courts of this State. This directly relates to my due process rights, as when a state like New York, in practice, effectively moves ineffective assistance of counsel claims from being considered in totality (i.e. tactical reasons, strategic purpose, errors of omission and

commission) outside the direct appeal process, where counsel is not provided, it becomes violative of federal law.

B.   The Failure To Expand The Record And Assign Counsel In This Proceeding Will Prevent Me From Determining My Ineffective Assistance of Counsel Claims On the Merits In Any State Court Under The Baldi Standard, "Representation As A Whole" and "In Totality", Because In Practice It Is Impossible To Reach

There is precedent to support adequacy challenges predicates on a state's failure to provide effective procedures for allowing defendants to raise ineffective assistance of trial counsel claims. Oklahoma's procedural rules, for example, require defendants to raise ineffective assistance of trial counsel on direct appeal and provide defendant's with the opportunity to ask for a remand for an evidentiary hearing to expand the trial record to support their ineffective assistance of trial counsel claims when necessary. In practice, however, appellate courts (like the ones in New York) provide limited expansion ability (Appendix Item L, M, N, O, P), and trial courts almost never grant hearings despite frequent requests, as occurred in my case.

Federal Courts have also struck down procedures in Idaho[2] and New Mexico[3] that required defendants to raise ineffective assistance of trial counsel claims on direct appeal. Although these adequacy challenges were raised in states that required defendants to present ineffective assistance of trial counsel claims on

---

[2] *See* Hoffman v. Arave, 236 F.3d 523, 535-36 (9th Cir. 2001)
[3] *See* Jackson v. Shanks, 143 F.3d 1313, 1319 (10th Cir. 1998)

direct appeal, a similar challenge can be raised about the lack of a fair opportunity to present ineffective assistance of trial counsel claims in states like Texas and New York that do not have that requirement. Because the opportunity to raise these extra-record claims is illusory or non-existent on direct appeal in these states, the state's procedures for raising ineffective assistance of trial counsel claims on direct appeal fail to give defendants a realistic opportunity to vindicate their Sixth Amendment rights to effective trial counsel and can be deemed ineffective.

Like the Arizona state courts in Martinez v. Ryan, *supra*, the New York State Court of Appeals has long recommended that ineffective assistance of counsel claims be brought in post conviction proceedings (*compare*, People v. Brown, 45 N.Y.2d 852, 853-854 [1978])("in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceedings").

I would like to bring to this Court's attention People v. Maxwell, 89 A.D.3d 1108 (2nd Dept. 2011), in an analogous situation where it was stated that, "In this case since some of the defendant's allegations of ineffectiveness involve matters appearing on the records, while others involve matters that are outside the record." The Court of Appeals has held that in these types of cases, the defendant has

presented a "mixed claim" of ineffective assistance of counsel (People v. Evans, 16 N.Y.3d 571, 575, n.2, *cert. denied* - - U.S. - -, 132 S.Ct. 325).

But as the above procedural mechanism is not being adhered to by the Appellate Courts of this state, and when in the rare case that they do the state does not assign counsel; a statutory mechanism to expand the record on direct appeal, where counsel is assigned, will insure the vindication of these ineffective assistance of counsel claims on a full and complete record. To do otherwise would run afoul of due process and equal protection rights.

C.    The Holdings Of Trevino V. Thaler, *Supra*, Are Applicable To the Law In New York State

New York courts have developed a regular practice and procedure (as stated above in Brown, *supra* and Evans, *supra*), in recognition of the fact that, like Texas, "in the vast majority of cases, the undeveloped record on direct appeal will be insufficient for a defendant to raise, or a court to evaluate, a claim of trial ineffectiveness (Thompson v. State, 9 S.W.3d 808, 814 n.6 [Tex. Crim. App. 1999]).

Unlike New York, "When defendants do raise ineffective assistance claims on direct appeal, Texas courts routinely dismiss those claims without prejudice to the defendant's right to present the issue on collateral review" (*see. e.g.*, Rylander v. State, 101 S.W.3d 107, 111 & n.1 [Tex. Crim App. 2003] [finding record

insufficient to support appellant's ineffective assistance claim, but noting that appellant may submit claim in [post-conviction application]).[4]

In Trevino, the court assigned him an attorney for that collateral review proceeding. In my case, the court refused to assign me an attorney. In New York, an untrained pro-se litigant like me must somehow obtain the knowledge and skills to present my claims in a manner which will get a hearing granted, before the court will assign me an attorney. When I presented what were clearly mixed claims, to some lesser or greater degree, in which trial counsels tactical reasoning or strategic purpose, otherwise known as trial counsels errors of omission or commission, could not be determined from the record on appeal; the trial court denied my motion pursuant to C.P.L. § 440.30(1) and (4)(b) and applied a procedural bar pursuant to C.P.L. § 440.10(2)(b).

Important to note is at this point I could NEVER again have these claims considered in conjunction with the record on appeal because this Court denied me permission to consolidate the appeal of this post conviction application with my direct appeal, which was still pending (People v. Anthony Rucano, App. Div.

---

[4] Robinson v. State, 16 S.W. 808, 813 at n.7 ("proper procedure" is for the appellate court to overrule ineffective assistance claims "without prejudice to appellant's ability to dispute counsel's effectiveness collaterally," except in "the rare case where the record on direct appeal is sufficient to prove that counsel's performance was deficient"); Ex Parte Torres, 943 S.W.2d 469, 475 (rejection of ineffective assistance claim on direct appeal "does not bar relitigation of [the] claim on [collateral review]" because "direct appeal cannot be expected to provide an adequate record to evaluate the claim in question, and the claim might be substantiated through additional gathering in a [post collateral] proceedings").

18

Docket No. 2015-01499 [2nd Dept. 2015]). It is here that I, and all other indigent defendants in the State of New York, are hindered, frustrated and prevented from ever hearing all claims of ineffective assistance of trial counsel (record based, mixed claims and dehors the record) in one court with assigned counsel in order to meet the state practiced standard of "representation as a whole" and "in totality."

The Martinez court explicitly declined to address whether the right to counsel should be extended to collateral proceedings.[5] In its opinion in what would become Trevino, the Fifth Circuit had taken Martinez at its word, limiting its application to situations where ineffectiveness claims were explicitly delayed until the collateral stage - - in contrast to Texas, where certain procedures exist for bringing ineffectiveness allegations on direct appeal.[6] But Texas law, while permitting ineffectiveness claims to be raised on direct appeal, "make[s] it 'virtually impossible' for an ineffective assistance claim to be presented on direct review."[7]

The question the Supreme Court faced in Trevino was: is there a significant difference between "impossible" and "virtually impossible?" the Court answered in the negative. Its opinion hinged in part on its conclusion that, "as a systematic matter, Texas [does not] afford [] meaningful review of a claim of ineffective

---

[5] Id. at 1315; see also Mary Dewey, Comment, Martinez v. Ryan; A Shift Toward Broadening Access to Federal Habeas Corpus, 90 Denv. U.L. Rev. 268, 270 (2012)
[6] Ibarra v. Thaler, 687 F.3d 222, 227 (5th Cir. 2012)
[7] Trevino v. Thaler, 133 S.Ct. 1911, 1915 (2013) (quoting Robinson v. State, 16 S.W.3d 808. 810-811 [Tex. Crim App. 2000]).

assistance of trial counsel" on direct review. Texas, like New York, allows claims of ineffectiveness to be raised both on direct and collateral review. Because "the Texas procedural system…does not offer most defendants a meaningful opportunity to present a claim on ineffective assistance of trial counsel on direct appeal," it "precludes as a matter of course" what "Arizona law [in Martinez] prohibited by explicit terms" Id. at 1919-21.

D.     The Unconstitutional Statutory and Procedural Schemes In This State Will Lead To Them Being Challenged Via The Adequacy Doctrine

As an initial matter, a state like Texas, where the opportunity to raise ineffectiveness challenges on direct appeal is illusory (comparable to New York), should be estopped from claiming that it is exempt from Martinez because it allows defendants to raise ineffective assistance of trial counsel in state post-conviction proceedings. Adequacy, much like cause, is a doctrine rooted in equity. If equity concerns motivated the Martinez court to hold that states had to provide adequate post-conviction counsel to defendants who were forced to raise ineffective assistance of trial counsel in collateral review proceedings for their procedural defaults to be enforced in federal court, those same equity concerns will find a state procedural scheme that de facto forces defendants to raise ineffective assistance of trial counsel claims in post-conviction proceedings without the assistance of effective counsel are inadequate.

Adequacy doctrine is designed to address state practices that place precisely this type of undue burden on the exercise of a federal right. Given that the right at issue is the fundamental right to effective counsel, which the Martinez court described as a "bedrock principle in our justice system" and the "foundation of our adversary system" (Id. at 1317), the federal courts should be particularly resistant to state procedures that prohibit enforcement of that right.

State post-conviction review is attracting the attention of legal scholars across the United States.[8] The application of the Adequacy Doctrine being employed by the Courts will create obligations that bind state courts themselves, when a state-court litigant asserts a claim of a federal right that was denied by a state procedural rule. In other words, when the court holds a state procedural ground inadequate to bar direct review, the Court in effect holds, as a matter of federal common law, that the ground cannot validly be used by state courts to bar a litigant's assertion of a federal law contention.[9] It follows then that if the state law ground is inadequate, the federal court can review the federal law issue and can

---

[8] *E.g.* Eric M. Freedman, State Post-Conviction Remedies in the Next Fifteen Years: How Synergy Between the State and Federal Government Can Improve the Criminal Justice System Nationally, 24 Fed. Sent'g rep. 298, 298 (2012)("[T]he Adequacy of State Post-Conviction Proceedings Will Be A Centrally Contested Issue in the Years Ahead."); Justin F. Marceau, Challenging the Habeas Process Rather Than the Result, 69 wash. Lee. L. Rev. 85, 146-56, 166-76(2011).

[9] *E.g.* Daniel J. Meltzer, State Court Forfeitures of Federal Rights, 99 Harv. L. rev. 1128, 1182 (1986)(arguing that "when state foreclosure rules...cannot be squared with federal purposes, state and federal courts should be free to exercise their authority to fashion federal common law in order to ensure the vindication of federal rights").

vacate or reverse the judgment if the court's disposition of the federal issue so requires.

The court's holding of inadequacy, in effect, binds the state court, and as a matter of federal law cannot bar the vindication of the federal right either in the state court on remand. The vacature of the state court judgment indicates that the state high court's prior disposition of the case was incorrect, and indicates that the correct disposition would have been for the state court to ignore the inadequate procedural ground and reach the merits on the federal issue. Logically, it seems hard to confine such a duty to the case in which the inadequacy ruling is announced; if the ground is inadequate to block the state court's duty to consider the federal-law contention in one case, to ought to be equally inadequate in all similar cases and weaken the presumption that state courts can condition the vindication of federal rights on a litigants compliance with state procedural rules.

V.  When Considering the Unconstitutional and Convoluted Procedural Morass Defendant Rucano Is Entrenched In As A Result Of The Mechanisms In Place, This Court Should, In the Unique Facts and Circumstances Presented Herein, Expand The Record, Assign Counsel and Compel Prior Appellate Counsel To Answer Questions Concerning His Appellate Decisions

I have painstakingly trudged my way through the convoluted procedural morass in this state involving the vindication of my ineffective assistance of trial counsel claims, and now I am trying to assert those claims in this court based on

this court's agreement with the trial court that the claims should have been raised on direct appeal.

I have taken every procedural step possible to avoid the pitfalls created by the convoluted system in place, just to have door after door shut in my face because of some misstep resulting from the fact that every assigned counsel, either at the trial level or appellate level, has not presented these claims in the appropriate manner. It is at the point where I feel justice has become obsolete, and the overall desire to keep the status quo has become prevalent.

I plead with this Honorable Justices of this court to review the entire record and exhibits and to examine the time consuming and painstaking procedural steps I have taken to vindicate my ineffective assistance of trial counsel claims

Because this Court was presented with these very similar questions in my motion to withdraw appellate counsels brief just a little more than 2 years ago, where I foretold, and this court agreed, that appellate counsel raised numerous unpreserved issues, and declined to address them; I respectfully ask this court to consider the questions presented in this application in support of coram nobis relief and to expand the record and determine whether under the unique facts and circumstances presented in the case at hand, expansion of the record is appropriate.

<u>CONCLUSION</u>

I ask this Honorable Court to consider this supplemental affidavit and memorandum of law in support of motion for A Writ of Error Coram Nobis and for expansion of the record as the underlying foundation of appellate counsels failures. They provide context and clarity to my claims that appellate counsel failed to assemble a complete record on appeal, then investigate to discover the numerous instances of trial counsels errors of omission and commission, outlined in detail in my primary affidavit and memorandum of law in support of my Writ of Error Coram Nobis relief.

I am also seeking an order from this Court directing appellate counsel to provide his strategic and tactical rationale for his failures prior to this Court's resolution of this application, a procedure routinely used by this Court which has proven effective in providing a more rounded record for determination of coram nobis applications.

As I am a pro-se litigant, untrained and unlearned in formal matters of law and procedure, my inability to take the facts presented herein and apply them correctly and in the right context to the law, to effectively present, challenge and argue my claims before this court would be more realistic if this Court would assign me experienced counsel in this matter.

In light of the heavenly message of equality, Pope Francis gave us the following wisdom that applies to the claims of statewide importance I have presented to this Honorable Court today, "Let us use the same yardstick of opportunity for others as we use for ourselves."

Let these words of wisdom guide this Honorable Court in addressing the matter I have presented today, which cries out for justice in the form of due process and equal protection for all; regardless of their income, social status, race or religion. God Bless this Honorable Court.

WHEREFORE, based on the foregoing with attached exhibits, the attached Memorandum of Law in Support to Expand the Record, the main affidavit in support, and the arguments advanced in the Memorandum of Law and the supporting exhibits; I would pray that this Court grant the Writ of Error Coram Nobis and reverse the conviction, or in the alternative grant a de novo appeal and assign experienced counsel, and for such other and further relief as this Honorable Court deems just, proper and equitable.

Date: _September 1st_, 2016

_Anthony Rucano_

Anthony Rucano
DIN # 11-A-0528
Defendant, Pro Se
Great Meadow Correctional Facility
P.O. Box 51
Comstock, N.Y. 12821-0051



AD 9-59

## Table of Contents

PRELIMINARY STATEMENT                                                    2

  I. Introduction                                                       3

POINT 1

The Domino Effect of Under-Qualified, Inexperienced And Poorly Compensated
Counsel At Trial, Combined With The Unworkable, Unconstitutional And
Convoluted Procedural Scheme In New York State, Cumulatively Violates The
Due Process And Equal Protection Rights of the Indigent Defendant Class     7

  A. The Underlying Failures And Deficiencies in the Assigned Counsel Plan
     Have Been Known For Over A Decade                                  7

POINT 2

Considering The Dicta Raised In Martinez v. Ryan, And Its Refinement In
Trevino v. Thaler, The Failure To Create A Collateral Review Doctrine Or Assign
Counsel On Collateral Review Will Prevent An Indigent Defendant From Timely
Vindicating Their State And Federal IATC Claims, And Thereby Violate Due
Process, Equal Protection And The Supremacy Clauses                    10

  A. The Reality of Raising Ineffective Assistance of Trial Counsel    11

  B. The Convoluted Procedural In N.Y. State That Frustrates Vindication
     of IATC Claims Defeats The Rules of Procedure Which Are Designed
     To Insure Finality In Judgments; Calling For The Creation Of A
     Collateral Review Doctrine                                        12

  C. Case In Point – Procedural Bars – IATC – Financial Constraints –
     Appellate Advocates                                               14

     I. Contract Between The City of New York And Appellate
        Advocates                                                      15

        A. Scope of Work – July 1st 2015 to June 30th 2017 – Appendix "B"   16

II. Actual Services Provided By Appellate Advocates ................................ 16

   A. The Services Currently Provided By Appellate Advocates Under

     Contract To Indigent Defendents Does Not "Fully And Competently"

     Represent Their Clients And Can Be Deemed "Breach of Contract" .. 18

III. OILS, Appellate Standards And Best Practices - 2015 ............... 19

   A. XX. Collateral Litigation; CPL Article 440 Motion ............ 20

IV. The Current Procedural Scheme Is Unsustainable, As It Violates

    An Indigent Defendants Due Process And Equal Protection Rights .. 21

POINT 3

The Question As To Whether The Dicta In Martinez v. Ryan And The Statements
In Trevino v. Thaler Renders State Statutes Like County Law § 722, CPLR §1101/1102
And Procedural Protocols Associated With Article 440 Unconstitutional (Because
They Fail To Assign Counsel And Other Ancillary Services To Help Investigate,
Prepare And Submit IRC P Applications), Is One of State-Wide And Nation-Wide
Importance, Which Ought To Be Reviewed By This Court ...... 22

  A. When Viewed Through The Statements In Martinez v. Ryan, And It's

    Refinement In Trevino v. Thaler The Failure To Assign Indigent Defendants

    Counsel To Prepare And Submit An Article 440 Motion, Practically And

    Effectively Renders County Law § 722 And CPLR §§ 1101/1102, As

    Applied, Unconstitutional ............................. 22

  B. In Light of Martinez v. Ryan And Trevino v. Thaler, The Procedural

    And Evidentiary Protocols Enacted Under CPL § 440.30 Violates Due

    Process And Equal Protection Guarantees, As Well As The Supremacy

    Clauses ................................................... 25

  C. Without A Collateral Review Doctrine, CPL § 440.10 Is The Only Effective

    Vehicle To Obtain A Full And Fair Review of My IATC Claims In New

    York State Courts ....................................... 28

I. First-Tier Review By Counsel Is Critical To The Identification And Development of Claims Based On Ineffective Assistance of Trial Counsel ... 29.

II. The New York State Court of Appeals Has Consistently Dictated How IATC Claims Should Be Resolved, Yet The Lower Courts of This State Do Not Consistently Apply Their Holdings ........ 30

POINT 4

This Court Should Take The "Proverbial Leap" And Determine Whether The Procedural Scheme In This State That Moves IATC Claims Outside The Direct Appeal Process Prevents Indigent Defendants From Vindicating Their State And Federal IATC Claims In Any State Court, Allowing The Challenge of These Laws Via The Federal Adequacy Doctrine ........ 31

A. Martinez v. Ryan, And The Refinements In Trevino v. Thaler, Cry Out For An Over Haul of The Convoluted Procedural And Statutory Scheme And Mechanisms Dealing With IATC Claims ........ 31

B. Federal Courts In Other States Have Taken Action On States Failures To Provide Effective Procedures For Indigent Defendants To Raise IATC Claims At State Level ........ 32

C. The Holdings of Trevino v. Thaler Are Applicable To The Law In New York State ........ 34

D. Indigent Defendants Are Entrenched In A Procedural Morass As A Result of The Convoluted Procedural Rules In New York State ........ 37

E. When Considering The Unconstitutional And Convoluted Procedural Morass Indigent Defendants Are Forced To Navigate Without Counsel As A Result of the Mechanisms That Move IATC Claims Outside The Direct Appeal Process, Thereby Preventing And/Or Frustrating The Vindication of Federal And State IATC Claims In The Proper Venue and "In Totality" At The State Level, Corrective Action Becomes Necessary To Protect An Indigent Defendents Due Process and Equal Protection

I. The Foundational Cause Upon Which The Unworkable And Convoluted Procedural Scheme Was Built Upon Creates A Domino Effect of Due Process And Equal Protection Violations ... 39

II. The Reality of Raising IATC Claims On Direct Appeal Within The Current Convoluted Procedural Scheme Is Examined Through The Workings of Appellate Advocates Which, In Its Present State, Violates An Indigent Defendants Due Process and Equal Protection Rights ... 41

III. Viewed Through The Lens of Martinez and Trevino, Portions of County Law §722, CPLR §§1101/1102 And The Procedural and Evidentiary Protocols of CPL §440.30 Are, As Applied, Unconstitutional; Ultimately Leading To Their Challenge Under The Federal Adequacy Doctrine ... 42

Point 5

Case In Point - Anthony Rucano - The Perfect Storm Revealed ... 44

A. Procedural History ... 45
B. Initiation of Direct Appeal ... 45
C. Motion To Withdraw Appellate Counsels Brief ... 46
D. Article 440 Motion ... 47
E. Pro-Se Supplemental Brief ... 47
F. Leave To Appeal Article 440 To Second Department ... 47
G. Decision And Order on Direct Appeal - July 1st, 2015 ... 48
H. Leave To Appeal To The Court of Appeals - July 1st, 2015 ORDER ... 49
I. Leave To Appeal To The Court of Appeals - May 19th, 2014 ORDER ... 49
J. Writ of Error Coram Nobis ... 49
K. 18-B Trial Attorney Eugene Lambs Failures ... 51
L. Appellate Advocates Attorney Warren Landau Failed On Multiple Levels ... 53

M. The Combination of A Convoluted Statutory And Procedural Scheme That Frustrates And/Or Prevents The Vindication of State And Federal IATC Claims, And Which Practically And Effectively Moves Those Claims Outside The Direct Appeal Process Where N.Y. State Has Denied Me Counsel Renders The Entire Process - As Applied - Unconstitutional; As It Violates MY Equal Protection And Due Process Rights; And MY Case Represents "The Perfect Storm" of Prejudice That All Indigent Defendants in New York State Face .......... 56

Summary - Questions To Consider .......... 59

Conclusion .......... 62

## Table of Authorities

State Cases

New York County Lawyers Ass'n v. State, 196 Misc.2d 761 (N.Y. Sup 2003)    9
People v. Baldi, 54 NY2d 137 (1981)    24
People v. Brown, 45 NY2d 852, 853-854 (1978)    1, 28, 34
People v. Evans, 16 NY3d 571 (2011)    28, 34
People v. Freeman, 93 AD3d 805 (2nd Dept. 2012)    25, 28
People v. Lopez, 71 NY2d 662, 665 (1988)    30
People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011)    28, 34
People v. Melendez-Smith, 66 AD3d 1042 (2nd Dept. 2009)    28
People v. Mendoza, 298 AD2d 532 (2nd Dept. 2003)    28
People v. Morales, 58 NY2d 1008 (1983)    28
People v. Rivera, 71 NY2d 705 (1988)    24, 30
People v. Stultz, 2 NY3d 277, 284 (2004)    25, 30

Federal Cases

Brecht v. Abrahamson, 507 US 619, 635 (1983)    24
Carney v. Fabian, 441 F.Supp.2d 1014, 1019 (D. Minnesota 2006)    28
Case v. Nebraska, 381 U.S. 336, 337 (1965)    27
Coleman v. Thompson, 501 US 722 (1991)    34, 22
Dickins v. Ryan, 740 F.3d 1302, 1319 (9th Cir. 2014)    5
Douglas v. California, 372 U.S. 353 (1963)    32
English v. Cody, 146 F.3d 1257, 1262 (10th Cir. 1998)    11
Gideon v. Wainwright, 372 US 335 (1963)    24
Guinan v. United States, 6 F.3d 468 (C.A. 7, 1993)    12
Halbert v. Michigan, 545 US 605, 619 (2005)    32
Hayes v. Battaglia, 403 F.3d 935, 937 (7th Cir. 2005)    28
Hoffman v. Arave, 236 F.3d 523, 535-536 (9th Cir. 2001)    33
Ibara v. Thaler, 687 F.3d 222, 227 (5th Cir. 2012)    35
Jackson v. Shanks, 143 F.3d 1313, 1319 (10th Cir. 1998)    33
Kimmelman v. Morrison, 477 U.S. 365, 378 (1986)    29
Martinez v. Ryan, 132 S.Ct. 1309 (2012)    4, 5, 22, 23, 25-27, 31   PASSIM
Massaro v. United States, 538 US 500 (2003)    11-13, 24, 27, 29   PASSIM
Miller-El v. Cockrell, 537 US 322 (2003)    4, 5
Murray v. Carrier, 477 U.S. 478, 488 (1986)    3
Pham v. United States, 371 F.3d 178, 186-187 (2nd Cir. 2002)    30
Robinson v. State, 16 S.W.3d 808, 810-811 (Texas Crim. App. 2000)    35
Rose v. Lundy, 455 US 509, 518 (1982)    24
Rylander v. State, 101 S.W.3d 107, 111, n.1 (Texas Crim. App. 2003)    34

State v. Spreitz, 39 P.3d 525, 526 (Ariz. 2012) .......... 34
Strickland v. Washington, 466 US 668 (1994) .......... 12, 24, 28, 29
Sweet v. Bennett, 335 F.3d 135 (2ⁿᵈ Cir. 2003) .......... 28
Thompson v. State, 9 S.W.3d 808, 814, n.6 (Texas Crim. App. 1999) .......... 34
Trevino v. Thaler, 133 S.Ct. 1911 (2013) .......... 4, 5, 22, 25, 26
Walter v. Dalshaim, 669 F.Supp 68, 70 (SDNY 1987) .......... 28

Statutes
County Law §722 .......... 1, 9, 22-24, 26-27
C.P.L. §440.10 .......... 1, 11, 27
C.P.L. §440.30 .......... 1, 26, 27
C.P.L.R. §§1101/1102 .......... 1, 23, 24
Executive Law §832 .......... 19

Treatises
ABA Standard 4-8.3(b) .......... 30
ABA Standard 4-8.6(a) .......... 30

Law Journal Articles
Effective Trial Counsel After Martinez v. Ryan: Focusing on the Adequacy of State
Procedures, 122 Yale L.J. 2604, June 2013 .......... 31

Martinez v. Ryan : A Shift Toward Broadening Access To Federal Habeas Corpus,
90 Denv. U.L. Rev. 268, 270 (2012), by Mary Dewey

State Post-Conviction Remedies in the Next Fifteen Years: How Synergy Between The
State and Federal Government Can Improve The Criminal Justice System Nationally,
24 Fed. Sent'g Rep. 298 (2012), by Eric M. Freedman .......... 37

Challenging The Habeas Process Rather Than The Result, 69 Wash. Lee L. Rev. 85,
146-56 (2011), by Justin F. Marceau .......... 37

State Court Forfeitures of Federal Rights, 99 Harv. L.Rev. 1128, 1182 (1986)
by Daniel L. Meltzer .......... 37

# Appellate Advocates
# Quarterly Programmatic Report
# July – September 2014
# Fiscal Year 2015
# 1st Quarter

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085   FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
BARRY S. STENDIG

SUPERVISING ATTORNEYS
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON

DIRECTOR OF INNOCENCE INVESTIGATIONS
DE NICE POWELL

ALEXIS A. ASCHER
STEVEN R. BERNHARD
SAMUEL E. BROWN
ELIZABETH E. BURNITZ
DENISE A. CORSI
A. ALEXANDER DONN
ALLEGRA GLASHAUSSER
LEILA BULL
LAUREN E. JONES
JONATHAN M. KRATTER
BRYAN KREYKES
JOHN B. LATELLA
JOSHUA M. LEVINE
TAMMY E. LINN
BENJAMIN S. LITMAN
PATRICIA PAZNER
ANNA PERVUKHIN
SHANDA SIBLEY
NAO TERAI
MARK W. VORKINK
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
DINA ZLOCZOWER

OF COUNSEL
ELLEN FRIED
MELISSA S. HORLICK
WILLIAM A. LOEB

## QUARTERLY PROGRAMMATIC REPORT

Contract CT00220060001564
July - September 2014

### INTAKE

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| TOTAL INTAKE | 52 | 52 |
| AD INTAKE | 24 | 24 |
| Reassignments | 1 | 1 |
| New Assignments | 23 | 23 |
| Cases Received With | | |
| Record Already Prepared | 1 | 1 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 23 | 23 |
| AT INTAKE | 8 | 8 |
| Reassignments | 0 | 0 |
| New Assignments | 8 | 8 |
| Cases Received with | | |
| Record Already Prepared | 0 | 0 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 8 | 8 |
| ADDITIONAL ASSIGNMENTS | | |
| Court of Appeals | 7 | 7 |
| Assignments to 440 Motions | 2 | 2 |
| SORA Hearings | 6 | 6 |
| IDP Padilla 440 Referrals | 5 | 5 |

|                          | This Quarter | Fiscal Year-to-Date |
|--------------------------|:------------:|:-------------------:|
| TOTAL CASES SUBTRACTED    | 2            | 2                   |
| Relieved                  | 0            | 0                   |
| Substituted               | 0            | 0                   |
| Vacated                   | 2            | 2                   |
| NET ASSIGNMENTS TO DATE    | 52           | 52                  |

**CASE-BY-CASE RECORD** (CONTINUED)

<u>Case</u>                          <u>Assigned</u>                      <u>Filed</u>

**September 2014 Appellate Term Assignments** (4; all new assignments)

|  |  |
|--|--|
| ██████████████████ | 9/4/14 |
|  | 9/4/14 |
|  | 9/4/14 |
|  | 9/4/14 |

21

### FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL APPELLATE DIVISION & TERM FILINGS** | | |
| Briefs | 33 | 33 |
| Sentence Reduction Motions | 5 | 5 |
| Other Dispositive Documents Filed: | | |
|     Abandonment Motion | 1 | 1 |
|     Stipulation Withdrawing Appeal | 8 | 8 |
|     Absconder Motion | 1 | 1 |
| **TOTAL APPEALS PERFECTED:** | 47 | 47 |
| Miscellaneous Dispositions: | | |
|     Vacated: | 2 | 2 |
| Additional dispositive filings: | | |
|     Court of Appeals Briefs | 3 | 3 |
|     SORA hearings | 6 | 6 |
|     440.10 Padilla motions | 2 | 2 |

|                                   | This Quarter | Fiscal Year-to-Date |
|-----------------------------------|:------------:|:-------------------:|
| **Additional Litigation:**        |              |                     |
| Response to Show Cause Order      | 1            | 1                   |
| 440 Leave applications            | 2            | 2                   |
| SORA eligibility letter           | 1            | 1                   |
| Reargument motion                 | 3            | 3                   |
| Motion to settle transcript       | 1            | 1                   |
| Stay application                  | 1            | 1                   |
| Opp. To dismissal motion          | 1            | 1                   |
| **MISCELLANEOUS MATTERS:**        |              |                     |
| Reply briefs:                     | 29           | 29                  |
| Supplemental briefs               | 4            | 4                   |

23

|                        | This Quarter | Fiscal Year-to-Date |
|------------------------|:------------:|:-------------------:|
| **TOTAL APPEALS ARGUED** | 20         | 20                  |

**AVERAGE TIME (IN DAYS) FROM RECEIPT OF COMPLETE RECORD TO PERFECTION OF APPEAL:**

220 DAYS

I certify that all work performed under this agreement has been performed in compliance with the terms and conditions of the agreement.

Dated: October 30, 2014



24

**Report on Criminal Appeals**

Fiscal Year _15_

Name of Organization

APPELLATE ADVOCATES

☒ 1st  ☐ 2nd  ☐ 3rd  ☐ 4th

I. INTAKE

(Reporting Period (Quarter by Fiscal Year)

|  | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
|  | 1st | 2nd |  |  |
| Assignments |  | 24 | 8 | 7 |
| SORA Hearings |  | 6 |  |  |
| Padilla Referrals |  | 5 |  |  |
| ~~Filed DLRA Motions~~ Assignments to 440 Motions |  | 2 |  |  |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals |  |  |  | 3 |
| Trials |  | 19 |  |  |
| People's Appeals |  |  |  |  |
| DLRA Motions in Trial Court |  |  |  |  |
| Hearings |  |  |  |  |
| SORA Appeals |  | 3 |  |  |
| Substantive Pleas |  | 2 |  |  |
| Non-Substantive Pleas (including Excessive Sentence Motions) |  | 5 |  |  |
| Appeals from Order Denying 440 |  |  |  |  |
| Anders Briefs |  | 4 | 2 |  |
| Stipulations to Withdraw |  | 8 |  |  |
| Motions to Dismiss/Discontinue, etc. |  | 2 |  |  |
| Other (specify – must dispose of assignment) Resent. appeals (2); Response to show cause order(1); Padilla Motions (2); 440 leave apps (2); SORA Hs (6) |  |  |  |  |

## II. (B) PROVIDER-DISPOSITIVE FILINGS
### (Disposes of assignment to provider but not of case),
### Count each case only once

|  | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) |  |  |  |  |
| Substitution by Retained Counsel |  |  |  |  |
| Relieved for Any Other Reasons |  |  |  |  |
| Other (specify)   Vacated |  | 2 |  |  |
| Average Time from Assignment to Filing Motion |  | 23 days |  |  |

## III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions   (Padilla) | 2 |
| 440.20 Motions |  |
| Federal Habeas Corpus Petitions |  |
| 2nd Circuit Court of Appeals |  |
| USSC Cert Petitions |  |
| Other (specify) Stay (1); opp. to dism. motion (1); motion to settle transcript (1); rearg. motions (3); sora elig. letter (1) |  |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 29 |
| Other (specify)  Supp. Briefs | 4 |

|  | Number |
|---|---|
| Appeals Orally Argued | 20 |

# Appellate Advocates
# Quarterly Programmatic Report
# October – December 2014
# Fiscal Year 2015
# 2nd Quarter

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085    FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
LYNN W. L. FAHEY

*ASSISTANT ATTORNEY-IN-CHARGE*
BARRY S. STENDIG

*SUPERVISING ATTORNEYS*
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON

*DIRECTOR OF INNOCENCE INVESTIGATIONS*
DENICE POWELL

ALEXIS A. ASCHER
STEVEN R. BERNHARD
SAMUEL E. BROWN
ELIZABETH E. BUDNITZ
DENISE A. CORSÍ
A. ALEXANDER DONN
ALLEGRA GLASHAUSSER
LEILA HULL
LAUREN E. JONES
JONATHAN M. KRATTER
BRYAN KREYKES
JOHN B. LATELLA
JOSHUA M. LEVINE
TAMMY E. LINN
BENJAMIN S. LITMAN
PATRICIA PAZNER
ANNA PERVUKHIN
SHANDA SIBLEY
NAO TERAI
MARK W. VORKINK
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
DINA ZLOCZOWER

*OF COUNSEL*
MELISSA S. HORLICK

## QUARTERLY PROGRAMMATIC REPORT

Contract CT00220060001564
October - December 2014

### INTAKE

| | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| TOTAL INTAKE | 109 | 161 |
| AD INTAKE | 79 | 103 |
| Reassignments | 0 | 1 |
| New Assignments | 79 | 102 |
| Cases Received With | | |
| Record Already Prepared | 0 | 1 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 79 | 102 |
| AT INTAKE | 9 | 17 |
| Reassignments | 0 | 0 |
| New Assignments | 9 | 17 |
| Cases Received with | | |
| Record Already Prepared | 0 | 0 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 9 | 17 |
| ADDITIONAL ASSIGNMENTS | | |
| Court of Appeals | 4 | 11 |
| Assignments to 440 Motions | 0 | 2 |
| SORA Hearings | 6 | 12 |
| IDP Padilla 440 Referrals | 9 | 14 |
| DLRA Motion | 1 | 1 |
| DLRA Remands | 1 | 1 |

|                          | This Quarter | Fiscal Year-to-Date |
|--------------------------|:------------:|:-------------------:|
| TOTAL CASES SUBTRACTED    | 1            | 3                   |
|     Relieved    | 1 | 1 |
|     Substituted | 0 | 0 |
|     Vacated     | 0 | 2 |
| NET ASSIGNMENTS TO DATE   | 108          | 160                 |

2

## CASE-BY-CASE RECORD (CONTINUED)

Case                          Assigned                        Filed

**November 2014 Appellate Term Assignments** (1; new assignment)
                             11/28/14

**December 2014 Appellate Division Assignments** (6; all new assigns.)
                            12/18/14
                            12/18/14
                            12/18/14              **12/31/14**
                            12/19/14
                            12/29/14
                            12/29/14

**December 2014 Appellate Term Assignments** (4; all new assignments)
                            12/4/14
                            12/4/14
                            12/4/14
                            12/22/14

## FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| TOTAL APPELLATE DIVISION & TERM FILINGS |  |  |
| Briefs | 73 | 106 |
| Sentence Reduction Motions | 18 | 23 |
| Other Dispositive Documents Filed: |  |  |
| Abandonment Motion | 10 | 11 |
| Stipulation Withdrawing Appeal | 11 | 19 |
| Absconder Motion | 1 | 2 |
| TOTAL APPEALS PERFECTED: | 113 | 161 |
| Miscellaneous Dispositions: |  |  |
| Vacated: | 0 | 2 |
| Relieved (conflict): | 1 | 1 |
| Additional dispositive filings: |  |  |
| Court of Appeals Briefs | 5 | 8 |
| SORA hearings | 6 | 12 |
| 440.10 Padilla motions | 6 | 8 |
| DLRA Motions | 1 | 1 |
| DLRA Remands | 1 | 1 |

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **Additional Litigation:** | | |
| Response to Show Cause Order | 2 | 3 |
| 440 Leave applications | 7 | 9 |
| SORA eligibility letter | 0 | 1 |
| Reargument motion | 1 | 4 |
| Motion to settle transcript | 0 | 1 |
| Stay application | 0 | 1 |
| Opp.to People's motion | 2 | 3 |
| COA appl. to 2d Cir. | 1 | 1 |
| Post-hearing memos | 2 | 2 |
| Motions for late not. of app. | 2 | 2 |
| Motion to transfer case | 1 | 1 |
| | | |
| **MISCELLANEOUS MATTERS:** | | |
| Reply briefs: | 40 | 69 |
| Supplemental briefs | 2 | 6 |
| | | |
| **TOTAL APPEALS ARGUED** | 67 | 87 |

**AVERAGE TIME (IN DAYS) FROM RECEIPT OF COMPLETE RECORD TO PERFECTION OF APPEAL:**

239 DAYS

I certify that all work performed under this agreement has been performed in compliance with the terms and conditions of the agreement.

Dated: January 20, 2015



**Report on Criminal Appeals**

Fiscal Year _15_

Name of Organization

*APPELLATE ADVOCATES*

I. INTAKE

☐ 1st  ☒ 2nd  ☐ 3rd  ☐ 4th
(Reporting Period (Quarter by Fiscal Year)

| | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
| | 1st | 2nd | | |
| Assignments | | 78 | 9 | 4 |
| SORA HEARINGS | | 6 | | |
| Padilla Referrals | | 9 | | |
| Filed DLRA Motions | | 1 | | |
| DLRA Remands | | 1 | | |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals | | | | 5 |
| Trials | | 27 | 2 | |
| People's Appeals | | | | |
| DLRA Motions in Trial Court | | 1 | | |
| Hearings | | 3 | 2 | |
| SORA Appeals | | 9 | | |
| Substantive Pleas | | 5 | 2 | |
| Non-Substantive Pleas (including Excessive Sentence Motions) | | 18 | | |
| Appeals from Order Denying 440 | | 4 | | |
| Anders Briefs | | 8 | 6 | |
| Stipulations to Withdraw | | 11 | | |
| Motions to Dismiss/Discontinue, etc. | | 9 | 1 | |
| Other (specify – must dispose of assignment) *Resentencing appeals (5); Absconder(1); DLRA Remand (1), Sora hearings (6)* | | 13 | | |

II. (B) PROVIDER-DISPOSITIVE FILINGS
   (Disposes of assignment to provider but not of case)
   *Count each case only once*

|  | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) |  | *1* |  |  |
| Substitution by Retained Counsel |  |  |  |  |
| Relieved for Any Other Reasons |  |  |  |  |
| Other (specify) |  |  |  |  |
| Average Time from Assignment to Filing Motion | *244 days* |  |  |  |

III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | *6* |
| 440.20 Motions |  |
| Federal Habeas Corpus Petitions |  |
| 2nd Circuit Court of Appeals   *(applic. for cert. & app.)* | *1* |
| USSC Cert Petitions |  |
| Other (specify) *440. lv. apps (7); post-hearing memos (2) opp to Peok motions (2); m for late not. of app (2); SORA lv. app.(1); rearg m.(1); m to transfer case(1); ord.to sh. cause resp.(2)* | *18* |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | *40* |
| Other (specify)  *Supp. Briefs* | *2* |

|  | Number |
|---|---|
| Appeals Orally Argued | *67* |

# Appellate Advocates
# Quarterly Programmatic Report
# January – March 2015
# Fiscal Year 2015
# 3rd Quarter

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085    FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
LYNN W. L. FAHEY

*ASSISTANT ATTORNEY-IN-CHARGE*
BARRY S. STENDIG

*SUPERVISING ATTORNEYS*
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON

*DIRECTOR OF INNOCENCE INVESTIGATIONS*
DE NICE POWELL

ALEXIS A. ASCHER
STEVEN R. BERNHARD
SAMUEL E. BROWN
ELIZABETH E. BUDNITZ
DENISE A. CORSI
A. ALEXANDER DONN
ALLEGRA GLASHAUSSER
LEILA HULL
LAUREN E. JONES
JONATHAN M. KRATTER
BRYAN KREYKES
JOHN B. LATELLA
JOSHUA M. LEVINE
TAMMY E. LINN
BENJAMIN S. LITMAN
PATRICIA PAZNER
ANNA PERVUKHIN
SHANDA SIBLEY
NAO TERAI
MARK W. VORKINK
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
DINA ZLOCZOWER

*OF COUNSEL*
MELISSA S. HORLICK

## QUARTERLY PROGRAMMATIC REPORT

Contract CT00220060001564
January - March 2015

### INTAKE

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| TOTAL INTAKE | 184 | 345 |
| AD INTAKE | 152 | 255 |
| Reassignments | 1 | 2 |
| New Assignments | 151 | 253 |
| Cases Received With |  |  |
| Record Already Prepared | 0 | 1 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 152 | 254 |
| AT INTAKE | 14 | 31 |
| Reassignments | 0 | 0 |
| New Assignments | 14 | 31 |
| Cases Received with |  |  |
| Record Already Prepared | 0 | 0 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 14 | 31 |
| ADDITIONAL ASSIGNMENTS |  |  |
| Court of Appeals | 11 | 22 |
| Assignments to 440 Motions | 2 | 4 |
| SORA Hearings | 1 | 13 |
| IDP Padilla 440 Referrals | 4 | 18 |
| DLRA Motion | 0 | 1 |
| DLRA Remands | 0 | 1 |

|                          | This Quarter | Fiscal Year-to-Date |
|--------------------------|:------------:|:-------------------:|
| TOTAL CASES SUBTRACTED    | 3            | 6                   |
|   Relieved      | 1            | 2                   |
|   Substituted   | 1            | 1                   |
|   Vacated       | 0            | 2                   |
|   Pro se subst. | 1            | 1                   |
| NET ASSIGNMENTS TO DATE   | 181          | 339                 |

**CASE-BY-CASE RECORD** (CONTINUED)

<u>Case</u>                     <u>Assigned</u>                  <u>Filed</u>

<u>March 2015 Appellate Division Assignments</u> (continued)

[redacted]
                              3/31/15
                              3/31/15
                              3/31/15
                              3/31/15
                              3/31/15
                              3/31/15

<u>March 2015 Appellate Term Assignments</u> (6; all new)

[redacted]
                              3/20/15
                              3/20/15
                              3/20/15
                              3/20/15
                              3/30/15
                              3/30/15

27

## FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|                                          | This Quarter | Fiscal Year-to-Date |
|------------------------------------------|:------------:|:-------------------:|
| TOTAL APPELLATE DIVISION & TERM FILINGS  |              |                     |
| Briefs                                   | 55           | 161                 |
| Sentence Reduction Motions               | 14           | 37                  |
|                                          |              |                     |
| Other Dispositive Documents Filed:       |              |                     |
|     Abandonment Motion | 5          | 16                  |
|     Stipulation Withdrawing Appeal | 9 | 28              |
|     Absconder Motion  | 0           | 2                   |
|                                          |              |                     |
| TOTAL APPEALS PERFECTED:                 | 83           | 244                 |
|                                          |              |                     |
| Miscellaneous Dispositions:              |              |                     |
|     Vacated:          | 0           | 2                   |
|     Relieved (conflict): | 1        | 2                   |
|     Substituted:      | 1           | 1                   |
|     Pro se subst:     | 1           | 1                   |
| Additional dispositive filings:          |              |                     |
|     Court of Appeals Briefs | 6       | 14                  |
|     SORA hearings     | 1           | 13                  |
|     440.10 Padilla motions | 2        | 10                  |
|     440.20 motions    | 1           | 1                   |
|     DLRA Motions      | 0           | 1                   |
|     DLRA Remands      | 0           | 1                   |

|                                      | This Quarter | Fiscal Year-to-Date |
|--------------------------------------|:------------:|:-------------------:|
| **Additional Litigation:**           |              |                     |
| Response to Show Cause Order         | 1            | 4                   |
| 440 Leave applications               | 1            | 10                  |
| SORA eligibility letter              | 0            | 1                   |
| Reargument motion                    | 0            | 4                   |
| Motion to settle transcript          | 0            | 1                   |
| Stay application                     | 1            | 2                   |
| Leave motion to COA                  | 1            | 1                   |
| Opp. to People's motion              | 0            | 3                   |
| COA appl. to 2d Cir.                 | 0            | 1                   |
| Opp. to cert. Pet.                   | 2            | 2                   |
| Post-hearing memos                   | 0            | 2                   |
| Motions for late not. of app.        | 3            | 5                   |
| Motion to transfer case              | 0            | 1                   |
|                                      |              |                     |
| **MISCELLANEOUS MATTERS:**           |              |                     |
| Reply briefs:                        | 18           | 87                  |
| Supplemental briefs                  | 2            | 8                   |
|                                      |              |                     |
| TOTAL APPEALS ARGUED                 | 68           | 155                 |

<u>AVERAGE TIME (IN DAYS) FROM RECEIPT OF COMPLETE RECORD TO PERFECTION
OF APPEAL:</u>

280 DAYS

I certify that all work performed under this agreement has been performed in compliance with the terms and conditions of the agreement.

Dated: April 29, 2015



**Report on Criminal Appeals**

Fiscal Year _15_

Name of Organization

APPELLATE ADVOCATES

I. INTAKE

☐ 1st  ☐ 2nd  ☒ 3rd  ☐ 4th

(Reporting Period (Quarter by Fiscal Year)

| | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
| | 1st | 2nd | | |
| Assignments | | 152 | 14 | 11 |
| IDP Padilla Referrals | | 4 | | |
| ~~Filed DLRA Motions~~ SORA Hearings | | 1 | | |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals | | | | 6 |
| Trials | | 31 | 2 | |
| People's Appeals | | | | |
| DLRA Motions in Trial Court | | | | |
| Hearings | | 4 | 3 | |
| SORA Appeals | | 4 | | |
| Substantive Pleas | | 5 | | |
| Non-Substantive Pleas (including Excessive Sentence Motions) | | 13 | 1 | |
| Appeals from Order Denying 440 | | 2 | | |
| Anders Briefs | | 3 | 1 | |
| Stipulations to Withdraw | | 9 | | |
| Motions to Dismiss/Discontinue, etc. | | 5 | | |
| Other (specify – must dispose of assignment) Response to show cause (1), SORA H. (1); Padilla M. (2) | | 4 | | |

Page 2 of 2

## II. (B) PROVIDER-DISPOSITIVE FILINGS
(Disposes of assignment to provider but not of case)
*Count each case only once*

|  | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) |  | 1 |  |  |
| Substitution by Retained Counsel |  | 1 |  |  |
| Relieved for Any Other Reasons (client going pro se) |  | 1 |  |  |
| Other (specify) |  |  |  |  |
| Average Time from Assignment to Filing Motion |  | 555 days |  |  |

## III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 2 |
| 440.20 Motions | 1 |
| Federal Habeas Corpus Petitions | 1 |
| 2nd Circuit Court of Appeals | 1 |
| USSC Cert Petitions (opposition to Peo's pet.) | 2 |
| Other (specify) |  |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 18 |
| Other (specify)   Supp. Briefs | 2 |

|  | Number |
|---|---|
| Appeals Orally Argued | 68 |

# Appellate Advocates
# Quarterly Programmatic Report
# April – June 2015
# Fiscal Year 2015
# 4th Quarter

<u>**QUARTERLY PROGRAMMATIC REPORT**</u>

Contract CT00220060001564
April - June 2015

<u>**INTAKE**</u>

|  | <u>**This Quarter**</u> | <u>**Fiscal Year-to-Date**</u> |
|---|---|---|
| <u>**TOTAL INTAKE**</u> | **185** | **530** |
|  |  |  |
| <u>**AD INTAKE**</u> | **137** | **392** |
| Reassignments | 1 | 3 |
| New Assignments | 136 | 389 |
| Cases Received With |  |  |
| Record Already Prepared | 1 | 2 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 136 | 390 |
|  |  |  |
| <u>**AT INTAKE**</u> | **25** | **56** |
| Reassignments | 0 | 0 |
| New Assignments | 25 | 56 |
| Cases Received with |  |  |
| Record Already Prepared | 0 | 0 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 25 | 56 |
|  |  |  |
| <u>**ADDITIONAL ASSIGNMENTS**</u> |  |  |
|  |  |  |
| Court of Appeals | 4 | 26 |
| Assignments to 440 Motions | 5 | 9 |
| SORA Hearings | 3 | 16 |
| IDP Padilla 440 Referrals | 7 | 25 |
| DLRA Motion | 4 | 5 |
| DLRA Remands | 0 | 1 |

|  | **This Quarter** | **Fiscal Year-to-Date** |
|---|---|---|
| **TOTAL CASES SUBTRACTED** | **4** | **10** |
| Relieved | 2 | 4 |
| Substituted | 2 | 3 |
| Vacated | 0 | 2 |
| Pro se subst. | 0 | 1 |
| **NET ASSIGNMENTS TO DATE** | **181** | **520** |

2

## CASE-BY-CASE RECORD (CONTINUED)

| Case | Assigned | Filed |
|------|----------|-------|

**June 2015 Appellate Term Assignments** (continued)



6/8/15
6/8/15
6/8/15
6/8/15
6/15/15
6/22/15
6/22/15
6/22/15
6/22/15
6/22/15

31

## FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| TOTAL APPELLATE DIVISION & TERM FILINGS | | |
| Briefs | 97 | 258 |
| Sentence Reduction Motions | 15 | 52 |
| Other Dispositive Documents Filed: | | |
| Abandonment Motion | 6 | 22 |
| Stipulation Withdrawing Appeal | 9 | 37 |
| Absconder Motion | 0 | 2 |
| TOTAL APPEALS PERFECTED: | 127 | 371 |
| Miscellaneous Dispositions: | | |
| Vacated: | 0 | 2 |
| Relieved (conflict): | 2 | 4 |
| Substituted: | 2 | 3 |
| Pro se subst: | 0 | 1 |
| Additional dispositive filings: | | |
| Court of Appeals Briefs | 8 | 22 |
| SORA hearings | 3 | 16 |
| 440.10 Padilla motions | 2 | 12 |
| 440.20 motions | 0 | 1 |
| DLRA Motions | 0 | 1 |
| DLRA Remands | 0 | 1 |

|                                 | This Quarter | Fiscal Year-to-Date |
|---------------------------------|:------------:|:-------------------:|
| **Additional Litigation:**      |              |                     |
| Response to Show Cause Order    | 1            | 5                   |
| 440 Leave applications          | 3            | 13                  |
| SORA eligibility letter         | 0            | 1                   |
| Reargument motion               | 3            | 7                   |
| Motion to settle transcript     | 0            | 1                   |
| Stay application                | 0            | 2                   |
| Leave motion to COA             | 4            | 5                   |
| Opp. to People's motion         | 1            | 4                   |
| COA appl. to 2d Cir.            | 0            | 1                   |
| Opp. to cert. Pet.              | 0            | 2                   |
| Memos on remand                 | 3            | 5                   |
| Motions for late not. of app.   | 5            | 10                  |
| Motion to transfer case         | 0            | 1                   |
| **MISCELLANEOUS MATTERS:**      |              |                     |
| Reply briefs:                   | 30           | 117                 |
| Supplemental briefs             | 1            | 9                   |
| **TOTAL APPEALS ARGUED**        | 42           | 197                 |

<u>**AVERAGE TIME (IN DAYS) FROM RECEIPT OF COMPLETE RECORD TO PERFECTION OF APPEAL:**</u>

246 DAYS

I certify that all work performed under this agreement has been performed in compliance with the terms and conditions of the agreement.

Dated: July 16, 2015



34

**Report on Criminal Appeals**

Fiscal Year _15_

Name of Organization

APPELLATE ADVOCATES

I. INTAKE

☐ 1st   ☐ 2nd   ☐ 3rd   ☒ 4th
(Reporting Period (Quarter by Fiscal Year)

|  | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
|  | 1st | 2nd |  |  |
| Assignments |  | 137 | 25 | 4 |
| SORA Hearings IDP Padilla Referrals |  | 3 7 |  |  |
| Filed DLRA Motions Assignm. to 440 Motion |  | 4 5 |  |  |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals |  |  |  | 7 |
| Trials |  | 68 | 7 |  |
| People's Appeals |  | 1 |  |  |
| DLRA Motions in Trial Court |  | 4 |  |  |
| Hearings |  | 2 |  |  |
| SORA Appeals |  | 5 |  |  |
| Substantive Pleas |  | 6 |  |  |
| Non-Substantive Pleas (including Excessive Sentence Motions) |  | 14 | 1 |  |
| Appeals from Order Denying 440 |  | 1 |  |  |
| Anders Briefs |  | 1 |  |  |
| Stipulations to Withdraw |  | 7 | 2 |  |
| Motions to Dismiss/Discontinue, etc. (as abandoned) |  | 5 | 1 |  |
| Other (specify – must dispose of assignment) From resentencing or denials of resents. |  | 5 |  |  |

II. (B) PROVIDER-DISPOSITIVE FILINGS
(Disposes of assignment to provider but not of case)
. *Count each case only once*

| | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) | | 2 | | |
| Substitution by Retained Counsel | | 2 | | |
| Relieved for Any Other Reasons | | | | |
| Other (specify) | | | | |
| Average Time from Assignment to Filing Motion | Subst: av. 901 days; Rel'd: av. 103 days | | | |

III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 2 |
| 440.20 Motions | |
| Federal Habeas Corpus Petitions | |
| 2nd Circuit Court of Appeals | 1 |
| USSC Cert Petitions | |
| Other (specify)   SORA   HEARINGS | 3 |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 30 |
| Other (specify) Rearg. motions (3), 440 leave (3), order to show cause response (1), leave M to COA (4), remand m. ends (3), late IA motions (5), opp Peo'c m. to dismiss (1) | 10 |

| | Number |
|---|---|
| Appeals Orally Argued | 42 |

Appellate Advocates
Quarterly Programmatic Report
July – October 2015
Fiscal Year 2016
1st Quarter
*** MISSING ***
Purposely Omitted

# Appellate Advocates
# Quarterly Programmatic Report
# October – December 2015
# Fiscal Year 2016
# 2nd Quarter

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085      FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
BARRY S. STENDIG

SUPERVISING ATTORNEYS
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON
LEILA HULL

DIRECTOR OF INNOCENCE INVESTIGATIONS
DE NICE POWELL

ALEXIS A. ASCHER
STEVEN R. BERNHARD
SAMUEL E. BROWN
ELIZABETH E. BUDNITZ
DENISE A. CORSI
A. ALEXANDER DONN
LAUREN E. JONES
ANNA KOU
BRYAN KREYKES
JOHN B. LATELLA
JOSHUA M. LEVINE
TAMMY E. LINN
BENJAMIN S. LITMAN
LAUREN NAKAMURA
PATRICIA PAZNER
ANNA PERVUKHN
YVONNE SHIVERS
SHANDA SIBLEY
ANGAD SINGH
LAURA B. TATELMAN
NAO TERAI
ERIN TOMLINSON
MARK W. VORKINK
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
DINA ZLOCZOWER

OF COUNSEL
MELISSA S. HORLICK

## QUARTERLY PROGRAMMATIC REPORT

Contract CT10022016000090
October - December 2015

### INTAKE

| TOTAL INTAKE | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **AD INTAKE** | **171** | 309 |
| Reassignments | **120** | |
| New Assignments | 0 | **214** |
| Cases Received With | 120 | 1 |
| Record Already Prepared | | 213 |
| Partial Record | 0 | |
| Record to be Prepared | 0 | 1 |
| Appeal is from | 120 | 0 |
| Trial | | 213 |
| SORA | 50 | |
| Order denying 440 motion | 6 | 98 |
| Resentencing | 2 | 9 |
| Hearing | 1 | 4 |
| As yet undetermined | 5 | 3 |
| | 56 | 5 |
| | | 95 |
| **AT INTAKE** | | |
| Reassignments | **28** | 52 |
| New Assignments | 0 | |
| Cases Received with | 28 | 0 |
| Record Already Prepared | | 52 |
| Partial Record | 0 | |
| Record to be Prepared | 0 | 0 |
| | 28 | 0 |
| | | 52 |

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
|  | 23 | 43 |
| **ADDITIONAL ASSIGNMENTS** |  |  |
| Court of Appeals | 11 | 16 |
| Assignments to 440 Motions | 0 | 3 |
| SORA Hearings | 4 | 5 |
| SORA Modifications | 1 | 1 |
| IDP Padilla 440 Referrals | 6 | 16 |
| DLRA Motion | 1 | 2 |
|  | 1 | 5 |
| **TOTAL CASES SUBTRACTED** |  |  |
| Relieved | 0 | 0 |
| Substituted | 0 | 2 |
| Vacated | 1 | 1 |
| Pro se subst. | 0 | 2 |
|  | 170 | 304 |
| **NET ASSIGNMENTS TO DATE** |  |  |

2

## CASE-BY-CASE RECORD (CONTINUED)

| Case | Assigned | Filed |
|------|----------|-------|

December 2015 Appellate Division Assignments (continued)

|  | 12/11/15 | TRIAL |
|--|----------|-------|
|  | 12/11/15 | TRIAL |
|  | 12/11/15 |  |
|  | 12/11/15 |  |
|  | 12/11/15 | TRIAL |
|  | 12/11/15 | TRIAL |
|  | 12/11/15 |  |
|  | 12/11/15 |  |
|  | 12/11/15 | TRIAL |
|  | 12/11/15 | TRIAL |
|  | 12/11/15 |  |
|  | 12/18/15 | 440 DENIAL |
|  | 12/21/15 |  |
|  | 12/21/15 |  |
|  | 12/21/15 |  |
|  | 12/21/15 | TRIAL |
|  | 12/21/15 |  |
|  | 12/21/15 |  |
|  | 12/21/15 |  |
|  | 12/21/15 |  |
|  | 12/21/15 | TRIAL |
|  | 12/21/15 | TRIAL |
|  | 12/21/15 | TRIAL |
|  | 12/21/15 |  |
|  | 12/21/15 | TRIAL |
|  | 12/21/15 | TRIAL |
|  | 12/21/15 | TRIAL |
|  | 12/21/15 |  |
|  | 12/21/15 |  |
|  | 12/21/15 |  |
|  | 12/21/15 | TRIAL |
|  | 12/21/15 |  |
|  | 12/21/15 |  |
|  | 12/21/15 | TRIAL |
|  | 12/23/15 |  |

December 2015 Appellate Term Assignments (1, new)

|  | 12/23/15 |  |
|--|----------|--|

## FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL APPELLATE DIVISION FILINGS** | 77 | 121 |
| Trial Briefs | 36 | 56 |
| Hearings | 4 | 5 |
| People's Appeals | 0 | 2 |
| SORA Appeals | 5 | 9 |
| Appeals from 440 Denials | 2 | 4 |
| Substantive Pleas | 1 | 2 |
| Sentence Reduction Motions | 12 | 16 |
| Show Case Order Responses | 4 | 6 |
| Other Dispositive Documents Filed: | | |
|     Anders Briefs | 1 | 5 |
|     Stipulation Withdrawing Appeal | 12 | 15 |
|     Mootness Motions | 0 | 1 |
| | | |
| **TOTAL APPELLATE TERM FILINGS** | 8 | 17 |
| Trial Briefs | 3 | 7 |
| Substantive Pleas | 0 | 2 |
| Other Dispositive Documents Filed: | | |
|     Anders Briefs | 2 | 2 |
|     Abandonment Motions | 1 | 2 |
|     Stipulation Withdrawing Appeal | 2 | 4 |

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **Miscellaneous Dispositions:** | | |
| Substituted: | 0 | 2 |
| Pro se subst: | 0 | 2 |
| Vacated: | 1 | 1 |
| **Additional dispositive filings:** | | |
| Court of Appeals Briefs | 7 | 10 |
| SORA hearings | 4 | 5 |
| SORA Modifications | 1 | 1 |
| 440.10 motions | 3 | 6 |
| DLRA Motions | 1 | 2 |
| Coram nobis petitions | 2 | 2 |
| PRS resentencing | 1 | 1 |
| **Additional Litigation:** | | |
| Opp. To Peo's Dismissal Mot. | 0 | 1 |
| Stay extention motion | 1 | 1 |
| Unsealing motion | 1 | 1 |
| Reargument motions | 2 | 2 |
| **MISCELLANEOUS MATTERS:** | | |
| Reply briefs: | 32 | 64 |
| Supplemental briefs: | 1 | 1 |
| **TOTAL APPEALS ARGUED** | 50 | 80 |

31

## BACKLOG REPORT

As of December 31, 2015, we had verified that we had the complete record (minutes, file papers, and pre-sentence report) in a total of 383 unfiled cases.  We also had several cases in which we had received minutes and were screening them to determine whether they were complete.  Of the 383 cases in which we knew the record was complete:

**100   were briefable but not yet being briefed because the attorney was working on another case; of those, there were:**

    53 trial cases

    21 hearing cases

    23 plea cases

    3 other cases

This amounts to approximately 1.4 trial appeals and 1.3 other appeal per attorney and does not constitute a backlog.

**59   were being briefed** (including briefs in the supervision process or completed and with the client for review before filing)

**72   involved issue selection delays; of those:**

    15   involved active 440 or innocence investigations

    6   were unusually complex (2,000+ page records, voluminous documents, multiple proceedings, etc.)

    24   involved risk decisions the client had to make

    18   involved continued correspondence with the client regarding issue selection

    9   were cases in which we were trying to locate clients

**112   were missing exhibits or other items; of those:**

    97    were missing exhibits requested from the
            District Attorneys' offices

    15    were missing other documents or information we needed
            before we could proceed with the appeal

**40   involved delays to benefit the client; of those:**

    12    were immigration-related

    7    were to see how the client fared on probation

    19    were to await a decision in a related or controlling
            case

    2    were at the client's request

     I certify that all work performed under this agreement has been
performed in compliance with the terms and conditions of the
agreement.

Dated: January 27, 2016



**Report on Criminal Appeals**

Fiscal Year _16_

Name of Organization

APPELLATE  ADVOCATES

I. INTAKE

☐ 1st   ☒ 2nd   ☐3rd   ☐4th

(Reporting Period (Quarter by Fiscal Year)

| | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
| | 1st | 2nd | | |
| Assignments | | 120 | 28 | 11 |
| SORA Hearings | | 4 | | |
| SORA Modifications | | 1 | | |
| Filed DLRA Motions | | 1 | | |
| IDP Referrals | | 6 | | |
| PRS Resent. | | 1 | | |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals | | | | 7 |
| Trials | | 36 | 3 | |
| People's Appeals | | | | |
| DLRA Motions in Trial Court | | 1 | | |
| Hearings | | 4 | | |
| SORA Appeals | | 5 | | |
| Substantive Pleas | | 1 | | |
| Non-Substantive Pleas (including Excessive Sentence Motions) | | 12 | | |
| Appeals from Order Denying 440 | | 2 | | |
| Anders Briefs | | 1 | 2 | |
| Stipulations to Withdraw | | 12 | 2 | |
| Motions to Dismiss/Discontinue, etc. | | | 1 | |
| Other (specify – must dispose of assignment) Show cause responses | | 4 | | |
| SORA HEARINGS | | 4 | | |
| SORA MODIFICATIONS | | 1 | | |
| PRS RESENT. | | 1 | | |

Page 2 of 2

## II. (B) PROVIDER-DISPOSITIVE FILINGS
### (Disposes of assignment to provider but not of case)
*Count each case only once*

|  | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) |  |  |  |  |
| Substitution by Retained Counsel |  |  |  |  |
| Relieved for Any Other Reasons |  |  |  |  |
| Other (specify)   Vacated |  | 1 |  |  |
| Average Time from Assignment to Filing Motion |  |  |  |  |

## III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 3 |
| 440.20 Motions |  |
| Federal Habeas Corpus Petitions |  |
| 2nd Circuit Court of Appeals |  |
| USSC Cert Petitions |  |
| Other (specify)   CORAM NOBIS PETITIONS | 2 |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 32 |
| Other (specify)   Supp Briefs | 1 |

|  | Number |
|---|---|
| Appeals Orally Argued | 50 |

# Appellate Advocates
# Quarterly Programmatic Report
# January – March 2016
# Fiscal Year 2016
# 3rd Quarter

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085    FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
LYNN W. L. FAHEY

*ASSISTANT ATTORNEY-IN-CHARGE*
BARRY S. STENDIG

*SUPERVISING ATTORNEYS*
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON
LEILA HULL
A. ALEXANDER DONN
PATRICIA PAZNER

*DIRECTOR OF INNOCENCE INVESTIGATIONS*
DE NICE POWELL

ALEXIS A. ASCHER
STEVEN R. BERNHARD
SAMUEL E. BROWN
ELIZABETH E. BUDNITZ
DENISE A. CORSI
LAUREN E. JONES
ANNA KOU
BRYAN KREVKES
JOSHUA M. LEVINE
TAMMY E. LINN
BENJAMIN S. LITMAN
LAUREN NAKAMURA
ANNA PERVUKHIN
YVONNE SHIVERS
SHANDA SIBLEY
ANGAD SINGH
LAURA B. TATELMAN
NAO TERAI
ERIN TOMLINSON
MARK W. VORKINK
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
DINA ZLOCZOWER

*OF COUNSEL*
MELISSA S. HORLICK

## QUARTERLY PROGRAMMATIC REPORT

Contract CT10022016000090
January - March 2016

### INTAKE

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL INTAKE** | **221** | **530** |
| **AD INTAKE** | **175** | **389** |
| Reassignments | 7 | 8 |
| New Assignments | 168 | 381 |
| Cases Received With |  |  |
| Record Already Prepared | 3 | 4 |
| Partial Record | 2 | 2 |
| Record to be Prepared | 170 | 383 |
| Appeal is from |  |  |
| Trial | 51 | 149 |
| SORA | 13 | 22 |
| Order denying 440 motion | 3 | 7 |
| Resentencing | 3 | 6 |
| Hearing | 12 | 17 |
| DLRA appeal | 1 | 1 |
| As yet undetermined | 92 | 187 |
| **AT INTAKE** | **31** | **83** |
| Reassignments | 1 | 1 |
| New Assignments | 30 | 82 |
| Cases Received with |  |  |
| Record Already Prepared | 1 | 1 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 30 | 82 |

|                                  | This Quarter | Fiscal Year-to-Date |
|----------------------------------|:------------:|:-------------------:|
| **ADDITIONAL ASSIGNMENTS**       | **15**       | **58**              |
| Court of Appeals                 | 3            | 19                  |
| Assignments to 440 Motions       | 0            | 3                   |
| SORA Hearings                    | 8            | 13                  |
| SORA Modifications               | 0            | 1                   |
| IDP Padilla 440 Referrals        | 3            | 19                  |
| DLRA Motion                      | 1            | 3                   |
| **TOTAL CASES SUBTRACTED**       | **10**       | **15**              |
| Relieved                         | 2            | 2                   |
| Substituted                      | 5            | 7                   |
| Vacated                          | 1            | 2                   |
| Pro se subst.                    | 2            | 4                   |
| **NET ASSIGNMENTS TO DATE**      |              | **515**             |

2

### FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL APPELLATE DIVISION FILINGS** | 89 | 210 |
| Trial Briefs | 35 | 91 |
| Hearings | 4 | 9 |
| People's Appeals | 0 | 2 |
| SORA Appeals | 3 | 12 |
| Appeals from 440 Denials | 4 | 8 |
| Appeals from Resentencings | 2 | 2 |
| Substantive Pleas | 7 | 9 |
| Sentence Reduction Motions | 13 | 29 |
| Show Case Order Responses | 5 | 11 |
| Other Dispositive Documents Filed: | | |
| Anders Briefs | 9 | 14 |
| Stipulation Withdrawing Appeal | 5 | 20 |
| Abandonment Motion | 1 | 1 |
| Mootness Motions | 0 | 1 |
| Abatement Motion | 1 | 1 |
| | | |
| **TOTAL APPELLATE TERM FILINGS** | 18 | 35 |
| Trial Briefs | 1 | 8 |
| Hearings | 1 | 1 |
| Substantive Pleas | 4 | 6 |
| Resentencings | 1 | 1 |

|                                   | This Quarter | Fiscal Year-to-Date |
|-----------------------------------|:------------:|:-------------------:|
| **Other Dispositive Documents Filed:** |         |                     |
| Anders Briefs                     | 8            | 10                  |
| Abandonment Motions               | 2            | 4                   |
| Stipulation Withdrawing Appeal    | 1            | 5                   |
| **Miscellaneous Dispositions:**   |              |                     |
| Relieved:                         | 2            | 2                   |
| Substituted:                      | 5            | 7                   |
| Pro se subst:                     | 2            | 4                   |
| Vacated:                          | 1            | 2                   |
| **Additional dispositive filings:** |           |                     |
| Court of Appeals Briefs           | 5            | 15                  |
| SORA hearings                     | 8            | 13                  |
| SORA Modifications                | 0            | 1                   |
| 440.10 motions                    | 4            | 10                  |
| DLRA Motions                      | 1            | 3                   |
| 440 Leave applications:           | 1            | 1                   |
| Pre-sentence memorandum           | 2            | 2                   |
| SORA leave motion:                | 5            | 5                   |
| Coram nobis petitions             | 0            | 2                   |
| PRS resentencing                  | 0            | 1                   |

|                                    | This Quarter | Fiscal Year-to-Date |
|------------------------------------|:------------:|:-------------------:|
| **Additional Litigation:**         |              |                     |
| Opp. To Peo's Dismissal Mot.       | 0            | 1                   |
| Stay motion                        | 1            | 1                   |
| Motion to extend stay:             | 1            | 2                   |
| Unsealing motion                   | 0            | 1                   |
| Reargument motions                 | 2            | 4                   |
| **MISCELLANEOUS MATTERS:**         |              |                     |
| Reply briefs:                      | 17           | 81                  |
| Supplemental briefs:               | 0            | 1                   |
| **TOTAL APPEALS ARGUED**           | 63           | 143                 |

## BACKLOG REPORT

As of March 31, 2016, we had verified that we had the complete record (minutes, file papers, and pre-sentence report) in a total of 410 unfiled cases.  We also had several cases in which we had received minutes and were screening them to determine whether they were complete, and 2 cases in which we were waiting for retained attorneys to file motions to be substituted for our office.  Of the 410 cases in which we knew the record was complete:

**111   were briefable but not yet being briefed because the attorney was working on another case; of those, there were:**

57 trial cases

13 hearing cases

37 plea cases

4 other cases

This amounts to approximately 1.5 trial appeals and 1.4 other appeal per attorney and does not constitute a backlog.

**72   were being briefed** (including briefs in the supervision process or completed and with the client for review before filing)

**83   involved issue selection delays; of those:**

15   involved active 440 or innocence investigations

3   were unusually complex (2,000+ page records, voluminous documents; multiple proceedings, etc.)

43   involved risk decisions the client had to make

14   involved continued correspondence with the client regarding issue selection

8   were cases in which we were trying to locate clients

38

**98   were missing exhibits or other items; of those:**

> 84   were missing exhibits requested from the District Attorneys' offices
>
> 14   were missing other documents or information we needed before we could proceed with the appeal

**46   involved delays to benefit the client; of those:**

> 20   were immigration-related
>
> 5   were to see how the client fared on probation
>
> 18   were to await a decision in a related or controlling case
>
> 3   were at the client's request

I certify that all work performed under this agreement has been performed in compliance with the terms and conditions of the agreement.

Dated: April 25, 2016



39

## Report on Criminal Appeals

Fiscal Year __16__

Name of Organization

APPELLATE ADVOCATES

☐ 1st  ☐ 2nd  ☒ 3rd  ☐ 4th
(Reporting Period (Quarter by Fiscal Year)

### I. INTAKE

| | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
| | 1st | 2nd | | |
| Assignments | | 175 | 31 | 3 |
| SORA HEARINGS | | 8 | | |
| Filed DLRA Motions / IDP Padilla Referrals | | 1 / 3 | | |

### II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals | | | | 5 |
| Trials | | 35 | 1 | |
| People's Appeals | | | | |
| DLRA Motions in Trial Court | | 1 | | |
| Hearings | | 4 | 1 | |
| SORA Appeals | | 3 | | |
| Substantive Pleas | | 7 | 4 | |
| Non-Substantive Pleas (including Excessive Sentence Motions) | | 13 | | |
| Appeals from Order Denying 440 | | 4 | | |
| Anders Briefs | | 9 | 8 | |
| Stipulations to Withdraw | | 5 | 1 | |
| Motions to Dismiss/Discontinue, etc. | | 1 | 2 | |
| Other (specify – must dispose of assignment) 3 resent. appeals; 1 m. to abate | | 3 | 1 | |

II. (B) PROVIDER-DISPOSITIVE FILINGS
   (Disposes of assignment to provider but not of case)
   *Count each case only once*

| | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) | | 2 | | |
| Substitution by Retained Counsel | | 5 | | |
| Relieved for Any Other Reasons (Δ going pro se) | | 2 | | |
| Other (specify) vacated | | 1 | | |
| Average Time from Assignment to Filing Motion | | | | |

III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 5 |
| 440.20 Motions | |
| Federal Habeas Corpus Petitions | |
| 2nd Circuit Court of Appeals | |
| USSC Cert Petitions | |
| Other (specify) Order to Show Cause Responses | 5 |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 17 |
| Other (specify) | |

| | Number |
|---|---|
| Appeals Orally Argued | 63 |

# Appellate Advocates
# Quarterly Programmatic Report
# April – June 2016
# Fiscal Year 2016
# 4th Quarter

# APPELLATE ADVOCATES

### 111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
### PHONE: (212) 693-0085    FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
LYNN W. L. FAHEY

*ASSISTANT ATTORNEY-IN-CHARGE*
BARRY S. STENDIG

*SUPERVISING ATTORNEYS*
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON
LEILA HULL
A. ALEXANDER DONN
PATRICIA PAZNER

*DIRECTOR OF INNOCENCE INVESTIGATIONS*
DE NICE POWELL

MICHAEL ARTHUS
ALEXIS A. ASCHER
STEVEN R. BERNHARD
SAMUEL E. BROWN
ELIZABETH E. BUDNITZ
DENISE A. CORSÍ
GOLNAZ FAKHIMI
LAUREN E. JONES
ANNA KOU
BRYAN KREYKES
JOSHUA M. LEVINE
TAMMY E. LINN
BENJAMIN S. LITMAN
ANDERS NELSON
ANNA PERVUKHIN
YVONNE SHIVERS
SHANDA SIBLEY
ANGAD SINGH
LAURA B. TATELMAN
NAO TERAI
ERIN TOMLINSON
MARK W. VORKINK
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
DINA ZLOCZOWER

*OF COUNSEL*
MELISSA A. HORLICK

## QUARTERLY PROGRAMMATIC REPORT

### Contract CT10022016000090
### April – June 2016

### INTAKE

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL INTAKE** | **211** | **741** |
| | | |
| **AD INTAKE** | **143** | **532** |
| Reassignments | 1 | 9 |
| New Assignments | 142 | 523 |
| Cases Received With | | |
| Record Already Prepared | 0 | 4 |
| Partial Record | 0 | 2 |
| Record to be Prepared | 143 | 526 |
| Appeal is from | | |
| Trial | 37 | 186 |
| People's Appeal | 1 | 1 |
| SORA | 10 | 32 |
| Order denying 440 motion | 1 | 8 |
| Resentencing | 1 | 7 |
| Hearing | 7 | 24 |
| DLRA appeal | 1 | 2 |
| As yet undetermined | 85 | 272 |
| | | |
| **AT INTAKE** | **52** | **135** |
| Reassignments | 4 | 5 |
| New Assignments | 48 | 130 |
| Cases Received with | | |
| Record Already Prepared | 2 | 3 |
| Partial Record | 0 | 0 |
| Record to be Prepared | 50 | 132 |

|                               | **This Quarter** | **Fiscal Year-to-Date** |
|-------------------------------|:----------------:|:-----------------------:|
| **ADDITIONAL ASSIGNMENTS**    | 16               | 74                      |
| Court of Appeals              | 3                | 22                      |
| Assignments to 440 Motions    | 0                | 3                       |
| SORA Hearings                 | 9                | 22                      |
| SORA Modifications            | 0                | 1                       |
| IDP Padilla 440 Referrals     | 3                | 22                      |
| DLRA Motion                   | 1                | 4                       |
| **TOTAL CASES SUBTRACTED**    | 2                | 17                      |
| Relieved                      | 0                | 2                       |
| Substituted                   | 1                | 8                       |
| Vacated                       | 0                | 2                       |
| Pro se subst.                 | 1                | 5                       |
| **NET ASSIGNMENTS TO DATE**   | 209              | 724                     |

2

## **CASE-BY-CASE RECORD** (CONTINUED)

| Case | Assigned | Filed |
|------|----------|-------|

June 2016 Appellate Division Assignments (continued)

|  | 6/3/16 | HEARING |
|--|--------|---------|
|  | 6/3/16 | HEARING |
|  | 6/6/16 | TRIAL |
|  | 6/6/16 | TRIAL |
|  | 6/6/16 |  |
|  | 6/6/16 | SORA |
|  | 6/6/16 | TRIAL |
|  | 6/6/16 |  |
|  | 6/8/16 | TRIAL |
|  | 6/8/16 | TRIAL |
|  | 6/8/16 |  |
|  | 6/8/16 |  |
|  | 6/14/16 | SORA |
|  | 6/17/16 |  |
|  | 6/20/16 | SORA |
|  | 6/21/16 | SORA |
|  | 6/24/16 |  |
|  | 6/30/16 |  |
|  | 6/30/16 |  |

June 2016 Appellate Term Assignments (3; all new)

|  | 6/3/16 |  |
|--|--------|--|
|  | 6/30/16 |  |
|  | 6/30/13 |  |

39

**FILINGS, OTHER LITIGATION,
AND ORAL ARGUMENT**

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL APPELLATE DIVISION FILINGS** | **161** | **371** |
| Trial Briefs | 65 | 156 |
| Hearings | 1 | 10 |
| People's Appeals | 1 | 3 |
| SORA Appeals | 9 | 21 |
| Appeals from 440 Denials | 2 | 10 |
| Appeals from Resentencings | 2 | 4 |
| Substantive Pleas | 7 | 16 |
| Sentence Reduction Motions | 44 | 73 |
| Show Case Order Responses | 1 | 12 |
| Other Dispositive Documents Filed: | | |
| Anders Briefs | 12 | 26 |
| Stipulation Withdrawing Appeal | 13 | 33 |
| Abandonment Motion | 4 | 5 |
| Mootness Motions | 0 | 1 |
| Abatement Motion | 0 | 1 |
| | | |
| **TOTAL APPELLATE TERM FILINGS** | **33** | **68** |
| Trial Briefs | 4 | 12 |
| Hearings | 0 | 1 |
| Substantive Pleas | 6 | 12 |
| Resentencings | 0 | 1 |

|                                         | This Quarter | Fiscal Year-to-Date |
|-----------------------------------------|:------------:|:-------------------:|
| **APPELLATE TERM FILINGS** (continued)  |              |                     |
| Other Dispositive Documents Filed:      |              |                     |
|     Anders Briefs   | 14           | 24                  |
|     Abandonment Motions | 7        | 11                  |
|     Stipulation Withdrawing Appeal | 2 | 7                |
| Miscellaneous Dispositions:             |              |                     |
|   Relieved:                   | 0            | 2                   |
|   Substituted:                | 1            | 8                   |
|   Pro se subst:               | 1            | 5                   |
|   Vacated:                    | 0            | 2                   |
| Additional dispositive filings:         |              |                     |
|   Court of Appeals Briefs     | 7            | 22                  |
|   SORA hearings               | 7            | 20                  |
|   SORA Modifications          | 0            | 1                   |
|   440.10 motions              | 7            | 17                  |
|   DLRA Motions                | 0            | 3                   |
|   440 Post-Hearing Memo       | 1            | 1                   |
|   440 Leave applications:     | 2            | 3                   |
|   Pre-sentence memorandum     | 0            | 2                   |
|   SORA leave motion:          | 3            | 8                   |
|   Coram nobis petitions       | 1            | 3                   |
|   PRS resentencing            | 0            | 1                   |

|                                  | This Quarter | Fiscal Year-to-Date |
|----------------------------------|:------------:|:-------------------:|
| **Additional Litigation:**       |              |                     |
| Federal habeas corpus            | 1            | 1                   |
| Cert. Petition                   | 1            | 1                   |
| Opp. To Peo's Dismissal Mot.     | 0            | 1                   |
| Stay motion                      | 0            | 1                   |
| Motion to extend stay:           | 0            | 2                   |
| Unsealing motion                 | 0            | 1                   |
| Reargument motions               | 1            | 5                   |
| **MISCELLANEOUS MATTERS:**       |              |                     |
| Reply briefs:                    | 23           | 104                 |
| Supplemental briefs:             | 2            | 3                   |
| **TOTAL APPEALS ARGUED**         | 50           | 193                 |

## <u>BACKLOG REPORT</u>

As of June 30, 2016, we had verified that we had the complete record (minutes, file papers, and pre-sentence report) in a total of 371 unfiled cases.  We also had several cases in which we had received minutes and were screening them to determine whether they were complete.  Of the 371 cases in which we knew the record was complete:

**131   were briefable but not yet being briefed because the attorney was working on another case; of those, there were:**

   94 trial cases

   15 hearing cases

   20 plea cases

   2 other cases

This amounts to less than 2.5 trial appeals and approximately 1 other appeal per attorney and does not constitute a backlog.


**48     were being briefed** (including briefs in the supervision process or completed and with the client for review before filing)


**81     involved issue selection delays; of those:**

   9    involved active 440 or innocence investigations

   5    were unusually complex (2,000+ page records, voluminous documents, multiple proceedings, etc.)

   34   involved risk decisions the client had to make

   20   involved continued correspondence with the client regarding issue selection

   13   were cases in which we were trying to locate clients

**50   were missing exhibits or other items; of those:**

40    were missing exhibits requested from the
        District Attorneys' offices

10    were missing other documents or information we needed
        before we could proceed with the appeal

**61   involved delays to benefit the client; of those:**

27    were immigration-related

11    were to see how the client fared on probation

20    were to await a decision in a related or controlling
        case

3    were at the client's request

I certify that all work performed under this agreement has been
performed in compliance with the terms and conditions of the
agreement.

Dated: July 28, 2016



**44**

**Report on Criminal Appeals**

Fiscal Year _16_

Name of Organization

APPELLATE ADVOCATES

I. INTAKE

☐ 1st  ☐ 2nd  ☐ 3rd  ☑ 4th
(Reporting Period (Quarter by Fiscal Year)

| | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
| | 1st | 2nd | | |
| Assignments | | 143 | 52 | 3 |
| IDP Referrals | | | | |
| SORA Hearings | | 8 | | |
| Filed DLRA Motions | | 1 | | |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals | | | | 7 |
| Trials | | 65 | 4 | |
| People's Appeals | | 1 | | |
| DLRA Motions in Trial Court | | 1 | | |
| Hearings | | 1 | | |
| SORA Appeals | | 9 | | |
| Substantive Pleas | | 7 | 6 | |
| Non-Substantive Pleas (including Excessive Sentence Motions) | | 44 | | |
| Appeals from Order Denying 440 | | 2 | | |
| Anders Briefs | | 12 | 14 | |
| Stipulations to Withdraw | | 13 | 2 | |
| Motions to Dismiss/Discontinue, etc. | | 4 | 7 | |
| Other (specify – must dispose of assignment) Resent. appeals (2); show cause (1) | | 3 | | |

Page 2 of 2

## II. (B) PROVIDER-DISPOSITIVE FILINGS
### (Disposes of assignment to provider but not of case)
*Count each case only once*

|  | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) |  |  |  |  |
| Substitution by Retained Counsel |  | 1 |  |  |
| Relieved for Any Other Reasons |  |  |  |  |
| Other (specify) Client proceeding pro se |  | 1 |  |  |
| Average Time from Assignment to Filing Motion |  |  |  |  |

## III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 7 |
| 440.20 Motions |  |
| Federal Habeas Corpus Petitions | 1 |
| 2nd Circuit Court of Appeals |  |
| USSC Cert Petitions | 1 |
| Other (specify) Coram nobis (1) SORA Lv.(3), 440 (v.(2), post-14 memo (1), SORA Hearings(7) | 14 |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 23 |
| Other (specify) Supp. briefs | 2 |

|  | Number |
|---|---|
| Appeals Orally Argued | 50 |

# Appellate Advocates
# Quarterly Programmatic Report
# July – September 2016
# Fiscal Year 2017
# 1st Quarter

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085    FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
PAUL SKIP LAISURE

SUPERVISING ATTORNEYS
DAVID P. GREENBERG
ERICA HORWITZ
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON
LEILA HULL
A. ALEXANDER DONN
PATRICIA PAZNER

DIRECTOR OF INNOCENCE INVESTIGATIONS.
DE NICE POWELL

DIRECTOR OF FEDERAL LITIGATION
MARK W. VORKINK

SENIOR STAFF ATTORNEYS
ALEXIS A. ASCHER
STEVEN R. BERNHARD
DENISE A. CORSI
JOSHUA M. LEVINE

SENIOR COUNSEL
MELISSA S. HORLICK

STAFF ATTORNEYS
MICHAEL ARTHUS
SAMUEL E. BROWN
GOLNAZ FAKHIMI
REBECCA J. GANNON
CAITLIN HALPERN
MEREDITH S. HOLT
LAUREN E. JONES
ANNA KOU
BRYAN KREYKES
TAMMY E. LINN
BENJAMIN S. LITMAN
SEAN H. MURRAY
ANDERS NELSON
ANNA PERVUKHIN
YVONNE SHIVERS
ANGAD SINGH
LAURA B. TATELMAN
NAO TERAI
ERIN TOMLINSON
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
HANNAH ZHAO *
DINA ZLOCZOWER

*AWAITING ADMISSION

## QUARTERLY PROGRAMMATIC REPORT

Contract CT10022016000090
July - September 2016

### INTAKE

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL INTAKE** | **151** | **151** |
| **AD INTAKE** | **126** | **126** |
| Reassignments | 3 | 3 |
| New Assignments | 123 | 123 |
| Cases Received With |  |  |
| Record Already Prepared | 3 | 3 |
| Record to be Prepared | 123 | 123 |
| Appeal is from |  |  |
| Trial | 22 | 22 |
| SORA | 6 | 6 |
| Resentencing | 4 | 4 |
| Hearing |  |  |
| As yet undetermined | 88 | 88 |
| **AT INTAKE** | **14** | **14** |
| Reassignments | 0 | 0 |
| New Assignments | 14 | 14 |
| Cases Received with |  |  |
| Record Already Prepared | 0 | 0 |
| Record to be Prepared | 14 | 14 |

|                            | **This Quarter** | **Fiscal Year-to-Date** |
|----------------------------|:---:|:---:|
| **ADDITIONAL ASSIGNMENTS** |     |     |
| Court of Appeals           | 4   | 4   |
| SORA Hearings              | 4   | 4   |
| IDP Padilla 440 Referrals  | 3   | 3   |
| **TOTAL CASES SUBTRACTED** |     |     |
| Pro se subst.              | 1   | 1   |
| **NET ASSIGNMENTS TO DATE** | **150** | **150** |

2

**FILINGS, OTHER LITIGATION,
AND ORAL ARGUMENT**

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL APPELLATE DIVISION FILINGS** | **46** | **46** |
| Trial Briefs | 22 | 22 |
| Appeals from 440 Denials | 1 | 1 |
| Substantive Pleas | 3 | 3 |
| Sentence Reduction Motions | 8 | 8 |
| Show Case Order Responses | 2 | 2 |
| Other Dispositive Documents Filed: | | |
|     Anders Briefs | 2 | 2 |
|     Stipulation Withdrawing Appeal | 8 | 8 |
| **TOTAL APPELLATE TERM FILINGS** | **8** | **8** |
| Trial Briefs | 4 | 4 |
| Other Dispositive Documents Filed: | | |
|     Anders Briefs | 1 | 1 |
|     Abandonment Motions | 1 | 1 |
|     Stipulation Withdrawing Appeal | 2 | 2 |
| Miscellaneous Dispositions: | | |
|     Pro se subst: | 1 | 1 |

|                                     | This Quarter | Fiscal Year-to-Date |
|-------------------------------------|:------------:|:-------------------:|
| **Additional dispositive filings:** |              |                     |
| Court of Appeals Briefs             | 4            | 4                   |
| SORA hearings                       | 4            | 4                   |
| 440.10 motions                      | 4            | 4                   |
| 440.20 motions                      | 1            | 1                   |
| 440.30 motions                      | 1            | 1                   |
| 440 Leave applications              | 3            | 3                   |
| SORA leave motions                  | 1            | 1                   |
| Coram nobis petitions               | 1            | 1                   |
|                                     |              |                     |
| **Additional Litigation:**          |              |                     |
| Federal habeas corpus               | 1            | 1                   |
| Opp. To Peo's dismissal mot.        | 1            | 1                   |
| Stay motion                         | 1            | 1                   |
| Motion to extend stay               | 1            | 1                   |
| Unsealing motion                    | 1            | 1                   |
|                                     |              |                     |
| **MISCELLANEOUS MATTERS:**          |              |                     |
| Reply briefs:                       | 46           | 46                  |
| Supplemental briefs:                | 3            | 3                   |
|                                     |              |                     |
| TOTAL APPEALS ARGUED                | 22           | 22                  |

34

## BACKLOG REPORT

As of September 30, 2016, we had verified that we had the complete record (minutes, file papers, and pre-sentence report) in a total of 486 unfiled cases.   We also had several cases in which we had received minutes and were screening them to determine whether they were complete.   Of the 486 cases in which we knew the record was complete:

**151     were briefable but not yet being briefed because the attorney was working on another case; of those, there were:**

    83 trial cases

    22 hearing cases

    40 plea cases

    6 other cases

This   amounts   to   less   than   2.1   trial   appeals   and approximately 1.7 other appeal per attorney and does not constitute a backlog.

**70     were being briefed** (including briefs in the supervision process or completed and with the client for review before filing)

**134    involved issue selection delays; of those:**

    14     involved active 440 or innocence investigations

    6     were   unusually   complex   (2,000+   page records, voluminous documents, multiple proceedings, etc.)

    54     involved risk decisions the client had to make

    39     involved continued correspondence with the client regarding issue selection

    21     were cases in which we were trying to locate clients

**60   were missing exhibits or other items; of those:**

    48    were missing exhibits requested from the
                District Attorneys' offices

    12    were missing other documents or information we needed
                before we could proceed with the appeal

**71   involved delays to benefit the client; of those:**

    31    were immigration-related

    14    were to see how the client fared on probation

    23    were to await a decision in a related or controlling
                case

     3    were at the client's request

    I certify that all work performed under this agreement has been performed in compliance with the terms and conditions of the agreement.

Dated: October 28, 2016



36

**Report on Criminal Appeals**

Fiscal Year _1 7_

Name of Organization

APPELLATE ADVOCATES

I. INTAKE

☒ 1st  ☐ 2nd  ☐ 3rd  ☐ 4th
(Reporting Period (Quarter by Fiscal Year)

|  | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
|  | 1st | 2nd |  |  |
| Assignments |  | 126 | 1 4 | 4 |
| SORA HEARINGS |  | 4 |  |  |
| IDP Padilla REFERRALS |  | 3 |  |  |
| Filed DLRA Motions |  |  |  |  |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals |  |  |  | 4 |
| Trials |  | 22 | 4 |  |
| People's Appeals |  |  |  |  |
| DLRA Motions in Trial Court |  |  |  |  |
| Hearings |  |  |  |  |
| SORA Appeals |  |  |  |  |
| Substantive Pleas |  | 3 |  |  |
| Non-Substantive Pleas (including Excessive Sentence Motions) |  | 8 |  |  |
| Appeals from Order Denying 440 |  | 1 |  |  |
| Anders Briefs |  | 2 | 1 |  |
| Stipulations to Withdraw |  | 8 | 2 |  |
| Motions to Dismiss/Discontinue, etc. |  |  | 1 |  |
| Other (specify – must dispose of assignment) Show cause responses |  | 2 |  |  |

## II. (B) PROVIDER-DISPOSITIVE FILINGS
### (Disposes of assignment to provider but not of case)
*Count each case only once*

|  | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) |  |  |  |  |
| Substitution by Retained Counsel |  |  |  |  |
| Relieved for Any Other Reasons (client going pro se) |  | 1 |  |  |
| Other (specify) |  |  |  |  |
| Average Time from Assignment to Filing Motion | 1 yr. + 3½ mos. |  |  |  |

## III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 4 |
| 440.20 Motions | 1 |
| Federal Habeas Corpus Petitions | 1 |
| 2nd Circuit Court of Appeals |  |
| USSC Cert Petitions |  |
| Other (specify) 440.30 mot. (1), SORA Hs (4), 440 leave apps (3), SORA leave (1), coram nobis pet. (1), opp. to dism. mot. (1), stay (1), stay ext (1), unseal. (1) | 14 |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 46 |
| Other (specify) Supp. briefs | 3 |

|  | Number |
|---|---|
| Appeals Orally Argued | 22 |

# Appellate Advocates
# Quarterly Programmatic Report
# October - December 2016
# Fiscal Year 2017
# 2nd Quarter

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085   FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
LYNN W. L. FAHEY

*ASSISTANT ATTORNEY-IN-CHARGE*
PAUL SKIP LAISURE

*SUPERVISING ATTORNEYS*
DAVID P. GREENBERG
ERICA HORWITZ
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON
LEILA HULL
A. ALEXANDER DONN
PATRICIA PAZNER

*DIRECTOR OF INNOCENCE INVESTIGATIONS*
DE NICE POWELL

*DIRECTOR OF FEDERAL LITIGATION*
MARK W. VORKINK

*SENIOR STAFF ATTORNEYS*
ALEXIS A. ASCHER
STEVEN R. BERNHARD
DENISE A. CORSI
JOSHUA M. LEVINE

*SENIOR COUNSEL*
MELISSA S. HORLICK

*STAFF ATTORNEYS*
MICHAEL ARTHUS
SAMUEL E. BROWN
GOLNAZ FAKHIMI
REBECCA J. GANNON
CAITLIN HALPERN
MEREDITH S. HOLT
LAUREN E. JONES
ANNA KOU
BRYAN KREYKES
TAMMY E. LINN
BENJAMIN S. LITMAN
SEAN H. MURRAY
ANDERS NELSON
ANNA PERVUKHIN
YVONNE SHIVERS
ANGAD SINGH
LAURA B. TATELMAN
NAO TERAI
ERIN TOMLINSON
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
HANNAH ZHAO
DINA ZLOCZOWER

*OF COUNSEL*
ALAN CHEVAT

## QUARTERLY PROGRAMMATIC REPORT

Contract CT10022016000090
October - December 2016

### INTAKE

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL INTAKE** | **190** | **341** |
|  |  |  |
| **AD INTAKE** | **138** | **264** |
| Reassignments | 1 | 4 |
| New Assignments | 137 | 260 |
| Cases Received With |  |  |
| Record Already Prepared | 1 | 4 |
| Record to be Prepared | 137 | 260 |
| Appeal is from |  |  |
| Trial | 32 | 54 |
| SORA | 5 | 11 |
| Resentencing | 6 | 10 |
| Hearing | 4 | 10 |
| Order | 6 | 6 |
| DLRA appeal | 1 | 1 |
| As yet undetermined | 84 | 172 |
|  |  |  |
| **AT INTAKE** | **47** | **61** |
| Reassignments | 2 | 2 |
| New Assignments | 45 | 59 |
| Cases Received with |  |  |
| Record Already Prepared | 0 | 0 |
| Record to be Prepared | 47 | 61 |

|                              | **This Quarter** | **Fiscal Year-to-Date** |
|------------------------------|:----------------:|:-----------------------:|
| **ADDITIONAL ASSIGNMENTS**   |                  |                         |
| Court of Appeals             | 0                | 4                       |
| SORA Hearings                | 2                | 6                       |
| IDP Padilla 440 Referrals    | 3                | 6                       |
|                              |                  |                         |
| **TOTAL CASES SUBTRACTED**   |                  |                         |
| Pro se subst.                | 0                | 1                       |
| Relieved                     | 2                | 2                       |
| **NET ASSIGNMENTS TO DATE**  | **188**          | **338**                 |

2

**CASE-BY-CASE RECORD** (CONTINUED)

Case                          Assigned                    Filed

December 2016 Appellate Term Assignments (11; all new assignments)

```
                                11/30/16*
                                11/30/16*
                                11/30/16*
                                12/8/16
                                12/8/16
                                12/8/16
                                12/8/16
                                12/12/16
                                12/15/16
                                12/21/16
                                12/21/16
```

37

## FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL APPELLATE DIVISION FILINGS** | **102** | **148** |
| Trial Briefs | 35 | 57 |
| Appeals from Hearings | 2 | 2 |
| Appeals from 440 Denials | 2 | 3 |
| SORA Appeals | 3 | 3 |
| Appeals from Resentencings | 5 | 5 |
| Substantive Pleas | 0 | 3 |
| Sentence Reduction Motions | 23 | 31 |
| Show Case Order Responses | 1 | 3 |
| Other Dispositive Documents Filed: | | |
|     Anders Briefs | 16 | 18 |
|     Stipulation Withdrawing Appeal | 12 | 20 |
|     Abandonment Motions | 3 | 3 |
| **TOTAL APPELLATE TERM FILINGS** | **22** | **30** |
| Trial Briefs | 2 | 6 |
| Substantive Pleas | 3 | 3 |
| Other Dispositive Documents Filed: | | |
|     Anders Briefs | 13 | 14 |
|     Abandonment Motions | 2 | 3 |
|     Stipulation Withdrawing Appeal | 2 | 4 |

|                                | This Quarter | Fiscal Year-to-Date |
|--------------------------------|:------------:|:-------------------:|
| **Additional dispositive filings:** | | |
| Court of Appeals Briefs        | 2            | 6                   |
| SORA hearings                  | 2            | 6                   |
| DLRA motions                   | 1            | 1                   |
| Article 78                     | 1            | 1                   |
| 440.10 motions                 | 4            | 8                   |
| 440.20 motions                 | 0            | 1                   |
| 440.30 motions                 | 0            | 1                   |
| 440 Leave applications         | 3            | 6                   |
| SORA leave motions             | 1            | 2                   |
| Coram nobis petitions          | 0            | 1                   |
| **Additional Litigation:**     | | |
| Federal habeas corpus          | 1            | 2                   |
| Opp. To Peo's dismissal mot.   | 0            | 1                   |
| Stay motion                    | 0            | 1                   |
| Motion to extend stay          | 2            | 3                   |
| Unsealing motion               | 1            | 2                   |
| **MISCELLANEOUS MATTERS:**     | | |
| Reply briefs:                  | 24           | 70                  |
| Supplemental briefs:           | 0            | 3                   |
| **TOTAL APPEALS ARGUED**       | 42           | 64                  |

39

## **BACKLOG REPORT**

As of December 30, 2016, we had verified that we had the complete record (minutes, file papers, and pre-sentence report) in a total of 535 unfiled cases. We also had several cases in which we had received minutes and were screening them to determine whether they were complete. Of the 535 cases in which we knew the record was complete:

**184   were briefable but not yet being briefed because the attorney was working on another case; of those, there were:**

    107 trial cases

    30 hearing cases

    41 plea cases

    6 other cases

This amounts to approximately 2.6 trial appeals and 1.9 other appeals per attorney. This does not constitute a backlog as yet. But since it is inching upward, and since we anticipate being paid soon (pursuant to our contract amendment) for the FY16 work for which we have not yet been paid, we have hired 4 additional attorneys to begin work this spring and another 3 to begin work this coming fall. We anticipate that this addition to our staff will prevent us from developing a backlog.

**84   were being briefed** (including briefs in the supervision process or completed and with the client for review before filing)

**135   involved issue selection delays; of those:**

    13   involved active 440 or innocence investigations

    7   were unusually complex (2,000+ page records, voluminous documents, multiple proceedings, etc.)

    54   involved risk decisions the client had to make

    43   involved continued correspondence with the client regarding issue selection

    18   were cases in which we were trying to locate clients

**57**   **were missing exhibits or other items; of those:**

    40   were missing exhibits requested from the
           District Attorneys' offices

    17   were missing other documents or information we needed
           before we could proceed with the appeal

**75**   **involved delays to benefit the client; of those:**

    43   were immigration-related

    12   were to see how the client fared on probation

    20   were to await a decision in a related or controlling
           case

## BREAKDOWN OF CASES BY EXPERIENCE LEVEL OF ATTORNEY

    As of December 30, 2016, our attorneys and their unbriefed caseloads could be broken down as follows:

5   attorneys of 6 months' or less tenure, who had, on average:

    4.4 trial cases

3   attorneys of between 6 months and 1 year tenure, who had, on average:

    7.3 trial and 3.7 other cases

14   attorneys of more than 1 year tenure but not yet senior status, who had, on average:

    6.7 trial and 7.1 other cases

7   very senior attorneys, who had, on average:

    6.8 trial and 3.4 other cases

| | |
|---|---|
| 1 | attorney who handles primarily Padilla and related matters |
| 2 | hourly attorneys, who had, on average 2.5 trial and 1.5 other cases |
| 9 | supervisors, who had, on average: |
| | 3.9 trial and 11.8 other cases |
| 1 | office head, who had: |
| | 3 trial and 62 other cases |

I certify that all work performed under this agreement has been performed in compliance with the terms and conditions of the agreement.

Dated: January 31, 2017



**Report on Criminal Appeals**

Fiscal Year _17_

Name of Organization

APPELLATE ADVOCATES

I. INTAKE

☐ 1st  ☒ 2nd  ☐ 3rd  ☐ 4th
(Reporting Period (Quarter by Fiscal Year))

|  | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
|  | 1st | 2nd | | |
| Assignments | | 138 | 47 | |
| SORA Hearings | | 2 | | |
| Filed DLRA Motions / IDP Referrals | | 3 | | |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals | | | | 2 |
| Trials | | 35 | 2 | |
| People's Appeals | | | | |
| DLRA Motions in Trial Court | | | | |
| Hearings | | 1 | | |
| SORA Appeals | | 2 | | |
| Substantive Pleas | | 3 | | |
| Non-Substantive Pleas (including Excessive Sentence Motions) | | 3 | | |
| Appeals from Order Denying 440 | | 23 | | |
| | | 2 | | |
| Anders Briefs | | 16 | 13 | |
| Stipulations to Withdraw | | 12 | 2 | |
| Motions to Dismiss/Discontinue, etc. | | 3 | 2 | |
| Other (specify – must dispose of assignment) Resent. appeals (5), show cause (1) | | 6 | | |

Page 2 of 2

## II. (B) PROVIDER-DISPOSITIVE FILINGS
### (Disposes of assignment to provider but not of case)
*Count each case only once*

|  | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) | | 2 | | |
| Substitution by Retained Counsel | | | | |
| Relieved for Any Other Reasons | | | | |
| Other (specify) | | | | |
| Average Time from Assignment to Filing Motion | | | | |

## III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 4 |
| 440.20 Motions | |
| Federal Habeas Corpus Petitions | 1 |
| 2nd Circuit Court of Appeals | |
| USSC Cert Petitions | |
| Other (specify) Art. 78 (1), 440 /v. (3), SORA /r (1) M. to extend stay (2), unseal m. (1) | 8 |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 24 |
| Other (specify) | |

|  | Number |
|---|---|
| Appeals Orally Argued | 42 |

# Appellate Advocates
# Quarterly Programmatic Report
# January - March 2017
# Fiscal Year 2017
# 3rd Quarter

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085    FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
  LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
  PAUL SKIP LAISURE

SUPERVISING ATTORNEYS
  DAVID P. GREENBERG
  ERICA HORWITZ
  LISA NAPOLI
  WILLIAM G. KASTIN
  KENDRA L. HUTCHINSON
  LEILA HULL
  A. ALEXANDER DONN
  PATRICIA PAZNER
  MARK W. VORKINK

DIRECTOR OF INNOCENCE INVESTIGATIONS
  DE NICE POWELL

SENIOR STAFF ATTORNEYS
  ALEXIS A. ASCHER
  STEVEN R. BERNHARD
  DENISE A. CORSI
  JOSHUA M. LEVINE

SENIOR COUNSEL
  MELISSA S. HORLICK

STAFF ATTORNEYS
  MICHAEL ARTHUS
  SAMUEL E. BROWN
  GOLNAZ FAKHIMI
  REBECCA J. GANNON
  CAITLIN HALPERN
  MEREDITH S. HOLT
  LAUREN E. JONES
  ANNA KOU
  BRYAN KREYKES
  TAMMY E. LINN
  BENJAMIN S. LITMAN
  SEAN H. MURRAY
  ANDERS NELSON
  ANNA PERVUKHIN
  YVONNE SHIVERS
  ANGAD SINGH
  LAURA B. TATELMAN
  NAO TERAI
  ERIN TOMLINSON
  KATHLEEN E. WHOOLEY
  JENIN YOUNES
  RONALD ZAPATA
  HANNAH ZHAO
  DINA ZLOCZOWER

OF COUNSEL
  ALAN CHEVAT

## QUARTERLY PROGRAMMATIC REPORT

Contract CT10022016000090
January – March 2017

### INTAKE

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL INTAKE** | 155 | 496 |
| **AD INTAKE** | 114 | 378 |
| Reassignments | 4 | 8 |
| New Assignments | 110 | 370 |
| Cases Received With | | |
| Record Already Prepared | 4 | 8 |
| Record to be Prepared | 110 | 370 |
| Appeal is from | | |
| Trial | 26 | 80 |
| SORA | 5 | 16 |
| Resentencing | 1 | 11 |
| Hearing | 3 | 13 |
| Order | 0 | 6 |
| DLRA appeal | 0 | 1 |
| As yet undetermined | 79 | 251 |
| **AT INTAKE** | 28 | 89 |
| Reassignments | 0 | 2 |
| New Assignments | 28 | 87 |
| Cases Received with | | |
| Record Already Prepared | 0 | 0 |
| Record to be Prepared | 28 | 89 |

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **ADDITIONAL ASSIGNMENTS** | | |
| Court of Appeals | 2 | 6 |
| SORA Hearings | 7 | 13 |
| IDP Padilla 440 Referrals | 3 | 9 |
| DLRA Motion | 1 | 1 |
| | | |
| **TOTAL CASES SUBTRACTED** | | |
| Pro se subst. | 1 | 2 |
| Relieved | 0 | 2 |
| **NET ASSIGNMENTS TO DATE** | **154** | **492** |

## FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL APPELLATE DIVISION FILINGS** | **118** | **266** |
| Trial Briefs | 52 | 109 |
| People's Appeals | 1 | 1 |
| Appeals from Hearings | 0 | 2 |
| Appeals from 440 Denials | 1 | 4 |
| SORA Appeals | 11 | 14 |
| Appeals from Resentencings | 0 | 5 |
| Substantive Pleas | 1 | 4 |
| Sentence Reduction Motions | 15 | 46 |
| Show Case Order Responses | 2 | 5 |
| Other Dispositive Documents Filed: | | |
|     Anders Briefs | 15 | 33 |
|     Stipulation Withdrawing Appeal | 19 | 39 |
|     Abandonment Motions | 1 | 4 |
| **TOTAL APPELLATE TERM FILINGS** | **18** | **48** |
| Trial Briefs | 6 | 12 |
| Substantive Pleas | 1 | 4 |
| Other Dispositive Documents Filed: | | |
|     Anders Briefs | 6 | 20 |
|     Abandonment Motions | 0 | 3 |
|     Stipulation Withdrawing Appeal | 5 | 9 |

41

|                                  | This Quarter | Fiscal Year-to-Date |
|----------------------------------|:------------:|:-------------------:|
| **Additional dispositive filings:** |          |                     |
| Court of Appeals Briefs          | 1            | 7                   |
| SORA hearings                    | 6            | 12                  |
| SORA modifications               | 1            | 1                   |
| DLRA motions                     | 1            | 2                   |
| Article 78                       | 0            | 1                   |
| 440.10 motions                   | 4            | 12                  |
| 440.20 motions                   | 0            | 1                   |
| 440.30 motions                   | 0            | 1                   |
| 440 Leave applications           | 1            | 7                   |
| SORA leave motions               | 2            | 4                   |
| Coram nobis petitions            | 0            | 1                   |
|                                  |              |                     |
| **Additional Litigation:**       |              |                     |
| Federal habeas corpus            | 0            | 2                   |
| Opp. To Peo's dismissal mot.     | 0            | 1                   |
| Stay motion                      | 0            | 1                   |
| Motion to extend stay            | 0            | 3                   |
| Unsealing motion                 | 0            | 2                   |
| Trial court memos                | 2            | 2                   |
| **MISCELLANEOUS MATTERS:**       |              |                     |
| Reply briefs:                    | 32           | 102                 |
| Supplemental briefs:             | 1            | 4                   |
| **TOTAL APPEALS ARGUED**         | 69           | 133                 |

42

## BACKLOG REPORT

As of March 31, 2017, we had verified that we had the complete record (minutes, file papers, and pre-sentence report) in a total of 587 unfiled cases.  We also had several cases in which we had received minutes and were screening them to determine whether they were complete.  Of the 587 cases in which we knew the record was complete:

**158  were briefable but not yet being briefed because the attorney was working on another case; of those, there were:**

> 91 trial cases (including 11 with transcripts of more that 2,000 pages)

> 67 hearing, plea, or other cases

This amounts to approximately 2.1 trial appeals and 1.5 other cases per attorney.  This does not constitute a backlog, but to guard against developing one, we started hiring additional attorneys as soon as we knew of the contract amendment that will reimburse us for our excess of intake in FY16.  Four new attorneys began work this spring and 4 more will begin in September.

**94  were being briefed** (including briefs in the supervision process or completed and with the client for review before filing)

**186  involved issue selection delays; of those:**

> 23   involved active 440 or innocence investigations

> 56   involved risk decisions the client had to make

> 72   involved continued correspondence with the client regarding issue selection

> 35   were cases in which we were trying to locate clients

**51  were missing exhibits or other items; of those:**

> 31   were missing exhibits requested from the District Attorneys' offices

> 20   were missing other documents or information we needed before we could proceed with the appeal

43

**98**  **involved delays to benefit the client; of those:**

    55    were immigration-related

    11    were to see how the client fared on probation

    23    were to await a decision in a related or controlling
           case

     8    were pursuant to the client's request that we delay

     1    was to await the filing of a substitution motion by
           counsel being retained by the client's family

## BREAKDOWN OF CASES BY EXPERIENCE LEVEL OF ATTORNEY

As of March 31, 2017, our attorneys and their unbriefed caseloads could be broken down as follows:

2    very recent hires, who had, on average:

    2 trial cases

5    attorneys of approximately 7 to 9 months' tenure, who had, on average:

    3.4 trial and 4.2 other cases

3    attorneys of approximately 1 year tenure, who had, on average:

    6.7 trial and 7.7 other cases

12    attorneys of more than 1 year tenure but not yet senior status (1 additional attorney in this group is currently on maternity leave), who had, on average:

    6.8 trial and 8.0 other cases

7    very senior attorneys, who had, on average:

    5.6 trial and 4.6 other cases

2    attorneys who handle primarily <u>Padilla</u> and related matters

2     hourly attorneys, who had, on average 3.5 trial and 1 other
cases

10    supervisors, who had, on average:

3.4 trial and 10.2 other cases

1     office head, who had:

2 trial and 86 other cases

I certify that all work performed under this agreement has been
performed in compliance with the terms and conditions of the
agreement.

Dated: April 26, 2017



**Report on Criminal Appeals**

Fiscal Year l 7

Name of Organization

APPELLATE ADVOCATES

☐ 1st  ☐ 2nd  ☒ 3rd  ☐ 4th

(Reporting Period (Quarter by Fiscal Year))

. I. INTAKE

|  | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
|  | 1st | 2nd |  |  |
| Assignments |  | 114 | 28 | 2 |
| SORA HEARINGS |  | 7 |  |  |
| PADILLA REFERRALS |  | 3 |  |  |
| Filed DLRA Motions |  | 1 |  |  |

II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals |  |  |  | 1 |
| Trials |  | 52 | 6 |  |
| People's Appeals |  | 1 |  |  |
| DLRA Motions in Trial Court |  | 1 |  |  |
| Hearings |  | 1 |  |  |
| SORA Appeals |  | 11 |  |  |
| Substantive Pleas |  | 1 | 1 |  |
| Non-Substantive Pleas (including Excessive Sentence Motions) |  | 15 |  |  |
| Appeals from Order Denying 440 |  | 1 |  |  |
| Anders Briefs |  | 15 | 6 |  |
| Stipulations to Withdraw |  | 19 | 5 |  |
| Motions to Dismiss/Discontinue, etc. |  | 1 |  |  |
| Other (specify – must dispose of assignment) SORA HEARINGS |  | 7 |  |  |

## II. (B) PROVIDER-DISPOSITIVE FILINGS
### (Disposes of assignment to provider but not of case)
#### Count each case only once

| | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) | | | | |
| Substitution by Retained Counsel | | / | | |
| Relieved for Any Other Reasons | | | | |
| Other (specify) | | | | |
| Average Time from Assignment to Filing Motion | | | | |

## III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 4 |
| 440.20 Motions | |
| Federal Habeas Corpus Petitions | |
| 2nd Circuit Court of Appeals | |
| USSC Cert Petitions | |
| Other (specify) 440 lv., SORA lv. (2), trial ct memos (2) | 5 |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 32 |
| Other (specify)   SUPP. BRIEFS | 1 |

| | Number |
|---|---|
| Appeals Orally Argued | 69 |

# Appellate Advocates
# Quarterly Programmatic Report
# April – June 2017
# Fiscal Year 2017
# 4th Quarter

# APPELLATE ADVOCATES

### 111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
### PHONE: (212) 693-0085    FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
LYNN W. L. FAHEY

*ASSISTANT ATTORNEY-IN-CHARGE*
PAUL SKIP LAISURE

*SUPERVISING ATTORNEYS*
DAVID P. GREENBERG
ERICA HORWITZ
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON
LEILA HULL
A. ALEXANDER DONN
PATRICIA PAZNER
MARK W. VORKINK

*DIRECTOR OF INNOCENCE INVESTIGATIONS*
DE NICE POWELL

*SENIOR STAFF ATTORNEYS*
ALEXIS A. ASCHER
STEVEN R. BERNHARD
DENISE A. CORSI
JOSHUA M. LEVINE

*SENIOR COUNSEL*
MELISSA S. HORLICK

*STAFF ATTORNEYS*
MICHAEL ARTHUS
SAMUEL E. BROWN
ISKUHI CHAKARIAN
CYNTHIA COLT
GOLNAZ FAKHIMI
REBECCA J. GANNON
CAITLIN HALPERN
MEREDITH S. HOLT
LAURA B. INDELLICATI
LAUREN E. JONES
ANNA KOU
BRYAN KREYKES
TAMMY E. LINN
BENJAMIN S. LITMAN
SEAN H. MURRAY
ANDERS NELSON
ELIZABETH PLIMPTON
JONATHAN SCHOEPP-WONG
YVONNE SHIVERS
ANGAD SINGH
NAO TERAI
ERIN TOMLINSON
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
HANNAH ZHAO
DINA ZLOCZOWER

*OF COUNSEL*
... CHEVAT

### QUARTERLY PROGRAMMATIC REPORT

Contract CT10022016000090
April - June 2017

### INTAKE

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL INTAKE** | **232** | **728** |
| | | |
| **AD INTAKE** | **188** | **566** |
| Reassignments | 2 | 10 |
| New Assignments | 186 | 556 |
| Cases Received With | | |
| Record Already Prepared | 1 | 9 |
| Record to be Prepared | 187 | 557 |
| Appeal is from | | |
| Trial | 34 | 115 |
| SORA | 8 | 24 |
| Resentencing | 4 | 15 |
| Hearing | 11 | 24 |
| Order | 0 | 6 |
| DLRA appeal | 0 | 1 |
| As yet undetermined | 131 | 381 |
| | | |
| **AT INTAKE** | **24** | **113** |
| Reassignments | 1 | 3 |
| New Assignments | 23 | 110 |
| Cases Received with | | |
| Record Already Prepared | 1 | 1 |
| Record to be Prepared | 23 | 112 |

|  | **This Quarter** | **Fiscal Year-to-Date** |
|---|---|---|
| **ADDITIONAL ASSIGNMENTS** | | |
| Court of Appeals | 2 | 8 |
| SORA Hearings | 8 | 21 |
| IDP Padilla 440 Referrals | 9 | 18 |
| DLRA Motion | 0 | 1 |
| SORA Modification | 1 | 1 |
| **TOTAL CASES SUBTRACTED** | | |
| Pro se subst. | 0 | 2 |
| Relieved | 3 | 5 |
| **NET ASSIGNMENTS TO DATE** | | **721** |

2

**CASE-BY-CASE RECORD** (CONTINUED)

Case                           Assigned                        Filed

June 2017 Appellate Term Assignments (1; new assignment)

▮▮▮▮▮▮▮▮                       6/20/17

## FILINGS, OTHER LITIGATION, AND ORAL ARGUMENT

|  | This Quarter | Fiscal Year-to-Date |
|---|---|---|
| **TOTAL APPELLATE DIVISION FILINGS** | **207** | **473** |
| Trial Briefs | 52 | 161 |
| People's Appeals | 0 | 1 |
| Appeals from Hearings | 3 | 5 |
| Appeals from 440 Denials | 2 | 6 |
| SORA Appeals | 15 | 29 |
| Appeals from Resentencings | 1 | 6 |
| Substantive Pleas | 4 | 8 |
| Sentence Reduction Motions | 53 | 99 |
| Show Case Order Responses | 3 | 8 |
| Other Dispositive Documents Filed: |  |  |
|     Anders Briefs | 34 | 67 |
|     Stipulation Withdrawing Appeal | 29 | 68 |
|     Abandonment Motions | 11 | 15 |
| **TOTAL APPELLATE TERM FILINGS** | **42** | **90** |
| Trial Briefs | 12 | 24 |
| Substantive Pleas | 8 | 12 |
| Other Dispositive Documents Filed: |  |  |
|     Anders Briefs | 9 | 29 |
|     Abandonment Motions | 10 | 13 |
|     Stipulation Withdrawing Appeal | 3 | 12 |

48

|                                     | This Quarter | FiscalYear-to-Date |
|-------------------------------------|:------------:|:------------------:|
| **Additional dispositive filings:** |              |                    |
| Court of Appeals Briefs             | 1            | 8                  |
| SORA hearings                       | 8            | 20                 |
| SORA modifications                  | 1            | 2                  |
| DLRA motions                        | 0            | 2                  |
| Article 78                          | 0            | 1                  |
| 440.10 motions                      | 6            | 18                 |
| 440.20 motions                      | 0            | 1                  |
| 440.30 motions                      | 0            | 1                  |
| Response to Peo's 440 motion        | 1            | 1                  |
| 440 Leave applications              | 2            | 9                  |
| SORA leave motions                  | 1            | 5                  |
| Coram nobis petitions               | 0            | 1                  |
|                                     |              |                    |
| **Additional Litigation:**          |              |                    |
| Cert petition                       | 1            | 1                  |
| Federal habeas corpus               | 0            | 2                  |
| Objection to Habeas report          | 1            | 1                  |
| Opp. To Peo's dismissal mot.        | 1            | 2                  |
| Motion to reargue                   | 2            | 2                  |
| Motion to strike                    | 1            | 1                  |
| Opp. to People's motion to strike   | 1            | 1                  |
| Stay motion                         | 0            | 1                  |
| Motion to extend stay               | 0            | 3                  |
| Unsealing motion                    | 0            | 2                  |

|                       | This Quarter | FiscalYear-to-Date |
|-----------------------|:------------:|:------------------:|
| Trial court memos     | 1            | 3                  |

MISCELLANEOUS MATTERS:

| | This Quarter | FiscalYear-to-Date |
|-----------------------|:------------:|:------------------:|
| Reply briefs:         | 35           | 137                |
| Supplemental briefs:  | 0            | 4                  |
| TOTAL APPEALS ARGUED  | 81           | 214                |

50

## BACKLOG REPORT

As of June 30, 2017, we had verified that we had the complete record (minutes, file papers, and pre-sentence report) in a total of 548 unfiled cases. We also had several cases in which we had received minutes and were screening them to determine whether they were complete. Of the 548 cases in which we knew the record was complete:

**125   were briefable but not yet being briefed because the attorney was working on another case; of those, there were:**

>  69 trial cases (including 13 with transcripts of more that 2,000 pages)

>  56 hearing, plea, or other cases

This amounts to approximately 1.6 trial appeals and 1.3 other cases per attorney, a slight diminution over earlier reports in FY17. It does not constitute a backlog, but to guard against developing one, we started hiring additional attorneys in early 2017.

**78    were being briefed** (including briefs in the supervision process or completed and with the client for review before filing)

**161   involved issue selection delays; of those:**

>  34    involved active 440 or innocence investigations

>  65    involved risk decisions the client had to make

>  37    involved continued correspondence with the client regarding issue selection

>  25    were cases in which we were trying to locate clients

**63    were missing exhibits or other items; of those:**

>  32    were missing exhibits requested from the District Attorneys' offices

>  31    were missing other documents or information we needed before we could proceed with the appeal

**117   involved delays to benefit the client; of those:**

    66   were immigration-related

    16   were to see how the client fared on probation

    25   were to await a decision in a related or controlling case or a pending motion

    10   were pursuant to the client's request that we delay

## BREAKDOWN OF CASES BY EXPERIENCE LEVEL OF ATTORNEY

As of June 30, 2017, our attorneys and their unbriefed caseloads could be broken down as follows:

3   very recent hires, who had, on average:

3 trial cases

5   attorneys of approximately 9 months' tenure, who had, on average:

4 trial and 5 other cases

6   attorneys of approximately 1 - 2 years' tenure, who had, on average:

6 trial and 9 other cases

9   attorneys of more than 2 years' tenure but not yet senior status (1 additional attorney in this group is currently on maternity leave), who had, on average:

7 trial and 9 other cases

6   very senior attorneys, who had, on average:

6 trial and 4 other cases

2   attorneys who handle primarily <u>Padilla</u> and related matters

52

2   hourly attorneys, who had, on average 2.5 trial and 2 other
    cases

10  supervisors, who had, on average:

    2.5 trial and 10 other cases

1   office head, who had:

    2 trial and 58 other cases

 

 

    I certify that all work performed under this agreement has been
performed in compliance with the terms and conditions of the
agreement.

Dated: July 28, 2017



# Report on Criminal Appeals

Fiscal Year _17_

Name of Organization

APPELLATE ADVOCATES

I. INTAKE

☐ 1st ☐ 2nd ☐ 3rd ☒ 4th

(Reporting Period (Quarter by Fiscal Year)

| | Appellate Division | | Appellate Term | NY COA |
|---|---|---|---|---|
| | 1st | 2nd | | |
| Assignments | | 18.8 | 24· | 2 |
| SORA Hearings | ✓ | 8 | | |
| IDP Padilla Referrals | | 9 | | |
| Filed DLRA Motions | | | | |
| SORA Modification | | 1 | | |

## II. (A) CASE-DISPOSITIVE FILINGS
(Disposes of assignment to provider and case)
*Count each case only once*

| Initial Briefs Filed | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| New York Court of Appeals | | | | 1 |
| Trials | | 52 | 12 | |
| People's Appeals | | | | |
| DLRA Motions in Trial Court | | | | |
| Hearings | | 3 | | |
| SORA Appeals | | 15 | | |
| Substantive Pleas | | 4 | 8 | |
| Non-Substantive Pleas (including Excessive Sentence Motions) | | 53 | | |
| Appeals from Order Denying 440 | | 2 | | |
| Anders Briefs | | 34 | 9 | |
| Stipulations to Withdraw | | 29 | 3 | |
| Motions to Dismiss/Discontinue, etc. | | 11 | 10 | |
| Other (specify – must dispose of assignment) Resent. Apps- Show cause responses | | 1 3 | | |

## II. (B) PROVIDER-DISPOSITIVE FILINGS
### (Disposes of assignment to provider but not of case)
*Count each case only once*

|  | AD1 | AD2 | AT | COA |
|---|---|---|---|---|
| Motions to be Relieved (conflict) |  | 3 |  |  |
| Substitution by Retained Counsel |  |  |  |  |
| Relieved for Any Other Reasons |  |  |  |  |
| Other (specify) |  |  |  |  |
| Average Time from Assignment to Filing Motion |  |  |  |  |

## III. OTHER

| Ancillary Proceedings | Number |
|---|---|
| 440.10 Motions | 6 |
| 440.20 Motions        *Opp. to Pro's 440 motion* | 1 |
| Federal Habeas Corpus Petitions |  |
| 2nd Circuit Court of Appeals |  |
| USSC Cert Petitions | 1 |
| Other (specify) |  |

| Miscellaneous Matters | Number |
|---|---|
| Reply Briefs | 35 |
| Other (specify) |  |

|  | Number |
|---|---|
| Appeals Orally Argued | 81 |