AGREEMENT dated 5/19/15 between the CITY OF NEW YORK ("CITY") acting by and through its Mayor's Office of Criminal Justice ("Department"), having an office located at 1 Centre Street, 1012N, New York, NY 10007, and Appellate Advocates ("Contractor") a not-for-profit corporation having its principal office located at 111 John Street, 9th Floor, New York, NY 10038.

WHEREAS, the CITY recognizes the need to provide criminal defense appellate services to indigent defendants; and

WHEREAS, the Contractor will provide criminal defense appellate services to indigent defendants in the Second Department of the Appellate Division, Appellate Term, and the New York Court of Appeals; and

WHEREAS, the Contractor has been selected by means of a competitive sealed proposal pursuant to §3-03 of the Procurement Policy Board Rules to provide these services from July 1, 2015 to June 30, 2017, and

WHEREAS, the CITY has appropriated $5,447,500 in FY16 and $5,447,500 in FY17 for a maximum contract amount of $10,895,000 in City Tax Levy funds to be used to provide the services described herein during the period July 1, 2015 to June 30, 2017; and

WHEREAS, the Contractor will intake up to 500 of the annual assignments in the Second Department of the Appellate Division, Appellate Term, and the New York Court of Appeals; and

WHEREAS, Contractor, having been awarded the Contract, is ready, willing and able to perform;

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I — DEFINITIONS

### Section 1.01  Definitions

The following words and expressions, or pronouns used in their stead, shall, wherever they appear in this Agreement, be construed as follows, unless a different meaning is clear from the context:

A.     "Assignment" shall mean any case assigned to Contractor by the Second Department of the Appellate Division, Appellate Term, and the New York Court of Appeals, as well as additional matters as described herein. Assignments shall include all proceedings required to fully and competently represent their clients.

B.     "Board of Directors" or "Board" means the board of directors, board of trustees or a similar body vested with the duty and responsibility for management and oversight of Contractor's affairs as they relate to its performance under this Agreement.

Human Services Performance Based          1 of 23
Standard Contract
June 2014

C.     "Budget" shall mean the line-item costs and/or the performance based measures or fee-for-service rate schedule attached hereto as Appendix C.

D.     "City" shall mean The City of New York.

E.     "Commissioner" or "Agency Head" shall mean the head of the Department or his or her duly authorized representative. The term "duly authorized representative" shall include any person or persons acting within the limits of his or her authority.

F.     "Comptroller" shall mean the Comptroller of the City of New York.

G.     "Contractor" shall mean the entity entering into this Agreement with the Department.

H.     "Department" shall mean the City agency that has entered into this Agreement.

I.     "Fiscal Agent" shall mean an entity (if any) retained by the Department, or retained by the Contractor at the direction of the Department, to issue payments to third parties on behalf of the Contractor or otherwise to assist the Contractor in the administration of its financial affairs.

J.     "Fiscal Manual" shall mean a set of instructions provided by the Department to the Contractor documenting the applicable policies and procedures of the Department for Contractor to use in such matters as record-keeping, bookkeeping, reporting, invoicing and claiming, budgeting, cost allocating, procurement and payroll, as may be amended by the Department.  The Fiscal Manual is incorporated       by         reference        and        may        be       found      online       at http://www.nyc.gov/html/cjc/html/home/home.shtml. The Fiscal Manual is not intended to amend the material terms of this agreement with respect to either the Scope of Work, or the terms and conditions of this document or Appendix A.

K.     "Improper Related Party Transaction" shall mean a Related Party Transaction that violates Not-for-Profit Corporation Law section 715.

L.     "Key Employee" shall mean any person who is covered by the definition of "key employee" in Not-for-Profit Corporation Law section 102(a)(25). Key Employees are persons, not including City officers and employees acting within the scope of their official government duties, in a position to exercise substantial influence over the affairs of the Contractor, including voting members of the Board, the president, chief executive officer, chief operating officer, the treasurer and chief financial officer, and persons with a material financial interest in a provider-sponsored organization (as defined in 42 U.S.C. § 1395w-25), and anyone else meeting the definition of a person in a position to exercise substantial influence in 26 U.S.C. section 4958(F)(1)(A) and 26 CFR section 53.4958-3(C), (D), and (E).

M.     "Law" or "Laws" shall mean the New York City Charter ("Charter"), the New York City Administrative Code ("Admin. Code"), a local rule of the City of New York, the Constitutions of the United States and the State of New York, a statute of the United States or of the State of New York and any ordinance, rule or regulation having the force of law and adopted pursuant thereto, as amended, and common law.

N.      "Related Party" shall mean (i) any director, officer or Key Employee of the Contractor or any affiliate of the Contractor; (ii) any relative of any director, officer or Key Employee of the Contractor or any affiliate of the Contractor; or (iii) any entity in which any individual described in clauses (i) and (ii) of this definition has a thirty-five percent or greater ownership or beneficial interest or, in the case of a partnership or professional corporation, a direct or indirect ownership interest in excess of five percent.

O.      "Related Party Transaction" shall mean any transaction, agreement or any other arrangement in which a Related Party has a financial interest and in which the Contractor or any affiliate of the Contractor is a participant.

P.      "State" shall mean the State of New York.

## ARTICLE II — TERM OF AGREEMENT

**Section 2.01   Term.** The term of this Agreement begins on July 1, 2015 for a period of two (2) years through June 30, 2017.

**Section 2.02   Renewal.**      The Department, in its sole discretion, may renew this Agreement two (2) times for a period of two (2) years for each renewal. The Department, in its sole discretion, reserves the right to modify the length of the renewal term listed above, provided that the total term of this Agreement after the exercise of all of the options to renew shall not exceed six (6) years. All renewals shall be on substantially the same terms and conditions contained in the Agreement.   Any renewal will not be effective unless and until the renewal is registered pursuant to New York City Charter §328.  The Department shall renew this Agreement by giving written notice to the Contractor prior to the expiration date of this Agreement and prior to the expiration date of any renewal option. The Department will endeavor to give the Contractor notice ninety (90) days prior to renewal.  Failure to give notice at least 90 days prior to renewal shall not impair the Department's right to exercise its option to renew and shall not invalidate an option exercised by the Department.

**Section 2.03   Future funding.** Since the period of performance contemplated by this Agreement involves performance by the Contractor in a subsequent City fiscal year(s), funding for this Agreement is subject to the appropriation of funds for such subsequent City fiscal year(s).  Contractor also understands that the Department is under no obligation to continue its funding after the expiration of the term of this Agreement.

## ARTICLE III — SCOPE OF WORK AND BUDGET

**Section 3.01   Scope of work.**

A.      **Services and Activities.**  Contractor shall provide the services and activities in program areas or programs listed and described in the Scope of Work attached hereto as Appendix B.

B.      **Healthy food environment.** The City aims to reduce the prevalence of chronic disease, such as obesity, diabetes and cardiovascular disease, by improving dietary intake of its citizens. Accordingly, in addition to the services set forth in Appendix B, the Contractor shall make best efforts to

distribute to any staff members providing services to program participants under the Agreement and to program participants funded in whole or in part by this Contract, any healthy food promotional materials provided to the Contractor by the Department.

C. **New York City Food Standards.** This paragraph applies only if this Agreement includes a requirement that the Contractor supply food to program participants as a material part of the client services funded by the Department. The City aims to reduce the prevalence of chronic disease, such as obesity, diabetes and cardiovascular disease, by improving dietary intake of its citizens. Accordingly, the Contractor shall provide a healthy food environment in connection with the client services provided under this Agreement by complying with the attached New York City Agency Food Standards with regard to the provision of food to program participants under this Agreement, including compliance with the New York City Food Standards for beverage vending and food vending machines (http://www.nyc.gov/html/doh/html/cardio/cardio-vend-nutrition-standard.shtml) for any vending machines to which program participants are granted access.

**Section 3.02 Budget.** Contractor shall provide such services and activities in accordance with the Budget attached hereto as Appendix C. Contractor may request modifications to the Budget in the manner prescribed in the Fiscal Manual.

**Section 3.03 Payment.** The CITY shall pay Contractor an amount not to exceed $5,447,500 for the period July 1, 2015 to June 30, 2016 and $5,447,500 for the period July 1, 2016 to June 30, 2017, for a two-year total of $10,895,000 for all services provided under the Agreement (subject to audit by the Office of the Mayor and post-audit by the Office of the Comptroller of the City of New York) and subject to the following:

A. The Department has established a base rate of $10,000 ("Base Rate") for each new Assignment taken in during the period July 1, 2015 to June 30, 2017, based on Contractor's anticipated number of annual Assignments.

B. Applying the Base Rate, Contractor will be paid on a scale depending on the type of Assignment taken in and in accordance with the table below:

| Type of Assignment | Base Rate | Point Per Case | Final Cost Per Case |
|---|---|---|---|
| Appellate Division Trials | $10,000 | 1.50 | $15,000 |
| SORA (Hearings) | $10,000 | 1.25 | $12,500 |
| Padilla Motions | $10,000 | .95 | $9,500 |
| Court of Appeals | $10,000 | .95 | $9,500 |
| SORA (Appeals) | $10,000 | .90 | $9,000 |
| 440 Denials | $10,000 | .75 | $7,500 |
| Appellate Term | $10,000 | .65 | $6,500 |
| All Other Assignments | $10,000 | .85 | $8,500 |
| Late Relief / Substitution (6+ months) | $10,000 | .30 | $3,000 |

C. Shall the FY16 caseload exceed 500 new Assignments and/or the annual Contract Value of $5,447,550, the excess Assignments and/or Contract Value will be carried over to FY17 and considered part of the FY17 caseload paid for in that Fiscal Year up to the two-year contract amount of $10,895,000.

Human Services Performance Based  4 of 23
Standard Contract
June 2014

D.     Shall the FY17 caseload exceed 500 new assignments and/or the annual Contract Value of $5,447,550, including those Assignments and/or Contract Value carried over from FY16, the excess Assignments and/or Contract Value will be considered during renewal negotiations or contract closeout.

E.     Where Contractor is substituted or relieved from an Assignment after six (6) months from the date of Assignment, but before the appeal is perfected, the CITY will pay Contractor 30% of the Base Rate in accordance to the table above.  Therefore, 70% of the Base Rate shall be deducted from the subsequent invoice.

F.     Where the Contractor has filed the opening brief or other case-dispositive documents prior to being substituted by retained counsel or relieved by the Court, the CITY will pay Contractor 50% of the Final Cost Per Case value as noted in paragraph B above.  Therefore, 50% of the Final Cost Per Case value shall be deducted from the invoice immediately subsequent to the substitution or relief.

G.     Contractor shall make reasonable efforts to reduce any current backlog[1] and limit future backlog to the satisfaction of the Department and shall report quarterly backlog information in accordance with Appendix B attached hereto.

H.     The Contractor shall submit invoices in accordance with the attached Appendix B. Contractor's invoices for payment shall be in duplicate and shall contain a signed certification specifying that all work performed under this Agreement has been performed in compliance with the terms and conditions of this Agreement.

I.     The Department will make every effort to review invoices and corresponding monthly reports within fifteen (15) business days of receipt, subject to verification, and agrees to pay the Contractor for the work indicated and verified in compliance with CITY prompt payment provisions and subject to reducing the amount to be paid by any amount paid as an advance pursuant to Article IV, Section 4.03 of this Agreement, and subject to the maximum contract amount of $5,447,500 for Fiscal Year 2016 and $5,447,500 for Fiscal Year 2017.  Any advance will be recouped in five (5) equal installments beginning with the 7th month during the term of the Agreement, or according to terms upon which the CITY and the Contractor mutually agree.

J.     At the end of every quarter during the term of this Agreement, the Department and the Contractor will meet to review case assignment trends and quarterly report numbers.  Among the criteria evaluated will be the Contractor's existing caseload and assignment targets.

K.     The Department will monitor case assignments to determine if adjustments to contractual targets and corresponding budgets are required.

This Agreement shall not obligate the Department beyond the dollar amount designated as the maximum contract amount in the absence of a duly executed written contract amendment registered pursuant to section 328 of the New York City Charter.

---

[1] For purposes of defining "backlog" under this Agreement, Appellate briefs are required to be filed in a timely fashion in accordance with court rules.  To the extent that a proposer does not currently meet this standard, there is a backlog.

**Section 3.04   Cost allocating and duplication.**

A.      **Duplication**.  Contractor represents and warrants that the work to be performed under this Agreement shall in no way duplicate any work performed under other agreements between the City and Contractor, nor under any agreement with any other governmental funding source, except upon the express written permission of the Department.  Costs attributable to the program and not paid for by the City are not duplication (e.g. program enhancements, unreimbursed portions of staff salaries) but are subject to the cost allocation provisions set forth below. Noncompliance with this Section shall constitute a material breach of this Agreement.

B.      **Cost allocation plan**. Contractor shall accurately and equitably allocate costs which are attributable to the operation of two or more programs among such programs, or which are costs attributable to two or more governmental funding sources, by a method which represents the benefit of such costs to each program or funding source.

[Remainder of section intentionally omitted].

**Section 3.05   Cost of living increases.**  Where the Contractor's industry has experienced an increase in costs (e.g., salary, wage or fringe benefit cost of living increases, a change in the prevailing or living wage, a renegotiated collective bargaining agreement, an industry-wide increase in the Producer Price Index (PPI) for fuel or energy), and the Office of Management and Budget (OMB) or another independent agency has determined in writing that additional funds will be made available to a City agency for the class of contracts pursuant to which the Contractor provides the same or substantially similar services, then the Department shall adjust the Budget to account for such increases in costs to the extent that such increases have been authorized by the City for contracts within such class of contracts and to the extent that funds are appropriated for such purposes. Any cost of living increase will not be effective unless and until an amendment to the contract is registered pursuant to New York City Charter §328.

## ARTICLE IV — FISCAL PROCEDURES

**Section 4.01   Cooperation and compliance.**  Contractor hereby agrees to fully cooperate and comply with the Fiscal Manual on all fiscal matters related to this Agreement.

**Section 4.02   Accounts**

A.      Contractor shall establish and maintain one or more separate accounts for the funds obtained from or through the City of New York related to this and all other agreements with the City, and shall maintain records for such account to track and clearly identify the funds obligated through this Agreement.

B.      Contractor shall notify the Department of the name, locations and account numbers of all bank accounts in which any funds pursuant to this Agreement are maintained, and of any change in the name,

Human Services Performance Based            6 of 23
Standard Contract
June 2014

location, or account numbers of such accounts within five (5) days of such establishment or change. Such bank shall have a branch located in New York City unless otherwise approved by the Department.

C.    Contractor shall notify the Department of the names, titles, and business addresses of such persons authorized by the Contractor to receive, handle or disburse monies under this Agreement, including the company name and company address where such persons are not employees of the Contractor. Such notification must be in writing and furnished to the Department within five (5) days from the execution of this Agreement, and within five (5) days from any subsequent change or substitution of authorized signatories.

**Section 4.03   Advance.**   The amount of any advance to be paid to Contractor under this Agreement shall be determined solely by the Department in accordance with its Fiscal Manual and any applicable Comptroller directives.  The funds shall be used exclusively for the payment of expenditures and obligations authorized by and properly incurred pursuant to the Budget.

**Section 4.04   Financial records, reporting and invoicing.**   Contractor shall submit financial reports and invoices to the Department in accordance with the terms of the Fiscal Manual.  Any supporting documents required to be maintained by this Agreement or the Fiscal Manual shall be made available for inspection and reproduction by the Department, the City Comptroller, and such other persons as authorized by the Department, including the Inspector General for the Department and the Department of Investigation.   Contractor acknowledges that repeated failure to submit required financial reports within the time limits prescribed may result in termination of this Agreement.

**Section 4.05   Procurement requirements.**

A.    [Paragraph intentionally omitted].

B.    [Paragraph intentionally omitted].

C.    [Paragraph intentionally omitted].

D.    **M/WBE suppliers.**   Contractor is encouraged to utilize businesses and individual proprietors listed on the NYC Online Directory of Certified MWBE Businesses, available at www.nyc.gov/sbs, as sources for its purchases of goods, supplies, services and equipment using funds obtained through this Agreement.  Contractor is also encouraged to utilize businesses and individual proprietors owned/operated by people with disabilities as sources for its purchases of goods, supplies, services and equipment using funds obtained through this Agreement.

E.    **Disputes with suppliers.**  Contractor, without recourse to the City or the Department, shall be responsible for the settlement and satisfaction of all contractual obligations and administrative issues arising out of any procurement or leasing contracts paid with funds obtained through this Agreement.

**Section 4.06   Limitation on use of funds.**

A.     **Proper purposes.**  No funds obtained through this Agreement shall be spent for any expense not incurred in accordance with the terms of the Agreement.   All such funds shall be administered in accordance with the Fiscal Manual.

[Remainder of section intentionally omitted].

**Section 4.07   Recoupment of disallowances, improperly incurred costs and overpayments.** The Department may, at its option, either require the Contractor to reimburse the Department or withhold for the purposes of set-off any monies due to Contractor under this Agreement up to the amount of any disallowance or improperly incurred costs resulting from any audits of Contractor, the amount of any overpayment to Contractor with regard to this Agreement or to any other agreement between the parties hereto, including any agreement(s) that commenced prior to the commencement date of this Agreement, and/or amounts incurred on any Improper Related Party Transaction. Prior to the imposition of withholding for the purposes of set-off, the Department will provide the Contractor with an opportunity to be heard upon at least ten (10) days prior written notice.

**Section 4.08   Failure to earn funds.**  In the event that Contractor fails to earn funds for any part of the Budget within the time indicated therein (i.e., the fiscal year unless otherwise indicated) or at the level of expenditures indicated therein, the Department reserves the right, in its discretion, to recoup any funds advanced and not earned. If Contractor fails to earn funds in the budget, the Department reserves the discretion to reduce the budget going forward to account for the expected future level of earnings.

**Section 4.09   Provisions Applicable When Fiscal Agent Disburses Funds To Contractors**

A.     **Payment by Fiscal Agent.**  Where the Department has retained a Fiscal Agent to make payments to third parties on behalf of Contractor, then the Contractor is obligated to use the Fiscal Agent to make payment to third parties at the Department's direction, including for the purchase of such goods, supplies, services and/or equipment made by Contractor under this Agreement. Where the Department directs that Contractor utilize a Fiscal Agent, Contractor shall not pay any obligations on its own behalf except to the extent specifically allowed by this Agreement and the Department's Fiscal Manual.

B.     **Payroll processing by Fiscal Agent.**  In the event that a Fiscal Agent is processing the Contractor's payroll, Contractor shall deliver to the Fiscal Agent signed and dated time and attendance records for each staff member and consultant to be paid under this Agreement, in the form required and delivered at the time required by the Fiscal Agent and the Department's Fiscal Manual. Subject to the Department's approval, the Fiscal Agent shall prepare the payroll checks and supporting materials based on the documents submitted.

C.     **Fiscal Agent documentation.** Upon reasonable request and approval by the Department, Contractor shall have the right to inspect any fiscal documents relating to this Agreement as may be maintained by a Fiscal Agent, if applicable. Contractor may request from the Department copies of any or all the following documents relating to the funds to be provided hereunder, with said documents to be furnished by the Fiscal Agent, subject to the Department's approval, within a reasonable time of the request: monthly budget and expenditure reports; budgets and budget modifications; and audit reports, where available.

## ARTICLE V — RECORDS, DELIVERABLES, AUDITS AND REPORTS

**Section 5.01   Records to be maintained.**   In addition to any other records required to be maintained and/or provided for inspection pursuant to this Agreement, Contractor shall maintain and make available to the Department for inspection, upon reasonable request, the following documents: tax returns; audit reports; all programmatic records and accounts maintained in connection with this Agreement, including program, research and other reports and publications prepared in connection with this Agreement; all financial books, records and accounts reflecting payments made by Contractor for petty cash expenditures in connection with this Agreement;  all applicable licenses and permits; Board member lists and all minutes and attendance sheets (dated and signed) for meetings of the Board of Directors and any of its committees responsible for the oversight of the program(s) funded under this Agreement; certificate of incorporation and by-laws; all other contracts related to providing services under this Agreement, to which Contractor is a party and the contract terms coincide, in whole or in part, with the term of this Agreement; the Contractor's Conflict of Interest Policy, if applicable pursuant to Not-for-Profit Corporation Law section 715-a; the Contractor's Whistleblower Policy, if applicable pursuant to Not-for-Profit Corporation Law section 715-b; the documents concerning the Board's approval of a Related Party Transaction, if applicable pursuant to Not-for-Profit Corporation Law section 715; any Related Party's disclosure statement, if applicable pursuant to Not-for-Profit Corporation Law section 715-a(c); and any other records or materials reasonably requested at such reasonable times and places and as often as may be reasonably requested. Contractor shall permit the Department and its authorized representatives including the Department's Inspector General, the Comptroller of the City of New York, the New York City Department of Investigation, or their designees, or other interested federal, State or City agency representatives, to attend all meetings of the Board of Directors and to be present at the program site(s) to observe the work and activities being performed in connection with this Agreement.

**Section 5.02   Deliverables and reports.**   Contractor shall submit the deliverables and periodic reports required by this Agreement, in accordance with the Scope of Work attached hereto.  Contractor shall administer such assessment tools, collect and report such data, maintain records, make reports and take such other actions as may be directed by the Department.

**Section 5.03   Audit disclaimers.**   If any audit of Contractor's records shall include a Disclaimer of Opinion relating to any contract with the Department or other funding sources, said Disclaimer shall be ground for termination of this Agreement.

**Section 5.04   Federal audit requirements.**   If applicable, the Contractor shall fulfill the audit requirements of the Federal Office of Management and Budget Circular A-133, "Audits of Institutions of Higher Education and Other Non-Profit Organizations," and shall provide such audit to the Department within thirty (30) days after its receipt of the final audit by the Contractor from the preparing accountant.

**Section 5.05   State charities registration and audit requirements.**   If the Contractor is required by New York State law to register with and make annual filings to the Charities Bureau of the New York State Office of the Attorney General, timely compliance with such requirements shall be deemed a material term of this Agreement.  Contractor shall make available to the Department all such filings, including any audit and/or financial report required to be submitted with such filings, within thirty (30) days of receiving such final audit or financial report from its preparer, and in no event later than ten (10) days following the filing of such audit or financial report with the Charities Bureau.

## Section 5.06   Additional audit and financial reporting requirements.

A.      If any Contractor is exempt from making annual filings to the Charities Bureau of the New York State Office of the Attorney General, the Contractor will, at direction of City, provide the City with annual disclosure reports equivalent to those filings that Contractor would have filed with the State had they been required to file. As of the effective date of this Agreement, the requirements are as follows:

1.      Contractors with gross revenues less than $250,000 in any fiscal year shall file a copy of the annual unaudited financial report that it is required to file pursuant to Not-for-Profit Corporation Law section 172-b(2-a) with the Department.

2.      Contractors with gross revenues between $250,000 and $500,000[2] in any fiscal year shall file an annual financial statement with the Department, which includes an independent certified public accountant's review report in accordance with the "statement on standards for accounting and review services" issued by the American Institute of Certified Public Accountants. The financial statement shall be prepared in conformance with generally accepted accounting principles (GAAP), including compliance with all pronouncements of the Financial Accounting Standards Board and the American Institute of Certified Public Accountants that establish accounting principles relevant to not-for-profit organizations.

3.      Contractors with gross revenues in excess of $500,000[3] shall file with the Department an annual audit report by an independent certified public accountant. Said audit report shall contain an opinion, signed by such certified public accountant that the financial statements are presented fairly in all material respects and in conformity with GAAP, including compliance with all pronouncements of the Financial Accounting Standards Board and the American Institute of Certified Public Accountants that establish accounting principles relevant to not-for-profit organizations, and that the financial sheet and balance sheet present fairly the financial operations and position of the organization. The financial report must be signed by the president or other authorized officer and the chief fiscal officer under penalties of perjury that the statements are true and correct to the best of their knowledge.

B.      Contractors receiving funds pursuant to this Agreement in excess of $1,000,000 will, at direction of City, provide to the Department an audit report from an independent certified public accountant containing an opinion that the Contractor has appropriately allocated costs in accordance with the terms of the Agreement, including that the costs have not been improperly double-charged between multiple City and/or State contracts or between multiple governmental funding sources. The Contractor may satisfy this requirement by including the appropriate analysis in any audits required pursuant to Section 5.04 or 5.05.

C.      The Contractor must submit all required audit and financial reports under this Section to the Department within thirty (30) days after receipt of the final audit from its accountant and, if no audit is required, within thirty (30) days of filing with the Attorney General, but in any event no later than twelve

---

[2] As of July 1, 2017, this provision applies to contractors with gross revenues between $250,000 and $750,000. As of July 1, 2021, this provision applies to contractors with gross revenues between $250,000 and $1,000,000.
[3] As of July 1, 2017, this provision applies to contractors with gross revenues in excess of $750,000. As of July 1, 2021, this provision applies to contractors with gross revenues in excess of $1,000,000.

(12) months after close of the audit period, or such period as determined by the Department. The audit and financial reports shall comply with the applicable provisions in the Fiscal Manual throughout the term of this Agreement, including terms mandating the audit period and frequency of such audits and reports.

D.    The Department may in its sole discretion conduct its own programmatic or financial audits of the Contractor.

## ARTICLE VI — PERSONNEL PRACTICES AND RECORDS

**Section 6.01   Definition of employee.**   The term "employee" as used in this Article shall be limited to salaried personnel and shall include neither consultants under contract to the Contractor to provide specified services nor participants in the program who are being paid as trainees.

**Section 6.02   Compensation of certain employees, Vacancies, and Board of Directors.**

**A.    Employee list.**   Contractor shall submit to the Department within thirty (30) days of the execution of this Agreement and at the beginning of each new fiscal year a list of certain employees, which shall include the Executive Director, Chief Financial Officer, Chief Operating Officer, or the functional equivalent of such positions, and the senior financial and programmatic supervisory personnel involved directly or indirectly in the performance of this Agreement. For each listed employee, Contractor shall provide the current total compensation (including all benefits), all sources of the employee's total compensation, whether from this contract or another City, State, Federal or private source, and the dollar amount of compensation from each such source.

**B.    Vacancies.**   Contractor shall notify the Department in writing within ten (10) days of their occurrence any appointments to or resignations from the positions of Executive Director, Chief Financial Officer and/or Chief Operating Officer, and/or the senior programmatic supervisory personnel or the functional equivalent of such positions.

**C.    Board compensation.**   Contractor shall submit to the Department within thirty (30) days of the execution of this Agreement and at the beginning of each new fiscal year a listing of all members of its Board of Directors and identify any of its members who receive compensation in any form, including but not limited to salary, stipend, per diem payments and/or payments for services rendered, from the Contractor or its affiliates, together with the amount of any such compensation, regardless of the source of its payment, and a description of its purpose.

**Section 6.03   Collective bargaining.**   Contractor acknowledges that neither the City nor the Department is responsible or shall be liable for any obligations contained in any agreement into which Contractor or a representatives of Contractor has entered concerning the collective bargaining rights or benefits of its employees paid in full or in part by funds provided through this Agreement. Furthermore, Contractor agrees to abide by all applicable Laws governing the use of funds in connection with union activities.

## Section 6.04   Recruitment and hiring of staff.

A.   **Maintenance of skilled staff.**   Contractor shall maintain sufficient personnel and resources, including computer technology, to deliver the services described in the Scope of Work and perform necessary administrative functions throughout the term of this Agreement, including but not limited to: program evaluation; program monitoring; program research and development, including the preparation of reports required by this Agreement; fiscal reporting, review, audit, and close-out of the Program; and implementation of any corrective actions required by the Department.

B.   **Background checks.**

1.   The Contractor shall be responsible for the recruitment and screening of employees and volunteers performing work under the Agreement, including the verification of credentials, references, and suitability for working with clients and participants. Where consistent with State and federal law, if directed by the Department, the Contractor will undertake the fingerprinting of employees and volunteers, including applicants, in accordance with instructions from the Department.

2.   The Contractor shall comply with Article 23-A of the New York State Correction Law and Section 296(15) and (16) of the New York State Executive Law when considering an applicant's prior criminal convictions in determining their suitability for employment. In accordance with Article 23-A, nothing in this Agreement shall be construed to limit a Contractor's authority to withdraw conditional offers of employment for any lawful reason, including the determination that the candidate has a conviction that bears a direct relationship to the duties and responsibilities of the position sought, or their hiring would pose an unreasonable risk to property or to the safety of individuals or the general public.

3.   With respect to any employment governed by Article 23-A of the Correction Law or Section 296 of the New York State Executive Law, except where the Contractor obtains prior written approval from the Department, the Contractor shall not ask questions regarding an applicant's prior criminal convictions, juvenile delinquency adjudications, or youthful offender adjudications on any preliminary employment application documents or ask questions about an applicant's prior criminal convictions, juvenile delinquency adjudications, or youthful offender adjudications before or during the first interview with the applicant.

4.   Consistent with the requirements of Executive Law §296(15) and (16), following the first interview, the Contractor may ask applicants to disclose their prior criminal convictions and any arrests or criminal accusations that are pending and have not been terminated in favor of the applicant. Agencies shall limit their review and consideration of an applicant's criminal convictions to (i) an individual's felony convictions in the state of New York or in any other jurisdiction; (ii) an individual's unsealed misdemeanor convictions in the state of New York or in any other jurisdiction; and (iii) any pending charges against the applicant. Consistent with State law, past arrests not leading to a criminal conviction shall not be considered. (Please note that, pursuant to Section 380.1 of the Family Court Act, juvenile delinquency adjudications are not criminal convictions. Also, pursuant to Section 720.35(1) of the Criminal Procedure Law, a youthful offender adjudication is not a criminal conviction.) In addition, the Contractor may request a waiver from the Department of any provision of this Section and be permitted to ask relevant questions pertaining to the qualifications to hold a specific position, upon demonstrating the need for such waiver.

5.       Notwithstanding any other provision of this Section, if the Contractor is hiring for positions requiring licensure, including positions such as interns and apprentices for such licensed positions (e.g. prospective attorneys), the Contractor may ask applicants the same questions asked by the licensing body, in accordance with New York State law.  In addition, if the Contractor is hiring for positions where certain convictions or violations are a bar to employment in that position under Law, the Contractor may ask questions about those convictions or violations.

6.       Where practicable, the Contractor shall provide for the review by a supervisor of a decision not to hire based on prior criminal convictions.

## C.   Drug-free workplace.

1.       Contractor shall conspicuously post at any facility at which activities funded in whole or in part through this Agreement occur, a statement notifying all staff that the manufacture, distribution, dispensing, unauthorized possession, and unauthorized use of controlled substances are prohibited and specifying the actions that will be taken against employees for violation of such prohibition (the "Drug-Free Workplace Policy").  Contractor shall provide a copy of the Drug-Free Workplace Policy to each staff member as part of his or her initial employment orientation with Contractor, and shall inform such staff member that compliance with the terms of the Drug-Free Workplace Policy is a mandatory condition of employment or retention of employment.  Contractor shall provide the Department with a written certification that its Facility complies with the Drug-Free Workplace Policy prior to commencement of services funded through this Agreement.

2.       Contractor shall provide an on-going drug-free awareness program to inform all staff about the dangers of drug abuse in the workplace; the Contractor's enforcement of its Drug-Free Workplace Policy; the availability of drug counseling, rehabilitation and employee assistance programs; and the penalties that may be imposed upon staff and clients or participants for violating the Drug-Free Workplace Policy.

3.       Contractor shall require staff members to notify Contractor in writing of his/her arrest or conviction for violation of a criminal drug statute occurring in the workplace no later than five (5) calendar days after such arrest or conviction.  Contractor shall thereafter notify the Department within ten (10) calendar days of Contractor's receipt of the above-described notice of conviction from a staff member or of the date Contractor otherwise received actual notice of such conviction.

4.       Contractor shall take one of the following actions within thirty (30) calendar days of receiving notice of such a conviction with respect to any staff member so convicted: (a) appropriate personnel action, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or (b) requiring such convicted staff member both to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a federal, State, or local health, law enforcement, or other appropriate agency, and to make a good faith effort to continue to abide by the Drug-Free Workplace Policy.

**Section 6.05    Board of Directors.**

A.    Except as provided in Paragraph B of this Section 6.05, the Contractor's employees and members of their immediate families, as defined in Paragraph C of this Section 6.05, may not serve on the Board of Directors of the Contractor ("Board"), or any committee with authority to order personnel actions affecting his or her job, or which, either by rule or by practice, regularly nominates, recommends or screens candidates for employment in the program to be operated pursuant to this Agreement.

B.    If the Board has more than five (5) members, then Contractor's employees and members of their immediate families may serve on the Board, or any committee with authority to order personnel actions affecting his or her job, or which, either by rule or by practice, regularly nominates, recommends or screens candidates for employment in the program to be operated pursuant to this Agreement, provided that (i) Contractor's employees and members of their immediate families are prohibited from deliberating and/or voting and being present during deliberation and/or voting on any such personnel matters, including but not limited to any matters directly affecting their own salary or other compensation, and shall fully disclose all conflicts and potential conflicts to the Board, and (ii) Contractor's employees and members of their immediate families may not serve in the capacity either of Chairperson or Treasurer of the Board (or equivalent titles), nor constitute more than one-third of either the Board or any such committee.

C.    Without the prior written consent of the Commissioner, no person may hold a job or position with the Contractor over which a member of his or her immediate family exercises any supervisory, managerial or other authority whatsoever whether such authority is reflected in a job title or otherwise, unless such job or position is wholly voluntary and unpaid. For the purposes of this Section 6.05, a member of an immediate family includes: husband, wife, domestic partner, father, father-in-law, mother, mother-in-law, brother, brother-in-law, sister, sister-in-law, son, son-in-law, daughter, daughter-in-law, niece, nephew, aunt, uncle, first cousin, and separated spouse. Where a member of an immediate family has that status because of that person's relationship to a spouse (e.g., father-in-law), that status shall also apply to a relative of a domestic partner. For purposes of this paragraph, a member of the Board is deemed to exercise authority over all employees of the Contractor.

D.    If the Contractor has contracts with the City that in the aggregate during any twelve-month period have a value of more than One Million Dollars ($1,000,000) and such amount constitutes more than fifty percent (50%) of the Contractor's total revenues, then the Contractor must have a minimum of five (5) persons on its Board.

This Section 6.05 shall apply only if Contractor is a not-for-profit corporation.

**Section 6.06    Conflict of interest policy.**

A.    If required by section 715-a(a) of the Not-for-Profit Corporation Law, Contractor shall maintain a Conflict of Interest Policy that includes, at a minimum, the following provisions:

1. A definition of the circumstances that constitute a conflict of interest;
2. Procedures for disclosing a conflict of interest;
3. A requirement that the person with the conflict of interest not be present at or participate in Board or committee deliberation or vote on the matter giving rise to such conflict;

4. A prohibition against any attempt by the person with the conflict to influence improperly the deliberation or voting on the matter giving rise to such conflict;

5. A requirement that the existence and resolution of the conflict be documented in the Contractor's records, including in the minutes of any meeting at which the conflict was discussed or voted upon;

6. Procedures for disclosing, addressing, and documenting Related Party Transactions in accordance with section 715 of the Not-for-Profit Corporation Law; and

7. A requirement that each director annually submit the statement required pursuant to Section 6.06(B), below.

B.      The Conflict of Interest Policy shall require that prior to the initial election of any director, and annually thereafter, such director shall complete, sign and submit to the Board Secretary a written statement identifying, to the best of the director's knowledge, any entity of which such director is an officer, director, trustee, member, owner (either as a sole proprietor or a partner), or employee and with which the Contractor has a relationship, and any transaction in which the Contractor is a participant and in which the director might have a conflicting interest. The Board Secretary shall provide a copy of all completed statements to the chair of the audit committee or, if there is no audit committee, to the Board Chairperson.


## ARTICLE VII — PROGRAM FACILITY

**Section 7.01   Suitability.**  Contractor shall maintain all facilities used for the provision of services funded in whole or in part through this Agreement, whether owned, leased, or used pursuant to an in-kind agreement or arrangement, whether permanent or temporary, in a condition suitable to provide services pursuant to this Agreement.

**Section 7.02   Signage.**  Upon request by the Department, and consistent with applicable Laws and applicable lease and license requirements, Contractor will prominently display signs inside and outside the facility(ies) used for the program indicating such information as the program name, its sponsorship by the Department, the program activity and the days and hours of operation. In addition, Contractor shall prominently display inside the facility(ies) all signs, provided by the Department, if any, advising of any of the Contractor's obligations with regard to Equal Employment Opportunity laws.

**Section 7.03   Security and emergency plan.**

A.      Prior to the commencement of services under this Agreement, Contractor shall adopt, implement, and instruct staff regarding a written plan to provide for the safety and security of clients, participants, staff, and the Contractor's facility, including procedures to follow during emergencies. Contractor shall maintain a current file of emergency contacts for each client and participant, which shall include the names, addresses, telephone numbers, and locations where such contacts can be reached.   A security plan applying to all of Contractor's operations rather than specifically to the City-funded operations shall be sufficient to comply with the terms of this requirement.  The Contractor shall cooperate with the City during any emergency affecting the Contractor's services and/or facilities.

B.      In the event that a State of Emergency (SOE) is declared by the Mayor of the City, the City may suspend Contractor's normal operations until further notice.  No damages shall be assessed for

suspension of normal services during this time.  All other terms and conditions of this Agreement shall remain in effect, except as modified by a contract amendment registered pursuant to Charter §328 or other appropriate contract action. The Contractor may, at the request of and in a manner determined by the Department, assist the Department in carrying out emergency procedures during a State of Emergency. Emergency procedures shall remain in effect until the Mayor has determined that the SOE has expired.  In consideration thereof, the City agrees to indemnify the Contractor against all claims by third parties arising out of the actions of its employees during the SOE that are directed by the City and not otherwise required to be performed under this Agreement, except for those arising out of the employees' gross negligence or intentional misconduct.

## ARTICLE VIII — CENTRAL INSURANCE PROGRAM

**Section 8.01    Availability.**  If offered to Contractor by the Department, participation in the City-sponsored Central Insurance Program (CIP) plan shall satisfy Contractor's responsibility to obtain any of the types of insurance provided under such CIP plan.  The Department may facilitate the provision of this insurance plan as a convenience for Contractor and for the protection of the City. Provision of these plans through the Department is in no way an admission by the Department or the City of liability for acts, omissions or negligence of Contractor or its employees.

**Section 8.02    Cancellation.** The Department reserves the right to cancel or modify any CIP plan offered to Contractor as it deems advisable, and at such time as it deems advisable, in its sole discretion. In such event, or in the event of cancellation by the insurers, the Department will promptly notify Contractor.    Contractor must maintain all required insurance at all times during the term of this Agreement either through participation in the CIP plan or through insurance obtained separately by the Contractor.

**Section 8.03    Notification concerning occurrence of incidents.** If Contractor is enrolled in the CIP plan, upon the occurrence of any injury to any client/participant, employee, volunteer, officer, visitor, or any other person, in conjunction with the services funded in whole or in part through this Agreement, and/or of any damage to the facility or any damage to or theft of equipment purchased with funds paid under this Agreement, Contractor shall provide telephone notice to the Department within twenty-four (24) hours of the incident, followed by a written report on the approved Incident Report Form to be delivered to the Department within three (3) business days.

## ARTICLE IX — REPRESENTATIONS AND COVENANTS OF CONTRACTOR

**Section 9.01    Eligibility.** Contractor represents and warrants that it has complied and continues to comply with the eligibility requirements set out in the solicitation document (e.g., the request for proposals) under which it proposed for and was awarded this Agreement. Any material change in the eligibility compliance information supplied in Contractor's contract proposal must be reported to the Department within a reasonable time thereof. Failure to do so will be deemed a material breach of this Agreement and could result in termination of this Agreement.

**Section 9.02   Program services.**

A.      Except where expressly set forth in the Scope of Work and approved by the Department, Contractor represents and warrants that eligibility for admission to the services funded through this Agreement shall not be restricted on the basis of actual or perceived race, color, creed, national origin, alienage or citizenship status, sex, gender, sexual orientation, disability (including presence of a service dog), marital status, partnership status, military status, or any other class protected from discrimination by federal, state, or local law.

B.      Contractor further represents and warrants that no clients or participants shall be charged a fee or required to make any other payment or purchase or participate in any activity designed to raise funds as a condition of eligibility for or participation in the services funded through this Agreement, except as required by law or unless a waiver of this provision is approved in writing by the Department. Waivers may be considered under the following conditions: (i) Contractor's total costs for the Services set forth in the Scope of Work exceed the total value of the Agreement; (ii) Contractor's fees for Services and/or the arrangements made to include those participants unable to pay such fees are deemed reasonable and appropriate by the Department; and (iii) the fees are set at a level that does not discourage or impede participation by members of the community to be served by the services.

**Section 9.03   Allegations of abuse or maltreatment.**   Contractor will notify the Department within twenty-four (24) hours of promptly determining that reasonable cause exists to suspect that any of Contractor's administrators or staff, including both paid and volunteer, has abused, maltreated, neglected, assaulted or endangered the welfare of any program participant. In addition, if such reasonable cause is found, the Contractor shall take appropriate action to remove the person from the proximity of program participants while the matter is being investigated by the Contractor. The term abuse shall mean the infliction of physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ. The term maltreatment shall mean (i) treatment that results in serious physical injury other than by accidental means, or (ii) neglect or failure to exercise a minimum degree of care that impairs, or places in imminent danger of being impaired, the physical, mental or emotional condition of a program participant. Contractor shall provide telephone notice to the Department within 24 hours of determining that reasonable cause exists,, followed by a written report, to be delivered to the Department within three (3) business days. Compliance with this reporting requirement does not satisfy any other legally mandated reporting of abuse, such as to the New York State Central Registry (SCR).

## ARTICLE X — MISCELLANEOUS

**Section 10.01 Headings.**   The article and paragraph headings throughout this Agreement are for convenience and reference only and the words contained therein shall in no way be deemed to define, limit, describe, explain, modify or add to the interpretation or meaning of any provision of this Agreement or the scope or intent thereof, nor in any way affect this Agreement.

**Section 10.02 Order of priority.**   During the term of the Agreement, conflicts between the various documents shall be resolved in the following order of precedence, such documents constituting the entire Agreement between the parties:

Human Services Performance Based                    17 of 23
Standard Contract
June 2014

- Standard Human Services Agreement (this document);
- Appendix A (General Provisions Governing Contracts for Consultants, Professional, Technical and Human Client Services);
- Appendix B (Scope of Work);
- Appendix C (Budget); and
- Fiscal Manual.

## ARTICLE XI— SUPPORTIVE SERVICES AND TECHNICAL ASSISTANCE

**Section 11.01 Availability of supportive services and technical assistance.** At its sole discretion, the City may provide, either directly or through its designee, technical assistance to Contractor in such areas as: (1) program planning, development, coordination and dissemination of information; (2) preparation of reports and materials required by the City and/or other governmental entities with jurisdiction over Contractor's activities relating to the operation of services funded through this Agreement; (3) compliance with applicable Laws, guidelines and administrative memoranda; and/or (4) issues or matters affecting Contractor's performance under this Agreement.

**Section 11.02 Training.** At its sole discretion, the City may provide, either directly or through its designee, training/technical assistance to Contractor's employees and Board members, relating to the management and operation of the program funded through this Agreement. If training and/or technical assistance is made available, Contractor must commit appropriate employees and board members to attend/participate at training sessions, as instructed by the City or its designee. Failure to do so may negatively affect Contractor's performance rating, which could in turn lead to termination of this Agreement.

**Section 11.03 Capacity Building and Oversight (CBO) Review for not-for-profit Contractors.** If requested by the Department, the Contractor must complete the Mayor's Office of Contract Services (MOCS) Capacity Building and Oversight (CBO) Review process. As part of that process, the Contractor must submit specified documents to the CBO unit of MOCS, which then conducts an evaluation of the Contractor and its operations for compliance with the terms of its contracts, its own by-laws, internal fiscal controls, applicable laws and regulations, and best practices in not-for-profit organization administration. The specified documents may include, but are not limited to, the Contractor's Internal Revenue Service ("IRS") determination of tax exemption, the most recent IRS Form 990 filing; the most recent audited financial statement (including the auditor's letter to the management), the functional budget for the current fiscal year in the format approved by the Board of Directors, an organizational chart identifying key staff by title, a copy of the most recently-approved Board Minutes, the by-laws of the corporation, a roster of the membership of the Board of Directors and a list of Board committees, the Contractor's current policies and procedures as adopted, and any other organizational documents, whether or not they are specifically required to be maintained pursuant to this contract or applicable laws and regulations. In the course of the CBO review process, MOCS may make recommendations to the Contractor, request the Contractor to take certain remedial actions and/or to implement certain policy changes. Any such recommendations, and the Contractor's responses thereto, will be provided to the Department for its consideration and any appropriate actions under this contract.

**Section 11.04 Disclaimer.** The technical assistance and training that the Department, in its sole discretion, may provide to Contractor shall not be construed to be a condition precedent to Contractor's obligation to provide the services funded through this Agreement in accordance with the Scope of Work.

## ARTICLE XII – APPENDIX A

**Section 12.01 Appendix A.** The attached Appendix A, "General Provisions Governing Contracts for Consultants, Professional, Technical, Human and Client Services" is incorporated and made a part of this Agreement.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the date first above written.

CITY OF NEW YORK                    CONTRACTOR

By:                                 By:

Diana Gutierrez                     LYNN W.L. FAHEY
Agency Chief Contracting Officer
                                    Title:
                                    PRESIDENT

                                    Fed. Employer I.D. No. or Soc. Sec. No.

                                    ▇▇▇▇▇▇▇▇▇▇▇

Human Services Performance Based        19 of 23
Standard Contract
June 2014

## ACKNOWLEDGEMENT BY CITY

STATE OF NEW YORK )
:ss:
COUNTY OF NEW YORK )

On this _19ᵗ_ day of _May_ 20 _15_, before me personally came _Alan Gutierrez_, to me known and known to me to be ___Agency Chief Contracting Officer___ of the NEW YORK CITY MAYOR'S OFFICE OF CRIMINAL JUSTICE, the person described in and who is duly authorized to execute the foregoing instrument on behalf of the Commissioner, and she acknowledged to me that she executed the same for the purpose therein mentioned.

Notary Public or Commissioner of Deeds.

JAMISON D. BLAIR
NOTARY PUBLIC-STATE OF NEW YORK
No. 02BL6267433
Qualified In New York County
My Commission Expires August 20, 2016

## ACKNOWLEDGMENT OF CONTRACTOR IF A CORPORATION

State of _New York_ County of _New York_ ss:

On this _8th_ day of _May_ 20 _15_ before me personally came _Lynn W.L. Faley_ to me known, who, being by me duly sworn did depose and say that he/she resides at _567 4th St., Brooklyn, N.Y. 11215_; that he/she is the _President_ of the corporation described in and which executed the foregoing instrument; and that he signed her name to the foregoing instrument by order of the directors of said corporation as the duly authorized and binding act thereof.

Notary Public or Commissioner of Deeds.

ERICA HORWITZ
Notary Public, State of New York
No. 02HO4766950
Qualified in Westchester County
Commission Expires May 31, 20 18

Human Services Performance Based
Standard Contract
June 2014

20 of 23

**Public Assistance Hiring Commitment Rider for HRA, DHS, and ACS**

A.      Except as otherwise provided by subsection G below, Contractor agrees as a condition of this Agreement, to hire at least one Public Assistance Recipient ("PA Recipient") for each $250,000 in value of this Agreement, or to the extent that the Contractor enters into other contracts with the Department of the City, for each $250,000 of the cumulative value of contracts of the Contractor during the term of this Agreement.

B.      Such hiring shall be for full-time employment of at least a minimum of thirty-five (35) hours per week. The rate of pay shall be at least 20% above the federal minimum wage, and the duration of the employment shall be for at least one (1) year. In the event that a replacement of a PA Recipient is made by the Contractor during the one (1) year, such replacement shall not count as an additional employee toward Contractor's hiring requirement set forth herein.

C.      Within thirty (30) days of the commencement date of this Agreement ("commencement date") or fifteen (15) days following notice from the Department that a request for an exemption from the provisions of this Rider has been denied, Contractor shall submit, on forms specified by the Department, information and specifications for the position(s) available.

D.      The Contractor may at its option request the assistance of the Department in identifying potential employees. In such case, the Department will refer PA Recipients to the Contractor for employment interviews.

E.      Contractor shall hire the number of employees agreed upon pursuant to this Section within ninety (90) days of the commencement date or such longer period as may be specified, in writing, by the Department.

F.      In the event Contractor fails to hire the required number of PA Recipients within the required time period, or fails to pay and retain such employees pursuant to the above requirements, Contractor shall pay to the Department or the Department may at its option, deduct from monies due or become due to Contractor, the amount of nineteen dollars and eighteen cents ($19.18) per employee for each calendar day for which such PA Recipient(s) is/are not employed by Contractor as required by this Article. Such amount is hereby fixed and agreed as liquidated damages.

G.      Contractor may apply to the Department for exemption from all or part of the requirements of this Article. Any application for an exemption must be made before the expiration of thirty (30) days after the commencement date of this contract, or any subsequent contract as discussed in subsection 1 herein, and shall be in the form specified by the Department. Exemption may be granted upon a showing that the operation of this Section will constitute an extreme hardship, within the sole discretion of the Department; or to any Contractor not employing twenty (20) or more employees at a place of business within the City of New York.

## LANGUAGE ASSISTANCE RIDER FOR HRA

Language Assistance Services. The Contractor shall provide free language assistance services to limited English proficient individuals.

A.    Service Delivery. When a limited English proficient individual seeks or receives benefits or services from a Department Contractor, the Contractor shall provide promptly language assistance services in all interactions with that individual, whether the interaction is by telephone or in person. The Contractor shall meet its obligation to provide prompt language assistance services by ensuring that limited English proficient individuals do not have to wait unreasonably longer to receive assistance than individuals who do not require language assistance services.

B.    Translation.    Where an application or form requires completion in English by a limited English proficient individual for submission to a state or federal authority, the Contractor shall provide oral translation of such application or form as well as certification by the limited English proficient individual that the form was translated and completed by an interpreter. The Contractor shall make all reasonable efforts to provide language assistance services in person by bilingual personnel.    The Contractor shall screen bilingual personnel and interpreter personnel for their ability to provide language assistance services.    The Contractor shall translate all documents into every covered language, as indicated in subsection 2, below.  The Contractor shall provide annual training for bilingual personnel and interpreter personnel and ensure that they are providing appropriate language assistance services.

1. Notices.  Upon initial contact, whether by telephone or in person, with an individual seeking benefits and/or services offered by the Contractor, the Contractor shall determine the primary language of such individual.    If it is determined that such individual's primary language is not English, the Contractor shall inform the individual in his/her primary language of the right to free language assistance services.    The Contractor shall post conspicuous signs in every covered language at all of its offices informing limited English proficient individuals of the availability of free language assistance services.   The Contractor shall provide in all application and recertification packages a notice advising participants that free language assistance services are available at its offices and where to go if they would like an interpreter. This notice shall appear in all covered languages.

2. Covered Languages.  "Covered Languages"  shall mean Arabic, Chinese, Haitian Creole, Korean, Russian or Spanish.  Nothing in this section shall preclude a Contractor from providing language assistance services beyond those required in this section.

**CONTINUITY OF OPERATIONS PLAN RIDER: TO BE USED FOR THOSE PROGRAMS
WHERE CONTINUATION OF SERVICES IN THE IMMEDIATE AFTERMATH OF AN
EMERGENCY IS ESSENTIAL FOR PUBLIC HEALTH OR SAFETY**


Prior to the commencement of services under this Agreement, Contractor shall submit for the Department's review and approval a written Continuity of Operations Plan (COOP) for its business which indicates its ability to continue the provision of essential services to the Department in the event that a State of Emergency is declared by the Mayor.  The vendor should seek guidance from the Department on how to develop a COOP plan.  A COOP plan includes, but is not limited to: the identification of an alternate site of business; appointment of alternate personnel for identified essential staff; development of protocols for the safekeeping of vital business records; and, a transportation contingency plan for its employees.

# NOTICE TO BIDDERS, PROPOSERS, CONTRACTORS, AND RENEWAL CONTRACTORS

This contract includes a provision concerning the protection of employees for whistleblowing activity, pursuant to New York City Local Law Nos. 30-2012 and 33-2012, effective October 18, 2012 and September 18, 2012, respectively. The provisions apply to contracts with a value in excess of $100,000.

Local Law No. 33-2012, the Whistleblower Protection Expansion Act ("WPEA"), prohibits a contractor or its subcontractor from taking an adverse personnel action against an employee or officer for whistleblower activity in connection with a City contract; requires that certain City contracts include a provision to that effect; and provides that a contractor or subcontractor may be subject to penalties and injunctive relief if a court finds that it retaliated in violation of the WPEA. The WPEA is codified at Section 12-113 of the New York City Administrative Code.

Local Law No. 30-2012 requires a contractor to prominently post information explaining how its employees can report allegations of fraud, false claims, criminality, or corruption in connection with a City contract to City officials and the rights and remedies afforded to employees for whistleblowing activity. Local Law No. 30-2012 is codified at Section 6-132 of the New York City Administrative Code.

## Scope of Work

### Appellate Advocates

### July 1, 2015 to June 30, 2017

1. Assignments:
   a. During the term of this Agreement, the Contractor will take in approximately 500 Assignments annually of indigent criminal appeals in the Second Judicial Department. Assignments may include those on which the record on appeal must be prepared as well as some for which the record on appeal has already been prepared. Assignments may be reassigned to the Contractor from other appellate providers. Assignments will be made by the Clerks of the Courts of the Appellate Division, Second Department, and the Appellate Term, Second Department. Assignments taken in pursuant to this Agreement shall include not only such Appellate Division assignments, but also New York Court of Appeals assignments generated by cases assigned by the Appellate Division or Appellate Term pursuant to this Agreement.

   b. Assignments shall include all proceedings required to fully and competently represent Contractor's clients, including additional matters assigned to Contractor, such as 440 motions, habeas corpus petitions, and Article 78 motions.

   c. Additional matters will be included in the annual Assignment count in accordance with the Budget attached hereto as Appendix C.

2. Invoice Requirements:
   a. The Contractor will submit invoices to the Department on a monthly basis and will be due within ten (10) days following the end of the month for which the invoice is being submitted.

   b. Invoices shall include a cover page with, at minimum, the total payment requested during the invoice period and a signed certification specifying that all work performed under this Agreement has been performed in compliance with the terms and conditions of this Agreement.

   c. For each Assignment, invoices shall include the name of the client, the date assigned, filed or substituted/relieved, and corresponding documentation ("Proof of Assignment") for each assignment in the form of the following:
      i.   Order received from the court;
      ii.  First page of a filed motion with proof of receipt by the District Attorney and the Court;
      iii. Assignment Notification Memo; or
      iv.  Referral forms approved by the Department.

   d. Contractor shall notify the Department immediately if they are unable to produce any of the above documentation. In such instances, the Department will determine acceptable

Proof of Assignment for Contractor to submit in accordance with the invoice procedures set forth herein.

e.  Invoices shall break out Assignments according to the chart below.  For Assignments in the "Other" category, Contractor shall write in, where possible, the Type of Assignment invoiced.

| Division | Type of Assignment | Point Per Assignment | Monthly Assignments |
|---|---|---|---|
| App. Div. | Trials | 1.5 | |
| App. Div. | SORA Appeals | .90 | |
| App. Div. | Appeals from 440 Denials | .75 | |
| App. Div. | People's Appeals | .85 | |
| App. Div. | Hearings | .85 | |
| App. Div. | Substantive Pleas | .85 | |
| App. Div. | Resentencing Appeals | .85 | |
| App. Div. | DLRA Appeals | .85 | |
| App. Term | Trials | .65 | |
| App. Term | Other | .65 | |
| Misc. | Court of Appeals | .95 | |
| Misc. | SORA Hearings | 1.25 | |
| Misc. | Padilla Motions | .95 | |
| Misc. | 440 Motions | .85 | |
| Misc. | SORA Modifications | .85 | |
| Misc. | DLRA Remands | .85 | |
| | TOTAL ASSIGNMENTS | | |
| Other | List type of "Other" Assignment below | | Monthly Assignments |
| 1) | Cannot Determine At This Time | .85 | |
| 2) | | .85 | |
| 3) | | .85 | |
| 4) | | .85 | |
| 5) | | .85 | |
| 6) | | .85 | |
| 7) | | .85 | |
| 8) | | .85 | |
| 9) | | .85 | |
| 10) | | .85 | |
| | TOTAL "OTHER" ASSIGNMENTS | | |
| Relief | Late Relief / Substitution (6+ months) | (.70) | |
| | Monthly Assignment Totals | | |

3. <u>Quarterly Reporting Requirements:</u>
   a. Contractor will submit to the Department on a quarterly basis, programmatic reports which shall contain the following:
      i. Number of cases taken in. These cases should be divided into the number for which the record on appeal is already prepared and the number for which the record must be prepared. The report should indicate the number of cases that have been reassigned to Contractor from another appellate provider;
      ii. For each case, the date of assignment, date appeal is perfected and the date the brief is filed;
      iii. Number of briefs filed (to include substantive briefs, memoranda or motions accompanied by memoranda of law, habeas petitions);
      iv. Any other litigation; and
      v. Number of appeals argued.

   b. Reports should cover each calendar quarter, and will be due by the end of the month following the end of the quarter. (*E.g.*, for the quarter July 1 through September 30, the report would be due by October 31). Quarterly reports should present data for the quarter and should also present cumulative data for the year.

   c. Contractor agrees to provide additional information as deemed necessary by the Department.

4. <u>Backlog Reporting:</u>
   a. Contractor shall make reasonable efforts to reduce any current backlog[1] and limit future backlog to the satisfaction of the Department. Contractor shall include a QUARTERLY backlog report setting forth specific backlog numbers and covering:
      i. cases that are briefable but the attorney has older cases with priority;
      ii. briefs assigned/being written;
      iii. issue selection delays due to missing information, defendant cooperation, etc.;
      iv. missing exhibitions/minutes; and/or
      v. other relevant factors.

5. To the extent possible, Contractor will ensure that the preparation of the record on appeal is handled by non-attorney staff.

6. Contractor will ensure that translation services are available for those cases in which they are necessary.

7. Contractor will maintain an office that is convenient to the courthouse for the Appellate Division, Second Department.

8. Contractor will abide by the Code of Professional Responsibility, especially with respect to potential conflicts of interest in representing clients.

---

[1] For purposes of defining "backlog" under this Agreement, Appellate briefs are required to be filed in a timely fashion in accordance with court rules. To the extent that a proposer does not currently meet this standard, there is a backlog.

Appendix C

## Budget

### Appellate Advocates

### July 1, 2015 to June 30, 2017

Case Variation:

A. The below table is an estimated caseload based on historical and proposed annual Assignment intakes. Individual "Type of Assignment" intakes and total "Estimated # of Assignments" may vary up to the annual contract value of $5,447,500.

B. Shall the FY16 caseload exceed 500 new Assignments and/or the annual Contract Value of $5,447,500, the excess Assignments and/or Contract Value will be carried over to FY17 and considered part of the FY17 caseload paid for in that Fiscal Year up to the two-year contract amount of $10,895,000.

C. Shall the FY17 caseload exceed 500 new assignments and/or the annual Contract Value of $5,447,500, including those Assignments and/or Contract Value carried over from FY16, the excess Assignments and/or Contract Value will be considered during renewal negotiations or contract closeout.

| Division | Type of Assignment | Point Per Assignment | Cost Per Case (Base Rate of $10,000) | Estimated # of Assignments | Contract Value |
|---|---|---|---|---|---|
| Appellate Division | Trials | 1.50 | $15,000 | 180 | $2,700,000 |
| Appellate Division | People's Appeal | 0.85 | $8,500 | 5 | $42,500 |
| Appellate Division | Hearings | 0.85 | $8,500 | 10 | $85,000 |
| Appellate Division | Substantive Pleas | 0.85 | $8,500 | 10 | $85,000 |
| Appellate Division | Resentencing Appeals | 0.85 | $8,500 | 5 | $42,500 |
| Appellate Division | SORA Appeals | 0.90 | $9,000 | 15 | $135,000 |
| Appellate Division | Appeals from 440 Denials | 0.75 | $7,500 | 10 | $75,000 |
| Appellate Division | Excessive Sentence | 0.85 | $8,500 | 55 | $467,500 |
| Appellate Division | DLRA | 0.85 | $8,500 | 7 | $59,500 |
| Appellate Division | Anders | 0.85 | $8,500 | 30 | $255,000 |
| Appellate Division | Stipulations | 0.85 | $8,500 | 30 | $255,000 |
| Appellate Division | Discontinuance | 0.85 | $8,500 | 10 | $85,000 |
| Appellate Term | Trials | 0.65 | $6,500 | 15 | $97,500 |
| Appelalte Term | Other | 0.65 | $6,500 | 35 | $227,500 |
| Miscellaneous | Court of Appeals | 0.95 | $9,500 | 20 | $190,000 |
| Miscellaneous | SORA Hearings | 1.25 | $12,500 | 20 | $250,000 |
| Miscellaneous | Padilla Motions | 0.95 | $9,500 | 30 | $285,000 |
| Miscellaneous | Other | 0.85 | $8,500 | 13 | $110,500 |
| **Total** | | | | **500** | **$5,447,500** |

# NEW YORK STATE OFFICE
# OF INDIGENT LEGAL SERVICES
# APPELLATE STANDARDS AND BEST PRACTICES
### Effective January 5, 2015

## TABLE OF CONTENTS

Preamble ................................................................................ 1

### QUALIFICATIONS, TRAINING, AND OVERSIGHT

I.     Qualifications of Assigned Appellate Attorneys ............................... 1
II.    Selection Process ........................................................... 2
III.   Continued Evaluation of Attorneys .......................................... 2
IV.    Mandatory Brief Review ..................................................... 3

### DUTIES OF APPELLATE COUNSEL

V.       Accepting Cases ......................................................... 4
VI.      Conflicts of Interest ................................................... 4
VII.     Initial Client Contact and Case Assessment .............................. 5
VIII.    Obtaining the Complete Record ........................................... 6
IX.      Meeting with the Client ................................................. 7
X.       Counseling about Risks .................................................. 8
XI.      Filing the Appeal in a Timely Manner .................................... 8
XII.     The Appellate Brief ..................................................... 9
XIII.    Reply Briefs ............................................................ 10
XIV.     Oral Argument ........................................................... 10
XV.      Leave Applications ...................................................... 11
XVI.     Seeking Relief after State Remedies Have Been Exhausted ................. 11
VII.     Representing Non-U.S. Citizen Clients ................................... 12
XVIII.   Holistic Representation ................................................. 13
XIX.     Sentencing Issues ....................................................... 13
XX.      Collateral Litigation : CPL Article 440 Motions ......................... 14

### SPECIAL ETHICAL CONSIDERATIONS

XXI.     Client Communication .................................................... 14
XXII.    Issue Selection ......................................................... 15
XXIII.   *Anders* Briefs ......................................................... 16
XXIV.    Diminished Capacity ..................................................... 17
XXV.     Case File ............................................................... 17
XXVI.    Coram Nobis ............................................................. 18

# NEW YORK STATE OFFICE
# OF INDIGENT LEGAL SERVICES
# APPELLATE STANDARDS AND BEST PRACTICES

## PREAMBLE

The Office of Indigent Legal Services (ILS), in consultation with its Board, promulgates these standards under the authority conferred by Executive Law § 832. The Standards for Appellate and Post-Judgment Representation apply to all mandated post-judgment representation in criminal cases, post-disposition representation in family law cases, appeals of Sex Offender Registration Act (SORA) risk level determinations, and Mental Health Law Article 10 appeals. Because appellate practice is a specialized area of practice requiring distinct expertise, particularized standards apply. These standards are to be read in conjunction with the ILS Standards and Criteria for the Provision of Mandated Representation in Cases Involving a Conflict of Interest and the New York State Bar Association Revised Standards for Providing Mandated Representation.

The standards promulgated here apply to all existing and future systems for the delivery of mandated indigent appellate representation. ILS recognizes, however, that not all existing systems comply with these appellate standards, and will assist counties in developing plans that do meet the standards.

## QUALIFICATIONS, TRAINING, AND OVERSIGHT

### I. Qualifications of Assigned Appellate Attorneys

Before accepting responsibility for the appeal of a criminal or family court case, attorneys must demonstrate competence to handle the assignment.

### Commentary

A competent appellate attorney must know the law, rules, procedures and principles governing appellate practice, including preservation, harmless error, mode of proceedings error, and interest of justice jurisdiction, and be sufficiently experienced in the substantive and procedural law of New York to obtain a complete record within the appropriate time frame, to supplement the record as might be necessary, to identify appealable issues from a record, to write a persuasive, well researched and well supported professional brief, and, generally, to provide effective and zealous client-centered representation.

Before appointment to an appellate panel, all attorneys must demonstrate competence: e.g. sufficient knowledge and skill to handle criminal appellate assignments. *See* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.1(a) ("A lawyer should provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.").

1

Attorneys who are assigned to criminal appellate assignments must be familiar with motions to vacate convictions and sentences pursuant to CPL article 440, since a particular assignment may require the filing of such a motion. *See* Standard XX – Collateral Litigation: CPL Article 440 Motions. Further, assigned counsel should be familiar with civil proceedings related to criminal defense, such as state writs of habeas corpus (CPLR article 70) and petitions for a writ of mandamus or prohibition (CPLR article 78). Attorneys who accept family law assignments should be familiar with civil practice pursuant to the Family Court Act or, in the case of Supreme Court assignments, with the CPLR and the Domestic Relations Law. Finally, in every case, counsel should consider the possibility of continuing to seek relief on behalf of the client after exhausting all state remedies, as required by Standard XVI – Seeking Relief After State Remedies Have Been Exhausted.

Attorneys who have been trained and supervised by institutional providers may demonstrate their competence and qualifications through recommendations and formal evaluations created in the institutional program. Alternatively, attorneys can establish their competence and qualifications by submitting five substantive appellate briefs. If attorneys do not have five substantive briefs to submit with their application, attorneys may demonstrate competence and knowledge through other relevant prior work experience, including clerkships.

## II. Selection Process

A selection committee shall review applications and conduct interviews of all candidates for appointment to appellate criminal and family court panels.

### Commentary

A selection committee comprised of at least three persons shall interview all attorneys applying to join an appellate criminal or family court panels. Selection committees shall include experienced local appellate practitioners. Members of the selection committee need not reside or practice in the county in which the selection committee operates. Selection committees shall review the applicants' materials, including the appellate briefs submitted.

Briefs should be evaluated on the basis of legal analysis, writing skills, and persuasiveness. *See* Standard XII – The Appellate Brief.  In the interviews, selection committees shall gauge applicants' ability to communicate and answer questions in a professional and thoughtful manner, and  probe applicants' knowledge of relevant area of law, with attention to whether and how applicants keep abreast of legal developments.

## III. Continued Evaluation of Attorneys

Institutional defender programs and assigned counsel plans shall create systems to periodically re-evaluate staff and panel members, respectively, ensuring that all attorneys continue to provide competent, effective and zealous representation after their initial hiring or acceptance to an appellate panel.

2

## Commentary

Institutional defense offices must hire on the basis of merit and have in place an evaluation system to ensure that attorneys are providing competent, high quality, representation to their clients. Assigned Counsel Plans shall create a system of re-evaluation of panel members. Service on a panel is a privilege not a right, and there shall be no preference for retaining current panel members over new applicants.

Whether the continued evaluation system relies on the judgment of an administrator or that of a committee of panel members, re-evaluation will consider panel members' writing, ability to recognize legal issues, research, and client communications skills. The reviewer(s) will consider what Continuing Legal Education courses panel members have completed, and which research tools they use.

Newly admitted panel members shall be re-evaluated after either one year of service on the panel or the submission of three briefs, whichever comes first. All three substantive briefs should be read as well as all *Anders* briefs, which must be read in conjunction with the record. Panel members who have been on the panel for more than one year and who have been successfully re-evaluated on at least one occasion shall be periodically re-evaluated.

## IV. Mandatory Brief Review

No appellate criminal or family court brief should be filed without having been reviewed by another experienced lawyer.

## Commentary

Effective appellate representation requires consultation to ensure that meritorious issues are identified and arguments are well-honed. Attorneys who work at institutional defense offices must have their work reviewed by supervising attorneys; senior attorneys' work must be reviewed by other senior attorneys. Assigned counsel plan attorneys' work must be reviewed by an experienced attorney before it is filed with the court. To ensure that there are sufficient numbers of reviewers, all qualified panel members shall review colleagues' briefs. To be qualified to review briefs, panel members must have three years of experience in family law or criminal appeals. Panel attorneys who review briefs shall be compensated at the 18-B rate for such services.

Reviewers working with new panel members must review the record on appeal to ensure that meritorious issues are identified and properly presented, that appropriate relief has been sought, and that adverse facts are not overlooked or omitted. Review of the record shall continue until all those who have reviewed the new panel member's work deem the attorney competent to review the record independently, and the attorney has been re-certified to continue on the panel. However, all panel members, no matter what their level of experience, must submit their briefs for critique to an experienced attorney. Reviewers are not responsible for editing briefs but are free to make editing and substantive suggestions. Therefore, panel members should submit briefs for review early enough to allow time for revision and, if needed, resubmission. This

3

collaborative process, however, does not relieve panel members of their duty to present polished briefs for review.

## DUTIES OF APPELLATE COUNSEL

### V. Accepting Cases

Before agreeing to accept assignments, appellate counsel must ensure that they have sufficient experience, expertise, time, and resources to provide quality representation.

### Commentary

Attorneys handling assigned appeals, whether at an institutional defender or as individual assigned counsel, should refuse to accept cases that exceed their ability and resources. Attorneys with minimal experience should not handle complex cases. See Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.1 (b) (a lawyer shall not handle a matter when not competent to do so without associating with a lawyer competent to handle it). Courts should not require public defense plans or programs or individual assigned counsel to accept excessive workloads. Accepting complex cases beyond one's ability may result in the failure to address meritorious issues, while accepting too many cases may result in delays in prosecuting the appeal. "Justice delayed is justice denied" when an incarcerated defendant waits too long for a meritorious issue to be raised on appeal. Individual attorneys, as well as institutional defenders, must use their best professional judgment in determining whether accepting additional cases or continued representation in previously accepted cases will cause inadequate representation. If so, they must take appropriate steps, including declining additional cases, seeking leave to withdraw from existing cases, and seeking funds for additional attorneys or other staff or resources.

### VI. Conflicts Of Interest

Upon being assigned, appellate counsel must make sure that no conflict of interest exists and promptly move to be relieved as counsel if a conflict does exist. In family law cases, where multiple parties may be involved, a conflict check must be done as to every party.

### Commentary

Like all clients, those entitled to mandated representation deserve an attorney who has no conflicts of interest, and attorneys must have in place systems to check for conflicts. *See* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.10 (e) ("A law firm shall make a written record of its engagements, at or near the time of each new engagement, and shall implement and maintain a system by which proposed engagements are checked against current and previous engagements when: (1) the firm agrees to represent a new client; (2) the firm agrees to represent an existing client in a new matter; (3) the firm hires or associates with another lawyer; or (4) an additional party is named or appears in a pending matter."). Conflicts on appeal can take many forms; it is impossible to provide an exhaustive list of potential conflicts. The most obvious conflicts are presented by the representation of criminal co-defendants or multiple respondents in

family law cases. Consideration must also be given to other conflicts, such as where counsel represents a critical witness. While some conflicts may be waivable, any waiver must be explained fully to both clients involved, and if either client is unwilling to waive the conflict, counsel must move to be relieved.   *See* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.7 (conflict of interest: current clients) Rule 1.9 (duties to former clients) and Rule 1.0(j) (informed consent).

Additional concerns are presented for institutional defenders where the client has been represented by the trial division and representation continues through the appeal. In such circumstances, appellate counsel from a mixed provider should carefully consider claims of ineffectiveness and seek to be relieved when such a claim is arguable. Counsel should be mindful that screening for ineffective assistance should not be undertaken if there is a significant risk that the attorney's own interests would cloud professional judgment, and in that case the screening should be undertaken by an attorney who can make an objective determination of whether there is a colorable claim of ineffectiveness.  If that is not possible, the office must move to be relieved. *See* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.7. The appellate counsel who screens the case for an ineffectiveness claim must not have participated in representing the client at the trial level. Where the client has raised ineffective assistance, appellate counsel who determines that there is an arguable claim should seek to be relieved. Counsel who determines that there is no arguable claim should so inform the client. However, an institutional defender need not advise every client who was previously represented by its trial division that such office cannot raise an ineffectiveness claim, since that could signal to the client that there may be a viable claim, though none exists.

## VII. Initial Client Contact and Case Assessment

Immediately upon assignment, counsel should contact the client. As soon as practical, counsel should do an initial assessment of the case, including whether a stay and bail pending appeal should be sought.

## Commentary

The case assessment should include determining whether: immigration issues need to be addressed, bail pending appeal should be sought, additional convictions or matters should be addressed, and the client seeks the transcripts. If a post-conviction motion was denied, counsel must determine if a motion for permission to appeal was filed. When appropriate, counsel should seek to consolidate the appeal from denial of the motion with the direct appeal. In family law cases, this assessment should include ascertaining whether case developments have rendered the appeal academic or against the client's interests, warrant efforts to expedite the appeal, or otherwise affect the appellate strategy and whether counsel should seek to obtain the client's agreement to withdraw an appeal that will otherwise be dismissed as moot. *See* Standard XXI – Client Communication.

## VIII. Obtaining the Complete Record

Counsel must ascertain whether the appellate record is complete and, if not, obtain all missing documents as expeditiously as possible.

## Commentary

Obtaining a complete and accurate record of trial proceedings is a vital and sometimes daunting task. Lengthy delays may be experienced in obtaining transcripts, and thus they should be promptly ordered by counsel. *See* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.3 (diligence). Given the duty to promptly prosecute Family Court appeals, it is especially critical that, immediately upon assignment, counsel order record documents and, when encountering difficulty in timely obtaining them, seek assistance from the appellate court.

In criminal cases, counsel should determine that transcripts are complete and include pretrial hearings; plea proceedings or the trial including jury selection; and sentencing. If material portions of the minutes are lost, counsel should move for a reconstruction hearing. Counsel should seek to obtain transcripts of relevant proceeding not covered by the assignment. In addition, counsel should obtain a copy of the entire court file. If papers were filed with the court but are not part of the file, appellate counsel should seek to obtain them from trial counsel. In criminal cases, in addition to motion papers and decisions, counsel should obtain the file jacket, endorsements, accusatory instrument, prosecutor's disclosure statements, all written waivers, jury notes, the verdict sheet, predicate felony statement, sentence and commitment order, presentence report, and other sentencing documents.

In family law cases, relevant court file documents will include the notice of appeal, decision and order appealed, pleadings, motion papers, forensic evaluation reports, mental health studies, probation reports, written closing statements, and relevant prior orders in the same or related proceedings.

Counsel should obtain a copy of exhibits marked for identification or entered into evidence where relevant to issues to be raised, and in SORA cases should obtain a copy of the Board of Examiners of Sex Offender's Risk Assessment Instrument and Case Summary. In addition, counsel should move to unseal relevant records. Counsel should speak to trial counsel and request counsel's file where appropriate. Particular attention must be given to determining if there were issues raised or litigated that may not be apparent from the appellate record. If the client or the record reasonably suggests a possible ineffective assistance claim, counsel should request defense counsel's trial file.

While the types of documents needed for mandated representation appeals are uniform among all Appellate Division Departments, the manner of obtaining, compiling, and authenticating such documents vary. Thus, counsel must know the relevant Department's rules. In some Departments, counsel must subpoena original papers; in others, specific documents from the court file are requested and counsel compiles a record. In some Departments, the court obtains the transcripts for counsel; in others, counsel must order them. When counsel orders sealed transcripts, such as *Lincoln* hearings, they likely will be provided directly to the Appellate

Division. Practices differ among Departments, and sometimes among counties within a given Department, regarding how exhibits, forensic reports, and presentence reports are obtained and provided to the appellate court. Finally, some Departments permit certification of the record, while others, in the absence of a stipulation, require an order from the original court settling the record.

## IX. Meeting with the Client

To establish a relationship of trust and confidence, counsel must meet with the client. If the client is incarcerated, the meeting should occur in the jail or prison, unless such a meeting would not be in the client's best interest. If the client is not incarcerated, a meeting may occur at counsel's office. If that is not feasible or if a visit at another site might yield more relevant information, counsel should make appropriate arrangements. Once a relationship has been established, counsel may communicate by phone, but should be mindful that such conversations with incarcerated clients typically are not secure. Further, counsel should consider the security of phone calls to clients who live with co-defendants or co-respondents or anyone who might use information about the client in a harmful way.

### Commentary

Generally, after reviewing the record, counsel should meet in person with the client. If an in-person meeting is not reasonably feasible, counsel should communicate with the client on a secure phone line or, alternatively, through a secure video conferencing link. Meeting personally with the client provides an opportunity to establish a meaningful relationship, which is as important in appeals as in trials. The attorney is assigned to represent a client, not to write a brief. *See Commentary*, American Bar Association, ABA Standards, Criminal Justice, Prosecution Function and Defense Function, Standards 4-8.3 at 241 [3d ed. 1993], available at http://www.reasonabledoubt.us/aba_defensefunction.pdf : "Assigned counsel has a special responsibility to develop a relationship of trust and confidence with the client so that the client will appreciate that the lawyer knows the case and has the client's best interests clearly in mind."; *see also* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.4 (communication).

Clients are often incarcerated far from the county of conviction, and resources required for visiting clients are substantial. It is recognized that the resources to cover these substantial costs are not currently provided to appellate counsel. For this important standard to be satisfied and for prison visits to become routine, funders must cover the additional expenditures that will be required. When counsel is assigned, the need for personal visits should be considered by counsel (and the appointing authority). Counsel should be reimbursed for travel time and expenses, as well as phone charges.

Personal visits are important for many reasons. Clients may be unable to read and understand counsel's written communications, may be unable to form a trusting relationship with someone they have never met, may be unwilling to provide sensitive information by phone or letter, may be receiving bad advice, or may face circumstances that affect their decision-making and communication abilities. By visiting clients, counsel may learn far more from them and convey

7

far more to them than otherwise would be possible. Although appellate briefs may not contain facts outside the record, gaining information through in-person meetings can be crucial to litigating post-judgment claims. For example, if counsel learns that a client has a history of mental illness and was suffering from such condition during the proceedings below, a motion to vacate the conviction may be viable. *See* Standard XX – Collateral Litigation and Standard XXII – Issue Selection.

## X. Counseling about Risks

Counsel must fully advise the client as to potential risks involved in pursuing the appeal and attempt to minimize such risks as the appeal progresses. In family law cases, counsel must advise clients about the impact of subsequent and collateral proceedings on the judgment being appealed. Counsel should caution clients that an order entered on consent is not appealable and modifies any earlier order.

### Commentary

The client must be fully informed of risks presented by an appeal. Perhaps the area of greatest danger occurs when seeking vacatur of a guilty plea. Such appeals may present the risk that a defendant successful on appeal could ultimately suffer a more serious conviction or a greater sentence. Counsel who believes that potential risks outweigh potential benefits should advise the client to forgo the appeal. If the client nevertheless wishes to pursue the appeal, an in-person meeting may be required to discuss the matter. *See* Standard XXII – Issue Selection. Further, before going forward with such an appeal, counsel should obtain the client's signed, written statement that the risks have been explained and understood and that the client has decided to proceed with the appeal. In family law proceedings, disputes between the parties often evolve long after entry of the challenged order or judgment. Subsequent developments (such as removals, findings of derivative neglect, surrender of parental rights, or modification orders entered on consent) may supersede and moot the appeal. Thus, appellate counsel should advise the client to notify counsel of subsequent proceedings. In addition, appellate counsel should seek to discuss with trial counsel the potential impact of subsequent orders or judgments on the appeal.

## XI. Filing the Appeal in a Timely Manner

Counsel shall file the appeal expeditiously, taking care to safeguard the client's rights by taking all actions necessary to meet applicable time limits.

### Commentary

The appeal process is inherently lengthy, and counsel is obligated to seek to move the appeal forward as expeditiously as possible. *See* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.3 (diligence). Clients often wait months before an appellate attorney is assigned. Once assigned, counsel should contact the client and promptly seek to obtain all record documents. In some Appellate Division Departments, counsel should move to settle the record if the opposing parties do not cooperate in a timely manner. *See* Standard VIII – Obtaining the Complete

8

Record. Counsel should ensure that caseload demands do not prevent prompt completion of other steps in the appeal process. *See* Standard V – Accepting Cases. These steps include record review, legal research, and brief writing. The duty to file the appeal in a timely manner applies with special force in appeals from Family Court orders or judgments. Recognizing the urgency of litigation that may involve placement or custody of children, Family Court Act § 1112 (a) confers a preference in such cases. In addition, the rules of some Appellate Division Departments impose a duty upon attorneys handling assigned Family Court cases to prosecute the appeals promptly.

## XII. The Appellate Brief

The appellate brief should be clear, concise, and well organized, and it should provide the court with the facts and law necessary to make a well-reasoned decision. The brief should be professional in appearance, free of typographical errors, consistent with court rules and citation requirements, and accurate in record and legal cites.

## Commentary

To be effective, an appellate brief should distill the relevant facts, law, and arguments supporting the claims presented to their essence in order to assist the court in making a correct decision. Counsel should keep in mind that courts and their clerks are dealing with a large case load involving a great variety of issues, so that clarity, brevity, and persuasiveness are at a premium. Presenting the facts coherently is particularly important. Judges are often familiar with the applicable legal principles; on the other hand, they must rely on the brief to learn the facts relevant to the legal issues. After providing a succinct recital of events to place the case in context, the brief writer should focus primarily on the facts that are necessary for resolution of the arguments raised. A witness-by-witness chronology may be helpful in preparing to write the brief, but it is not an effective way to convey the facts the court needs. The writer should provide a cogent, compelling narrative emphasizing the facts most salient to the claims.

The argument section should present the claims in a logical order, beginning with the strongest point, unless there is good reason to begin with another claim (for example, one that would result in dismissal, rather than a new trial). An introductory paragraph should summarize key facts, arguments, and relief requested. The following paragraphs should develop the components of the argument, beginning with topic sentences to guide the reader. Controlling authority should be set forth, and precedents should be used to explain why the relief sought should be granted. Key favorable cases should be carefully analogized to the facts, and key unfavorable cases should be distinguished. Whenever possible, decisions of the New York Court of Appeals or the relevant Appellate Division Department should be cited. Lengthy string citations typically are not helpful.

Counsel should know the applicable court rules, which differ among appellate courts, regarding brief length, format, font size, and other such matters. Where applicable, counsel should familiarize themselves with the rules on confidentiality, such as redacting names, addresses, social security numbers, etc.

## XIII. Reply Briefs

Appellate counsel should file a reply brief that addresses arguments in the respondent's brief, unless a reply would not serve the client's best interests. In family law appeals, where there are multiple parties, the reply brief should address the arguments raised by all of the parties and the attorney for the child or children.

### Commentary

The appellate attorney should take advantage of every opportunity to advocate effectively for the client. In most cases, a reply brief will advance the client's cause. This is obviously the case where the opposition's brief contains misstatements or raises new issues or where a new relevant appellate decision has been rendered. Further, reply briefs may point out weaknesses in the opposing counsel's arguments, sharpen the issues for oral argument, and reveal the strength of the appeal.

## XIV. Oral Argument

Where oral argument is permitted, counsel should appear and advocate on behalf of the client, unless doing so would not serve the client's interest. Zealous, effective representation requires that counsel thoroughly prepare for oral argument by reviewing the briefs, the record, and all relevant case law, including post-briefing decisions. Counsel should strive to present oral argument in a clear, cogent, and persuasive manner. The client should be informed promptly of the date, time, and place scheduled for oral argument.

### Commentary

Oral argument is a critical opportunity to advocate for one's client and should not be waived unless it would not benefit the client. Thus, oral argument is the rule, and submission on the brief is the exception. Appellate justices have stated that, in close cases, oral argument can make a difference in the outcome. While the time permitted for oral argument is short, thorough preparation is labor intensive. This process should result in development of an outline setting forth key points, cites to key record pages and appellate decisions, and answers to anticipated questions. Where appropriate, counsel should be moot-courted and observe oral arguments in the subject court.

Counsel should be familiar with the relevant appellate court's rules regarding cases in which argument is permitted, how to make requests for argument, how notification of argument is provided, and whether rebuttal and post-argument submissions are permitted. In family law cases, counsel should know the relevant Department's practice regarding matters outside the record (*see Matter of Michael B.*, 80 NY2d 299 (1992) (allowing for disclosure upon appeal of subsequent developments in certain circumstances). Counsel should notify the client of the date, time, and place of oral argument so that the client or friends or relatives can attend.

## XV. Leave Applications

If the intermediate appellate court does not grant the full relief sought, counsel must make an application for leave to appeal to the Court of Appeals, unless the client instructs counsel not to do so. If opposing counsel files a leave application, the assigned attorney must oppose it. In family law cases, counsel should consult with the client to discuss the possibility of further appeal and proceed according to the client's wishes. Where counsel is unable to consult with the client within the time allowed for filing a leave application, counsel should file the application. Then counsel should explain the appellate process and determine whether the client wishes to proceed. If not, counsel should withdraw the application.

### Commentary

In criminal cases, all Appellate Division Departments require a leave application if counsel is not successful. Counsel should be familiar with the different statutory provisions governing leave applications in criminal cases (where the motion is made either to an Appellate Division justice or the Court of Appeals) and in civil cases (where counsel may move first in the Appellate Division and then, if leave is denied, in the Court of Appeals). In addition, counsel should be familiar with the applicable court rules, including Court of Appeals rules requiring letter-applications in criminal cases and the need for formal motions in other cases. Finally, the availability of motions for reargument should be understood, and such applications should be made where appropriate.

When seeking leave in a criminal case in the Court of Appeals, in a case that contains issues cognizable in the Court of Appeals, filing only a form letter with copies of the briefs does not constitute effective appellate advocacy. Upon the filing of the initial leave letter, when a judge is assigned to consider the application, counsel should then make a substantive submission to the assigned judge. Such submission should be a persuasively written letter explaining why the case warrants review. Such reasons might include a split of authority, a novel issue or one of statewide importance, or the recent grant of leave in a case involving a similar issue. In addition, counsel should explain how the issue is preserved for review and should include relevant portions of the record. Finally, counsel should include all issues cognizable in a federal habeas petition. Similar principles apply to presenting leave-worthy issues in family law, Sex Offender Registration Act, and Mental Hygiene Law article 10 appeals.

## XVI. Seeking Relief after State Remedies Have Been Exhausted

In every case, after having exhausted all state remedies, counsel must consider the possibility of pursuing further avenues for relief and, where appropriate, should seek such relief. If counsel determines that there is no realistic possibility that further review might yield positive results, counsel must explain to the client all options for such review.

### Commentary

In most instances, once the state conviction becomes final, counsel's obligation to seek relief ends. However, in some cases, there may be a realistic possibility that relief may be achieved by a petition for federal habeas corpus relief or for U.S. Supreme Court review or by further investigation of the case. This standard recognizes that, in such a case, if the requisite resources are available, counsel should pursue these avenues. If such resources are lacking, counsel should consider law school clinics, legal services organizations, and other entities that might represent the client. Where further efforts would be futile, there is no obligation to pursue them. Counsel must inform the client of the options available for pro se litigation, as well as the relevant filing deadlines. In the rare family law case where further efforts are appropriate, counsel should consider pursuing such litigation or seek to make a referral to a nonprofit organization or pro bono counsel.

## XVII. Representing Non-U.S. Citizen Clients

Counsel must promptly determine the client's immigration status, and when the client is not a U.S. citizen, ascertain the existence of immigration proceedings and the potential impact of the subject appeal on immigration status. If the appeal involves a criminal conviction or family law matter that is the basis for immigration proceedings, the attorney must ensure that immigration authorities are aware of the pending appeal. The attorney must investigate the advice provided by trial counsel concerning immigration consequences. Where such advice was defective or plea negotiations failed to address immigration consequences, the attorney must pursue an ineffective assistance claim. Counsel should assess the viability of all claims that might improve immigration consequences. A client's deportation does not relieve an attorney of the obligation to pursue appellate and post-conviction remedies. If pending immigration proceedings are based on a conviction that is not the subject of the assigned appeal, counsel should explore ways to vacate that conviction, since deportation may imperil the appeal.

## Commentary

Given the severity and inevitability of deportation for many non-citizen criminal defendants, deportation is an integral part of the potential penalty when such defendants plead guilty to specified crimes. *Padilla v Kentucky*, 559 US 356 (2010); *People v Peque*, 22 NY3d 268 (2013). As a result, providing competent appellate representation to such clients includes determining the immigration impact of the conviction and pursuing all available avenues for relief. This will require an attorney to possess knowledge in immigration law or consult other attorneys who possess such expertise. *See* Rules of Professional Conduct, Rule 1.1 (b) (a lawyer shall not handle a matter when not competent to do so without associating with a lawyer competent to handle it).

The U.S. Supreme Court has held that an attorney deprives a non-citizen defendant of effective assistance by failing to advise, or by misadvising, about the immigration effects of a conviction. *See Padilla v Kentucky, supra*. Thus, an appellate attorney representing such a defendant must investigate and pursue any viable claims arising from such lapses, either on direct appeal or via collateral attack. Moreover, the trial court has a duty to advise the non-citizen defendant of the possible deportation consequences of a guilty plea. *See People v Peque, supra*. The failure to do so may present an issue on direct appeal. The length of a defendant's sentence may trigger

immigration consequences. Therefore, an attorney handling a non-citizen's appeal should argue for sentence reduction when available. *See People v Cuaran*, 261 AD2d 169 (1st Dept 1999) (reducing negotiated sentence from one year to 364 days to relieve defendant of unanticipated immigrant impact). A defendant's involuntary deportation does not justify dismissal of an appeal, at least where the remedy requested does not require further proceedings. *See People v Ventura*, 17 NY3d 675 (2011). Accordingly, an attorney should pursue all available appellate and post-conviction remedies, even when a client has been deported. Obtaining relief may enable a client to return to the United States.

## XVIII. Holistic Representation

Appellate counsel has an obligation to provide comprehensive representation during the appellate assignment and also should determine whether the client needs assistance with matters beyond the assignment, such as parole advocacy, re-entry, or unacceptable prison conditions.

### Commentary

Incarcerated clients face many challenges they are ill-equipped to handle on their own. Moreover, they usually have difficulty accessing legal and social services. Their situation imposes a unique duty on appellate attorneys, who are often these clients' only legal advocates. When the resources needed to provide needed assistance are unavailable, the attorney should at least attempt to help the client contact appropriate services.

## XIX. Sentencing Issues

When reviewing the issues to be raised on direct appeal in criminal cases, counsel must determine the legality of the sentence imposed. Counsel should also determine whether a client's sentence has been properly calculated by jail or prison officials and take steps to correct errors that operate to the client's disadvantage.

### Commentary

The complexity of New York's sentencing laws imposes a special duty on appellate counsel to carefully review the legality of a client's sentence. For predicate felons, such review necessarily entails determining whether the subject prior felony sentence was legal and whether a prior out-of-state conviction qualified as a predicate felony in New York. For example, counsel's review may reveal that a client was wrongly sentenced as a second felony offender based on a crime not set forth in the Penal Law. *See e.g. People v Cammarata*, 216 AD2d 965 (4th Dept 1995). The client may have received a determinate sentence rather than a mandatory indeterminate sentence. *See e.g. People v McKay*, 10 AD3d 734 (2d Dept 2004). Counsel must raise such issues on direct appeal, or when that is not possible, must pursue relief via a CPL 440.20 motion. *See* Standard XX. Collateral Litigation: CPL Article 440 Motions. In addition, counsel has a duty to ensure that the sentence has been correctly calculated by correctional personnel and that jail time has been properly credited. In this regard, see *Matter of Guido v Goord*, 1 NY3d 345 (2004) (inmates do not secure jail time credit for out-of-state or federal detention unless certified record of detention is provided). Finally, a person confined pursuant to a civil commitment of the Family

13

Court for a fixed period of time may receive jail time credit.  See Correction Law §804-a (1); *Matter of Cunha v. Urias*, 112 A.D.3d 923 (2d Dept 2014) (discretionary reduction of the term of a civil commitment is available where the sentence is for a fixed period of time and the release is not conditional upon performance of an act.)

## XX. Collateral Litigation: CPL Article 440 Motions

After reviewing the record and case file, and after meeting with the client, appellate counsel must determine whether an investigation is warranted as to a possible CPL § 440.10 or § 440.20 motion. Claims not cognizable on direct appeal may involve ineffective assistance of counsel, undisclosed *Brady* material, competency of the client, newly discovered evidence, improper and prejudicial conduct outside the courtroom, and sentencing issues that cannot be raised on direct appeal. If such a motion is warranted, counsel must file it, seek permission to appeal from the denial of such a motion, and represent the client if leave is granted to defendant or to the prosecutor.

### Commentary

A client's rights may not be adequately protected when counsel limits the challenge to the conviction to filing a direct appeal; thus, appellate counsel must consider whether any issues should be raised through a post-conviction motion under CPL 440.10 or 440.20. See American Bar Association, ABA Standards, Criminal Justice, Prosecution Function and Defense Function, Standard 4-8.3(b) at 239 [3d ed. 1993], available at http://www.reasonabledoubt.us/aba_defensefunction.pdf : "Counsel, when inquiring into the case, should consider all issues that might affect the validity of the judgment of conviction and sentence, including any that might require initial presentation in a postconviction proceeding." The most common ground for a postconviction motion is a claim of ineffective assistance of counsel based on counsel's failure to investigate or prepare the defense, but appellate counsel should be aware of other possible claims that require the filing of an Article 440 motion. For example, counsel may learn that a witness's exculpatory statement to police was not provided to trial counsel; that the client suffers from a mental illness or cognitive impairment that rendered the proceedings, or particular rulings, invalid; that a juror committed misconduct; or that newly discovered evidence suggests that the conviction should be vacated. Counsel should also investigate where it appears that the sentence may have been improper, such as when a predicate felony conviction was illegal or, if from another state, did not include essential elements of a New York felony. When it appears that a CPL § 440.10 or § 440.20 motion is warranted, appellate counsel must make such application, seek permission to appeal from a denial, and represent the client on an appeal, if any. Counties must provide adequate funding for counsel to pursue these motions.



## SPECIAL ETHICAL CONSIDERATIONS

## XXI. Client Communication

14

At the outset of representation, counsel must provide general information about the appeal process and time frames and thereafter should keep clients informed about the status of their appeal or post-judgment motion, including explaining delays and providing a copy of each substantive document filed. Counsel must promptly and fully respond to client correspondence throughout the course of the representation. Counsel should inform the client of the right to file a brief pro se where such right exists, and counsel should provide the procedural advice required to conform the client's filing to the rules of the court. The client should be notified promptly of any court decision, the proposed action in response, and the scope of any further representation. Counsel must be mindful of circumstances that could interfere with the client's understanding of the appeal process.

**Commentary**

Counsel's duty to keep their clients reasonably informed about their case is set forth in Rule 1.4 (a) of the Rules of Professional Conduct [22 NYCRR 1200.0]. Since appellate clients are often incarcerated and have limited ability to contact their attorneys, counsel must be proactive in providing salient information. Impediments to meaningful communication—such as language differences, illiteracy, youth, or mental or physical impairment—impose a special duty to ensure meaningful communication. *See* Standard XXIV– Diminished Capacity. At the outset of representation, counsel must ascertain if there are potential communication barriers and take steps needed to ensure that information provided is understood. For example, an interpreter or translator may be required. *See People v Rosario*, 19 AD3d 333 (1st Dept 2005). If the client cannot read, then the attorney must convey information verbally in a manner that facilitates a full understanding and protects sensitive and confidential material. *See United States v Santiago*, 495 F3d 27 (2d Cir 2007). *See* Standard IX - Meeting with the Client.

 **XXII. Issue Selection**

Strategic decisions regarding the issues to be pursued on appeal should be made after thorough consultation between attorney and client. Counsel have an obligation to advise their clients of the potential risks presented, as well as to recommend a course of action. The attorney should raise all colorable issues the client desires, unless doing so could prejudice the client. The attorney should strive to include issues that can be further reviewed in a higher appellate court or through a federal habeas corpus petition if the intermediate appellate court appeal is unsuccessful.

**Commentary**

The client, not the attorney, decides whether to proceed with the appeal. *See Jones v Barnes*, 463 US 745, 751 (1983). Since potential appeal issues may present risks of a worse ultimate outcome following the appeal, counsel must advise the client as to recommended issues. *Boria v Keane*, 99 F3d 492 (2d Cir 1996) (attorney has constitutional obligation to provide client with professional advice as to course of action to pursue). *See* Standard XI – Counseling about Risks. In all cases, counsel should have a productive dialogue with the client about issues and strive to reach an agreement. *See* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.2(a) ("Subject to provisions herein, a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the"

3

means by which they are to be pursued."). In most cases, there should be no ultimate disagreement. Where the client seeks to present issues against advice, counsel generally should accede to the client's wishes. Counsel should only decline to raise a desired issue if doing so would negatively affect viable issues raised. Where a desired issue is not raised, counsel must inform the client of his or her right to file a pro se supplemental brief and assist the client in adhering to court rules.

## XXIII. *Anders* Briefs

Counsel should avoid filing motions and briefs asserting that no non-frivolous issues exist and seeking to withdraw as counsel. A narrow exception exists in criminal appeals where the client pled guilty, there were no substantive hearings (or rulings denying hearings), the minimum sentence was imposed, and there are no plea vacatur issues or the client is unwilling to risk vacatur of the plea. In those rare cases, there well may be no non-frivolous issues, and filing an *Anders* brief may be appropriate.

## Commentary

Early assertions by counsel that there is nothing to appeal may damage the attorney-client relationship, impeding an agreement on an appeal strategy. In most cases, in-depth analysis of the case, effective communication, and zealous representation will avert the need to file an *Anders* brief (*Anders v California*, 386 US 738 [1967]). Generally, such briefs are disfavored. The American Bar Association Standards, for example, declare: "Appellate counsel should not seek to withdraw from a case because of counsel's determination that the appeal lacks merit." American Bar Association, ABA Standards, Criminal Justice, Prosecution Function and Defense Function, Standards 4-8.3(a) at 239 [3d ed. 1993], available at http://www.reasonabledoubt.us/aba_defensefunction.pdf . That standard would allow withdrawal only where continuing representation would mislead the court. Commentary points out that, if a ground for relief "lacks any legal support or is contravened by existing law, counsel may nonetheless argue for extension, modification, or reversal of existing law." Id. at 241.

In New York, *Anders* briefs have long been a source of concern. In *People v Stokes*, 95 NY2d 633 (2001), the Court of Appeals reversed the Appellate Division and remitted for a de novo appeal with new counsel because an *Anders* submission—by counsel who had filed *Anders* briefs in 21 out of 26 cases—failed to safeguard the client's rights. Recently, the Second Department heightened its review of *Anders* briefs, and emphasized that with *Anders* briefs, a two-step analysis applies. *Matter of Giovanni S. (Jasmin A.)*, 89 AD3d 252 (2d Dept 2011). First, the reviewing court must be satisfied that counsel has conducted a thorough search of the record to discern any arguable claim that might exist. That means that the brief must do more than recite underlying facts and must provide more than an opinion that no non-frivolous issues exist. Second, where the requisite showing is made, the appellate court must do an independent review of the record to determine the correctness of counsel's assessment. While New York courts do not prohibit *Anders* briefs, counsel must do substantial research and analysis before contemplating such a brief, keeping in mind that the client cannot choose appellate counsel. In plea cases where no substantive hearings were held or were denied and clients received the minimum available sentence, *Anders* relief may be denied where a possible plea withdrawal

issue exists. However, if the client is unwilling to assume the associated risk, counsel may want to consider filing a motion to be relieved on such basis.

## XXIV. Diminished Capacity

Based on the record or personal contact with the client or information from third parties, if counsel reasonably believes that a client has diminished capacity to make decisions about the appeal, an appropriate course of action should be determined. Counsel should consider whether the appeal presents significant risks, whether a record should be made regarding the client's diminished capacity, and whether a person or entity could act for the client in making decisions as to the appeal.

### Commentary

"When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a conventional relationship with the client." Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.14 (a). Appellate representation presents a unique challenge as to such clients. Standard 7-5.4 of the Criminal Justice Mental Health Standards of the American Bar Association directs counsel to alert the court to doubts about competence to proceed, to prosecute the appeal despite such incompetence, and to raise issues deemed appropriate. However, such standard does not address appeal risks or the fact that disclosure of diminished capacity could adversely affect the client, such as by resulting in an unwanted change in conditions of confinement based on mental health status. No specific statutory mechanism exists to deal with appellate client incompetency. Given the complexities presented by clients with diminished capacity, this standard does not direct any specific action, but requires careful consideration of relevant factors before deciding how to proceed.

## XXV. Case File

The case file maintained by counsel belongs to the client. Institutional defenders and assigned counsel should retain the file under as secure conditions as reasonably feasible throughout the client's life, unless directed otherwise. Counsel should promptly furnish a client's file to successor counsel. However, counsel may not disclose confidential information to successor counsel unless the client gives permission.

### Commentary

The file belongs to the client; this includes attorney work product, with some minor exceptions. See *Sage Realty Corp. v Proskauer Rose Goetz & Mendelson,* 91 NY2d 30 (1997). While much discussion about client files arises in the context of trial representation, files created and maintained by appellate counsel are no different. In the absence of a client's specific directive otherwise, retention of files by county public defenders is governed by the State Education Department's records retention rules, which require such files to be maintained throughout the client's life. *See* 8 NYCRR 185.13 (Appendix J). Even if legal aid societies and assigned counsel

17

are deemed beyond the rules' reach, the same principles apply. One ethical opinion says that, after retention for a reasonable amount of time, if counsel has requested instructions and received none, they may destroy files that do not contain foreseeably needed material. NY St Bar Assn Comm on Prof Ethics Op 623 (1991). It *is* foreseeable that mandated representation clients will need their files in the future due to theft or loss of documents in prison or during hasty moves or periods of homelessness. Such information could be important, for example, in CPL article 440 motions, immigration proceedings, family court matters, and predicate offender status determinations. As to the form in which files are maintained, the relevant rule states that copies may be kept in any "medium that preserves an image of the document that cannot be altered without detection." Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.15 (d) (3). Originals should be maintained where they may be needed in future proceedings.

When counsel's representation has ended, and the client has obtained successor counsel for post-disposition proceedings in the same matter or another matter in which the client's file is relevant, the file should be provided to the client or successor counsel. Rules of Professional Conduct, rule 1.16 (e). This includes information in digital form. As stated in the Commentary to Standard XXVI – Coram Nobis, *infra,* counsel's obligation to cooperate with successor counsel does not cease just because the latter counsel may make an ineffective assistance claim; the duty to cooperate includes prompt provision of the file to such counsel. Client permission is required to disclose confidential information. Rules of Professional Conduct, Rule 1.9 (c) (2). Retained counsel may not withhold a file on the basis of inability to pay for copies; institutional defenders should not either. The expense of copying files upon request should be anticipated in the budget.

**XXVI. Coram Nobis**

Appellate attorneys are not permitted to disclose confidential information to prosecutors in post-conviction proceedings challenging the effectiveness of appellate representation. If a court seeks such information, attorneys should resist disclosure beyond what is needed to defend against an accusation of wrongdoing. In a coram nobis petition, if the client misrepresents relevant facts, counsel should provide the court with accurate information about the decision-making process. When counsel agrees that a mistake was made in the appellate representation, an affirmation admitting error should be provided.

**Commentary**

Attorneys have ethical duties to former clients, and a claim of ineffective assistance of counsel does not waive confidentiality. The Rules of Professional Conduct [22 NYCRR 1200.0] prohibit attorneys from disclosing confidential information, except upon informed consent (Rule 1.6 [a] [1]) or when reasonably necessary to defend the attorney against an accusation of wrongful conduct (Rule 1.6 [b] [5]). The rules prohibit use of confidential information to the disadvantage of a former client or disclosure of such information, except as permitted with regard to current clients (Rule 1.9 [c]). Under duties regarding loyalty and protection of confidences, counsel should avoid assisting prosecutors seeking to uphold former clients' convictions and sentences. These principles apply even when counsel's effectiveness is challenged. The American Bar Association Committee on Ethics and Professional Responsibility emphasizes the importance of maintaining confidential information when counsel is accused of ineffectiveness. *See* Formal Op

10-456 (2010). According to the opinion, attorneys may disclose only information reasonably necessary to prevent harm that would result from a finding of ineffectiveness. The opinion concludes that it is highly unlikely that disclosure of confidential information would be justifiable.

In response to a coram nobis petition, counsel should take no position and should supply only documents necessary to correct misrepresentations. When challenged as ineffective, counsel may wish to defend the performance rendered, but must recognize the transcendent duty to protect the client's interests. While at the trial level counsel may have information vital to an ineffectiveness claim, that is rarely the case at the appellate level. After all, the court has the transcript and the briefs, raising some issues and omitting others. The coram nobis petition presumably sets forth issues that purportedly should have been raised, the prosecution has every incentive to argue that appellate counsel was not ineffective for failing to raise them, and the court is in a position to make its own assessment of the comparative strength of the issues. Counsel's opinion would add only self-serving rationalizations.