FILED
IN CLERKS OFFICE
US DISTRICT COURT E.D.N.Y.

★ JAN 07 2019 ★

BROOKLYN OFFICE

United States District Court
Eastern District of New York
Anthony Rucano,

      Petitioner-Pro Se,

         - Against -

J. La Manna, Superintendent,
Green Haven Correctional Facility

         Respondent,

Index No. 18-CV-4586
        (KAM)

Amended And Supplemental
Memorandum of Law In Support of
Petition For Writ of Habeas Corpus
Pursuant to 28 U.S.C. 2254

Anthony Rucano, Pro-Se, 11A0528
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582-4000

December 31st, 2018

Anthony Rucano, Proceeding Pro-Se, hereby submits the following Amended And Supplemental Petition with Memorandum of Law in Support of Writ of Habeas Corpus Relief Pursuant to 28 U.S.C. §2254. This Amendment is not intended to eliminate Any Issues or Arguments raised in the original Filings of My 2254 Form And Application For Habeas Relief. In Little John v. Artuz, 271 F.3d 360, 362 (2nd Cir. 2001), the Second Circuit found that An Amended Habeas Petition Should Not be construed As A Second or Successive Petition. Furthermore, Rule 15 (A) of the Fed. R. Civ. P. Allows A Party to Amend his Pleading As of Right Any time before receiving An Answer or within 21 days of service of A responsive Pleading. Although the respondents Answer was dated December 10th, 2018, this Petitioner did not receive it until Monday, December 17th, 2018. Nevertheless, this Amended And Supplemental Petition with Memorandum of Law is timely.

I. Incorporation By Reference

The standards of review, facts And arguments set forth in My Application for Habeas Relief And Form 2254 initially filed on August 3rd, 2018 are fully incorporated by reference within As if set forth in length. As such, All claims raised within Are Asserted Under those standards And Arguments of fact And law.

Based on the Respondents claims that My Habeas Petition "does not conform to conventional styles of Argumentation" And "are frequently discussed in separate Places", with "defendants discrete claims of error [] not clearly delineated by his Petition", I have submitted this Amended And supplemental Memorandum of law with clarifying facts organized more conventionally so the respondent can reply to All of My claims for relief submitted to this Court, which Are fully exhausted below.

All of my claims of Prosecutorial Misconduct and Ineffective Assistance of Trial Counsel, including Brady Violations and other claims, are presented herein in the same format that I presented them to the New York State Courts first in my Article 440 prior to my direct appeal being heard, then in my Writ of Error Coram Nobis after my direct appeal being heard. As the trial court applied, partially and vaguely, a procedural bar stating claims should have been raised on direct appeal, and the App. Div., Second Dept. agreed with this position when they denied my leave application from Order denying my Article 440 without a hearing; these claims are fully exhausted. Somehow though, no New York State Court ruled on the substance and merit of my claims; this has been the focus of my litigation for past 5 years. The facts and law presented in Section 1 represent the claims asserted in my Article 440 and application for Writ of Error Coram Nobis Relief, and I refer to relevant portions of original filing when applicable.

Section 2 refers to my arguments asserted when seeking leave to appeal the trial courts failure to hold an evidentiary hearing under C.P.L. § 440.30(5) and the App. Div., Second Dept's erroneous affirmation of that decision, which I assert was an unreasonable determination of the facts. This is an expansion of Point 1, Part III of my application for Habeas Relief.

As for the facts and arguments of law presented in Section 1, any of those claims found to be properly raised on direct appeal must, according to N.Y. State Law, be considered validly asserted in my Writ of Error Coram Nobis in the context of Ineffective Assistance of Appellate Counsel. The arguments presented herein are an expansion of Grounds 1, 2 and 4, that I asserted in my original 2254 form, with Ground 4 together with Point 2 of my original "Application For Habeas Relief" addressing the contradictory holdings of the App. Div., Second Dept. in their various decision and orders on Motions to Withdraw Appellate Counsels Brief, Enlarging the Judgment Roll, Leave To Appeal Article 440 and Direct Appeal, all hopelessly irreconcilable.

-3-

# Section 1

## I. Introduction

The following facts represent those presented to the lower courts of New York State in my Article 440, and also in my Writ of Error Coram Nobis. I have attached an amended Appendix Page refering the Court to the Electronically Filed A.D. No's instead of the originally labeled Appendix Items for clarity and ease of use for the Court. The facts begin Paragraph Numbering at 9, and end at 219, as the Arguments of law immediately following refer to said Paragraph numbers. This is the most concise rendering of my claims presented and fully exhausted to the state courts below.

Although the claims raised herein may be less then artfully plead, presented and in a proper format, their substance and merit are in no way diminished. The Convoluted Statutory and Procedural Scheme in this state, applied in the context of my unique and narrowly construed facts and procedural path, has placed me in a procedural morass that almost no Pro-Se defendant can comprehend or challenge. I am not one of these Pro-Se defendants! God has placed me here with a purpose, to protect and defend the rights of indigent defendants, and I will diligently and persistently pursue Justice to insure this broken system is fixed until the time God removes me from the earth to join him in Heaven. God Bless The Court.

## II. Procedural History and Relevant Background Facts

9. On October 1st, 2009, I was arraigned for rape, sexual misconduct and assault. I entered a plea of not guilty, posted bail and was later arraigned on indictment. On Sept. 9th, 2010, I was tried by Jury in Richmond Co. Sup. Ct. (Rooney, J.). Prior to the case being submitted to the Jurors for deliberations, 11 of the 23 felony counts were dismissed. On Sept. 30th, 2010, the case was submitted to the Jurors on the remaining 12 felony counts from July 17th, 2009 until Sept. 21st, 2009. On September 21st, 2010, I was found Guilty of 4 of the remaining 11 Felony Counts, two each on

September 25th, 2009 and September 28th, 2009, only 4 and 1 day, respectively, before my arrest; and 2 misdemeanors. On January 21st, 2011, I was sentenced to a twelve (12) year determinate sentence, with five (5) years post-release supervision.

### III.    Direct Appeal

**10.**  In February 2011, I filed a timely notice of appeal. On August 18th, 2011, this Court assigned Lynn Fahey of Appellate Advocates to represent me on appeal; of counsel was Warren Landau. In June of 2013, Mr. Landau filed his appellate brief.

**11.**  After filing a motion requesting permission to file a supplemental pro-se brief on September 23rd, 2013, a motion to enlarge the judgment roll on September 10th, 2013, and a supplemental motion for same on October 15th, 2013, this Court, on January 6th, 2014, granted permission to file a supplemental pro-se brief by April 7th, 2014. My motion to enlarge the judgment roll was granted in part, and an order was issued for the grand jury proceeding transcripts to be produced to this Court under seal. Also ordered was the production of the stenographic transcripts for July 7th, July 16th and August 11th, 2010 as part of the judgment roll.

**12.**  I filed a motion to resettle or amend the January 6th, 2014 Decision and Order enlarging the judgment roll shortly afterwards, and on April 21st, 2014, this Court granted that motion to include the October 1st, 2009 (Arraignment) and October 5th, 2009 (180/80 day) Transcripts.

13. On March 20th, 2014, I filed a motion to withdraw appellate counsel's brief asking for the assignment of new counsel on appeal to aid in the preparation of an Article 440 motion and to hold the direct appeal in abeyance until such determination was made on the Article 440 motion. This application challenged the constitutionality of County Law § 722, CPLR §1101/1102 and the potential application of CPL § 440.10 (2) procedural bars, and served on the Attorney General Pursuant to Executive Law § 71 and CPLR § 1012(b) [Appendix Item B].

14. The motion specifically informed this Court that appellate counsel was aware of and failed to pursue substantive issues involving more than 50% of my ineffective assistance of counsel "mixed claims" in an Article 440 motion. I provided numerous and detailed correspondence to and from appellate counsel Warren Landau, including affidavits from expert witnesses not presented at trial, substantial records received with the help of the Connecticut Attorney General showing that the trial court received falsified documents under subpoena from Licensed Clinical Social Worker Anna Lorusso-Moramarco, and other records.

15. The Deputy Solicitor General for Criminal Matters declined to intervene, my appellate attorney took no position and the Richmond County District Attorneys Office was silent on the constitutional challenges, simply stating the brief should not be withdrawn. This Court simply stated that the motion was denied without any explanation, findings of fact or conclusions of law.

## IV.   Article 440 Application

16.  On July 15th, 2014, I filed a CPL § 440.10 motion with a separate assignment of counsel application and a motion for an evidentiary hearing.

17.  On September 26th, 2014, the People stated, "The bulk of defendant's particular claims of ineffective trial counsel and prosecutorial misconduct are entirely record based." "He also raises <u>eight</u> particular claims of ineffective representation by his trial counsel, Eugene Lamb Esq., which are dehors the record…" but that I failed to provide an affidavit from my trial counsel, or explain why I did not provide one. The People argued that the court should exercise its discretion under C.P.L. § 440.30 (4)(d) to deny my motion without a hearing.

18.  On December 15th, 2014, the Supreme Court, Richmond County (Rooney, J.) denied the motion in its entirety stating that:

> "The defendant's claims fall into two categories. They are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record. The defendant does not state his basis of knowledge for his conclusory allegations (*e.g.* the defense attorney failed to investigate and the defense attorney failed to adequately prepare). Hence, the defendant is not entitles to the relief he seeks based upon conclusory allegations" *see*, C.P.L. § 440.30(1) and (4)(b)
> Additionally, "pursuant to C.P.L. § 440.10(2)(b) the Court must deny a motion when the judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such appeal. The defendant's direct appeal is currently pending before the Appellate Division, Second Department. Therefore, petitioner's motion to vacate his judgment pursuant to C.P.L.§ 440.10 is denied."

## V.   Pro Se Supplemental Brief

**19.**   On October 7th, 2014, I filed my pro-se supplemental brief, with the District Attorney responding on April 14th, 2015. I also filed a motion to submit a reply brief, which was denied.

## VI.   Leave To Appeal Article 440 Denial

**20.**   On January 15th, 2015, I sought permission to appeal from the trial courts denial of my December 15th, 2014 Article 440 application, and a request that the appeal be consolidated with my direct appeal. On February 10th, 2015, the People opposed the motion and on February 24th, 2015, I filed an affidavit in reply.

**21.**   On April 30th, 2015, Associate Justice Coleen D. Duffy denied my application to appeal from the denial of my C.P.L. § 440.10 motion (see, People v. Anthony Rucano, App. Div. Docket No. 2015-01499 [2[nd] Dept. 2015]).

## VII.   July 1st, 2015 Decision And Order On Direct Appeal

**22.**   This Court held that the challenge to the legal sufficiency of the evidence was unpreserved for appellate review, and in any event, was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. The Court also held that the verdict was not against the weight of the evidence, the challenge to the prosecutor's summation remarks was unpreserved for appellate review, and in any event, was responsive to trial counsel's summation.

23.  Finally, the Court stated that there was no merit to my constitutional claims to the effective assistance of counsel, and that the remaining contentions, including those in my pro se brief, are "unpreserved" and otherwise without merit.

### III.   Leave To Appeal To The Court Of Appeals

24.  On August 7th, 2015, appellate counsel filed my criminal leave application, and on August 11th, 2015, I submitted my supplemental criminal leave application. The People submitted their opposition on August 24th, 2015.

25.  On January 26th, 2016, I submitted my statement in support of an application for leave to appeal to the Court of Appeals from the May 19th, 2014 order denying my motion to relieve counsel, withdraw appellate counsels brief, for assignment of new counsel (to submit Article 440), and to hold my direct appeal in abeyance; submitted on March 20th, 2014.

26.  On April 4th, 2016, the Court of Appeals denied leave to appeal the order of the this Court dated July 1st, 2015, affirming the judgment of the Supreme Court, Richmond County, rendered January 21st, 2011.

27.  On April 4th, 2016, the Court of Appeals denied leave to appeal the order of the this Court, dated May 19th, 2014, denying my motion on appeal from the judgment, inter alia, to relieve counsel, strike his brief, assign new counsel, and hold direct appeal in abeyance.

## IX.  Writ of Certiorari – Article 440 Application

28.  On July 27th, 2015, I submitted a Writ of Certiorari to the United States Supreme Court from the denial of my Article 440 application in the State Courts. On October 19th, 2015, the petition was denied.

## X.  Appellate Counsel's Brief Lacked Meritorious Claims

29.  Appellate counsel raised 2 Points in his appellate brief [*see*, Appellate Brief, Pro-Se Brief and Respondents Reply Briefs to both, attached as Appendix Item A].

### POINT 1

The People Failed To Prove Appellant's Guilt Beyond A Reasonable Doubt and the Verdict Was Against The Weight of the Evidence, Given The Complainant's Delayed and Inconsistent Outcry, The Lack of Genital Trauma, Evidence of Her Intent to Fabricate a Sex Offense Complaint, and the Jury's Acquittal of Appellant of the Majority of the Submitted Charges

### POINT 2

Appellant Was Denied Due Process and the Effective Assistance of Counsel When: (A) The Prosecutor Elicited A Neighbor's Speculation That Appellant and the Complainant Were Having Sex When the Complainant Said "I No Want", (B) After a Key Defense Witness Testified About the Complainant's Threat To Fabricate a Sex Complaint, The Prosecutor Persistently Cross-Examined Him About His Prior "Arrest" and "Charges", Despite The Court's Admonition Not To Do So, (C) The Prosecutor Appealed to the Jury's Emotion In Summation; and (D) Defense Counsel Failed To Properly Protect The Neighbor's Speculation, Seek A Mistrial in Response to the Prosecutor's Prejudicial Cross-Examination, or Protest Her Summation

30.  This Court held Point 1 was unpreserved for appellate review, and that the verdict was not against the weight of the evidence.

31.   This Court held Point 2, sub-point C, "prosecutor's summation remarks", were unpreserved for appellate review, and stated "There is no merit to the defendant's contention that he was deprived of the constitutional right to effective assistance of counsel" (citations omitted).

32.   Appellate counsel was made aware of many persuasive issues involving trial counsel's ineffectiveness and failed to address them, preventing him from submitting a meritorious brief that would meet the Baldi standard of "representation as a whole" and "in totality."

33.   In Sub-Point A, appellate counsel raised a weak and unpreserved issue concerning the prosecutor eliciting speculation from his witnesses, without objection from trial counsel, about what was happening in a room she was not present in. In Sub-Point B, he raised another weak issue in which counsel objected to the prosecutors questioning of a defense witnesses "arrest" and "charges", but where the court issued curative instructions in response. Sub-Point D was a reiteration of Sub-Point A, addressing counsel's failure to object to speculation or seek a mistrial.

34.   This court held that "The defendant's remaining contentions, including those raised in his pro se supplemental brief, are unpreserved for appellate review, and, in any event, without merit."

11

35.  Appellate counsel was made aware of numerous claims of ineffective assistance of counsel that were not only stronger, but would have showed that trial counsel failed to perform an investigation of the facts and the law as it applied to his case.

36.  This Court is in a unique situation to reach the truth by answering the questions presented in the attached memorandum of law during the adjudication of this application for Writ of Error Coram Nobis relief.

## XI.   STATEMENT OF FACTS RELATED TO GRAND JURY PRESENTATION

### A.    The Defendant's Right to Testify at the Grand Jury

37.  The People convened a grand jury before I was arraigned on the felony complaint on October 1st, 2009. Arraignment attorney Carol Siegel Esq. asserted my right to testify at the grand jury at arraignment [reflected in the arraignment record], and shows my case was adjourned for C.P.L. § 180.80 purposed until October 5th, 2009 [Appendix Item C].

38.  The CPL § 190.50 notice filed on September 30th, 2009, was made part of the court record. I was not produced for arraignment, nor was I assigned an attorney until October 1st, 2009; so how could the People have provided notice of grand jury action to my attorney? (440 Ex. "1-D")

Also see Crim. Court Folder Docket Sheet (Ex "1-A"), Notice Pursuant to CPL § 710.30 And 250.20, dated 9/30/09 (Ex. "1-C") And Order of Protection, dated 9/30/09 (Ex. "1-B") RAP Sheet Showing Initial report of Docket # on 9/30/09 (Ex. "1-E")

### (i)   Irregularities of Grand Jury Notice

39.   In addition to the Grand Jury Notice being dated 9/30/09, the number "9" for the month looks like it was physically altered from a "7" by closing the loop, especially when comparing it to the number "9" in the year.

40.   Furthermore, the date I could testify (10/5/09) also looks altered. The number "0" in 10, the month, looks like someone started to write the upper loop of number "9", then made a "0" out of it and put a number "1" in front of it to make it "10".

41.   In further support of this, I received a copy of this §190.50(5)(A)(B) notice through FOIL from the Richmond County District Attorney, an exhibit I submitted with my Article 440 that naturally dehors the record. It is clearly the same notice except that the top portion of the page was not cut off. (Exhibit "A")

42.   When examining the copy received through FOIL, it becomes obvious this notice was faxed to somebody. But, as the date/time fax stamp clearly shows as "SEPT 10, 2009, 10:50", almost 3 weeks before I was arrested, there is overwhelming support that this notice was falsified, which a subpoena of phone records could clearly uncover.

### (ii)   Proceedings on October 5th, 2009, the 180.80 day

43.   I appeared in Court on 10/5/09, with Bankruptcy Attorney Dennis J. O'Sullivan, in front of Judge Green in AP1, and Mr. O'Sullivan was asked, "I take

it you are reaffirming cross [grand jury notice]?" to which he replied "Yes." The People did not have their file on my case, so it was adjourned to 12/3/09, AP1, for grand jury action. Hence, the court or the district attorney present at court had no knowledge that the matter had already been presented to the grand jury before I was arraigned on the felony indictment on the morning of 10/1/09, heard all testimony in the case, and was re-convened in just a few hours later that day [Appendix Item D].

44.   The record supports this, as ADA Katchen sent a Notice of Arraignment on Indictment to my arraignment attorney on 10/6/09, who no longer represented me.

**B.    Serious Irregularities Concerning Evidence and Testimony Presented To the Grand Jury**

45.   The Felony Complaint and DD5 report completed by SVU Detective Wasson only allege crimes committed on September 28th, 2009, and Detective Wasson closed the investigation on the case on October 6th, 2009.

46.   The grand jury stenographic transcripts, which this Court received under seal after issuing an order to enlarge the judgment roll on 1/6/14, were part of the record on appeal. Furthermore, they were provided to Appellate Advocates, with detailed information concerning the issues provided below, more than one (1) year before my direct appeal was drafted, perfected and submitted. This issue was brought to this Court's attention, in detail, in my motion to withdraw appellate counsels brief, which included copies of detailed correspondence providing proof

14

of this claim (See Motion to Withdraw Appellate Counsel's Brief, Appendix Item B).

### (i)    The Substance of the Grand Jury Testimony of the Complainant

47.  The cover page of the grand jury transcript indicates that two (2) ADA's were present at the proceedings on 10/1/09, ADA Katchen and ADA Rudich, with Stenographer Donielle McKenna recording the proceedings [Appendix Item E].

48.  The first page starts by marking for identification exhibits 1-6, and with ADA Katchen stating "Good Morning", indicating the case was heard the morning on 10/1/09, before I was arraigned on the felony complaint at approximately 2 PM that same day.

49.  After directing the complainant's attention to July 17th, 2009, ADA Katchen asks to explain what happened. The complainant states "Can I look at my book to refresh?" As the complainant has not requested to look at a piece of evidence marked for identification, what book is she referring to? [Appendix Item E, Pg. 4, at ¶ 16-19].[1]

### a. Non-Verbal Cues During the Grand Jury Testimony and "The Book"

50.  The stenographer records "NO VERBAL RESPONSE" as ADA Katchen's answer to that question. The complaint responds with "Yes." It becomes clear that a non-verbal cue by either ADA Katchen or ADA Rudich, like a nod of the head,

---

[1] "Appendix Item E" followed by numbers refers to page and line numbers of Grand Jury Transcripts

was used to respond, because the Complainant started testifying. But once again, she was not provided with any document from which to "refresh" her memory, so where did she get this "book" from?

51. Of even more importance is the question "How many non-verbal cues actually occurred and were not recorded, what were there substance, and why were they improperly being used in the first place?" Furthermore, the use of the word "refresh" by a person not of the legal profession, in that context, is indicative of the complainant being coached by the District Attorney on how to testify from a "book" inappropriately taken to the stand to testify from, while bypassing the rules of evidence concerning "refreshing your recollection" from a document.

### b. Leading Questions, Statements and More Non-Verbal Cues

52. ADA Katchen allowed the complainant to take the stand with "the book", which soon is revealed as a "diary", without marking it for identification. One has to wonder what other papers or "scripts" was she allowed to take to the stand and use to testify from. Considering that all court and investigative records only talked about crimes on one date, it becomes clear that this "diary" forms the basis of ADA Katchen's entire grand jury presentation.

53. The grand jury record is replete with ADA Katchen asking leading questions and statements designed to guide the complainant's testimony [Appendix Item E, Pg. 5 at ¶ 7-25, Pg. 6 at ¶ 1-19]. ADA Katchen even goes as far as

testifying for the complainant to meet the statutory requirement of Criminal Sexual Act in the First Degree, [P.L. §130.50(1)], Count 7 of the indictment, by stating "Okay and by 'Oral Sex', you mean his penis was in your mouth?" [Appendix Item E, Pg. 6 at ¶ 18-19]. His leading questions, designed to elicit answers to meet the statutory requirement of Rape in the First Degree, P.L. §130.35(1), continued when he stated "Did he pull your legs apart?" Count 1 of the Indictment, by establishing forcible compulsion [Appendix Item E, Pg. 7, at ¶ 10-11].

54. When ADA Katchen jumps to questioning on the next date that alleged crimes occurred by asking "Okay, I'd like to now direct your attention to July 28th, did anything take place between you and Mr. Rucano on that date?" The complainant responds "yes", but says nothing else. ADA Katchen states, "okay" and then the complainant once again states "Um, I have to look at my (indicating) --" [Appendix Item E, Pg. 7 at ¶ 15-21].

55. The stenographer recorded the word "indicating" to show that the complainant, using a non-verbal cue, was pointing at her "book." The question of utmost importance is, why was the complainant reluctant to say, "look at my book" again? It becomes obvious that the books existence was not supposed to be revealed, hence the reason she was allowed to take it to the stand without it being marked for identification, allowing her to testify from it without having it

challenged and entered into evidence, as it was being used as the "truth of the matter asserted."

56. It is important to note here that during the trial charge conference, Judge Rooney dismissed 11 of 23 major felonies because they were not supported by evidence or testimony during trial. I submit that this was because of the fact that, unlike at the grand jury, at trial the complainant did not have her "book" (diary) and script of responses to reassert her lies, nor did she have the help of ADA Katchen to provide leading questions and statements designed to meet the statutory requirements of the charges he was looking to invent.

57. The final straw that broke the camels back comes when ADA Katchen tries to clean up the testimony of the complainant by having her reveal that she is, in fact, reading from a diary in which she has allegedly recorded incidents occurring between "Anthony and I" [Appendix Item E, Pg. 7, at ¶ 22-25, Pg. 8, at ¶ 1-6].

58. I submit that it is here that ADA Katchen shows he was the one who coached the complainant on how to testify from this diary, impermissibly brought to the stand to testify from at the grand jury, when he asks "Is that what you're using to *refresh your recollection*?" to which the complainant responds "Yes" [Appendix Item E, Pg. 8, at ¶ 7-9](Emphasis Added).

59. It is important to note that Count 7 of the Indictment (id. at ¶ 53, *supra*), along with Counts 12-15, 17, 19-22 and 25, were dismissed and never presented to

the petit jury for deliberation. Even more compelling is that every other count of the indictment [exclusively found only in the diary used at the grand jury] (except the 2 misdemeanors), resulted in a verdict of NOT GUILTY (Counts 1-5, Rape in the First Degree, counts 8-9, Criminal Sexual Act in the First Degree and count 16, Assault in the Second Degree)(Exhibit "L"). Verdict Sheet, 440 Ex " 1-5"

60.  I submit that ADA Katchen, in order to bolster his weak and circumstantial case, "stacked the deck" by introducing multiple unsupported, unsubstantiated charges through inadmissible hearsay (in the diary), which allowed him to fabricate "battered woman's syndrome" and produce an expert to bolster his case, a theory which the petit jury rejected by my finding of not guilty on all charges except those within a few days of my arrest, not in the diary.

## C.  The Nature and Substance of the Diary

61.  The diary has 7 dated entries over a 3-month period (7/17/09, 7/28/09, 7/30/09, 8/24/09, 9/3/09, 9/18/09 and 9/21/09), with 6 of those entries having one line added to the end of it accusing the defendant of a crime. It was also easily discernable that the added entries were added at a later time [Appendix Item F]. This is substantial evidence to offer that the book [diary] had been significantly altered.

62.  There was one entry in the diary dated September 18th, 2009, which alleged crimes throughout the entire entry, yet no corresponding charges were brought to

the grand jury for indictment. As I will discuss later, this date was ignored because it was when we left New York for the Pocono's for a romantic weekend (id. at ¶ 70-80, 167-170, *infra*).

    **(i)**    **July 17th, 2009**

63. Comparison of the diary entry for July 17th, 2009 to her grand jury testimony is almost identical. Comparison of the two, and the way ADA Katchen interjects, reveals the ADA based his questioning of the complainant on a diary talking about events not known to any other law enforcement agency. I submit he stepped outside of his role as prosecutor and acted as an investigator of the diary, which should have resulted in recusing himself as prosecutor at trial.

- **Diary:**     As soon as I got into the car, Anthony started yelling at me. He grabbed my phone and rip my dress. He started yelling at me and asking me who have I been calling and wanted to check my phone [Appendix Item F, Pg. Q1]. [Compare to Grand Jury Testimony]
- Complainant:     He wanted - - we got into an argument. He wanted to know who I was calling on the phone and he wanted to check the phone [Appendix Item E, Pg. 4 at ¶ 23-25].
- ADA Katchen:     Okay. And what happened during the course of the conversation.
- Complainant:     It turned violent.
- ADA Katchen:     What do you mean by that?
- Complainant:     He ripped me dress off - -.
- ADA Katchen:     Okay.
- Complainant:     - - broke the other strap of my dress.
- ADA Katchen:     When you say he broke the other strap of your dress, did he initially break the first strap of your dress? [Appendix Item E, Pg. 5, at ¶ 1-11].

64.   I submit that it is at this point it becomes clear that ADA Katchen is usurping the grand jury's fact-finding process, by preventing them from hearing the independent recollection of the events as remembered by complainant, caused by his unwarranted intrusion into her testimony.

> **Diary**:          (Continued) He just kept yelling at me and then he put his hand on me. As soon as I got in the house he kept yelling and then he rip the other strap of my dress and then he…[Appendix Item F, Pg. Q1]
> Complainant:      Yes. What happened on that day, I got off the ferry and he was at the ferry picking me up.
> ADA Katchen:    Okay.
> Complainant:      And he - - [pauses] when I got into the car he grabbed me and then wanted to know who I was talking to on the phone.
> ADA Katchen:    Okay.
> Complainant:      And that's when the first strap, um, broke.
> ADA Katchen:    And then you went back to his house on Merry Mount Street - -
> Complainant:      Yes.
> ADA Katchen: - - on Staten Island? [Appendix Item E, Pg. 5, at ¶ 12-25]. Okay. And that's where he broke the second strap?
> Complainant:      Yes [Appendix Item E, Pg. 6, at ¶ 1-3].
> ADA Katchen:    Were you inside the house?
> Complainant:      Yes. I was in the - - (pauses) in the house.
> ADA Katchen:      After he broke the second strap of your dress, tell me what happened next.
> Complainant:      Then I put on a shirt.
> ADA Katchen:    Okay.
> Complainant:      Then he ripped off the shirt.
> ADA Katchen:    Okay.
> Complainant:      And then he, um (pauses), he ripped my bra off. I'm sorry (id. at ¶ 4-13).

65.   I submit the complainant picked up on another non-verbal cue in regards to her testimony, then stated I'm sorry when she testified that the shirt was ripped off first, then the bra; contradicting what was recorded in the diary.

➢ **Diary:** (continuing) …torn my bra off. He kept hitting me. I had to fight back and he tore my shirt off [Appendix Item F, Pg. Q1]

66.  ADA Katchen continues to lead the complainant and testify for her with the following.

➢ Complainant:      Then he told me - - He was like, now I'm going to fuck you [verbatim quote from the diary]
➢ ADA Katchen:      And what happened?
➢ Complainant:      Then he forced himself - - he took his penis and put it in my vagina.
➢ ADA Katchen:      And how did he go about forcing that?
➢ Complainant:      He forced himself on top of me.
➢ ADA Katchen:      Did he pull your legs apart?
➢ Complainant:      Yes. [Appendix Item E, Pg. 7, at ¶ 5-13].

**(ii)**    **July 28th, 2009**

67.  As spoken about earlier, this is where ADA Katchen is forced to reveal that the complainant is reading from a diary instead of a "book", after consistently deceiving the court and the jurors into thinking that she had an independent recollection of the events she was testifying to. Even after this "revelation", ADA Katchen continues to usurp the grand jury's fact-finding process by leading the complainant and testifying for her when necessary.

➢ **Diary:**        I told him no I didn't want to have sex. He grabbed me and forced himself on top of me [Appendix Item F, Pg. Q2]
➢ Complainant:    I told him no. And then he started hitting me and, um - - he grabbed me and then he forced himself again. And I kept saying no.
➢ ADA Katchen: When you say he forced himself ***upon you***, you mean to have ***sexual intercourse?*** {Emphasis Added}
➢ Complainant:    Yes.
➢ ADA Katchen: ***And that means he inserted his penis into your vagina?*** {Emphasis Added}

➢ <u>Complainant</u>:      Yes [Appendix Item E, Pg. 8, at ¶ 17-25].

**68.**  I submit that ADA Katchen independently offered, in a manner which repeatedly made him an unsworn witness, the emphasized text above; as the complainant never said what "he forced himself again" to do.

**69.**  The complainant, starting in her grand jury testimony about events on July 28th, states that I would hit and choke her, in the same generally descriptive manner [Appendix Item E, Pg. 10, at ¶ 14-17). This repeats over and over for each date, July 30th (Pg. 11, at ¶ 12-13, 15-16), August 24th (Pg. 14, at ¶ 21-24, Pg. 15, at ¶ 6-7), and September 3rd (Pg. 16, at ¶ 17-18).

**70.**  This is important because none of the 5 corresponding dated entries of the diary up until September 18th, 2009 have any mention of choking or blacking out as occurring. What is of interest is that September 18th, 2009 is the only date in the diary, which accused me of crimes, specifically alleging I choked the complainant 4 separate times, sometimes in the past tense; yet no charges are filed against me.

### (iii)   September 18th, 2009 and September 21st, 2009

**71.**  I submit that the intent of the complainant bringing the diary to the grand jury was as a tool for revenge, as one week before my arrest, while at the office of Licensed Clinical Social Worker Anna Lorusso-Moramarco, I told her that I wanted to leave her. This is the genesis of the allegations, charges and conviction.

72. All of the diary entries up until this point only accuse me of a crime in the last sentence of each entry. Forensic Document Examiner Robert Baier's report clearly shows that all allegations of crimes up until and including September 18th, 2009, were made at a later date and/or time; with noticeable changes in the angle of handwriting, pen pressure and even different types of pens, all indicative of someone adding these entries at a later time with malicious intent and purpose. As we continue, it becomes very clear that these added entries, as well as the entire entries dated September 18th and September 21st, were added to the diary for the sole purpose of revenge, as I continue to expound on below.

73. Even more compelling is the fact that the complainant suddenly needs to identify me by name, Anthony, for the first time, in the September 18th, 2009 entry. One must wonder why my name needed clarification, and more importantly, whom is she clarifying it for?

### a. The Complainant Has the Need to Identify Anthony By Name

74. A diary is a reflection of events of events recorded for your own use, and by its nature is not meant to be shared or shown to anyone else. Why would she have the need to identify me by name in parentheses ("Anthony") in a personal diary, and for the first time on September 18th, 2009?

75. The answer is the diary was no longer a reflection of personal events in her mind at the time that she made this entry, it was now a tool ***planned*** on being used

against me to exact her revenge. I submit that the complainant, with this mindset and context firmly in place with her plan, needed to make sure "Anthony" was identified for when she carried out her ***plan*** to present it to the District Attorney.

### b. The Complainant Needs to Reiterate 4 Separate Times How I "Choked Her"

76.   Her plan included accusing me of consistently hitting and choking her, but she failed to place choking in her diary when she hastily added those lines to the entries up until September 18th, 2009. In her desire to ensure this point was made and her plan was carried out as she intended, which I submit was on or about September 21st, 2009; she drafted the entry of September 18th, 2009, which is clearly written in the past tense [Appendix Item F, Q4).

> ➤ Q4, id. at ¶ 2-4: "It's getting worst to the point that he (Anthony) is starting to choke me until I black out."
> ➤ Q4, id. at ¶ 7-10: "The other night he grabbed me by the throat and started to choke me and I'm trying to tell I can't breathe, but he didn't."
> ➤ Q4, id. at ¶ 14-17: "Everyone at my job are asking me about the marks on my body and face including my neck where he continues to choke me."

77.   In an even further obsessive and compulsive need, I submit the complainant continues on the 2nd page of the September 18th, 2009 diary entry, labeled "Q5", by later adding an entry to the end (which I submit is when she added the additional entries to all previous dated entries in the diary) accusing me of crimes. But this time, she switched from a felt tip pen to a ballpoint pen, with noticeably different angle of handwriting.

➢ Q5, id. at ¶ 7-9: "Again he continues to force me to have sex, and if I don't he starts to choke me" [Appendix Item F, Court Exhibit #1]. [She is now talking in the present sense]

78. Forensic Document Examiner Robert Baier's complete report with supporting papers will be explored in depth in the next section, when dealing with ineffective assistance of counsel.

### c. The Complainant Went To The Pocono's With Defendant on Sept. 18th, 2009

79. The complainant and I went to the Pocono's on the evening of September 18th, 2009, where we enjoyed a romantic weekend in a room with a heart shaped Jacuzzi, miniature pool, stream room and breakfast in bed, all in a lakeside villa. We had consensual sexual relations multiple times throughout the entire weekend.

80. When considering this fact in conjunction with the District Attorney's decision not to charge me with any crimes allegedly occurring that day, when she was in work all day, and the fact that the diary entry was written in the past tense; I submit that it became obvious the District Attorney himself did not believe the facts stated in the diary for this date to be true.

### C.   Substance of Witness Testimony Available For the Grand Jury

81. The People rushed this case to the grand jury before I was arraigned on October 1st, 2009, and allowed the grand jury to vote a true bill just 2 business days later without the court or my attorney of record ever knowing the case was presented to the grand jury at all, as court records prove. This prevented me from

presenting numerous witnesses and other evidence to the grand jury in my defense, in direct contradiction of the complainant's allegations.

**82.** When considering the substance of the following witnesses testimony available for the grand jury to hear, this failure of trial counsel was exacerbated and prejudice ensued.

### (i)   Licensed Clinical Social Worker Anna Lorusso-Moramarco

**83.** The Complainants own grand jury testimony admits she was attending couples counseling with me; and Ms. Moramarco, LCSW, was our counselor [Appendix Item E, Pg. 8]. Judge Rooney released the session notes to defense counsel during trial (Tr. Pg. 223 at ¶ 10-15)[2], one of which he described as <u>Brady</u> material (Tr. Pg. 223 at ¶ 11-25).

**84.** It is reasonable and safe to believe that the grand jury would have chosen to hear from a professional who had direct and complex knowledge of this relationship. As Ms. Moramarco had a session with the complainant and I just 7

( 440 Ex " I-R" )

days before my arrest on September 22nd, 2009, where I offered to help complainant move out and pay all moving expenses because of the ongoing physical violence between us, her testimony would have been very insightful into the strained relationship (Tr. Pg. 407 at ¶ 2-13). Furthermore, emails which my trial counsel failed to admit into evidence (addressed in my Article 440 motion)

( 440 Ex.'s " 3-E, 3-F, 3-G, 3-H" )

---

[2] "Tr." Followed by numbers refers to Page Numbers and Line Numbers of My Trial Transcript.

because he lacked knowledge of their admissibility, showed that I had offered to help her move out multiple times, but she always used sex as a way to convince me she would change (Tr. Pg. 282 at ¶ 5, Pg. 283 at ¶ 1-5, Pg. 428 at ¶ 1-8).

   (ii)   **Diane Smith, My Common Law Wife and Mother of Our 7 Children**

85.  My common law wife of 25+ years would have testified as she did at trial, that as early as mid-July with bruises and scratches over large parts of my body, from when the complainant tried to push me down the stairs and murder me on August 3rd, 2009 (Tr. Pg. 398 at ¶ 4-18).

86.  She also would have testified that after this incident on August 3rd, 2009, which the complainant testified never occurred and that she never left our apartment (Tr. Pg. 295 at ¶ 2-14), that my common law wife and children came to my apartment to stay for 2 days, after I showed up at my common law wife's apartment hysterically crying and upset (Tr. Pg. 488 at ¶ 3-16).

87.  Her testimony would have provided a more complete and accurate view of the relationship to the grand jurors, contradicting the vague and inconclusive grand jury testimony of the complainant who needed to read from her falsified diary before answering any questions. This would have resulted in the grand jury returning a vote of no true bill.

### (iii)   Catherine Smith, Defendants Adult Daughter

**88.**  Catherine, my 20-year-old daughter, would have testified about the repeated times she witnesses her father physically abused, as well as his mental and emotional suffering when visiting. She would have testified about when I arrived at their home on August 3rd, 2009, at 11:30 pm, limping, bruised and emotionally distraught, and how she, her youngest brother and her mom spent 2 nights with her dad at the apartment I shared with complainant.

**89.**  More importantly, she would have described the conversation between the complainant and I, which was routed through my cars hands-free system over the car speakers, where the complainant said how sorry she was for hurting me and begging if she could come back home (Tr. Pg. 399 at ¶ 10-20). This was more significant testimony unexplored and un-presented.

### (iv)   My Proposed Testimony at the Grand Jury

**90.**  My testimony that I threatened to call the police would have been shared, which caused complainant to flee our apartment. Ironically, although she testified that she never left our apartment that night (Tr. Pg. 295 at ¶ 2-14), she somehow filed a complaint report against me at the 94th precinct in Brooklyn on August 4th, 2009, at 5:10 am (id. at ¶ 108-110, *infra*).

**91.**  This shows the propensity of the complainant to use any and all means necessary to exact her revenge by using the Police and the Courts as a weapon.

Although I specifically told trial counsel Eugene Lamb Esq. of complaint report number 2009-00510-94, he never obtained or investigated it. This fact was also made known to appellate counsel who did not investigate this and use proper appellate procedure to raise this issue, leaving more significant testimony unexplored and un-presented

## XII.  STATEMENT OF FACTS – PRE-TRIAL PROCEEDINGS AND DIARY

92.  Trial counsel Mr. Lamb presented an in limine motion on July 7th, 2010 for an ORDER directing the People to provide the original copy of the diary kept by complainant to handwriting expert John Paul Osborne for examination, while accompanied by the District Attorney, because upon viewing the copies it appeared that entries were altered [July 7th, 2010, Appendix Item G].

### A.    The Diary and The Law On Prompt Outcry

93.  On July 7th, 2010, after reviewing several pages of the diary provided to him, explained that after "extensive conferences with the D.A.'s office with regard to the diary and with regard to in general the notation that the complaining witness made a timely outcry with regard to this, I am just now being provided with a copy of the diary which seems to indicate she wrote in the diary that she had been sexually abused" [Appendix Item G, Tr. Pg. 3, at ¶ 24-25, Pg.4, at ¶ 1-6].

94.  The Court replied, "You are equating a diary entry with prompt outcry?" Mr. Lamb replied "Yes, Judge." The Court stated, "I don't understand. Who would

30

the outcry be to? The diary?" Mr. Lamb continues to argue to the Judge, who in response to his continued rambling simply said, "The Court, "Okay. So you have it" [Appendix Item G, Tr. Pg. 4, at ¶ 7-17]. ). Trial counsel expressed interest in using the session notes in regard to whether or not the complainant made prompt outcry to her therapist on July 7th, 2010 (Tr. Pg. 5 at ¶ 16-25, Pg. 6 at ¶ 1-6)

95.  On July 16th, 2010, another discussion ensues about the diary, in which counsel argues about having a handwriting expert to examine it, and he states the following about the diary [July 16th, 2010, Appendix Item H]

> ➤ "…made those notations in such a fashion, made it appear contemporaneous with the actual incidents taking place."
> ➤ "Even a laymen viewing these pages would see there is different angles to the writing with different, obviously, different ink used."
> ➤ "These are, obviously, later entries to these diary entries [Indicating lines added at end of each dated entry]. And, there is opposition that this goes directly to her credibility, directly to her motive to fabricate the charges against the defendant."
> ➤ "I think it is very relevant issue in this case and I'm asking the courts permission to permitting an order assigning this handwriting expert. He indicated it would be pro bono, will not submit a bill to the 18-B panel, strictly because of his belief that all individuals should have equal rights to defend themselves."
> ➤ "I would ask that this Court sign the order when I prepare it, which I hope to have along with his CV, by the middle of next week" [Appendix Item H, Tr. Pg. 2, at ¶ 24-25, Pg. 3, at ¶ 1-25, Pg. 4, at ¶ 1-4].

96.  This motion was submitted in written form on July 16th, 2010 (Exhibit "B"). The last paragraph of this motion informed Judge Rooney that, "Mr. Osborne [Handwriting Expert] has also represented to me that it is **impossible** to conduct a

thorough and accurate examination of a photo static or Xerox copy, such as the copies provided to me by the District Attorney."

## B.    The Trial Court Denies Examination of Diary By An Expert

97.  Judge Rooney never put his decision in writing, but made it orally. Please note Judge Rooney's disregard of the substance of Mr. Lamb's oral and written motion, which was (1) "...this goes directly to her credibility, directly to her motive to fabricate the charges against the defendant", and (2) "...it is **impossible** to conduct a thorough and accurate examination of a photo static or Xerox copy, such as the copies provided to me by the District Attorney."

> The Court: "...they're [District Attorney] provide the original for that purpose. They're not going to sent the original in the field."
> Mr. Lamb: "...He [expert] has indicated to me that the equipment that he uses is not conducive to carrying in the field, very delicate equipment, expensive delicate equipment that cannot be carried to a location. The documents being examined have to be brought to his office where the equipment is located."
> The Court: "I'm not going to sign any such order at this point. Number one, you say he's working pro bono. If he can work off the copies the D.A. provided [It was established this was **impossible**], if you want to go with the D.A., that's agreed, they meet him at a mutual time. I'm not going to send an order sending the original diary. *The D.A. is not going to offer the diary. I don't see how they could* [How is this relevant?]. the same would apply to the defense. However, if you wanted to get into this without objection then, I stay out of it and we'll see were we go with it. *I can't imagine why you want to get into it, prior consistent statements by the complainant. I haven't read it.* If you want to use it for impeachment purposes. At this point, I'm not going to sign an order. There are other methods you can use to examine it. If this becomes a trial issue, I can't imagine if it would, but if it does, we'll deal with it then. August 11[th]" (Appendix Item H, July 16[th], 2010, Tr. Pg. 4, at ¶ 8-25, Pg. 5 at ¶ 1-15).

## C.    Late Disclosure of Diary in True Form

98.   The late disclosure of the diary in its true form <u>after</u> the start of trial, which should have been provided in a high quality color copy, resulted in a prejudicial <u>Brady</u> violation. This was exacerbated by the failure of my trial lawyer to understand the law on prompt outcry (<u>id</u>. at ¶ 93-96, *supra*) and the abuse of discretion of the trial court to allow an expert to evaluate the original in his laboratory because "it is **impossible** to conduct a thorough and accurate examination of a photo static or Xerox copy, such as the copies provided to me by the District Attorney" (<u>id</u>. at ¶ 97, *supra*).

99.   The Prosecutorial Misconduct of ADA Katchen, clear from the record, involved subversion of the grand jury before, during and after the proceedings involving the "diary", which include (A) Prosecutorial Overreaching, (B) Non Verbal Cues, (C) Leading Questions and Statements, (D) Bolstering, Overcharging and "Stacking the Deck", (E) Becoming and Unsworn Witness, and (F) Violations of the Advocate-Witness Rule. It is clear that this misconduct allowed the People to pursue an erroneous and improperly bolstered theory of battered woman's syndrome, which prejudiced me by allowing the People to present experts, which would have otherwise not been allowed to testify.

## XIII.  INEFFECTIVE ASSISTANCE OF COUNSEL - TRIAL PROCEEDINGS

100.  Trial counsels failure to review the trial record was apparent from the record, but appellate counsel failed to raise these meritorious claims. The failure of trial counsel to review the grand jury testimony (id. at ¶ 37-91, *supra*), medical records, voicemail recordings, DD5 reports of Detective Wasson, Affirmation of trial attorney Dennis J. O'Sullivan (who represented defendant at grand jury proceedings only) and notebook entries of P.O. Brown, resulted in a "snowball effect" of numerous errors that cumulatively deprived me of counsel that was able to apply the facts to the law relevant to my case and create an effective adversarial testing. Below are fourteen (14) specific claims of ineffective assistance of trial counsel that were available to appellate counsel.

### A.    Failure to Review Grand Jury Minutes

101.  On June 21st, 2010, 2 ½ months before jury selection started, ADA Katchen released the complete grand jury transcripts to trial counsel, as shown in a letter detailing discovery release found in the trial courts record (Exhibit "C").

102.  On the first day of trial, September 13th, 2010, trial counsel admitted to reviewing the grand jury minutes when arguing about allowing a battered woman's expert to testify (Tr. Pg. 104 at ¶ 19-25, Pgs. 105-109, Pg. 110 at ¶ 1-12), yet he failed to raise numerous colorable arguments of prosecutorial misconduct

concerning the impairment of the integrity of the grand jury proceedings (id. at ¶ 37-60, *supra*), including but not limited to:

➢ Assuming a dual role before the grand jury as prosecutor and witness.
➢ Providing substantive, influential and permissible testimony, which invaded the grand jury's province as exclusive evaluator of evidence.
➢ The use of non-verbal cues.
➢ Deception of Grand Jurors into thinking the Complainant had an independent recollection of events by allowing her to read from diary while testifying
➢ Bypassing the Rules concerning Past Recollection Recorded

**B.    Failure to Review Medical Records of the Complainant**

**103.**  Prior to cross-examination of prosecution witness Rina Ganeles, P.A., on September 13th, 2010, trial counsel failed to review medical records entered into evidence at trial, causing him to overlook significant opportunities to impeach the credibility of the complainant.

**104.**  P.A. Ganeles completed the sexual assault assessment form at 1 PM on September 29th, 2009. She testified that the complainant told her that she was sexually assaulted since July 2009, which represented 2 months (Tr. Pg. 66 at ¶ 15-25, Pg. 67 at ¶ 1-5). (440 Ex. "2-C")

**105.**  Trial counsel informed her that a hospital report indicated the abuse was for 6 months, but she replied that said report was not hers (Tr. Pg. 67 at ¶ 6-25, Pg. 68 at ¶ 1-9). (440 Ex. "2-D")

**106.**  Trial counsel failed to identify the Nursing Emergency Dept. Ambulance assessment note completed 45 minutes **prior** to the examination of P.A. Ganeles

(12:13 p.m.), where Lili Frost R.N. recorded, under the Physical/Sexual Abuse Section, "No, Patient states no physical/sexual abuse", and under the Domestic Violence Assessment section, "History of Abuse: Reported None" (Exhibit "D"); more significant testimony unexplored and un-presented. ( 440 Ex " 2-D")

107. There is even a third conflicting statement **after** the examination of P.A. Ganeles, at 2:54 p.m., to Shiney Valiyaparambil, P.A., where it is recorded, "Pt. States she has been repeatedly sexually assaulted over 6 months ans has by physically injured by bites and hits" (Exhibit "D"). ( 440 Ex " 2-D")

C.    **Failure to Review DD5 Reports of Detective William Wasson**

108. Complaint follow up information report # 2009-120-11351 states complainant walked into 70th Precinct (almost 1 mile from her job on Church Ave and Flatbush Ave.) and stated she was raped by her boyfriend the previous night, and at no time during the investigation did she indicate any other crimes, with the investigation closed about 1 week later on October 6th, 2009. ( 440 Ex. " 1-U")

109. This DD5 report revealed the existence of complaint report # 2009-094-00510, filed in the 94th precinct near the complainant's mothers house, after the complainant tried to throw me down the stairs in the apartment we just moved into, which I testified about (id. at 129-130, *infra*). The complainant testified she never left our apartment that evening (Tr. at ¶ 295 at ¶ 2-14). The failure to impeach the credibility of the complainant after I allegedly raped her three times, the third time

36

just 2 days before she moved into a bi-level townhouse with me at my expense, showed the propensity of the complainant to utilize the police and the courts to exact revenge and seriously prejudiced me in a trial where credibility was the determining factor.

### (i)   Trial Counsel Contradicts Himself Concerning Cross-Examining Complainant About Detective Wasson

110.   Trial counsel states he is going to question the complainant about extensive contact she had with Detective Wasson (Tr. Pg. 103 at ¶ 5-8), yet the trial record reveals he never asked the complainant one question concerning the interview. If trial counsel had reviewed the DD5 reports, he could have called Detective Wasson to testify, and been provided with cross-examination fodder to support the theory of the defense, that the charges were fabricated.

### D.   Failure to Review Voice Mail Recordings

111.   Mr. Lambs failure to object to the admission of voice mail recordings by the prosecution (Tr. Pg. 212 at ¶ 14-20) until after they were played for the jury was inorexably tied to his failure to review them.

### (i)   The Record Reveals Trial Counsels Inability to Object With Specificity

112.   Trial counsel objected to the voice mail recordings after they were played for the jury, stating they appeared to be speeded up and gave the impression of heightened anger and anxiety, which was an unnatural portrayal of his emotions

(Tr. Pg. 224 at ¶ 22-25, Pg. 225 at ¶ 1-10). He admitted to listening to the recordings "many, many months ago" and that "it almost sounded like Alvin and the Chipmunks" (Tr. Pg. 225, ¶ 23-25, Pg. 226 at ¶ 1-18).

113. The trial court tries to help counsel by stating "I'm not sure what else I can do. I don't know if you have a **legitimate objection** or not" [Emphasis Added] (Tr. Pg. 227 at ¶ 7-8).

114. The record then reveals trial counsel's unfamiliarity concerning the requirements of admissibility of recorded material into evidence by trial counsel's following response.

> ➢ "Perhaps it was the way it was recorded by the complaining witness, in which it would be cross-examination fodder."
> ➢ "Quite frankly, Judge, **I don't know either**. Ideally, from a defense standpoint I'd ask that it be stricken and the jury admonished to disregard that."
> (Tr. Pg. 227 at ¶ 9-11, Pg. 228 at ¶ 6-9).

## (ii)   Trial Counsels Failure to Identify Issues Concerning Admissibility of Voicemails

115. The complainant reveals on cross-examination that she saved the voicemails [from her cell phone] on a digital recorder, which she kept at her job (Tr. Pg. 281 at ¶ 1-9). The voicemails provided to trial counsel were on cd-rom. That means there were recorded off cellular phone, onto digital recorder, and then downloaded to a computer before recording it onto a cd-rom. There clearly exists an argument for chain of custody and violates the best evidence rules.

116. The people submitted a supplement to their Molineux application dated June 10th, 2010, who misrepresented the evidence by stating "The recordings form the best evidence of the nature of the defendants continued harassment of the victim" (Exhibit "E"). *(440 Ex. "2-H")*

117. The People further admit the substance of the voicemails in a second supplement to <u>Molineux</u> application made on June 21st, 2010, in a footnote stating, "As such, the People will play an edited version of such disc where certain calls, such as messages left by Detective Wasson are omitted" (Exhibit "F"). *(440 Ex "2-I")*

118. The complainant went to work the day after I was arrested to pick up her digital recorder at work (Tr. Pg. 281 at ¶ 1-9), but she made sure she recorded the most recent voicemails from Detective Wasson, left the day I was arrested, onto the cd-rom she provided to District Attorney ADA Katchen on October 1st, 2009 (Tr. Pg. 280 at ¶ 23-25), the same morning the grand jury convened, the same day she also presented her falsified diary which she used to testify from at the grand jury.

### E.    Failure to Review Circumstances of Grand Jury Proceedings As Related to Affidavit of Attorney Dennis J. O'Sullivan

119. On June 29th, 2010, trial counsel submitted a motion to dismiss the indictment based on the ineffective assistance of counsel of Dennis J. O'Sullivan, who represented me from 10/5/09, my 180/80 day, until my arraignment on the

indictment on 10/27/09. The reason trial counsel stated was failure to consult with me regarding my right to testify at the grand jury.

120. On July 6th, 2010, I obtained a signed affirmation from Mr. O'Sullivan (Exhibit "H"), where he admitted, "I discussed, with Mr. Rucano, **the possibility that the complaining witness might not elect to appear before the grand jury**. In that even, I believed the matter would come to an end" [Emphasis Added]. (440 Ex. "2-I")

121. Mr. O'Sullivan also stated that he never made me aware I had a limited time to challenge the indictment or that I had a right to testify. He also candidly admitted his law practice was almost exclusively limited to consumer bankruptcy and has never handled a matter that appeared before the grand jury; more significant testimony unexplored and un-presented.

### (i)   Record Based Failures Trial Counsel Failed To Address

122. I was arraigned in the afternoon of October 1st, 2009, and the grand jury convened **before** I was arraigned, that morning, and heard the complete testimony of the complainant at that time.

123. The question becomes, why didn't trial counsel address how it was possible that Attorney Dennis J. O'Sullivan, who first put in his notice of appearance on October 5th, 2009, gave me advice that complaining witness may not elect to testify at the grand jury, when her complete testimony was heard 4 days earlier?

124. Trial counsel also ignored the substantial record based claims concerning the failure by the prosecution to afford me a date and time I could exercise his statutory right to testify at the grand jury (id. at ¶ 37-44, *supra*). These claims of prosecutorial misconduct and others had substantial merit and should have been presented in a motion to dismiss the indictment pursuant to C.P.L. § 210.35(5).

### F.     Failure to Subpoena E-Mails Sent To The Complainant

125. I provided trial counsel with numerous emails I sent to complainant over the last 3 months of the relationship, which expressed love, care and concern for the complainant's erratic behavior. In an email sent on July 20th, 2009, I testified about some of this behavior, which included angry episodes like cutting off her own hair in a fit of rage, burning herself with cigarettes and throwing things (Tr. Pg. 389 at ¶ 11-16). ( 440 Ex. "3-E")

126. I told her she does not value the relationship like I do, and offered to help her move out. As corroborated by the trial testimony of my common law wife Diane Smith (concerning my condition), I also wrote about the physical violence between us, resulting in bruising, scratch and bite marks on both our bodies (Tr. Pg. 486 at ¶ 15-24, Pg. 487 at ¶9-25, Pg. 488 at ¶ 1-18).

127. I testified about our weekend in Amish Country in Pennsylvania, before going to see her cousin in Delaware (Tr. Pg. 376 at ¶ 1-23), and the hotel room we stayed in with heart shaped Jacuzzi, candles and wine (Tr. Pg. 377 at ¶ 1-10).

128. As described in this email, I candidly admitted my anger and telling her to leave, after which I went to get her cousin because she would not let me take her there, and my concern for her roaming the streets (Tr. Pg 377 at ¶ 11-25).

129. As also described in this email, I testified about her unprovoked punch in the face while I was driving, and an attempt to swerve the car in front of a bus (Tr. Pg. 385 at ¶ 3-19), her repeated use of sex as a way to manipulate me (Tr. Pg. 400 at ¶ 15-20), and always telling me what I want to hear but not following through (Tr. Pg. 408 at ¶ 1-25, Pg. 409 at ¶ 15-20).

(440 Ex "3-F")     (440 Ex "3-G")

130. Numerous other emails sent on July 24th, 2009 and July 25th, 2009 also showed my continued attempt to reach out to the complainant with love, care and

(440 Ex. "3-H")

concern. In an email sent on August 5th, 2009, I wrote that after she tried to push me down the stairs, I threatened to call the police. My testimony corroborated this, and that she left my apartment on the night of August 3rd, 2009 and slept at her mother's house (Tr. Pg. 399 at ¶ 10-25, Pg. 400 at ¶ 1-10).

(i)    **Failure of Trial Counsel To Recognize The Importance and Admissibility of These Emails**

131. My attempt to have trial counsel subpoena certified copies of these email from Yahoo, the email service provider, resulted in loud verbal arguments between us, which resulted in him hanging up the phone on me. I provided him with copies of all the emails, but he adamantly stated, "They are not admissible." Obviously, counsel was wrong.

132. Trial counsel's cross-examination of the complainant asked, "And did he email you send emails to you telling you he was going to leave you?" The complainant answered "No" (Tr. Pg. 283 at ¶ 3-5). These emails were admissible and not subject to the Rape Shield Law.

### G.   Failure to Investigate Lack of Prompt Outcry of Sexual Assault to Dr. Saluja Raveen

133. Less than 1 week before my arrest the complainant had her finger examined after we had a fight and I had bit her finger before she broken mine, as she had mine bent back trying to break it. Dr. Raveen recorded "boyfriend assaulted her, she has a plan to leave, refuses shelter, has family" (Ex. "I"). (440 Ex. "2-N")

134. An examination of the medical records of Dr. Saluja Raveen reveal that the complainant made prompt outcry of <u>only assault</u> to her doctor days before my arrest. Trial counsel's failure to examine these records and discover this information prevented him from asking the complainant:

➢ Why didn't you report these alleged rapes to your doctor?

➢ Why did you only report assault to your doctor?

➢ Why did you lie to your doctor about going to your family's house that night?

➢ What was your plan to leave and what did it involve?

135. The failure of trial counsel to investigate these medical records left crucial questions unanswered that went to the heart of my defense, that she lied and fabricated charges against me.

### H. Failure to Timely Move To Recuse ADA Katchen As An Unsworn Witness

136. Defense counsel received the grand jury minutes of the complainant on June 21st, 2010, a full 10 weeks before trial started. As I have spoken about previously (id. at ¶ 45-80, *supra*), the grand jury minutes revealed that ADA Katchen had exclusive knowledge of the diary, which he used to provide leading questions and statements about crimes only alleged in that diary. There were no investigatory police reports, DD-5's, or felony complaint alleging any crimes brought to the grand jury **except** the one alleged to occur on Sept. 28th, 2009. Even the medical records were unavailable to the District Attorneys Office until after I was indicted.

137. If trial counsel had performed proper pre-trial investigatory methods, then shortly after he received the diary and the grand jury minutes on June 21st, 2010 and June 30th, 2010, he would have immediately moved for dismissal of the indictment and/or recusal of ADA Katchen for being an unsworn witness in this case, as when the prosecutors pretrial [investigatory] involvement will be an issue, recusal is the appropriate course of action.

**138.** I informed trial counsel about ADA Katchen being an unsworn witness months before trial, which I repeated during jury selection on September 8th, 2010 [Appendix Item I, J.S. Tr. Pg. 8 at ¶ 3-10].[3]

**139.** On September 8th, 2010, trial counsel stated "Just for the record, Judge, I contacted quite a while ago...the assigned counsel plan gave me a very short list of the People that are on the plan that hold themselves out as forensic document experts" [Appendix Item I, J.S. Tr. Pg. 11 at ¶ 8-13].

**(i)    Record Made By Me Concerning ADA Katchen Being Unsworn Witness**

**140.** I made it clear to the court on September 8th, 2010 that I wanted to find an expert witness and explained the relevant factors involved [Sept. 8th, 2010, Appendix Item I].

> Defendant:   "There was - - nobody else saw this diary except the District Attorney technically making him a potential witness for being the only one to see that" [Appendix Item I, J.S. Tr. Pg. 9 at ¶ 1-10].
> The Court:   "Okay. Let me say first based on the record the last time and also in chambers, the DA does not intend to introduce the diary on their direct case, am I correct?" [Appendix Item I, J.S. Tr. Pg. 9 at ¶ 17-20].
> Mr. Katchen:       "That's correct." [Appendix Item I, Tr. Pg. 9 at ¶ 21].
> Defendant:   "If it's not planned to be brought into evidence there is no reason why the District Attorney shouldn't allow it to be examined." [Appendix Item I, J.S. Tr. Pg. 12 at ¶ 12-15].
> The Court:   "It's not going to be in evidence. There is no reason to talk about it" [Appendix Item I, J.S. Tr. Pg. 12 at ¶ 16-17].

---

[3] "J.S. Tr." Followed by numbers indicates page numbers of Jury Selection Transcripts, and "¶" followed by numbers indicates line numbers of previously referenced page numbers.

## I.  Failure to Challenge Prosecution Theory With Available Expert Witnesses

141. Trial counsel failed to use experts in pursuit of the theory of the defense that the complainant fabricated the charges against me. Trial Counsel was unable to find a handwriting expert before trial started in early September 2010 after the trial court abused its discretion by refusing to allow the diary to be brought to a handwriting expert who would examine it pro-bono (id. at ¶ 92-97, *supra*).

### (i)  Clinical Psychologist Dr. Michael Brustein – Battered Woman's Syndrome

142. The trial court, in a voucher submitted under 18-B on April 28th, 2010, approved Dr. Brustein. Trial counsel submitted an affirmation for services stating "People are offering evidence of 'battered woman's syndrome' by way of expert witness; Dr. Brustein is being offered to rebut said evidence." (440 Ex. "2-0")

143. Mr. Lamb asked to present Dr. Brustein, possibly out of order, on the first day of Jury selection, September 8th, 2010 [Appendix Item I, J.S. Tr. Pg. 3 at ¶ 14-20]. Mr. Lamb's decision not to call this expert to rebut the prosecutions theory of battered woman syndrome served no tactical reason or strategic purpose.

### (ii)  Forensic Document Examiner Robert Baier

144. The court, when I raised the issue during jury selection concerning retaining a handwriting expert, told my trial attorney, "The DA does not want to send an original document to New Jersey for an expert to examine in his office

rather than come here. I indicated you could find someone else and that offer still stands. We will start picking today, but you have several days" [Appendix Item $\underline{I}$, J.S. Tr. Pg. 13 at ¶ 1-6]. As stated previously, this disregarded the very important reason why the document needed to be examined in his **multi-million dollar laboratory**, **not his office** (id. at ¶ 97-99, *supra*).

**145.** That evening I found Forensic Document Examiner Robert Baier, who was part of the 18-B assigned counsel list of experts.

### (a)    Proposed Testimony of Forensic Document Examiner Robert Baier

**146.** On September 1**3**[th], 2010, Mr. Baier submitted his Letter of Opinion to the court (Tr. Pg. 2 at ¶ 9-19), and placed it in its files (Exhibit "J"), which was a

(440 Ex "2-Q")

preliminary report based on black and white photocopies that I emailed to him. His report, summarized, stated that "the evidence supports my professional opinion that it is 'highly probable' some of the writings…were not written at the original time of entry."

**147.** Mr. Baier reiterated the same concerns as the previous expert Mr. Osborne did, "It is not possible to bring my laboratory with all my equipment to the site of the diary." He also stated that based on the level of examination he may be able to "show a high probability that someone went back and made all of the [additional] entries at the same time."

**148.** On September 13th, 2010, after Mr. Baier was finally allowed to examine the original diary, he submitted a supplement to report to the court after lunch, which stated in part:

> After examining the original writings of the diary, I was able to reinforce my opinions expressed in the original report. I feel certain that the last sentence of Q4/Q5 was added at a later date/time. The writing of both pages was done with a liquid writing implement for 1 and a ½ pages until the last sentence, which was done with a ball point pen. There is no logical reason someone would stop their writing at the last sentence after writing a page and a half and change writing implements unless the liquid implement ran out of ink and I would have been able to determine that.
>
> It is my opinion that Q1, Q2, Q3 and Q6 had writings that were added after the time of the original entries. All of the added writings contained the accusations of rape (Exhibit "K"). (440 Ex. "Z-R")

**149.** Trial counsels failure to use these experts is apparent from the record. In a case where damaging the credibility of the complainant and impeaching her testimony would have resulted in an acquittal of all charges, this served no tactical reason or strategic purpose, as it supported the theory of the defense that the alleged rapes were fabrications because I was going to leave her (Tr. Pg. 281 at ¶ 16-18, Pg. 282 at ¶ 13-15, 22-24, Pg. 283 at ¶ 6-9, Pg. 285 at ¶ 15-17, Pg. 287 at ¶ 9-10). Trial counsel also spoke about this in summation (Tr. Pg. 569 at ¶ 17-23).

**J.    Failure to Effectively Cross-Examine Witnesses**

**150.** Trial counsel failed to effectively cross-examine the following witnesses with record based information available to him to advance the theory of the

defense that the charges were fabricated, preventing him from damaging her credibility.

### (i)    Police Officer Sharon Brown

**151.** On September 13th, 2010, ADA Katchen asks about stipulating the testimony of 3 witnesses as to chain of custody of evidence concerning DNA swabs (Tr. Pg. 7 at ¶ 4-12).

**152.** P.O. Brown had first contact with complainant when she walked into the 70th precinct to report the alleged crimes. Trial counsel stated "I won't stipulate to it with regard to Brown, because I intend to cross-examine her with regards to what was said by the complaining witness when she first walked into the 70th precinct and told PO Brown 'I was raped' or words to that effect" (Tr. Pg. 8 at ¶ 24-25, Pg. 9 at ¶ 1).

**153.** Trial counsel then, for no reason apparent in the record, illogically stipulated her testimony away (Tr. Pg. 75 at ¶ 6-16), further preventing a challenge to her credibility about events occurring in the short time after she first reported these crimes (id. at ¶ 107-111, *supra*)[4]

**154.** Trial counsel admitted to reading the DD5 report, which spoke about the complainant speaking to PO Brown after walking into 70th precinct (Tr. Pg. 7 at ¶ 15-22), and he also failed to notice a complaint report filed against me on August

---

[4] This relates to the failure of trial counsel to address 3 conflicting stories given while at the hospital.

4th, 2009, less than one week after the alleged rape occurring July 30th, 2009 (id. at

¶ 90-91, *supra*).

### (ii)   Physicians Assistant Rina Ganelas

155. Direct examination of P.A. Rina Ganelas revealed conflicting stories that

were ripe for cross-examination, but trial counsel ineptness prevented him from

challenging it.

> ➢ ADA:          "Did you ever ask why she came to Brooklyn to report it?
> ➢ PA Ganelas: "Yes, because she was at work in Brooklyn and her co-
> workers actually picked up on the bruising and encourages her to go to
> police" (Tr. Pg. 64 at ¶ 3-7).

156. This contradicts the complainant's own testimony about this event.

> ➢ ADA:          "Did you in fact go to work?"
> ➢ Complainant:  "Yes".
> ➢ ADA:          "What if anything happened while you were at work?"
> ➢ Complainant:  I came into work, nobody was there, my supervisor was
> in the office. And I just sat back in my chair, looked out the window
> thinking about what happened the night before. I turned on the computer and
> I said, that's it, I had enough"
> ➢ ADA:          "What did you do?"
> ➢ Complainant:  "…I got up, went to my supervisor's office and told her I
> had to leave." (Tr. Pg. 199 at ¶ 15-22, Pg. 200 at ¶ 1-3).

157. Which story was true, her co-workers were there or they were not there.

The complainant told PA Ganelas her co-workers encouraged her to go to police,

but she testified her co-workers weren't there. Trial counsels only attempt

concerning this highlights his inability to cross-examine effectively when he

attempts to cross-examine complainant.

> ➤ Mr. Lamb:      "Did you ever tell Elizabeth, your friend at work, or any of your co-workers?"
> ➤ Complainant:   "I don't recall if I did"
> ➤ Mr. Lamb:      "You don't recall?"
> ➤ Complainant:   "I don't remember" (Tr. Pg. 284 at ¶ 15-19).

### K.    Failure to Effectively Cross-Examine Complainant

158. The numerous and multiple opportunities that were lost to effectively cross-examine the complainant, challenge and damage her credibility, and advance the theory of the defense that the charges were fabricated, appear throughout the trial record.

### (i)    Voice Mail Recordings

159. The following highlights trial counsel's failure to understand the law concerning best evidence and chain of custody.

> ➤ Mr. Lamb:      "And you were the person who gave those voicemails - - got the tapes of the voicemails to the District Attorney?
> ➤ Complainant: "They were saved and I did turn them over."
> ➤ Mr. Lamb:      "Okay. And over what period of time did those voicemails represent?" … "So they expand from July to September 28ᵗʰ, is that right?"
> ➤ Complainant: "Yes."
> ➤ Mr. Lamb:      "…Did you receive quite a few voicemails?"
> ➤ Complainant: "Yes."
> ➤ Mr. Lamb:      "But you chose to save only those voicemails; is that right?"
> ➤ Complainant: "No, I didn't choose."
> ➤ Mr. Lamb:      "You didn't choose to save them, somebody else saved them?"
> ➤ Complainant: "No, I didn't choose to save those."
> ➤ Mr. Lamb:      "But you saved them, right?"
> ➤ Complainant: "Yes"
> ➤ Mr. Lamb:      "Why did you save them, what was your purpose for saving them?"
> ➤ Complainant: "There was no purpose in saving them."

➢ Mr. Lamb:     "No Purpose."
➢ Complainant:  "He was basically filling up my voice mail, I had to delete voicemail so people could leave voice messages."
➢ Mr. Lamb:     "But you saved those voicemails for a purpose, did you not?"
➢ Complainant:  "I didn't - - I just pressed the button and saved" (Tr. Pg. 279 at ¶ 1-18, Pg. 280 at ¶ 14-22).

160. After all that, Mr. Lamb never followed through with the following important question, "Why didn't you just delete the voicemails completely?" The following testimony reveals her motive and intent [purpose] to use the voicemails as a tool for revenge, **her plan**, but Mr. Lamb did not possess the knowledge or skill to expose this, as is shown below.

### (a)   Motive and Intent to Use Voicemails For Revenge

161. The following testimony gives Mr. Lamb the information he needs to literally destroy the complainant's credibility, but he never follows through. This is apparent from the record and should have been raised by appellate counsel on direct appeal.

➢ Mr. Lamb:     "And when did you turn them [voicemails] over to the DA, do you remember?"
➢ Complainant:  "October 1st, 2009" [**Important**: This was the day she testified at the grand jury, less then 24 hours **after** I was arrested and more then 24 hours **before** I was arraigned on felony complaint]
➢ Mr. Lamb:     "So you saved those voicemails that we heard yesterday some of them going back to July you saved them, right, am I right?"
➢ Complainant:  "Yes."
➢ Mr. Lamb:     "And did you hide them somehow so you make sure that Anthony didn't find them or see what they were, did you hide them somehow?"
➢ Complainant:  "They were on my digital recorder, and the recorder was left at my job."

➢ <u>Mr. Lamb:</u>           "Okay. So I ask you again, what was the purpose for
  saving them?"
➢ <u>Complainant:</u>        "I didn't have a purpose" (Tr. Pg. 280 at ¶ 23-25, Pg. 281
  at ¶ 1-9).

162. Trial counsel had information in a second supplement to <u>Molineux</u>
submitted by ADA Katchen on June 21st, 2010, that the voicemails in question
were provided on a disc [CD-Rom], and that "messages left by Detective Wasson
(440 Ex "2-I")
[we]re omitted" (<u>id.</u> at 121, Exhibit "F"). **This brings some very important**
**information to light.** (A) That on September 30th, 2009, the day after the
complainant spent most of the day undergoing a sexual assault examination at
Coney Island Office, the complainant went to work, (B) While at work, she copied
voicemails, including ones left by Detective Wasson 2 days earlier, onto her digital
recorder, and (C) Then either at work or at home **that same day**, before she went
to the District Attorneys Office on October 1st, 2009, the day she testified at the
grand jury, she connected her digital recorder to her computer, downloaded the
voicemails, and recorded them to CD-ROM, so she could provide them to the
District Attorney along with her diary. This was done by her to fulfill her plan for
revenge, as the voicemails, left by me one week earlier, revealed I wanted to leave
her.

### (ii)   Moving Into New Apartment Together

163. Trial counsel questions complainant, after asking if she was raped on July
28th and July 30th, 2009, about moving into a new apartment with me on August 1st,

53

2009. He has to remind her that she moved in with me and co-signed a lease, while her stuff is still in storage (Tr. Pg. 268 at ¶ 5-25, Pg. 269 at ¶ 1-23). Instead of following up with questions designed to impeach her credibility that the rapes never occurred, he asks her "Did anybody help you move?" (Tr. Pg. 269 at ¶ 5), then jumps away from that topic to talk about the fact we were seeing a couples counselor (Tr. Pg. 269 at ¶ 24-25, Pg. 270 at ¶ 1).

164.   Trial counsel never addressed the complainant pushing me down the stairs on August 3rd, 2009 (Tr. Pg. 398 at ¶ 4-18), and instead jumps forward to talk about August 24th, 2009 (Tr. Pg. 271 at ¶ 16-17).

## (a)   Lack of Direction or a Coherent Trial Strategy

165.   Trial counsel attempts to return to the August 3rd, 2009 on re-cross, severely limited in the scope of his questioning. He asks the complainant "Didn't you and Anthony have a fight in early August in which - - and you had left the Sylvaton address and spent the night at your mother's house because of the fight?" She answered "No. The following day my mother called me and her attitude was you made your bed now you lay in it" (Tr. Pg. 295 at ¶ 2-10). Trial counsel never got a response.

166.   An examination of the DD5 report would have revealed the existence of a complaint report filed by the complainant less then ½ mile away from her mothers house on the Queens/Brooklyn border on August 4th, 2009 at 5:10 am in the

morning, which would have clearly revealed her as a liar and severely damaged her credibility (id. at ¶ 112-114, *supra*). Trial counsels confusion and lack of trial strategy continues when he now jumps forward to the weekend of September 21st, 2009, the weekend the complainant and I spent in the Pocono's for a romantic getaway.

### (iii)   Weekend In The Pocono's at Paradise Stream Resort

**167.** On the night of September 18th, 2009, I picked up the complainant at work at 5 PM to go to Paradise Stream Resort, for an all-inclusive romantic weekend in a lakeside villa (Tr. Pg. 273 at ¶ 6-14).

**168.** When trial counsel asked "And during that period of time, did you - - were you and he intimate?" he allows her to respond by stating, "At one point it turned violent" without objection for being non-responsive. Not only that, he allows her to go into a rambling tirade about drinking and violence (Tr. Pg. 273 at ¶ 15-25, Pg. 274 at ¶ 1-21).

**169.** Trial counsel, continuing without direction, purpose or strategy, allows the complainant to then testify about July 19th, 2009, and after the court corrects him and he apologizes, he abandons that line of questioning to discuss broken shot glasses at length (Tr. Pg. 274 at ¶ 24-25, Pg. 275 at ¶ 1-21).

**170.** Considering the diary had an entry alleging that I beat her, choked her and raped her on September 18th, 2009 (yet no corresponding charges were filed for

**only** this one diary entry), the failure to question her about the diary and ask why she would travel to a remote part of Pennsylvania can be easily discerned from the record.

### (iv)   Allegations of September 21st and September 25th, 2009

171.   Trial counsel's cross-examination of the complainant about September 21st, 2009 was non-existent. Furthermore, trial counsel reinforced the prosecution theory that the sex was forced by asking the complainant questions like "I believe you indicates the next time after August 24th that Mister - - that Anthony forced himself on you was September 21st, is that correct?" (Tr. Pg. 273 at ¶ 2-4).

172.   After letting the complainant dictate the testimony given, trial counsel completely abandons any questioning about September 25th, 2009 (the only 2 felony's I was convicted of not occurring on the date alleged in original felony complaint), and spends an inordinate amount of time discussing underwear and panty-liners, in a case where I never denied we had sex, only that it was forced (Tr. Pg. 276 at ¶ 4-25, Pg. 277, Pg. 278 at ¶ 1-18).

173.   I submit that trial counsel's failure to cross-examine the complainant about September 25th, 2009 was a concession of guilt to the jury. These failures were effectively carried over into his cross-examination of the only prosecution witness who was not law enforcement or an expert, Ms. Mach, my downstairs neighbor.

### (v) Direct Examination of Complainant About September 28th, 2009

174. The complainant stated that after I returned home, I came toward the bed and tried to grab her, and she sprayed me with hairspray, then I knocked her to the floor, punched and choked her, at which point she ran upstairs (Tr. Pg. 193 at ¶ 20-25, Pg. 194 at ¶ 1-6).

175. What was unknown to the jury, as it was unknown to trial counsel because of his failure to look at the apartment, 10 minutes from his house; was that it was a spare bedroom not in use at all since my downstairs neighbor first complained of noise, as that was complainants old spring type mattress. The master bedroom was on the third floor.

176. When ADA Katchen asked what happened upstairs, she replied, "When I ran upstairs he was - - he came behind me, he started closing the living room door and he started closing all the windows. He started putting the TV on real loud and I'm screaming. And I screaming **hoping** that my downstairs neighbor hears me" (Tr. Pg. 194 at ¶ 8-12). I then allegedly grabbed her onto **the bed**, then forced her legs open and had sex with her (Tr. Pg. 195 at ¶ 1-16). The importance of this testimony will become relevant when we look at the testimony of the downstairs neighbor Ms. Mach shortly.

### (vi)   Cross Examination of Complainant About September 28th, 2009

177. Trial counsel starts his cross-examination by repeating, bolstering and essentially supporting her version of the facts with questions like "[d]id you testify that he forced you to have sex, sexual intercourse with him, is that right, on September 28th?" After responding yes, trial counsel continues by asking "That he had first taken your clothes off, is that correct?" Again, she states yes and then he asks, "Your underwear off, and panty liner?" She states, "Yes." (Tr. Pg. 275 at ¶ 25, Pg. 276 at ¶ 1-8). None of this questioning is adversarial; he is simply repeating, bolstering and reinforcing the prosecutions theory of the case.

178. Although trial counsel had multiple session notes released to the defense, some of which the judge described as arguably "<u>Brady</u>" material, he used none of them to impeach the complainant's credibility (Tr. Pg. 223 at ¶ 10-18). Instead, he only asked "[d]idn't he say even in front of your therapist that he was going to leave you?" And she answered "No" (Tr. Pg. 283 at ¶ 6-16). The session notes contradicted this. More importantly, this session note was billed to my insurance, which the complainant was not a part of. Hence, not only could it not be her therapist, but also the session note, which listed her as the patient; was fraudulently submitted under subpoena to the trial court.

179. The only time trial counsel barely approached the issue of prompt outcry was when he asked the complainant, "during the time that you were living with

Anthony and seeing your therapist did you ever tell your therapist that he was sexually abusing you?" She replied, "I don't recall if I did" and repeats that when asked if she ever told her mom, brother, sister, friends or co-workers (Tr. Pg. 283 at ¶ 8-25, Pg. 284 at ¶ 1-19).

**180.** Trial counsel lost the opportunity to contradict the complainants own testimony on direct examination by ADA Katchen when he asked, "...Isn't it a fact that you began screaming and hollering and stomping your foot on the floor?" and "So in an effort that the neighbor downstairs would think that you and he were fighting?" to which she responded "No" (Tr. Pg. 285 at ¶ 21-25, Pg. 286 at ¶ 1-11, <u>compare</u> to Tr. Pg. 194 at ¶ 8-12).

**L.**     **Direct and Cross-Examination of Downstairs Neighbor, Ms. Mach**

**181.** ADA Rajeswari asks Ms. Mach about the location of my bedroom and testifies it is right above hers (Tr. Pg. 352 at ¶ 12-22), but Ms. Mach had never been in my apartment.

**182.** ADA Rajeswari elicits testimony from Ms. Mach about when she goes to sleep during August through September 2009 and trial counsel objects as to what specific day (Tr. Pg. 352 at ¶ 23-25, Pg. 353 at ¶ 1-12). He then draws Ms. Mach's attention to the end of September 2009 and asks the generic question, "Do you remember the last time that his fiancée lived at Sylvaton Terrace?" After she responds "Yes" he asks, "What, if anything, did you hear that night from your

bedroom? What if anything, happened, did you hear anything that night?" (Tr. Pg. 353 at ¶ 13-25, Pg. 354 at ¶ 1-4).

183. There is no objection from Mr. Lamb as to what day in the end of September Ms. Mach is testifying about, even though I am charged with 3 crimes on 3 different dates in end of September. Furthermore, the complainant herself testified the alleged incident occurred on the 3rd floor (Tr. Pg. 194 at ¶ 1-12, pg. 195 at ¶ 1-16).

184. Furthermore, ADA Rajeswari elicited what "happened" upstairs from Ms. Mach while acknowledging she was in her apartment and not present, which was designed to elicit speculative and prejudicial testimony (Tr. Pg. 354 at ¶ 5-9).

**M.    Defense Counsel Took A Position Contrary To The Defense By Failing To Call Forensic Document Examiner Robert Baier To The Stand To Testify**

185. Trial counsel's unexplained reason for not introducing the diary into evidence to impeach her testimony at the grand jury and trial, and advance the theory of the defense that the charges against his client were fabricated, were on the face of the record and should have been raised by appellate counsel.

186. Reiterating trial counsel petitioning for a document examiner on July 7th, 2010, followed up with a written motion on July 16th, 2010, trial counsel also made the following statements during the first two days of trial (September 13th and 14th, 2010)

> Mr. Lamb: "...my handwriting expert did in fact have an opportunity to and did in fact examine the diary at the D.A.'s office...I feel he has evidence value and I intend to call him as an expert witness on behalf of the defense offer his testimony offer him as an expert.
> As far as scheduling is concerned, he comes from Warwick, New York, and recently had a death in the family, as a matter of fact, his mom - - ."
> The Court: "You want to him out of order on Wednesday."
> Mr. Lamb: "I'd like to be able to call him, if necessary, to of order on Wednesday afternoon; is that all right with the Court."
> The Court: "It's fine with me."
> Mr. Lamb: "Thursday he may have to go back to Massachusetts to make further arrangements regarding his mother's funeral" (Tr. Pg. 58 at ¶ 8-16, Pg. 59 at ¶ 10-22).

187. The following day (September 14th, 2010), Judge Rooney confirms that Mr. Baier will be testifying tomorrow (September 15th, 2010).

> The Court: "And your handwriting expert is not available until tomorrow afternoon?"
> Mr. Lamb: "Yes" (Tr. Pg. 231 at ¶ 10-12).

188. Mr. Baier received confirmation to drive down over 2 ½ hours from Warwick, N.Y. to testify on my behalf the next day, on the evening of September 14th, 2010, from both my trial attorney Eugene Lamb and me. Yet, without warning or change in circumstance, here is what Mr. Lamb stated after I confronted him when finishing the cross-examination of the complainant the next day, September 15th, 2010, without questioning her about the diary and thereby laying the foundation to introduce it into evidence and call Mr. Baier as an expert witness.

> Mr. Lamb: "We took a short break after I finished my cross-examination of the complaining witness in this case and I thought I had communicated clearly with my client that I was prepared to rest and did he have any other problems. He is now telling me that he did not understand and that he is

protesting the fact that I did not make any reference to the diary, which would then allow the expert witness to testify. *In my judgment it shouldn't have come in and no reference should have come in on the cross examination and therefore we make the expert's testimony irrelevant. He is protesting that* [Emphasis Added] (Tr. Pg. 331 at ¶ 13-25, Pg. 332 at ¶ 1).

➢ The Court: "You've made your record. There's nothing for me to say" (Tr. Pg. 332 at ¶ 3).

189. Mr. Lamb, who previously showed so much concern for Mr. Baier, who was grieving his mother's death and making arrangements for her funeral, inexplicably changed his mind. On October 5th, 2010, the initial sentencing day, I made a record concerning this unexplained action.

➢ Mr. Lamb: "I mean the major thrust of my conduct at trial is my belief that if the use of the diary then introduced a handwriting expert to impeach the diary would have been harmful."

➢ [**First**, the defense theory is that the charges were fabricated, how could showing the diary was the basis of her grand jury testimony and was falsified been harmful].

➢ Defendant: "He was ready to testify. The handwriting expert was in the building that day. Because of his failure to bring up that, I believe that he would have been able to show the jury prejudice in the fact that every single page of the diary was written in a different handwriting by a different pen. It shows she went back and maliciously added stuff to the diary, took it to the grand jury and presented a false document [see Section VI, Sub Section C]. I was never given notice of Grand jury. I had filed a notice for that as well. I showed it to a dozen people and can see the handwriting is different" [Appendix Item J, Oct. 5th, 2010, Tr. Pg. 8 at ¶ 25, Pg. 9 at ¶ 1-20].

➢ Mr. Lamb: "There was a handwriting expert that was brought on actually assigned to 18b, he was actually in the building ready, willing and able to testify."

➢ The Court: "For strategic reasons you decided not to call him."[5]

➢ Defendant: "Against my wishes."

---

[5] Upon information and belief, providing a reason for trial counsels actions was an Abuse of Discretion by the Trial Court

➤ Mr. Lamb: "We did discuss it. As a result of our conversation regarding that it was my feeling that the defendant agreed with me [In actuality, we argued extensively] that at that point that it was unwise as a trial strategy to introduce the existence of the diary."

➤ Defendant: I wouldn't have had the guy drive down from Upstate New York if I didn't want him to testify. That morning Mr. Lamb talked about a lot of stuff and he may not remember, but I specifically told him that was **the most important part of my trial**. And I object and I wouldn't have had the guy drive down three hours. I found the handwriting expert. Mr. Lamb couldn't find one. I made all the arrangements for this guy to be here. Why would I do that if I didn't want him to testify in my trial?"

➤ The Court: "All right, your lawyer is going to make that 330.30 application" [Appendix Item J, Oct. 5th, 2010, Tr. Pg. 10 at ¶ 6-25, Pg. 11 at ¶ 1-6].

## XIV. Retroactive Misjoinder and Prejudicial Spillover

**190.** The use of the inadmissible diary (as the truth of the matter asserted) at the Grand Jury resulted in retroactive misjoinder, allowing the People to assert a theory of "Battered Woman's Syndrome" and present evidence from an expert, which would ordinarily not be allowed, improperly bolstering the prosecution's case. This resulted in prejudicial spillover from the 11 counts dismissed by the trial court before the jury started deliberating, representing almost 50% of the felony charges against me.

**191.** In this case the record has established that Counts 7, 12-15, 17, 19-22 and 25, for a total of 11 counts (all originating **solely** from the complainant reading from her diary on the stand during her grand jury testimony), were dismissed and never presented to the petit jury for deliberations (Verdict Sheet, Ex. "L"). (440 Ex. "1-5") Every other count in the indictment, which appeared in some form in the diary, resulted

in a verdict of NOT GUILTY (Counts 1-5, Rape in the First Degree, Counts 8-9, Criminal Sexual Act in the First Degree, and Count 16, Assault in the Second Degree).

192. I was only found guilty of misdemeanor assault and possession of a weapon on September 3rd, 2009, Criminal Sexual Act and Attempted Rape on September 25th, 2009, and Second Degree Assault and Rape on September 28th, 2009. The district attorney improperly bolstered their case and "stacked the deck" by allowing the complainant to read from an inadmissible diary at the grand jury, thereby usurping the grand jury's role as exclusive fact finder, while at the same time bypassing the rules of evidence designed to prevent such abuse.

193. This created a reasonable probability that the jury's findings were prejudicially influenced by the sheer multitude of this evidence, and it can be reasonably inferred that this evidence was presented in such a manner that tends to indicate the jury utilized this evidence in reaching a verdict on the remaining counts.

194. Trial counsel's failure to challenge the admissibility of this diary in a motion to dismiss the indictment under C.P.L. § 210.35 (5), before trial, combined with his failure to advance the theory of the defense that the charges were fabricated by using the expert witness to testify about the serious inconsistencies in

the diary, further supporting the C.P.L. § 210.35 (5) motion was apparent from the record and appellate counsel was remiss for not raising these meritorious claims.

## XV.   Failure to Object and To Articulate A Specific Reason For Mistrial Following Summation

195.   The failure to object and to move for a mistrial at the end of the People's case on numerous issues prevented proper appellate review.

### A.   Failure To Object To Speculative Testimony of Ms. Mach

196.   ADA Rajeswari elicits information concerning when Ms. Mach goes to sleep during August into September 2009 (id. at ¶ 181-184), and trial counsel never objects to her speculative testimony concerning "what happened" upstairs in a room she was not present in.

197.   After trial was over and the jurors were deliberating, they sent a jury note requesting the testimony of Ms. Mach to be read back to them. This is when Mr. Lamb advocated removing testimony that was clearly speculative and prejudicial under the guise of damage control, but in reality was because of his failure to promptly object (Tr. Pg. 688 at ¶ 18-19).

198.   The court made specific rulings concerning Mr. Lamb's proposed objections, which include, "You asked me to go back and sustain an objection that was never made. I can't do that" (Tr. Pg. 680 at ¶ 11-12). 'I don't see how I can go back and retroactively sustain an objection that was never made" (Tr. Pg. 682 at ¶ 1-2). "There was no objection made subsequently at a different issue which I

sustained, but I can't go back and retroactively sustain an objection that was not made. I will deny your application on that regard" (Tr. Pg. 682 at ¶ 10-14).

199. Mr. Lamb instead advocates removing various objections to speculative and prejudicial testimony, which was objected to, sustained and stricken in front of the jury, and succeeded in doing so, with Judge Rooney ruling "he wants it in. I don't care…Normally when I sustain an objection its stays stricken" (Tr. Pg. 688 at ¶ 10-13). This occurred after trial was over, and during a request for a read-back during jury deliberations, an important factor.

200. The trial court abused its discretion and allowed testimony that was stricken in front of the jury during trial and admonished that they could not use in their deliberations **three times**, at the start of trial (Tr. Pg. 17 at ¶ 2-17), during the objections (Tr. Pg. 353-359) and in the jury charge before deliberating (Tr. Pg. 617 at ¶ 5-7), to be read back to the jury in response to a jury note.

### B.   Failure To Ask For Mistrial Concerning Defense Witness Ortiz

201. The prosecutor repeatedly asked defense witness Mr. Ortiz about his single contact with the criminal justice system inappropriately, by asking whether he had been "arrested on August 11[th], 1994", what he was "charged" with, and whether he was "charged" with crimes beyond his offense of conviction (Tr. Pgs. 478-480).

202. Each time the court sustained trial counsel's objection and admonished the prosecutor, but trial counsel failed to move for a mistrial on the specific grounds of this prosecutorial misconduct, thereby failing to preserve it for appellate review.

### C.    Failure To Object Or Ask For A Mistrial For Summation Misconduct

203. The prosecutor pursued a highly inflammatory theme, repeatedly talking about the tears in complainant's eyes and how she struggled to speak. He also recounted how the complainant had to detail "10 – 12" hospital employees about the "most private, embarrassing moments of her life", and "take her clothes off" during a sexual assault examination where they "plucked hair off her body and stuck objects into her vagina", which were improper sympathy evoking comments designed to elicit the juror's sympathies (Tr. Pgs. 581-583).

204. These comments addressed evidence and testimony outside the trial record, brought solely to induce an emotional response from the jurors. Not satisfied with this, the prosecutor then vouched for her credibility, commenting that she "had no reason to be lying" (Tr. Pg. 583).

205. These actions by the prosecutor were not fair response or fair comments to trial counsels summation, which detailed the evidence, noted weaknesses in the prosecutor's case and highlighted complainant's "contrived" appearance. Trial counsel failed to move for a mistrial on the specific grounds of this prosecutorial misconduct, thereby failing to preserve it for appellate review.

**D.** **Failure To Object and Ask For A Mistrial For Denying Expert To Examine Diary in Laboratory**

206. On August 11th, 2010, trial counsel revisited the issue concerning an expert to examine the diary in his laboratory, based on ADA Katchen's written response which indicated the People intend to introduce the diary "as an explanation for how the complaining witness remembers specific dates and times as to when the alleged rapes took place, that she refreshed her recollection with her diary…" [Aug. 11th, Appendix Item J, Pgs. 3-5, Pg. 5 at ¶ 1-2].

207. The following colloquy occurred during court on August 11th, 2010.

> ➤ Mr. Lamb: "It would appear to any layman, that there have been altercations and additions made to the pages that were submitted to me, therefore, that diary and it's authenticity becomes relevant in this case [id. at ¶ 6-10]. He [expert] has indicated that there is **no way of telling with certainty** whether a document has been altered by looking as a Xerox or photocopy" [id. at ¶ 14-17].
> ➤ The Court: "How could a handwriting expert tell when an entry or alteration was made?" [Aug. 11th, Appendix Item J, Pg. 6 at ¶ 1-4].
> ➤ Mr. Lamb: "Mr. Lamb reiterates his earlier explanations [Aug. 11th, Appendix Item J, Pg. 4 at ¶ 5-15, Pg. 5 at ¶ 11-19, Pg. 6 at ¶ 5-7], that the expert requires the use of delicate instruments, not just things that can be thrown in the trunk of a car. He has a laboratory [id. at ¶ 16-18].

208. The court adamantly denies directing the DA to bring the original to the laboratory of the expert for examination in N.J. [id. at ¶ 8-15, 19-21].

209. ADA Katchen states he may get into the diary in his direct case in "some way." But, when Mr. Lamb asks about the complaining witness responding that she remembers the dates "because I refreshed my recollection looking at the diary"

[like her grand jury testimony reveals], ADA Katchen responds that it may come up [Aug. 11th, Appendix Item J, Pg. 7 at ¶ 15-22].

210. The Court, although being informed of the equipment needed, refused to allow the diary to be brought to a laboratory for proper and extensive testing [Aug. 11th, Appendix Item J, Pg. 10 at ¶ 1-7]. Following the courts logic, a ballistics expert or a narcotics expert would also be required to perform their testing at the District Attorney's Office as well.

211. Trial counsel's failure to articulate a specific objection to this erroneous ruling combined with his failure to ask for a mistrial on these same grounds; were failures which were clear from the record and should have been raised by appellate counsel.

## XVI. Defense Counsel's Critical Failure in Handling The Deliberating Jury's Note Requesting of Testimony Violated My Due Process Right To A Fair Trial

212. Defense counsel's failure to object to the speculative testimony of prosecution witness Ms. Mach (id. at 196-200) is compounded because of the way he chose to address that failure when the deliberating jury sent a note asking for a read-back of that testimony.

213. The substance of this speculative and prejudicial testimony he did not object to is as follows:

> **The People**:   "...In the last - - in the end of September, the last time that his fiancée lived with him, what, if anything, did you hear that night?"

- ➢ **Ms. Mach**: "I hear this time, maybe nine, maybe ten - -."
- ➢ **The People**:     "At night?"
- ➢ **Ms. Mach**: "Yes, night, Mr. Rucano fiancée go to bed. Soon - - as soon start to sex, and the fiancée no want. Start screaming, I no want, leave me alone" (Tr. Pg. 354 at ¶ 2-9).

214. The jury sent in a note, marked as Court Exhibit # 5, requesting pictures, index cards and testimony of Ms. Mach. They were provided with pictures and index cards right away, and it was agreed to give them the testimony of Ms. Mach tomorrow, because it was almost 5 PM (Tr. Pg. 666 at ¶ 19-25, Pg. 667 at ¶ 1-5).

215. Before the jury was read back the testimony of Ms. Mach, the next day a long discussion occurred outside of the presence of the jury (id. at ¶ 198). The following colloquy occurred at the end of this discussion about the un-objected to testimony above, which is important for context:

- ➢ **The Court**:     "I am not criticizing you for not making an objection. I am noting that you did not make an objection."
- ➢ **Defense Counsel**: "I couldn't object to something that I could not hear…" (Tr. Pg. 683 at ¶ 1-5).
- ➢ [Ms. Rajeswari highlights the ineptness of this statement by defense counsel, and his even worse attempt of explaining **the reason why he did not object**.]
- ➢ **The People**:     "If we may amplify the record, he did state that he didn't hear and had several of the questions read back to him. This was no the only instance. The record will support several times the defense counsel asked for the question read back because you couldn't hear. He could have had that happen in this instance."
- ➢ **Defense Counsel**: "How could I do that if I couldn't hear" (Tr. Pg. 683 at § 22-25, Pg. 684 at ¶ 1-6).

216. When defense counsel finally realized he lost his argument to retroactively strike testimony her never objected to, he petitioned the court to remove objections

to other speculative and prejudicial testimony, ***after trial was over and in response to the jury's request for a read-back*** (Tr. Pgs. 686-688, 689 at ¶ 1), that was **objected to**, **sustained** and **stricken from the record** by Judge Rooney in front of the jury **before they started deliberating**, to be read back to the jury in response to this jury note from the deliberating jury, allegedly for "damage control", the damage being his own failure to object to speculative and prejudicial testimony, even though it supported the People's theory that the sex was forced.

217. The People even supported this position **when they opposed** Judge Rooney retroactively striking testimony at defense counsels request **after trial was over**. "I jury asked for a readback. It is not the time to decide what should be read to them...And to rule that, you know, all the prior testimony on the page before in the transcript is inadmissible is so prejudicial to the People, where no objection is made to the testimony at trial. So the People are denied the opportunity to have even -- if it was objectionable ask the question in a different way" (Tr. Pg. 678 at ¶ 8-17).

218. The jury was instructed at the start of trial (Tr. Pg. 17 at ¶ 2-17), admonished again after defense counsel's objections to the speculative and prejudicial testimony were sustained numerous times (Tr. Pgs. 353-359), and instructed a third time during the jury charge before going in to deliberate the case (Tr. Pg. 617 at ¶ 5-7), **that any testimony to which an objection was sustained**

could not be considered as evidence in their deliberations. This objected to, sustained and stricken speculative and prejudicial testimony was then read back to the jury without the objected to and sustained paragraphs or admonishments being included (Tr. Pgs. 689-691).

219. The trial record reveals this was not only a position contrary to the defense, but which also led to a violation of trial court's response from a deliberating jury as governed by C.P.L. § 310.30

## Argument of Law

The following represents my arguments of law presented in my Memorandum of Law in support of Coram Nobis Relief. They also mimic the arguments of law raised in my Article 440 application, albiet, in a more clear and concise form. It begins with the Questions presented to the Appellate Division, Second Dept. that highlight (A) The Trial Courts decision on my denial of Article 440, compared to (B) The App. Div. Second Dept's decision to deny leave to appeal said Article 440 and to deny consolidation with my then pending Direct Appeal, and also, finally (C) The contradictions inherent in the Appellate Divisions various rulings, especially in the context of my application to withdraw Appellate Counsels Brief, which was incorporated fully into my Writ of Error Coram Nobis; where I attached to it documentary proof that Appellate Counsel Warren Landau of Appellate Advocates was made aware of, but ignored, substantive "mixed claims" of ineffective assistance of trial counsel. It was ironic that the App. Div, Second Dept. mirrored what I asserted in my Motion To Withdraw Appellate Counsels Brief when they decided my Direct Appeal on July 1st, 2015, that most of the claims Appellate Counsel raised were unpreserved for Appellate review, enhancing the contradictions in their various decisions previously.

## QUESTIONS PRESENTED FOR REVIEW

1.      If prosecutorial misconduct, intertwined with ineffective assistance of counsel, some involving errors related to the Grand Jury proceedings, are record based, how can the failure of appellate counsel to raise the majority of my record based claims [presented herein] in a State which practices the "cumulative effect" of trial counsel's errors using the Baldi standard, "representation as a whole" and "in totality," not be deemed the ineffective assistance of appellate counsel?

2.      Accepting that the issues of prosecutorial misconduct and ineffective assistance of counsel presented herein are record based, how will this Court reconcile trial counsel's inexplicable errors that are dehors the record into its review under the Court of Appeals holding in People v. Evans, 16 N.Y.3d 571, 575, n.2 (2011), and this Court's decisions in People v. Maxwell, 89 A.D.3d 1108 (2nd Dept. 2011) and People v. Freeman, 93 A.D.3d 805 (2nd Dept. 2012)?

3.      Alternately, if this Court reaches the conclusion that these claims, instead, lie within the realm of "mixed claims," how will it reconcile with the collateral review court's decision to deny my Article 440 application on December 15, 2014 (id. at ¶ 16-18), and this Courts denial of my leave application decision on April 30, 2015 (see, People v. Anthony Rucano, App. Div. Dkt. No. 2015-01499 [2nd

Dept. 2015], id. at 20-21), where the District Attorney conceded I had raised eight specific claims of ineffective assistance of counsel that were dehors the record?

4.      Finally, will this Court exercise its authority, prior to the resolution of this petition, and direct appellate counsel to provide his strategic and tactical rationale for his failures as detailed in this brief, and more importantly, direct appellate counsel to explain such rationale in the context of the information I provided to him and to this Court in my pro-se motion submitted on March 20, 2014, to withdraw appellate counsels brief, where I had preemptively attempted to seek redress on these very same claims.

## PRELIMINARY STATEMENT

This application is being submitted on behalf of the judgment rendered in the Appellate Division, Second Department, affirming my conviction rendered in the Supreme Court, Richmond County, convicting me after a jury trial of Rape in the 1st Degree, in which I was sentenced to a determinate term of imprisonment of 12 Years, with 5 Years Post-Release Supervision on January 21st, 2011 (Rooney, J.). The judgment being challenged is People v. Rucano, 130 A.D.3d 656 (2nd Dept. 2015), which affirmed my conviction with an opinion. I am currently incarcerated pursuant to the judgment at the Great Meadow Correctional Facility, Post Office Box 51, in Comstock, New York, 12821-0051.

## POINT 2

**Appellate Counsel Failed To Identify That The Cumulative Effect of Prosecutorial Misconduct By The Richmond County District Attorneys Office Was Pervasive, Unethical and Constituted a Substantial Likelihood of Prejudice; Which Deprived Me of My Due Process Right to A Fair Trial. U.S. Const. Amend. XIV, N.Y. Const. Art. I, § 6**

### Federal Standard

More than a half a century ago the Supreme Court counseled prosecutor's "to refrain from improper methods calculated to produce a wrongful conviction" Berger v. United States, 295 U.S. 78, 88 (1935). The Court made it clear, however, that the adversary system permits the prosecutor to "prosecute with earnestness and vigor." Ibid. In other words while he may strike hard blows, he is not at liberty to strike foul ones." Ibid. Recognizing that prosecutorial misconduct may infect a trial with unfairness as to make the resulting conviction a denial of due process, Greer v. Miller, 483 U.S. 756, 765 (1987); (*quoting* Donnelly v. DeChristforo, 416 U.S. 637, 643 (1974).

In this particular case, the clearly intentional nature of the misconduct weighs heavily in favor of defendant; such a patently dishonest argument brings the case close to the more traditionally established forms of misconduct such as the prosecution against a prosecutor's knowingly use of false testimony. *See e.g.* Giglio v. United States, 405 U.S. 150 (1972); Brown v. Wainwright, 785 F.2d 1457, 1464 (11th Cir. 1986).

The appropriate standard for review of a claim of prosecutorial misconduct is whether the prosecutor engaged in egregious misconduct amounting to a denial of a constitutional process. Floyd v. Meachum, 907 F.2d 347, 348 (2nd Cir. 1990); quoting Donnelly, supra, at 647-48). Prosecutor misconduct denies a defendant due process when it is "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer, supra, at 765 (quoting United States v. Bagley, 473 U.S. 667, 676 [1985]). The Second Circuit looks to three factors to determine whether prosecutorial misconduct caused the accused substantial prejudice; the severity of the misconduct; the measure adapted to cure the effects of the misconduct; and the certainty of conviction in its absence. See United States v. Russo, 74 F.3d 1383, 1396 (2nd Cir. 1996) (quoting United States v. Modica, 663 F.2d 1173 (2nd Cir. 1981); United States v. Melendez, 57 F.3d 238, 241 (1995).

### State Standard

Prosecutors occupy a dual role as advocates and as public officers and, as such, they are charged with the duty not only to seek convictions but also to see that justice is done. In their role as public officers, they must deal fairly with the accused and be candid with the courts (see People v. Pelchat, 62 N.Y.2d 97, 105 [1984]; see also, People v. Vilardi, 76 N.Y.2d 67, 76 [1990]).

The defendant through his pleadings herein, will examine, evaluate and determine the extent of prosecutorial misconduct, and show that this conduct caused the defendant substantial prejudice that deprived him of a fair trial.

I.   **The Prosecutorial Misconduct of the District Attorneys Office Before and During the Grand Jury Proceedings Constituted A Substantial Likelihood of Prejudice, Rendered My Trial Fundamentally Unfair and Usurped the Grand Jury's Fact Finding Process**

### Federal Standard

Under the Due Process Clause of the Fourteenth Amendment, criminal prosecution must comport with prevailing notions of fundamental fairness. This standard of fairness as interpreted by the Supreme Court requires that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard the right, the Court has developed "what might loosely be called the area of constitutionality guaranteed access to evidence" United States v. Valenauela-Bernal, 458 U.S. 858, 867 (1982). Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of the Criminal Justice System. California v. Trombetta, 467 U.S. 479, 485 (1984).

The grand jury has two principle functions. First, it bears the weighty responsibility of investigating crime and determining whether there is probable cause to believe that a crime has been committed. United States v. Calandra, 414 U.S. 338 (1974). The second, and no less important, task of the grand jury is to

"serv[e] the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will." <u>Wood v. Georgia</u>, 370 U.S. 375, 390 (1962). To further the grand jury's investigative function, the grand jury traditionally has been given "wide latitude" in its inquiries. <u>Calandra</u>, *supra*, 414 U.S. at 343. *See also* <u>United Stated v. Dinisio</u>, 410 U.S. 1, 17-18 (1973).

### State Standard

As was acknowledged in <u>People v. Pelchat</u>, 62 N.Y.2d 97, 105 (1984), the prosecutor's duty of fairness is premised on the "familiar doctrine that a prosecutor serves a dual role as an advocate and public officer [and is] charged with the duty not only to seek convictions but also to see that justice is done." Critical to an understanding of this duty is the relationship that exists between the important function served by the Grand Jury in our system and the prosecutor's unique role in the Grand Jury's execution of that function. The Grand Jury exists to protect citizens from needless and unfounded prosecutions as well as to investigate crimes.[2] For the most part the Grand Jury fulfills this responsibility passively, by sifting and evaluating the evidence presented to it by the prosecutor. Thus as a practical matter the Grand Jury ordinarily relies on the prosecutor to apprise it of

---

[2] *See e.g.*, <u>People v. Lancaster</u>, 69 N.Y.2d 20, 25 (1986); <u>People v. Ford</u>, 62 N.Y.2d 275, 282 (1984); <u>People v. Iannone</u>, 45 N.Y.2d 589, 594 (1978).

all of the facts it needs to determine whether an indictment should issue. In this regard, the prosecutor's office operates as a filter through which the material that the Grand Jury will use to make its determination must pass.

It is clear that the People have broad discretion in presenting their case to the Grand Jury and that they are not obligated either to search for evidence favorable to the defense or to present all evidence in their possession that might be favorable to the accused. (People v. Lancaster, 69 N.Y.2d 20, 25-26 [1986]). However, there are some circumstances in which the exculpatory evidence is so essential to a complete understanding of the case that the prosecution's failure to disclose it can actually prevent the Grand Jury from functioning as an intelligent and informed decision-making body. In such cases, withholding the evidence precludes the Grand Jury from performing its essential role as a bulwark against prosecutorial excess (see, People v. Lancaster, supra at 25). Those are the cases in which the duty of fair dealing is operative.

CPL § 210.35(5) provides that a Grand Jury proceeding is defective when "the integrity thereof is impaired and prejudice to the defendant may result." The exceptional remedy of dismissal is thus warranted only where a defect in the indictment created a possibility of prejudice (see, People v. Di Falco, 75 N.Y.2d 449, 450 [1990]). Although this statutory test "is very precise and very high" (People v. Darby, 75 N.Y.2d 449, 450 [1990]), it does not require actual prejudice

(see, People v. Sayavong, 83 N.Y.2d 702, 709 [1994]; People v. Wilkins, 68 N.Y.2d 269, 276 [1986]). Indeed, two earlier drafts of CPL § 210.35(5) required a showing of actual prejudice before an indictment could be dismissed as the result of defective grand jury proceedings. The Legislature, however, rejected a requirement of actual prejudice in favor of the current provision – requiring only that "prejudice to the defendant *may* result" (CPL § 210.35[5][emphasis added]).[3]

Dismissal of indictments under CPL § 210.35(5) should thus be limited to those instances where prosecutorial wrongdoing, fraudulent conduct or errors potentially prejudice the ultimate decision reached by the Grand Jury. The likelihood of prejudice turns on the particular facts of each case, including the weight and nature of the admissible proof adduced to support the indictment and the degree of inappropriate prosecutorial influence or bias.

**II.   ADA Katchen Assumed a Dual Role Before the Grand Jury as Prosecutor and Witness When he Acted As An Investigator and Processed the Diary Before the Grand Jury Proceeding On the Morning of October 1st, 2009 and Became An Unsworn Witness, Violating My Right To A Fair Trial**

The diary or its contents were unknown to any law enforcement investigator, and were only revealed to ADA Katchen before the grand jury convened on October 1st, 2009, 3-6 hours before I was arraigned on the felony complaint (Aff. at ¶ 37-38, 43-44).

---

[3] See People v. Di Falco, 44 N.Y.2d 482, 487, *supra*.

The investigative actions of ADA Katchen in processing the diary put him in a position to be questioned by the defense as a potential witness at trial. His conduct in using the diary, as the basis of his questioning of the complainant, was a material issue to be raised during trial, making him an unsworn witness (Aff. at ¶ 47-80, 136-140).

When ADA Katchen prosecuted this case before the grand jury and became an unsworn witness, it was a violation of ABA Model Code of Professional Responsibility EC 5-9 (1978), which states "the role of an advocate and a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively."

The advocate-witness rule is embodied in the provisions of Disciplinary Rules 5-101(B) and 5-102 of the Code of Professional Responsibility and generally require the lawyer [Prosecutor] to withdraw from employment [prosecuting] when it appears that he...will be called to testify regarding a disputed issue of fact [or investigative action].

As stated in People v. Paperno, 54 N.Y.2d 294 (1981),

> "The unsworn witness rule poses more subtle problems in our efforts to preserve the right to a fair trial. This rule has no definitive contours, but stands for the proposition that the prosecutor may not inject his own credibility into the trial. Thus, we have reversed conviction where the prosecutor to the prejudice of the defendant has expressed personal belief on matters which may influence the jury [Aff. at ¶ 47-52](People v. Tassiello, 300 N.Y. 425 [1950])...or has, by cross-

examination, suggested the existence of facts not in evidence [Aff. at ¶ 53, 58, 63-68](People v. Duncan, 13 N.Y.2d 37 [1963]). Such conduct on the part of the prosecutor amounts to a subtle form of testimony against the defendant as to which the defendant may have no effective means of cross-examination. Hence the rule is founded upon the possible danger that the [grand] jury, impressed by the prestige of the office of the District Attorney, will accord great weight to the beliefs and opinions of the prosecutor" (Paperno, 54 N.Y.2d at 300-01).

ADA Katchen used leading questions that provided the date, location and other testimonial information during a large portion of his grand jury examination of the complainant, the type of conduct specifically addressed in Paperno, *supra*. This can be construed as expressing his personal belief on matters, which influenced the jury into believing the non-existent independent recollection of the complainant. This can be easily discerned by reviewing the grand jury minutes (People v. Tassiello, *supra*). The complainant could not answer any questions about July 17th, 2009 and July 28th, 2009, without looking at her book, later revealed as a diary.

ADA Katchen's investigatory actions, before I was arraigned on the felony complaint, and conduct at the grand jury; violated my right to a fair trial. "The appellate division seeking to effectuate the 'spirit' of the unsworn witness rule held that in any case in which the prosecutor's pretrial conduct is a material issue, he must be recused" (Aff. at ¶ 140-144) (Paperno, *supra* at 123). ADA Katchen did not recuse himself and went to great lengths to prevent the revelation of the diary

until right before trial, and even then would only provide a poor black and white Xerox copy, which did not reveal its true nature (Aff. at ¶ 97-100, 145, 148-153).

ADA Katchen violated the duty of fair dealing by usurping the grand jury's fact-finding process, acting as an unsworn witness and by testifying with leading questions; thereby invading the grand jury's province as exclusive evaluator of evidence. He was also required to reveal the diary, with its exculpatory entries, as Brady material within Omnibus motion (Aff. at ¶ 98-99)(Mem. at Pgs. ¶ 34-47, *infra*).

**A.     ADA Katchen Violated the Duty of Fair Dealing By Engaging in Pervasive Misconduct During the Grand Jury Proceedings, Which Impaired Its Integrity and Prejudiced the Defendant**

The minutes of the grand jury in this case reveal what can happen when the prosecutor is too determined to obtain an indictment. There are certain limitations on the presentation that a prosecutor may make to the grand jury. *See e.g.* United States v. Ciambrone, 601 F.2d 616, 623 (2nd Cir. 1979)(prosecutor may not mislead grand jury or engage in fundamentally unfair tactics before it). In fact, the gain in prosecutors influence over grand juries is all the more reason to insist that these limitations be observed strictly. Due process considerations prohibit the government from obtaining an indictment based on known perjured testimony. *See* United States v. Barsurto, 497 F.2d 781, 785 (9th Cir. 1974). Under the guidelines, prosecutors have an ethical obligation strictly to observe the status of the grand

jury as *an independent legal body*.[4] A prosecutor as an officer of the court is sworn to ensure that justice is done, not simply to obtain an indictment.

This improper questioning allowed the prosecutor to give important and extensive substantive testimony, which courts have found reason to allow dismissal of the indictment. U.S. v. Gold, 470 F.Supp. 1336 (1979); U.S. v. Treadway, 445 F.Supp. 959 (1978).

**B.**   **The Substance of the Grand Jury Questioning of the Complainant and the Resulting Prejudice That Occurred, Which Included Non-Verbal Cues and Testimony by ADA Katchen; Rendered the Grand Jury Proceedings Fundamentally Unfair**

The substance of the grand jury questioning of the complainant reveal leading questions, the use of non-verbal cues and strongly suggest that the complainant was instructed to read from the diary in a certain manner. She was allowed to take the diary with her on the stand without it ever being presented to her to "refresh her recollection", or to be marked for identification as required (Aff. at ¶ 47-49). For all we know, the complainant read from the diary throughout her entire grand jury testimony. This was to avoid bring attention to the diary.

ADA Katchen also guided the complainant with information designed to help her testify about events she had no independent recollection of, to prevent her from constantly referring to her diary. The use of non-verbal cues, by both ADA

---

[4] *See* ABA Standards For Criminal Justice, Standard 3-3.5 at 3-48 (2d ed. 1980); United States Attorney's Manual 9-11.015 (August 17th, 1998).

Katchen and the complainant (Aff. at ¶ 47-60), was pervasive and allowed testimony that was unethical and improper. The only reason we know of these non-verbal cues is because of Grand Jury Stenographer Donielle McKenna.[5]

Stenographer McKenna may not have been able to record all non-verbal cues, with two ADA's present. The important question becomes "How many non-verbal cues actually occurred and were not recorded, what was their substance and why were non-verbal cues being used in this proceeding in the first place?"

These non-verbal cues reveal the intention of ADA Katchen to keep the existence of the diary out of the awareness of the grand jurors, usurping their fact finding process and giving no deference to their status as an independent legal body, with serious professional and ethical consequences that prejudiced me (Aff. at ¶ 47-60). ADA Katchen was aware of the diaries inadmissibility, unreliability and exculpatory nature; yet he continuously pursued a course of conduct designed to conceal its existence.

### i.     The "Book" is Now Identified as a "Diary", Which Was Not Part of the Independent Recollection of the Complainant

The reason ADA Katchen uses non-verbal cues and leading questions becomes apparent when the "book" complainant is referring to is revealed as being a "diary" (Aff. at ¶ 57-58), which the complainant was improperly allowed to read from on the stand as she had no independent recollection of the falsified events,

---

[5] *See* ABA Standards for Criminal Justice § 3-3.5 (c) (3d ed. 1993), "A Prosecutor's communications and presentations to the Grand Jury should be on the record."

which she wrote in this diary (Aff. at ¶ 49, 53-54, 61-70). Her choice of the word "incidents" to describe an alleged series of violent assaults and rape, is unusual to say the least, as this "diary" only had 7 dated entries over a 2 ½ month period.

**C.**　　**ADA Katchen Deceived the Grand Jurors Into Thinking the Complainant Had An Independent Recollection of the Events, Failed to Inform the Grand Jury About the Diary, Which Constituted Hearsay; and Violated the Rules Regarding Past Recollection Recorded**

The previous section explained the deceptive actions of ADA Katchen in presenting this case to the grand jury. The record reflects that even though the complainant was provided the date and location in the form of a leading question, she was unable to provide the barest amount of information without reading from her "book", eventually revealed as a "diary."

She did so not to refresh her memory, implying she had some knowledge of the events, but testified by reading from it as the truth of the matter asserted, clearly against the rules of evidence before the grand jury (Aff. at ¶ 47-60).

"Although there is no prohibition on the use of hearsay evidence before a Grand Jury, [the] decision in United States v. Estapa, 471 F.2d 1132 (2nd Cir. 1972), indicates that extensive reliance on hearsay testimony is disfavored. More particularly the government prosecutor presenting hearsay evidence to the grand jury must not deceive the jurors as to the quality of the testimony they hear. Id. at 1137. Heavy reliance on secondary evidence is disfavored precisely because it is

not first-rate proof. It should not be used without cogent reason[6], and never be passed off to the grand jurors as quality proof when it is not." U.S. v. Hogan, 712 F.2d 757, 761 (C.A. 2 [Conn.] 1983). These rules concerning hearsay were violated by ADA Katchen to avoid dealing with the rules of evidence regarding past recollection recorded, thereby preventing the diary from being marked for identification and/or being entered into evidence, requiring foundation.

The exact formulation of the rules regarding past recollection recorded has been stated in many different ways and by many different authorities.[7] The principle of past recollection recorded has been part of common law of this State for well over a century. Essentially, the principle is as follows; when a witness is either unable to or unwilling to testify as to the contents of a memorandum, written by him or at his direction prior to trial, the memorandum *may be shown to the witness* and the memorandum itself retains no value as evidence, referred to as "present recollection revived", not testify by reading from it!

This rule has was defined in People v. Caprio, 25 A.D.2d 145, 150 (2nd Dept. 1966), in the following terms: "the rule of past recollection recorded may be simply stated. When a witness is unable to testify concerning facts recited by or through him in a memorandum, the memorandum [diary] is admissible as evidence

---

[6] *See* ABA Standards for Criminal Justice Commentary Standard 3-3.6 at 3.50 (2d ed. 1980).
[7] *See* 3 Wigmore, Evidence (Chadbourne rev), ss 744-748, 22 N.Y. Jur. Evidence, s § 507; Richardson, Evidence (Prince, 10th ed.) ss 469-473; 1 Bender's New York Evidence, s 26.05 (1)

of the facts contained therein if he observed the matter recorded, it was made contemporaneously with the occurrence of the facts recited and the witness is able to swear that he believed the memorandum correct at the time made." This is important, as the authenticity of the diary comes into question with an examination by Forensic Document Examiner Robert Baier (Aff. at ¶ 92-97, 141, 144-149).

The requirement of trustworthiness is not to be taken lightly. "Like most exceptions to the hearsay rule the doctrine of past recollection recorded is grounded on a guarantee of correctness. During the formative period of the rule in this State, the courts often noted that the willingness to permit the introduction of the record should be directly linked to the apparent trustworthiness of that record" (Ianelli v. Consolidated Edison Co., 75 A.D.2d 223, 230 [1980]).[8]

**D.   The Hearsay Rule Forbade the Use of the Diary as Bolstering Statement, or as Testimony to the Truth of the Matter Asserted; As The Complainant Had Significant Cause, Reason and Purpose to Deviate From the Truth**

It is important to identify when the motive to deviate from the truth, i.e. fabricate, arose. The complainant had significant cause, reason and purpose to create the diary when she first observed me sending an email to my friend Steve

(440 Ex. "1-T")

Frankl about the disturbing events occurring in our relationship (Tr. Pg. 386 at ¶ 11-14). Ironically, that email was dated July 17th, 2009, the first entry of her diary

---

[8] *See also* Brown v. Provident Loan Soc. Of N.Y., 282 N.Y. 453 (1940); Brown v. Western Union Tel. Co., 26 A.D.2d 316 (1966); *Quoting* People v. Raja, 433 N.Y.S.2d 200, 203 (1980).

and the first crime I was charged with. The complainant had significant cause, reason and purpose to turn the diary into a weapon when I told her that I was going to leave her in a couples counseling session, one week before she had me arrested, which was played in a voicemail heard by the jury (Aff. at ¶ 111-114), and which I also testified about (Tr. Pg. 408 at ¶ 9-25).

A witnesses [grand jury] testimony ordinarily may not be bolstered with pretrial statement (People v. McClean, 69 N.Y.2d 426, 428 [1987]; *see* People v. Singer, 300 N.Y. 120, 123-124 [1949]). Several rationales underlie the rule: untrustworthy testimony does not become less so merely by repetition (McClean, *supra* at 428); testimony under oath is preferable to extrajudicial statements (People v. McDaniel, 81 N.Y.2d 10, 16 [1993]).

"Moreover...prosecutor may not by his or her conduct potentially prejudice ultimate decision reached by the grand jury. The likelihood of prejudice turns on the particular facts of each case including the weight and nature of the admissible proof adduced to support the indictment and the degree of inappropriate prosecutorial influence or bias" (People v. Huston, 88 N.Y.2d 400, 409 [1996], *see also* People v. Goldstein, 73 A.D.3d 946 [2nd Dept. 2010]).

### E.     The Resulting Prejudice That Occurred

The record supports the fact that ADA Katchen acted in an investigatory manner, assumed a dual role before the grand jury as prosecutor and an unsworn

witness, used non-verbal cues and leading questions and violated the advocate-witness rule. Through prosecutorial overreaching, ADA Katchen manipulated the grand jury testimony of the complainant for the sole purpose of obtaining an indictment for crimes that had no substantiality or basis in fact (Aff. at ¶ 46-80).

ADA Katchen violated all 3 parts of the "Relations with Grand Jury" section of the ABA Standards for Criminal Justice when he did not give due deference to the <u>Grand Jury's status as an independent legal body</u> (ABA Standard 3.35 at 3-4.8), <u>presentation should be on the record</u> (ABA Standard § 3-3.5 [c]), and when he abused his discretion in the <u>charging decision to the grand jury</u> (ABA Standards For Criminal Justice § 3-3.9 [f]), which states "The prosecutor should not bring or seek charges greater in number or degree then can reasonably be supported with evidence at trial or than are necessary to fairly reflect the gravity of the offense."

ADA Katchen was aware of the statutory requirement that these charges be run concurrent, so in order to bolster his weak and circumstantial case he "stacked the deck" by introducing multiple, unsupported, unsubstantiated charges through an inadmissible hearsay document, without laying a foundation, to obtain a conviction. The fact that all charges extracted from the diary at the grand jury were either dismissed (11 felonies), or resulted in a verdict of "Not Guilty" (8 felonies)(Aff at ¶ 59), support and substantiate the defendant's claims above.

The conduct of ADA Katchen was not only unethical, it constituted prosecutorial overreaching and the manipulation of the grand jury on such a level to meet the standard set in C.P.L § 210.35(5), which provides that a grand jury proceedings is defective when "the integrity thereof is impaired and prejudice to the defendant **may** result" [Emphasis Added]. Even though the statutory test is "very precise and very high" (People v. Darby, 75 N.Y.2d at 455, *supra*), it does not require actual prejudice (People v. Sayavong, 83 N.Y.2d at 709, *supra*; People v. Wilkins, 68 N.Y.2d at 276, *supra*).

### III.   ADA Katchen Usurped the Grand Jury's Fact Finding Process by Using Incompetent and Inadmissible Evidence Before the Grand Jury

ADA Katchen allowed incompetent and inadmissible evidence to form the basis of the complainants' testimony, which was more pervasive due to his exclusive knowledge of that evidence [diary] being unreliable and false, and usurped the grand jury's fact-finding process

"The primary function of the Grand Jury is to uncover crimes and misconduct... for the purpose of prosecution (*see* N.Y. Const. Art. I, § 6; CPL 190.65, 190.55). False testimony before the Grand Jury, then, especially by the holder of public office is a grave matter affecting the public interest and the administration of justice. It is not properly a principle aim of Grand Jury, however, to 'create' new crimes in the course of the proceedings" People v. Rao, 73 A.D.2d 88, 1980 (2nd Dept. 1980).

**A.**     **The Diary, Which Was Used as Evidence During the Grand Jury Proceedings, Was Not Competent and Admissible According to the Statute**

C.P.L. § 190.30(1) states, "Except as otherwise provided in this section, the provisions of Article 60 governing rules of evidence and related matters with respect to criminal proceedings in general, where appropriate, applicable to grand jury proceedings." In addition to this provision, C.P.L. § 190.65(1) requires "legally sufficient" and "competent and admissible" evidence in grand jury proceedings (*see also* C.P.L.  190.30[2] through [7]), deviation from this principle is limited. Thus, general criminal trial court evidentiary rules normally apply to grand jury proceedings.

An examination of C.P.L. § 190.65 (1) reveals that a Grand Jury may indict a person for an offense when ...(b) competent and admissible evidence before it provides reasonable cause to believe that such person committed such offense.

In practice, a decision of a New York Grand Jury to charge a defendant with an offense must, except otherwise specified in C.P.L. § 190.30, be based on competent evidence (*see* C.P.L. §§ 70.10[1], 190.30[1]).

C.P.L. § 70.10, titles "Standards of Proof, Definition of Terms", states in subdivision (1), "legally sufficient evidence" means competent evidence which, if accepted as true would establish every element of an offense charged and defendants commission thereof..." Evidence that is competent is not necessarily

admissible if it constitutes hearsay not covered under the exceptions in C.P.L. § 190.30(2) through (7).

As the commentary in C.P.L. § 70.10 by Peter Prieser states:

> This section defines two important completely distinct standards of proof applicable solely to criminal procedure. The standards herein apply throughout the CPL to determination on matters such as authority of an officer to arrest, issuance of search warrants, validity of misdemeanor and felony complaints, the sufficiency of an information, *authority for a grand jury to indict*, the sufficiency of proof for conviction, etc.
>
> "Legally sufficient evidence" is "competent evidence" – i.e., evidence *not subject to an exclusionary rule*, *such as hearsay* – establishing every element of the crime charged and defendant's commission thereof. People v. Swamp, 84 N.Y.2d 725, 730 (1995); Baxter & Alexander, Evidence in New York State and Federal Courts, § 1.2 at 3 n.4 (2001). As defined in subdivision one, the term connotes a purely legal concept sometimes called "a prima facie case" (*see e.g.*, People v. Jennings, 69 N.Y.2ds 103, 115 [1986]) [Emphasis Added].

The extremely important distinction here is that the requirement of when a grand jury is authorized to issue an indictment under C.P.L. § 190.65(1)(b) states "competent and admissible evidence."

By inserting the connector "and" in the formulation of the statute, it shows a legislative intent that both "competent *and* admissible evidence" is required to satisfy the statutory requirement. Thus, evidence not subject to an exclusionary rule, i.e. "hearsay", is not admissible (People v. Swamp, 84 N.Y.2d at 730, *supra*). The diary was not admissible at the Grand Jury as evidence of truth of its contents.

"[O]ur criminal justice system is befouled and besmirched whenever law enforcement officers conduct a grand jury proceeding in which…(c) the introduction of competent and admissible evidence is the exception rather than the rule, (d) exculpatory evidence directly bearing on an issue placed before the grand jury is consciously withheld from that Grand Jury…" (People v. Rao, 425 N.Y.S.2d at 128, *supra*).

ADA Katchen presented inadmissible evidence at the Grand Jury and took measures to conceal it, to prevent revealing the exculpatory content. He bypassed the safeguards designed to assure the diary's reliability, and allowed the complainant to take the stand with the diary in her possession [and possibly other notes]; usurping the grand jury's fact finding process, and in a course of pervasive misconduct set forth to deprive me of my right to testify at the grand jury.

**IV.   The People Violated My Statutory Right to Provide Me With Actual Notice That Was Reasonably Calculated to Appraise Me of a Date and Time I Could Invoke My Right to Testify at the Grand Jury; Thereby Allowing Dismissal of the Indictment Pursuant to C.P.L. § 210.35(5)**

The facts and circumstances reveal that 3 to 6 hours before I was arraigned a grand jury was convened and heard the testimony of the complainant (Aff. at ¶ 37-38). I made bail and the evidence shows the prosecutor's office failed to provide notice reasonably calculated to provide me with a date and a time I could testify at the grand jury (Aff. at ¶ 39-44).

Taken in the context of the facts of this particular case, which includes the weight and nature of admissible proof adduced to support the indictment and the degree of inappropriate prosecutorial influence and bias during the grand jury proceedings; together with the fact that this case was presented to the grand jury before the defendant was arraigned and again convened 2 business days later to vote a true bill, the question remains, "Why was this case rushed to the Grand Jury in the first place?"

The following questions raise just as important questions. "Why did Judge Alan Meyer have no idea a grand jury was convened on Thursday, October 1st, 2009?" before I was arraigned later that same day (Aff. at ¶ 37-38), and "Why did Judge Desmond Green have no idea a grand jury was ever convened on October 5th, 2009, the 180-80 day, or that grand jury action was scheduled for 2:15 p.m. that same day?" (Aff. at ¶ 43-44).

## A.     Article 190 and the Statute's Legislative Intent

C.P.L. § 210.20(1)(c) authorizes a court to dismiss an indictment on the ground that "the grand jury proceeding was defective, within the meaning of C.P.L. § 210.35." C.P.L. § 210.35, in turn, sets forth four specific types of defects, including an "illegally constituted" Grand Jury and certain quorum deficiencies (C.P.L. § 210.35 [1] – [3]; see also CPL § 210.35 [4] [concerning failures to accord the target a right to testify]). A separate catchall provision is included for those

proceedings that "otherwise fail to conform to the requirements of [CPL Art 190] *to such a degree that the integrity thereof is impaired and prejudice to the defendant may result*" (C.P.L. § 210.35[5] [emphasis added]; People v. Williams, 73 N.Y.2d 84, 90-91 [1989]).

**B.     The People Violated My Right to Testify at the Grand Jury**

The People convened a grand jury before I was arraigned on the felony complaint, during the morning of October 1st, 2009, and neither the arraignment nor the 180-80 court on October 5th, 2009 knew grand jury action was commenced. It is well settled that 3-4 days is considered reasonable time to appraise the defendant of Grand Jury proceedings to allow him to exercise his right to testify. People v. Moore, 249 A.D.2d 575 (3rd Dept. 1998), *lv. denied*, 92 N.Y.2d 857)

C.P.L. § 190.50(5)(a) requires that "the district attorney...notify the defendant or his attorney of the prospective or pending Grand jury proceeding and accord the defendant a reasonable time to exercise his right to appear as a witness therein." It is established that it is the "independent obligation of the People to furnish the defendant proper notice of the Grand Jury presentation." People v. Ruffino, 72 A.D.3d 1353, 1355 (3rd Dept. 2010); People v. Jordan, 153 A.D.2d 263, 268 (2nd Dept. 1990), *lv. denied* 75 N.Y.2d 967.

### i.     Notice of Grand Jury Action Served on Me Was Physically Altered

The grand jury notice reveals numerous irregularities that are not easily reconciled (Aff. at ¶ 39-42). Combined with the substantive proof of the continuing effort of the People to prevent me from testifying at the Grand Jury, this Court should investigate this matter.

The pervasive misconduct of falsifying a Notice of Grand Jury action was an effort to conceal the improper and unethical actions occurring during the grand jury proceedings.

### ii.     Proceedings on October 5th, 2009, the 180/80 Day

The proceedings occurring on October 5th, 2009, and shortly afterwards, lend credence to the fact that the People failed in their independent obligation to provide notice reasonably calculated to permit me to testify at the grand jury (Aff. at ¶ 43-44). The fact that the People were still sending paperwork to my arraignment attorney, Ms. Siegel, after I had already appeared with Mr. O'Sullivan and the grand jury voted a true bill, support the claim that I was not provided notice to my attorney of record before the grand jury voted a true bill.

Notice to the defendant or his attorney of a prospective or pending grand jury proceeding "must be reasonably calculated to apprise the defendant of the Grand Jury proceedings and permit him or her to exercise his or her right to testify at such proceedings." People v. Ruffino, at 1355, *supra*; People v. Wise, 236

A.D.2d 739, 740-741 (3rd Dept. 1997). "As the Court of Appeals instructs, a defendant's right to testify before the grand jury must be scrupulously protected" People v. Smith, 87 N.Y.2d 715, 721 (1996).

My situation is analogous to Jordan and Ruffino, as there was no possibility that notice was provided to me or my attorney on October 5th, 2009, before the grand jury convened that day, as the court or the People's representative did not know a grand jury was ever convened in this case. "Under these circumstances the People failed to provide notice which was reasonably calculated to apprise the defendant of the grand jury proceedings" (People v. Jordan, at 266-267, *supra*).

The Court of Appeals noted that, in New York, "Defects in Grand Jury proceedings may be raised even after a plea of guilty" People v. Wilkins, 68 N.Y.2d 269, 277 n.7 (1986). I was precluded from exercising my right to appear and to present potential witnesses before the grand jury, which voted to indict me (*see*, People v. Lincoln, 80 A.D.2d 877 [1981]). Accordingly, the indictment should be dismissed.

### iii.    Substance of Testimony and Witnesses to be Presented to Grand Jury

The People rushed this case to the Grand Jury with the intent of bolstering their weak domestic violence case and creating a battered woman's syndrome case, alleging rape, which did not exist.

I would have been available to testify and present numerous witnesses and evidence to the grand jurors (Aff. at ¶ 81-91), and the ability to hear these witnesses would have altered the outcome of the grand jury's vote. The passing of 6 years has prevented me from providing the same quality and quantity of testimony and evidence, irreversibly and permanently prejudicing me from being able to re-present this case to a new grand jury, with the resulting prejudice to never be fully known.

### iv. Consequences and Prejudice Resulting From Denial of Right to Testify and Present Witnesses On My Behalf In A Timely Manner

It is clear that the failure to allow me the option to testify and present the grand jurors with witnesses able to testify (Aff. at ¶ 81-91), combined with prosecutorial misconduct occurring before, during and after the grand jury proceedings, has impaired the integrity of the grand jury and prejudiced me to such an extent that dismissal of the indictment is mandated.

In rare cases such as this where irregularities in presenting the case to the Grand Jury rise to the level of impairing those proceedings and creating the risk of prejudice, "the indictment [can] not be permitted to stand even though it is supported by legally sufficient evidence" (People v. Calbud Inc., 49 N.Y.2d 389, 395 [1980]).

Likewise, conviction after trial does not cure defective grand jury proceedings (*see*, People v. Wilkins, 68 N.Y.2d at 277, n.7, *supra*).[9] This is supported by the statutory scheme – while the Legislature has provided that claims of insufficiency of evidence to support the indictment are barred upon conviction after trial (*see*, C.P.L. § 210.35[6]). No similar provision exists for claims of defects based upon impairment of the Grand Jury proceedings (C.P.L. § 210.35[5]).

The failure of trial counsel to challenge the denial of my right to testify in a motion to dismiss the indictment in a timely fashion was an issue, which clearly lies on the record, yet appellate counsel failed to address this meritorious claim of ineffective assistance of trial counsel in favor of unpreserved issues. This is not the action of advocate with an eye befitting his client.

**V.     The Intentional Suppression of Known Brady Material Was A Flagrant Violation of ADA Katchen's Professional and Ethical Obligations, Constituted a Substantial Likelihood of Prejudice and Deprived Me of My Due Process Right to a Fair and Impartial Trial Worthy of Confidence. U.S. Const. Amend. XIV, N.Y. Const. Art. I, § 6**

On the morning of October 1st, 2009, before I was arraigned on the felony complaint, ADA Katchen convened a Grand Jury after meeting with the complainant and processing, reviewing and discussing the diary with her. The

---

[9] *See e.g.* People v. Sayovong, 83 N.Y.2d at 702, *supra* [dismissing indictment of defendant convicted after jury trial, where impairment of Grand Jury proceeding potentially prejudiced the defendant].

diary alleged crimes that were unknown to any law enforcement agency, and formed the entire basis of the charges brought at the grand jury.

As discussed previously (*see* sub-sections II and III, *supra*), ADA Katchen used this diary improperly, and withheld a true color copy of the diary until the first day of trial, which revealed different color and type of pens in the diary entry of September 18th, 2009, the only entry alleging crimes in which no criminal charges were filed against me, and also the day the complainant and I went to the Pocono's for a romantic weekend.

## A.    Baseline Rules Regarding the Brady/Kyles/Vilardi Obligations

### i.    Materiality Analysis Under Kyles

In <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the Supreme Court explained how to assess "materiality" under the federal constitutional test by making three key points. <u>First</u>, materiality is assessed "in terms of suppressed evidence considered collectively, not item by item...[and its] cumulative effect." <u>Second</u>, the materiality assessment is not a sufficiency of the evidence test – "a defendant need not demonstrate that after discounting inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." <u>Third</u>, "a showing of materiality does not require demonstration of preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or

acceptance of an explanation for the crime that does not inculpate the defendant)." Instead, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence" see Kyles, 514 U.S. at 434-438, supra; see also Banks v. Dretke, 540 U.S. 668, 698 (2004) ("Our touchstone on materiality is Kyles").

The federal constitutional materiality standard (which simply asks whether the non-disclosure "undermines confidence" in a conviction) should not be deemed too demanding. See e.g., People v. Colon, 13 N.Y.3d 343, 346-50 (2009); People v. Hunter, 11 N.Y.3d 1, 3-7 (2008).

The state constitutionality materiality threshold is much lower then "undermining confidence" − it is merely a "reasonable probability" of another outcome. See People v. Vilardi, 76 N.Y.2d 67, 77 (1990) ("The 'reasonable probability' standard [is] essentially a reformulation of the 'seldom if ever [is non-disclosure] excusable' rule").

I have met the state constitutionality threshold, which is merely a "reasonable probability" of another outcome. My case, which cradled on credibility, relied solely on the complainant improperly reading from the diary while testifying at the Grand Jury. When the complainant could not read from this diary at trial, it resulted in 11 of 19 charges being dismissed by the trial court

during the charge conference for lack of evidence. The remaining 8 of 19 charges, **only found in the diary**, resulted in jury verdict of not guilty.

If ADA Katchen released the diary as Brady material pursuant to C.P.L. § 240.20(1)(h), the *Brady/Kyles/Vilardi* materials would have been disclosed under C.P.L. § 240.80(3), "within fifteen days of the service of the [defense's discovery] demand or as soon thereafter as is practicable." The resulting challenge would have constituted a "reasonable probability" of the suppression of the diary and dismissal of the indictment. This would have led to the prosecution being unable to pursue "Battered Woman's Syndrome" or present an expert witness on the subject. Cumulatively, this prevented me from receiving a fair trial resulting in a verdict worthy of confidence. *See* Kyles, 514 U.S. at 434-438, *supra*. This also ultimately led to the constitutional violation of retroactive misjoinder and prejudicial spillover (Aff. at ¶ 190-194, *also see*, Point 3, subsection IV, *infra*).

> **ii.    No Distinction Between "Impeachment" and "Exculpatory" Information**

Even if the People state the diary was not exculpatory in nature, its appearance, random and infrequent allegations of crimes and other inconsistencies provided colorable impeachment evidence that could damage the credibility of the complainant (People v. Steadman, 82 N.Y.2d 1, 7 [1993]), especially in a case where the outcome of the case turned on evidence impacting adversely on her

credibility (People v. Janota, 181 A.D.2d 932, 934 [3rd Dept. 1992]); and constituted Brady material.

"The Prosecutors duty is not lessened because Brady material may affect the credibility of government witnesses" People v. Steadman, 82 N.Y.2d at 7, *supra*, *accord* U.S. v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. U.S., 405 U.S. 150, 154 (1972); People v. Fuentas, 12 N.Y.3d 259, 263 (2009) ("impeachment evidence falls within the ambit of a prosecutor's Brady obligation").[10]

### iii.   Gauging the "Reliability" of Information is For The Jury (Not the Prosecutor)

ADA Katchen based his Grand Jury examination on the diary and had knowledge of its unreliable appearance and exculpatory content. Examining and comparing it to the complainant's grand jury testimony reveals this. The exclusion of one (1) dated entry in the diary, which alleged crimes, September 18th, 2009, from being testified to at the grand jury; amounted to intentional suppression of this Brady material, as it was known to ADA Katchen to be exculpatory. This was the day the complainant and I went to Pocono's for a romantic weekend.

"Where use is made in a judicial proceeding of a prior declaration, the entire declaration at the time made so far as relevant must be taken together. A party may not utilize only so much of the declaration as is for his benefit; but he must also

---

[10] *See e.g.* People v. Janota, 181 A.D.2d 932, 934 (3rd Dept. 1992)("There is no doubt that where, as here, the outcome of a case turns on the credibility of the complaining witness, evidence impacting adversely on her credibility constitutes Brady material").

admit that which is against his interest, and the whole must stand or fall together" (*see* People v. Gallo, 12 N.Y.2d 12, 15 [1962][internal quotations and citations omitted]). In other words, a "defendant [i]s entitled to have the entirety of the admissions, both the inculpatory and exculpatory portions, placed in evidence before the trier of facts" (*see* People v. Dlugash, 41 N.Y.2d 725, 736 [1977])

The rule of completeness is grounded in the principles of fairness and equity. The People are not allowed to elicit some of a defendant's [or complainant's] statements, in this case by allowing complainant to read from only portions of the diary; picking and choosing to create a favorable but misleading impression or to complete the picture. The unfairness involved in the selected presentation of only parts of a statement or parts of an investigation is that it poses a threat to the accuracy of a judgment. The defense was entitled, under the rule of completeness, to fully explore what was recorded in the diary.

The jury – not the prosecutor – ultimately determines the credibility of witnesses and the reliability of evidence. It is not for the prosecutor, therefore, to decide the "usefulness" or the "believability" of potential *Brady/Kyles/Vilardi* information, and even when the prosecutor has valid reasons to doubt its reliability, it must still be disclosed. *See* DiSimone v. Phillips, 461 F.3d 181, 195 (2nd Cir. 2006) ("if there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel – and not of the prosecution

– to exercise judgment in determining whether the defendant should make use of it… To allow otherwise would be to appoint the fox as henhouse guard.

This rule is at the core of the *Brady/Kyles/Vilardi* duty. *See* <u>Kyles v. Whitley</u>, 514 U.S. at 439-440, *supra* (resolving doubtful questions in favor of disclosure "will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations"); <u>Brady v. Maryland</u>, 373 U.S. 83, 87-88, (1963) (observing that a prosecutor who withholds evidence that tends to exculpate the defendant casts himself "in the role of an architect of a proceeding that does not comport with standards of justice", even when the decision :is not the result of guile"); <u>People v. Vilardi</u>, 76 N.Y.2d at 77-78, *supra* (explaining the N.Y. Constitution provides greater protections than Brady in order to uphold the "vital interest" in a verdict "rendered by a jury" that is "unimpeded" by lack of access to information").

### iv.   The Duty Applies Even When Information is Partially Inculpatory

That the information or evidence simultaneously has both an inculpatory and an exculpatory effect does not exempt it from disclosure. *See* <u>DiSimone v. Phillips</u>, 461 F.3d at 195, *supra* (to the extent that the information was also inculpatory…this Court has already made it unmistakenly clear that evidence having both an inculpatory and exculpatory effect must be turned over to the defense counsel as <u>Brady</u> material"); <u>U.S. v. Rivas</u>, 377 F.3d 195, 198-200 (2nd Cir.

2004); *see e.g.* <u>U.S. Triumph Capitol Group Inc.</u>, 544 F.3d 149, 165 (2nd Cir. 2008); <u>People v. Colon</u>, 13 N.Y.3d 343, 348-50 & n.3 (2009) (notes from interviews with two women who had named various persons as participants in the shooting should have been disclosed); <u>People v. Hopper</u>, 87 A.D.3d 193, 196 (2nd Dept. 1982) (grand jury testimony of a non-testifying witness that implicated not only the defendant, but also a prosecution witness as an accomplice in the stabbing). This duty specifically applies to the diary in this case.

### v.     The Timing of Disclosures

The intentional suppression of the diary at the Grand Jury was inexcusable, when examining ADA Katchen's actions in keeping it from being marked for identification, entered into evidence, or more importantly, hidden from the knowledge of the grand jurors (Aff. at ¶ 39-80).

Providing the diary in true color for the first time and on the first day of trial was patently improper and shows further ill will (Aff. at ¶ 146-148, 185-189), as ADA Katchen knew its exposure and examination would mark an end to his case.

The prosecutor must disclose *Brady/Kyles/Vilardi* materials in sufficient time for the defense to perform a reasonable investigation and meaningfully use the information. *See* <u>Leka v. Portuondo</u>, 257 F.3d 89, 99-103 (2nd Cir. 2001)("the prosecution did not identify Garcia until thee business days before trial...[T]he disclosure was too little, too late...[O]nce trial comes, the prosecution may not

assume that the defense is still in the investigtory mode…{T]he longer the prosecution withholds information, or (more particularly) the close to trial the disclosure is made, the less opportunity there is for use"); <u>DiSimone v. Phillips</u>, 461 F.3d 181, 197 (2nd Cir. 2006)("the more a piece of evidence is valuable and rich with potential leads, the less likely it will be that late disclosure provides the defense an 'opportunity for use'"), <u>People v. Cortijo</u>, 70 N.Y.2d 868, 870 (1987)(the defense must be "given a meaningful opportunity to use the allegedly exculpatory material to cross-examine…or as evidence"); <u>People v. Roberts</u>, 203 A.D.2d 600, 601-602 (2nd Dept. 1994)("it must be turned over to the defendant in time for it to be used effectively.[11]

Moreover, constitutionally required discovery must be disclosed under C.P.L. § 240.20(1)(h), and thus *Brady/Kyles/Vilardi* materials must be disclosed under C.P.L. § 240.80(3), "within fifteen days of the service of the [defense's discovery] demand or as soon thereafter as is practicable."

**B.    The Three Components of a True Brady Violation**

The prosecutions <u>Brady</u> obligation is well known: "[t]o the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation [grounded in the 14th

---

[11] *See e.g* <u>People v. Santorelli</u>, 95 N.Y.2d 412, 421 (2000) ("A prosecutor must…promptly disclose such material evidence to the defendant"); <u>People v. Steadman</u>, 82 N.Y.2d 1, 6-8 (1993); <u>People v. Baba-Ali</u>, 179 A.D.2d 725, 729-730 (2nd Dept. 1992).

Amendment] to disclose that evidence to the defendant." <u>Leka v. Portuondo</u>, 257 F.3d 89, 98 (2nd Cir. 2001); *quoting* <u>United States v. Avellino</u>, 136 F.3d 249, 255 (2nd Cir. 1998).

The Supreme Court has identified the "three components of a true <u>Brady</u> violation."

> "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-282 (1999); *see also* <u>Boyette v. Lefevre</u>, 246 F.3d 76, 89 (2nd Cir. 2001); <u>DiSimone v. Phillips</u>, 136 F.3d at 255, *supra*.

> **i.     The Evidence at Issue Must Be Favorable to the Accused, Either Because it is Exculpatory, or Because it is Impeaching**

The evidence at issue is a diary, known by ADA Katchen who, acting as an investigator, processed the diary when the complainant presented it to him before the grand jury convened for the first time. He based his entire line of questioning on this diary, down to the details of each separately dated entry, yet omitted one exculpatory date of September 18th, 2009, that alleged crimes on the day the complainant and I went to the Pocono's for a romantic weekend; but no corresponding charges were filed.

ADA Katchen knew we went to the Pocono's that day, knew that the diary entry of September 18th, 2009 was written in two different color pens, and knew

the diary entry was inconsistent as the definition of a diary; plus some entries were written in past tense. Finally, the identification of the defendant by name, "Anthony", in parentheses in a private diary not meant for anyone else to see, left the impression of fabrication (Aff. at ¶ 74-75).

### ii. The Evidence Must Have Been Suppressed by the State, Either Willfully or Inadvertently

ADA Katchen, in a pervasive course of misconduct, willfully suppressed this diary in numerous ways from the Grand Jury proceedings through to the start of trial, and took action to insure it would not be revealed in numerous ways, as previously discussed (Aff. at ¶ 39-80).

This shows a level of comfortability to disregard the Court and the ethical and professional rules of conduct. This violated my right to a fair and impartial review before an unbiased jury based on actual, not fabricated or bolstered charges.

### iii. Prejudice Must Have Ensued

That prejudice ensued is supported by the facts and circumstances herein:

➢ The suppression of the diary as Brady material allowed the prosecutor to overcharge, bolster and inflate the charges presented to the Grand Jury, causing retroactive misjoinder and prejudicial spillover (Aff. at ¶ 61-70), and allowed the prosecution to present an expert on an erroneous and unsubstantiated theory of Battered Woman's Syndrome (Aff. at ¶ 194-198).

➢ The prosecutor was able to mislead the grand jurors and petit jurors from the actual facts and substance of the case, which was that the complainant could not provide enough testimony at trial in support of the fabricated, bolstered and inflated charges improperly brought at the grand jury.

> ➢ The failure to release the diary in a timely manner according to C.P.L. §
> 240.80(3) prevented defense counsel from effectively and efficiently
> performing a full investigation and the ability to timely raise an effective
> challenge by expert witnesses, which instead had to be presented and found
> on the eve of trial. This also prevented counsel from challenging this in a
> pre-trial motion to dismiss the indictment (Aff. at ¶ 185-189).

It is deeply disturbing that an Officer of the Court could so easily bypass the

requirements to support a prima facie case at the Grand Jury, allowing the creation

and fabrication of crimes for no other purpose then his personal goals and agenda.

## VI. Did It Constitute Plain Error So Prejudicial to Defendant to Deprive Him of His Due Process Right To A Fair and Impartial Trial Worthy of Confidence

Plain error is error that is "clear" and "obvious" and affects the defendants

"substantial rights." Failure to preserve an objection will preclude appellate review

only if it is deemed to be a waiver of the objection, that is, an "intentional

relinquishment or abandonment of a known right." If the failure to preserve is a

mere forfeiture, the federal appellate court will consider whether an irregularity

amounts to "plain error." To determine if a ruling affects substantial rights, a court

must analyze the alleged error in the context of the entire record. The defendant

generally bears the burden of persuasion with respect to this prejudice.

Errors of a constitutional nature are more likely to be considered plain than

non-constitutional errors. Although a variety of practices can constitute plain error,

claims frequently involve improper admission of evidence (hearsay testimony) and

errors in sentencing and prosecutorial misconduct.

In the federal courts, if an error is plain and affects substantial rights, a court may only exercise its discretion to grant the defendant relief if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." U.S. v. Alamo, 507 U.S. 725, 732 (1993); U.S. v. Jones, 527 U.S. 373, 394-95 (1999); U.S. v. Johnson, 529 F.3d 493, 502 (2nd Cir. 2008).

Appellate courts consider a number of factors in evaluating the seriousness of misconduct, including whether prosecutors misconduct was deliberate or accidental, the degree to which the prosecutors conduct may have prejudiced the defendant, the effect (if any) of curative instructions to the jury, and whether the weight of the evidence made conviction certain absent the improper conduct. Shih Wei Su v. Filion, 335 F.3d 119, 129 (2nd Cir. 2003).

In this case, I did not forfeit my right to object to the misconduct occurring before the grand jury. When looking at these claims cumulatively as they lie on the record, including the inadmissible evidence before the grand jury and the use of bolstering evidence when the motive to fabricate was evident, there is no tactical reason or strategic purpose for appellate counsel not to raise these meritorious claims. When you take the claims and combine them with (14) other claims of ineffective assistance of trial counsel, the failure of appellate counsel to raise the abundance of trial counsel's errors of omission and commission amounts to ineffective assistance that prevented a fair and impartial trial worthy of confidence.

Appellate counsel inexplicably declined to raise these meritorious claims of trial counsel's ineffectiveness apparent from the record in favor of weak claims or claims this court found were unpreserved for appellate review. These errors by trial counsel created a cumulative "snowball effect" of errors and led to his failure to advance the theory of the defense, that the charges were fabricated.

## POINT 3

**Appellate Counsel Failed to Identify That Defense Counsel Lacked Basic Trial Skills and Was Responsible For Numerous Errors of Omission and Commission Which Did Not Demonstrate Reasonable Competence; Undermining the Proper Functioning of the Adversarial Process and Denying Me of Effective Assistance of Counsel and My Due Process Right To A Fair Trial (U.S. Const. Amends VI, XIV, N.Y. Const. Art. I § 6)**

### State Standard

Under the New York Constitution, "prejudice" is examined more generally in the context of whether defendant received meaningful representation. People v. Benevento, 91 N.Y.2d 708, 713 (1998); *see* People v. Baldi, 54 N.Y.2d 137, 147 (1981). Thus, under the state standard:

> While the inquiry focuses on the quality of the representation provided to the accused, the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather then its particular impact on the outcome of the case. In that regard, we have refused to apply the harmless error doctrine in cases involving substantial claims of ineffectiveness (citations omitted). Thus, whether defendant would have been acquitted of the charges but for counsel's errors is irrelevant, but not dispositive under the state constitutional guarantees of effective assistance of counsel. The safeguards provided under the constitution must be applied in all cases to be effective and for that reason "our legal system is concerned as much with the

integrity of the judicial process as with the issue of guilt or innocence" People v. Donovan, 13 N.Y.2d 148, 153-154 (1963); People v. Benevento, 91 N.Y.2d at 714, *supra*.

Throughout the proceedings below, defense counsel's performance was so poor as to undermine the proper functioning of the adversarial process. Appellate counsel's failure to identify and raise these numerous claims deprived me of my due process right to the effective assistance of appellate counsel as guaranteed by the State and Federal Constitutions.

## I.   Defense Counsel Failed To Adequately Prepare For Trial, Investigate the Available Evidence and to Provide and Use Evidence in Support of the Theory of the Defense

Defense counsel evinced a level of trial experience far below what was necessary to represent appellant adequately in this case. I have identified 14 instances of defense counsel's failure to use evidence available to him during trial in support of the theory of the defense.

It is well established that competent counsel must "conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed and to allow...time for reflection and preparation for trial" People v. Bennett, 29 N.Y.2d 462, 466 (1972).

Furthermore, it is fundamental to any finding of meaningful representation that defense counsel adequately investigates the law and the facts relevant to his clients' defense. *See* People v. Droz, 39 N.Y.2d 457, 462 (1976) ("It is elementary

that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense and who is familiar with, and able to employ at trial, basic principles of criminal law and procedure").

Defense counsel's failure to review the trial record directly resulted in a "snowball effect" of numerous errors which cumulatively deprived me of defense counsel that was able to apply the facts to the law directly relevant to my defense. Appellate counsel's failure to assemble a complete record on appeal, and then investigate, also resulted in a snowball effect of errors. I urge this court to review and consider appellate counsel's failure to assemble a complete record on appeal in order for his investigation to be meaningful by examining the supplemental affidavit in support of expanding the record with accompanying memorandum of law, as it provides the foundation and crucial context for all of appellate counsel's failures described below.

**A.     Failure To Review Grand Jury Minutes**

Defense counsel failed to address numerous issues in pre-trial motions to challenge the prosecutorial misconduct of ADA Katchen. Some of the most notable instances include his failure to challenge the fact that complainant read from the diary during her entire grand jury presentation, allowing her to use the diary as testimony to the truth of the matter asserted; especially since she had

significant cause, reason and purpose to deviate from the truth (Aff. at ¶ 37-80, 101-102, *also see* Point 2, *supra*, for complete accounting of these errors).

**B.   Failure To Review Medical Records of the Complainant**

Defense counsels failure to investigate, review the medical records and to identify conflicting testimony on direct and cross-examination made by complainant within the first few hours of reporting, prevented his ability to use cross-examination effectively as an impeachment tool (Aff. at ¶ 103-107). Appellate counsel's failure to identify these failures was a direct result of his own lack of investigation and failure to perform proper appellate advocacy.

The failure to take advantage of available medical records was not strategy but oversight (People v. Baba-Ali, 179 A.D.2d 725 [2nd Dept. 1992]). When a "trial attorney failed to cross-examine complainant about inconsistent statements she had made to hospital personnel hours after the attack..." and "where a witness has offered prior testimony which is significantly at odds with his or her trial testimony, the discrepancy can be used on cross-examination to cast doubt on the credibility of the witness" (People v. Cantave, 83 A.D.3d 857, 858 [2nd Dept. 2011]) (internal citations omitted).

The people's case hinged entirely on credibility of the complainant, and the hospital records containing her prior inconsistent statements were received into evidence and readily available to trial counsel. As the entire case rested on the

defense that the charges were fabricated, if properly utilized along with other impeachment testimony not used by trial counsel (Aff. at ¶ 93-94, 133-135), would have cast doubt on the complainants incredible accounts of the events occurring.

### C.    Failure to Review DD5 Reports of Detective Wasson

Defense counsel failed to investigate the contents of the DD5 complaint reports, which show that P.O. Brown's report to Detective Wasson only reported one (1) crime on one (1) date, and also prevented him from discovering conflicting versions of testimony by the complainant (Aff. at ¶ 108-110, 165-180) and witnesses on direct and cross-examination (Aff. at ¶ 151-154).

A reasonably competent attorney would perform a thorough examination of the trial record to utilize available information to create a theory of the defense, which pursues, not neglects, the adversarial process. Appellate counsel erred in not raising this claim, as the DD5 reports were part of the court file.

### D.    Failure to Review and Object to Voice Mail Recordings

Defense counsel admitted to reviewing the voicemail recordings "many, many months ago", and this failure to review them before trial led to his poor performance in identifying and properly objecting to their introduction into evidence before they were played for the jury (Aff. at ¶ 111-114). He was even afforded the opportunity to renew his objections the next day, to have time to

research and prepare the appropriate argument with case law, but the record reveals he abandoned his objections to these meritorious issues (Aff. at ¶ 115-118).

Concerning the matter of authentication of recordings, "Evidence sufficient to support foundation of admission of taped recorded conversations [was required]…where testimony failed to establish where and when recordings were made to establish adequate custody…proof by expert witness that the tapes had not been altered [sped up] or spliced in any way or by establishing custody", the result being "because the foundation for the tapes was not sufficiently established there must be a reversal and a new trial" People v. Ely, 68 N.Y.2d 520, 527-528 (1986); People v. Roberts, 887 N.Y.S.2d 327-328 (3rd Dept. 2009).

Foundation requirements for recordings as evidence in trial are an established procedure as a matter of law that a reasonable attorney would be expected to employ. The judgment was reversed and a new trial ordered with a suppression hearing when the court found, "Among the deficiencies in counsel's performance were her lack of familiarity with rules of evidence, her failure to review Rosario material, her inability to effectively cross-examine the People's witnesses" People v. Cortez, 296 A.D.2d 465 (2nd Dept. 2002).

Defense counsel's failure to move for suppression was evidence of his unfamiliarity with the rules of evidence and his overall lack of basic trial skills.

Appellate counsel's failure to raise this cannot be attributed to a tactical reason or strategic purpose that benefited his client.

### E.   Failure to Review Affirmation of Mr. O'Sullivan

On June 29th, 2010, defense counsel submitted a motion to dismiss the indictment on the grounds of the ineffective assistance of counsel of Mr. O'Sullivan, who represented me from October 5th, 2009 (180-80 day) until my arraignment on the indictment on October 27th, 2009 (Aff. at ¶ 119-121). Defense counsel stated was he was ineffective for failing to consult with me regarding my right to testify.

### i.   Inconsistencies Not Addressed By Mr. Lamb

The affirmation of Mr. O'Sullivan reveals issues not addressed by defense counsel. These issue were lost to defense counsel because he failed to do a basic investigation into the procedural history of my case before submitting a motion for ineffective assistance of counsel. He should have raised the failure by the prosecution to provide reasonable notice that afforded me a date and a time I could exercise my statutory right to testify at the grand jury (Aff. at ¶ 122-124. Mem. at ¶ Pgs. 28-34, *supra*). Appellate counsel should have raised this critical failure.

### F.   Failure to Subpoena Emails to Complainant

The emails would have shown my state of mind and deep concern for the complainant and would have impeached the witnesses testimony by showing that I

did offer to help her move out one week before she had me arrested. Email messages were admissible as evidence of statements made to her about my intention to help her move out, and were not subject to the Rape Shield Law (Aff. at ¶ 125-132).

The emails in question do not discuss the complainant's sexual conduct in any way, and that being the case the Rape Shield Law is inapplicable (*See generally*, People v. Jovanovic, 263 A.D.2d 182, 192-195 [1ˢᵗ Dept. 1999] *appeal dismissed*, 95 N.Y.2d 846 [2000]).

Defense counsel's failure to investigate and properly determine the admissibility of these emails, then to subpoena them, prevented him from supporting the theory of the defense that she fabricated the charges against me and severely damaged the credibility of the complainant in a case where her credibility was precarious at best.

## G.   Failure to Understand the Law Concerning Prompt Outcry

### i.   Pre-Trial Proceedings Concerning The Session Notes and Diary

The session note released as Brady material dated July 21ˢᵗ, 2009 admitted to her counselor, Anna Lorusso-Moramarco, that during a verbal argument she swung at me first. But as I testified to, she did not tell her that she punched me in the face while driving and tried to steer the car I was driving at the time into the front of a city bus (Aff. at ¶ 129, 178-179, *see also* ¶ 92-96). This shows no prompt outcry of

rape just 4 days after the alleged incident, or in any session over the next few months, as Ms. Moramarco would have been duty bound to report it.

Defense counsel's failure to use the session note, Brady material, to show complainant's violent tendencies and have Ms. Moramarco testify as a witness prevented him from pursuing proof she never made any prompt outcry and damaged the complainants credibility. The failure to use these session notes to impeach her was a position contrary to the defense (see also Mem. Pgs. 69-70, Point 3, Section I, M, infra), supporting the theory that charges were fabricated.

Trial counsel's failure to challenge the trial court in a formal motion that asserted law showing an expert was allowed was evident from the record (Aff. at ¶ 92-97; see also Mem at Pgs.¶ 69-70, Point 3, Subsection I, M, infra); and there can be no tactical reason or strategic purpose for appellate counsel not to raise this meritorious claim. Even based on trial counsel's limited assertion to obtain said expert, it was so lacking in form and substance that appellate counsel's failure to raise an abuse of discretion in combination with trial counsel's failure squandered a meritorious claim that would have supported the defense theory, that the charges were fabricated.

### ii.    Dr. Saluja Raveen M.D.

Defense counsel failed to interview Dr. Raveen about complainant's statements during a doctor visit, to obtain substantive testimony that she made

prompt outcry of assault only, which prevented questioning designed to impeach her and damage her credibility (Aff. at ¶ 133-135).

The prejudice that I suffered because of the failure of trial counsel to know the law as it applied to prompt outcry, combined with the abuse of discretion by the trial judge in failing to allow an expert, who was willing to work at no cost to the state; prevented me from asserting my defense of the violations occurring at the grand jury concerning the diary. This would have led to trial counsel submitting a motion to dismiss the indictment Pursuant to C.P.L. § 210.35(5) for its improper use at the grand jury. Appellate counsel's critical error to identify trial counsel's failure to understand the law on prompt outcry was crucial to showing the willingness of the complainant to lie and fabricate the charges, in support of the theory of the defense.

## H. Failure to Timely Move To Recuse ADA Katchen As An Unsworn Witness

Defense counsel received the grand jury minutes of the complainant on June 21st, 2010; a full 10 weeks before trial started, which clearly reveal that ADA Katchen had exclusive knowledge of the diary. As the arrest reports and other police investigatory records reveal nothing about any other crimes but the ones charged in the felony complaint, September 18th, 2009; how did ADA Katchen know to question the complainant about all these crimes on specific dates, which he provided in the form of leading questions and statements?

The only conclusion is that ADA Katchen acted as an investigator and became an unsworn witness when the complainant presented him with this diary right before the grand jury presentation. The complainant's testimony was in alignment with, and almost identical to, what was recorded in the diary. Appellate counsel's failure to identify this prosecutorial misconduct (Aff. at ¶ 136-139), was caused by his lack of investigation and poor appellate practices.

## I.      Failure to Challenge the Prosecutions Theory With Expert Witnesses

I asked for experts to refute the People's expert on "Battered Woman's Syndrome" and to challenge the authenticity of the diary. I was forced to find an expert on my own, on the first day of trial, because of defense counsels failure to argue effectively to allow the diary to be examined in an independent laboratory (*see* Mem. Pgs. 69-70, Point 3, Section I, M, *infra*).

Defense counsel failed to present any of the experts he petitioned the court for in pursuit of his theory of the defense, even though he originally petitioned the court for them to testify and refute the prosecution. The use of the expert's would have provided substantive testimony in support of the defense theory that the complainant was fabricating the charges against me, and would have also refuted the prosecutions expert on "Battered Woman's Syndrome."

This is a clear violation of my constitutional right to due process as well as F.R.C.P., § 3485, Rule 28. This is reiterated in Ake v. Oklahoma, 470 U.S. 68, 82-

83 (1985) that "due process entitles the services of a court appointed expert to conduct appropriate examination and to assist in the evaluation, preparation and presentation of their offense [defense].

The Second Circuit has acknowledged that there is no per se rule that requires trial attorney's to seek out an expert; expert consultation is not always necessary in order to provide effective assistance of counsel in sexual abuse cases. However, "{I}n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel" Gersten v. Senkowski, 426 F.3d 588, 607 (2nd Cir. 2005).[12] "This is particularly so", the Gersten panel explained, "where the prosecutor's case beyond the purported medical evidence of abuse, *rests on the credibility of the alleged victim*, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony" [Emphasis added] Gersten, 426 F.3d at 607 (*citing* Eze, 321 F.3d at 128; Pavel, 261 F.3d at 224).

### i.   Clinical Psychologist Dr. Michael Brustein

Even though Dr. Brustein was hired by the defense to testify 3-4 months before trial, defense counsel never called him to the stand (Aff. at ¶ 142-143).

---

[12] *Citing* Eze v. Senkowski, 321 F.3d 110, 127-28 (2nd Cir. 2003); Pavel v. Hollins, 261 F.3d 210, 224 (2nd Cir. 2001); Lindstadt v. Keane, 239 F.3d 191, 201 (2nd Cir. 2001).

### ii.   Forensic Document Examiner Robert Baier

I requested an expert witness to examine the diary, and after defense counsel presented one willing to work pro bono, the Court denied the request, even though he made the court aware that "Mr. Osborne has also represented to me that it is **impossible** to conduct a thorough and accurate examination of a photo static or Xerox copy, such as the copies provided to me by the District Attorney" [Emphasis Added](Aff. at ¶ 92-99). Defense counsel never objected to this denial, and the court directed him to find someone that would examine the diary in the District Attorney's Office (Aff. at ¶ 97, 144-145).

### a.   Reports and Exhibits of Robert Baier

The reports and exhibits of Forensic Document Examiner Robert Baier substantiate my position that the entries were falsified, thereby supporting the theory of the defense (Aff. at 144-149).

I explained to defense counsel that the expert could perform a "Water Solubility Test", which places a small amount of water on the ink of the paper, and by watching the ink dissolve under a microscope, it can be determined if some ink on the page is older then the other ink on the same page. More importantly, this test could have definitively proven that the added lines accusing me of rape on seven different entries **were all written at the same time**, when compared to the ink on the rest of each dated entry.

This would have severely damaged the credibility of the complainant and lent substance to my argument that the diary was created for the sole purpose as a tool for revenge when she brought it to the grand jury and read from it.

**J.** **Defense Counsel's Failure to Use Cross-Examination Effectively As An Impeachment Tool to Damage the Complainants Credibility Was A Direct Result of His Failure to Perform An Adequate Investigation Into the Facts and the Law of the Case**

The credibility examination of witnesses is the central focus of the trial process, with its main focus on witness examination, credibility testing and impeachment. Its purpose is to develop evidence on behalf of defendant's case where possible. It is also useful to minimize or destroy the condemning aspects of direct examination.

Courts have found that inconsistency may be found in evasive answers, inability to recall, silence or change of position. U.S. v. Ingelsias, 535 F.3d 150, 159 (2nd Cir. 2008). Lack of basic trial skills and failure to meaningfully cross-examine the prosecutions key witnesses was strong evidence of ineffectiveness. People v. Brown, 45 N.Y.2d 852 (1978); People v. Kilstein, 174 A.D.2d 756 (2nd Dept. 1991); People v. Daley, 172 A.D.2d 619 (2nd Dept. 1991).

Counsel's failed attempt to impeach the witnesses below effectively demonstrated he was incapable and unaware how to do so with evidence provided him before trial.

### i.    Police Officer Sharon Brown

Defense counsel's failure to cross-examine P.O. Brown and stipulate her testimony away, after stating that he intended to do so concerning about when she first walked into the 70th precinct; served no tactical reason or strategic purpose (Aff. at ¶ 151-154).

### ii.    Physicians Assistant Rina Ganelas

Defense counsel's failure to impeach the complainant with conflicting testimony of what she told three (3) different hospital employees (Aff. at ¶ 155), along with her won conflicting testimony (Aff. at ¶ 156-157), could have been used to impeach her.

### K.    Defense Counsel's Lack of Focus, Direction and Inability to Cross Examine Complainant Effectively Resulted in His Failure To Impeach Her With Illogical and Inconsistent Statements

Defense counsel failed to provide meaningful representation due to his lack of focus, direction and inability to cross-examine effectively while using the evidence provided to him, resulting in his failure to impeach complainant with illogical and inconsistent statements.

### i.    Voice Mail Recordings

The complainant selectively recorded voicemails over a period of months from her cell phone, and then recorded onto a digital recorder without any date or time stamps, allegedly without choosing and with no purpose. Defense counsel

failed to use available evidence to him about how she chose, which would have revealed motive and intent to use voicemails as a tool for revenge, and overlooked colorable arguments of foundation, chain of custody and proof not altered (Aff. at ¶ 158-162).

Cross-examination of these facts would have shown her conscious decision to act and save specific messages. Even though the possibilities to get this information were endless, defense counsel's lack of basic trial skills destroyed my chance to damage the credibility of the complainant, where that credibility was precipitous at best.

### ii.   Moving Into New Apartment Together

Defense counsel asked complainant about moving into a new apartment with me after allegedly being raped three times, with 2 of those alleged rapes occurring just 2 and 4 days respectively before moving in with me (Aff. at ¶ 163-164).

### a.   Lack of Direction Prevented Defense Counsel From Focusing on Substantive Issues With A Coherent Trial Strategy

Defense counsel's confusion and inability to effectuate effective cross-examination is obvious when he consistently fails to press any logical line of questioning that could damage the credibility of the complainant. His trial strategy was non-existent; he consistently jumped between dates and issues with no substantive questioning or purpose (Aff. at ¶ 165-166).

### iii.   Critical Failure to Address Weekend in the Pocono's

Defense counsel allowed the complainant to go on a tirade about drinking and violence in the Pocono's without objection; all non-responsive testimony. Instead, counsel lets the complainant ramble on (Aff. at ¶ 167-170), then abandons any substantive questioning concerning this romantic weekend. He then jumps forward to September 28th, 2009, and spends an inordinate amount of time talking about her underwear and panty liner (Aff. at ¶ 171-172).

### iv.   Critical Failure to Cross-Examine Complainant About September 21st, 2009 and September 25th, 2009 Amounted To Counsel Being Unavailable During A Portion of the Trial

The failure of defense counsel to cross-examine the complainant about these dates, when reviewing the trial testimony, amounting to a concession of guilt in the eyes of the jury.

Defense counsel's cross-examination of the complainant about September 21st and 25th, 2009, was non-existent. He jumped forward from August 24th, 2009 to September 21st, 2009, then without addressing September 21st, 2009 at all; goes back to the weekend of September 18th through 20th, when we spent an all inclusive weekend in a Pocono's resort called Paradise Stream, then spends time talking about shot glasses and jumps directly to September 28th (Aff. at ¶ 169-170). Defense counsel, after jumping forward to September 28th, 2009, ignored

allegations of Rape on September 21st, 2009 and Attempted Rape on September 25th, 2009 (Aff. at ¶ 171-173).

"It is well established that a defendant, having accepted the assistance of counsel, retains authority over certain fundamental decisions regarding the case, such as 'whether to plead [concede to being] guilty, waiv[ing] a jury trial, and testify[ing] in his or her own behalf or take an appeal'" (People v. Colon, 90 N.Y.2d 824, 825-826 [1997], *quoting* People v. White, 73 N.Y.2d 468, 478 [1989]).[13]

It has been stated that, "evidence of defense counsel's decision making process sometimes demonstrates constitutional deficiency. Here, I have established that counsel's choices were not that of a "conscious, reasonable, informed decision made by an attorney with an eye benefiting his client", courts may question such choices" Griener v. Wells, 417 F.3d 305, 325 (2nd Cir. 2005). Defense counsel's failure to consult me about failure to refute these alleged crimes, thereby conceding to Attempted Rape in the First Degree, were in no way a reasonably informed decision with an eye benefiting me.

I did not benefit from counsel's failure to consult me about his concession. In all probability had I consulted with him prior to making this decision, I would have informed counsel of my Constitutional right as well as the prosecutors burden

---

[13] *See* Jones v. Barnes, 463 U.S. 745, 751 (1983); *see also* People v. Petrovich, 87 N.Y.2d 592 (1996).

to prove beyond a reasonable doubt every element of each offense charged, persuading counsel to forgo his erroneous concession. ABA Standards For Criminal Justice, 4-3.1(a). Arguably, counsel's failure to consult me led to his failure to comprehend his duty.

Defense counsel deprived me of my Sixth Amendment Constitutional Right to the effective assistance of counsel. This concession is the functional equivalent of a guilty plea, which as a right, must be entered voluntarily by me. Defense counsel conceded the issue of guilt during trial by failing to challenge the accusations against me. The adversarial process came to a halt and effectively deprived me of a fair trial. I did not consent to this concession of guilt, clearly a fundamental decision solely in my province. Counsel therefore violated his duty to me.

### v.   Direct Examination of Complainant About September 28th, 2009

The complainant's testimony about September 28th, 2009 was unbelievable and leads up to testimony that would impeach and seriously damage her credibility (Aff. at ¶ 174-176).

The crucial error of defense counsel not objecting to Ms. Mach testifying as to the "end of September" allowed all the critical testimony of the complainant concerning September 28th, 2009 to go unchallenged. This crippled my ability to impeach the complainant and Ms. Mach. Combined with defense counsels failure

to cross-examine the complainant about September 21st and September 25th, he created a perfect storm of errors so damaging that I could not have possibly received a fair trial worthy of confidence.

### vi.   Cross Examination of Complainant About September 28th, 2009

Although defense counsel had a plethora of cross-examination fodder to discredit the complainant, his lack of the most basic and important trial skill of cross-examination becomes painfully obvious, crippling the defense (Aff. at ¶ 177-180). The importance of effective cross-examination was critical in a case where the deciding factor in the case revolved around credibility. This is summed up by Dean-Wigmore who termed cross-examination as "the greatest legal engine ever invented for the discovery of truth." When this process is impaired, this great legal engine "runs out of gas" and the adversarial process comes to a halt, which is what happened to me here.

Defense counsel questions complainant about voice mails, but he failed to cross-examine her about her motive to use them for revenge (Aff. at ¶ 111-118). Defense counsel erroneously failed to use emails I sent the complainant about leaving her after the fight in the beginning of August 2009, preventing him from impeaching her that she never received any email about me leaving her (Aff. at ¶ 131-132). Defense counsel's inexcusable failure to impeach her with prior inconsistent testimony was not the action of a reasonable and competent attorney

with my best interest in mind. Since the evidence of my guilt was not overwhelming, the errors at trial cannot be deemed harmless (*see* People v. Cruz, 72 A.D.2d 748 [1979]).[14]

### L.      Defense Counsel's Critical Failure to Object and Effectively Cross-Examine Ms. Mach Concerning Her Testimony, Which Conflicted With the Complainants, About the "End of September", Was A Fatal Error

Defense counsel's failure to object to the question of when my fiancée last lived at Sylvaton Terrace, and his failure to object as to what specific day at the "end of September" she was testifying about, was a critical error as I was accused of three alleged crimes within less than 1 week of the end of September. This allowed the jury to speculate about what day she was testifying about, when she in fact had no independent and specific recollection about when these events occurred (Aff. at ¶ 181-184, 196-200, *see also* ¶ 200-211, failure to object and ask for mistrial).

### i.      This Error Was Compounded By Defense Counsel's Critical Failure in Handling Jury Note Requesting Readback and the Trial Court's "Meaningful Response"; Violating My Right to Due Process and a Fair Trial,

The facts and circumstances concerning defense counsel's critical failure in handling the jury note requesting a readback of the testimony of prosecution

.m.

---

[14] *see generally* People v. Crimmins, 36 N.Y.2d 230 (1975); People v. Vargas, 143 A.D.2d 699 (1988).

witness Ms. Mach while they were deliberating violated my right to due process and a fair trial (Aff. at ¶ 212-219).

C.P.L. § 310.30 imposes two requirements on the trial court following substantive jury communications. The duty to provide "meaningful notice" to counsel, the specific contents of the juror's request, and a "meaningful response"; that the court **responds meaningfully** to the substance of the juror's note...(*see* Rogers v. United States, 422 U.S. 35, 39 [1975]; United States v. Ronder, 639 F.2d 931, 934 [2nd Cir. 1981]; People v. O'Rama, 78 N.Y.2d 270, 277 [1991]; *see also* C.P.L. § 470.05[1]), which mandates, "In determining whether an error is so fundamental as to be a mode of proceedings error, its trivial and inconsequential nature is irrelevant."

I want to narrow the focus to the following part of C.P.L. § 310.30, which specifically directs that the Court "must give such requested information or instruction **as the court deems proper**."

Considering the courts instructions to the jurors that any testimony that an objection was sustained to in trial "**must be disregarded**" and could not be used in their deliberations, defense counsel's erroneous request to read back this testimony without the objected to or sustained passages confused the jury. Defense counsel's error can not be deemed harmless given the fact that I was only found guilty on the felony charges directly related to this testimony, especially in light of trial

counsel's failure to object because "**he could not hear**" was the only reason he was "**doing damage control**" and requested the trial court to retroactively remove objections to testimony that was sustained and stricken from the record. This "**damage control**" allowed the jury to hear prejudicial and speculative testimony, in response to a deliberating jury's request for a readback, that actually supported the people's position that the sex was forced.

More importantly, the courts decision to "**give such requested information...as the court deems proper**" cannot be said to "**respond meaningfully**" to such request, when considering the specific and conflicting instructions that "**any testimony that an objection was sustained in trial must be disregarded.**"

This part of the trial has been recognized by the Court of Appeals as crucial; jury's request for testimony "may well be determinative of the outcome of the case, coming as they do in response to questions raised by the jurors themselves" (People v. Ciaccio, 47 N.Y.2d 431 [1979]).

The trial court committed prejudicial error by erroneously altering the trial record and allowing the jury to hear multiple instances of testimony strongly implying the sex was forced and thereby supporting the People's theory of the case. Considering the facts (Aff. at ¶ 212-219), the trial court failed to provide a "meaningful response" to the jury's request for a read-back of Ms. Mach's

testimony and violated C.P.L. § 310.30. This testimony was filled with objections to multiple portions of speculative and prejudicial testimony which the jury was told to disregard multiple times, which likely contributed to them requesting this testimony to be read back so they could be clear on **what testimony they could consider** and **what testimony they could not consider**. The trial court's erroneous decision that allowed this read-back, regardless of trial counsel's request to do so, cannot be deemed proper and caused more confusion.

### M. Defense Counsel Took A Position Contrary To The Defense By Failing To Call Forensic Document Examiner Robert Baier To The Stand To Testify

Defense counsel was responsible for errors or omission and commission, which caused him to take a position contrary to the defense. The record reveals that these decisions served no tactical reason or strategic purpose, and defeated the adversarial process.

Defense counsel petitioned for an expert on July 7th, 2010 (Aff. at ¶ 93-94) and again in a written motion on July 16th, 2010 (Aff. at ¶ 95-99). On September 13th, 2010 (the first day of trial), defense counsel expressed his intent to call Mr. Baier as an expert witness, explaining that Mr. Baier's mother just died and may require to be called out of turn (Aff. at ¶ 186)

Mr. Baier got confirmation to come to court the next day, September 14th, 2010, from both me and defense counsel, and he drove down over 2 hours from

Warwick, New York to be at court to testify that morning. Inexplicably, defense counsel fails to cross-examine the complainant about diary. When this is discussed on the record after he finishes cross-examining complainant he states, "**In my judgment it shouldn't have come in**" (Aff. at ¶ 187-188).

This complete contradiction by counsel to cross-examine the complainant about how she brought the diary to ADA Katchen at the grand jury and used it to testify from during her testimony there was the most important focal point of my defense, that the charges were fabricated, actually crippled my case and was a position contrary to the defense

After I was found guilty at trial, I was produced to court on October 5th, 2009 and made a detailed record concerning this failure by trial counsel (Aff. at ¶ 189). These statements made by defense counsel contradict all of his earlier statements concerning Mr. Baier testifying. This decision, based on the underlying record, the theory of the defense that these charges were fabricated, along with the overall facts of this case; defeated the adversarial process and were not understood to be a position that benefited me, and were a position contrary to the defense.

## II. Appellant Was Denied Due Process and the Effective Assistance of Counsel by His Failure to Object and/or Articulate a Specific Reason For Mistrial Following Summation on Multiple Issues and Preserve Questions of Law, Which Prejudiced Mr. Rucano

One of the most important roles of defense counsel is to ensure that the prosecutor does not transgress the bounds of proper conduct (*see* Washington v.

Hofbauer, 228 F.3d 689 [6[th] Cir. 2000][holding trial counsel ineffective for failing to object to clear misconduct by the prosecutor]). He does this by employing objections and other corrective devices designed to not only alert the court to the prosecutor's errors so that they can be corrected, but to insure that a question of law is preserved for appellate and/or federal review should the trial court overrule his objections. Trial counsel made no objections to the introduction of highly prejudicial testimony.

Given that several State and Federal Courts have found such evidence so prejudicial that reversal is required (*see e.g.* People v. Brown, 70 A.D.3d 1045 [4[th] Dept. 1970][sexual misconduct]), counsel must be deemed ineffective. His failure to object and/or move for a mistrial at the end of the People's case on multiple issues contributed to his failure.

**A.**     **The Failure To Ask For A Mistrial About Prosecutor Asking Inappropriate Questions to Defense Witness Ortiz About His "Arrests", not Convictions, Over the Court's Repeatedly Sustained Objections, Prejudiced Mr. Rucano**

The prosecutor repeatedly asked Mr. Ortiz about his single contact with the criminal justice system inappropriately by asking what he had been arrested for on August 11th, 1994, and what he was charged with, beyond what he was actually convicted of. Mr. Ortiz testified hearing the complainant threaten to fabricate a rape complaint against me. The testimony of Mr. Ortiz directly related to the only charges the defendant was found guilty of (Aff. at ¶ 201-202).

The prejudice of having this witness questioned on his "arrest" and "charges" was a violation of clearly established "hornbook law", as the prosecutor knows this is not a permitted area for impeachment. In a case where a majority of the charges were either dismissed or resulted in a verdict of not guilty and challenging the complainant's credibility was critical; this was not the action of an attorney with an eye benefiting his client. Defense counsels failure to move for a mistrial based on the prosecutor ignoring the repeated admonishments of the court amounted to the ineffective assistance of counsel.

**B.    Failure to Object and Ask For A Mistrial About Prejudicial Remarks Made By The Prosecutor in Summations Prejudiced Mr. Rucano**

The prosecutor's persistent efforts to inflame the jury against me and plead for sympathy for the complainant were not fair response to the summation of the defense. The prosecutor's extended and persistent appeal to emotions for sympathy far exceeded reasonable response to defense counsel's summation, which detailed the evidence presented at trial, noted weaknesses in the case and spoke about complainant's "contrived" appearance (Aff. at ¶ 203-205).

As the evidence was not overwhelming and came down to credibility, defense counsel's failure to object to these prejudicial remarks in front of the jury allowed these comments to be digested by the jurors. Defense counsel was constitutionally required to be at the ready and protect his client from the

prejudicial blows of the prosecutor. His failure to timely request a mistrial is another spoke in the wheel demonstrating defense counsel's ineffectiveness.

### C. Failure To Object and Ask For A Mistrial For Denying Expert To Examine Diary in Laboratory

The trial court refused to allow the diary to be brought to a laboratory. Following the court's erroneous logic, a ballistics or narcotics expert would also be required to perform their testing in the District Attorney's Office as well. The failure of the court to deny the expert to examine the diary in his laboratory where thorough and extensive testing could only occur was an abuse of discretion by the trial court (Aff. at ¶ 206-211). Defense counsel's failure to ask for a mistrial on these grounds was an inexcusable error that seriously prejudiced the defendant.

### D. Defense Counsel's Cumulative Errors to Object and/or Articulate a Specific Reason For A Mistrial Failed to Protect Mr. Rucano From Prejudicial Evidentiary and Summation Errors and Remarks; Prejudicing Mr. Rucano

Any reasonable competent appellate attorney would have known that general objections by trial counsel might not be sufficient to alert the trial judge to error that is allegedly occurring so that he can correct it. And that if the objection were overruled, said objection would be insufficient to preserve the error for appellate review (People v. Tevaha, 84 N.Y.2d 879 [1994]); *also see* People v. Rivera, 73 N.Y.2d 941 [1989]). Appellate counsel should have argued that trial counsel was

ineffective because he failed to specifically articulate the purpose and grounds for the objection when the erroneous testimonies, described above, were admitted.

In the present case, defense counsel only made a general motion to dismiss aimed at all of the counts. According to the holdings of <u>People v. Gray</u>, 86 N.Y.2d 10 (1995), this was insufficient to preserve as a question of law the several meritorious arguments which would have eliminated or reduced my liability on several counts before they even reached the jury.

Because a trial order of dismissal is perhaps the single most important motion in a defense counsel's arsenal, and in sexual abuse cases such as this it was necessary to identify the numerous deficiencies to challenge the credibility of the complainant, in a case that rested solely on the complainants credibility which was precarious at best; defense counsel's failure to move for a mistrial for the above numerous reasons was patently improper.

### III. Defense Counsel Was Ineffective For Failing to Raise a Clear Cut and Dispositive Prosecutorial Misconduct Claim

The essential inquiry in assessing the constitutional adequacy of pretrial representation is not whether a better result might have been achieved, but whether reviewed objectively, counsel's actions were consistent with those of a reasonably competent pretrial attorney (*see* <u>People v. Borrell</u>, 12 N.Y.3d 365, 368 [2009]). But when, as demonstrated here, there is a clear cut and dispositive prosecutorial misconduct claim (*see* Point <u>2</u>, *supra*), which would have been sure fire winner had

it been timely presented during pre-trial proceedings, defense counsel must be deemed ineffective and relief granted no matter how competent he was in other areas (see People v. Turner, 5 N.Y.3d 476 [2005]).

**IV.    The Use of the Inadmissible Diary at the Grand Jury Resulted in Retroactive Misjoinder, Allowing the People to Assert Battered Woman's Syndrome and to Present An Expert Otherwise Not Allowable; Leading to 11 Dismissed Counts and Thereby Causing Prejudicial Spillover**

The use of the inadmissible diary at the grand jury, looked at in the context of the specific facts and circumstances of my case, resulted in retroactive misjoinder and allowed the People to assert a theory of Battered Woman's Syndrome and present evidence from an expert not otherwise allowable. This was accomplished by ADA Katchen using leading questions, non-verbal cues and by allowing the complainant to read from her diary during her entire grand jury testimony (Aff. at ¶ 47-80). This resulted in prejudicial spillover, as 11 unsubstantiated charges were dismissed when the complainant could not read from the diary on the stand during trial. These 11 dismissed charges represented half the testimony and evidence presented at trial in support of the People's erroneous theory of "Battered Woman's Syndrome." This unfairly influenced the jury to convict me on the remaining charges (Aff. at ¶ 190-194).

"Whether an error in the proceedings relating to one [or multiple] count[s] requires reversal of convictions on other jointly tried counts is a question that can

only be resolved on a case-by-case basis" (People v. Baghai-Kermani, 84 N.Y.2d 525, 532 [1994]). We must evaluate "the individual facts of the case, the nature of the error and its potential for prejudicial impact on the over-all outcome" (People v. Concepcion, 17 N.Y.3d 192, 196-197 [2011] [internal quotation marks and citations omitted]; *see also* People v. Doshi, 93 N.Y.2d 499, 505 [1999]). Reversal is required if "there is a reasonable probability that the jury's decision to convict on the tainted counts influenced its guilty verdict on the remaining counts in a meaningful way" (Doshi, 93 N.Y.2d at 505 [internal quotation marks and citations omitted], *see also* People v. Daly, 14 N.Y.3d 848, 849 [2010]).

In Green v. Lee, 964 F.Supp.2d 237 (E.D.N.Y. 2013), it was held that defense counsels errors regarding sexual abuse counts [dismissed by the court] had spillover effect on the remaining counts, and dismissed those as well (id. at 263).

The federal courts have addressed retroactive misjoinder in United States v. Jones, 16 F.3d 487 (2nd Cir. 1994), where it was held:

> "Retroactive misjoinder" arises where joinder of multiple counts was proper initially, but later developments - - such as district court's dismissal of some counts for lack of evidence...render the initial joinder improper. *See generally* 8 James Wm. Moore, Moore's Federal Practice, ¶ 8.03[3] (2d. ed 1993). In this circuit, "[t]o invoke retroactive misjoinder", a defendant "must show compelling prejudice" United States v. Novad, 927 F.2d 726, 728 (2nd Cir. 1991) (citations and internal quotation marks omitted), *cert. denied* 500 U.S. 919 (1991); *see* United States v. Warner, 690 F.2d 545, 553-54 (6th Cir. 1982). Jones, 16 F.3d at 493.

"[A] court that overturns fewer than all criminal counts must consider the spillover effect on the remaining counts." Lindstadt, 239 F.3d at 205; *see also* United States v. Morales, 185 F.3d 74, 82 (2nd Cir. 1999). Three factors guide the inquiry on impermissible spillover.

> (1) Whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining counts;

> (2) Whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts; and

> (3) The strength of the government's case on the remaining counts

> Green, 964 F.Supp.2d at 262; *see also* United States v. Naiman, 211 F.3d 40, 50 (2nd Cir. 2000)[15]

As to the first factor, "sexual abuse of a child is a heinous crime and those who commit it are thought by many to be serial offenders and incorrigible; a jury that finds a defendant guilty of three counts of sexual abuse on one occasion is primed to find the defendant guilty of another." Lindstadt, 239 F.3d 206. This is analogous to the sexual crimes charged in my case.

Thus, the court must **first** examine the evidence introduced in support of the vacated or dismissed counts to see if it "was of such an inflammatory" nature that it 'would have tended to incite or arouse the jury into convicting the defendant on the remaining counts'" Wapnick, 60 F.3d at 953 (*quoting* United States v.

---

[15] *See also* United States v. Wapnick, 60 F.3d 948, 953-54 (2nd Cir. 1995); United States v. Rooney, 37 F.3d 847, 855-56 (2nd Cir. 1994).

Friedman, 854 F.2d 535, 582 (2nd Cir. 1988), *cert. denied* 490 U.S. 1004 (1989), and Rooney, 37 F.3d at 855).

I have met this factor. The evidence presented in the form of testimony of the complainant and prosecution expert on "Battered Woman's Syndrome", which did not substantiate 11 of the 19 charges brought from ADA Katchen's improper use of the diary at the grand jury resulting in dismissal; was of an "inflammatory nature" which "tended to incite and arouse the jury" to convict me of the remaining charges (Aff. at ¶ 190-191).

The **second** factor tips toward the finding of spillover prejudice. The evidence and facts pertaining to the dismissed counts 7, 12-15, 17, 19-22 and 25, compared with that pertaining to the remaining counts, must be scrutinized to examine the degree of overlap and similarity between the two. *See* Wapnick, 60 F.3d at 954; Rooney, 37 F.3d at 855. "In cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover" Wapnick, 60 F.3d at 954 (collecting cases).

The prejudicial spillover occurred when the jurors heard testimony that "was of such an inflammatory" nature that it "… tended to incite or arouse the jury into convicting [me] on the remaining []" 4 sexually based crimes, 2 on September 25th, 2009 (which trial counsel never challenged; Aff. at ¶ 172-173), and 2 on

September 28th, 2009 (the crimes I was originally arrested for), based on the propensity of the dismissed charges, rather then sufficient evidence to establish a reasonable doubt for each individual charge. In effect, this negated the prosecutions theory of battered woman's syndrome, and as such prejudicial spillover occurred.

As noted above, the remaining counts emanate from different dates and distinct facts and testimony then the evidence presented from the 11 dismissed counts by the Court, as well as the testimony from the expert on "Battered Woman's Syndrome" supporting these counts. They would not have been admissible to both, **or in the aggregate**; and should have never been presented to the petit jury. Furthermore, without the prosecutorial misconduct of ADA Katchen and his improper use of the diary at the grand jury to "stack the deck" with numerous unsupported and unsubstantiated charges (*see* Point 2, *supra*), he would have lacked support to present an expert on "Battered Woman's Syndrome."

Inasmuch as this case involved a credibility contest, had trial counsel properly investigated, cross-examined effectively and otherwise created an effective adversarial process (*see* Point 3, *supra*), this would have "cast doubt on the veracity of the alleged victim's testimony in its entirety," and thus counsel's errors can be presumed to have "infect[ed] all of the counts of which petitioner was convicted." Gersten, 426 F.3d at 614-15.

**Third**, the courts must "make a general assessment of the strength of the government's case on the remaining counts. Id., *see also* Rooney, 37 F.3d at 856.

As to the third factor – the strength of the prosecution's case on the remaining counts –the people reliance on expert testimony about battered woman's syndrome and credibility was central to their case. The fact that the jurors, after hearing testimony about 11 of 19 dismissed charges related to "Battered Woman's Syndrome", found me not guilty of the remaining 8 charges in support of that same theory (dated between July 17th and Sept. 21st, 2009), shows the jurors discounted this. The only direct evidence against me was the testimony of the complainant.

Considering the aggregate of testimonial and documentary evidence presented, resulting in 11 felonies being dismissed before the petit jury deliberated, with another 8 counts resulting in a verdict of "Not Guilty"; it weighs substantially in favor of my retroactive misjoinder and prejudicial spillover argument.

**V.**   **The Cumulative Effect of Defense Counsels Failure to Perform an Adequate Investigation Into the Facts and the Law of the Case Directly Resulted in His Failure to Provide Evidence in Support of the Theory of the Defense and Undermined The Proper Functioning of the Adversarial Process**

**A.**   **Strickland – The Performance Prong**

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Wiggins v. Smith, 539 U.S. 510, 521 (2003)(*quoting* Strickland, 466 U.S. at 690).

The failure of defense counsel to assemble a complete record, investigate, raise and then utilize the appropriate appellate procedures to advance claims of ineffective assistance of trial counsel and prosecutorial misconduct, which are the core grounds for my claim of ineffective assistance of appellate counsel and the relief sought, caused me serious prejudice.

The facts and circumstances concerning this above described failure to assemble a complete record and then investigate have been expounded upon in the separately submitted supplemental affidavit in support of Motion For A Writ of Error Coram Nobis Application and to Expand the Record with attached Memorandum of Law. I urge this Court to consider the detailed facts and record based support outlined in this attached supplemental affidavit with exhibitys as it lays the foundation and is crucial to determining all the errors of appellate counsel claimed herein.

"The duty to investigate is essential to the adversarial testing process '[b]ecause th[e] testing process generally will not function properly unless defense counsel has done some investigation into the People's case and into various defense strategies.'" Griener v. Wells, 417 F.3d 305, 320 (2nd Cir. 2005)(quoting Kimmelman v. Morrison, 477 U.S. 365, 384 [1986]).

In a crucial part of the case, trial counsel failed to cross-examine the complainant on her reliance on the diary at the grand jury (Aff. at ¶ 47-70), call

handwriting expert Robert Baier to the stand to challenge the "diary" (Aff. at ¶ 144-149, 185-189), and its numerous inconsistencies, irregularities and other deviations that supported the fact it was falsified (Aff. at ¶ 39-42, 71-80).

As the Second Circuit has noted, "[i]n nearly every case [as here] that concludes that counsel conducted a constitutionally deficient investigation, the court's point to readily available evidence neglected by counsel." Griener, 417 F.3d at 322; *see e.g.* Rompilla v. Beard, 545 U.S. 374, 385-390 (2005)(faulting defense counsel for not consulting a "readily available file" "sitting in the trial courthouse, open for the asking" and emphasizing that "[t]he unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the trial courthouse"); Williams, 529 U.S. at 395 (faulting counsel for failing to access available records); Kimmelman, 477 U.S. at 386-87 (faulting counsel for failing to request discovery from People); Eze, 321 F.3d at 128-130 (faulting counsel for failing to consult available experts and available literature); Pavel, 261 F.3d at 221 (faulting counsel for not interviewing "readily-available fact witnesses); Lindstadt, 239 F.3d at 200 (faulting counsel for not obtaining information "available from a variety of sources).

In Pavel v. Hollins, 261 F.3d 210 (2nd Cir. 2001), there exist analogous circumstances to my case. In Pavel his trial attorney failed to call fact witnesses and medical expert. Circuit court Judge Jose A. Calabrenes explains that they

concluded that the cumulative weight of these flaws deprived <u>Pavel</u> of his Sixth Amendment rights (*quoting* <u>Lindstadt</u>, 239 F.3d at 199) ("holding that for Sixth Amendment purposes attorney errors must be considered in the aggregate").

Ineffective assistance may be demonstrated where counsel performs competently in some respects, but not in others. *See* <u>Eze v. Senkowski</u>, 321 F.3d 110, *3 (2nd Cir. 2003). Although there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, "the court must keep in mind' that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support" <u>Strickland</u>, 466 U.S. at 696; *also see* <u>Baldi</u>, 54 N.Y.2d at 556.

In this case, trial counsel failed in his duty to present multiple material facts and exhibits, expounded upon in Points <u>2</u> and <u>3</u>, *supra*, which were readily available and easily obtainable and, with "reasonable probability," would have resulted in an acquittal of all charges

### B. <u>Strickland</u> – The Prejudice Prong

"The level of prejudice that [I] need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" <u>Lindstadt</u>, 239 F.3d at 204 (*quoting* <u>Strickland</u>, 466 U.S. at 693). I 'must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694).

Indeed, the Second Circuit has recognized prejudicial impact in cases with more evidence of guilt than that presented here. For example, in Lindstadt and Gersten, the complainant and the perpetrator were the only eyewitnesses who testified as to the alleged abuse. However, in both of those cases, unlike my case, there was medical expert testimony consistent with sexual abuse, yet the Second Circuit granted habeas relief in both cases.

The Second Circuit in Lindstadt disagreed with the district court, noting that "aside from the testimony of [the expert], the only [direct] evidence of abuse came from his wife and daughter [in my case complainant]; their credibility lay at the heart of the prosecution's case. Had defense counsel mounted a proper challenge to [her] testimony as to [the diary], it would have naturally called into question whether the abuse occurred at all." Lindstadt, 239 F.3d at 199.

Similarly, in Gersten, the Second Circuit found prejudice where

> The prosecution's entire case rested on the credibility of the alleged victim. All other evidence presented by the prosecution [downstairs neighbor, expert on battered woman's syndrome] was indirect evidence offered to corroborate aspects of the alleged victim's story. Defense counsel's failure to investigate the prosecution's evidence led him to decide not to challenge what was clearly the most significant corroborative evidence [the diary].

426 F.3d at 612.

This evidence, taken together, clearly establishes a "reasonable probability" that the outcome of the trial would have been different had trial counsel investigated and presented not only the evidence described above, but all of the evidence outlined in Point 2 and 3, *supra*, herein.

### State Standard

Counsel's failure to prepare for trial undoubtedly contributed to his poor performance. "Lack of preparation and investigation among grounds for ineffectiveness findings. People v. Smith, 237 A.D.2d 388 (2nd Dept. 1997).

Here, the record is replete with instances illustrating that defense counsel was "unprepared and unversed in both the law and the facts" as they applied to my case (People v. Rojas, 213 A.D.2d 56 [1st Dept. 1995], *appeal denied* 87 N.Y.2d 907 [effective assistance of counsel denied "where defendant's trial counsel made no effort to investigate…"]).

In sum, counsel not only failed to weaken the prosecutions case by competently challenging the admissibility of damaging evidence and effectively cross-examining its witnesses, his actions affirmatively damaged the defense and aided the prosecution. People v. Zaborski, 59 N.Y.2d 863 (1983). Counsel's numerous and enormously prejudicial errors deprived me of meaningful representation (People v. Benevento, *supra*), and created a reasonable probability

that, Absent his errors, the Jury "would have had A reasonable doubt respecting guilt" on the few charges I was found guilty on (Strickland, supra).

Counsels numerous blunders Permeated every Aspect of the case, And Appellate counsels failure to review the record led to his uninformed decision not to Pursue these Avenues of investigation, And cannot be deemed to have Any tactical reason or strategic Purpose.

## Section 2

Arguments of Fact and Law For Leave To Appeal Denial of Article 440

Presented in the Pages to Follow You Will Find A Breakdown of the Trial Courts Erroneous decision that denied my Article 440 motion without a hearing, as Presented to the Appellate Division, Second Department, with said denial representing the exhaustion of these claims in New York State Courts.

It starts with Four (4) Distinct "Questions Presented", all of which are addressed in the following pages except Question Four (4), an argument to the "Unconstitutional Convoluted Procedural Scheme In This State", which I presented fully in Point Two (2) of my Application For Habeas Relief submitted to this Court on August 3rd, 2018, I have continually raised this Point throughout every Procedural step in my Appellate Process in the New York State Courts.

Please Note: The facts and law in this section are presented in four (4) Points, using sequentially Numbered Paragraphs labeled 7 through 137.

The Addendum to Section 2, labeled Pages 154A-154Z, Provide much needed clarity on issues raised in the trial court, which were Part of my Article 440. The interaction of these claims with each other are uniquely expounded upon with these Arguments, and I urge the Court to examine the Article 440 Exhibits referenced, As they Provide "Good Cause Shown" For Granting of Discovery Under Rule 6 (A) for Certified Records from AETNA, showing falsified records were submitted before trial in my case; representing Criminal Conduct by Anna Lorusso-Moramarco, and showing trial counsel was ineffective under Strickland many times over. This represents one of the core issues in my deprivation of a fair trial.

# Addendum To Section 2

This Addendum represents expanded Arguments involving the following topics raised in My Article 440:

II. Defense Counsels Failure To Timely Move To Recuse ADA Katchen As An Unsworn Witness

III. Defense Counsels Failure To Challenge Prosecution Theory With Available Expert Witnesses Lacked Any Tactical Reason or Strategic Purpose
    (i) Clinical Psychologist Dr. Michael Brustein
    (ii) Forensic Document Examiner Robert Baier
    (iii) Forensic Handwriting Analyst Trelce d'Gabriel Montoya (Personality Profiler)

E. Defense Counsels Failure To Use Session Notes of Licensed Clinical Social Worker Anna Lorusso-Moramarco To Cross-Examine Complainant on Prompt Outcry Was A Position Contrary to The Defense

F. E-mails Sent By Defendant To Steve Frankl (Same Reasons As E.)

VI. Defense Counsel Took A Position Contrary To The Defense — Mr. Lambs Failure To Call Forensic Document Examiner Robert Baier To The Stand To Testify.

VIII. Newly Discovered Evidence of Falsified Session Notes Released Under Subpoena, Constituting Criminal Conduct of Anna Lorusso-Moramarco

The following builds upon the Points raised in my Application For Habeas Relief Submitted on August 3rd, 2018, and in my original 2254 Form. It represents my initial Presentation of these claims in my Article 440, and is central to the certified records I seek in my Motion For Discovery under Rule 6 Pending before the Court. The Exhibits referred to herein Are Attached to the Article 440 submitted by the respondent. God Bless the Court

II. Defense Counsels Failure To Timely Move To Recuse ADA Katchen As An Unsworn Witness For Acting As An Investigator And Violating The Advocate-Witness Rule Was An Omission Which Did Not Demonstrate Reasonable Competence And Denied Me of Effective Assistance of Counsel And My Due Process Right To A Fair Trial

Defense Counsel received the Grand Jury Minutes of the complainant on June 21, 2010; A full 10 weeks before trial started. The Grand Jury minutes of the complainant clearly reveal that ADA Katchen had exclusive knowledge of the diary, and the arrest reports And other Investigatory Police records reveal nothing About Any crimes on Any other dates but Sept. 28th 2009. How did ADA Katchen know to Ask About All these specific dates, which he Provided to the complainant in the form of leading statements And Questions?

154 B

The DD5 report and felony complaint all show there were only crimes alleged to have occurred on September 28th, 2009. Once defense counsel was provided with the diary and the grand jury minutes on June 21st and June 30th, 2010, he should have immediately moved for dismissal of the indictment and/or recusal of ADA Katchen for being an unsworn witness in this case. Where the prosecutor's pretrial [investigatory] involvement will be an issue, recusal is the appropriate course of action.

There was no logical conclusion as to how ADA Katchen gained exclusive knowledge of the events to question the complainant at the grand jury. Even a cursory examination of the diary would reveal the complainant's grand jury testimony was practically identical to that of the diary. Furthermore, the grand jury testimony clearly shows complainant reading from this diary throughout the entire grand jury proceedings. Mr. Lamb's failure to identify these issues and apply the rules of professional conduct and ethics, as well as the law as it applies to leading, bolstering, hearsay and other issues were all because of Mr. Lamb's lack of basic trial skills.

I informed defense counsel about ADA Katchen being an unsworn witness months before trial, which I repeated before trial started in a statement made directly to the Court by me on September 8th, 2010, reflected in the transcripts. (J.S. Tr. Pg. 8 at ¶ 3-10)[18]

### III.   Failure to Challenge Prosecution Theory with Expert Witnesses Lacked Any Tactical Reasoning or Strategic Purpose

Mr. Lamb failed to use any of the three experts he petitioned the Court for in the pursuit of the theory of his defense, although the use of those expert's would have provided testimony in support of his theory that the complainant was fabricating the charges against me.

---

[18] "J.S. Tr." Followed by numbers indicates page numbers of Jury Selection Transcripts, and ¶ followed by numbers indicates line numbers of previously referenced page numbers.

I petitioned for experts to refute the prosecution's expert concerning "Battered Woman's Syndrome", and I found and presented to Mr. Lamb multiple experts to perform forensic examinations of the alleged diary, because Mr. Lamb was unable to find any prior to trial. In fact, I found both experts on the evening of September 8th, 2010, the same day Mr. Lamb told him he could not find any on the 18-B panel list of experts.

**A.    Expert Testimony To Refute Theory of Battered Woman's Syndrome**

Mr. Lamb petitioned Court for two expert witnesses and submitted two affirmations for services under County Law, Section 722-C. One of the experts was to provide testimony that refuted Prosecution's Theory of Battered Woman's Syndrome, but was never called to the stand.

I provided Mr. Lamb with detailed studies published by the U. S. Government concerning I.P.V. (Inter Personal Violence), which recognizes violence of one person against another. The studies tracked instances of Domestic Violence across the United States in various groups, including a 2,000 couple study of diversified couples, which included various ethnic backgrounds, locations, ages, financial status and other factors. These studies conclusively showed that women suffer more from bi-polar syndrome, depression and other clinical diagnosis related to a deficient mental state.

These studies were provided to Mr. Lamb by me 3-4 months before trial, and he never gave them to the Clinical Psychologist Dr. Michael Brustein, or called him to testify.

**(i)   Clinical Psychologist Dr. Michael Brustein**

Dr. Michael Brustein has an office in Manhattan, and was approved by the Honorable Court to provide testimony on April 28th, 2010. (EX "2-O")

Mr. Lamb's Affirmation for Services under Article 18-B of the County Law, Section 722-C (EX "2-O") clearly states "People are Offering Evidence of 'battered wife syndrome' by way of expert witness Dr. Brustein is being offered to rebut said evidence."

Dr. Brustein completed his pre-doctoral internship at Harvard Medical School and currently participates in a group forensic practice conducting court ordered psychological evaluations through Forensic Pathology P.C., and works at James J. Peters VA Medical Center. He completed a one-year course on family forensics specifically focusing on legal ethics and family dynamics at Washington Square University in New York in August 2006.

His testimony would have been crucial in presenting the government studies on Inter Personal Violence ("IPV") that I gave Mr. Lamb months before trial, providing an alternate theory to the prosecutor's "Battered Woman's Syndrome" theory to show that the complainant's testimony could be ruled out as inconsistent with a person suffering from such syndrome.

Mr. Lamb asked to present Dr. Brustein, possibly out of order, on the first day of jury selection, September 8th, 2010. (J.S. Tr., Pg. 3 at ¶ 14-20) Mr. Lamb's decision not to call this expert to testify was against his sworn affidavit to the court that he was offering this expert to rebut the prosecutions theory and served no tactical reason or strategic purpose..

### (ii) Expert Testimony of Forensic Document Examiner and Handwriting Analyst

After Mr. Lamb was told by Judge Rooney to find an expert who could examine the diary at the D.A.'s office on July 17th, 2010, and being denied to have it brought to the laboratory of John Osborne; Mr. Lamb failed to find anyone else before jury selection on September 8th, 2010. Mr. Lamb stated on September 8th, 2010 "Just for the record, Judge, I contacted quite a

while ago...the assigned counsel plan gave me a very short list of the people that are on the plan that hold themselves out as forensic document experts." (J.S. Tr., Pg.11 at ¶ 8-13)

 Mr. Lamb also reminded the court that the one expert he did find could not bring his equipment to the D.A.'s Office, and the court would not sign an order instructing the D.A. to bring it to him.(J.S. Tr., Pg. 11 at ¶ 14-23)

 I made it clear to the court on September 8th, 2010 that I wanted to find an expert myself and explained the relevant factors involved and elicited the following:

➢ Defendant: "Your Honor I just wanted to be on the record that I still as you've said on the stand on our last date in court, that given my opportunity for my attorney to have a handwriting expert come to the District Attorney's office because he was unwilling to let this diary that was only seen by the District Attorney [unsworn witness]...No other investigation on this specific piece of paper called a diary has been made." (J.S. Tr. Pg 7 at ¶ 23-35 Pg. 8 at ¶ 1-8)

➢ Defendant: "[C]atherine comes to the District Attorney with this diary which is a falsified document and then all these charges are against my account. No other investigation was done on this piece of paper." (J.S. Tr. Pg 8 at 11-15)

➢ Defendant: "My attorney just told me just now he was unable to get somebody to come to his office. I would like to at my own expense and my family's expense get a handwriting expert to come... to prove there were falsified statements written in on different dates at the same time. In other words, she went back and added in stuff on multiple dates at the same time concerning these charges and then presented that to the District Attorney as proof what all these previous charges were. There was - - nobody else saw this diary

except the District Attorney technically making him a potential witness for being the only one to see that." (J.S. Tr. Pg. 8 at ¶ 21-24 Pg. 9 at ¶ 1-10)

➤ The Court: "Okay. Let me say first based on the record the last time and also in chambers, the DA does not intend to introduce the diary on their direct case; am I correct?" (J.S. Tr. Pg 9 at ¶ 17-20)

➤ Mr. Katchen: "That's correct." (J.S. Tr. Pg. 9 at ¶ 21)

➤ Defendant: "If it's not planned to be brought into evidence there is no reason why the District Attorney shouldn't allow it to be examined." (J.S. Tr. Pg 12 at ¶ 12-15)

➤ The Court: "It's not going to be in evidence. There is no reason to talk about it." (J.S. Tr. Pg 12 at ¶ 16-17)

I made the court aware that ADA Katchen acted in an investigatory manner, potentially becoming an unsworn witness and informed the court of the substance of the expert document examiner's investigation and testimony, all highly relevant to the defense. I went on the internet that evening and found 18-B certified Forensic Document Examiner Robert Baier located in Warwick, N.Y. and Forensic Handwriting Analyst Treyce d'Gabriel-Montoya.

### a. Proposed Testimony of Forensic Document Examiner Robert Baier

Mr. Lamb presented an oral motion on July 7th, 2010 to request that a handwriting expert John Paul Osborne perform a forensic examination of the diary, because upon viewing the copies it appeared entries were altered or added on to at a later time.

The court, when I raised the issue on the first day of jury selection, told Mr. Lamb, "The DA does not want to send an original document to New Jersey for an expert to examine in his office rather then come here. I indicated you could find someone else and that offer still

stands. We will start picking today, but you have several days." (J.S. Tr. Pg 13 at ¶ 1-6) Judge Rooney was unwilling to let it be taken to the expert's professional laboratory, even though Mr. Lamb made it clear that "Mr. Osborne has also represented to me that it is *impossible* to conduct a thorough, meaningful and accurate examination of a photo static or Xerox copy, such as the copies provided to me by the District Attorney." [Emphasis Added]

    I found a Forensic Document Examiner the first day of Jury selection, September 8th, 2010; after Mr. Lamb told the Honorable Court he could not find one who was assigned to the 18-B panel list of approved experts. I provided the expert with photocopies via email for a preliminary evaluation and gave Mr. Lamb the expert's information the next day.

    I explained to Mr. Lamb in detail that the expert could perform a "Water Solubility Test", which places a small amount of water on the ink of the paper and by watching the ink dissolve under a microscope, it can be determined if some ink on the page is older then other ink on the same page. The purpose of this test was to definitively prove that the added lines accusing me of crimes of 7 different dated entries **were all the same age.** This would scientifically prove that the added entries accusing me of crimes on 7 different dated entries were all written at **the same time.** This would also prove that she testified falsely at the grand jury as her entire testimony was **word for word** exactly as recorded in her diary, which she was allowed to take to the stand with her and read from during her entire grand jury testimony.

### b. Reports and Exhibits of Forensic Document Examiner Robert Baier

    On September 11th, 2010, Mr. Baier submitted Document Examiner Letter of Opinion (EX "2-Q") which was a preliminary report of photocopies emailed to him by me. His opinion

stated in brief "the evidence supports my professional opinion that it is 'highly probable' some of the writings…were not written at the original time of entry."

Mr. Baier also reiterated, as did the previous expert Mr. Osborne, "It is not possible to bring my laboratory with all my equipment to the site of the diary." He also stated that based on the level of examination he may be able to "show a high probability that someone went back and made all of the [additional] entries at the same time."

Then, on September 13th, 2010, Mr. Baier was allowed to review 8 pages of original documents under supervision at the District Attorney's Office and on September 14th, 2010, he submitted a Supplemental Report. His conclusive findings in that report state the following:

➤ Findings: "After examining the original writings of the diary I was able to reinforce my opinions expressed in the original report. I feel certain that the last sentence of Q4/Q5 was added at a later date/time. The writing of both pages was done with a liquid writing implement for 1 and ½ pages until the last sentence which was done with a ball point pen. There is no logical reason someone would stop their writing at the last sentence after writing a page and a half and change writing implements unless the liquid implement ran out of ink and I would have been able to determine that."

➤ "It is my opinion that Q1, Q2, Q3, Q6 had writings that were added after the time of the original entries. All of the added writings contained the accusations of rape." (EX "2-R")

   **c.    Proposed Testimony of Forensic Handwriting Analyst Treyce d'Gabriel-Montoya**

Expert Witness Treyce d'Gabriel-Montoya, President of the Center of Forensic Profiling, National Association of Handwriting & Document Experts (NAHDE) and the International Association of Handwriting Formation Therapists (IAHFT); who submitted a Letter

of Opinion on September 14th, 2010; has a field of expertise is the forensic review of handwriting to determine deception and accompanying personality factors of the persons handwriting. Her 40 page CV includes local, state and government agencies across the country and all over the world.

Mr. Lamb refused to submit this expert's CV to the Court to provide testimony in my behalf. This evidence would have greatly affected the jury's deliberation, as it raised serious questions of the complainant's credibility and state of mind. The refusal of Mr. Lamb to use available evidence in support of the theory of the defense had no basis in tactical reasoning or strategic purpose and as a result the defense once again lost the ability to put the complainant's credibility in question in a case where credibility was the only defining factor.

   d.   **Expert Report of Forensic Handwriting Analyst Treyce d'Gabriel-Montoya**

   Ms. Montoya examined 3 diary entries, July 17th, 28th and 30th of 2009. Her opinion was based on the following factors stated in brief:

➢ The severe slant of the writer indicates she has significant and pronounced indicators of bipolar disorder. This occurs in 90% of her writings.

➢ The use of lowercase i used in place of appropriate capital "I" indicates her low self esteem and inferiority complex. This appears in 60% of her writings.

➢ Her lead-in strokes of letters h m, n, p, w and y predominately indicate her resistance argumentativeness, ability to criticize, find fault and blame others. This occurs in 75% of her writings.

➢ Words and letters that raise above the pre-printed line indicate an excessive need to engage in mental thought or activity such as *thinking about what to write*. [Emphasis Added] If the statements are honest and happened in the recent days, hours or minutes

prior to writing the event would be immediately memorable and the need for excessive mental thoughts would not be necessary. This occurs in 70% of the writings.

> "Liar's Loops" appear on many vowels. Vowels are communication letters and vowels that are illegible, have excessive marks or loops, close or are too narrow, all indicate ones unwillingness to tell the truth and indicate withholding information. This occurs in 75% of the writings.

> Entrance strokes on the letter c (which cause them to become closed like an o) indicate her obsessive thoughts. Once she has a plan or idea in her head combined with the above-mentioned resistance, critical, and argumentativeness, she obsesses until she is satisfied. In this situation, this only feeds into her desire to make you, Mr. Rucano, miserable. This occurs in over 50% of her writings.

> Deceptive letters or letters that, if they stood alone, would be illegible or unrecognized by the general public indicate deception and anxiety. This occurs in 95% of the writings.

Ms. Montoya then identifies clear places where deception is obvious in each dated entry. (Exhibit "2-B") Her synopsis is brief states "the writer of these diary entries is being deceptive and extorting any truths that may exist within", and are fully stated previously.

The failure of Mr. Lamb to present the C.V. of this handwriting expert, in a case where damaging the credibility of the complainant and impeaching her testimony would have resulted in an acquittal of all charges; served no tactical reason or strategic purpose. It supported the theory of the defense that the alleged rape charges are fabrications, because I was going to leave her. (Tr. Pg. 281 at ¶ 16-18, Pg. 282 at ¶ 13-15 22-24, Pg. 283 at ¶ 6-9 Pg. 285 at ¶ 15-17, Pg. 287 at ¶ 9-10) Mr. Lamb also spoke about this in summation. (Tr. Pg 569 at ¶ 17-23)

## A Position Contrary To The Defense

Mr. Lamb then asks "during the period of time that you were living with Anthony and seeing your therapist did you ever tell your therapist that he was sexually abusing you?" Now the complainant says "I don't recall if I did" and she repeats that when asked if she ever told her mom, brother sister, friends and co-workers. (Tr. Pg. 283 at ¶ 8-25, Pg. 284 at ¶ 1-19)

Mr. Lamb's failure to introduce the session notes released by Judge Rooney at his own request to impeach the witness was inexcusable and defeated the adversarial process.

Mr. Lamb then asked the complainant "After he told you that, isn't it a fact that you began screaming and hollering and stomping your foot on the floor?" and "So in an effort that the neighbor downstairs would think that you and he were fighting?" The complainant responds "No." (Tr. Pg. 285 at ¶ 21-25, Pg. 286 at ¶ 1-11). This testimony directly contradicts the complainants own testimony on direct examination by ADA Katchen. (Tr. Pg. 194 at ¶ 8-12)

**E.    Failure To Use Session Notes of Licensed Clinical Social Worker Anna Lorusso-Moramarco To Cross-Examine Complainant on Prompt Outcry Was A Position Contrary To The Defense**

Licensed Clinical Social Worker Anna Lorusso-Moramarco was treating the complainant in individual counseling sessions starting on July 9th, 2010. Shortly thereafter, I arranged for us to go to separate couples counseling sessions billed to my insurance. Judge Rooney released 1 individual session note of the complainant as potential Brady material on September 8th, 2010 (J.S. Tr. Pg. 28 at ¶ 11-25), and all three couples counseling session notes on September 9th, 2010 (J.S. Tr. Pg. 223 at ¶ 10-15), after the complainant and me each waived our right to confidentiality on the record. (J.S. Tr. Pg. 223 at ¶ 1-5, Pg. 224 at ¶ 1-5)

In the individual session note of the complainant dated July 21st, 2009, redacted for privacy reasons, it shows the complainants propensity to initiate violent behavior. (Exhibit "2-S") Mr. Lamb failed to use this potential Brady material to show the complainants violent tendencies and otherwise inquire further about her actions directly after the first alleged incident claimed by the complainant.

In this individual session between her and Ms. Moramarco she offers, "Duane stated they had a really big fight on Friday night. She had gone out with friends. When she came home he was yelling at her, she got angry and swung at him and he in turn punched her in the eye." (Exhibit "2-S")

The complainant's contemporaneous prompt outcry to her social worker on July 21st, 2009, 4 days after it happened; admit that during a verbal argument she swung at me first. Of course, she fails to state she punched me in my face while driving (Tr. Pg. 385 at ¶ 3-12). The complainant's testimony at the grand jury almost 2 ½ months later is surprisingly more detailed, especially when reading from her diary of fabrications.

More importantly, there was no prompt outcry of rape 4 days after it allegedly occurred as Ms. Moramarco a Licensed Clinical Social Worker, would have been duty bound to report it. At this point there was no "learned helplessness" of a person allegedly suffering from battered woman's syndrome, no testimony by the complainant of threats. The failure to use these session notes to impeach her was a position contrary to the defense, as they supported the theory of the defense that these allegations were fabricated.

The session note for July 28th, 2009 (Exhibit "2-T") is clearly marked "This was a couple's session" and confirmed my claims of her inability to communicate and being intimate and withdrawn during sex. (Tr. Pg. 389 at ¶ 1-4)

Mr. Lamb pursues a line of questioning that takes a position contrary to the defense when he asks "Okay, Matter of fact, didn't you invite Anthony to sit in on several sessions, turn it into couples' sessions?" (Tr. Pg. 270 at ¶ 21-25). This was in direct contradiction to my testimony that these sessions were requested by me and completely separate from the complainant's individual sessions on different days. (Tr. Pg. 401 at ¶ 8-23, Pg. 402 at ¶ 16-20)

Mr. Lamb consistently attempts to impeach my testimony by stating that the complainant invited me into her sessions. A subpoena for the social workers records would reveal the sessions were billed to my insurance, which she was not a part of. Mr. Lamb failed to subpoena Ms Moramarco as a hostile witness, exposing the contents of the session notes, which revolve exclusively around me. This would have shown his effort to receive counseling in the relationship, and impeached the complaining witness' testimony as to the truth of her statements.

Mr. Lamb's failure to use the session notes and to call Ms. Moramarco as a witness prevented him from pursuing proof that complainant never made prompt outcry to her counselor.

**F.     Email Sent by Defendant to Steve Frankl**

On July 17th, 2009, I sent an email to my friend Steve Frankl. I stated in the email "Hold onto this, problems with girlfriend" and attached a word document called KatherineProblems.doc. (Tr. Pg. 386 at ¶ 11-14) (Also see EX "1-T")

The word document sent with the email was prompt outcry by myself concerning the growing concern I was having about my now live-in fiancées erratic behavior and surprisingly, and is same date as first entry in complainant's alleged diary. The contents of the document, in which a certified copy is available by subpoena from Yahoo, the internet service provider; was sent on July 17th, 2009 at 10:50 and 40 seconds P.M. and states the following:

❖ "I picked her up from the ferry and she started talking about killing herself. She started hitting herself then bit me and punched me in the face; I had to defend myself so I grabbed her hand. She tried to make me crash my car so I hit her in the side of the face. She calmed down and we got home then she started cursing me and telling me she was going to stab me in my sleep then sad she was going to call the cops and say I hit her. She has a history of trying to kill herself, I have been trying hard to get her to counseling and she started 2 weeks ago, but I think her talking about the past is making her worst. This morning in the car she started talking about killing herself, I told her not to play around like that but I could not tell if she was serious or not. She is in the bathroom smoking a cigarette, I have ice on my eye and I have her teeth marks in my arm, I don't want to call the cops on her so I am writing this and sending it to a few friends of mine So I have some proof of what is going on. I spoke to my friend Jimmy Owens and also Ray Mojica from NYCT, Coney Island yard about the problems I have been having with Katherine for the past few weeks. I hope she calms down but I need to protect myself now because I don't know if she will try to stab and kill me or kill herself." Anthony Rucano 10:45pm on 7/17/09.

This email provides details concerning the problems between complainant and I. She observed me as I was sending this email and asked me what I was doing and I told her. It is at this point the complainant formulates her "plan" to create the diary.

The fact is the diary was a fabrication from the start, recording our fights, which actually occurred; in a way that portrayed her as a victim. In fact, the trauma and pain she was experiencing from her past rape by a family member in her childhood (Tr. Pg. 240 at ¶ 7-20), combined with her now being in a relationship which was open, loving and caring scared her to death and started her on a path to self-destruction because of her lack of self worth.

154-0

On September 8th, 2010, Steve Frankl was brought to the attention of the court. (J.S. Tr. Pg. 5 at ¶ 9-10) Again, on September 15th, 2010, there was a discussion of upcoming defense witness', and Steve Frankl was on that list (Tr. Pg. 333 at ¶ 15-19), yet Mr. Lamb never attempted to contact Mr. Frankl who was ready and willing to testify.

Mr. Lamb's failure to cross-examine complainant about the email sent on July 17th, 2009, produce it, then call Steve Frankl as a defense witness; was a critical error to a case where the credibility of the complainant was precarious at best.

## VI.      Defense Counsel Took A Position Contrary to the Defense

Upon information and belief, Mr. Lamb was responsible for errors of commission and omission causing him to take a position contrary to the defense. This was not strategic in nature, served no tactical reason or strategic purpose, and did not further the adversarial process.

## A.      Mr. Lamb's Failure to Call Forensic Document Examiner Robert Baier to the Stand to Testify Was a Position Contrary to the Defense

I contacted Mr. Baier in February 2011 and on March 2nd, 2011; and he sent me a requested confirmation letter for Case # 1009-455-4, which was notarized. (EX "2-U") He stated in brief that he prepared court displays and booklets in preparation for trial on September 15th, 2010. Mr. Baier specifically stated the following:

➢ "I was told to be at court on September 15[th] by both Mr. Rucano with confirmation the night before and by attorney Eugene Lamb. Upon my arrival I was told my services would no longer be needed in this case."

➢ "I have enclosed an affidavit (EX "2-V") which explains in great detail everything that transpired in only 4 business days which was prepared and submitted to the Assigned

Counsel Plan 18b. This is an unsigned un-notarized copy of the affidavit with the original being signed and notarized and is on file with the Assigned Counsel Plan 18b."

Mr. Lamb's unexplained reason for not introducing the diary into evidence by cross-examining her on how she testified at the Grand Jury, where there was no mention in any law enforcement report of any crimes on any other date but September 28th, 2009; had no tactical reason or strategic purpose and was a position contrary to the defense,

Besides Mr. Lamb petitioning for an expert on July 7th, 2010, and again in a written motion on July 16th, 2010, he stated the following during the first 2 days of trial:

➢ Mr. Lamb: [Sept. 13th, 2010] "Before we do that Judge, my handwriting expert did in fact have an opportunity to and did in fact examine the diary at the D.A.'s Office…I feel he has evidence value and I *intend* to call him as an expert witness on behalf of the defense offer his testimony offer him as an expert." {Emphasis Added] (Tr. Pg. 58 at ¶ 8-16)

Mr. Lamb goes further to highlight the importance of the witness to testify and the concern for the expert's time due to a death in his family.

➢ Mr. Lamb: [September 13th, 2010] "As far as scheduling is concerned, he comes from Warwick, New York, and recently had a death in the family, as a matter of fact, his mom - -." (Tr. Pg. 59 at ¶ 10-13)

➢ The Court: "You want to put him out of order on Wednesday." (Tr. Pg. 59 at ¶ 14-15)

➢ Mr. Lamb: "I'd like to be able to call him, if necessary, out of order on Wednesday afternoon; is that all right with the Court?" (Tr. Pg. 59 at ¶ 16-18)

➢ The Court: "It's fine with me." (Tr. Pg. 59 at ¶ 19)

➢ Mr. Lamb: "Thursday he may have to go back to Massachusetts to make further arrangements regarding his mother's funeral." (Tr. Pg. 59 at ¶ 20-22)

The next day the Honorable Judge Rooney confirms with Mr. Lamb about Mr. Baier, the handwriting expert, testifying tomorrow.

➢ The Court: "And your handwriting expert is not available until tomorrow afternoon?" (Tr. Pg. 231 at ¶ 10-11)

➢ Mr. Lamb: "Yes." (Tr. Pg. 231 at ¶ 12)

Mr. Baier got confirmation to come to court the next day on Tuesday night, September 14th, 2010, after appearing in court that afternoon, from both myself and Mr. Lamb. Mr. Baier drove over 2 hours from Warwick N.Y. to court to testify that morning, yet here is what Mr. Lamb stated a short while after cross-examining the complainant the next day.

➢ Mr. Lamb: "We took a short break after I finished my cross examination of the complaining witness in this case and I thought I had communicated clearly with my client that I was prepared to rest and did he have any other problems. He is now telling me that he did not understand and that he is protesting the fact that I did not make any reference to the diary which would then allow the expert witness to testify. *In my judgment it shouldn't have come in and no reference should have come in on the cross examination and therefore we make the expert's testimony irrelevant. He is protesting that.*" [Emphasis Added] (Tr. Pg 331 at ¶13-25, Pg. 332 at ¶1)

➢ The Court: "You've made your record. There's nothing for me to say." (Tr. Pg. 332 at ¶ 2-3)

In Mr. Baiers affidavit to Assigned Counsel Plan (Exhibit "2-V") on Page 3, paragraph 8, he states, "When I arrived home I contacted my client and client's attorney to find out what happened and was told that the District Attorney decided not to enter the diary into evidence.".

Furthermore, Mr. Lamb, who was so concerned with Mr. Baiers time and being able to have him testify because of the death of his mother, showed no concern at all by making him drive down from Warwick, N.Y., in over a 2-hour drive; just to be told he was not needed.

On October 5th, 2010, I was produced for sentencing and made a statement concerning Mr. Baier, and then Mr. Lamb makes a record concerning his conduct at trial.

➢ Mr. Lamb: "I mean the major thrust of my conduct at trial is my belief that if the use of the diary then introduced a handwriting expert to impeach the diary would have been harmful." (Tr. Oct. 5th, Pg. 8 at ¶ 25, Pg. 9 at ¶ 1-4)

➢ Defendant: "He was ready to testify. The handwriting expert was in the building that day. Because of his failure to bring up that I believe that he would have been able to show the jury prejudice in the fact that every single page of the diary was written in a different handwriting by a different pen." (Tr. Oct. 5, Pg. 9 at ¶ 5-11)

➢ Defendant: "It shows she went back and maliciously added stuff to the diary, took it to the grand jury and presented a false document. I was never given notice of Grand Jury. I had filed a notice for that as well." (Tr. Oct. 5 Pg. 9 at ¶ 12-16)

➢ Defendant: "I showed it to a dozen people and can see the handwriting is different." (Tr. Oct. 5th, Pg. 9 at ¶ 19-20)

➢ Mr. Lamb: "There was a handwriting expert that was brought on actually assigned to 18b, he was actually in the building ready, willing and able to testify." (Tr. Oct. 5th, Pg. 10 at ¶ 6-9)

➢ The Court: "For strategic reasons you decided not to call him."[21] (Tr. Oct. 5th, Pg. 10 at ¶ 10-11)

---

[21] The Honorable Court abused its discretion by giving trial counsel direction concerning his trial decision and strategy in this matter, which violated the Ethical and Professional Canons of Judges.

➤ Defendant: "Against my wishes." (Tr. Oct. 5th, Pg. 10 at ¶ 12)

➤ Mr. Lamb: "We did discuss it. As a result of our conversation regarding that it was my feeling that the defendant agreed with me that at that point that it was unwise as a trial strategy to introduce the existence of the diary." (Tr. Oct. 5th, Pg. 10 at ¶ 13-17)

➤ Defendant: "I wouldn't have had the guy drive down from Upstate New York if I didn't want him to testify. That morning Mr. Lamb talked about a lot of stuff and he may not remember, but I specifically told him that was the most important part of my trial. And I object and I wouldn't have had the guy drive down three hours. (Tr. Oct. 5[th], Pg. 10 at ¶ 19-25)

➤ Defendant: "I found the handwriting expert. Mr. Lamb couldn't find one. I made all the arrangements for this guy to be here. Why would I do that if I didn't want him to testify in my trial?" (Tr. Oct. 5th, Pg. 11 at ¶ 1-4)

➤ The Court: "All right, your lawyer is going to make that 330.30 application." (Tr. Oct. 5th, Pg. 10 at ¶ 5-6)

Upon information and belief, these statements made by Mr. Lamb contradict all his earlier statements concerning Mr. Baier testifying in this matter, and are clearly a position contrary to the defense. Based on the underlying record, the overall facts of the case, and the theory of the defense that these charges were fabricated; this decision shows that Mr. Lamb took a position that served no tactical reason or strategic purpose, which defeated the adversarial process and can not be understood to be made with an eye benefiting his client. This prejudiced my ability to mount a viable defense and resulted in less then meaningful representation and the ineffective assistance of counsel.

~~it determination that the juror was not grossly unqualified to serve that was based on speculation. Additionally, the Supreme Court erred in failing to place the reasons for its ruling on the record as they were not subject to meaningful proper analysis, the conviction must be reversed~~

## VIII.   Newly Discovered Evidence of Falsified Session Notes Released Under Subpoena

Furthermore, trial counsel Eugene Lamb was able to petition the Honorable Judge Rooney for Social Worker Anna-Lorusso Moramarco's' session notes during the trial in my case. Trial Counsel Mr. Lamb never introduced these session notes into evidence at trial. These session notes were released under subpoena., and are highly relevant as they support his ineffective assistance of counsel claims against Eugene Lamb Esq. (Exhibit "2-X")

Judge Rooney released 1 individual session note of the complainant as potential Brady material on September 8th, 2010 (Jury Selection [J.S.] Tr. Pg. 28 at ¶ 11-25) (Exhibit. "2-S"), and all three couples counseling session notes on September 14th, 2010 (Tr. Pg. 223 at ¶ 10-15) (Exhibits "2-T, 2-W, 1-R"), after the complainant and I each waived our right to confidentiality on the record. (Tr. Pg. 223 at ¶ 16-25, Pg. 224 at ¶ 1-5).

In the individual session note of the complainant dated July 21st, 2009, which is redacted for privacy reasons, it shows the complainants propensity to initiate violent behavior. (Exhibit "2-S")

The session note dated July 28th, 2009 (EX. "2-T") is the first couples counseling session I paid for and attended with Anna Lorusso-Moramarco L.C.S.W. The two other sessions were dated August 11th, 2009 and September 22nd, 2009. (Exhibit "2-W, 1-R")

This couples counseling session note is clearly marked "This was a couple's session." Although the session note lists the complainant as the patient, my AETNA Claims Report clearly

show that this session and the 2 other sessions that followed were all billed to my insurance, which the complainant was never a part of. (Exhibit "3-D")

I initiated a complaint with the Connecticut Attorney General George C. Jepsen in a letter dated October 17th, 2013. This concerned my Health Insurance Provider, AETNA, being reluctant to provide documents proving that the session notes released by subpoena to the Honorable Judge Rooney prior to the start of my criminal trial were falsified, thereby making this provider guilty of Falsifying Business records. Mr. Jepsen's office contacted AETNA in an effort to get them to comply with my requests. This was assigned case Number 2014-9646. (Exhibit "2-Y")

I also initiated a malpractice lawsuit against Anna Lorusso-Moramarco L.C.S.W. in Richmond County Supreme Court, Index # 102435/12. Ms. Moramarco is also under investigation by the New York State Department of Financial Services Insurance Frauds Bureau. On May 28th, 2013 Director Frank Orlando informed me that the Investigation was assigned Log # 2013-L-008985. (Exhibit "2-Z")

Ms. Moramarco submitted an affidavit in this malpractice lawsuit where she stated that at no time did she ever provide services to me in a couples counseling capacity or in any capacity. (Exhibit "3-A") This affidavit fails to explain how Ms. Moramarco billed my AETNA medical insurance for the services of counseling, when the complainant was NEVER a part of his insurance policy at any time.

On December 17th, 2013, AETNA replied to Frances T. McCaffrey of the Connecticut Office of the Attorney General, Antitrust and Government Program Fraud Department, who in turn forwarded documents providing proof that Anna Lorusso-Moramarco billed me 3 times for individual psychotherapy, which correspond with the 3 dated session notes submitted to Judge

Rooney which all talk about me. Ms. Moramarco submitted a sworn affidavit to the Honorable Judge Philip Minardo of the Richmond County Supreme Court that, she "never provided services to me individually or in a couples counseling capacity." How then did Ms. Moramarco obtain my private health care insurance and bill me for services she swears she never provided when my fiancée, the complainant; is verified by these records as never being a beneficiary on my health care insurance? (Exhibit "3-B')

Even more condemning is this provider billed for the service of CPT code "90801" on July 28th, 2009, verified as being for a "Psychiatric Diagnostic **Interview** Examination", which is billed at a higher rate to compensate for the additional time required to do an "intake" on a new patient for the first time. This patient was me, **not** my fiancée, as my fiancée saw this provider twice before, once on July 9th, 2009 and again on July 21st, 2009, which was billed to her private insurance with her employer. This is verified by the individual session note of July 21st, 2009, provided by Judge Rooney (EX. "2-S"), which does not show on my AETNA claims report.

An investigation and subpoena for the providers billing records of Duane Katherine Ramos will reveal the separate billing to her private insurance for the dates July 9th, 2009 and July 21st, 2009, as well as multiple dates after these. These were all separate from the dates billed to my insurance where I was the primary patient, for couples counseling. The content of the session notes, that talk exclusively about me, and the billing records, all support these claims.

Paralegal Specialist Frances T. McCaffrey sent me a letter dated December 19th, 2013 forwarding documents received from AETNA, which were stamped received by the Connecticut Office of the Attorney General on December 18th, 2013, with all the documents received from AETNA via the Connecticut Attorney General attached. (Exhibit "3-C")

The AETNA letter/report had annexed to it a Certified and unredacted copy of my AETNA Claims Report (Exhibit "3-D"), which is an exact copy of the redacted claims report previously submitted to Judge Minardi. The claims report provided by AETNA in this package (Exhibit "3-D") has a computer generated "document control number" (DCN) of 131106068686 EI, which is verifiable as the copy of the electronic record on file with AETNA.

On Page 1 and 2 of the AETNA letter/report provided to the Connecticut Attorney General, then to me; is a listing of all covered members on my AETNA Health Insurance, described as "printouts from our eligibility database showing the coverage effective and termination dates for the subscriber and each dependant as follows." This uncontrovertibly verifies that Duane Katherine Ramos was **NEVER** a covered member on my insurance. As such, the billing of services to AETNA by this provider for services that she submitted a sworn affidavit stating she "never provided to me in either an individual or couples counseling capacity", must result in multiple criminal charges being brought against Ms. Moramarco.

Anna Lorusso-Moramarco submitted falsified session notes under subpoena, from the Honorable Judge Rooney for use in my criminal trial under Indictment # 270/09. The evidence shows that this provider is guilty of one or more of the following crimes in New York State, and possibly other crimes in Connecticut and/or violations on interstate federal commerce laws:

A.  Falsifying Business Records in the 1st degree (P.L. § 170.10), which one is guilty of "when he commits the crime of falsifying business records in the 2nd degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."

B.  Health Care Fraud in the Fifth Degree (P.L. § 177.05), which one is guilty of "when, with intent to defraud a Health Care Plan, he or she knowingly and willingly provides materially false

information or omits material information for the Purpose of requesting Payment from A Health Care Plan for A health care item or service And, As A result of such information or omission, he or she or Another Person receives Payment IN AN Amount that he, she or Another Person is not entitled to under the circumstances.

C. Perjury in the 2nd Degree (P.L. § 210.10) which one is Guilty of " when he swears falsely And when his false statements is, (A) Made in A subscribed written instrument for which An oath is required by law, And (B) made with intent to mislead A public servant in the Performance of his official functions, And (c) material to the Action, Proceeding or matter involved."

Intentionally Left Blank

## QUESTIONS PRESENTED

### QUESTION 1

Because neither CPL § 440.30(1) or (4) (b) applied to my application, as the defendant submitted sworn allegations of fact from 2 different expert witnesses, an uncalled witness, as well as his own affirmation, which was further supported by numerous pieces of documentary evidence and information tending to support the allegations in his moving papers all in support of his constitutional claims...

    a).    Did the motion court's failure to hold the mandatory hearing I was entitled to under CPL § 440.30(5) violate my right to due process?

### QUESTION 2

The trial courts order denying my application for CPL §§ 440.10 relief stated that my record based claims "are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based on matters that are within the record... [and are] based upon conclusory allegations. See C.P.L. 440.30 (1) and (4) (b)" Furthermore, the court also quoted C.P.L. 440.10 (2) (b) and applied a procedural bar to my claim, stating the issues [which were mixed claims] could have been raised on my pending appeal.

    a).    Was the court's invocation of CPL § 440.10's procedural bar to my claims of ineffective assistance of counsel violative of and contrary to the holdings of <u>Massaro v. United States</u>, 538 US 500 (2003) and <u>Martinez v. Ryan</u>, 132 S.CT. 1309 (2012)?

    b).    Was the motion court's application of CPL § 440.10's procedural bar to my claims of ineffective assistance of counsel violative of and contrary to the holdings of the clearly defined state court precedents of <u>People v. Maxwell</u>, 89 AD3d 1108 (2nd Dept. 2011) and <u>People v. Freeman</u>, 93 AD3d 805 (2nd Dept. 2012)?

    c).    Did the motion court abuse it's discretion when it failed to consider the numerous non-record based exhibits upon which the defendants motion to vacate the judgment was predicated on, and therefore ignore the Second Department and Courts of Appeals precedents involving "<u>Mixed Claims</u>"?

    d)    Should this Court take Judicial Notice of the Appellant's Previous Applications to Enlarge the Judgment Roll and to Withdraw Appellate Counsel's Brief When Considering Whether the Trial Court's Application of Procedural Bars was Erroneous and Contrary to Federal and State Precedents?

e)   Is CPL § 440.10 the Only Vehicle to Obtain A Full and Fair Review of My Prosecutorial Misconduct and Ineffective Assistance Of Trial Counsel Claims, When Considering Sub-Points (a), (b), (c) and (d), *supra*?

## QUESTION 3

Considering the Defendants Application To Enlarge the Judgment Roll With Records Previously Submitted to This Court, Which this Court Denied **Except** for the Requests for Stenographic Transcripts (Thereby Implying Those Records Dehor The Record); and also Considering the Defendants Application To Withdraw Appellate Counsel's Brief Because of His Failure To Develop Substantive and Numerous Claims of Ineffective Assistance of Counsel, Which This Court Summarily Denied…

a).   Regardless of whether the lower court has conducted an evidentiary hearing on a motion to vacate judgment, it is statutorily required to set forth its findings of fact, conclusions of law and the reasons for its determination for each of the constitutional and/or procedural arguments raised by a defendant's motion (see CPL § 440.30[7]). Was its failure to do so considered a violation of due process as the defendant was not given effective notice of the court's decision denying his application, and therefore was deprived of an effective means of challenging the decision in future appellate or federal review applications?

b).   Because the lower court answered none of the constitutional questions raised by my CPL § 440.10 application, should this matter be held in abeyance and remitted to the lower court for compliance with CPL § 440.30(7), with directions to answer specific questions of law and fact affecting the merits of the motion?

## QUESTION 4

Should This Court Take the "Proverbial Leap" and Find that the Unconstitutional and Convoluted Procedural Scheme in this State that Moves Ineffective Assistance Of Counsel Claims Outside The Direct Appeal Process Prevents Defendants From Determining These Claims Fully on the Merits Under The State Practiced Standard for Those Claims, "**Baldi**", Which is "**Representation as a Whole**" and "**In Totality**"; Because in Practice It is Impossible To Reach and Will Lead To The Challenge Of These Laws Via the Adequacy Doctrine?

## I.   RELEVANT BACKGROUND FACTS AND PROCEDURAL HISTORY

7.     I was arraigned for rape, sexual misconduct and assault on October 1st, 2009. I entered a plea of Not Guilty and posted bail the next day in the amount of $5,000. I was tried in this Court before the Honorable Judge Stephen Rooney on September 9th, 2010. The case was submitted to a jury, which rendered a verdict of guilty.

8.     On January 21st, 2011, I was sentenced to a twelve year determinate sentence.

9.     After filing a motion requesting permission to file a supplemental pro-se brief, and a separate motion to enlarge the judgment roll, on January 6th, 2014 the Appellate Division, Second Department granted permission to file a supplemental pro-se brief by April 7th, 2014. My motion to enlarge the judgment roll was granted in part, and the Court issued an order for the Grand Jury proceedings to be produced by the Nisi Prius Court to the Appellate Division under seal, as well as an order to produce the stenographic transcripts for July 7th, July 16th, and August 10th, 2010 as part of the judgment roll (Exhibit "4-D").

10.     I filed a motion to amend the decision and order of January 6th, 2014, to enlarge the record to include the October 1st, 2009 and October 5th, 2009 transcripts, which were requested as part of the original motion. On April 21st, 2014, the Appellate Division, Second Department issued a Decision and Order enlarging the judgment rolls, and ordered the stenographer to produce said transcripts within 45 days, which ended on June 5th, 2014. The Court also extended the time for me to file my supplemental pro-se brief until July 21st, 2014 (Exhibit "4-E").

11.     On March 20th, 2014, I filed a motion to withdraw appellate counsel's brief, and if granted, for the assignment of new counsel on the appeal to aid in the preparation of a CPL 440 motion, and to hold the appeal in abeyance pending the determination of the CPL 440 motion. This motion also challenged the constitutionality of County Law § 722 and the potential

application of CPL § 440.10(2) procedural bars, and was served on the Attorney General Pursuant to Executive Law § 7101 and CPLR § 1012(b).

12. I received a response dated April 30th, 2014, from Nikki Kowalski, Deputy Solicitor General for Criminal Matters, of the Office of the Attorney General, explaining that her office will not intervene concerning the constitutional challenges Pursuant to Executive Law § 71 or C.P.L.R. § 1012(a)(1) at this time.

13. The Richmond County District Attorney's response was silent on the constitutional challenges also, simply stating that appellate counsel's brief should not be withdrawn.

14. On May 19th, 2014, this Court issued a Decision and Order on the motion to Withdraw Appellate Counsel's brief and related relief. This Court's decision simply stated that the motion is denied (Exhibit "4-F"). As this Court denied the motion to withdraw appellate counsels brief, which was a prerequisite to be granted for this Court to entertain the assignment of counsel portion of the motion, this court never considered the assignment of counsel application.

15. On July 15th, 2014, the defendant filed 3 separate and distinct motions with the Richmond County Supreme Court, which were:

a. Notice of Motion and Affidavit in Support of Motion for the Assignment of Counsel.
b. Notice of Motion and Affidavit in Support of Motion for An Evidentiary Hearing
c. Notice of Motion, Affidavit in Support and Memorandum of Law in Support of Motion to Vacate Judgment Pursuant to Criminal Procedure Law § 440.10 (1) (C) (D) (F) (G) (H)

## II. <u>THE COURT'S DECISION AND ORDER ON THE ARTICLE 440</u>

16. The court-below denied all three separately submitted motions in one combined Decision and Order dated December 15th, 2014, on the grounds that (1) <u>Motion to Vacate the</u>

Judgment: The arguments were either conclusory and not supported by documentary evidence or affidavits, or are record based claims and could have been raised on direct appeal (see CPL § 440.10 [2][b]), (2) Motion For An Evidentiary Hearing: There is no constitutional or common-law right to discovery in criminal cases, as defendant's motion is nothing more than an attempt to depose his trial attorney, which is not authorized by C.P.L. Article 240 or 440 and therefore, must be denied, and (3) Motion for the Assignment of Counsel: A defendant cannot claim a state or federal constitutional right to effective assistance of counsel on a motion pursuant to C.P.L. 440. (Exhibit "4-C")

## A.    THE TRIAL COURTS OPINION

17.    The trial court dedicated a single paragraph of its decision to state that "The defendant's claims fall into two categories. They are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record. The defendant does not state his basis of knowledge for his conclusory allegations (e.g. the defense attorney failed to investigate and the defense attorney failed to adequately prepare). Hence, the defendant is not entitled to the relief he seeks based upon conclusory allegations, See, C.P.L. 440.30 (1) and (4) (b)" (see Exhibit "4-C").

18.    The trial court states further, "Additionally, pursuant to CPL § 440.10(2)(b) the Court must deny a motion when the judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal. The defendant's direct appeal is currently pending before the Appellate Division, Second Department. Therefore, petitioner's motion to vacate his judgment pursuant to C.P.L. § 440.10 is denied" (see Exhibit "4-C").

19.   Then, the trial court denied defendant's motion for an evidentiary hearing, stating the defendant is attempting to discover evidence that would support his conclusory allegations, and then qualified this by stating there is no constitutional or common-law right to discovery in criminal cases. The Court stated "the defendant's motion for an evidentiary hearing is nothing more then an attempt to depose his trial attorney. Such a procedure is not authorized by either C.P.L. Article 240 or 440 and therefore, must be denied" (see Exhibit "4-C").

20.   The trial court ignored multiple affidavits from expert and other witnesses who were never called to testify at trial, ignored documentary evidence in the form of billing records received with the help of the Connecticut Attorney General's Office showing that falsified documents were submitted by Licensed Clinical Social Worker Anna Lorusso-Moramarco after Judge Rooney issued a subpoena for these records, emails and multiple other documents.

21.   Judge Rooney's statement that, "They are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record"; is completely unfounded as the motion and accompanying exhibits clearly include this documentary evidence and affidavits (See Appendix "A", list of exhibits).

22.   The trial court ignored the Court of Appeals precedents clearly and concisely laid out by the defendant in his motion for Assignment of Counsel, which stated:

> ➢ The defendant would like to bring to the Courts attention People v. Maxwell, 89 A.D.3d 1108 (2nd Dept. 2011), which is analogous to the defendants case, where it was stated "In this case since some of the defendant's allegations of ineffectiveness involve matters appearing on the record, while others involve matters that are outside the record. The defendant has presented a "mixed claim" of ineffective assistance (People v. Evans, 16 N.Y.3d 571, 575 n. 2, *cert. denied* --- U.S. ---, 132 S.Ct. 325) In order to properly review a defendant's claim of ineffective assistance, a court must consider all of his or her allegations – as well as the evidence the law, and the circumstances of the case – "in totality" (People v. Baldi, 54 N.Y.2d 137, 147). Thus, where, as here, a defendant presents a mixed claim of ineffective assistance that depends, in part, upon matters that do not appear on the record, it cannot be said that "sufficient facts appear on the record

with respect to the ground or issue raised upon such motion to permit adequate review thereof upon such an appeal" (CPL 440.10[2] [b]).

23.   The Assignment of Counsel motion (Exhibit "4-G"), although not part of the appeal before this Court[3] was part of the combined response by the Richmond County District Attorney's office to all 3 of my separately filed motions[4], and the trial court issued a single combined Decision and Order. Due to the Prosecutor and Trial Courts treatment of them, it is being provided to this Court to provide proper context to the Trial Court's Decision and Order.

24.   The defendant filed the combined Decision and Order Issued by the Honorable Judge Rooney with a Notice of Appeal and Notice of Entry, with the Richmond County Clerk Stephen J. Fiala on January 6th, 2015 (Ex. "4-H"), to appeal as of right the denial of the Assignment of Counsel Motion, which challenged the constitutionality of the laws in N.Y.

24A.   In the defendants reply brief (Ex. "4-J"), he specifically pointed out that in respondents opposition they conceded to eight particular claims of ineffective representation of trial counsel that dehor the record (Ex. "4-I", at ¶ 7), and the defendant then reiterated to the trial court that he has presented "mixed claims" and that procedural bars should not be imposed (Ex. "4-J", at ¶ 4-5). Finally, the defendant refuted respondents contention that he has not explained his failure to obtain an affidavit from trial counsel (Ex. "4-I", at ¶ 8), yet Ex. "3-L" clearly shows Mr. Lamb refused to respond to a certified letter, sent with return receipt, asking for an affidavit.

24B.   For the following reasons as stated below, the trial court misinterpreted the law involving mixed claims of ineffective assistance of trial counsel, which involves issues of fact and law which dehor the record. Accordingly, this Court should remit this matter back to the trial court with instructions to have an evidentiary hearing to develop these non-record based claims.

---

[3] Appealed to the Court of Appeals as of Right Pursuant to CPLR § 5601 9b0 (2).
[4] Motion for Article 440 Relief, Evidentiary Hearing and Assignment of Counsel, also *See* Letter Requesting an Extension of Time to Respond to Assignment of Counsel Motion from District Attorney, Ex. "4-I"

III.    <u>QUESTIONS OF LAW AND FACT WHICH OUGHT TO BE REVIEWED BY</u>
<u>THIS COURT</u>

<u>POINT 1</u>

**BECAUSE NEITHER CPL § 440.30(1) OR (4) (B) APPLIED TO MY APPLICATION, THE MOTION COURT'S FAILURE TO HOLD THE MANDATORY HEARING I WAS ENTITLED TO UNDER CPL § 440.30(5) VIOLATED MY RIGHT TO DUE PROCESS**

25.    If, as here, CPL § 440.30(1) or (4) (b) does not apply, a motion court must conduct a hearing and make findings of fact (see e.g. <u>People v. Ausserau</u>, 77 AD2d 152 [4[th] Dept. 1980]). Moreover, a hearing should be held to promote justice when the issues raised by the motion are sufficiently unusual as to suggest searching investigation (see <u>People v. Crimmins</u>, 38 NY2d 407, 416 [1975]).

26.    In this case, CPL § 440.30(1) does not apply because the defendant submitted sworn allegations of fact from 2 different expert witnesses and an uncalled witness, as well as his own affirmation, which was further supported by numerous pieces of documentary evidence and information tending to support the allegations in his moving papers, all in support of my constitutional claims (see <u>People v. Rodriguez</u>, 23 AD2d 683 [2[nd] Dept. 1965]). Indeed, the court who presided over this action failed to adequately review the moving papers submitted, or it would have seen the multiple affidavits and documentary support. Furthermore, as the facts and circumstances warranted detailed pleadings of fact and law, the defendant should not be punished for submitting a detailed and extended brief, which is not repetitive and has merit

27.    CPL § 440.30(4) (b) does not apply because the moving papers specifically and explicitly contain sworn allegations tending to substantiate all the essential facts. The subdivision of the statute reads as follows:

> <u>CPL § 440.30(4)</u> "Upon considering the merits of the motion, the court may deny it without conducting a hearing if: <u>(b)</u> The Motion is based upon

the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts, as required by subdivision one..."

29.     Therefore, because the claims were neither (1) conclusively refuted by unquestionable documentary proof in the prosecutor's affirmation in opposition, nor contradicted by a court record or other official document which establishes that the allegations were false or without merit, and (2) the prosecutors affirmation in opposition admits that the claims raised dehor the record (see Exhibit "4-I" pages 3-4) --- none of the subdivisions of CPL § 440.30(4) (b) applied, and I was entitled to a mandatory hearing (see People v. Ausserau, 77 AD2d 152 [4th Dept. 1980]); also see People v. Baxley, 84 NY2d 208 [1994]).

30.     It will no doubt be argued that because the chances of my ultimate success at a hearing were slim, no hearing was required. But the fact that my chances of success in meeting my burden of proof with respect to issues raised in my motion might have been slight, or even remote, did not furnish a basis for the motion court to deny my motion without a hearing where my motion was not based merely on my own averments (see e.g. People v. Hughes, 181 AD2d 912 [2nd Dept. 1992]), but supported by objective proof in the form of affidavits and other records establishing that trial counsel's failures to use evidence available to him during trial (Appendix "A") prevented the defendant from arguing actual innocence to the most serious charges against him, rape, in a case substantially based on the credibility of the complainant's allegation that the sex was forced. This prejudiced the defendant and resulted in a violation of his constitutional right to a fair trial.

31.     I am asking this Court to follow its previous precedent case-law in holding that a hearing will be granted on a defendant's motion to vacate judgment where the defendant's unrefuted allegations claim prosecutorial misconduct (see People v. Gayle, 148 AD2d 307

[1998]; also see <u>People v. Wedra</u>, 56 AD2d 903 [2nd Dept. 1977]), or where there are allegations that the judgment was obtained because of numerous claims of ineffective assistance of counsel.

32.    In light of the district attorney's affirmation's failure to comport with the evidentiary rebuttal requirements implicitly recognized by the Court of Appeals in (see <u>People v. Baxley</u>, 84 NY2d 208 [1994])[5] concerning the Prosecutorial Misconduct at the Grand Jury and claims of Ineffective Assistance of Counsel, and the courts ignorance of the multiple affidavits and other documentary support tending to support the allegations be the defendant (see Exhibit "<u>4-A</u>"), there is a valid question of law and/or fact as to whether the motion court's failure to hold the mandatory hearing to which I was entitled under CPL § 440.30(5) was an inexcusable abuse of discretion, arbitrary and capricious, or otherwise violative of procedural due process protections.

33.    Furthermore, the defendant would like the Court to take Judicial Notice of the fact that the District Attorney has failed to acknowledge considerable and substantial claims of prosecutorial misconduct at the Grand jury in his response, and that the Court also has bypassed the issue. The defendant deems this important in light of this Courts previous decision on January 6th, 2014 that enlarged the judgment roll to include the complete Grand Jury proceedings under seal for this Court's review on my pending direct appeal, after making a prima facie showing of multiple instances of prosecutorial misconduct.

34.    Furthermore, Judge Rooney, my trial judge, is in charge of Grand Jury matters in Richmond County. When I filed an Article 78 petition seeking to compel release of ministerial records of the grand jury in the possession of the D.A.'s Office, the Petition was given Index # 80275/2012, and Judge Rooney assigned.[6] (EX "3-I").

---

[5] See District Attorneys Affirmation in Opposition, Ex "<u>4-I</u>".
[6] Judge Rooney was in charge of handling all Grand jury matters in Richmond County, and made rulings concerning the Grand Jury in my trial. This created a substantial appearance of a conflict of interest, and his failure to recuse himself was an abuse of discretion.

**POINT 2**

**THE MOTION COURT'S DECISION AND ORDER APPLYING PROCEDURAL BARS UNDER CPL § 440.10(2) (B), VIOLATED THE HOLDINGS OF <u>MASSARO V. UNITED STATES</u>, 538 US 500 (2003), AND <u>MARTINEZ V. RYAN</u>, 132 S.CT. 1309 (2012)**

35.    In the trial court's order denying my application for CPL §§ 440.10 relief, the motion court stated that my record based claims "are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based on matters that are within the record...Hence, the defendant is not entitled to the relief he seeks based upon conclusory allegations. See C.P.L. 440.30 (1) and (4) (b)" (see Exhibit "<u>4-C</u>", page 1).

36.    Furthermore, the court also stated that "Additionally, pursuant to C.P.L. 440.10 (2) (b) the court must deny a motion when the judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal. The defendant's direct appeal is currently pending before the Appellate Division, Second Department. Therefore, petitioner's motion to vacate his judgment pursuant to C.P.L, 440.10 is denied."

37.    This finding, however, presupposes that a direct appeal is the appropriate venue to raise claims of ineffective assistance of counsel which by their very nature are mixed claims of law and fact. Furthermore, the court's finding completely ignores recent precedent set in the Supreme Court --- and in this Court --- which would not allow the application of procedural bars to initial review proceedings involving full pallet ineffective assistance of counsel claims.

38.    For instance, in <u>Martinez v. Ryan</u>, 132 S.CT. 1309 (2012), the Supreme Court held that because ineffective assistance claims often depend on evidence outside the trial record (even when it seems record based), direct appeals are not equipped for resolving such claims (see <u>Martinez v. Ryan</u>, 132 S.CT. 1309, at 1318 (2012). The Supreme Court further reasoned that

when a state's jurisprudence defers the resolution of an ineffective assistance claim to a post conviction application (i.e. initial review proceedings), the state cannot assert procedural bars to those claims when, through no fault of the defendant, his state appellate counsel fails to raise that claim in a state court post conviction proceeding as required by state law.[7]

39.   I asked for the assignment of counsel to help me prepare and submit my CPL § 440.10 application. But instead of granting the hearing I was entitled to (see Point 1, supra), the motion court invoked a procedural bar to my prosecutorial misconduct and ineffective assistance of counsel claims (see Exhibit "4-C", Page 1), failed to respond on the merits to any of my claims (see Point 2, supra), and never even considered assigning counsel to my case, simply stating that I have no constitutional right to effective assistance of counsel (see Exhibit "4-C", page 2).

40.   In Massaro v. United States, 538 US 500 (2003), the Supreme Court held that a trial court rather than an appellate court is best suited to develop the record necessary for determining the adequacy of representation during proceedings before the trial court (see Massaro v. United States, 538 US at 504-505)[8].

41.   In Sanchez-Llama v. Oregon, 548 US 331 (2006), the Supreme Court,  addressing a claim of whether the States are required to hear Vienna Convention claims raised for the first time in State post conviction proceedings, held that "given that the convention itself imposed no such [post conviction presentation] requirement" (see Sanchez-Llama v. Oregon, 548 US at 359), the Court could not perceive of any grounds to require State procedural rules to adhere to Massaro (id.).

42.   From this language it can rationally be inferred that if there is some State court procedural rule or caselaw that holds that presentation of an ineffective assistance of counsel

---

[7] This is narrowed and clarified in Trevino v. Thaler, Point 4 (B), supra.
[8] There is a question of law as to whether the Supreme Court in Martinez v. Ryan, 132 S.Ct. 1309 (2012), made this decision binding on the court by citing Massaro.

claim would best be developed on a post conviction application, then the application of <u>Massaro</u> would apply (see <u>Martinez v. Ryan</u>, 132 S.Ct. 1309, 1318, [holding that states do not act with impropriety by reserving claims of ineffective assistance for collateral proceedings]). Fortunately, under New York State jurisprudence there are post conviction presentation requirements which even Federal courts have acknowledged using the same language and rational as <u>Massaro</u>, supra.

**A.     THE MOTION COURT'S APPLICATION OF CPL § 440.10'S PROCEDURAL BARS TO MY CLAIMS OF PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL WAS CONTRARY TO CLEARLY DEFINED STATE COURT PRECEDENTS**

43.    In <u>People v. Melendez-Smith</u>, 66 AD3d 1042 (2nd Dept. 2009), the Second Department held that when a defendant's claim is based on affirmations and other matters dehors the main record, it is not properly before the Appellate Division without initial presentation to the State trial court (also see <u>People v. Mendoza</u>, 298 AD2d 532 [2nd Dept. 2003])[9]. Supporting this rational is the Court of Appeals holding that in the "typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel can be bottomed on an evidentiary exploration by collateral or post conviction proceedings brought under CPL § 440.10" (see <u>People v. Brown</u>, 45 NY2d 852, 853-854 [1978]), particularly when trial counsel's rational for his performance failures are necessary to evaluate counsel's strategic and tactical decisions (see e.g. <u>Strickland v. Washington</u>, 466, U.S. 668, 104 S.Ct. 2052, 2066 [1984]; also see <u>People v. Morales</u>, 58 NY2d 1008 [1983]).

44.    Also, in <u>Walter v. Dalshiam</u>, 669 F.Supp. 68 (S.D.N.Y 1987), the district court held that under New York law the proper vehicle for raising a claim of ineffective assistance of trial

---

[9] Also see <u>People v. Maxwell</u>, 89 AD3d 1108 (2nd Dept. 2011); <u>People v. Freeman</u>, 93 AD3d 805 (2nd Dept. 2012).

counsel is generally not a direct appeal but a motion to the trial court to vacate the judgment under CPL § 440.10. The district court reasoned that the appellate court has no basis upon which it would be able to consider the substance of an ineffective assistance of counsel claim until a record of the relevant facts has been made at the trial court level (compare <u>Massaro v. United States</u>, 538 US at 504-505 with <u>Walter v. Dalshiam</u>, 669 F.Supp. at 70).

45.   This was recently echoed in <u>Martinez v. Ryan</u>, 132 S.Ct. 1309 (2012), where the Supreme Court held that because ineffective assistance of trial counsel claims often depend on "evidence outside the trial record," direct appeal is not effective for "developing the factual basis" for the ineffective assistance claims (<u>id</u>. at 1318) (citing to <u>Massaro v. United States</u>, supra). And as Exhibit "<u>4-A</u>" establishes that the records identified in Appendix "<u>A</u>" were outside of the record, a mixed question was raised upon which I was entitled to <u>de novo</u> review.

46.   Based on the above, my prosecutorial misconduct and ineffective assistance of counsel claim --- both of which are supplemented by non-record facts never presented in any other proceeding (i.e. 190.50 Notice received through FOIL, the Affidavits from Experts, Records · from AETNA, etc. [See Appendix "<u>A</u>"]) --- can only be brought by way of a post conviction motion, not an appeal. The motion court's application of procedural bars under CPL §§ 440.10(2) violated my due process right to access to the only forum actually capable of providing a full and fair hearing of my ineffective assistance of counsel claims under either <u>Strickland</u>'s performance/prejudice test, or <u>Baldi</u>'s overall performance test (see <u>Martinez v. Ryan</u>, supra), which relies on "representation as a whole" and "in totality".

**B.   THE MOTION COURT ABUSED IT'S DISCRETION IN FAILING TO CONSIDER THE NUMEROUS NON-RECORD BASED EXHIBITS UPON WHICH HIS MOTION TO VACATE THE JUDGMENT WAS PREDICATED ON, AND THEREFORE IGNORED THE SECOND DEPARTMENT AND COURTS OF APPEALS PRECEDENTS INVOLVING "MIXED CLAIMS"**

47.   Because an inquiry into defense counsel's rational is essential to any post conviction evaluation of trial counsel's litigation decisions, and the best source of this information would be trial counsel himself (see People v. Morales, 58 NY2d 1008 [1983]; also see People v. Taylor, 211 AD3d 603 [1st Dept. 1999]), such an inquiry by its very nature requires reference to non-record facts (i.e. trial counsel's affidavit, which this defendant attempted to obtain numerous times, see Exhibit "3-L", also referred to in Page 4 of my motion for an Evidentiary Hearing). Therefore a CPL § 440.10 motion, not an appeal, was (and is) the appropriate venue to raise my ineffective assistance of counsel claims, notwithstanding appellate counsel's raising components of this claim on defendant's direct appeal pending before this Court.

48.   This understanding was recently echoed in People v. Freeman, 93 AD3d 805 (2nd Dept. 2012), where this Court held that when an ineffective assistance of trial counsel claim is based on matters not appearing on the record, and in part, on matters outside of the record, a mixed claim of ineffective assistance of counsel has been created which cannot be resolved on direct appeal.

49.   Similarly, in People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011), the Second Department held that because an ineffective assistance claim constitutes but a single ground, requiring reference to both record and non-record based issues, and as the ultimate question is with the fairness of the process as a whole, the entirety of counsel's conduct must be reviewed, making application of any procedural bars under either CPL § 440.10(2) or CPL § 440.10(3), inapplicable to my ineffective assistance of counsel claims.

50.    In light of the recent Supreme Court holdings in <u>Martinez v. Ryan</u>, 132 S.CT. 1309 (2012), and <u>Massaro v. United States</u>, 123 S.CT. 1690 [2003] [requiring all ineffective assistance of counsel claims to be raised on a post conviction motion, not an appeal], and in light of the holdings by this Court in <u>People v. Freeman</u>, supra, and <u>People v. Maxwell</u>, supra, the Richmond County Court's failure to review my mixed claims of ineffective assistance of counsel --- under the facts advanced above and in my original CPL § 440.10 application --- warrants an extended discussion which can only occur if this Court grants leave.

51.    Even though this Court has held that an ineffective assistance of trial counsel claim constitutes but a single ground requiring reference to both record and non-record based facts, and that in reviewing claims of ineffective assistance of counsel the motion court must review the entirety of the allegations of counsel's alleged misconduct (see <u>People v. Maxwell</u>, 89 AD3d 1108 (2011), the motion court ignored detailed records that were clearly "Mixed Claims", which include, but are not limited to, the following:[10]

### (i)    PROSECUTORIAL MISCONDUCT

52.    First, the defendant raised issues of Prosecutorial Conduct by the Richmond County District Attorney's Office before, during and after the grand jury proceedings in excruciating detail, which were supported in part by Court Records that were part of the lower court's file. The problem is that many records that were available to Mr. Lamb were never used. There were also multiple records obtained by the defendant, like a Notice of Grand Jury Action received from the Richmond County District Attorney's Office through FOIL on 2 separate occasions **that irrefutably show this document was allegedly faxed to my trial attorney almost 3**

---

[10] Defendant refers the Court to his Preliminary Statement in the Memorandum of Law (Exhibit "<u>4-A</u>"), Pages <u>ix</u> through <u>xx</u>, for a complete synopsis of all claims presented.

**weeks before I was arrested** (see Ex. "1-D"[11], compare to Ex. "1-I"[12] and ""1-J"[13]). This conclusively shows this document was altered, as the physical characteristics of the handwriting on the document clearly show. Furthermore, Mr. Lamb's failure to contemporaneously object and file a motion Pursuant to C.P.L. § 210.20 and/or § 210.35 to dismiss the indictment failed to preserve these meritorious issues for appellate review (see Section 2 [Affidavit in Support of Article 440], and Point 2, [Memorandum of Law in Support of Article 440] and appropriate paragraphs highlighted in Footnote 7, 8 and 9, *supra*, in the Affidavit in Support).

### (ii)    THE ALLEGED "DIARY"

53.    Second, also intertwined in the pervasive misconduct occurring in the grand jury proceedings is the alleged "diary" (See Ex. "1-Q")[14]. This diary permeates not only the grand jury but the entire trial from the beginning to the end. The District Attorney allowed the complaining witness to read from the diary during her entire grand jury testimony, and the diary was never marked for identification, nor was it used to refresh her recollection. Once again, my trial attorneys failure to review the grand jury minutes and challenge it in a § 210.20 and/or § 210.35 motion to dismiss the indictment failed to preserve these issues for appellate review.

54.    Mr. Lamb tried to equate the diary with contemporaneous prompt outcry by the complapaint (See Ex. "1-X")[15] on July 7th, 2010, which left the trial judge stupefied. Furthermore, Mr. Lamb requested the subpoena of records from Licensed Clinical Social Worker

---

[11] Notice Pursuant to CPL § 190.50(5)(A)(B) dated September 30th, 2009, ¶ 117, 171, 174, 181-82, 188, 190, 192
[12] Notice Pursuant to CPL § 190.50(5) (A) (B) Received Through FOIL, ¶ 134, 135, 139-141
[13] FOIL Related Papers Sent to Richmond County District Attorney, ¶ 134, 137
[14] Complainants Diary, ¶ 152, 199, 206, 209, 211, 213, 215, 216, 227-28, 241, 242, 291, Also see Ex. "1-T" Affidavit from Steve Frankl concerning Email sent to him, which corresponds to first dated entry in alleged diary, ¶ 203, 235, 500
[15] Stenographic Transcripts of July 7th, 2010, ¶ 272, 273, 283  (see also ¶ 274-275)

Anna Lorusso-Moramarco (See Ex. "2-X")[16], and when the Court asked if he was interested in examination of those records (see Exhibit "2-S"[17], "2-T"[18], "2-W"[19] and "1-R"[20]) with regard to whether or not the complainant made a prompt outcry to the therapist, he replied yes.[21]

55.   Furthermore, Mr. Lamb failed to investigate lack of prompt outcry (of rape) to a doctor seen by the complainant less then 1 week before my arrest, where the complainant did make prompt outcry of assault, an allegation the defendant never denied (See Ex. "2-N").[22] **Yet, Mr. Lamb did not introduce the session notes into evidence, question the complainant on prompt outcry or pursue prompt outcry in any manner, failing to preserve the issue for appellate review.**

### (iii)   FAILURES CONCERNING EXPERT WITNESSES

56.   Third, the diary was entrenched further into another mixed claim issue which involved multiple expert witness reports and testimony which was central to the defendant's case. Multiple affidavits from both experts were submitted with the defendants Article 440 claims, a fact the trial court completely ignored by stating that "They are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record. The defendant does not state his basis of knowledge for his conclusory allegations (e.g. the defense attorney failed to investigate and the defense attorney failed to adequately prepare). Hence, the defendant is not entitled to the relief he seeks based upon conclusory allegations, See, C.P.L. 440.30 (1) and (4) (b)" (see Exhibit B).

---

[16]  Subpoena Issued By Judge Rooney for Anna Lorusso-Moramarco, ¶ 541 [Records were Produced]
[17]  Session Note of L.C.S.W. Ms. Moramarco dated July 21st, 2009, ¶ 492-493, 542, 543, 550
[18]  Session Note of L.C.S.W. Ms. Moramarco dated July 28th, 2009, ¶ 496, 542, 544
[19]  Session Note of L.C.S.W. Ms. Moramarco dated August 11th, 2009, ¶ 542, 544
[20]  Session Note of L.C.S.W. Ms. Moramarco dated September 22nd, 2009, ¶ 167, 254
[21]  See Affidavit in Support at ¶ 276-277
[22]  Medical Records of Dr. Saluja Raveen, M.D. of Complainant, ¶ 372, see also ¶ 371-375

57.    To the contrary the defendant submitted a report from expert witness Treyce d'Gabriel-Montoya (see Exhibit "2-B")[23], and Mr. Lamb refused to present her CV to the Court so she could testify at my trial and present the report to the Court. The defendant also submitted multiple reports and signed affidavits of Handwriting Expert Robert Baier (See Exhibits "2-Q"[24] and "2-R"[25]), all which dehor the record because they were not introduced into evidence, nor was Mr. Baier called to the stand to testify. I contacted Mr. Baier after trial and he supplied me with an affidavit relating the facts about him being sent home from Court (See Exhibit "2-U"[26]). Mr. Lamb had highlighted for the Court the importance of Mr. Baiers testimony and the concern for the expert's time due to a death in his family (See Exhibit "4-A", Affidavit in Support at ¶ 509-511), yet he still made Mr. Baier drive 2 ½ hours from Warwick, N.Y. to testify in this matter while his mother was in a funeral home waiting to be buried.

58.    When the defendant objected to Mr. Lamb not questioning the complainant about and introducing the diary into evidence during the cross-examination of the complainant, Mr. Lamb completely contradicted himself by stating "...In my judgment it shouldn't have come in and no reference should have come in on the cross examination and therefore we make the expert's testimony irrelevant. He is protesting that." (Tr. Pg 331 at ¶13-25, Pg. 332 at ¶1) (See Affidavit in Support at ¶ 512-514)

59.    Finally, to add injury to insult, the Trial Court abused its discretion on October 5th, 2010, the proposed day of sentencing, by engaging in tactics designed to prevent appellate review of counsel's failure concerning the handwriting expert during the following colloquy:

---

[23] Forensic Handwriting Personality Profiler Treyce d'Gabriel-Montoya Letter of Opinion dated September 14th, 2010, ¶ 285, 404
[24] Forensic Document Examiner Robert Baier Letter of Opinion, ¶ 398
[25] Forensic Document Examiner Robert Baier Supplemental Report, ¶ 400
[26] Confirmation Letter from Robert Baier dated March 2nd, 2011, ¶ 507

> Mr. Lamb: "I mean the major thrust of my conduct at trial is my belief that if the use of the diary then introduced a handwriting expert to impeach the diary would have been harmful." (Tr. Oct. 5[th], Pg. 8 at ¶ 25, Pg. 9 at ¶ 1-4)

> Defendant: "He was ready to testify. The handwriting expert was in the building that day. Because of his failure to bring up that I believe that he would have been able to show the jury prejudice in the fact that every single page of the diary was written in a different handwriting by a different pen." (Tr. Oct. 5, Pg. 9 at ¶ 5-11)

> Defendant: "It shows she went back and maliciously added stuff to the diary, took it to the grand jury and presented a false document. I was never given notice of Grand Jury. I had filed a notice for that as well." (Tr. Oct. 5 Pg. 9 at ¶ 12-16)

> Defendant: "I showed it to a dozen people and can see the handwriting is different." (Tr. Oct. 5[th], Pg. 9 at ¶ 19-20)

> Mr. Lamb: "There was a handwriting expert that was brought on actually assigned to 18b, he was actually in the building ready, willing and able to testify." (Tr. Oct. 5[th], Pg. 10 at ¶ 6-9)

> The Court: "For strategic reasons you decided not to call him."[27] (Tr. Oct. 5[th], Pg. 10 at ¶ 10-11)

> Defendant: "Against my wishes." (Tr. Oct. 5[th], Pg. 10 at ¶ 12)

> Mr. Lamb: "We did discuss it. As a result of our conversation regarding that it was my feeling that the defendant agreed with me that at that point that it was unwise as a trial strategy to introduce the existence of the diary." (Tr. Oct. 5[th], Pg. 10 at ¶ 13-17)

> Defendant: "I wouldn't have had the guy drive down from Upstate New York if I didn't want him to testify. That morning Mr. Lamb talked about a lot of stuff and he may not remember, but I specifically told him that was the most important part of my trial. And I object and I wouldn't have had the guy drive down three hours. (Tr. Oct. 5[th], Pg. 10 at ¶ 19-25)

> Defendant: "I found the handwriting expert. Mr. Lamb couldn't find one. I made all the arrangements for this guy to be here. Why would I do that if I didn't want him to testify in my trial?" (Tr. Oct. 5[th], Pg. 11 at ¶ 1-4)

> The Court: "All right, your lawyer is going to make that 330.30 application." (Tr. Oct. 5[th], Pg. 10 at ¶ 5-6)

60.    These statements clearly contradict all of Mr. Lamb's earlier statements concerning Mr. Baier testifying in this matter, and are clearly a position contrary to the defense (See Mem. of Law [Ex. "4-A"] Point 3, I, C & F, *supra*). The trial court's action of placing words in trial counsel's mouth concerning his reasoning was prejudicial, biased and inappropriate.

61.    When considering the totality of the circumstances involving expert witness Robert Baier, the centrality of the diary to this entirely circumstantial case where credibility was the

---

[27] The Honorable Court abused its discretion by giving trial counsel direction concerning his trial decision and strategy in this matter, which violated the Ethical and Professional Canons of Judges.

crucial determining factor for the jury to consider, and the further involvement of this diary's inappropriate use at the Grand Jury; the severity of misconduct, prejudice and bias demands further review by the lower court in the form of an evidentiary hearing.

### (iv)   TRIAL COUNSEL'S NUMEROUS ERRORS OF OMISSION AND COMMISSION

62.   Intertwined with the above mentioned issues in sub-points **i**, **ii**, and **iii**, *supra*, and standing alone on numerous other issues, were trial counsels errors of omission and commission which dehor the record, and could only be determined by trial counsel himself as they relate to any tactical reasons or strategic purposes trial counsel may have made.

63.   It is here that the defendant would like to provide context and bring to the Court's attention the lack of qualifications and experience of Eugene Lamb ESQ., who should have never been allowed to participate in the 18-B Assigned Counsel Plan, or at the very least, should never have been assigned to a case such as defendant's involving allegations of rape, as Mr. Lamb was inexperienced, unqualified and incapable of creating an effective adversarial process.

64.   The defendant refers this Honorable Court to Section 1 of his Affidavit in Support of his Article 440 brief, titled "**The Domino Effect of Under-Qualified, Inexperienced and Poorly Compensated Counsel at Trial, Through a Mismanaged Assigned Counsel Plan, Has Created Convoluted Practices, Which Violate Due Process and Equal Protection, Resulting in Waste of Financial and Judicial Resources in New York State**". Specifically, the defendant would like the Court to take notice of Section 1 (IV) titled "**Assigned Counsel Plan Deficiencies**", (A), where I provide the comparative guidelines from the "**New York State Bar Association Revised Standards for Providing Mandated Representation**", outlining the "Qualification of Counsel" and "Performance" standards.

65.   In Section 1 (IV) (B), I provide detailed records of trial attorney Eugene Lamb ESQ in the form of a summary of Vouchers for the last seven years[28], application and recertification documents received from the Office of Court Administration[29] and Vendor Payment Records[30]. These records, when viewed in conjunction with each other and in context of Mr. Lamb's representation of me, provide detailed insight into his inexperience, which resulted in his inability to create an effective adversarial process. When looking at a summary of his failures outlined below[31] and plead fully in my Article 440 application, it becomes apparent his errors of omission and commission seriously prejudiced my right to receive my federal right to the effective assistance of counsel.

➢   Mr. Lamb's failure to review the trial record, which included his failure to review the Grand Jury minutes (Aff. at ¶ 291-292), Medical Records of the Complainant (Aff. at ¶ 293-299), DD5 Reports of Detective Wasson (Aff. at ¶ 300-311), Voice Mail Recordings (Aff. at ¶ 312-327), Circumstances of the Grand Jury proceedings in relation to Mr. Sullivan's numerous errors (Aff. at ¶ 328-343), Sexually explicit pictures showing prior consensual relations with complainant (Aff. at ¶ 344-348), Emails sent to Complainant (Aff. at ¶ 349-370), Lack of Prompt Outcry to Dr. Raveen (Aff. at ¶ 371-375); resulted in a "snowball effect" of numerous errors, cumulatively depriving me of counsel that was able to apply the facts to the law relevant to my defense, amounting to less then meaningful representation and the ineffective assistance of counsel, violating my due process right to a fair trial.

➢   These errors of omission and commission led to Mr. Lamb's failure to move to recuse ADA Katcher as an unsworn witness for violating the advocate-witness rule (Aff. at ¶ 376-379), his failure to challenge the prosecution theory with multiple expert witnesses he requested (Aff. at ¶ 380-405), his failure to use cross-examine effectively as an impeachment tool (Aff. at ¶ 406-431); which further resulted in his failure to impeach complainant with illogical and inconsistent statements, defeating the adversarial process (Aff. at ¶ 432-422). This also prevented him from focusing on substantive issues with a coherent trial strategy (Aff. at ¶

---

[28] Provided as Exhibits were Vouchers of cases he went to trial on, all of which resulted in a finding of Guilt, and none of which (except my own case in 2009) for a case involving rape. These vouchers were received through a FOIL request to the Department of Finance, the city agency who processes payments for the Assigned Counsel Plan.

[29] These documents were received after a Judiciary Law request sent to this Court was appealed and fulfilled by the Office of Court Administration.

[30] These documents were received during ongoing Article 78 Litigation against the Assigned Counsel Plan for the Second, Eleventh and Thirteenth Judicial Districts, and show Mr. lamb receiving between $125,000 and $150,000 per year, and billing 42-48 full 40 hour work weeks per year, essentially making him a full time employee of the City of New York.

[31] In the interest of brevity, the following outline of issues is fully plead in my Article 440 Affidavit and Supported with Arguments of Law in the accompanying Memorandum of Law.

442-444), like his failure to address the weekend in the Pocono's in relation to the diary entry of September 18th, 2009 (Aff. at ¶ 445-450) and finally, like his critical failure to object and effectively cross-examine Ms. Mach and the Complainant concerning the conflicting accounts of "The end of September" (Aff. at ¶ 451-490).

➢ Unfortunately, Mr. Lamb's failures don't stop there. He failed to use session notes of Licensed Clinical Social Worker Anna Lorusso-Moramarco to cross examine complainant on prompt outcry, which he argued for to the Court and received, some designated by the Court as potential Brady material (Aff. at ¶ 491-499). This was exacerbated when I recently obtained and discovered proof that the records submitted to the court under subpoena by Ms. Moramarco were falsified and misrepresented to this Court, amounting to obstruction of justice (Aff. at ¶ 541-555).

➢ We continue with Mr. Lamb's failure to review an email sent to family friend Steve Frankl on July 17th, 2009, which amounted to prompt outcry by me concerning my fiancés erratic behavior. Ironically, the complainant's alleged diary's first entry is also July 17th, 2009, hardly a coincidence. Mr. Lamb had Mr. Frankl on the defense witness list, but never called him to the stand (Aff. at ¶ 500-505).

➢ Mr. Lamb took a position contrary to the defense on multiple occasions, but most dramatically when he failed to call Forensic Document examiner Robert Baier to the stand to testify (Aff. at ¶ 506-516).

➢ The use of the inadmissible diary at the Grand Jury resulted in retroactive misjoinder, allowing the people to assert a theory of "Battered Woman's Syndrome" and present evidence from an expert witness which ordinarily would not be allowed, improperly bolstering the prosecution's case. This resulted in prejudicial spillover from the 11 dismissed counts, which represented more then half the evidence in support of the People's theory of "Battered Woman's Syndrome." The failure of Mr. Lamb to identify and address the issues concerning the diary in a pre-trial motion to dismiss the indictment allowed this to occur (Aff. at ¶ 556-563).

➢ I was denied due process when the trial court abused its discretion and allowed testimony stricken during trial to be read back to the jurors after trial was over during a request for a read-back, even though Mr. Lamb requested this testimony to be read back (Aff. at ¶ 565-570).

➢ Mr. Lamb failed to ask for a mistrial concerning the prosecutors questions to defense witness Ortiz about his arrests (Aff. at ¶ 571-575), failed to object and ask for a request for a mistrial for the prejudicial remarks made by the prosecutor in summation (Aff. at ¶ 576-580), and failed to object and seek a mistrial for the court's error of not issuing a written decision and order, and for failing to seek a mistrial for the court's abuse of discretion, in denying permission for the expert witness to examine the diary in his laboratory (Aff. at ¶ 581-589).

➢ These errors of omission and commission by Mr. Lamb failed to protect me from prejudicial evidentiary rulings and summation remarks, prejudicing my right to a fair and impartial trial worthy of confidence (Aff. at ¶ 590-593).

66.    All of these issues outlined above mostly fall into two distinct categories, (1) They involve trial counsels failure to investigate and use records and information available to him at

the time of trial. This is why there are numerous records submitted as exhibits like official court docket sheets, discovery letters etc., technically part of the record, but trial counsels failure to use them to the defendant's benefit distinctly involve trial counsels reasoning, which dehors the record; or (2) They involve extra-record material obtained after trial that was never obtained by trial counsel due his lack of investigation, or entered into evidence as an exhibits and as such they dehor the record.

67.    In the following section, the defendant will reiterate his previous applications presented to this Court to enlarge the Judgment Roll, and to Withdraw Appellate Counsel's brief; as they directly relate to the defendant's due process rights to have a full and fair opportunity to an adequate and complete appeal as of right, with an attorney. This is important for this Court to consider as I will explain in <u>Point 4</u>, *supra*, of these moving papers, concerning the unconstitutional and convoluted procedural scheme in this state that moves ineffective assistance of counsel claims outside the direct appeal process.

C.    **THE DEFENDANT ASKS THIS COURT TO TAKE JUDICIAL NOTICE OF HIS PREVIOUS APPLICATION TO THIS COURT TO ENLARGE THE JUDGMENT ROLL AND TO WITHDRAW APPELLATE COUNSEL'S BRIEF WHEN CONSIDERING WHETHER THE TRIAL COURT'S APPLICATION OF PROCEDURAL BARS WAS ERRONEOUS AND CONTRARY TO FEDERAL AND STATE PRECEDENTS**

68.    The defendant submitted a motion to enlarge the judgment roll, which specifically asked to include the following documents, which were attached as exhibits to the motion to enlarge the judgment roll. (Records Eventually Granted to be Part of the Record in **Bold**)[32]

➢ 1-Q      Complaiants Diary
➢ 1-F      **Grand Jury Transcripts of October 1st, 2009**
➢ 1-K      **Stenographic Transcripts of October 5th, 2009 (180/80 Day)**

---

[32] These exhibit numbers reflect the exhibit numbers as attached to the Article 440 Application, <u>not</u> the motion to enlarge the judgment roll

| | | |
|---|---|---|
| ➢ **1-H** | **Stenographic Transcripts of October 1st, 2009 (Arraignment)** | |
| ➢ 1-R | Session Note of L.C.S.W. Ms. Moramarco dated September 22nd, 2009, | |
| ➢ **1-X** | **Stenographic Transcripts of July 7th, 2010** | |
| ➢ 1-T | Affidavit Concerning Email to Steve Frankl | |
| ➢ **1-Y** | **Stenographic Transcripts of July 16th, 2010** | |
| ➢ 2-B | Forensic Handwriting Personality Profiler Treyce d'Gabriel-Montoya Letter of Opinion dated September 14th, 2010 | |
| ➢ 2-G | Detective Wasson's Memo Book Entries received from Mr. Lamb | |
| ➢ 2-S | Complainant's Individual Session Note with Anna Lorusso-Moramarco Released as Brady Material, Dated July 21st, 2010 | |
| ➢ 2-U | Confirmation Letter from Robert Baier dated March 2nd, 2011 | |
| ➢ 2-V | Unsigned Affidavit of Mr. Baier on File with Assigned Counsel Plan | |
| ➢ 2-T | Session Note of L.C.S.W. Ms. Moramarco dated July 28th, 2009 | |
| ➢ 2-W | Session Note of L.C.S.W. Ms. Moramarco dated August 11th, 2009 | |

69.    On January 6th, 2014, this Court, in a combined decision and order, granted permission to file a supplemental pro-se brief by April 7th, 2014, and also granted my motion to enlarge the judgment roll in part. This Court issued an order for the Grand Jury proceedings to be produced by the Nisi Prius Court to the Appellate Division under seal, as well as an order to produce the stenographic transcripts for July 7th, July 16th, and August 10th, 2010 as part of the judgment roll.[33]

70.    I then filed a motion to amend the decision and order of January 6th, 2014, to enlarge the record to include the **October 1st, 2009** and **October 5th, 2009** transcripts, which were requested as part of the original motion. On April 21st, 2014, this Court granted my motion and issued a Decision and Order enlarging the judgment rolls further, ordering the stenographer to produce said transcripts within 45 days, which ended on June 5th, 2014.

71.    The decision by this Court granted my motion for transcripts only, which by default told this defendant that these other requested records were not properly a part of the record on appeal, hence the defendant's inclusion of these documents supporting his claims of ineffective

---

[33] The defendant did not possess the August 10th, 2010 transcripts (which were actually August 11th, 2010), but as the defendant explained their relevancy by referring to previous transcripts, this Court enlarged the record to include these transcripts as well.

assistance of counsel were included in his Article 440 application (as they dehor the record), the subject of this leave to appeal application.

72.     After fully realizing my appellate counsel's failure to expand the record via an Article 440 proceeding, on March 20th, 2014, I filed a motion to withdraw appellate counsel's brief with this Court This motion, if granted, also asked for the further relief of the assignment of new counsel on the appeal to aid in the preparation of a CPL 440 motion, and to hold the appeal in abeyance pending the determination of the CPL 440 motion. This motion also challenged the constitutionality of County Law § 722 and the potential application of CPL § 440.10(2) procedural bars (**which is exactly what occurred**), and was served on the Attorney General Pursuant to Executive Law § 7101 and CPLR § 1012(b).

73.     I submitted detailed pleadings which conclusively provided this court with exhibits in the form of correspondence to and from Mr. Landau, my assigned appellate attorney from Appellate Advocates, showing he consistently told me he would discuss pursuing an Article 440 motion with me and never did. This Court declined my motion without explaining its decision, simply stating that the motion is denied. As this Court denied the motion to withdraw appellate counsels brief, which was a prerequisite to be granted for this Court to entertain the assignment of counsel portion of the motion, this court never considered the assignment of counsel portion of the application.[34]

74.     I am asking this Court to take judicial notice of the previous applications, and this Court's Decision and ORDER on each of them, because I believe it is important to let the record reflect that I have exhausted every possible avenue for relief, in an effort to receive a full and fair opportunity to have my issues heard on my first and only appeal in N.Y. State where I am

---

[34] It is for this reason the defendant presented this application in a separate stand alone motion to the lower court, a more suitable venue, and is now appealing that motion directly to the Court of Appeals Pursuant to CPLR 5601 (b) (2).

afforded counsel **as of right**. This directly relates to the defendant's due process rights, as when a state, like New York, in practice (as occurred in the case presented to you here today) effectively moves ineffective assistance of counsel claims outside the direct appeal process, where counsel is not provided, it becomes violative of federal law. To reiterate, this is important for this Court to consider as I will explain in Point 4, *supra*, of these moving papers, titled:

> "This Court Should Take The "Proverbial Leap" And Find That The Unconstitutional And Convoluted Procedural Scheme In This State That Moves Ineffective Assistance Of Counsel Claims Outside The Direct Appeal Process Prevents Defendants From Determining These Claims Fully On The Merits Under The State Practiced Standard For Those Claims, 'Baldi', Which Is 'Representation As A Whole' And 'In Totality'; Because In Practice It Is Impossible To Reach, And Will Lead To The Challenge Of These Laws Via The Adequacy Doctrine."

75.    The common practice in New York to obtain a full and fair review of my ineffective assistance of counsel claims is to file a CPL § 440.10 motion, which is expounded on below.

## D.    CPL § 440.10 IS THE ONLY VEHICLE TO OBTAIN A FULL AND FAIR REVIEW OF MY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS

76.    In Massaro v. United States, 538 US 500 (2003), the Supreme Court held that a trial court rather than an appellate court is best suited to develop the record necessary for determining the adequacy of representation during proceedings before the trial court (see Massaro v. United States, 538 US at 504-505). But in Sweet v. Bennett, 335 F3d 135 (2nd Cir. 2003), the Second Circuit held that because Massaro was not decided on constitutional grounds its holdings are not applicable to State post conviction applications (see Sweet v. Bennett, 335 F3d at 140-141; also see Carney v. Fabian, 441 F.Supp.2d 1014, 1019 [D. Minnesota 2006] [holding that there is no constitutional ruling in Massaro that is binding on State courts]; Hayes v. Battaglia, 403 F3d 935, 937 [7th Cir. 2005]).

77.     Fortunately, under both the New York State and Federal jurisprudence there are post conviction presentation requirements which even state courts have acknowledged using the same language and rational as <u>Massaro</u>, supra.

78.     In <u>People v. Melendez-Smith</u>, 66 AD3d 1042 (2nd Dept. 2009), the Second Department held that when a defendant's claim is based on affirmations and other matters dehors the main record, it is not properly before the Appellate Division without initial presentation to the State trial court (also see <u>People v. Mendoza</u>, 298 AD2d 532 [2nd Dept. 2003]). Supporting this rational is the Court of Appeals holding that in the "typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel can be bottomed on an evidentiary exploration by collateral or post conviction proceedings brought under CPL § 440.10" (see <u>People v. Brown</u>, 45 NY2d 852, 853-854 [1978]), particularly when trial counsel's rational for his performance failures are necessary to evaluate counsel's strategic and tactical decisions (see e.g. <u>Strickland v. Washington</u>, 466, U.S. 668, 104 S.Ct. 2052, 2066 [1984]; also see <u>People v. Morales</u>, 58 NY2d 1008 [1983]).

79.     For instance, in <u>Walter v. Dalshiam</u>, 669 F.Supp. 68 (S.D.N.Y 1987), the district court held that under N.Y. law the proper vehicle for raising a claim of IAC is generally not a direct appeal but a motion to the trial court to vacate the judgment under CPL § 440.10. The district court reasoned that an appellate court has no basis to consider the substance of an IAC claim until a record of the relevant facts has been made at the trial court level (compare <u>Massaro v. United States</u>, 538 US at 504-505 with <u>Walter v. Dalshiam</u>, 669 F.Supp. at 70).

80.     I am entitled to full and fair review of the constitutional issues affecting the validity of my trial counsel's performance, which could only occur if I am provided with an attorney and an expert to help investigate, prepare and submit my CPL § 440.10 application. **It is only under**

**these circumstances that my assigned attorney could question trial counsel's performance at my trial, an important pre-requisite to properly evaluate the defendant's claims.**

81.     I am respectfully asking this Court to take a comprehensive look at these issues, and determine if its dicta in <u>Martinez v. Ryan</u>, supra, should be applied to this case challenging the effectiveness of trial counsel, to the extent that without having a hearing and assigning counsel for the investigation, preparation and submission of my **initial** review collateral proceedings challenging the effectiveness of trial counsel, this Court will be denying the defendant his **first** opportunity to a full a fair hearing of these issues on their merits.

82.     Based on the above, my IAC claim, which is supplemented by non-record facts, can only be brought by way of a post conviction motion, not an appeal. The application of the procedural bars by the trial court under CPL § 440.10(2) has violated my due process right to access to the only forum actually capable of providing a full and fair hearing of my IAC claims under <u>Strickland</u>'s performance/prejudice test, and <u>Baldi</u>'s "Representation as a Whole" and "In Totality" standard.

### POINT 3
**BECAUSE THE LOWER COURT ANSWERED NONE OF THE CONSTITUTIONAL QUESTIONS RAISED BY MY CPL § 440.10 APPLICATION, THIS MATTER MUST BE HELD IN ABEYANCE, AND REMITTED TO THE LOWER COURT FOR COMPLIANCE WITH CPL § 440.30(7) WITH DIRECTIONS TO ANSWER SPECIFIC QUESTIONS OF LAW AND FACT AFFECTING THE MERITS OF THE MOTION**

83.     Prior to the enactment of CPL § 440. 10 there were several writs which could be filed affecting the validity of a judgment (see Practice Commentary to CPL § 440.10). The eight subdivisions of CPL § 440.10(1) codified these prior writs, and established specific evidentiary thresholds for their review. Therefore, objective evidence that would not warrant post conviction relief under the newly discovered evidence subdivision of CPL § 440.10(1) (g), theoretically

could establish post conviction relief under subdivisions (b), (c) and/or (h) of CPL § 440.10(1); the subdivisions I used to establish my prosecutorial misconduct and ineffective assistance of counsel claims, respectively.

84.    And regardless of whether a motion court has conducted an evidentiary hearing on a motion to vacate judgment, it is statutorily required to set forth its findings of fact, conclusions of law and the reasons for its determination for each of the constitutional and/or procedural arguments raised by a defendant's motion (see CPL § 440.30[7]). Its failure to do so may be considered a violation of due process as a defendant is not given effective notice of the court's decision denying his application, and therefore is deprived of an effective means of challenging the decision in future appellate or federal review applications.

85.    But when, as here, the motion court fails to make any findings of fact or conclusions of law as to each branch of the motion before it, or provides only conclusions of law based on an incomplete assessment of the facts, an Appellate Court reviewing a leave application challenging the constitutionality of  a decision and order of  a county court must hold its determination in abeyance and remit the matter to the motion court for compliance with CPL § 440.30(7) (see e.g. People v. Williams, 184 AD2d 608 [2nd Dept. 1992]). Furthermore, when justice so demands, the Appellate Court is authorized to submit the matter back to the lower court with directions to answer specific questions of law and fact essential to its review of the application.

86.    In the instant matter at bar, the motion court supplied only conclusions of law based on procedural bars to the issues I raised in my CPL § 440.10 motion, and declined to review them on their merits as mixed claims. It provided no findings of fact or conclusions of law as to my ineffective assistance of counsel claim (CPL § 440.10[1][h]) or my prosecutorial misconduct claims (CPL § 440.10[1][b,c]).

## MOTION TO REARGUE

## POINT 4

## THE LOWER COURT ERRED IN DENYING RUCANOS' CPL §440.10 MOTION WITHOUT A HEARING

### I. The Plain Text of N.Y. C.P.L. § 440.30 is Unequivocal and Governs When A Hearing Must Be Held

**87.** ~~88~~ Mr. Rucanos' case falls squarely under N.Y. C.P.L. § 440.30(5), which requires the court to hold a hearing. See N.Y. C.P.L. § 440.30(5) ("If the court does not determine the motion pursuant to subdivisions two, three or four, it <u>must</u> conduct a hearing and make findings of fact essential to the determination thereof." (emphasis added). Under N.Y. C.P.L. §440.30(5), the court does not have discretion to deny a motion without a hearing. In the case of *People v. Jones*, 2014 WL 7069803 (N.Y., <u>December 16th, 2014</u>), the Court of Appeals held "that the Appellate division abused its discretion in summarily denying defendant's motion for an evidentiary hearing in this case, and remand it to the Supreme Court for further proceedings…"

**88.** ~~89~~ In deciding whether to hold a hearing on a N.Y. C.P.L. § 440.10 motion, a court must look to N.Y. C.P.L. § 440.30 for guidance. See e.g., *People v. Ausserau*, 77 A.D.2d 152, 154-155 (4th Dept. 1980). The subsections of N.Y. C.P.L. § 440.30 instruct a court on the precise circumstances under which it: "<u>must</u> summarily deny" a motion; *see* N.Y. C.P.L. § 440.30 (2); "<u>must</u> grant [the motion] without conducting a hearing," *see* N.Y. C.P.L. § 440.30(3); "<u>may</u> deny [the motion] without conducting a hearing," *see* N.Y. C.P.L. § 440.30(4); and when it <u>cannot</u> summarily decide a motion and accordingly "<u>must</u> conduct a hearing and make findings of fact essential to the determination thereof," *see* N.Y. C.P.L. § 440.30(5) (emphasis added). Even a cursory glance at the statutory scheme reveals that the provisions are unequivocal as to when a

court has discretion, using the term "may"; the provisions are equally clear as to when a court lacks discretion, using the term "must."

89.   The only provision of N.Y. C.P.L. § 440.30 under which a court has discretion to deny a motion to vacate without a hearing is N.Y. C.P.L. §440.30(4). However, such denial is only warranted if one of the following four circumstances is present:

> a.  The moving papers do not allege any ground constituting legal basis for the motion; or
> b.  The motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts, as required by subdivision one; or
> c.  An allegation of fact essential to support the motion is conclusively refuted by unquestionable documentary proof; or
> d.  An allegation of fact essential to support the motion (i) is contradicted by a court record or other official document, or is made solely by the defendant and is unsupported by any other affidavit or evidence, and (ii) under these and all other circumstances attending the case, there is no reasonable probability that such allegation is true.

N.Y. C.P.L. § 440.30(4). If none of the above circumstances is present, a court does not have discretion to summarily deny the motion. See N.Y. C.P.L. §440.30(5) ("If the court does not determine the motion pursuant to subdivisions two, three or four, it must conduct a hearing and make findings of fact essential to the determination thereof.") (emphasis added); see Ausserau, 77 A.D.2d at 154-155 ("CPL 440.30 [Subd 5] provides that the court must conduct a hearing and make findings of fact on the post-judgment motion…") (internal quotation marks omitted).[2]

90.   The statute is clear that even if one of the circumstances in N.Y. C.P.L. § 440.30 (4) is present, a court may nevertheless order an evidentiary hearing as a matter of discretion. See N.Y. C.P.L. § 440.30(4) ("Upon considering the merits of the motion, the court may deny it without conducting a hearing if …") (emphasis added). But the statute does not provide for

---

[2] The 1967 proposed change to N.Y. C.P.L. § 440.30 noted that subdivision five "mandates the court to conduct a hearing for the purpose of making findings of fact." Proposed New York Criminal procedure Law at 297, available at http://lawweb.pace.edu/library/pnycpl1967.pdf (emphasis added).

discretion in the other direction, as there is no discretion to deny a hearing in the absence of one of the factors enumerated in N.Y. C.P.L. § 440.30 (4). None of the factors that the trial court relied upon in N.Y. C.P.L. § 440.30 (1) or (4) (b) is present in Mr. Rucanos' case, and the denial of Mr. Rucanos' motion without the statutorily required hearing was an error of law.

## II. The Court Erred in Determining That CPL § 440.30 (1) or (4) (b) Applied To My Application

### A. The Applicable Law

91. 🔲 The Court of Appeals and this Court have made it abundantly clear that, where a 440 movant alleges, "non-record facts," which "if established could entitle defendant to the relief sought," the 440 court must grant a hearing. *People v. Ferreras*, 70 N.Y.2d 630, 631 (1987) (emphasis added). See also, *People v. Lou*, 95 A.D.3d 1035 (2nd Dept. 2012), lv. denied, -- N.Y.3d – (October 3rd, 2012) (error to summarily deny C.P.L. 440.1- motion where witness credibility should have been determined at a hearing"), *People v. Baxley*, 84 N.Y.2d 208, 214 (1994) (error to deny hearing").[3]

92. 🔲 A 440 judge is not entitled to reject sworn statements submitted in support of a defendant's CPL § 440.10 motion as incredible unless such statements are contradicted by the record *and* there is no "reasonable probability" that such statements are true. CPL § 440.30 (4) (d). *See also People v. Lou*, 95 A.D.3d at 1036. Thus, the credibility of the multiple expert witnesses, of potential witness Steve Frankl, and the validity of the medical records received from AETNA with the help of the Connecticut Attorney General's Office[4] "should have been

---

[3] *People v. Qualls*, 70 N.Y.2d 863, 865-66 (1987) (same); *People v. Frantz*, 57 A.D.3d 692, 693 (2nd Dept. 2008) (same); *People v. Goldberg*, 33 A.D.3d 1018, 1019-20 (2nd Dept. 2006) (same); *People v. Nau*, 21 A.D.3d 568, 569 (2nd Dept. 2005) (same); *People v. Delarosa*, 287 A.D.2d 735, 737 (2nd Dept 2001) (same).
[4] The trial court authorized the release of session notes from L.C.S.W. Anna Lorusso-Moramarco, received through a subpoena, some as potential BRADY material, for use at trial. The defendant provided substantial proof that these records were falsified, as they listed the complainant as the patient, but were billed to defendants insurance. Yet, the complainant was never part of the defendant's insurance, and the session notes talked exclusively about defendant!

determined at a hearing, where credibility could have been asserted on a more substantial basis than on a written statement[.]" *People v. Stokes*, 83 A.D.2d 968, 969 (2[nd] Dept. 1981) (quoting *People v. Daniels*, 48 A.D.2d 905, 906 (2[nd] dept. 1975) (internal quotation marks omitted). "That the defendant's chance of ultimate success in meeting his burden of proof... may be slight, or even remote, does not, by itself, furnish a basis to deny a motion without a hearing." *People v. Hughes*, 181 A.D.2d 912, 913 (2[nd] Dept. 1992).

93.  That credibility determinations be based on live testimony also is required by the Due Process Clause. Where, as here, interests protected by due process are at stake, "written submissions are a particularly inappropriate way" to decide whether a witness's account is credible; instead, such a decision generally requires "personal contact" between the witness and the finder of fact. *Califano v. Yamasaki*, 442 U.S. 682, 697 (1979). *See also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) (where due-process-protected interests are at stake, and "credibility and veracity are at issue..., written submissions are a wholly unsatisfactory basis for decision"); *Newton v. City of New York*, 681 F.Supp.2d 473, 489 (S.D.N.Y. 2010) (state-created post-conviction procedure created due-process-protected liberty interest in seeking release via that procedure) (citing *District Attorney's Office for Third Judicial Dist. V. Osborne*, 557 U.S. 52 [2009])

**B.** **The Court Below Was Not Entitled to Deny Rucano's Motion on the Papers Alone Because Neither CPL § 440.30(1) Or (4) (B) Applied To My Application. In Fact, No Provision Under CPL § 440.30(4) Can Be Applied**

94.  Neither Article 440 nor this Court's case law tolerates the motion court's summary rejection of Rucano's claims. The facts alleged in Rucano's motion, and the disputes arising from them, are precisely the type that *must* be resolved through live testimony. Subdivision "A"

cannot be applied because his moving papers allege numerous grounds that constitute a legal basis for the motion. Subdivision "B" cannot be applied because the defendant submitted affidavits from multiple experts never called to the stand to testify. He also submitted his own sworn affidavit, which relied upon in large part upon court documents that were available to counsel but actually dehor the record, because of trial counsel's failure to introduce them into evidence and use them at trial.

95, ~~200~~   Subdivision "C" cannot be applied because the facts and records submitted, which were essential to support the motion, were *not* conclusively refuted by unquestionable documentary proof. **In fact, they were not refuted by the People at all!** Finally, subdivision (d) cannot be applied because (i) the allegations of fact essential to support the motion were not contradicted by any court record or official document, and was supported by multiple affidavits from other people as well as numerous types of documentary evidence, and (ii) under these and all other circumstances attending the case, there was, *at least*, a "reasonable *possibility*" that Rucano's claims are true. Thus, under CPL § 440.30 (4) (d), the court was not allowed to summarily deny Rucano's motion.

96, ~~202~~   The Court, erroneously quoting C.P.L. § 440.30 (1) and (4) (b), found to the contrary and rejected defendant's own affidavit and the multiple affidavits of expert witnesses Treyce d'Gabriel-Montoya and Robert Baier, and the affidavit of Steve Frankl, as well as numerous records received with the help of the Connecticut Attorney General's Office that tended to support the allegation that **the court received falsified medical records under subpoena**! This issue was presented to this Honorable Court and briefed in full in Point **1**, *supra*, of defendants Leave to Appeal application.

**C.**    **Mr. Rucanos' Motion Contained Sworn Allegations Substantiating All Essential Facts, Thereby Meeting His Burden; and a Hearing Was Required Under The Statute as the Trial Court Lacked the Discretion to Deny Mr. Rucanos Motion Under C.P.L. § 440.30(4) (b)**

97.    Under N.Y. C.P.L. § 440.30 (4) (b), a motion to vacate must contain "sworn allegations substantiating or <u>tending to substantiate</u> all the essential facts." N.Y. C.P.L. § 440.30 (4) (b) (emphasis added). Mr. Rucanos' Motion to Vacate contained sworn allegations that, at a minimum, tend to substantiate his claims.

98.    It should be noted that Forensic Document Examiner Robert Baier was presented to the Court on the first day of trial, and Judge Rooney ordered the District Attorney to give him access to the original diary **for the first time**. This is discussed below and more fully in my Article 440 Affidavit[5] and Memorandum of Law.[6]

(i)    **Forensic Document Examiner Robert Baier**

99.    On September 11th, 2010, Mr. Baier submitted Document Examiner Letter of Opinion (Article 440, EX "2-Q")[7] which was a preliminary report of photocopies emailed to him

---

[5] Concerning the Diary, *see.*, "<u>Leading Questions and Statements at The Grand Jury</u>", Subsection B, "<u>The Nature and the Substance of the Alleged Diary</u>", <u>Pgs. 45-57</u>, also see, "<u>Pre-Trial Proceedings Concerning The Diary</u>", <u>Pgs 62-69</u>, for Mr. Lambs Failure Concerning the Diary; and., "<u>Failure to Challenge Prosecution Theory with Expert Witnesses Lacked Any Tactical Reasoning or Strategic Purpose</u>", <u>Pgs. 89-96</u>, and finally, "<u>Mr. Lamb's Failure to Call Forensic Document Examiner Robert Baier to the Stand to Testify Was a Position Contrary to the Defense</u>", <u>Pgs 123-127</u>.

[6] Concerning the Diary, see Point 2, Section II., "<u>ADA Katchen Assumed a Dual Role Before the Grand Jury as Prosecutor and Witness When He Acted as an Investigator and Processed the Diary Before the Grand Jury Proceeding on the Morning of October 1st, 2009, and Became an Unsworn Witness, Violating My Right to a Fair Trial</u>", <u>Pgs 8-17</u>, and Section III, "<u>ADA Anthony Katchen Usurped the Grand Jury's Fact Finding Process by Using Incompetent and Inadmissible Evidence to Form His Line of Questioning of the Complainant, When He Had Direct Knowledge It Was Unreliable and Exculpatory</u>", <u>Pgs 18-22</u>; *also see* Point 3, Section I, C, "<u>Defense Counsels Failure to Challenge the Prosecutions Theory with Expert Witnesses Lacked Any Tactical Reasoning or Strategic Purpose</u>", <u>Pgs 60-64</u>; and finally, *see* Point 3, Section I, F, (i), "<u>Mr. Lamb's Failure to Call Forensic Document Examiner Robert Baier to the Stand to Testify Was a Position Contrary to the Defense</u>", <u>Pgs 79-81</u>.

[7] All references to "EX" refer to Exhibits attached to his Article 440 Application.

by me. His opinion stated in brief "the evidence supports my professional opinion that it is 'highly probable' some of the writings…were not written at the original time of entry."

100. Then, on September 13th, 2010, Mr. Baier was allowed to review 8 pages of original documents under supervision at the District Attorney's Office and on September 14th, 2010, he submitted a Supplemental Report. His conclusive findings in that report state the following:

> Findings: "After examining the original writings of the diary I was able to reinforce my opinions expressed in the original report. I feel certain that the last sentence of Q4/Q5 was added at a later date/time. The writing of both pages was done with a liquid writing implement for 1 and ½ pages until the last sentence, which was done with a ballpoint pen. There is no logical reason someone would stop their writing at the last sentence after writing a page and a half and change writing implements unless the liquid implement ran out of ink and I would have been able to determine that."
> "It is my opinion that Q1, Q2, Q3, Q6 had writings that were added after the time of the original entries. All of the added writings contained the accusations of rape." (EX "2-R")

101. I contacted Mr. Baier in February 2011 and on March 2nd, 2011; and he sent me a requested confirmation letter for Case # 1009-455-4, which was notarized. (EX "2-U") He stated in brief that he prepared court displays and booklets in preparation for trial on September 15th, 2010. Mr. Baier specifically stated the following:

> "I was told to be at court on September 15[th] by both Mr. Rucano with confirmation the night before and by attorney Eugene Lamb. Upon my arrival I was told my services would no longer be needed in this case."
> "I have enclosed an affidavit (EX "2-V") which explains in great detail everything that transpired in only 4 business days which was prepared and submitted to the Assigned Counsel Plan 18b. This is an unsigned un-notarized copy of the affidavit with the original being signed and notarized and is on file with the Assigned Counsel Plan 18b."

102. Mr. Lamb's unexplained reason for not introducing the diary into evidence by cross-examining her on how she testified at the Grand Jury, where there was no mention in any law enforcement report of any crimes on any other date but September 28th, 2009; had no tactical reason or strategic purpose and was a position contrary to the defense,

191

103, ⊕  Besides Mr. Lamb petitioning for an expert on July 7th, 2010, and again in a written motion on July 16th, 2010, he stated the following during the first 2 days of trial:

> Mr. Lamb: [Sept. 13th, 2010] "Before we do that Judge, my handwriting expert did in fact have an opportunity to and did in fact examine the diary at the D.A.'s Office…I feel he has evidence value and I _intend_ to call him as an expert witness on behalf of the defense offer his testimony offer him as an expert." {Emphasis Added} (Tr. Pg. 58 at ¶ 8-16)[8]

104, ⊕  Mr. Lamb goes further to highlight the importance of the witness to testify and the concern for the expert's time due to a death in his family.

> Mr. Lamb: [September 13th, 2010] "As far as scheduling is concerned, he comes from Warwick, New York, and recently had a death in the family, as a matter of fact, his mom - -." (Tr. Pg. 59 at ¶ 10-13)
> The Court: "You want to put him out of order on Wednesday." (Tr. Pg. 59 at ¶ 14-15)
> Mr. Lamb: "I'd like to be able to call him, if necessary, out of order on Wednesday afternoon; is that all right with the Court?" (Tr. Pg. 59 at ¶ 16-18)
> The Court: "It's fine with me." (Tr. Pg. 59 at ¶ 19)
> Mr. Lamb: "Thursday he may have to go back to Massachusetts to make further arrangements regarding his mother's funeral." (Tr. Pg. 59 at ¶ 20-22)

105, ⊕  The next day the Honorable Judge Rooney confirms with Mr. Lamb about Mr. Baier, the handwriting expert, testifying tomorrow.

> The Court: "And your handwriting expert is not available until tomorrow afternoon?" (Tr. Pg. 231 at ¶ 10-11)
> Mr. Lamb: "Yes." (Tr. Pg. 231 at ¶ 12)

106, ⊕  Mr. Baier got confirmation to come to court the next day on Tuesday night, September 14th, 2010, after appearing in court that afternoon, from both Mr. Lamb and myself. Mr. Baier drove over 2 hours from Warwick N.Y. to court to testify that morning, yet here is what Mr. Lamb stated a short while after cross-examining the complainant the next day.

> Mr. Lamb: "We took a short break after I finished my cross examination of the complaining witness in this case and I thought I had communicated clearly with my client that I was prepared to rest and did he have any other problems. He is now telling me that he did not understand and that he is protesting the fact that I did not make any reference to the diary, which would then allow the expert witness to testify. _In my judgment it shouldn't have come in and no reference should have come in on the cross examination_

---

[8] All references to "Tr" refer to Official Trial Transcripts.

*and therefore we make the expert's testimony irrelevant. He is protesting that."* [Emphasis Added] (Tr. Pg 331 at ¶13-25, Pg. 332 at ¶1)

➢ The Court: "You've made your record. There's nothing for me to say." (Tr. Pg. 332 at ¶ 2-3)

107.   In Mr. Baiers affidavit to Assigned Counsel Plan (EX "2-V") on Page 3, paragraph 8, he states, "When I arrived home I contacted my client and client's attorney to find out what happened **and was told that the District Attorney decided not to enter the diary into evidence**."

108.   Furthermore, Mr. Lamb, who was so concerned with Mr. Baiers time and being able to have him testify because of the death of his mother, showed no concern at all by making him drive down from Warwick, N.Y., in over a 2-hour drive; just to be told he was not needed.

109.   On October 5th, 2010, I was produced for sentencing and made a statement concerning Mr. Baier, and then Mr. Lamb makes a record concerning his conduct at trial.

➢ Mr. Lamb: "I mean the major thrust of my conduct at trial is my belief that if the use of the diary then introduced a handwriting expert to impeach the diary would have been harmful." (Tr. Oct. 5th, Pg. 8 at ¶ 25, Pg. 9 at ¶ 1-4)
➢ Defendant: "He was ready to testify. The handwriting expert was in the building that day. Because of his failure to bring up that I believe that he would have been able to show the jury prejudice in the fact that every single page of the diary was written in a different handwriting by a different pen." (Tr. Oct. 5, Pg. 9 at ¶ 5-11)
➢ Defendant: "It shows she went back and maliciously added stuff to the diary, took it to the grand jury and presented a false document. I was never given notice of Grand Jury. I had filed a notice for that as well." (Tr. Oct. 5 Pg. 9 at ¶ 12-16)
➢ Defendant: "I showed it to a dozen people and can see the handwriting is different." (Tr. Oct. 5th, Pg. 9 at ¶ 19-20)
➢ Mr. Lamb: "There was a handwriting expert that was brought on actually assigned to 18b, he was actually in the building ready, willing and able to testify." (Tr. Oct. 5th, Pg. 10 at ¶ 6-9)
➢ The Court: "For strategic reasons you decided not to call him."[9] (Tr. Oct. 5th, Pg. 10 at ¶ 10-11)
➢ Defendant: "Against my wishes." (Tr. Oct. 5th, Pg. 10 at ¶ 12)
➢ Mr. Lamb: "We did discuss it. As a result of our conversation regarding that it was my feeling that the defendant agreed with me that at that point that it was unwise as a trial strategy to introduce the existence of the diary." (Tr. Oct. 5th, Pg. 10 at ¶ 13-17)

---

[9] The Honorable Court abused its discretion by giving trial counsel direction concerning his trial decision and strategy in this matter, which violated the Ethical and Professional Canons of Judges.

> ➢ Defendant: "I wouldn't have had the guy drive down from Upstate New York if I didn't want him to testify. That morning Mr. Lamb talked about a lot of stuff and he may not remember, but I specifically told him that was the most important part of my trial. And I object and I wouldn't have had the guy drive down three hours. (Tr. Oct. 5th, Pg. 10 at ¶ 19-25)

> ➢ Defendant: "I found the handwriting expert. Mr. Lamb couldn't find one. I made all the arrangements for this guy to be here. Why would I do that if I didn't want him to testify in my trial?" (Tr. Oct. 5th, Pg. 11 at ¶ 1-4)

> ➢ The Court: "All right, your lawyer is going to make that 330.30 application." (Tr. Oct. 5th, Pg. 10 at ¶ 5-6)

110, ~~110~~   Upon information and belief, these statements made by Mr. Lamb contradict all his earlier statements concerning Mr. Baier testifying in this matter, and are clearly a position contrary to the defense. Based on the underlying record, the overall facts of the case, and the theory of the defense that these charges were fabricated; this decision shows that Mr. Lamb took a position that served no tactical reason or strategic purpose, which defeated the adversarial process and can not be understood to be made with an eye benefiting his client. As Mr. Lambs tactical reason or strategic purpose in making these decisions is unknown, they naturally dehor the record. As such, the multiple affidavits and expert reports tend to substantiate my claims that she fabricated the diary and her resulting testimony at the grand jury and trial, and a hearing should have been held to compel Mr. Lamb to explain his decision-making in these matters.

### (ii)    Forensic Handwriting Analyst Treyce d'Gabriel-Montoya

111, ~~111~~   The diary represented a mixed claim issue, which involved multiple expert witness reports and testimony, which was central to the defendant's case. Multiple affidavits from both experts were submitted with the defendants Article 440 claims, a fact the trial court completely ignored by stating that, "They are either conclusory allegations that are not supported by any documentary evidence or affidavit, or they are based upon matters that are within the record. The defendant does not state his basis of knowledge for his conclusory allegations (e.g. the defense

attorney failed to investigate and the defense attorney failed to adequately prepare). Hence, the defendant is not entitled to the relief he seeks based upon conclusory allegations, See, C.P.L. 440.30 (1) and (4) (b)".

112. 420 To the contrary the defendant submitted a report from expert witness Treyce d'Gabriel-Montoya (see EX "2-B "), and Mr. Lamb refused to present her CV to the Court so she could testify at my trial and present the report to the Court. I urge this court to review said report in full, and to examine the defendant's Article 440 Affidavit at Section 3, III, A, ii, c; which is titled "Expert Report of Forensic Handwriting Analyst Treyce d'Gabriel-Montoya", Pages 96-97. See also Memorandum of Law, Point III, C. ii, d & e; which is titled "Proposed Testimony of Forensic Handwriting Analyst Treyce d'Gabriel-Montoya" and "Expert Report of Forensic Handwriting Analyst Treyce d'Gabriel-Montoya", Pages 64-65.

### (iii)   Mr. Rucano Submitted E-Mails Which Brought Credibility to His Claim and Testimony at Trial That The Charges Were Falsified, and Would Have Severely Damaged The Complainant's Credibility

113. 424 I provided counsel with approximately 15 emails that I sent to the complainant over a 3-month period that expressed my heartfelt love, care and concern for the complainant in an effort to open up a line of communication between us. They constituted an assortment of e-mails I sent to her e-mail address katherine011@live.com. About 1 month after engaged, the complainant started to "shut down" and exhibited violent, angry episodes like cutting of her own hair, burning herself with cigarettes and throwing things in a fit of anger. (Tr. Pg. 389 at ¶ 11-16)

114. 424 These emails represent highly credible and contemporaneous insight into the nature of the relationship **as it was occurring**. The defendant provided the Honorable Court with

subpoenas to sign and submit to Yahoo that would have irrefutably and conclusively shown that these emails were in fact sent to the complainant at the date and times shown on the emails.

115. More importantly, these emails would have contradicted and severely damaged the credibility of the complainant on multiple points, beginning with offering to help the complainant move out in late July 2009, the sequence of events that occurred in Delaware, and her violent conduct of punching me in the face while driving (Email of July 20th, 2009, EX "3-E").

116. Most importantly, exactly like I testified at trial, I consistently and repeatedly expressed my true feelings for her and admitted my faults, all in an effort to help her come out of her shell. Although I knew she had a troubled childhood, I was unaware of the level of sexual and physical abuse she suffered from her Uncle at the age of 12 (Tr. Pg. 141 at ¶ 2-25, Pg. 142 at ¶ 1-5), and unaware of the level of mental and physical torture and feelings of abandonment suffered by her from the hands of her own mother (Tr. Pg. 140 at ¶ 13-25, Pg. 141 at ¶ 1).

117. In an email sent on July 24th, 2009 (EX "3-F"), I reiterated my willingness to help her move out because of her inability to be trust me and be honest, in an attempt to reach out to her and open a line of communication, which I continuously tried to do (Tr. Pg. 404 at ¶ 2-7)

118. I sent an e-mail to the complainant on July 25th, 2009. (EX "3-G") I wrote, "I miss making love to you like I did last night." I expressed my hope we could do something together that night, like going to the beach and walking together, holding hands, or getting a bottle of wine and lighting some candles.

119. I expressed how much I love her and let her know that her feelings are important, urging her to think of "something that you want to do and something that you initiate because you want to spend time with me." I also wrote her a nice love poem at the end of this e-mail.

120, 00%  I sent an e-mail to the complainant on August 5th, 2009, (EX "3-H") (after she had been sleeping at her mother's house the past 2 nights), letting her know I was sorry we could not work out our differences and promising her to pack her stuff in the storage area downstairs. I also told her I would switch the gas and electric off in her name and pay the final bill. I reiterate how sorry I am over all the disagreements we have had, and explained, "I wish I could have done something different to reach you." This corroborates my testimony that she left my apartment on the night of August 3rd, 2009, and slept at her mother's house. (Tr. Pg. 398 at ¶ 4-22) **The complainant testified she never left our apartment that night**.

121, 00%  **More importantly,** later that day the complainant called me and asked her to meet me in downtown Brooklyn, and begged me to come back to the apartment. She also did this the previous night when she called me while I was driving and had Diane (my common-law wife) and kids in the car. My car has a Bluetooth kit, allowing me to hear her voice through the car speakers and talk to her hands-free, and Diane and my kids heard her apologizing and asking to come back. (Tr. Pg. 399 at ¶ 10-25, Pg. 400 at ¶ 1-10)

122, 00%  The failure of Mr. Lamb to subpoena these emails during trial severely prejudiced the defendant in a case where credibility was key. I provided printed copies of these emails to Mr. Lamb, which he refused to use to impeach the complaining witness at trial, adamantly stating, "They are not admissible."

123, 00%  Mr. Lamb cross examined the complainant and asked "And did he email you send emails to you telling you he was going to leave you?" Complainant, "No." (Tr. Pg. 283 at ¶ 3-5). These emails would have shown my state of mind and my deep concern for complainant, and would have impeached her testimony that **she did not receive e-mails** and **that I never offered to help her move out**.

124. Email messages were admissible as evidence of statements made to her about the defendant's intention to help her move out, and were not subject to the Rape Shield Law.

125. Yet, ADA Katchen, in his "Rosario/Discovery" letter to Mr. Lamb dated June 21st, 2010 (EX "2-I"), released a printed email from me to the complainant, thereby showing that the prosecution believed they were relevant. The failure to subpoena the emails from my internet service provider resulted in the loss of irrefutable and verifiable proof of the defendant's attempt to reach out to the complainant with love, care and concern. They would have provided evidence of my offer to help her move out, and would have supported the defense theory that she fabricated the alleged rapes by impeaching her testimony concerning her leaving the home on the night of August 3rd, 2009 after a fight. The complaint report was filed just minutes from her mothers house in Brooklyn (never acquired by Mr. Lamb), and supported the fact that the complainant had filed it at 5:10 a.m., August 4th, 2009 at the 94th precinct. This would have severely damaged the credibility of the complainant in a case where her credibility was precarious at best.

126. The facts, circumstances and affidavits from experts described above more than met the defendants burden and show that a hearing was required under the statute, and irrefutably show that the trial court lacked the discretion to deny Mr. Rucanos motion under C.P.L. § 440.30(4) (b), as more fully discussed below.

## III.   Mr. Rucano Met His Burden and a Hearing Was Required Under the Statute

127. Mr. Rucano met the requirements of N.Y. C.P.L. § 440.30 (4) by presenting sworn allegations as well as numerous other documentary evidence substantiating or tending to substantiate all the essential facts.

128.   Mr. Rucano met the requirements of N.Y. C.P.L. § 440.30 (4) (b) by presenting sworn affidavits from 2 different expert witness concerning the diary the complainant read from during her entire grand jury testimony, and its unreliability. He also submitted numerous other pieces of documentary evidence substantiating or tending to substantiate all the essential facts, in which a simple subpoena, provided to the court, could have been issued to obtain certified copies of said records. These records included medical billing records from AETNA showing that falsified records were obtained via subpoena from Licensed Clinical Social Worker Anna Lorusso-Moramarco, e-mails sent to the complainant that would have impeached a large portion of her testimony submitted under oath, and for copies of Complaint Report # 2009-00510-94, Filed at the 94th Precinct on August 4th, 2009 at 5:10 a.m.

129.   In a case where the credibility of the complainant was crucial, and where the defendant never refuted that they had sex, just that it was forced; the refusal of the trial court to grant the hearing Mr. Rucano was entitled to under the statute was an abuse of discretion that denied him of the only forum capable of hearing these colorable claims in New York State Courts. *See* **Point 1, Subsection II, C**. *supra*

IV.   **The Court Erred in Refusing To Consider Rucano's Argument That His Attorney Was Ineffective, Where Counsel's Failure Was *Not* Apparent in the Trial Record**

A.   **Ineffective Assistance of Counsel Claims Must Be Considered Cumulatively**

130.   A defendant is entitled to have his attorney's errors considered cumulatively on collateral attack. See *People v. Baldi*, 54 N.Y.2d 137, 147 (1981). Consistent with this rule, where a defendant presents a "mixed' claim of ineffective assistance of counsel – one where the attorney's errors appear both on and off the record – the court must consider all of the errors.

*People v. Maxwell*, 89 A.D.3d 1108, 1109 (2nd Dept. 2011), quoting *People v. Evans*, 16 N.Y.3d 571, 575 n. 2 (2011). Where a motion court overlooks this rule, this Court must remand for a hearing on all of defendant's allegations of ineffective assistance. *Id. See also People v. Isaacs*, 94 A.D.3d, 1017, 1018-19 (2nd Dept. 2012) (defendant's "mixed claim" was not procedurally barred and "the CPL § 440.10 proceeding is the appropriate forum for reviewing the claim of ineffectiveness in its entirety." (Internal quotations omitted); *Lou*, 95 A.D.3d at 1035-36.

131.    Thus, where a defendant's ineffective assistance claim – as a whole – is based on non-record facts, which are not contradicted by the record, or, even if they are contradicted by the record, have a "reasonable probability" of truth, the court *must* conduct a hearing. *See* **Point 1, Subsection I**, *supra*,

      **B.**    **Trial Counsel's Numerous Decisions Involving the Diary Dehor the Record, and His Failure to Pursue a Course of Action Designed to Impeach the Credibility of the Complainant on Numerous Levels Constituted Ineffective Assistance of Counsel.**

132.    The motion court abused it's discretion in failing to consider the numerous non-record based exhibits upon which his motion to vacate the judgment was predicated on, and therefore ignored the second department and courts of appeals precedents involving "mixed claims."

133.    Because an inquiry into defense counsel's rational is essential to any post conviction evaluation of trial counsel's litigation decisions, and the best source of this information would be trial counsel himself (see People v. Morales, 58 NY2d 1008 [1983]; also see People v. Taylor, 211 AD2d 603 [1st Dept. 1999]), such an inquiry by its very nature requires reference to non-record facts (i.e. trial counsel's affidavit, which this defendant attempted to obtain numerous times, see Exhibit "3-L", also referred to in Page 4 of my motion for an Evidentiary Hearing).

Therefore a CPL § 440.10 motion, not an appeal, was (and is) the appropriate venue to raise my ineffective assistance of counsel claims, notwithstanding appellate counsel's raising components of this claim on defendant's direct appeal pending before this Court.

134.    This understanding was recently echoed in People v. Freeman, 93 AD3d 805 (2nd Dept. 2012), where this Court held that when an ineffective assistance of trial counsel claim is based on matters not appearing on the record, and in part, on matters outside of the record, a mixed claim of ineffective assistance of counsel has been created which cannot be resolved on direct appeal.

135.    Similarly, in People v. Maxwell, 89 AD3d 1108 (2nd Dept. 2011), the Second Department held that because an ineffective assistance claim constitutes but a single ground, requiring reference to both record and non-record based issues, and as the ultimate question is with the fairness of the process as a whole, the entirety of counsel's conduct must be reviewed, making application of any procedural bars under either CPL § 440.10(2) or CPL § 440.10(3), inapplicable to my ineffective assistance of counsel claims.

136.    In light of the recent Supreme Court holdings in Martinez v. Ryan, 132 S.CT. 1309 (2012), and Massaro v. United States, 123 S.CT. 1690 [2003] [requiring all ineffective assistance of counsel claims to be raised on a post conviction motion, not an appeal], and in light of the holdings by this Court in People v. Freeman, supra, and People v. Maxwell, supra; the Richmond County Court's failure to review my mixed claims of ineffective assistance of counsel --- under the facts advanced above and in my original CPL § 440.10 application --- warrants an extended discussion which can only occur if this Court grants leave.

137.    To reiterate, the Court of Appeals and this Court have made it abundantly clear that, where a 440 movant alleges, "non-record facts," which "if established could entitle defendant to the relief sought," the 440 Court must Grant A Hearing.

## Section 3

Arguments of Fact and Law In Support of Claims Raised In My Direct Appeal

The following represents my Arguments of fact and law presented to the New York State Court of Appeals in a Leave Application after exhausting them in the Appellate Division, Second Department. They build upon Arguments raised Partially, and Poorly, by Assigned counsel Warren Landau of Appellate Advocates on direct appeal, and by A. Alexander Donn in my Criminal Leave Application.

The Arguments presented herein expand those found in Point 1, Section II "Direct Appeal Issues - Readback", and Section III, "Abuse of Discretion and IATC During Jury Selection Raised on Direct Appeal", in my Application for Habeas Relief submitted on August 3rd, 2018 (see Pgs 38-43 and 44-48)

These arguments expound on the Trial Courts Failure To Meaningfully Respond to the Deliberating Jurys request for a readback of testimony for Ms. Mach, the only Prosecution witness anywhere near the scene of alleged events occurring, my downstairs neighbor. It also raises trial counsels ineffectiveness on multiple levels, errors which caused a domino effect of Prejudice on numerous levels. This included, but was not limited to, trial counsel not objecting because he "could not hear" Prosecution witness Ms. Mach testifying, requesting Prejudicial and speculative testimony tending to infer that sex crimes were being committed that was objected to by him, sustained by the trial court and stricken from the record during trial to be read back to the deliberating Jury, with the trial court commenting "I don't care...", and numerous other errors during Jury selection.

The errors of the trial court described within this section considered cumulatively with trial counsels errors exacerbated the Prejudice I suffered when viewed in the context of my Retroactive Misjoinder/Prejudicial Spillover claims (see within this Application, Id. at ¶¶ 190-194 [Pg. 63-65 of Facts], and Pgs 142-197, Mem of Law). This Prejudice was compounded further when the App. Div, Second Dept. denied my state conferred right to file a Pro-Se Supp. Reply Brief After granting me permission to file a supplemental brief initially, as it prevented me from refuting new arguments raised by the People in their opposition to my Supp. Brief, at great Prejudice to me (concerning trial courts Actions during deliberating Jurys request for readback)(Id. at Pgs 40-41)

# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085     FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
BARRY S. STENDIG

SUPERVISING ATTORNEYS
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON

DIRECTOR OF INNOCENCE INVESTIGATIONS
DE NICE POWELL

ALEXIS A. ASCHER
STEVEN R. BERNHARD
DENISE A. CORSÌ
A. ALEXANDER DONN
ALLEGRA GLASHAUSSER
LEILA HULL
LAUREN E. JONES
JONATHAN M. KRATTER
BRYAN KREYKES
JOSHUA M. LEVINE
TAMMY E. LINN
PATRICIA PAZNER
ANNA PERVUKHIN
SHARDA SIBLEY
NAO TERAI
MARK W. VORKINK
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
DINA ZLOCZOWER

OF COUNSEL
ELLEN FRIED
MELISSA S. HORLICK
WILLIAM A. LOEB
REYNA E. MARDER

August 7, 2015

Hon. Leslie E. Stein
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York 12207-1095

Re:  People v. Anthony Rucano
Criminal Leave Application

Your Honor:

I am writing to urge that you grant leave to appeal in the above matter, which presents an important, but previously unresolved, question regarding the extent of a trial court's discretion during the most critical phase of a jury trial: in fashioning its response to a deliberating jury's request for a readback of trial testimony, does a trial court have the discretion to make new rulings regarding the admissibility of portions of the requested testimony? This Court has never addressed the issue.

The Facts

*The Allegations*

Appellant was indicted on six counts of first-degree rape, three counts of criminal sexual act, attempted first-degree rape, and related offenses in connection with a volatile domestic relationship. Appellant did not confess, and there was no prompt outcry or evidence of genital trauma.

The People's case rested almost entirely on the testimony of the complainant, appellant's girlfriend, who claimed that he sexually assaulted her numerous times in a three-month period in 2009. During the period of the alleged abuse, the complainant moved into a new apartment with appellant and co-signed the lease.

Hon. Leslie E. Stein                                                      August 7, 2015

### Stefania Mach's Testimony

In an attempt to corroborate the complainant's allegations, the People elicited testimony from Stefania Mach, appellant's downstairs neighbor. Shortly after Mach took the stand, defense counsel told the court that, due to "some kind of noise outside," he had been unable to hear a portion of her testimony (350-51). The court directed the prosecutor to ask the question again (350-51).

Asked what she "hear[d]" from her apartment "in the end of September," Mach said that appellant and the complainant went "to bed," and "soon start to sex, and the [complainant] no want. Start screaming, I no want, leave me alone" (354). Defense counsel did not object.

When Mach testified that, from her apartment downstairs, she could "tell the difference between [appellant] walking and the [complainant] walking" because of the different sounds of their respective footsteps, defense counsel objected (355). The court sustained the objection, ruling that it would not allow Mach to "reconstruct what may or may not have happened in a room upstairs that she [was] not in" (355).[1]

Later, the prosecutor asked Mach if she "hear[d] anything in . . . the beginning of August," and she responded, "[L]ot of times have very loud sex. She scream" (357). Counsel objected, and the court sustained the objection "as to sex" (357). The prosecutor proceeded to ask Mach what she "hear[d]," and she responded, "Whole time she scream. Sometime, sometime she no scream. But most when sleep together, she scream" (358). The court sustained counsel's objection and struck "the last statement" from the record.

### The Readback Request and Counsel's Motions

During deliberations, the jury asked to rehear Mach's testimony. Upon reviewing daily copy prepared by the court reporter, counsel moved the court to exclude from the readback Mach's testimony that appellant and the complainant "start[ed] to sex and [the complainant] no want" (677). Acknowledging that he had not objected to the testimony when it was elicited, counsel repeatedly represented "as an officer of the court" that, due to the noise outside the courtroom and Mach's "very heavy accent," he "did not hear th[e] [statement]" when it was said by the witness" (677, 679, 681).

Counsel noted that, in response to another objection shortly after the statement at issue, the court had ruled that Mach could not "reconstruct what may or may not have happened in a room upstairs that she is not in" (355, 677-80). Since it was "impermissible for [Mach] to speculate what was going on and reconstruct what was going on upstairs," and testimony that "they were having sex upstairs [was] a reconstruction," counsel contended that reading the challenged testimony back would be "inconsistent with the court's ruling" and "highly

---

[1] Sustaining a subsequent objection regarding the sound of appellant's footsteps, the court reaffirmed its ruling that it would not "let the jury speculate what may have happened [in appellant's apartment] based on testimony from a witness that was not present" (356).

204

Hon. Leslie E. Stein                                                        August 7, 2015

prejudicial" (679-80, 683).  Therefore, counsel asked the court, "in the interest of justice," to exclude the testimony from the readback (679-80, 683).

The court emphasized that counsel had "made no objection" to the contested testimony when it was elicited and ruled that it "can't retroactively sustain an objection that was never made," adding that its ruling regarding Mach's "reconstruct[ion]" of what had happened in appellant's apartment had been made "subsequently [on] a different issue" (679, 680, 681, 682, 683).  The court indicated that it would grant counsel's request if the prosecutor consented, but the prosecutor refused (682-83).  The court denied the motion (682-83).

In light of the court's ruling, counsel moved to "withdraw[]" two previously-sustained objections that had resulted in the court's striking Mach's testimony regarding appellant and the complainant having "sex" and "sleep[ing] together" in August of 2009 (688, 690).  Counsel explained that this "damage control" motion was intended to "counter balance" the court's "extremely prejudicial ruling," reasoning that if the jury was "going to hear as to sex on one night, they should h[ear] about it on all the nights" (687-88).  Therefore, counsel moved the court to "unstrike" the previously-stricken testimony and read it to the jury without his objections or the court's rulings (688, 690).  The prosecutor observed, "We are [u]n doing objections," and the court stated, "[Counsel] wants it in, I don't care," and granted the motion (688-89).

When the readback had been completed, counsel "renew[ed] his objection" to the court's ruling that Mach's testimony about appellant and the complainant "start[ing] to sex" would be read back to the jury (692).

### The Verdict

After deliberating over the course of two days, the jury acquitted appellant of five counts of first-degree rape, two counts of first-degree criminal sexual act, and second-degree felony assault.  The jury convicted appellant of one count of first degree rape, one count of first-degree criminal sexual act, attempted first-degree rape, second-degree felony assault, third-degree criminal possession of a weapon, and third-degree assault.

The counts of which appellant was convicted allegedly occurred in September of 2009, the month in which Mach claimed to have heard appellant and the complainant "start" to have sex in the apartment above hers while the complainant screamed, "I no want."

### The Appellate Division Decision

On appeal to the Second Department, appellant argued, <u>inter alia</u>, that Mach's testimony regarding appellant and the complainant "start[ing] to sex" in September of 2009 was improperly admitted.  The primary focus of appellant's claim was the initial elicitation of the testimony.  Appellant argued that counsel was ineffective for failing to object to the testimony and, in the alternative, that the Appellate Division should reach the issue in the interest of justice, adding that the court exacerbated the error by repeating the improper testimony, over objection, in its readback.  In a pro se supplemental brief, appellant argued, <u>inter alia</u>, that the trial court "abused its discretion" by "allow[ing] testimony that was stricken . . . to be read back to the jury."  The Appellate Division affirmed the conviction.

Hon. Leslie E. Stein                                                    August 7, 2015

<u>The Issue</u>

The primary issue presented by this case is whether a trial court has the discretion to strike from a readback improper testimony that was not objected to when elicited, but was objected to before the readback. Put differently: if counsel is "asleep" and fails to object when improper testimony is elicited, but "wakes up" and objects when the court is preparing to read the testimony back to the jury, does the trial court have the discretion to sustain the objection and strike the improper testimony before conducting the readback?

Trial courts have a degree of discretion in how they respond to jury notes requesting readbacks of trial testimony. C.P.L. § 310.30 (upon receiving request from deliberating jury, trial court "must give such requested information or instruction <u>as the court deems proper</u>"; emphasis added); <u>People v. Malloy</u>, 55 N.Y.2d 296, 302 (1982) (trial court is "vested with some measure of discretion in framing its response"). A trial court's "discretion is circumscribed" by "the requirement that [it] respond meaningfully to the jury's request." <u>Malloy</u>, 55 N.Y.2d at 302. In determining whether a court's response is meaningful, the factors to be considered are "the form of the jury's question, . . . the supplemental instruction actually given and the presence or absence of prejudice to the defendant." <u>Id.</u>

This Court has never determined whether a trial court's discretion in such situations includes the authority to exclude previously-admitted testimony from the readback or to include previously-stricken testimony. The most relevant Appellant Division decisions, however, seem to suggest that the court does have the discretion to do so. <u>See People v. Cuenea</u>, -- N.Y.S.3d --, 2015 WL 4002346, *1 (1st Dept. 2015) (holding that trial court had "properly exercised its discretion when it revisited its ruling and permitted the jury to hear the stricken testimony"); <u>People v. Leon</u>, 225 A.D.2d 481, 482 (1st Dept. 1996) (holding that trial court "had [the] discretion to decline without elaboration" counsel's request that the readback include "a portion of the record" that "would have introduced a confusing ambiguity"); <u>People v. Roman</u>, 149 A.D.2d 305, 307 (1st Dept. 1989) (improper for court to order readback of testimony that, "while in evidence, was both hearsay and bolstering, and should not have been highlighted at a crucial stage of the trial").

Here, before the court responded to the jury's readback request, counsel noticed, for the first time, Mach's speculative testimony that appellant and the complainant had "start[ed] to sex" in the apartment upstairs from hers one night in September of 2009. There is no dispute in the record regarding counsel's repeated representation that, because of noise outside the courtroom and Mach's heavy accent, he had simply not heard this brief portion of her testimony. Contending that reading the "highly prejudicial" testimony back to the jury would be "inconsistent" with the court's subsequent ruling that Mach could not "reconstruct what may or may not have happened in a room upstairs that she is not in," counsel asked the court to refrain from reading it back "in the interest of justice" (679-80, 683).

The court indicated that it was sympathetic to counsel's argument and even went so far as to suggest that it would grant the request if the prosecutor consented. When the prosecutor refused to consent, however, the court denied the motion. Critically, the court stated, "I <u>can't</u> retroactively sustain an objection that was never made" (682-83; emphasis added), which

Hon. Leslie E. Stein                                                August 7, 2015

constituted an explicit ruling that the court did not have the <u>discretion</u> to grant the motion. This Court should grant leave to determine whether a trial court's discretion is, in fact, so limited. Notably, this Court has previously held that a trial court erred in denying a justification charge that was made after summations and the court's initial charge. <u>See</u> People v. <u>Khan</u>, 68 N.Y.2d 921 (1986).

Granting leave would also allow the Court to consider the closely-related issue of whether, while preparing to respond to a readback request, a trial court has the discretion to "unstrike" previously-stricken testimony and include that testimony in the readback. Here, after failing to convince the court not to read back Mach's testimony about appellant and the complainant "start[ing] to sex," counsel made a strategic decision, aimed at "damage control," to withdraw his previously-sustained objections to testimony that appellant and the complainant had sex on other nights (687-88). Stating that it "d[id]n't care," the court granted the motion (688-89).

\*   \*   \*

Although the focus of appellant's brief in the Appellate Division was the impropriety of Mach's initial testimony, rather than the readback error, the preserved issue presented here is properly before the Court. C.P.L. § 470.35(1) ("Upon an appeal to the court of appeals from an order of an intermediate appellate court affirming a judgment . . . , the court of appeals may consider and determine . . . any question of law involving alleged error or defect in the criminal court proceedings resulting in the original criminal court judgment . . . , regardless of whether such question was raised, considered or determined upon the appeal to the intermediate appellate court.").

Addressing the issue would be particularly appropriate here because the contested testimony went to the heart of the People's case. The trial evidence against appellant contained no confession, prompt outcry, or proof of genital trauma. Instead, the People's case relied almost exclusively on the complainant's testimony that appellant sexually abused her on numerous specific dates over the course of three months. But the jury rendered a "not guilty" verdict on every rape count that was not allegedly corroborated by Mach's improper testimony that appellant and the complainant were having sex in the apartment above hers while she screamed, "I no want." Indeed, all of the crimes of which appellant was convicted were alleged to have occurred in September of 2009, the time period covered by this testimony. The court's error in including this testimony in its response to the jury's readback request was highly prejudicial. <u>See</u> People v. <u>Ciaccio</u>, 47 N.Y2d 431, 436 (1979) (trial court's supplemental instructions "may well be determinative of the outcome of the case, coming as they do in response to questions raised by the jurors themselves").

Appellant also seeks leave to appeal on all aspects of his Appellate Division main brief and <u>pro se</u> supplemental brief, including the federal constitutional claims based on the Sixth and Fourteenth Amendments to the United States Constitution.

## POINT 1

**Trial Counsel Took A Position Contrary to the Defense, And/Or The Trial Court Abused Its Discretion by Granting An Application Allowing Testimony Which Was Objected To, Sustained and Stricken By The Trial Court to be Read Back During Deliberations, Requiring A Reversal of His Conviction**

Building upon the Leave to Appeal Application of Appellate Counsel Alexander Donn, concerning trial counsels failure to contemporaneously object to prejudicial and speculative testimony because "he could not hear"; defendant places the further argument before this Honorable Court.

ADA Rajeswari elicits information concerning when Ms. Mach goes to sleep during August into September of 2009, and Mr. Lamb objects as to what specific day. The Court intervenes and allows the witness to answer. (Tr. Pg. 352 at ¶ 23-25, Pg. 353 at ¶ 1-12)[4]

ADA Rajeswari then draws the witnesses' attention to the end of September 2009 and asks the generic questions "Do you remember the last time that his fiancée lived at Sylvaton Terrace?" Ms. Mach responds "Yes", and then asks, "What, if anything, did you hear that night from your bedroom?" What, if anything, **happened**, did you hear anything that night?" (Tr. Pg. 353 at ¶ 13-25, Pg. 354 at ¶ 1-4)

After trial was over and the jurors were deliberating, they sent a note requesting the testimony of Ms. Mach to be read back to them. This is when Mr. Lamb took a position contrary to the defense by advocating removing testimony that was clearly speculative and prejudicial under the guise of damage control, but in reality was because of his failure to promptly object ("Tr.", Pg. 688, at ¶ 18-19).

The Trial Court made some specific rulings that contradict his actions in this matter, which Mr. Lamb never addressed. Some of these were "You asked me to go back and sustain an

---

[4] "Tr." followed by Pg. numbers and ¶, refers to page and line numbers, respectively, of the trial transcripts.

V.     LEAVE TO APPEAL TO THE APPELLATE DIVISION, 2ND DEPT.

On January 15th, 2015, defendant sought permission from the Appellate Division, 2nd Dept, to appeal from the Trial Courts December 15th, 2014, Decision and Order and to have the issues consolidated with his direct appeal (Appendix G). The People opposed the application on February 10th, 2015, and the defendant filed a reply affidavit on February 24, 2015.

On April 30th, 2015, Associate Justice Colleen D. Duffy denied defendant's application for permission to appeal from the denial of his C.P.L. § 440.10 motion (see, *People v. Anthony Rucano*, Decision & Order, App. Div. Dkt. No. 2015-00499 [2d Dep't April 30th, 2015]).

On April 30th, 2015, in a separate Decision and Order by Skelos, J.P., Balkin, Roman and Hinds-Radix, JJ (also received on or about May 19th, 2015), the Appellate Division, Second Department, ruled on my motions for poor person relief (assignment of counsel) and for a hearing (motion for evidentiary hearing) in connection with my motion pursuant to C.P.L. § 440.10, stating that:

> ORDERED that the motion is denied as the portions which denied his motions for poor person relief and for a hearing are not appealable as of right or by permission (see CPL 450.10, 450.15)

Although the Richmond County Supreme Court, and the Second Department, Appellate Division, have refused to entertain the challenge to the constitutionality of County Law § 722, CPL § 440.10(2), CPL § 440.30 and CPLR §§ 1101/1102, as being violative of my constitutional rights to Due Process and Equal Protection;[2] this issue was presented to the New York State Attorney General in accordance with Executive Law § 7101 (also see CPLR § 1012[b])[3], who declined to intervene.

---

[2] Because they do not have provisions for the assignment of counsel to help prepare and submit a meritorious post conviction motion before the granting of a hearing.
[3] See Motion to Withdraw Appellate Counsels brief, Appendix A

objection that was never made. I can't do that." (Tr. Pg. 680 at ¶ 11-12). "I don't see how I can go back and retroactively sustain an objection that was never made." (Tr. Pg. 682 at ¶ 1-2) "There was no objection made. There was an objection made subsequently at a different issue, which I sustained, but I can't go back and retroactively sustain an objection that was not made. I will deny your application on that regard." (Tr. Pg. 682 at ¶ 10-14)

After Mr. Lamb argued extensively for the Court to change its position, Mr. Lamb, in a position contrary to the defense, advocated to remove objections to speculative and prejudicial testimony and succeeded, with Judge Rooney ruling "He wants it in. I don't care... Normally when I sustain an objection it stays stricken." (Tr. Pg. 688 at ¶ 10-13) This occurred after trial was over, and during a request for a read-back during deliberations, an important factor.

. A.   **The Trial Court Abused Its Discretion by Granting An Application Allowing Testimony Which Was Objected To, Sustained and Stricken By The Trial Court to be Read Back During Deliberations, Requiring A Reversal of His Conviction, and the Appellate Division's Affirmation Was Erroneous**

The defendant's alleges that **after** the trial court declined to "retroactively sustain an objection that was never made", the trial court abused its discretion (The testimony Mr. Lamb wanted to retroactively object to was at Pg. 354-355 of the Trial Transcripts). This abuse of discretion occurred when it allowed Mr. Lamb to remove **later** objections to speculative and prejudicial testimony, *after trial was over*; that was **objected to**, **sustained** and **stricken** from the record **by Judge Rooney in front of the jury before they started deliberating**, to be read back to the jury during the readback, thereby altering the trial record.

**The People even supported this position** when they opposed Judge Rooney retroactively striking testimony *after trial was over*. "I jury asked for a readback. It is not the time to decide what should be read to them...And to rule that, you know, all the prior testimony

on the page before in the transcript is inadmissible is so prejudicial to the People, where no objection is made to the testimony at trial. So the people are denied the opportunity to have even - - if it was objectionable ask the question in a different way." (Tr. Pg. 678 at ¶ 8-17)

The following colloquy occurred, which is important for context.

➢ **The Court:** "I am not criticizing you for not making an objection. I am noting that you did not make an objection."
➢ **Mr. Lamb:** "I couldn't object to something that I could not hear..." (Tr. Pg. 683 at ¶ 1-5)
➢ [Ms. Rajeswari highlights the ineptness of this statement by Mr. Lamb, and his even worse attempt of explaining **the reason why he did not object**.]
➢ **Ms. Rajeswari:** "If we may amplify the record, he did state that he didn't hear and had several of the questions read back to him. This was not the only instance. The record will support several times the defense counsel asking for the question read back because you couldn't hear. He could have had that happen in this instance."
➢ **Mr. Lamb:** "How could I do that if I couldn't hear." (Tr. Pg. 683 at ¶ 22-25, Pg. 684 at ¶ 1-6).

Mr. Lamb actually tells the court that **the reason why he did not contemporaneously object** to this prejudicial and speculative testimony, *in a rape case*, that equated that the complainant screamed every time we had sex, **strongly implying that the sex was forced and thereby supporting the People's theory of the case**, because he could not hear! **This Is The Exact Reason Why He Should Have Requested A Readback!** I urge this Honorable Court to consider this as the type of inexcusable and egregious error no tactical reason or strategic purpose could explain, thereby resulting in the ineffective assistance of counsel.

Now, please look at the following with the above context in mind. Mr. Lamb requested, and was erroneously allowed by the Court; to remove his objections to testimony that was **objected to**, **sustained** and **stricken from the record during trial** during the following colloquy, when jurors were deliberating and after a jury note was received. *It is important to note Judge Rooney's responses and ADA Katchen's reaction* to what Mr. Lamb is doing.

**Mr. Katchen:** "On Page 357 there is also a number of sustained - - where there are two specific sustained objections. Line 2 through Line 8 should be excluded."

**The Court:**   "What?"

**Mr. Katchen:** "Line 2 on Page 357 through Line 8."

**The Court:**   "Well, that's all right with me. You hear that Mr. Lamb? Page 357 the D.A. is proposing to exclude line 2 through 8." **[This testimony, which was objected to and sustained during trial]**

**Ms. Rajeswari:**   "We will consent to that." [Other A.D.A.]

**Mr. Lamb:**   "Judge, no. I would have no objection to the jury hearing that. They are going to hear the first part then they should hear the part on 357."

**The Court:**   "Okay, fine."

**Mr. Katchen:** "It's a sustained objection." **[Note ADA Katchen's surprise]**

**The Court:**   "It's sustained as to sex..."

**Mr. Lamb:**   "I don't understand."

**The Court:**   "The D.A. is suggesting that I exclude everything from 2 through 8 because I sustained an objection "

**Mr. Lamb:**   "I'm asking that everything be read."

**The Court:**   "Fine, if that's what you want. Including the ruling?" [Judge Rooney, *in an abuse of discretion*, is allowing stricken testimony back into the trial record, *and is asking Mr. Lamb if he wants the ruling in also*, even though he later states the court reporter does not read sustained objection passages.]

**Mr. Lamb:**   "Yes."

**The Court:**   "Sustained as to sex."

**Mr. Lamb:**   "If they are going to hear as to sex on one night, they should hear about it on all the nights." [This is Mr. Lamb arguing that **because he did not contemporaneously object to the testimony on Page 354-355, *which was prejudicial and speculative*, because he could not hear, *and failed to get Judge Rooney to retroactively strike it*, to now let this prejudicial and speculative testimony in that he did object to, and succeeded during trial to have stricken from the record; *to be read back to the jury*.]**

**Mr. Katchen:** "20 through 23 should be excluded"

**Ms. Rajeswari:**      "Because you sustained that."

**The Court:**   "The reporter wouldn't read that anyway. They don't read sustained objection passages."

**Mr. Katchen:** "I guess the only other issue would be on page 358 Line 8 through 13...."

**The Court:**   "I think 358 line 9, 10 - - 8, 9, 10, 11, as I read the record, I sustained the objection to the last statement, meaning 'but when most sleep together, she scream.'

You said it will be stricken. I think we'll take that out. Agreed."

**Mr. Lamb:**   "I have no objection to it coming in." [This is Mr. Lamb arguing that **because he did not contemporaneously object to the testimony on Page 354-355, *which was prejudicial and speculative*, because he could not hear, *and failed to get Judge Rooney to retroactively strike it*, to now let this prejudicial and speculative testimony in that he did object to, and succeeded during trial to have stricken from the record; *to be read back to the jury*.]**

> **The Court:**   "He wants it in, *I don't care.*
> It's the defenses position that they prefer to have it in. Normally when I sustain an objection it's stricken." **[The Court is admittedly allowing in prejudicial and speculative testimony** that was stricken from the record **even though normally it stays stricken.** There is no argument of law that allows the trial record to be altered like this during a jury readback request.]

> **Mr. Lamb:**   "I understand. I am trying to counter balance what I think is extremely prejudicial.

> **The Court:**   "You are hung up on a ruling I already gave."

> **Mr. Lamb:**   "I am trying to do damage control here, Judge." [The damage control Mr. Lamb is talking about is his own failure **to contemporaneously object to the testimony on Page 354-355,** *which was prejudicial and speculative,* **because he could not hear, and his failure** *to get Judge Rooney to retroactively strike it.*]

> **The Court:**   "But most when sleep together, she scream."
> "Objection."
> "Sustained. The last statement will be stricken."
> "You are asking me to unstrike?"

> **Mr. Lamb:**   "Yes, Judge." (Tr. Pgs. 686-688, 689 at ¶ 1).

Judge Rooney refused to strike testimony and alter the trial record when no objection was made, even though the testimony was clearly speculative and prejudicial, yet abused his discretion by altering the trial record and allowing other prejudicial and speculative testimony in, testimony that was stricken in front of the jury, by ruling "He wants it in. I don't care… Normally when I sustain an objection it stays stricken." (Tr. Pg. 688 at ¶ 10-13)

**This caused great prejudice to me.** The Trial Court allowed testimony that was stricken in front of the jury and admonished they could not use in their deliberations to be read back to them. It is without moment when this alleged sex while screaming was occurring, as it implies it was regularly happening. The D.A. jumped quickly from talking about the end of September to the beginning of August, and then Ms. Mach replied in very general terms stating "in night, every night - - maybe not every night, but lots of times have very loud sex. She scream." It is impossible to discern exactly what night she is talking about (Tr. Pg 357 at ¶ 5-6).

This is further amplified, at great prejudice to me, when the Trial Court abused its

discretion by instructing the jury at the start of trial (Tr. Pg. 17 ¶ 2-17), admonishing them during the objections (Tr. Pgs. 353-359) and instructing them during the jury charge before deliberating (Tr. Pg. 617 at ¶ 5-7), that **any testimony to which an objection was sustained could not be considered as evidence in their deliberations**. Yet, this objected to and sustained testimony was read back to the jury **without** the objected to and sustained paragraphs, admonishments and with **NO CURATIVE INSTRUCTIONS** offered *sua sponte* by the Court (Tr. Pgs. 688-692). These jurors were also taking notes during trial, a fact Judge Rooney discussed in detail during his preliminary instructions to the jurors (Tr. Pg. 22 at ¶ 22-25, Pg. 23, Pg. 24 at ¶ 1-21), and also told the jurors "You can take your notebooks with you" (Tr. Pg. 692 at ¶ 10-13) when going to deliberate. This altered the trial record and repeated prejudicial and speculative testimony to the jury that was stricken from the record during trial. **More importantly, I was only found guilty of crimes directly related to this testimony**. **As such, harmless error does not apply**.

In my case, considering the aggregate of testimonial and documentary evidence presented at trial, which resulted in 11 Felony counts being dismissed, with another 8 Felony Counts resulting in a verdict of Not Guilty (leaving a guilty charge on 2 crimes for September 28th, 2009, 2 crimes for September 25th, 2009, and 2 misdemeanors); this weighs substantially in favor of showing that contrary to the People's position, **this was not a case** where there was "overwhelming evidence of the defendant's guilt" (Resp. Supp. Brief at 19).[5]

Finally, the Peoples confusing position arguing that the single unobjected to comment was in evidence and that the court was obliged to include it in the readback under CPL § 310.30 is not disputed by the defendant (Resp. Supp. Brief at 18, Paragraph 1). The record is clear that trial counsel admitted that he did not object because he could not hear. When the People asked

---

[5] "Resp. Supp. Brief", refers to Respondents Opposition to Defendants Supplemental Pro-Se Brief

Mr. Lamb, "if you could not hear, why didn't you request a readback?" he clearly stated, once again "I did not request a readback because I could not hear." This is the **EXACT REASON** to request a readback, an egregious error which resulted in the ineffective assistance of counsel.

B.   **The People's Opposition To Defendants Pro-Se Brief Stated That A Trial Court's Response to Inquiries From a Deliberating Jury is Governed by CPL § 310.30, and As Such, Defendant Claims That The Court Should Have Given the Jury A Curative Instruction Regarding the Speculative Nature of the Contested Comment; Raised A New Argument In Which The Appellate Division (A) Made An Error of Law Concerning The Definition of "Meaningful Response", and (B) Erroneously Denied Defendant Opportunity to Respond With A Reply Brief, in Violation of His Due Process Rights**

The defendant never argued that the court should have given the jury a curative instruction regarding the speculative nature of the contested comment, but instead clearly implied this was in relation to testimony that trial counsel removed his objections to, which occurred later in the proceedings. No reading of the defendant's brief can be taken to imply that I wanted a curative instruction regarding the speculative nature of any testimony, **but in fact was referring to the fact that this previously stricken testimony was now being read back to the jury,** *when the jurors were specifically told* numerous times that any testimony that an objection was sustained to in trial *must* **be disregarded,** and could not be used in their deliberations

Building on the argument presented to this Honorable Court by Appellate Counsel Alexander Donn, CPL § 310.30 imposes two requirements on the trial court following substantive jury communications. The duty to provide "meaningful notice" to counsel, the specific contents of the juror's request, and a "**meaningful response**", that the court responds meaningfully to the substance of the juror's note... (see *Rogers v. United States*, 422 U.S. 35, 39; *United States v. Ronder*, 639 F.2d 931, 934 [2[nd] Cir.]; *People v. O'Rama*, 78 N.Y.2d 270, 277, 189; see also, CPL § 470.05[1]), which mandates "In determining whether an error is so

fundamental as to be a mode of proceedings error, its trivial and inconsequential nature is irrelevant."

The People aptly quoted that "A trial court's response to inquiries from a deliberating jury is governed by CPL § 310.30, which provides that upon the jury's request for "further instruction **or information** with respect to ... the content or substance of **any trial evidence**,"

> the court must direct that the jury be returned to the courtroom and, after notice to both the People and counsel for the defendant, and in the presence of the defendant, **must** give such requested information or instruction **as the court deems proper**." [Emphasis added]
> (Resp. Supp. Brief at 17-18).

As stated previously, the jury was specifically instructed that any testimony that an objection was sustained to in trial ***must be disregarded*** and could not be used in their deliberations (*id.* at 42). See the instruction concerning objections that was given to the jury before they started deliberating below:

> Any testimony which was stricken from the record or to which an objection was sustained, must be disregarded by you. (Tr. Pg. 617 at ¶ 5-7)

Considering this, the People's statement that "Because the contested comment was in evidence, the Court was obliged to include it in the readback under CPL § 310.30", cannot stand muster under this Court's review. Any testimony that was stricken from the record "***must be disregarded***" according to the trial court's own instruction to the jury and as such these "contested comment[s]" were not evidence in trial and could not be deemed **proper**, and in fact, confused the jury.

Such an egregious error during a request for a readback cannot be considered harmless error, nor can trial counsel's request for this testimony to be read back excuse the trial court for making this error. This is especially in light of the fact of trial counsel's failure to contemporaneously object to testimony because, using his own words, "**he could not hear**", and

his failure to convince the trial court retroactively strike it (after he ignored the fact he could not hear by failing to request a readback), **was the only reason** he allegedly wanted to do "damage control." This "damage control" allowed the jury to here prejudicial and speculative testimony that actually supported the people's position that the sex was forced.

This part of the trial has been recognized by the Court of Appeals as crucial: jury's request for testimony "may well be determinative of the outcome of the case, coming as they do in response to questions raised by the jurors themselves." (*People v. Ciaccio*, 47 N.Y.2d 431, 391 N.E.2d 1347, 1350 [N.Y. 1979]).

In the instant case, the trial court committed prejudicial error by erroneously altering the trial record and allowing the jury to hear multiple instances of testimony **strongly implying that the sex was forced and thereby supporting the People's theory of the case**, because trial counsel could not hear and **simply disregarded the testimony**, by failing to contemporaneously object! To reiterate, **the People even supported this position** when they opposed Judge Rooney retroactively striking testimony (altering the record) *after trial was over*. "I jury asked for a readback. It is not the time to decide what should be read to them..." (Tr. Pg. 678 at ¶ 8-9).

Considering the above stated facts, the trial court failed to provide a "meaningful response" to the jury's request for a readback of Ms. Mach's testimony and violated CPL § 310.30. This testimony was filled with objections that were sustained, making it confusing, which more then likely contributed to them requesting this testimony to be read back **so they could be clear** *what testimony they could consider* and *what testimony they could not consider*. The trial court's erroneous decision that allowed this readback cannot be deemed proper, and caused more confusion instead of clarifying it. The trial court allowed this previously stricken testimony to be considered in their deliberations **against its own instructions to the jury**,

prejudicing the defendant's right to a fair and impartial trial, and must be reversed.

Furthermore, the decision by the Appellate Division, Second Department, which denied defendant Rucano the opportunity to file a reply brief was erroneous, considering that the People raised new issues concerning CPL § 310.30, and the defendant was denied an opportunity to refute these allegations in violation of his due process rights.

**C.**   **Failure of Trial Counsel To Contemporaneously Object To Prejudicial and Speculative Testimony Because "He Could Not Hear" And/Or To Request A Readback Amounted To Fatal Error, and When His Request To Retroactively Strike This Testimony Failed, His Further Request to Remove Objections and Readback Other Prejudicial and Speculative Testimony Resulted In Trial Counsels Complete Failure to Effectively Advocate For His Client, and Amounted To Ineffective Assistance of Counsel**

The People's position that the defendant received "highly effective representation overall" because I was found not guilty on a majority of the charges (Resp. Supp. Brief at 20-21) contradicts their previous statement concerning the defendant's claim of an erroneous readback. "Any such error would have been harmless given the overwhelming evidence of defendant's guilt, set forth in the People's main brief at 19-35" (Resp. Supp. Brief at 19). Surely, overwhelming evidence would result in guilt on a **majority**, and not a **minority** of the charges.

The fact is, this case relied completely on common sense and credibility. The incredible contradictions and unbelievable testimony of the complainant was the sole reason for the defendant being found not guilty on the majority of the charges. Contrary to the People's position, trial counsel did nothing to investigate, leading to his failure to effectively challenge the credibility of the complainant and impeach her, and overall failed terribly as an advocate for his client. Unfortunately, the majority of these substantial claims of trial counsel's ineffectiveness, as well as claims of Prosecutorial Misconduct before, during and after the grand jury proceedings, were denied this court's review when the Appellate Division, Second Department,

denied defendant's Application For Leave to Appeal the erroneous denial of his extensive Article 440 motion without a hearing (Appendix G).

Concerning what could be discerned on the record, Mr. Lamb's failure to promptly object because he "could not hear", and his failure to request a readback of that testimony, was a position contrary to the defense. This was done by advocating removing testimony that was clearly speculative and prejudicial under the guise of damage control, but in reality was because of his failure to object promptly, or request a readback of testimony he admittedly did not hear.

Putting a different twist on the statement of Appellate Counsel Alexander Donn, which appears on Page 4 of his Leave to Appeal application when first discussing "The Issue", he states, "...if counsel is 'asleep' and fails to object when improper testimony is elicited." Now, consider this identical scenario, "If counsel can not hear testimony of the prosecutions only witness [for any reason] other than the complainant, and simply decides '<u>I do not need to hear this testimony</u>', and fails to object and request a readback of that testimony, <u>**can any strategic decision by counsel**</u> (in this case, allegedly aimed at "<u>damage control</u>"), <u>**be considered an act of advocacy with an eye benefiting his client**</u>? ("Tr.", Pg. 688, at ¶ 18-19). This is clearly a position contrary to the defense, and satisfies the Baldi standard, which seriously prejudiced the defendant's right to a fair and impartial trial worthy of confidence, and overwhelmingly amounted to the ineffective assistance of counsel.

In this emotionally charged case, the court erroneously allowed previously stricken testimony to be re-introduced to the jury during deliberations in a request for a read-back of the testimony of Ms. Mach. As a result, the chance of a wrongful conviction was greatly enhanced by the likelihood that the jury would convict me based on the prejudicial nature of the stricken testimony. The jurors were further prejudiced against me by hearing all the evidence relative to

the eleven dismissed counts (which they noticed were gone on the verdict sheet, which showed the missing numbers for the indictment charges not presented to them), instead of the two dates for which the jury ultimately found me guilty of . This allowed the jury to convict me based on the propensity of the dismissed charges, rather than evidence sufficient to establish a reasonable doubt for the individual charges.

In the interest of brevity, the defendant refers this Honorable Court to Point 2, *supra*, of his *Pro-Se* Supplemental brief (Appendix L), for the argument of law in support of trial counsel taking a position contrary to the defense and thereby providing the ineffective assistance of counsel. Furthermore, the aggregate errors of counsel and the trial court also prevented me from receiving a fair and impartial trial worthy of confidence.

## POINT 2
**The Prosecutor's Improper Cross-Examination Of Defense Witness Frank Ortiz Violated Hornbook Law By Exceeding The Bounds Of Propriety By Venturing, Multiple Times, Into The Forbidden Territory Of The Arrest And Charges Of Defense Witness Frank Ortiz, The Appellate Division, Second Department, As A Matter of Law, Erroneously Denied Defendants Claims of Ineffective Assistance of Counsel In This Matter**

Building upon appellate counsel's brief, Point 2, sub-point B (Pgs. 42-43, 46-48), the fact that trial counsel Eugene Lamb failed to follow the "required and proper practice" of seeking a mistrial, with specificity, when the prosecutor persistently questioned defense witness Ortiz about his arrest and the charges he faced, over numerous objection of trial counsel; is obvious when looking at the four corners of the record.

Trial Counsel's failure to ask for a mistrial on this ground is in itself, obvious from the record and cannot be deemed strategic or tactical in nature, or to be an omission with an eye benefiting his client. The Appellate Divisions' determination that this issue is unpreserved is erroneous and without merit, allowing this Court to review it as a matter of law.

Appellate Counsel aptly summed this up in Point 2, sub-point D (Pgs. 48-51), and the defendant refers this Honorable Court to these pleadings, in the interest of brevity, for this Court's review. I ask this Honorable Court to consider this error, along with the other errors, cumulatively in the context of ineffective assistance of counsel, to reach the conclusion that taken together, trial counsel's failures warrant this Court to grant leave to appeal to consider this question fully.

**POINT 3**

**Defense Counsel Lacked Basic Trial Skills Surrounding Jury Selection, And Was Responsible for Errors of Commission and Omission Which Did Not Demonstrate Reasonable Competence, Undermining the Proper Functioning of the Adversarial Process and Denying the Defendant of Effective Assistance of Counsel and His Due Process Right to a Fair Trial, U.S. Const. Amends VI, XIV, N.Y. Const. Art. I § 6**

The defendant raised multiple issues of ineffective assistance of counsel relating to defense counsels failure to know and apply the law concerning jury selection, which deprived defendant of his constitutional right to a trial by a "particular jury chosen according to law, in whose selection he had a voice", N.Y. Const., Art 1, § 2.

These multiple issues were raised by defendant in his pro-se supplemental brief, and were not addressed individually by the appellate court, who instead simply stated that, "The defendant's remaining contentions, including those raised in his pro se supplemental brief, are unpreserved for appellate review and, in any event, without merit" (Appendix F). The defendant submits that these issues were apparent from the four corners of the record, and that the Appellate Division, Second Department, erred as a Matter of Law in holding them unpreserved. This error contributed to his claims of ineffective assistance of counsel not being fully considered by the State practiced standard of "representation as a whole" and "in totality."

**A.** **Defense Counsel Failed to Know and Apply The Law Concerning Jury Selection, and The Trial Court Abused It's Discretion, Depriving Me of My Constitutional Right To a Trial By A "Particular Jury Chosen According To Law, In Whose Selection I Had A Voice", N.Y. Const., Art 1, § 2**

In the interest of brevity, the defendant refers this Honorable Court to Point 1, Pgs 4-22 of his Supplemental Pro-Se Brief, which encompasses five separate errors. This defendant will concisely highlight why either these issues were preserved for appellate review, or that they did not require preservation, and explain why Leave to Appeal should be granted.

**I.** **Contrary to the People's Position, Prospective Juror Number One Brian Merrick Was Improperly Selected As a Sworn Juror, and Mr. Lamb's Absence During Jury Selection Could Not be Simply Deemed A "Ministerial" Portion of The Trial, Resulting in a "Mode of Proceeding Error"**

The People made an assumption that "the sequence of jurors was clarified immediately thereafter [and] counsel withdrew his challenge and clearly stated his acceptance of Merrick as [] juror number one" (Resp. Supp. Brief at 6). To the contrary, the record clearly shows the opposite, because neither the Court, the People nor defense counsel used the juror's names to determine which juror in particular they were talking about.

The People further contended that, "counsel was clearly in the court during this part of the jury selection process" (Resp. Supp. Brief at 7), which is a misrepresentation of the facts that is also belied by the record.

The defendant raised this point in Point 1, Sub-Point I, A and B of his supplemental pro-se brief (Appendix L, Pgs 8-12), and will show this Court why this issue is preserved as a Matter of Law and is deserving of this Court to grant Leave to Appeal.

> The Court: "So the Clerk is now going to pull sixteen names randomly from the drum. If you hear your name called, step up and have a seat where the officer directs you."
> Clerk: "Seat Number 1, step up, Brian Merrick. M E R R I C K. Seat Number 1."
> (Continued): "Seat two, Robert Schlaeger. S C H L A E G E R."

222

> ➤ (Continued): "Seat three, Patricia Comerford, C O M E R F O R D."
> ➤ Clerk: "Mr. Lamb, the lineup so far is Merrick one, Schlaeger two, Comerford three."
> ➤ (Continued): "Number 4, step up, Benjamin Santlofer. Could you spell your last name?"
> (J.S. Tr., Pg. 55 at ¶ 12-23)[6]

It is clear that the court clerk, by calling out to Mr. Lamb and stating, "The lineup so far is", could only be recounting the details of the juror's names to Mr. Lamb, as he was not present to hear it when first announced in the courtroom. As such, the People's position that "counsel was clearly in the court during this part of the jury selection process" was a misrepresentation of the facts and purely speculative opinion on their part, lacking merit.

Furthermore, it is well known that lawyers take notes during jury selection (as Mr. Lamb and myself both did) to identify potential jurors for further questioning and possible cause or preemptory challenge. Important to note is that during this selection of potential jurors from the drum, **each juror is assigned a seat number**, which Mr. Lamb and I both used to identify the jurors. Mr. Lamb, by entering the courtroom late during this process, got this seating arrangement confused, as I will show in the following paragraphs.

Also in support of this, the defendant would like to highlight that Mr. Lamb stated the following during the challenge session. "Comeford you said number one" (J.S. Tr., Pg. 121 at ¶ 4). This also just so happens to be the first potential jurors name Mr. Lamb heard when re-entering the courtroom during the selection of names from the drum (J.S. Tr., Pg. 55 at ¶ 12-23).

Combining his absence with the upcoming confusion of two ADA's participating in the Voir dire of one prospective juror, with the added confusion, at the same time, of Judge Rooney's inexplicable statement; allowed a juror that Mr. Lamb used a preemptory challenge on to become sworn juror number one.. Here is the continuation of what occurred.

---

[6] "J.S." followed by numbers refers to page numbers of jury selection transcripts, with ¶ identifying line number.

➢ Mr. Lamb: "Comerford you said number one."
➢ The Court: "No cause. No cause. No peremptory. You asked for a peremptory." [The record does not reveal the cause of this unexplained of what appears to be frustration]
➢ Mr. Lamb: "I thought we had moved to Number 2."
➢ Ms. Rajeswari: "We never did number one." [Throughout the entire Voir dire, both ADA Rajeswari and ADA Katchen are participating, a lot of times both make comments on the same juror, adding to the confusion]
➢ The Court: "You want one?"
➢ Mr. Lamb: "I do want one."
➢ The Court: "Are you withdrawing your peremptory to number one?"
➢ Mr. Lamb: "I thought it was number 2 was going to be seated... as Juror Number 1."
➢ (Continued): "Yes." [As Mr. Lamb just stated he thought number 2 (Schlaeger, **not Merrick**) was Juror Number 1]
➢ The Court: "Carmine (Clerk's first name), that's number one" (J.S. Pg 121 at ¶ 4-17).

Mr. Merrick, which the record reveals that Mr. Lamb issued a peremptory, becomes Juror Number 1; even though Mr. Lamb stated he thought number 2 (Schlaeger) was going to be seated as Juror Number 1. **When the court asked "You want one?", there is no way to know if the court meant do you want a preemptory [to Comeford] or do you want Juror No. 1 [Merrick].** The failure of the Court to use juror's names to identify which juror the Court was asking Mr. Lamb if he wanted to withdraw a preemptory to was inappropriate and prevented the defendant from having a jury of his choosing, in violation of his constitutional right.

The defendant refers to *People v. Hecker*, 15 N.Y.3d 625 (N.Y. 2010), in which this Court identified that "peremptory challenges are a mainstay in a litigant's strategic arsenal." As such, the attendance of a defense attorney during the selection process of prospective jurors, which allows him to **identify** each juror according to the seat he or she is occupying, and thereby allowing him to prepare himself for further questioning of said jurors for the challenge process; **is crucial**. If an attorney is not present at this vital stage, how can he be expected to adequately and effectively question and challenge said jurors later in the proceedings? It is for this reason that Mr. Lamb's absence at this stage of the proceeding cannot be deemed tantamount to "a scheduling matter."

The People alleged that Mr. Lamb's absence during jury selection, when prospective juror's names are selected prior to questioning, is of no moment; as the defendant has not provided any authority showing that counsel must be present. The People quote *People v. Carr*, 2015 WL 1470482 (April 2nd, 2015), in support of this claim, stating that jury selection is ministerial and tantamount to "a scheduling matter." This position is unsupported and meritless, based on the facts and circumstances of the defendant's individual case.

Given the deficiencies in the position taken by the People, which is based on their unsubstantiated interpretation of the record, this court should find that counsel's unexplained absence during jury selection, a non-ministerial portion of trial, deprived defendant of his right to counsel. This is a non-waivable constitutional right and a mode of proceeding error not subject to harmless error review, and requires a reversal as a matter of law. Alternatively, the defendant asks this Court to hold that the erroneous denial of a peremptory challenge violates CPL 270.25 (2) and requires reversal without regard to harmless error (see *People v. Payne*, 88 N.Y.2d 172, 186). Finally, the failure to enforce the preemptory challenge to Mr. Merrick denied the defendant a trial by a "Particular Jury Chosen According To Law, In Whose Selection He Had A Voice", N.Y. Const., Art 1, § 2.

**II.      Contrary to the People's Position, Mr. Beckett Was Improperly Discharged From Jury Service, and the Erroneous Ruling of the Trial Judge Was Preserved For This Court's Review Because The Defendant Cannot Waive His Constitutional Right To Trial By A "Particular Jury Chosen According To Law, In Whose Selection He Had A Voice", N.Y. Const., Art 1, § 2**

The defendant raised this point in Point 1, Sub-Point I, C and D of his supplemental pro-se brief (Appendix L, Pgs 12-19), and will show this Court why this issue is preserved as a Matter of Law and is deserving of this Court to grant Leave to Appeal.

The People mistakenly identified Mr. Merrick as properly discharged from jury service,

when in fact the subject was Mr. Beckett, as I properly identified him in my Pro-Se Supplemental Brief (Def. Supp. Brief at 12-16).

*Arguendo*, assuming the People are talking about Mr. Beckett, the fact that he possibly overheard a conversation between Mr. Lamb and a correction officer **after** he was selected to be a sworn juror at trial, but **before** he was sworn in, **does not** make it a technical deviation that did not prejudice the defendant in any way, **under the facts and circumstance of this case**.

In the People's response to my supplemental pro-se brief, they relied on *People v. Morales*, 168 A.D.2d 85, 89 (2nd Dept. 1991), stating that "[A] delay in swearing in a jury is merely a technical deviation and not per se reversible error", but omit the statement by Justice Balletta, which states, "[w]e find that the delay in swearing in the jury was harmless **under the circumstances of the case**" (emphasis added) (id. at 87).

The following facts in *Morales* distinguish it and make in inapplicable to the defendants case. Justice Balletta summarizes, stating that

> "[t]he jury was sworn prior to deliberations, the defendant has not indicated in what manner he may have been prejudiced by the delay, and there is no suggestion that the jurors disregarded their obligations. **Under these circumstances**, the delay in swearing in the jury was no more than a technical deviation and does not require reversal. In light of the overwhelming evidence of the defendant's guilt, the delay in swearing in the jury constituted harmless error) (emphasis added) (id. at 89).

In the instant case, as defendant had 11 felony charges (over 40%) dismissed for lack of evidence before trial court, and was found not guilty of 8 felony charges (over 30%), this clearly was not a case of overwhelming evidence. I will show not only that the People's argument in the Appellate Courts was flawed, but the Appellate Court erred as a matter of law in describing this ground as unpreserved, and explain in detail the prejudice caused by the delay, which ensued on multiple levels.

First, C.P.L. § 270.15 (4) was not meant to offer a way to circumvent the requirements of 270.15 (2) that a juror selected for service immediately be sworn. Subdivision 4 clearly states, "A challenge for cause of a **prospective juror** which is not made before he is sworn as a trial juror shall be deemed to have been waived, except that such a challenge based upon a **ground not known to the challenging party** at that time may be made at any time before a witness is sworn at trial." [Emphasis Added] In this case, as the People highlight ("A person [Mr. Beckett] was dismissed for cause based upon a conversation we couldn't know anything about outside." [J.S. Tr. Pg. 484 at ¶ 1-3]), **no cause or ground** was determined to challenge Mr. Beckett who allegedly overheard a conversation, when he was selected for service and not sworn because of an error on the part of the trial judge to immediately swear the juror once selected for service, as the statutory provision of subdivision 2 provides. This error cannot serve to bypass the defendant's constitutional right to a jury of his choosing, **without the requisite inquiry to determine if he could perform his duty as a juror**. This *changes* the statutory requirements for removal of a juror chosen by the defendant, as is conferred by his constitutional right to a jury of his choosing, to the more stringent application as provided in subdivision 3 that **ONLY** allows dismissal of a sworn juror only for reasons of **illness or incapacity**, or to §270.35 (1) or (2)(a).

Furthermore, the People's reliance on *People v. Jamerson*, 99 A.D.2d 816 (2nd Dept. 1984) and *People v. Sanchez*, 123 A.D.3d 624 (1st Dept 2014), in support of their argument is misplaced and was presented to the Appellate Court out of context. *Jamerson* involves a case where no mitigating circumstances occurred before the trial jurors were sworn, and none of them was discharged erroneously. *Sanchez* involves the discharge of a juror whose transportation problem would have delayed trial a day or two, and thus applying the 2-hour rule.

The People went further to state that because he was not a sworn juror, CPL §

270.35(2)(a) does not apply, which would require a "reasonably thorough inquiry" before discharging Mr. Beckett. This position has no basis in fact and is pure speculation, especially considering that Mr. Beckett was improperly allowed to go to the jury room with the sworn jurors after hearing a conversation that the court deemed was prejudicial enough to dismiss this juror for cause without any inquiry into what, **if anything**, he heard and **without a ground not known to the challenging party** as required by CPL § 270.15 (4). This was also in violation of C.P.L. § 270.15 (3), which provides in relevant part that

> In the court's discretion, sworn jurors who are removed from the jury box as provided herein may be seated elsewhere in the courtroom separate and apart from the unsworn members of the panel or may be removed to the jury room or be allowed to leave the courthouse. [Emphasis Added]

This statutory provision commands that, in the court's discretion, unsworn jurors should **NOT** be seated with sworn jurors in the courtroom, so it is especially true that unsworn jurors should **NOT** be seated with sworn jurors in the jury room. Yet, this is what happened in this case. I would like this Honorable Court to take judicial notice of the fact that the People never refuted that these two selected but unsworn jurors joined the sworn jurors in the jury room after one of them admittedly overheard a conversation. To reiterate, ADA Katchen later in the proceedings that day, during a disagreement concerning prospective juror Mr. Balaj, states "A person [Mr. Beckett] was dismissed for cause based upon a conversation we couldn't know anything about outside." (J.S. Tr. Pg. 484 at ¶ 1-3)

Assuming, but in no way conceding, the People's position in the Second Department, Appellate Division, that the failure of my trial lawyer to object makes this issue unpreserved, the defendant respectfully disagrees. The defendant cannot waive his constitutional right to a trial by a "particular jury chosen according to law, in whose selection I had a voice", N.Y. Const., Art 1, § 2. Mr. Beckett, regardless of whether or not he was sworn, was selected by me to be a trial

juror in my case. Judge Rooney did not attempt to ascertain whether or not Mr. Beckett actually

heard anything, or based on what if anything he heard; could still render an impartial verdict

based on the evidence free from bias in this case, before allowing him to be challenged for cause,

in violation of CPL § 270.15 (4).

ADA Katchen himself highlights the fact that this juror was allowed to be excused for

cause **for no reason** known to anyone. As such, it was an abuse of discretion for the Honorable

Judge Rooney to ask Mr. Lamb, "Your application is what?" and to allow him to challenge him

for cause without attempting to ascertain whether Mr. Beckett actually heard anything.

Finally, this error is compounded because we do not know what Mr. Beckett heard, **_and_**

**_the court's failure to inquire leaves open the question_**, "**Did he repeat any of this overheard**

**conversation with the sworn jurors when Mr. Beckett was improperly allowed to join them**

**in the jury room in violation of C.P.L. § 270.15 (3)?**" Fundamental to our constitutional

heritage is an accused's right to trial by an impartial jury (N.Y. Const., Art. I, § 2; U.S. Const.

6th, 14th Amends).

**III.   The People Conceded that Juror Buonincontro Requested to Be Dismissed
From Jury Service, and the Court Abused It's Discretion By Failing to
Follow the Statutory Guidelines in C.P.L. § 270.35, Which It Followed, in
Part, for Juror Pereyra**

The defendant raised this point in Point 1, Sub-Point I, E of his supplemental pro-se brief

(Appendix L, Pgs 19-22), and will show this Court why this issue is preserved as a Matter of

Law and is deserving of this Court to grant Leave to Appeal.

The People contended that, "The court properly required Juror Buonincontro to continue

to serve on the jury notwithstanding its dismissal of Juror Pereyra" (Resp. Supp. Brief at 13), and

also argued that, "nothing Buonincontro said in any way suggested that she would be incapable

of rendering an impartial verdict or that she was otherwise unfit to serve" (Resp. Supp. Brief at 14) (internal quotation marks omitted). Finally, the People also argued that her bare complaint of nervousness at the prospect of serving, without any explanation of how it might have affected her ability to be fair and impartial, did not render her grossly unqualified.

The trial court applied a different standard to Juror Pereyra, **who when asked a single question** clearly and calmly expressed his "professional and financial" sacrifices, allegedly causing him "to suffer something akin to disabling anxiety" (Resp. Supp. Brief at 14-15), to that of Juror # 12, whose feelings of nervousness, causing her to have physical "**shaking**" so bad that she was unable to explain why she did not want to be on the jury **when asked a single question** (Resp. Supp. Brief at 12).

Voir dire revealed that Juror Buonincontro was a single woman living at home with Mom, who was just changed from Alternate Juror #1 to Juror # 12. Considering that this was an emotionally charged rape case, **her inability to express herself clearly**, and **her nervousness and her physical shaking**; *all cry out* for an inquiry into why she was feeling this way.

On the first day of trial, Judge Rooney stated, "...we will have to talk to Juror # 12, she told the sergeant that **she wants out**. I have **no idea** what that's about" (Tr. Pg. 11 at ¶ 6-8). *This shows Judge Rooney and my attorney had actual knowledge she no longer wanted to be a juror*, with Judge Rooney admitting "**I have no idea what that's about**", and Judge Rooney still failed to uphold his Judicial and Statutory duty to do a **probing and tactful inquiry** into the *reason*, **not symptoms**, of why she was feeling that way. Juror #12 is then brought into the courtroom.

> Court Officer: "Juror # 12 entering."
> The Court: "She can have a seat. Any seat is good. This is Juror # 12 counselors. I'm told you want to speak to us. What is on your mind?"
> Juror # 12: "I don't know. I just - - I didn't feel right this morning when I came in. I felt very nervous and just, like, my hands were shaking, **and I just didn't feel like I should be, like, part of this**. I don't know. I didn't feel right."

➤ The Court: "Counselors, do you want to step up."
➤ (Whereupon, an off the record discussion was held at the bench)
➤ The Court: "We have talked about this, Miss Buonincontro. It is not at all unusual for people to get nervous. It happens. A lot of jurors are nervous, a lot of lawyers are nervous, I get nervous; it's part of the trial process."
➤ (Continued): "At this point what I want to say to you, this is not enough for me to excuse you from this matter. You are a sworn juror and once you're sworn you go into a category, and it's hard for me to let you go without a much better **reason**."
➤ (Continued): "What I'm going to say to you is this, the lawyers and I discussed this we are going to ask you to stay with us; we are going to start the trial and proceed."
➤ (Continued): "If as the trial unfolds your mindset becomes such that you want to talk to us again, tell the officers and we will speak to you again. And please don't discuss this discussion with the other jurors. Thank you very much."
➤ (Continued): "And we are going to send an officer in with you to tell the other jurors we're going to be about 20 minutes before we get started. Thank you."
➤ (Whereupon, Juror # 12 exits the courtroom)
➤ The Court: "For the record, that juror has left. We had our bench conference off the record. Counselors, did I say what you agreed that I should say?"
➤ Mr. Lamb: "Yes."
➤ Mr. Katchen: "Yes."
➤ The Court: "So that's satisfactory at this point?"
➤ Mr. Lamb: "It is to the defense."
➤ Mr. Katchen: "To the People also." (Exhibit "G", Trial, Day 1, Pg. 12 at ¶ 7-25, Pg. 13 at ¶ 1-25, Pg. 14 at ¶ 1-2)

The People ignored the purpose of this Courts holding in *People v. Buford*, 69 N.Y.2d 290, 299 (1987) (citing CPL § 270.35), which states:

> While these and other decisions are of some guidance, each case must be evaluated on its **unique facts** to determine whether a particular juror must be disqualified under CPL 270.35. **In reaching its conclusion,** the trial court **must** question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant. Counsel should be permitted to participate if they desire. In a **probing and tactful inquiry,** the court should evaluate the nature of what the juror has seen, heard or acquired knowledge of, and assess its importance and its bearing on the case. In this context, the court should carefully consider the juror's answer and demeanor **to ascertain whether her state of mind will affect her deliberations**. The trial court's ruling should be placed on the record. **In concluding that a juror is grossly unqualified, the court may not speculate as to partial partiality of the juror based on her equivocal responses**. Instead, it must be convinced that the juror's knowledge will prevent her from rendering an impartial verdict. [Emphasis Added]

The Trial Court should not have reach its conclusion without following the steps outlined in *Buford*, which flies in the face of common sense and completely defeats the statutory purpose of CPL § 270.35. The *Buford* Court clearly stated, "**In reaching its conclusion**, the trial court **must** question each allegedly unqualified juror … **in a probing and tactful inquiry**…" Using the word **must** mandates the court should perform this inquiry, and as such no objection is required for the courts failure to perform its duty. The failure of trial counsel Eugene Lamb to advocate for his client and object was an egregious error, and ineffective assistance of counsel..

Furthermore, Juror Buonincontro made far more then a bare complaint of nervousness, but in fact told the Judge that "I felt very nervous and just, like, **my hands were shaking**, and I just didn't feel like I should be, like, part of this." This clearly suggested, **at a minimum**, that further inquiry was required (Tr. Pg. 12 at ¶ 7-25, Pg. 13 at ¶ 1-25, Pg. 14 at ¶ 1-2).

I would like this Honorable court to consider the trial court's treatment of Juror Pereyra:

- ❖ The Court: "Grossly unqualified is the standard for a sworn juror. You think he is grossly unqualified for reasons we didn't know when he was selected?"
- ❖ Mr. Lamb: "I believe so."
- ❖ Mr. Katchen: "I do as well."
- ❖ The Court: "**Mr. Rucano, this is a sworn juror so I'd like to get your - - I guess the People and Mr. Lamb are consenting to excuse this juror**?
- ❖ Mr. Lamb: "Yes."
- ❖ Mr. Katchen: "Yes."
- ❖ The Court: "**Since he is sworn it's up to him, Mr. Rucano?**"
- ❖ Defendant: "I will agree with my lawyer." (J.S. Tr., Pg. 409 at ¶ 1-25, Pg. 410 at ¶ 1-3)[7]

**I was afforded the opportunity to exercise my right to participate in the decision of removing this sworn juror by the trial court with no prompting by trial counsel**. This juror, **upon a single question by the Court**, admitted he was a functioning director of operation and stated he was "anxious" and "stressed out", and had panic attacks in the past.

But in Juror No. 12's case, a completely opposite ruling for the same "anxious" and

---

[7] This refers to Page Number of Jury Selection Transcripts, followed by Paragraph Numbers.

"stressed out" feelings, expressed as "nervous", "don't feel right" and "hands are shaking" is made by the Court. The circumstances between Juror No. 4 and Juror No. 12 are analogous, yet the Trial Court denied me the opportunity to participate in the decision to remove this sworn juror, a single woman living at home with Mom **without ascertaining the reasons she was feeling this way**, all because she did not explain the reasons why when asked a single question.

Juror # 4 made a statement as to **why, when asked a single question,** he was worried about work, and admitted he was a functioning person; but in the case of both Juror #4 and Juror #12, a **probing** and **tactful** inquiry was not performed. The record reveals that in the case of Juror # 12, **only the symptoms**, and **not the cause**, was revealed.

In making such a determination "the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys **and defendant**" [Emphasis Added] (conducting "a 'probing and tactful inquiry' into the 'unique facts' of each case including a careful consideration of the juror's 'answers and demeanor.'" (*People v. Rodriguez,* 71 N.Y.2d 214, 219). "The trial court's reasons for the ruling should be placed on the record [and] the court may not speculate as to possible partiality of the juror." (*People v. Buford,* 69 N.Y.2d at 299; *see People v. Rodriguez,* 71 N.Y.2d at 219; *People v. Whyte,* 282 A.D.2d 629, 630).

Quoting, *People v. Porter,* 77 A.D.3d 771 (2nd Dept. 2010)

"The Supreme Court improvidently exercised it's discretion in discharging a sworn juror without first conducting "a reasonably thorough **inquiry** and **recitation** on the record of the **facts** and **reasons** for invoking the statutory authorization of discharging and replacing [the] juror based on continued unavailability" [Emphasis Added] (*People v. Page,* 72 N.Y. 2d 69, 73; CPL 270.35). The trial court's failure to conduct to requisite **inquiry** constitutes error as a matter of law and is not subject to harmless error analysis (*see, People v. Davis,* 178 A.D.2d 424, 425).

**The opposite is also true in these circumstances**. When a juror expresses a reluctance to continue to serve as a sworn juror based on unknown factors like Juror # 12 expressed, the same rules apply in order for a Judge to determine if this juror should be kept as a sworn juror. Holding this as true, "The trial court improperly discharged a sworn juror without conducting a sufficient investigation into the juror's unavailability to continue serving. In determining whether discharge of a juror is warranted based on illness, incapacity or unavailability, the court is required to make a 'reasonably thorough inquiry' into the **juror's circumstances** [Emphasis Added] (CPL 270.35 [2] [a]; *see People v. Mebane*, 70 A.D.3d 724, 725). The court's failure to conduct such an inquiry constitutes **error as a matter of law and is not subject to harmless error analysis**" [Emphasis Added] (*see People v. Guerrero*, 221 A.D.2d 465, 466; *People v. Dunn*, 196 A.D.2d 689, 689; *People v. Davis*, 178 A.D.2d 424, 425).

*Quoting, People v. Engstrom, 86 A.D.3d 580* (2nd Dept 2011)

As in *Engstrom,* the record does not establish that the court made the requisite inquiry of Ms. Buonincontro and the circumstances revolving around her **nervousness, hands shaking** and expression that *she no longer wanted to be a part of the trial*. **The defendant alleges that this Juror was the subject of sexual abuse in the past and did not reveal this during voir dire, hence the reason for the "hands shaking" and "feeling like I should not be a part of this."** The trial court never determined the reason why, failed to record it on the record and the court never asked Juror No. 12 if she could render a fair and impartial verdict free from bias on the evidence. **Instead, the court purely speculated that she could remain impartial**.

The failure of the trial court to do a probing and tactful inquiry, in fact, to do any type of inquiry at all; resulted in the trial court making a "determination that the juror was not grossly unqualified to serve [that] was **based on speculation** (*see generally People v. Whyte*, 282

A.D.2d 629; *People v. Ruggiero*, 279 A.D.2d 538; *People v. Dotson*, 248 A.D.2d 1004; *People v. Levy*, 213 A.D.2d 427; *People v. Vinson*, 143 A.D.2d 702, 703). Additionally, the Supreme Court erred in failing to place the reasons for its ruling on the record. (*see People v. Buford*, 69 N.Y.2d at 299). <u>As the error is not subject to harmless error analysis, the conviction must be reversed</u> (*see People v. Anderson*, 70 N.Y.2d 729, 730; *People v. Levy*, 213 A.D.2d at 428; *People v. Jones*, 210 A.D.2d 430, 431; *People v. Valesquez*, 167 A.D.2d 364, 365).

Quoting *People v. Porter*, 77 A.D.3d 771 (2nd Dept. 2010)

The trial court failed to perform its statutory duty and purely speculated Juror # 12 could be impartial, violating the defendants State Constitutional right to a far and impartial jury. This should result in a reversal and a new trial.

## IV.    The Cumulative Effect of Defense Counsels Failure During Jury Selection and Trial, Permeated and Undermined the Proper Functioning of the Adversarial Process

Counsels numerous blunders permeated every aspect of the case and require reversal of the Judgment of Conviction and a new trial. Under either New York's "meaningful representation" standard, <u>Baldi</u>, supra, or the Federal <u>Strickland</u> standard, supra; Counsel's incompetence undermined the functioning of the adversarial process, and a reversal is required.

Although there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, "the court must keep in mind" that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." See: <u>Strickland</u>, 466 US at 689, 696; also see: <u>People v. Baldi</u>, supra, 54 NY2d 556. My conviction is a perfect example of a weakly supported record where harmless error does not apply, was obtained in violation of due process of the law. It is for these reasons that this Court should grant leave to appeal.

·Under Strickland and it progeny, I must demonstrate two things: First, that my counsel's performance was deficient. And second, that I was prejudiced by counsel's performance. In order to demonstrate prejudice under the Strickland standard, I must show a reasonable probability that my counsel's errors affected the outcome of the trial (see Strickland v. Washington, 466 US at 686). But just what is a "reasonable probability"?

In Kyles v. Whitley, 514 US 419, 434 (1995), the United States Supreme Court explained that the "reasonable probability"[3] standard is met when the errors of trial counsel undermine "the confidence in the outcome of trial." The Kyles court further stated that the reasonable probability standard does not require demonstration by a preponderance of the evidence that counsel's errors "would have resulted ultimately in [my] acquittal" or that after discounting [errors of counsel], "there would not have been enough left to convict" (id. at 434-435).

Therefore, I need not show that I would have been acquitted or that I would have been entitled to judgment as a matter of law had my counsel not erred. Rather, I only·need show that counsel's performance undermines confidence in the verdict when considered as part of the whole case (id.). And as this determination may be made with the benefit of hindsight (see Lockhart v. Fretwell, 506 US 364, 372 [1993]), the touchstone of the prejudice prong is whether counsel's performance rendered the proceeding fundamentally unfair or left an unreliable result (id. at 369, 370).

The New York Standard under Baldi, which demands that criminal defense attorneys provide "meaningful representation," is supposed to be a more "flexible standard" than

---

[3] The district attorney may argue that because the Kyles decision·dealt with Brady issues, it is not applicable to ineffective assistance of counsel claims for analyzing prejudice. But such an argument would be horribly misleading as the Kyles decision specifically noted that the "reasonable probability" standard applicable to Brady violation analysis is identical to the reasonable probability analysis of the prejudice prong in ineffective assistance of counsel claims (see Kyles v. Whitley, 514 US at 433-434).

Strickland (see People v. Murray, 300 AD2d 819, 821 [3rd Dept. 2003]). New York courts have

never applied the ineffective assistance test "with such stringency as to require a defendant to

show that, but for counsel's ineffectiveness, the outcome would probably have been different"

(see People v. Stultz, 2 NY3d 277, 283 [2004]). Prejudice, under New York law, is "a significant

but not indispensable element in assessing meaningful representation" with the court's focus

being "on the fairness of the proceedings as a whole" (id. at 284) (emphasis added). Thus, a

defendant may obtain relief for ineffective assistance of counsel under the New York

Constitution even if he cannot demonstrate sufficient prejudice to meet the federal standard.

The reverse, however, is not true. If an attorney commits a single error that rises to the

level of prejudice specified by Strickland, then the defendant has been deprived of his Sixth

Amendment rights even if that attorney's representation was "competent in all other respects"

(see Henry v. Poole, 409 F3d 48, 61 [2nd Cir. 2005]). In Rosario v. Ercole, 601 F3d 118 (2nd Cir.

2010), the Second Circuit further explored the interplay between the New York State ineffective

assistance standard and Strickland. The majority opinion included, inter alia, the following:

> [The New York] approach … creates a danger that some court might misunderstand the
> New York standard and look past a prejudicial error as long as counsel conducted himself
> in a way that bespoke of general competency through the trial. That would produce an
> absurd result inconsistent with … the mandates of Strickland.

As a result of this recognized danger, the Second Circuit has strongly urged state courts

to analyze ineffective assistance claims under both the state and federal standards when both are

invoked (see Rosario v. Ercole, 617 F3d 683, 685, 687-688 [2nd Cir. 2010]).

Considering the above, under both the New York and Federal standards, an attorney who

ignores a "clear-cut and completely dispositive" issue – i.e. a "winning argument" that cannot

reasonably be thought not worth raising has plainly provided ineffective assistance (see People v. Turner, 5 NY3d 476, 481 [2008]).

I.     **The Cumulative Effect of Defense Counsels Failure During Jury Selection Resulted in His Failures and Undermined the Proper Functioning of the Adversarial Process**

Counsels numerous blunders permeated every aspect of the case and require reversal of the Judgment of Conviction, dismissal of the indictment and a new trial. Under either New York's "meaningful representation" standard, Baldi, supra, or the Federal Strickland standard, supra; Counsel's poor preparation and incompetence so undermined the proper functioning of the adversarial process that reversal is required.

Mr. Lamb had a duty to bring skill and knowledge to render the trial a reliable adversarial testing, but he breached his duty and caused a complete breakdown and the inability to effectuate a viable defense strategy.

Ineffective assistance may be demonstrated where counsel performs competently in some respects, but not in others. See: Eze v. Senkowski, 321 F3d 110, *3 (2nd Cir. 2003). Although there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, "the court must keep in mind" that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." See: Strickland, 466 US at 689, 696; also see: People v. Baldi, supra, 54 NY2d 556. My conviction, obtained in violation of due process of the law, must be reversed and a new trial ordered.

## Section 4

Arguments of Fact and Law For Leave To Appeal Denial of Writ of Error Coram Nobis

Presented in this final Section Are the Facts and Law Submitted In My Application For Leave To Appeal The Denial of my Writ of Error Coram Nobis To The N.Y. State Court of Appeals, thereby exhausting these claims, I Argued that together with my Supplemental Affidavit and Memorandum of Law That I submitted with my Writ of Error Coram Nobis, I was Prevented From Having The Totality of my Ineffective Assistance of Trial Counsel Claims Heard In The Appropriate Venue with Assigned Counsel, My Leave Application stated in conclusion that " Appellant seeks Leave To Appeal on All Aspects of his claims, including... Federal Constitutional claims based on the Sixth and Fourteenth Amendments to the United States Constitution..."

Point 2 in this Section Argues how Contractual and Financial Constraints of Appellate Advocates, in a contract with the City of New York to Provide Appellate Representation to a large Population of indigent NYC residents, Results in Representation that Fails To " Fully And Competently" represent its clients. I highlighted how 1 in 3 briefs submitted by then each Year (between 110-120) has more than 50% of their Points raised unPreserved for Appellate review. This was submitted in August 2017. Within the next 3-6 months, Attorney in Charge Lynn Fahey is no longer employed by Appellate Advocates. I have contacted various attorneys to Prepare A class Action lawsuit for Breach of Contract.

This Section concludes this Amended and Supplemental Memorandum of Law in Support of Petition For Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. God Bless The Court

Point I

The Facts And Law Submitted In My Application For Coram Nobis Relief And Supplemental Application To Expand The Record Show That I Was Prevented From Having The Totality of My Ineffective Assistance of Trial Counsel Claims Heard In The Appropriate Venue With Assigned Counsel, As Held In People v. Evans, Supra

I submitted a leave application to this Court on Second Departments May 19th 2014 Order denying motion to Withdraw Appellate Counsels brief (Jan. 26th 2016), which was denied. These issues Are Presented Again in a different context And show the Second Department erroneously denied motion for Coram Nobis relief, And explain the Prejudice I suffered.

A. Supplemental Application For Coram Nobis Relief and To Expand The Record Forms The Foundation of Appellate Counsels Failures

The Supplemental Memorandum of Law To Expand the Record Presents A coherent and well defined summary of how, in the narrowly defined And unique facts and circumstances of my case, I have received multiple erroneous and contradictory decisions by the trial court [7] And the Second Department on the identical "mixed claims" of IATC Presented to each court. Despite the numerous steps I took Preemptively in an effort to have my claims Presented with the help of Assigned counsel in the Second Department, so that the totality of these claims would be heard in the Appropriate forum designated by this Court in People v. Evans, supra; the Second Department constructively Prevented me from doing so at every Procedural Point in my Appeal Process in which it could have granted relief. This was compounded by the Second Departments failure to explain its denial in a memoranda decision at every turn (see Exhibit "3-C" Second Dept's May 19th 2014 Order denying my Motion to Withdraw Appellate Counsels brief; see Also Exhibit "3-B", denying Coram Nobis relief on April 12th 2017) (Summarized in Supp. Mem. at Pgs. 11-15) [9]

Moving the Majority of ineffective Assistance of trial counsel claims (dehors the record And mixed claims) outside the direct Appeal Process, during the only time a defendant is Provided with Assigned counsel, runs afoul of due Process, equal Protection

[7] See Exhibit "3-A", trial courts Dec. 16th 2014 decision on Article 440 alleging grand Jury misconduct, submitted during Eric Garner chokehold case, which Put national spotlight on the Richmond County Grand Jurys failure to indict Police officer; and recusal of Judge Rooney.

[8] See Exhibit "3-B", Second Dept's April 12th 2017 Order denying Error Coram Nobis relief

[9] "Supp. Mem." refers to Supplemental Memorandum of Law in Support of Coram Nobis relief And to Expand the Record, Provided As Part of the record to this Court

And the Supremacy clause [10] and constructively prevented me from vindicating my state and federal IATC claims under the "representation as a whole" and "in totality" standard (Supp. Mem. at Pgs. 5-16).

The facts and arguments of law in my Supplemental Application to Expand the Record focused on why expansion of the record was necessary, along with a hearing directing appellate counsel to provide answers about his strategic and tactical decisions when developing my brief; because this was the only relief possible at that procedural point in my appeal. This limited option would have omitted dehor the record and non-record based portions of mixed claims, but would have provided an expanded ability to present a larger majority of record based IATC claims in the context of appellate counsels errors of omission and commission.

I ask this Court to consider my argument that the state practiced "Baldi" standard of "representation as a whole" and "in totality" is impossible for me to reach in the narrowly defined and unique facts and circumstances of my case within the current convoluted procedural and statutory scheme in this state (Supp. Mem. at Pgs. 15-17).

Looking in the direction the Supreme Court has led us in deciding Martinez v. Ryan, 132 S. Ct. 1309 (2012), and in its narrow refinement found in Trevino v. Thaler, 133 S. Ct 1911 (2013), especially when considering that the application of laws in Texas found in Trevino are equally applicable to the law in New York State (Supp. Mem. at Pgs. 17-20), this court is looking squarely in the face of a meritorious challenge to the constitutionality of the convoluted procedural scheme in this state via the Federal Abeyancy Doctrine (Supp. Mem. at Pgs 20-22).

Considering the numerous attempts made to inform the Second Department about trial counsels errors of omission and commission, and appellate counsels failure to assemble a complete record, investigate and raise all claims of ineffective assistance of trial counsel in the proper forum with the help of assigned counsel, the Second Departments failure to render a memoranda decision on the totality of my record based claims presented in my Coram Nobis Application, on their individual merits, was erroneous.

This is especially so when considering the Second Departments denial of leave to appeal my Article 440, where I argued I was erroneously denied a hearing on "mixed claims", because the Second Departments denial constituted an agreement with the trial courts procedural bar pursuant to C.P.L. § 440.10(2)(b) that said claims should have been raised on direct appeal which was still pending. So, when I presented these very same claims submitted in my Article 440 to the Second Department in the context of appellate counsels failure to raise those claims in my Coram Nobis Application, they contradicted their denial of leave decision on my Article 440 and constructively prevented me from having these claims heard in any Court of this State.

10 Especially when trial counsel consists of underpaid, inexperienced trial counsels who are appointed by the State and have not received a raise since 2003 ($75 an hour) (See Appendix, Item "B": Motion to Withdraw Appellate Counsels Brief at Pgs. 45-73, providing detailed support of the deficiencies in the Assigned Counsel Plan).

242

B. The Claims of Prosecutorial Misconduct And Ineffective Assistance Of Trial Counsel
Present In My Coram Nobis Application, Viewed In The Context of Appellate Counsels
Failure to Assemble And Investigate A Complete Record On Appeal, Described IN MY
Pro-Se Applications, Rendered Appellate Counsel Woefully Ineffective

In opposition to my Article 440 motion (Exhibit "3-D-P"), the Richmond County District Attorney
("Prosecutor") Said that my Allegations of IATC And Prosecutorial Misconduct At the Grand Jury
And Trial were Mostly record based, And specifically stated that:

The bulk of defendants particular claims of ineffective trial counsel And Prosecutorial
misconduct Are entirely record-based, He Also Raises eight Particular claims of ineffec-
tive representations by his trial counsel, Eugene Lamb ESq, which Are derows the record
(Exhibit "3-D-P," PFS. 3-4)

The Prosecutor went on to state on as to State that Mr. Lamb Failed to review or investigate the
Minutes of the Grand Jury Proceedings, which Prevented counsel from challenging various Acts of
Prosecutorial misconduct during these Proceedings, And failure to review And investigate
other claims. In fact, trial counsels errors of omission And commission, expert witness
Reports, DD-5 reports And Pre-trial transcripts were All inoxicably intertwined with the bulk
of my claims that the Prosecutor held were entirely record based, And as such were "mixed"
claims," Properly Raised in An Article 440 (People v. Evans, SofIN). This would render the Procedural
bar found in my Article 440 decision erroneous," The Facts above Are important for this Court
to consider, As it Provides the necessary context in which to view the following Arguments,
Taking the Position that the Prosecutor, Trial court And Second Department, who denied my
Leave to Appeal on Article 440 motion, were All correct And the "bulk of defendants claims
of ineffective Trial counsel And Prosecutorial misconduct [at the grand Jury And Trial] Are
entirely record-based," consider the following:

Appellate counsel failed to include the Grand Jury Transcripts, Arraignment And 180-80 day
Transcripts, And Pre-Trial Transcripts on 3 other dates (Appendix, Items "D,E,G, H, I And K,")
As Part of the record on Appeal before filing his brief, even thoughh I specifically told him
of their relevance And imPortance to my defense, As such, his failure to Raise ANY of the
Prosecutorial misconduct claims occurrin At the Grand Jury And Trial was inexcusable.
Furthermore, As he out Raised 3 claims of IATC And 2 were found to be unPreserved
for Appellate review (Exhibit "3-E"), when I was able to identify And Present 14 claims
of IATC in my Coram Nobis Application, with the majority of them having record based
support. Now can Appellate counsel not be deemed ineffective? Below You will find A
brief synopsis of claims Available to Raise by Appellate counsel.

Numerous claims of Prosecutorial misconduct And Ineffective Assistance of Trial Counsel
involve Grand Jury violations APParent from the record, They include Violations of my right to testify?

243

(Aff. At ¶¶ 37-38, 111-124, Mem. At ¶¶ 28-34)," irregularities with the Grand Jury Notice (Aff. At ¶ 39-44), ADA Katchen becoming an answering witness (Mem. At ¶¶ 14-17), the use of non-verbal cues and leading questions (Aff. At ¶ 49-60, Mem. At ¶¶ 17-20), And ADA Katchen's deception of the Grand Jurors into believing the complainant had an independent recollection of events when she actually read from a diary while testifying, violating the rules of past recollection recorded (Mem. At ¶¶ 20-22), the hearsay rule forbade the use of the diary as a bolstering statement or as truth of the matter asserted, As the complainant had significant cause, reason and purpose to deviate from the truth (Mem. At ¶¶ 22-23), And the resulting prejudice occurring. Allowed ADA Katchen to usurp the Grand Jury's fact finding process by allowing incompetent and inadmissible evidence before the Grand Jury (Mem. At ¶¶ 25-28).

Claims of retroactive misjoinder and prejudicial spillover (Aff. At ¶¶ 190-194, Mem. At ¶¶ 76-81) are directly related to ADA Katchen overcharging me at the Grand Jury by stacking the deck (Mem. At ¶¶ 23-25). This finds merit in the fact that 11 of 19 felony charges found guilt in the diary were dismissed during the charge conference because the complainant could not read from the diary during trial like she was allowed to do at the Grand Jury. This is apparent when comparing her Grand Jury testimony to the diary, which trial counsel never challenged with experts (Aff. At ¶¶ 185-189, Mem. At ¶¶ 57-60).

The 8,100,000 question this Court should ask is "How did these 11 of 19 dismissed felonies that failed to make a prima facie showing at trial, meet that same standard at the Grand Jury?" The answer is clear, the Prosecutorial misconduct that Allowed the complainant to read from the diary at the Grand Jury could not be repeated at trial. Trial counsels failure to submit a motion pursuant to CPL § 210.35(5) to dismiss the indictment on the issues described herein reveal the severity of trial counsels ineffectiveness And severly crippled my defense. Appellate counsels failure to raise these claims is directly linked to his failure to assemble a complete record on appeal. And to then investigate, discover and raise all claims of IATC, And was compounded when he distributed w/ direct notice of these claims to his office, discussed in subsection II below. Claims solely comprised of IATC include the failure to review complainant's medical records (Aff. At ¶¶ 103-107, Mem. At ¶¶ 50-51), DD5 reports of detective Wasson (Aff. At ¶ 108-112, Mem. At ¶ 51), voice mail recordings (Aff. At ¶¶ 111-118, Mem. At ¶¶ 51-53), Failure to subpoena Emails sent to complainant (Aff. At ¶¶ 125-132, Mem. At ¶¶ 53-54), And Failure to raise lack of prompt outcry to Dr. Raveen (Aff. At ¶¶ 133-135, Mem. at ¶¶ 55-56), And the law concerning prompt outcry As it related to session notes of Licensed Clinical Social worker Aliana Lorusso-Marenco (Aff. At ¶¶ 92-96, 129, 178-179, Mem. at ¶¶ 54-55). These errors culminated in trial counsels failure to effectively cross-examine using these impeachment facts (Aff. At ¶¶ 150-157, 171-180, Mem. At ¶¶ 60-67).

1 "Aff." refers to Affidavit in Support of Writ of Error Coram Nobis, and "Mem." refers to the Memorandum of Law in Support of Writ of Error Coram Nobis.

By far, trial counsels most critical failures revolved around his handling of a jury note that requested a readback of testimony from Prosecution witness, Ms. Mach, Trial counsel moved the court, under the guise of Amber control, to have Prejudicial and Speculative testimony Stricken from the record during trial, to be read back to the jurors because of his admitted failure to object to testimony of the Prosecution witness he could not hear during trial! The Petit jurors were instructed At the beginning of trial, during objections And At the close of trial that any testimony Stricken from the record could not be used in their deliberations. As I was only found guilty of the 4 felonies directly related to this Prejudicial testimony, this error was not harmless. The trial courts statement of "I dont care" in response to my trial Attorneys incredible request before Admitting that normally when the court strikes testimony it stays Stricken, was not a "meaningful response" to a jury's request for a readback, and that duty is separate and apart from trial counsels incredible request, and severely Prejudiced me (Aff. At ¶¶ 181-184, 195-200, 212-219, Mem At Pls. 57-70).

The issues Presented herein in Point I, Subsection B, can be fully reviewed factually in a summary Provided in the Preliminary Statement of my Memorandum of Law in Support of Writ of Error Coram Nobis At Pls. XX- XXVIII). These issues were deserving of the Second Departments review with a priar on the individual claims in a memoranda decision on their merits, especially considering the Following Procedural reasons related in my submission of the following Pio-se Applications.

I. Pio-Se Motions to Enlarge The Judgment Roll

After successfull moving the Second Departments to enlarge the Judgment roll 6 months After my Appellate counsel submitted my brief to include grand Jury transcripts (Appendix, "E"), Arraignment And 180-80 day transcripts (Appendix, "C+D"), And the July 7th, July 16th And August 11th, 2010 Hansen Pts (Appendix, "G, H+I"), related to substantial claims of IATC Involuntive-failure to Address from entry And the retention And use of expert witnesses revolving around the diary, I realized the depth And scope of Appellate counsels failures in the various facts And circumstances of my case And I moved Second Department to withdraw Appellate Counsels Brief (Appendix, "H").

II. Pio-se Motion to Withdraw Appellate Counsels Brief And Assign New Counsel to Investigate Then Raise Ineffective Assistance of Trial Counsel (Utilizing A Complete Record was Necessary To Raise The totality of my claims Pursuant To People v. Evans, supra, In the Appropriate Venue With Assigned Counsel)

Made necessary by Appellate Counsels numerous failures, Plus Knowing And understanding that this courts holdings found in People v. Evans, supra; I moved the Second Department in a comprehensive And definite Application with sufficient exhibits to withdraw Appellate Counsels brief because of his failure to investigate All claims of IATC I brought to his Attention in the Proper form.

248

In my Application to Withdraw Appellate Counsels Brief, I provided substantive exhibits in the form of letters between us and documents I provided him (Appendix "B", Aff. in support to withdraw Appellate Counsels Brief, Exhibits "1-A through 2-F"), which informed him in detail of the issues presented in my Coram Nobis Application before this Court today. I explained how Appellate Counsel repeatedly led me to believe he would investigate, determine and decide the viability of the claims I presented him, but he never investigated those claims or moved to enlarge the record.

I provided proof in the form of Appellate Counsels own letters that he erroneously believed that "transcripts of Grand Jury Proceedings that leads to ones indictment are almost always part of the record on Appeal from a conviction stemming from the same indictment" (Appendix "B", Aff. in support at ¶ 67-69, Exhibit "2-A"), yet they were not as the Second Department granted my motion to enlarge the record and ordered the trial court to produce them under seal (Appendix "N"). This proves Appellate counsel never determined what the actual record on Appeal consisted of. Per the rules of the Second Department, A certification of the record on Appeal was required by Appellate Counsels firm, Appellate Advocates (Rules of the Second Department, §670.10.2(f)(i-ii)).

Further Proof provided in my Application to withdraw Appellate Counsels brief that lends credibility and support to my claims of substandard representation are found with Appellate Counsel Warren Landau, and his supervisor Attorney in charge of Appellate Advocates, Lynn Fahey's repeated failure to respond to my letters requesting the District Attorney's reply to Appellate Counsels brief on October 29th, November 6th and December 26th, 2013 (Appendix "B", Aff. in support at ¶ 92-93, Exhibits "2-E" and "2-F"), which they possessed since August 23rd, 2013. This resulted in my filing A Departmental Disciplinary Complaint with grievance Committee for the 2nd, 11th and 13th Judicial Districts on January 24th, 2014, and only then did I receive A copy of the District Attorney's brief on or about Feb. 7th, 2014 (Appendix "B", Aff. in support at ¶ 94-98, Exhibits "2-G", "2-H" and "2-I").

Once I reviewed Mr. Landau's brief, I realized why he did not want to send it to me; because the District Attorney agreed with my assessment of his brief, that 2 of 3 claims of IATC that he raised were unpreserved for appellate review. Incredibly, this is identical to the decision of the Second Department when deciding my direct appeal on July 1st 2015 (Exhibit "3-E"). At this point I moved forward in an attempt to rectify the situation by informing the Second Department with my Motion to withdraw Appellate Counsels Brief.

Finally, my Application to withdraw Appellate Counsels brief specifically brought to the Second Departments Attention the very records I sought to enlarge the record with in my Supplemental Affidavit in support of Writ of Error Coram Nobis and to Expand the Record; the expert reports (Supp. Aff., Exhibits "2-E" and "2-F"), DD5 and Memo book entries of Detective Wasson (Supp. Aff., Exhibit "2-G"), session notes and other records of Licensed Clinical Social Worker Anna Lorusso-Mormarco (Supp. Aff., Exhibits "2-A", "2-B" and "2-C"); and "Appellate counsels ignorance and/or failure to address, discuss or consider the numerous Prosecutorial and ineffective Assistance of counsel issues amounting to 'mixed claims' that have been consistently and repeatedly brought to his Attention beginning in September 2011 (Appendix "B", Aff. in support at ¶ 103-105).

246

In concluding this point in application to withdraw Appellate Counsels brief, I explained the reasons for the plethora of mixed claims, and detor the record issues found in my record on appeal, as being caused by incompetent and unqualified trial Attorney Eugene Lamb, ESQ., and the procedural morass that prevents me from meeting the Baldi standard of "representation as a whole" through convoluted, outdated and confusing laws that deprive me due process as a matter of law (Appendix "B" Aff. in support at ¶¶ 106-109). I then proceeded to explain the deminio effect of unabridhed, Inexperienced and Poorly Compensated counsel through a misnamed Assigned Counsel Plan, which is outside the scope of this Leave Application, but provides valuable insight into the core causes of the violations of due process and equal protection I suffered because of the failures and shortcomings of the system that Allowed 18-B counsel Eugene Lamb, ESQ. to represent me at trial. (Appendix "B" Aff. in support ¶¶ 110-181) (Exhibits "2-K" through "2-T" Are omitted herein, but available to this Court in my Leave to Appeal of May 14th, 2019 Order of the Second Dept. Submitted to this Court on January 26, 2016).

**C. Defendant Anciano Has Presented Unique And Novel Questions of First Impression That Raise Serious Constitutional Concerns, Allowing This Court To Grant Leave And Assign An Attorney.**

The questions presented today Are not only of statewide interest, but present questions of law worthy of this Courts consideration as they reveal conflicts between the Appellate divisions that incorrectly apply the holdings of this Court in People v. Evans, supra, involving "mixed claims" of ineffective Assistance of trial counsel, the improper Application of Procedural bars and the resulting denial of evidentiary hearings by the trial courts of this state which lack a statutory provision for this Court to review when the Appellate division does not grant leave.

Furthermore, the Second Departments denial of my comprehensive two part application to expand the record and for Coram Nobis Relief without an opinion on the merits of each claim constitutes an Abuse of discretion in the unique facts and circumstances of my case, and should have resulted in a detailed memoranda decision. This is a clear misapplication of this Courts Precedents in People v. Stultz, 2 NY3d 277, 280 (2004), People v. Turner, 5 NY3d 476 (2005), and People v. Bonell, 12 NY3d 365,368 (2009), and has effectuelt prevented me from having the majority of my ineffective Assistance of trial counsel claims heard in Any court of this State.

Point 2

Contractual And Financial Constraints of Appellate Advocates Resulted In Re Presentation That Failed To "Fully And Competently" Represent Me And Can Be Deemed "Breach of Contract", When Compared To OILS "Appellate Standards And Best Practices"

I request this Court review my Supplemental Memorandum of Law To Expand the Record, Point I, II, A, where I provide synopsis of the procedural steps I took Pro-Se before the Second Department to ensure a complete record on Appeal, And more importantly, the steps I took to notify the Second Department of Appellate Counsels failure to address the numerous IATC Claims I brought to his attention (Supp. Mem. at Pgs. 12-13)

This culminated with me filing a detailed motion with the Second Dept. to withdraw Appellate Counsels Brief and to assign New Counsel who would investigate And review these claims, And Present them in the appropriate venue. This motion included numerous exhibits representing, among other things, detailed correspondence between Appellate Counsel and myself over an 18 month period.

I specifically asserted to the Second Department numerous foundational violations of Appellate Advocates And Appellate Counsel revolving around ABA Standard 4-8.3(b) requiring "Appellate Counsel to utilize Post conviction Proceedings on issues that affect the validity of the Judgment Prior to Perfecting An Appeal" (Emphasis Added), And ABA Standard 4-8.6 (A) "direct[ing] Appellate Counsel to seek relief for his client on ineffective Grounds if, after investigation he is satisfied that trial counsel provided ineffective Assistance of counsel (Emphasis Added) (Supp. Mem. At Pgs. 13-14).

I Also informed the Second Dept. that in my "narrowly defined case I made Appellate counsel aware of numerous...' mixed claims' requiring An Article 440 to develop the claims factual Predicate (see Appendix B, Affidavit at ¶ 9-60), but Appellate Counsel Warren Landau failed to investigate the validity of those claims"(Supp. Mem. at Pg. 14).

I requested the Second Department to take Judicial Notice of All the Previous Pro-Se applications Submitted to and decided by them, to have "the record reflect that I have exhausted every Possible Avenue of relief in an effort to receive a full and fair opportunity to have my State and Federal Ineffective Assistance of Counsel claims vindicated in the courts of this State ". I explained that this "directly relates to my due Process rights, as when a State like New York, in Practice, effectively moves ineffective Assistance of counsel claims [where they can not be]considered in totality (i.e. tactical reasons, strategic Purpose, errors of omission and commission [dehors the record And mixed claims ]), outside the direct appeal process, where counsel is not Provided, it becomes violative of federal law (Supp. Mem. at Pgs. 14-15).

By examining the Contract between Appellate Advocates And the City of New York, the chilling effects of the contractual and financial constraints And consequences Are revealed as , what I believe to be A "Breach of Contract", resulting in sub-Par representation Provided to me by Appellate Advocates, which only serves to further support my claim of Ineffective Assistance of Appellate Counsel.

247

## A. Contract Between Appellate Advocates And The City of New York

Appellate Advocates is a not-for-profit Corporation that provides Appellate Representation for indigent defendants in Brooklyn, Queens and Staten Island via a contract with the City of New York to handle 500 cases per year for $5,447,500 per year. This is paid by City Tax Levy Funds.

This contract resulted from a competitive sealed proposal pursuant to § 3-03 of the Procurement Policy Board Rules of the City of New York. In other words, multiple vendors submit private bids to provide designated types of service, and the lowest bidder wins.

Appellate Advocates is required to intake up to 500 of the annual assignments from the Appellate Division, Second Department, Appellate Term and N.Y. State Court of Appeals pursuant to this Contract (Contract, Pt. 1, Exhibit "3-F")

Under Article I - Section 1.01- Definitions, A, "Assignments" is clarified by stating it "... shall include all proceedings required to fully and competently represent their client" (Emphasis Added). This terminology is important to remember. Article III - Section 3.01, Scope of Work and Budget, A, "Services and Activities" puts the term "Assignments" into context by stating "Contractors shall provide the services and activities in program areas or programs listed in Scope of Work attached hereto as Appendix B". Definitions, Section 1.01, G, defines "Contractor" to mean entity entering into Agreement with the Department, i.e. Appellate Advocates.

## I. Scope of Work - July 1st 2015 to June 30th, 2017 - Appendix "B"

Under Appendix "B" (1)(B), which is incorporated and made applicable to Contract through Article III, § 3.01 (A) it states "Assignments shall include all proceedings required to fully and competently represent Contractor clients ... such as 440 motions ..." (Contract, App. B).

It is clear that the term "All Proceedings" as applied to the definitions of "Assignments" in Article I, § 1.01 (A) and Article III, § 3.01 (A), which specifically includes "services ... listed in Scope of Work attached hereto as Appendix B" contractually binds Appellate Advocates under Appendix "B" (1)(B) to provide "services" that include "All proceedings required to fully and competently represent Contractor clients ... such as 440 motions ..." (Contract, App. B).

I would now like to examine the actual services that Appellate Advocates provides to its clients, which under their contract must "fully and competently represent contractors clients."

## B. Actual Services Provided By Appellate Advocates

In the Fiscal Year (FY) of 2016 and 2017, Appellate Advocates has submitted _____ Article 440 motions out of 500 assignments in FY 2016 and has submitted _____ Article 440 motions out of 500 assignments in FY 2017.

248

Appellate Advocates briefed approximately 353 direct appeal briefs challenging criminal convictions in FY 2016, and briefed approximately 364 direct appeal briefs challenging criminal conviction in FY 2017.

In the 353 direct appeal briefs submitted in FY 2016, approximately  33  % resulted in decisions by the Second Department, Appellate Division with more then half the issues raised being unpreserved for appellate review on direct appeal. Out of the  33  % of those decisions that had more than half the claims unpreserved for appellate review,  10  % of those rendered decisions (14 decisions) stated something similar to this:

> The defendant's contention that he was deprived of the effective assistance of counsel is based, in part, on matter appearing on the record and, in part, on matter outside the record, and, thus, constitutes a "mixed claim" of ineffective assistance (People v. Maxwell, 89 AD3d 1108, 1009; see People v. Evans, 16 NY3d 571, 575). In this case, it is not evidence from the matter appearing on the record that the defendant was deprived of the effective assistance of counsel (People v. Ockreym 142 AD3d 511, 511). Since the defendants claim of ineffective assistance of counsel cannot be resolved without reference to matter outside the record, a CPL 440.10 proceeding is the appropriate forum for reviewing the claim in its entirety (People v. Maxwell, 89 AD3d at 1109).

In the 364 direct appeal briefs submitted in FY 2017, approximately  30  % resulted in decisions by the Second Department, Appellate Division with more than half the issues raised being unpreserved for appellate review on direct appeal. Out of the  30  % of those decisions that had more than half the claims unpreserved for appellate review,  15  % of those rendered decision (15 decisions) stated that a CPL 440.10 motion was the appropriate forum for reviewing said claims, as explained above in detail (id. at 55).

Out of 1,000 assignments in FY 2016-2017, approximately 224 briefs submitted by appellate advocates were identified as raising a majority of claims which were unpreserved and unreviewable on direct appeal, which begs the question, "Why raise them at all?" This does not portray "fully and competently" representing your clients. These statistics only represent

the dehor the record and mixed claims of IATC that were partially briefed by Appellate Advocates and identified by the courts and does not factor in what I submit to be a much larger percentage of claims never raised and ignored for (A) Lack of investigation, (B) Financial constraints, or (C) Time Constraints.

As a pro-se litigant performing the research into these claims, who has been denied counsel to assist his in accessing a large amount of other statistical records; I ask this Court to allow me leeway to submit discovery required to bring a much wider and in depth representation of the issues I am presenting within, as I continue to seek assistance of pro-bono counsel.

## I.

The Services Currently Provided By Appellate Advocates Under Contract to Indigent Defendants Does Not "Fully and Competently" Represent Their Clients and Can Be Deemed "Breach of Contract"

Raising approximately one third of cases on average over the FY's of 2016 and 2017 with claims deemed worthy of raising by Appellate Advocates but were unpreserved and thus raised in the wrong forum begs the question Are attorneys within Appellate Advocates incapable of determining when a claim is unpreserved and unreviewable on direct appeal, or do financial and time constraints foster an environment that places costs above the effective and meaningful representation of their clients?"

As previously discussed; the domino effect of under-qualified, inexperienced and poorly compensated counsel assigned at trial rolls over into the same deficient and poorly compensated assigned appellate counsels who are restricted and constrained by numerous factors that include the convoluted procedural scheme in N.Y. State that moves IATC claims outside the direct appeal process without the assistance of assigned counsel, which effectively cripples, frustrates and or outright prevents an indigent defendants from vindicating his State and Federal IATC claims in any N.Y. Court.

250

But when we take all of these factors and view them through the New York State Office of Indigent Legal Services (OILS) Appellate Standards and Best Practices, Effective January 5th, 2015, the prejudice indigent defendants are subjected to becomes even more apparent and clearly defined.

C.    .. OILS, Appellate Standards and Best Practices - 2015

Executive Law §832 (2010) created the Office of Indigent Legal Services, whose purpose is "to monitor, study and make efforts to improve the Quality of Services provided Pursuant to Article 18-B of the County Law " and to "assist county governments and indigent legal service providers in the exercise of their responsibility under County Law 18-B to provide the effective assistance of counsel to those persons who are legally entitled to counsel, but cannot afford to hire an attorney."

In pursuit of this purpose, and as it relates to Appellate Advocates, OILS created the "Appellate Standards and Best Practices." Under the section Qualifications, Training and Oversight, I. "Qualifications of Assigned Appellate Attorneys" it states in relevant parts that "Attorneys who are assigned to criminal appellate assignments  must be familiar with motions to vacate convictions and sentences pursuant to Article 400, since a particular assignment may require the filing of such a motion, See Standard XX - Collateral Litigation CPL Article 440 Motions." (Emphasis Added) (Exhibit "36")

Under duties of Appellate Counsel, VIII, "Obtaining the Complete Record" it states in relevant parts that "Particular attention must be given to determining if there were issues raised or litigated that may not be apparent from the appellate record. If the client or the record suggests a possible ineffective assistance claim, counsel should request defense counsels trial file." All of this is clarified in the following section.

251

I. XX. Collateral Litigation: CPL Article 440 Motion

The best practices and standards of Appellate Counsel in Section XX, speaks about the duties of Appellate Counsel involving Article 440 motions by stating in relevant parts that "After reviewing the record and case file and after meeting with the client, appellate counsel must determine whether an investigation is warranted as to a possible CPL §440.10 motion. Claims not cognizable on direct appeal may involve ineffective assistance of counsel..."

It also states that "a clients rights may mot be adequately protected when counsel limits the challenge to the conviction to filing a direct appeal..." See American Bar Association, ABA Standards, Criminal Justice, Prosecution Function and Defense Function, Standard 4-8.3(b) at 239 (3rd ed. 1993). "Counsel, when inquiring into the case, should consider all issues that might affect the validity of the judgment of conviction and sentence, including any that might require initial presentation in a post conviction proceeding."

Finally, it states that "The most common ground for a post conviction motion is a claim of ineffective assistance of counsel based on counsels failure to investigate or prepare the defense...", and "When it appears that a CPL §440.10 or §440.20 motion is warranted, appellate counsel must make such application... Counties must provide adequate funding for counsel to pursue these motions."

The amount of Article 440 applications filed by Appellate Advocates, ████████████ when compared to the amount of direct appeals filed with a majority of claims unpreserved for appellate review ██████████ reveal that Appellate Advocates is not following the Appellate Standards and Best Practices that OILS has promulgated. This is the result of financial and political restraints which are represented in their contract With the City.

252

D. Appellate Advocates Violated Multiple ABA Standards And Appellate Standards
And Best Practices BY Failure To Investigate And Review IATC Claims. I Brought
To Their Attention, Thereby Breaching Their Contract With the City of New York, Which
Ultimately Resulted In Ineffective Assistance of Appellate Counsel.

The contract between the City of New York And Appellate Advocates requires them to "Fully"
And "Competently" Represent Their clients, But Financial constraints Placed on Appellate Advocates,
The lowest bidder, inhibits them from Following Promulgated ABA Standards And The Appellate
Standards And Best Practices of OILS, which is revealed by examining the Statistics. One out
of every three Appeals submitted by Appellate Advocates Asserts A Majority of Points that
Are unpreserved And unreviewable on direct Appeal (Id. At 55-56). This strongly suggests that
(A) These Points Were Deserving of Attention; (B) These Points consisted of Mostly
unpreserved And "mixed"claims of IATC, And (C) Appellate Advocates Failed to
debar the record And utilize All Procedures to raise these false Points in the Proper venue, A
collateral review Procedure.

But these statistics Are misleading, because in Actuality they only represent the "tip"
of the iceberg", i.e., A small Portion of cases where these Meritorious Points raised were
"mixed"claims And only Partially on the record, brought them into the light of DAY.
These facts reveal to the court the disparity between the contractual obligations
of Appellate Advocates, the ABA Standards And Best Practices for Provisions And
Meeting Appellate Standards Promulgated by OILS And the Actual services Provided by
Appellate Advocates.

I have been Able to identify And bring these claims to the courts Attention in A
cognizable Manner only because I Am An educated man with A college level reading
comprehension with An IQ close to 140, But what About the Majority of other indigent
defendants, the clients of Appellate Advocates, who lack the education And veracity
needed to comprehend the intricate And complex Predicament they Are entrenched in
while trying to vindicate their State And Federal Constitutional Rights to their DAY
In court with A Qualified And Experienced Appellate Attorney who can Provide Meaningful
Representation in Accordance with Accepted Norms And standards; who stands up
for these Poor And Forgotten Indigent Defendants?

For 18 months I repeatedly brought A wide range of Meritorious IATC claims, A
Majority of which were either debar the record or mixed claims, to the Attention of
Appellate Advocates. I Provided them with Affidavits from multiple expert witnesses,
documents from AETNA, MY healthcare Provider, that I received from the Connecticut
Attorney General 100% Pursuit that session notes submitted under subpoena to the
trial court were Falsified, Along with strong documentary evidence And testimonial evidence
supported by six separate sets of transcripts for Pre-trial court dates, including the
Grand Jury transcripts. All of which were ignored by Appellate Advocates And never investigated.

I was forced, Pro-Se, to submit A motion to enlarge the Judgment roll to include these transcripts even though I specifically informed him of their direct relevance to claims of IATC. In response to my motion to enlarge the Judgment roll, Appellate Counsel replied to me And revealed his lack of investigation, stating "Grand Jury transcripts Are normally Part of the record on Appeal". But yet, the Second Department issued An order enlarging the record which included Producing the Grand Jury Transcripts under seal, so obviously, they were not Part of the record on Appeal.

In reality, can the other 99.5% of clients represented by Appellate Advocates even come close to Putting up A fight for their rights to the effective Assistance of counsel, one not contractually, financially or Politically restrained? In the real world, Sadly, the Answer is A resounding No.

WHEREFORE, the Petitioner Asks that this Court Find That Retroactive MisJoinder occuring At the Grand Jury due to Prosecutorial Misconduct, And/or the PreJudicial Spillover that occured when 11 Felony counts were dismissed At charge conference for lack of evidence Infected the counts I was found Guilty of on Sept. 25th 2009 And Sept. 28th 2009, for which trial counsel was Ineffective for not raising At trial IN AN APProPriate motion under StricklAnd; or IN the Alternative that A reversal be Granted And A New trial ordered on ANY of the Numerous Grounds raised IN this Amended And SuPPlemental Memorandum of law, the Original 2254 Form And the APPlication For HAbeas Relief; Finding that the challenged state court decision, unconstitutional conduct or Procedure was contrary to or AN unreasonable APPlication of clearly established Federal Law As decided by the U.S. Supreme Court; or IN the Alternative that the AdJudication IN the state court resulted IN A decision based on AN unreasonable determination of the facts IN light of the evidence Presented IN the state court Proceedings; And for such other And further relief to which Petitioner MAY be entitled that this Court deems Just, ProPer And eQuitable under the uniQue facts And circumstances of this case.

I declare under the PenAlty of PerJury that the foregoing is true And correct, on this 31st DAY of December, 2018.

Respectfully Submitted,

Anthony Rucano

Anthony Rucano, 11A0528
Green HAven Corr. FAcility
P.O. Box 4000
Stormville, NY 12582-4000